## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**STEEL SUPPLEMENTS, INC.**, a Florida
corporation

      Plaintiff,

v.                                                    **CASE NO.**

**BLITZ NV, LLC,** a Nevada limited liability
company

      Defendant.

_____/

### COMPLAINT

    Plaintiff, **STEEL SUPPLEMENTS, INC.** ("STEEL") sues Defendant **BLITZ NV, LLC**

("Blitz") and states as follows.

### Nature of Action

    1.    This action stems from the material breach of a Personal Services

Sponsorship/License Agreement (the "Agreement") under which Blitz, through social media

celebrity, Dan Bilzerian ("Bilzerian"), agreed to promote, publicize and endorse STEEL's

products.

    2.    Blitz agreed Bilzerian would not promote, publicize or endorse the products or

services of any STEEL competitor, defined by the Agreement as a provider, seller, manufacturer,

or distributer of bodybuilding supplement products.

    3.    In violation of the express terms of the Agreement, Bilzerian has been promoting

endorsing, and/or publicizing competitors' products. Further, in violation of the Agreement, Blitz

has failed to ensure that Bilzerian provides the services required by the Agreement to the best of

1

his skill and ability. In addition, Blitz is responsible for Bilzerian's immoral acts that adversely affect the reputation of STEEL, also in violation of the Agreement.

4.      By this action, STEEL also seeks a declaration that the Agreement has been terminated.

## Jurisdictional Allegations

5.      Federal diversity jurisdiction is proper under 28 U.S.C. § 1332 because there is complete diversity between STEEL and Blitz and the amount in controversy exceeds $75,000.00, exclusive of costs, interest, and attorney's fees.

6.      STEEL is a Florida corporation with a principal place of business in Sarasota, Florida. Accordingly, STEEL is a citizen of Florida and is not a citizen of any other state.

7.      Blitz is a limited liability company. Blitz's sole member is Goat Works, LLC. The sole member of Goat Works, LLC is Bilzerian. Bilzerian is domiciled in Las Vegas, Nevada. Accordingly, Blitz is a citizen of Nevada and is not a citizen of any other state.

8.      STEEL seeks damages due to Blitz's failure to comply with its contractual obligations, which have damaged STEEL in an amount greater than $75,000.00.

9.      Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Sarasota County, Florida, where STEEL's principal place of business is located. Sarasota County, Florida is within the geographical boundaries of the Middle District of Florida. Additionally, pursuant to section 15 of the Agreement, venue for any action arising under or relating to the Agreement shall be in the court of appropriate jurisdiction for Sarasota County, Florida.

## General Allegations

### A. Huh and STEEL

10.     Jason Huh ("Huh") is a highly decorated former professional bodybuilder, who now owns and operates several successful health and fitness companies, including STEEL, that he built from the ground up.

11.     Huh was born in Korea. His parents immigrated to the United States with Huh when he was one month old, looking to make the American dream a reality for their family.

12.     Huh's father, who had been a professional bodybuilder in Korea, began working as a personal trainer in Sarasota, Florida, where the family made their new home. The family had few means at first, and Huh's father would ride his bicycle to work every day.

13.     Inspired by his father's self-discipline and dedication to bodybuilding and fitness, Huh was driven to succeed in the bodybuilding and fitness industry.

14.     Huh began his bodybuilding career at the age of 16, training for one year for a show and ultimately losing.

15.     Determined to persevere, Huh trained harder.

16.     Huh's hard work paid off. In 2004, he competed in the NPC Teen Nationals, winning first place overall and becoming titled Best Teenage Bodybuilder on the Planet.

17.     Huh's win in 2004 fueled his bodybuilding career.

18.     In addition to continuing to compete, in 2007, Huh opened Elite Nutrition and Smoothie in downtown Sarasota, with the goal of bringing premium bodybuilding supplements, fitness knowledge, and customer care to his hometown.

19.     As an athlete, Huh also became sponsored by a company called Pro Supps. Huh became close with the principal of Pro Supps, Arthur Atwood ("Atwood"), a coach who trained Huh for the 2010 national bodybuilding competition.

20.     In 2010, Huh turned pro, becoming the youngest person ever to do so.

21.     Upon turning pro, Huh agreed to sign a contract with Pro Supps to endorse its supplement products. Huh remained close with Atwood and began learning from him about the supplement industry, including the art and science of creating a supplement product.

22.     Under Atwood's wing, Huh gained expertise regarding supplement ingredients and measurements, paying close attention to detail. Huh was impressed by Atwood's dedication to the quality of the ingredients and the complexity of the formulas, finding Atwood's ideas and creations far better than the supplements available on the market at the time, which were often diluted in quality and produced with a lower level of care.

23.     Within a year of Huh signing the product endorsement contract with Pro Supps, Atwood passed away at age 37 of a heart attack. Pro Supps was acquired by others, and, without Atwood there, Huh decided to step away.

24.     In 2012, after years of training for professional bodybuilding competitions while simultaneously running Elite Nutrition and Smoothie seven days a week, Huh decided to step away from pro bodybuilding, choosing instead to focus on his nutrition and fitness businesses and further his expertise in supplements.

25.     Huh would learn to perfect supplement products through trial and error, testing them both on himself and on clients he trained.

26.     A few years later, Huh founded STEEL, a concept for a high-quality supplement company.

4

27. Determined to create quality products with great care, Huh reached out to well known chemists to assist him with creating safe and effective supplement formulations. Huh was determined STEEL would bring forth only the best supplement products in terms of quality and effectiveness.

28. Huh launched STEEL in August 2016 to great acclaim. Within four years, STEEL became a multi-million dollar company and grew from one employee to having approximately 60 full time employees.

29. A number of STEEL's current employees include those that have been with the company since close to the time of its inception.

30. At its core, STEEL consists of a tight-knight group that values credibility, transparency, family, athletics, and work ethic.

31. Today, STEEL sells its products at its retail location in downtown Sarasota and online.

32. STEEL remains devoted to producing innovative products using science to inspire action, help individuals push past previous physical limits, and achieve optimal health.

33. Ultimately, STEEL's mission is to create products, services and inspiration to instill definiteness of purpose and advance human potential through health and fitness.

34. To that end, STEEL's products are formulated based on science and research-based education. They contain only the highest quality ingredients, which are tested for accuracy and purity before and after manufacture.

35. STEEL's supplement products are conspicuously labeled to include its ingredients, which are also disclosed to consumers before purchase.

36.    STEEL provides extensive education to consumers about its products, describing, for example, the best way to take each supplement and which STEEL supplements may and may not be combined. STEEL provides additional health and fitness education on its blog, describing to followers how they can take realistic steps to achieve healthy and fit lifestyles.

37.    There are now dozens of STEEL supplement products for many different health and fitness applications, a representative sample of which are included in the following table:

| | | |
|---|---|---|
| **ADABOLIC** |  | A pre-, intra-, and post-workout endurance and recovery formulation. |
| **SHREDDED-AF** |  | An advanced multistage thermogenic that focuses on boosting metabolism, suppressing cravings, and providing all-day energy and mental clarity without the crash. |
| **ALPHA-AF** |  | A natural T booster that promotes fat loss. |

| | | |
|---|---|---|
| **AMPED-AF** |  | A pre-workout providing maximum energy and enhanced focus to allow faster, longer, and more intense training without crash. |
| **VEG-PRO** |  | A non-GMO verified pure vegan protein powder delivering a dairy-free protein complete profile of essential amino acids. |
| **RESTED-AF** |  | A pharmacist formulated sleep aid that improves sleep quality. |
| **CHARGED-AF** |  | A high-intensity and focus pre-workout designed to amplify energy, alertness, strength, stamina and pumps while providing essential nutrients to optimize anaerobic and aerobic capacity. |

| | | |
|---|---|---|
| **ATP FUSION** |  | A creatine monohydrate synthesized to pH 12. Perfect for men and women seeking lean muscle gains with no bloat or water retention. |
| **STEEL OCTANE** |  | A performance energy drink infused with nootropics, aminos, vitamins, and caffeine. |

38.   STEEL has many more supplement products; since its founding, STEEL's distinguished line of supplements has grown to an extensive collection of over 25 unique supplement formulations.

39.   To this day, Huh continues to have a hand in formulating nearly all of STEEL's supplement products.

40.   The proven efficacy of STEEL's supplement products has generated thousands of rave reviews and a loyal customer following.

41.   In addition to its supplement products, STEEL sells health and fitness accessories, including gym bags, hoodies, and gym towels.

**B. Dan Bilzerian, "King of Instagram"**

42.   Bilzerian is an actor, professional poker player, and a social media celebrity whose social media fame led to him being given the moniker, the "King of Instagram."

43.     As a social media influencer, Bilzerian posts photos and videos flaunting guns, expensive cars, scantily clad women, and fitness on social media platforms including Facebook, Twitter, Instagram, Snapchat, and YouTube. Bilzerian's social media identity has gained him in excess of 32 million Instagram followers.

44.     Bilzerian's Instagram content includes posts on his Instagram feed (permanent photos and videos that remain Bilzerian's Instagram page unless deleted) and Instagram stories (photos or videos displayed for up to 15 seconds on Bilzerian's Instagram page and which disappear after 24 hours unless converted to a story highlight).

45.     Blitz and Bilzerian are highly sophisticated in the art of social media influencing. Bilzerian's social media posts and stories are carefully measured to further his dual goals of maintaining his lavish social media identity and promoting his business ventures.

46.     Bilzerian's social media posts and stories are shot with the precision of a movie production, requiring multiple shots and editing. Everything is purposeful in the final version published to Bilzerian's almost 33 million followers.

47.     In light of Bilzerian's success as a social media influencer, STEEL entered into negotiations with Blitz for an exclusive sponsorship agreement.

**C. The Personal Services Sponsorship/License Agreement**

48.     On or about March 7, 2017, STEEL entered into the Agreement with Blitz, which manages and provides Bilzerian's services. STEEL would have attached the Agreement to this pleading as an exhibit; however, the Agreement contains a confidentiality clause, requiring that its contents be kept between the parties.

49.     Pursuant to the Agreement, Bilzerian, through Blitz, agreed to endorse STEEL's products through his social media sites, including Instagram and Facebook. *See* Agreement, § 3.1.

50.     Blitz agreed that Bilzerian shall not promote, publicize or endorse any of STEEL's competitors, which are providers, sellers, manufacturers or distributors of bodybuilding supplements. *See* Agreement, § 3.1.1.

51.     Although the Agreement gave Bilzerian/Blitz discretion regarding the content and amount of posting, the Agreement provided that Blitz would be sure Bilzerian performs to the best of his skill and ability. *See* Agreement, § 3.1.2.

52.     Section 2.2(i) of the Agreement allows STEEL to terminate under the following circumstances: if Bilzerian commits a criminal, wrongful, or immoral act which in STEEL's opinion would adversely affect its reputation, if Bilzerian dies or becomes incapacitated, or if Blitz is in material breach of the Agreement.

**D. Bilzerian's Endorsement of Competitors**

53.     Recently, Blitz has been breaching the Agreement as a result of Bilzerian promoting, publicizing, or endorsing competitors' products.

**1. The Treigning Lab**

54.     On or about July 3, 2020, Bilzerian posted two Instagram stories in which he responded to the question, "what supplements do you take and when do you take them?"



55.    While Bilzerian identified various supplements from STEEL, he also promoted, publicized, and endorsed a non-STEEL supplement from a company called "The Treigning Lab" which, according to Bilzerian, helps him achieve a better, deeper sleep.

56.    As depicted in the screenshot from Bilzerian's Instagram story below, Bilzerian endorsed The Treigning Lab product, an L-Tryptophan supplement clearly bearing the Treigning Lab's name and logo:



57.     This product directly competes with STEEL products, including "RESTED-AF", which promotes a deeper sleep and muscle recovery, and ADABOLIC, which includes the same active ingredient as the Treigning Lab's product, L-Tryptophan.

58.     The Treigning Lab provides, sells and/or manufactures bodybuilding supplements and, therefore, is a STEEL competitor, as defined by the Agreement.

59.     On its website, www.treigninglab.com, The Treigning Lab sells other bodybuilding supplements including but not limited to Creatine Monohydrate, L-Glycine, and L-Arginine, among others. By way of example, STEEL sells a product called "ATP-FUSION" which is a creatine formula containing the same active ingredient—Creatine Monohydrate—as the Treigning Lab's product.

60.     Bilzerian's endorsement of The Treigning Lab's product was not cleared by STEEL, nor would STEEL have consented, particularly where, as here, the product directly competes with STEEL's products.

## 2.  FULL SEND

61.     On or about December 23, 2019, Bilzerian appeared in a promotional video featuring the NELK Boys—a YouTube channel and social media company which owns the brand FULL SEND. The video's caption tags Bilzerian and states "FULL SEND Christmas Special is LIVE NOW👆 @danbilzerian."

62.     This was the first time STEEL learned about Bilzerian's relationship with the NELK Boys. At that time, however, FULL SEND did not sell bodybuilding supplements.

63.     A few months later, however, FULL SEND began selling bodybuilding supplements through its website, https://fullsendsupps.com/.

64.     In doing so, FULL SEND competes directly with STEEL.

65.     On or about October 26, 2020, after FULL SEND began selling bodybuilding supplements, Bilzerian posted an Instagram story in which he walked to the back of a parked truck and focused on the contents inside the open trunk.  As shown in the screenshot below, plainly visible, among three carefully placed guns, was a bright red gym bag with the words "FULL SEND" prominently written in the same style as on the FULL SEND bodybuilding supplements:



### 3.  Ignite

66.     In or around 2018, Bilzerian co-founded Ignite.

67.     In February 2020, Ignite unveiled a new product: an energy drink called "ZRO."

68.     ZRO is marketed as a "performance" drink and sold in supplement stores like The Vitamin Shoppe.

69.     In September 2020, James Gracely, President of Beverages at Ignite, appeared on the Supplement Engineer Podcast.

70.     Gracely noted that people use energy drinks, such as Ignite, as a pre-workout beverage.

71.     Gracely has explicitly promoted ZRO in lieu of traditional pre-workout supplements like those STEEL offers, commenting on the same podcast episode that "stim pre-

workouts are ridiculous they're irrelevant at this point people are drinking energy drinks all day long anyway what do you need more dividends for."

72.    Gracely comes from a supplement background, having worked at VPX Sports, a supplement company, prior to joining Ignite in August 2019.

73.    As reflected below in a post containing a picture of Bilzerian, ZRO's Instagram page also depicts Ignite as a pre-workout supplement.



74.    As depicted in the post below, Ignite has further advertised ZRO as a product to "help give you the motivation you need to hit the gym."



75.    In addition to natural caffeine, ZRO contains supplement ingredients such as 300mg of AlphaSize alpha-GPC and 250mg of tyrosine.

76.     STEEL sells competing pre-workout products, including products called "AMPED-AF", "CHARGED-AF", and "PRE".

77.     Bilzerian, an owner of Ignite, has been featured on Ignite's Instagram unabashedly promoting ZRO. By way of example only, on August 10, 2020, Ignite posted a series of photos on Instagram of Bilzerian with a ZRO can, encouraging followers to buy the product.



78.     Bilzerian also frequently endorses ZRO on his own social media platforms. By way of example only:

| On October 31, 2020, Bilzerian posted an Instagram video story with a ZRO can. |  |
|---|---|

15

| | |
|---|---|
| On November 9, 2020, Bilzerian posted the following image to Instagram. |  |
| Also on November 9, 2020, Bilzerian posted an Instagram video story in which the camera swivels from a view of dumbbells scattered on the floor of a pavilion to the following image of a ZRO can resting on top of exercise equipment. |  |
| On November 11, 2020, Bilzerian posted the following image to Instagram. |  |

79.    On November 30, 2020, Bilzerian posted an Instagram story promoting Ignite's Cyber Monday sale. The story included links to Ignite's products, including its ZRO beverage.

80.     Just a few days ago, on December 3, 2020, Bilzerian posted an Instagram story promoting Ignite by showing it on the shelves at The Vitamin Shoppe.

**E. Bilzerian's Immoral Acts**

81.     Sometime after executing the Agreement with STEEL, Bilzerian founded Ignite.

82.     Before it launched ZRO, Ignite began as a cannabis company offering for sale products containing Tetrahydrocannabinol, or THC.

83.     Ignite continues to offer for sale products containing THC.

84.     THC is a component of cannabis that remains a topic of great controversy in the U.S. due to its psychoactive effects.

85.     Ignite's THC based products are antithetical to STEEL's health-conscious and U.S.-based brand.

86.     Bilzerian's ownership and promotion of such products puts the STEEL brand at risk of dilution and risks isolating STEEL's health-conscious customers who turn to STEEL for fitness products, not illicit drugs.

87.     Bilzerian's production of THC based products is not the only example of Bilzerian's conduct with Ignite that puts STEEL's reputation at risk. Upon information and belief, STEEL has also learned Bilzerian has misappropriated Ignite funds to continue subsidizing his lavish lifstyle.

88.     Bilzerian has disregarded STEEL's brand and the Agreement in pursuit of his own interests.

### F. Bilzerian's Additional Bad Faith Acts

89.     Since the effective date of the Agreement through the filing of this lawsuit, Bilzerian has endorsed STEEL three (3) times on Facebook, one (1) time on Twitter, fifteen (15) times on Snapchat, twenty-four (24) times on Instagram, and never (0) on YouTube.

90.     Most of these posts occurred early, toward the start of the Agreement.

91.     There were times when Bilzerian did not post for months at a time, sometimes due to disagreements he had with STEEL.

92.     As an example only, there was a period of time in 2018 when Bilzerian did not post for approximately eight months following a disagreement with STEEL over the production of a promotional STEEL video.

93.     Bilzerian had demanded that STEEL create and publish a professionally shot and edited promotional video including Bilzerian's image.

94.     STEEL disagreed with the treatment Bilzerian had suggested, and at first declined the idea.

95.     Bilzerian, however, then refused to post any STEEL products on his social media. Bilzerian continued not to post any STEEL products for approximately eight months, until STEEL succumbed to Bilzerian's demand and spent approximately $130,000.00 to have the video professionally done in the manner Bilzerian wanted. Yet, once the video was complete and posted to STEEL's YouTube page, Bilzerian hardly, if ever, posted the video to any of his social media or otherwise endorsed it, instead pretending the video never existed.

96.     All conditions precedent to bringing this action have occurred, have been waived, or have otherwise been satisfied.

## COUNT I – BREACH OF CONTRACT

97.    This is an action for breach of contract.

98.    STEEL reincorporates paragraphs 1 through 96 above, as if fully set forth herein.

99.    Pursuant to the Agreement, Blitz agreed Bilzerian shall not promote, publicize or endorse any of STEEL's competitors, which are providers, sellers, manufacturers or distributors of bodybuilding supplements. *See* Agreement, § 3.1.1.

100.    The Treigning Lab, Full Send, and Ignite sell, manufacture and/or distribute bodybuilding supplements, thereby competing with STEEL.

101.    Blitz materially breached the Agreement by promoting, publicizing, and/or endorsing the services or products of STEEL competitors, The Treigning Lab, Full Send, and Ignite.

102.    Pursuant to the Agreement, Blitz agreed Bilzerian would perform to the best of his skill and ability. *See* Agreement, § 3.1.2.

103.    Since the Agreement was executed nearly four years ago, Bilzerian has posted about STEEL three (3) times on Facebook, fifteen (15) times on his Snapchat account (half of which were during the first year of the Agreement), twenty-four (24) times on Instagram, and once (1) on Twitter. Bilzerian's last Facebook and Twitter posts about STEEL came on October 3, 2019 and February 22, 2018, respectively.

104.    In contrast, Bilzerian has posted about ZRO on Instagram alone at least eight (8) times since October 31, 2020.

105.    Blitz has not ensured that Bilzerian provides the services to the best of his skill and ability and, accordingly, Blitz has breached the Agreement.

106. Pursuant to the Agreement, Bilzerian is required to promote, publicize and endorse STEEL's products through his social media sites, including Instagram and Facebook. *See* Agreement, § 3.1.

107. However, in addition to Instagram and Facebook accounts specifically mentioned by the Agreement, Bilzerian has other social media sites, including Twitter, Snapchat, and YouTube.

108. Since the Agreement was executed nearly four years ago, Bilzerian has posted about STEEL three (3) times on Facebook, fifteen (15) times on his Snapchat account (half of which were during the first year of the Agreement), twenty-four (24) times on Instagram, and once (1) on Twitter.

109. Bilzerian's last Facebook and Twitter posts about STEEL came on October 3, 2019 and February 22, 2018, respectively.

110. Bilzerian has *never* posted about STEEL on YouTube.

111. By Bilzerian failing to endorse STEEL on all his social media sites, Blitz is in breach of the Agreement.

112. As a result of Blitz's material breaches, STEEL incurred damages.

WHEREFORE, STEEL requests this Court issue judgment for damages in an amount to be proven at trial, award attorney fees and costs pursuant to section 6 of the Agreement, and award any such other and further relief as this Court deems just and proper.

## COUNT II – BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

113. This is an action for breach of the implied covenant of good faith and fair dealing.

114. STEEL reincorporates paragraphs 1 through 96 above, as if fully set forth herein.

115. Under Florida law, a covenant of good faith and fair dealing was implied in the Agreement.

116. Pursuant to the Agreement, Bilzerian was to promote STEEL through his social media, including Instagram and Facebook, by posting at his discretion as far as content and amount. *See* Agreement, § 3.1.2.

117. While the contract afforded Blitz and, accordingly, Bilzerian, substantial discretion, Blitz nevertheless agreed that it would ensure that Bilzerian performs to the best of his skill and ability.

118. In addition to this express contractual requirement, Blitz also owed STEEL the duty to act in good faith.

119. Over the course of the Agreement, STEEL made substantial payments to Blitz for Bilzerian to endorse STEEL.

120. Since the Agreement was executed nearly four years ago, Bilzerian has posted about STEEL three times (3) on Facebook, fifteen (15) times on his Snapchat account (half of which were during the first year of the Agreement), twenty-four (24) times on Instagram, and once (1) on Twitter.

121. Bilzerian's last Facebook and Twitter posts about STEEL came on October 3, 2019 and February 22, 2018, respectively.

122. Bilzerian has *never* posted about STEEL on YouTube.

123. Blitz breached the implied covenant by failing or refusing to discharge its contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but rather by a conscious and deliberate act, which unfairly frustrated the agreed common purpose—to promote STEEL's brand.

124.    In doing so, Blitz capriciously contravened STEEL's reasonable contractual expectations and deprived STEEL of the benefits of the Agreement.

125.    Blitz breached express terms of the Agreement as a result of: (a) Bilzerian promoting, publicizing, and/or endorsing the services of products of STEEL competitors, The Treigning Lab, Full Send, and Ignite; (b) Bilzerian's failure to endorse STEEL on all his social media sites; and, (c) Blitz's failure to ensure Bilzerian performs to the best of his skill and ability.

126.    As a result, STEEL incurred damages.

WHEREFORE, STEEL requests this Court issue judgment for damages in an amount to be proven at trial, award attorney fees and costs pursuant to section 6 of the Agreement, and award any such other and further relief as this Court deems just and proper.

## COUNT III – DECLARATORY JUDGMENT

127.    This is an action for declaratory relief.

128.    STEEL reincorporates paragraphs 1 through 96 above, as if fully set forth herein.

129.    Section 2.2(i) of the Agreement allows STEEL to terminate under the following circumstances: if Bilzerian commits a criminal, wrongful, or immoral act which in STEEL's opinion would adversely affect its reputation, if Bilzerian dies or becomes incapacitated, or if Blitz is in material breach of the Agreement.

130.    Blitz materially breached this Agreement as set forth herein, including by promoting competitor's products.

131.    STEEL has issued written notice of the breach and seeks a declaration that the Agreement is terminated.

132.     Bilzerian has also engaged in criminal, wrongful, or immoral acts that are adversely affecting STEEL's reputation.

133.     STEEL has issued written notice of Bilzerian's criminal, wrongful, or immoral acts and seeks a declaration that the Agreement is terminated.

134.     Section 2.1 of the Agreement alternatively allows STEEL to terminate at will.

135.     In relevant part, Section 2.1 provides that the term of the Agreement shall be for the contract period, unless the Agreement is terminated.

136.     The contract period is defined as the period of time commencing on the effective date and terminating upon either party providing thirty (30) days written notice of intent to terminate pursuant to Section 2.2.

137.     Under the plain language of Section 2.1, there is a distinct option for termination. Section 2.2. is not an exhaustive list of bases for termination.

138.     Because Section 2.2 constitutes a permissive and nonexclusive termination provision, the Agreement is terminable at-will.

139.     The Agreement is also terminable at will because it is indefinite. The conditions defined by the Agreement's termination provisions do not limit the duration of the Agreement or make its duration determinable in any real or concrete way.

140.     There is a bona fide, actual, present, practical need for the declaration.

141.     The claims at issue address some immunity, power, privilege, or right of the complaining party dependent on the facts or the law applicable to the facts.

142.     Blitz has, or reasonably may have, an actual, present, adverse, and antagonistic interest in the subject matter, either in fact or law.

143.     The antagonistic and adverse interests are all before the Court by proper process.

23

144.   The relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity.

WHEREFORE, STEEL requests this Court issue a declaratory judgment ruling the Agreement is terminated, award attorney fees and costs pursuant to section 6 of the Agreement, and award any such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/
Jason P. Stearns
Florida Bar No. 59550
Sarah A. Gottlieb
Florida Bar No. 125232
**FREEBORN & PETERS LLP**
201 North Franklin Street, Suite 3550
Tampa, FL  33602
Phone:  813-488-2920
Fax:  813-488-2960
E-mail:  jstearns@freeborn.com
E-mail:  sgottlieb@freeborn.com
Secondary E-mail:  ckitchell@freeborn.com
                                mbennett@freeborn.com

Brian D. Goodrich
Florida Bar No. 106948
**BENTLEY LAW, P.A.**
783 S. Orange Ave., Third Floor
Sarasota, FL  34239
Phone:  941-556-9030
Fax:  941-312-5316
E-mail:  bgoodrich@thebentleylawfirm.com
Secondary:  jbradley@thebentleylawfirm.com

*Attorneys for Plaintiff Steel Supplements, Inc.*