# EXHIBIT 13

## Page 1

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE No. 8:20-cv-2971-T-02AEP

STEEL SUPPLEMENTS, INC., a
Florida Corporation,

     Plaintiff,

-vs-

BLITZ NV, LLC, a Nevada limited
liability company,

     Defendant.

_____

REMOTE DEPOSITION OF DR. MARVIN HEUER
VIDEOTAPED

Tuesday, December 21, 2021

9:02 a.m. - 12:31 p.m.

Stenographically Reported By:
Jeana Kim, CRR, RMR, FPR, FPR-C, CLR
Certified Realtime Reporter
Anthem Reporting

## Page 2

1    REMOTE APPEARANCES:
2    On behalf of the Plaintiff:
3        JASON P. STEARNS, ESQUIRE
         FREEBORN & PETERS, LLP
4        201 North Franklin Street
         Suite 3550
5        Tampa, Florida 33602
         Phone: 813.488.2920
6        jstearns@freeborn.com
7
8    On behalf of the Defendant:
9        KEVIN P. MCCOY, ESQUIRE
         CARLTON, FIELDS, JORDEN, BURT, P.A.
10       4221 West Boy Scout Boulevard
         Suite 1000
11       Tampa, Florida 33607
         Phone: 813.229.4272
12       kmccoy@carltonfields.com
13
14
15
16   ALSO PRESENT:
17   DR. DOUGLAS KALMAN
18   TONY BARLOW, VIDEOGRAPHER
     ANTHEM REPORTING
19
20
21
22
23
24
25

## Page 3

1                    - - -
                   I N D E X
2                    - - -
3    WITNESS:      DIRECT   CROSS   REDIRECT   RECROSS
4    DR. MARVIN HEUER
5    BY MR. McCOY:      5
6
7
8                    - - -
                 E X H I B I T S
9                    - - -
10   NUMBER          DESCRIPTION          PAGE
11   DEFENDANT'S EX. 1   DR. MARVIN HEUER'S        8
                    OCTOBER 8, 2021 REPORT
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1            P R O C E E D I N G S
2                    - - -
3        Deposition taken before Jeana Kim, Registered
4    Realtime Reporter and Notary Public in and for the State
5    of Florida at Large, in the above cause.
6                    - - -
7        VIDEOGRAPHER:  We are on the record for the
8    deposition of Marvin Heuer, M.D. taken in the
9    matter of Steel Supplements, Inc. versus Blitz NV,
10   LLC.
11       Today is December 21, 2021, and the time is
12   9:02 a.m.  This deposition is being conducted
13   remotely by Zoom.
14       The court reporter is Jeana Kim, and the
15   videographer is Tony Barlow.
16       Will counsel please introduce themselves,
17   after which the court reporter will swear in the
18   witness.
19       MR. STEARNS:  Jason Stearns for Steel
20   Supplements, Inc.
21       MR. McCOY:  Kevin McCoy on behalf of Blitz NV,
22   LLC.
23                    - - -
24   Thereupon,
25           (DR. MARVIN HEUER)

Page 5

1  having been first duly sworn or affirmed, was examined
2  and testified as follows:
3        THE WITNESS: I do.
4              DIRECT EXAMINATION
5  BY MR. McCOY:
6     Q.  Good morning, Dr. Heuer.  I introduced myself
7  before we started.  I represent Blitz NV, LLC.
8     I understand you have in front of you a copy
9  of the written report that you signed and issued dated
10 October 8, 2021?
11    A.  Yes.
12    Q.  And that's the report that you issued on
13 behalf of Steel Supplements, Inc. in the matter
14 involving Blitz NV, LLC?
15    A.  That's correct.
16    Q.  Have you done anything to update, change, or
17 supplement any of the opinions set forth in the report
18 that you issued October 8, 2021?
19    A.  Nothing to update the opinions.  I did find
20 one typo in the report.  I don't know if you want that
21 or not.  But I have not done anything to update the
22 opinions.
23    Q.  All right.  Where is the typo that you found
24 in the report?
25    A.  Hold on.  The typo is on paragraph 33.  It's a

Page 6

1  product called "Treigning Lab."
2        (Dr. Kalman joined the proceedings.)
3  BY MR. McCOY:
4     Q.  Okay.
5     A.  Do you see that?
6     And it goes down in front, showing that it's a
7  tryptophan product in competition with Steel product
8  Rested-AF, which is a product for sleep and muscle
9  recovery.  And then there is an addition there,
10 ADAbolic, A-D-A-B-O-L-I-C, which also contains the amino
11 acid tryptophan.  So I added the ADAbolic, which...
12    Q.  And you're in paragraph 36?
13    A.  33.
14    MR. STEARNS: It's 36, Kevin.  I think --
15    THE WITNESS: I'm sorry, on mine, it's 33.
16 I'm sorry.  Let me see it.
17 BY MR. McCOY:
18    Q.  The copy I have, it would be 36.  But either
19 copy that you're looking at, Dr. Heuer --
20    A.  Hold on.  Yes, 33.  Let me see here.  The copy
21 I have, it was paragraph 33.  I'm trying to see the
22 difference between that and the one you're reading.
23    Q.  The one I'm reading, paragraph 33 starts with,
24 "I found it also informative that Mr. James Gracely."
25    A.  On mine, that's paragraph 30.

Page 7

1     Q.  Okay.  Well, it appears we may be looking at
2  two different reports.
3     A.  Yeah.  Let me just see, because you've
4  probably...
5     Yeah, do you want to email your copy to me,
6  and I can have someone print it out here so we work from
7  the same copy?
8     Q.  I'm not sure -- do you have a copy of your
9  final signed report, Dr. Heuer?
10    A.  One second.  I don't have a signed copy.  I
11 can ask my staff to print it out.
12    Q.  Okay.  I have a copy that has your signature
13 on it that ends with 43 paragraphs, and was attached to
14 a notice dated October 8, 2021.
15    A.  Okay.
16    Q.  Do you have -- do you have a signed copy of a
17 report that you authored that has 43 paragraphs?
18    MR. STEARNS: Yeah, let me -- I'll email it,
19    Kevin, unless you want to.  I mean --
20    THE WITNESS: Well, is it 43 paragraphs?
21    Let's see.  I think we just printed one out so we
22    can work from that.  Okay.  I have that copy here.
23 BY MR. McCOY:
24    Q.  All right.  You have now a copy of your report
25 that is 43 paragraphs and that has your signature on it?

Page 8

1     A.  That's correct.
2     Q.  And are all of the opinions in the copy of the
3  report that has 43 paragraphs opinions that you've
4  provided?
5     A.  Yes, they are.
6     Q.  So is there still a typo in paragraph 36 of
7  the report that you're reviewing?
8     A.  Let me just check if there would still be a
9  typo.  Yes.
10    Q.  What is the typo in paragraph 36 of the
11 report?
12    A.  Let me just compare these.  Okay.  On
13 paragraph 36, "after muscle recovery and" add ADAbolic,
14 A-D-A-B-O-L-I-C, that's what I mean, which contains
15 amino acid, tryptophan.
16    Q.  Okay.  Other than that edit to paragraph 36,
17 are there any changes that you intend to make or have
18 made to your report, that we'll attach as Exhibit 1 and
19 will be identified as the one with your signature from
20 October 8, 2020 [sic], with 43 paragraphs of content,
21 not including all of the exhibits?
22    A.  That's correct.  I have no changes.
23    (Defendant's Exhibit No. 1 was marked for
24 identification.)
25 BY MR. McCOY:

2 (Pages 5 to 8)

<br>

**Page 9**

1      Q.  Have you reviewed the report of Dr. Kalman
2 provided in this case?
3      A.  Yes, I did.
4      Q.  Have you been asked to express any opinions
5 concerning the opinions Dr. Kalman sets forth in his
6 report?
7      A.  I had discussions with my attorney on the
8 case.  I haven't written a report or comments section on
9 it.
10      Q.  Have you formulated opinions, even if not
11 written down, concerning any of the opinions Dr. Kalman
12 expressed in his report?
13      A.  Yes.
14      Q.  All right.  Let's turn to page -- well, this
15 actually isn't numbered by page, so I think what we will
16 do is just go by paragraph.  And at least to get started
17 here, we'll just make sure we're looking at the same
18 content as we go by paragraph.
19      I'm looking first at paragraph 6 of Exhibit 1.
20 And by "Exhibit 1," I mean what we're labeling your
21 report.  So I don't want you to get confused by that.
22      A.  Okay.
23      Q.  All right.  You're on paragraph 6?
24      A.  Hold on one second.  Yes, paragraph 6.
25      Q.  And you say in here, "I'm experienced in

**Page 10**

1 formulating all kinds of dietary supplements and in
2 reviewing all ingredients for use in dietary supplements
3 and pharmaceuticals."
4      You then go on to say, "I have also been
5 qualified as an expert in FTC and FDA regulations
6 concerning formulation and claims regarding dietary
7 supplements and pharmaceuticals."
8      Have -- what have you -- what work have you
9 done in terms of FDA regulations concerning --
10 concerning formulation and claims regarding dietary
11 supplements and pharmaceuticals?
12      A.  That's a big question.  Where are you -- where
13 specifically do you want to know?  Do you want to know
14 my pharmaceutical background, my nutraceutical
15 background, my FDA meetings, my FTC meetings?  That's a
16 really broad question.  That's 15 years of experience.
17      Q.  All right.  Let's maybe narrow it down more
18 precisely.  Do you recognize a difference between
19 beverages and dietary supplements?
20      A.  Well, that's an interesting question.  Yes.
21 Both are regulated by FDA, but there is a difference.
22      Q.  And beverages would include the drink
23 category, correct?
24      A.  Yes.
25      Q.  And the FDA regulates beverages and drinks

**Page 11**

1 different than dietary supplements?
2      A.  Well, beverages that are sold as food, yes.
3 Beverages that are sold as dietary supplements, yes
4 also, but in a different way.
5      Q.  I see.
6      So if a beverage is sold as a food, that is
7 considered different than a beverage that is sold as a
8 dietary supplement?
9      MR. STEARNS:  Object to the form.
10      THE WITNESS:  Yeah, go ahead.  Yes.  Yes,
11 they're different.
12 BY MR. McCOY:
13      Q.  And what is the determining factor, based upon
14 your experience with the FDA, on whether something would
15 be a beverage or a drink versus a dietary supplement?
16      A.  Well, the difference is basically how the
17 companies want to classify it.
18      You're aware of Monster changed the
19 classification of their drinks way back when.  But there
20 are different regulations.  There are food regulations
21 for food, which includes beverages such as drinks.  The
22 food regulations talk about specifically what can go in
23 a drink.  They also have a different labeling.  They
24 have a nutrition supplement label instead of a dietary
25 supplement label.

**Page 12**

1      And drinks are regulated differently as per
2 their ingredients.
3      Q.  I see.
4      A.  There is also a difference in regulation as to
5 reportable side effects between dietary supplements
6 which require reporting side effects and drinks which do
7 not.
8      Q.  So you would recognize, consistent with the
9 FDA, that something that qualifies as a drink is
10 different than a dietary supplement?
11      MR. STEARNS:  Object to the form.
12      THE WITNESS:  They're -- they're different
13 because they're classified as food.  They're the
14 same in that they're supplementing ingredients such
15 as amino acids or caffeine or whatever is in the
16 drink.  So they are supplementing a diet, which
17 puts them in a dietary supplement category.
18 BY MR. McCOY:
19      Q.  Well, even based upon your background, you
20 would acknowledge that the word "drink" has a different
21 connotation and meaning than "supplement"?
22      MR. STEARNS:  Object to form.
23      THE WITNESS:  No, not really.  Drink can be
24 water.  Water can be a supplement.  Water is a
25 supplement.  It's probably the most important one.

## Page 13

1    I think you're trying to split hairs here.
2    You're -- the issue is that people put things in
3    drinks, companies put things in drinks, and they're
4    allowed to by the regulations.  I can go into that
5    later.  By doing that, they're purposely giving
6    something to supplement a diet or supplement a
7    human body.
8  BY MR. McCOY:
9    Q.  You talk about some work that you have done
10  on -- in paragraph 8 concerning Hydroxycut.  Do you see
11  that, Dr. Heuer?
12    A.  Let me read it.  Just a minute.  In
13  paragraph 8?
14    Q.  Yes, sir.
15    A.  Whereabouts -- whereabouts are you?
16    Q.  At Item 8, "We greatly expand the formulas and
17  product offerings for diet products like Hydroxycut to
18  include single-serving energy shots, drinks, and
19  sachets."  I'm not sure if I said that right.
20    A.  Okay.  Yes.
21    Q.  And Hydroxycut, what is that?
22    A.  Hydroxycut was a diet product.
23    Q.  What did it do?
24    A.  As it -- as a supplement, it decreased
25  appetite and increased energy.

## Page 14

1    Q.  How did Hydroxycut increase energy?
2    A.  Well, it's been a long time since I worked on
3  the formulation.  We had caffeine in it, which is one of
4  the big indicators and big things used to stimulate
5  energy.
6    Q.  You said it here -- you said here, "It's an
7  offering for diet products like Hydroxycut."
8       Is Hydroxycut a bodybuilding supplement?
9    A.  Hydroxycut was a supplement just for the body,
10  for general, not necessarily bodybuilder strong guys,
11  but it's sold mostly in women in age 50.  So it was for
12  normal people to augment their diet.
13    Q.  And when you say not bodybuilder strong guys,
14  do you recognize that as a separate kind of category of
15  athlete?
16    A.  Well, that's a subset of people, you know, in
17  general.  There are people that body build, there are
18  runners, there are other trainers, there are yoga.
19  Yeah, it's a subset of people that supplement their
20  diet.
21    Q.  A subset of what, the general population?
22    A.  Of the general population, yes.
23    Q.  And then under the general population, what
24  would be some of those subsets?  There would be body
25  builders, you said yoga?

## Page 15

1    A.  I just listed them.  The Arnold Sports
2  Extravaganza, Arnold used to be a bodybuilder.  His
3  sports extravaganza does all kinds of things.  If you
4  Google it, you'll see they have table tennis, they have
5  badminton, they have archery, they have yoga, they have
6  running.  You name it.  So it's for human bodybuilders
7  and it's for all kinds.
8       There is also a contest there for the muscle
9  bodybuilders, there's a contest there for physique
10  individuals, men and women.  But it encompasses any
11  activity that, you know, that almost that you could do
12  in building your body.
13    Q.  Is someone playing table tennis a bodybuilder?
14    A.  You ask Arnold.  It's in his bodybuilding
15  extravaganza.
16    Q.  I'm asking you, sir, as the expert in the
17  case.
18    A.  Yes.  The answer is yes, and you can ask
19  Arnold, and he should know that.
20    Q.  And you would say someone who is running is a
21  bodybuilder?
22    A.  Of course.
23    Q.  And why would they qualify as a bodybuilder, a
24  runner?
25    A.  What they're doing is tearing down muscles and

## Page 16

1  building them back up.  It's much like when I have a
2  patient in the hospital there, digressed to immediately
3  start tearing down their muscles.  We immediately start
4  giving them supplementation, supplementation IVs, and so
5  on.  And amino acids, protein, and carbohydrate ensures
6  to build them back up.  That's bodybuilding.
7    Q.  I see.
8       And someone doing yoga, you would say is also
9  a bodybuilder?
10    A.  Absolutely.
11    Q.  And does that in any way tie to actually
12  building muscle through the activity or muscle gain?
13    MR. STEARNS:  Object to the form.
14    THE WITNESS:  I don't know about yoga.  I
15  haven't examined that in detail.
16       My feeling is that they work on mental
17  capacity, alertness, focus, relaxation.  You know,
18  relaxation, in fact, sleep is when your body
19  rebuilds.  So there is definitely some rebuilding
20  going on.
21  BY MR. McCOY:
22    Q.  And have you ever expressed, outside of your
23  retention in this case, the notion that a runner would
24  be a bodybuilder?
25    A.  I don't recall.  I don't think of any context

4 (Pages 13 to 16)

Page 17

1  where I would do that.  Actually, bike -- bicycle, which
2  is similar to running, we did do studies on that, and
3  that definitely is bodybuilding.
4      Q.  And have you ever expressed, outside of this
5  retention, the idea that someone playing table tennis is
6  bodybuilding?
7      A.  I don't recall that I've had the opportunity
8  to do that.
9      Q.  Have you ever expressed, outside of this
10  retention, that someone doing yoga is bodybuilding?
11      A.  Possibly to my staff, yeah.  That's possible.
12      Q.  Have you ever expressed the idea that table
13  tennis, running, or yoga is bodybuilding in anything
14  that has ever been peer reviewed by others in the
15  scientific community?
16      A.  No, I don't believe I have.
17      Q.  I want to go back.  We'll talk specifically
18  about your paragraph on bodybuilding in a moment, but do
19  you agree that bodybuilding has, as a core feature,
20  muscle gain?
21          MR. STEARNS:  Object to the form.
22          THE WITNESS:  As early as one possible
23      feature, yes.
24  BY MR. McCOY:
25      Q.  What are the other possible features of

Page 18

1  bodybuilding besides muscle gain?
2      A.  Muscle gain, muscle repair, possible weight
3  gain, possible weight loss, electrolyte balance, the
4  amino acid balance, calcium infusion.  You know, affect
5  the blood, affect the mental acuity, affect
6  concentration, affect sleep.  Those are all aspects of
7  bodybuilding.
8      Q.  Will you agree that a core component of muscle
9  gain involves calories?
10          MR. STEARNS:  Object to the form.
11          THE WITNESS:  I think it's a component.  I
12      don't think it's a core component.  I think muscle
13      gain is more related to protein and possibly
14      creatine, and it may be eccentric exercise.
15  BY MR. McCOY:
16      Q.  Would you say that calories are required or
17  not required for muscle gain?
18          MR. STEARNS:  Object to the form.
19          THE WITNESS:  Calories are required.  It may
20      vary as to amount.
21  BY MR. McCOY:
22      Q.  Depending on what goals you may want to
23  achieve, right?
24      A.  Or building here, again, like a hospitalized
25  patient or someone in a recovery phase after an

Page 19

1  accident.  You're going to titrate that a bit.
2      Q.  In paragraph 8, when you were talking about
3  Hydroxycut, you identified it as a diet product.  Was
4  Hydroxycut considered a diet product different than a
5  bodybuilding supplement?
6      A.  How do you mean?
7      Q.  Well, I'm looking at your word.  In that same
8  paragraph, you said, "Offerings for diet products like
9  Hydroxycut to include single-serving energy shots."
10          Then you go down and say, "We strive to
11  formulate the most potent muscle and bodybuilding
12  products in the industry with the most potent legal
13  ingredients in the industry."
14          And I'm trying to understand why you used a
15  different term, "diet products," for Hydroxycut and the
16  energy shots as opposed to the potent and muscle
17  bodybuilding products you were talking about later.
18          MR. STEARNS:  Object to the form.
19          THE WITNESS:  It's different thoughts.  One is
20      referring to the Hydroxycut, and on the lower part,
21      I'm referring to general products from that
22      company, which could be -- one could be Hydroxycut.
23  BY MR. McCOY:
24      Q.  So were you including Hydroxycut in the potent
25  muscle and bodybuilding products that you were talking

Page 20

1  about later?
2      A.  I'm including Hydroxycut in the most potent
3  formulated bodybuilding products in the industry from
4  Iovate.
5      Q.  Okay.  I see.
6          I just want to make sure, you would consider
7  Hydroxycut to be part of the bodybuilding products from
8  Iovate; is that right?
9      A.  It's one of them, yeah.  It's more of a weight
10  loss product and a diet control product.  It was.  I
11  don't know what it is today.
12      Q.  I want to talk -- let's move over to
13  paragraph 18, if you don't mind.  Are you there,
14  Dr. Heuer?
15      A.  Just a minute.
16      Q.  Okay.
17      A.  Materials reviewed?
18      Q.  Yes, sir.
19      A.  Okay.
20      Q.  I just want to make sure the materials that
21  you have reviewed would all have been listed here in
22  paragraphs 18 and 19, and there are no additional
23  materials that you considered or reviewed that are not
24  listed in those two paragraphs.
25      A.  Well, as I mentioned there, I regularly review

1    lots of materials.  And it's actually too comprehensive
2    to list here.  I have reviewed, you know, many, many
3    articles.  I review 3,000 journals a year.  So these are
4    not all inclusive, and they're not meant to be.
5         I relied on my expertise, which are based on
6    the preponderance of scientific information, not just
7    necessarily this particular list.
8         Q.  Let me maybe ask a better question here.  I
9    did not see in either paragraph 18 or 19 that you listed
10   any deposition, discovery, or other materials that were
11   exchanged in this case.  Did I review that correctly,
12   that you did not list any of those materials?
13        A.  In this case?
14        Q.  Yes, sir.
15        A.  No, I did not list anything.
16        Q.  And I did not see in paragraph 18 or 19 that
17   you identified any types of interviews or discussions
18   with anybody associated with Steel concerning facts in
19   this case; is that correct?  I read those two paragraphs
20   to not include that information?
21        A.  Other than the attorneys.  That's all.
22        Q.  But you didn't have any conversations with
23   Mr. Huh, Jason Huh?
24        A.  No.
25        Q.  All right.  And did you have any factual

1    information provided to you about what Mr. Huh
2    considered the definition of bodybuilding to mean in the
3    agreement?
4         A.  No.
5         Q.  So the opinions that you are expressing here
6    concerning bodybuilding supplements in the agreements
7    are definitions that you are providing, but they are not
8    based upon any information you obtained from Mr. Huh?
9         A.  I have no information.  I've never talked to
10   Mr. Huh.
11        Q.  And as you sit here right now, you don't know
12   if the opinions and definitions you have provided for
13   bodybuilding supplements are the same or different as
14   those held by Mr. Huh who negotiated this contract with
15   Blitz?
16        A.  I have no knowledge of his definitions.  These
17   are my expert opinions of how that definition would fit.
18        Q.  Well, you expressed opinions later in this
19   report about items being competing products based upon
20   provisions of the contract.  Do you see -- let's look at
21   paragraph 20, for example.
22        A.  Okay.  Which part?
23        Q.  Well, you say, "I have been asked to opine
24   regarding a section of the contract between Steel
25   Supplements and Blitz. Regarding Blitz, Mr. Bilzerian

1    promoted supplements from companies other than Steel on
2    his social media and various iterations."
3         And then you go on to cite Section 3.1.1 of
4    the contract.
5         Do you see that?
6         A.  Yes, I do.
7         Q.  And then in the definition that you cited
8    here, it says, "Competitor of Steel Supps defined as a
9    provider, seller, manufacturer or distributor of
10   bodybuilding supplement products."
11        Do you see that?
12        A.  Yes.
13        Q.  And as you sit here right now, you have no
14   idea what Mr. Huh intended that definition to include
15   when this contract was executed in 2017, correct?
16        MR. STEARNS:  Object to the form.
17        THE WITNESS:  I don't know what -- what either
18   signor -- I'm sorry, go ahead.
19   BY MR. McCOY:
20        Q.  No, go ahead.
21        A.  Oh, I don't know what either signor of the
22   contract had in their meeting.  I'm giving my definition
23   as I would read it.  And it seems pretty general they're
24   bodybuilding supplement products, which I believe, you
25   know, Steel sells a variety.  I listed some other

1    supplement companies that have supplement products.
2    There's a whole gamut.
3         So I took the contract to mean anything that a
4    bodybuilding supplement company would sell, which could
5    be in drinks, it could be powders, it could be others
6    that you constitute as drinks, it could be, you know,
7    anything in that bodybuilding -- well, I guess, it could
8    even be clothing, because they all seem to sell
9    clothing.
10        Q.  I see.
11        A.  So it's a very broad meaning just looking at
12   how I interpret the contract as an expert.
13        Q.  And that would be -- I believe if we turn to
14   paragraph 21, you give a definition of the term,
15   quote/unquote, bodybuilding in that first sentence?
16        A.  Okay.
17        Q.  Well, I'm asking you.  Do you see that?
18        A.  Okay, yes.  Uh-huh.
19        Q.  And then you say, "In medicine, we use the
20   term to refer to improving health, hydration, strength,
21   and sense of well-being.  The concept of bodybuilding
22   applies to healthy people just wanting physical
23   improvement and also to sick or debilitated individuals
24   needing to boost or, quote/unquote, build their physical
25   status."

6 (Pages 21 to 24)

Page 25

1    Do you see that part of your opinion?
2    A. Yes, I do.
3    Q. And is the definition and the explanation that
4  you're providing in 21 coming from your background as a
5  medical doctor?
6    A. It's coming from my background, long-term
7  medical doctor, my experience in medicine, my experience
8  in supplements, and my experience in supplementation.
9    Q. Well, you start the second sentence of
10 paragraph 21 by saying, "In medicine, we use the term,"
11 and that's referring back to the, quote/unquote,
12 bodybuilding in the first sentence, right?
13    MR. STEARNS: Objection.
14    THE WITNESS: Where are you? In the second
15 paragraph?
16 BY MR. McCOY:
17    Q. I'm in paragraph 21. And --
18    A. Okay.
19    Q. And you, in the first sentence, you say the
20 term, quote/unquote, bodybuilding. Do you see that?
21    A. Oh, okay, yes. Okay, uh-huh.
22    Q. And you say, "generally refers to any
23 development or improvement in one's physical status with
24 physical exercise and/or diet."
25    Did I -- that's your first sentence, right?

Page 26

1    A. Okay.
2    Q. And then you say, "In medicine, we use the
3  term," and that's referring to bodybuilding, right?
4    A. That's correct.
5    Q. And so the definition that you were providing
6  in 21, at least what was stated in your report,
7  pertained to the definition you use as a medical doctor?
8    MR. STEARNS: Object to the form.
9    THE WITNESS: There are two separate -- I'm
10 sorry.
11 BY MR. McCOY:
12    Q. Go ahead.
13    MR. STEARNS: I'm sorry, Dr. Heuer. I was
14 just objecting to form.
15    THE WITNESS: There are two separate thoughts
16 there, but all one definition. There's -- there's
17 the first sentence is referring to the physical,
18 and the second is referring to the same definition,
19 same word, but my continuing medical definition of
20 it. So it's all one thought, but two different
21 portions.
22 BY MR. McCOY:
23    Q. No, I understand. I'm just clarifying that
24 the basis for the definition that you're using for
25 bodybuilding comes from your experience as a medical

Page 27

1  doctor? That's why you said, "In medicine, we use the
2  term"?
3    MR. STEARNS: Object to form, Kevin.
4    THE WITNESS: It comes from my experience as
5  an expert in nutritional supplement, as an expert
6  in dietary supplements, as an expert in
7  pharmaceutics, as an expert in medicine. They're
8  all combined. It's just not just my medical
9  opinion. It's my total expert opinion.
10 BY MR. McCOY:
11    Q. All right. Well, we can at least agree that
12 in terms of what words you used here, you said, "in
13 medicine," and did not explain that you were providing a
14 definition found in any other background.
15    MR. STEARNS: Object to the form.
16    THE WITNESS: The first sentence is one
17 thought, the second sentence is another, all
18 encompassing the same term, bodybuilding.
19 BY MR. McCOY:
20    Q. Understood.
21    All right. And in paragraph 21, I did not see
22 any citation for either one of the thoughts you just
23 expressed to any kind of peer reviewed literature or
24 journal or article of any sort. Did I overlook that?
25    A. No, you did not. There are -- I did not

Page 28

1  reference. I felt no need. It's pretty common
2  knowledge.
3    Q. So the reference here in terms of the support
4  for the definitions that were provided in paragraph 21
5  would be just citation to Dr. Heuer, M.D.?
6    MR. STEARNS: Object to the form.
7    THE WITNESS: It's -- go back to the paragraph
8  where I talk about all of the things that I
9  reviewed, which are articles and journals and it's
10 talks with scientists. It's my total expert
11 opinion.
12    I didn't feel a need to cite articles on
13 giving IV therapy or emergency medical care or yoga
14 instruction because I think people can find those
15 themselves.
16    But, you know, it's my expert opinion on that
17 full statement.
18 BY MR. McCOY:
19    Q. I got it. I get that you're citing to your
20 experience that's listed.
21    I just want to be very clear, there is no
22 other authority for what's expressed in 21 other than
23 you citing your own personal experience.
24    MR. STEARNS: Objection, Kevin.
25    THE WITNESS: In this report, no. But should

7 (Pages 25 to 28)

Page 29

```
1    you wish citations, I could give you lots.  I think
2    it's common sense.  And I think anyone with a
3    general database of medicine and physical health
4    will understand the point.
5  BY MR. McCOY:
6    Q.   Outside of this retention, have you ever
7  expressed the opinion that bodybuilding would refer to
8  improving health, hydration, strength, and sense of
9  well-being?
10   A.   In what sense?  I mean, I've talked to
11 bodybuilders about it.  Do you want -- you want
12 citation?  You want a presentation?
13       I mean, it's pretty well -- as I've talked to
14 these guys, I've trained these guys, I helped them
15 develop their supplementation.  So certainly in that
16 sense, there may have been discussions such as that.
17   Q.   And I'm just trying to figure out if this is
18 the first expression of this opinion that we're now
19 reading in your report, or you've ever taken the
20 position that bodybuilding is this broad and
21 encompassing prior to being engaged in this case.
22   A.   That's my general impression of many years'
23 experience.  So it's not based on just one paper.  It's
24 based on many years of experience.
25   Q.   And then as I read your report, you used the
```

Page 30

```
1  definition of bodybuilding as the basis for your later
2  opinions in terms of what products qualified as
3  competitive products under the agreement.  Is that
4  correct?
5    A.   I used a definition.  I don't know where
6  exactly you're referring to specifically, but yes, I
7  used a broad definition of building the body, yes.
8    Q.   The one that's set forth in paragraph 21?
9    A.   Yes.
10   Q.   Let's go to paragraph 25, if you don't mind.
11       Actually, before we get there, let's go to
12 paragraph 24.  You talk about Gatorade.
13   A.   Yes.
14   Q.   And you say, "An initial drink that started a
15 craze for hydration in sports drinks was Gatorade."
16       Do you consider Gatorade to be a bodybuilding
17 supplement?
18   A.   Gatorade then or now?
19   Q.   I'm sorry, did you say then or now?
20   A.   Then or now?
21   Q.   I didn't know there was a difference.  Let's
22 talk about it when it started the craze associated with
23 the University of Florida players.
24   A.   The intent by Dr. Cade, who I worked with at
25 the University of Florida, and I developed some patents
```

Page 31

```
1  following Gatorade with Dr. Cade, was that this was a
2  bodybuilding supplement.  And I mentioned there the
3  Florida football players, it did seem to do something in
4  those players since they did win the title that year.
5    Q.   And is there something different about
6  Gatorade now that would make it not a bodybuilding
7  supplement?
8    A.   Well, that's a long history.  The initial
9  Gatorade was a combination that we worked on at the
10 University of Florida, in glycerol, and it had a fairly
11 high sugar content and it had potassium and it had
12 chloride and it had, you know, those basic elements.
13 And it was a hydration drink and was to replace the
14 electrolytes from sweat.  The glycerol helped you
15 retain.  It's a whole kind of a process, helps you
16 retain the water so you stayed hydrated so you had more
17 energy so you could go longer.  They could go a little
18 longer on the treadmill compared to non-Gatorade
19 individuals.
20       There was a big thing from the University of
21 Florida called the Gatorade Trust, which is Quaker Oats
22 and Pepsi and multiple companies full of attorneys that
23 follow Gatorade and the development of Gatorade.
24       In the subsequent, when a company took over
25 Gatorade, they changed the formulation.  The
```

Page 32

```
1  formulation, I haven't followed closely, but it's gone
2  under multiple iterations.  Most recently, I think the
3  company is -- with Gatorade, is trying to greatly reduce
4  the sugar and might even now have a sugar-free.  I
5  haven't kept up with what electrolytes and what other
6  GRAS additives they've added to it because they
7  classified it as a drink.  But it's undergone a lot of
8  change.
9    Q.   Is Gatorade at present, in your view, still a
10 bodybuilding supplement?
11   A.   Yes.  That's how they advertise it.  That's
12 how I look at it.
13   Q.   You say that in paragraph 25, "There are
14 hydration drinks, energy drinks, sports drinks,
15 bodybuilding drinks, health drinks, and all kinds of
16 other drinks."
17       Do you see those different categories?
18       MR. STEARNS:  Object to the form.
19       THE WITNESS:  Right.
20 BY MR. McCOY:
21   Q.   And you split out those different categories
22 because they are, in fact, all different from each
23 other?  Is that why you used different words to describe
24 them?
25       MR. STEARNS:  Objection.
```

Page 33

1    THE WITNESS: They're not different. I'm just
2  listing ways you can get drinks; hydration,
3  whatever is in it. Those are just different
4  synonyms for supplements. They can, again, have
5  various things in them, but they're all the same
6  principle.
7  BY MR. McCOY:
8    Q.  And so hydration, that would include water?
9    A.  Right.
10   Q.  Is water a bodybuilding supplement?
11   A.  Yes.
12   Q.  And energy, what is -- what are the components
13  that would go into an energy drink as you've listed here
14  on paragraph 25?
15   A.  Lots of things. The primary thing used is
16  caffeine, but other amino acids go in, electrolytes go
17  in. It can vary with the company or with the thought or
18  with how they want to position or advertise and what
19  consumer they want to target.
20   Q.  And how is it that an energy drink that
21  involves caffeine or amino acids would qualify, in your
22  opinion, as a bodybuilding supplement?
23   A.  It's pretty obvious. You know, you need these
24  things to devise. Some of the amino acids are used in
25  bodybuilding, some are building muscles, some are used

Page 34

1  for neurotransmitters, some are used for rest, to calm
2  the brain. Rest helps you build your body.
3    Water is essential. I mean, we're 98 percent
4  water. But I have seen people that are low on calcium,
5  low on potassium, low on chloride from running, from
6  bodybuilding, from sweating, from wearing a sweat suit
7  in a wrestling match. And they gained these things to
8  supplement their body as replacement and to build things
9  back.
10   Q.  And would that be true even if an energy drink
11  had 0 calories?
12   A.  Yes, of course, it's true. You know, yes.
13   Q.  And would that be true no matter what the
14  level of caffeine is in the energy drink?
15   A.  Be more specific. Do you mean a low caffeine
16  or a high caffeine? What are you -- what are you
17  thinking?
18   Q.  Well, do you need to know what, for example,
19  the amount of caffeine is in an energy drink to
20  determine whether or not it would be a bodybuilding
21  supplement?
22   A.  Not to determine if it's a bodybuilding
23  supplement, no.
24   Q.  And why not?
25   A.  If it's got caffeine in it, it's basically a

Page 35

1  supplement. And it can be used or is used for
2  bodybuilding or energy or focus, which helps in building
3  bodies. So any amount of caffeine.
4    Q.  And are the opinions that you express right
5  now about caffeine, have you always held those same
6  opinions concerning caffeine's role in energy, workout,
7  bodybuilding?
8    A.  Yes. Basically, yes.
9    Q.  What about amino acids, do you need to know
10  the amount of amino acids that might be in a drink to
11  determine whether it's a bodybuilding supplement?
12   A.  No, you don't need to know the amount. If
13  they're there, you know, nobody is going to just put in
14  1 molecule. So if they're there, your body is going to
15  pick them up and can certainly utilize them. So you
16  don't need to know the amounts.
17   Q.  What about, going back to caffeine, do you
18  need to know the amount of caffeine in a drink to
19  determine its effectiveness for, say, working out?
20   A.  No, not really.
21   Q.  What about for amino acids, do you need to
22  know the amount of amino acids in a drink to determine
23  its effectiveness in working out?
24   A.  No, not really.
25   Q.  If someone -- let me -- so is any consumption

Page 36

1  of caffeine -- well, let me ask you a different
2  question.
3    Is caffeine, just as an ingredient by itself,
4  a bodybuilding supplement?
5    A.  As an ingredient itself, yes.
6    Q.  And why would caffeine, just as an ingredient
7  in a product by itself, qualify as a bodybuilding
8  supplement in your opinion?
9    A.  Because of the effect on the body. The effect
10  on alertness, the effect on perception.
11   One of the big new indices that we study when
12  we study athletes and exercise now is perceived
13  exercise, caffeine increases your perceived exercise.
14  It's a bodybuilding supplement, even just as caffeine.
15   Q.  Is there a difference between energy and
16  stamina --
17    MR. STEARNS: Objection to form.
18  BY MR. McCOY:
19   Q.  -- or are those the same?
20   A.  They're -- they're basically different.
21   Q.  In what way?
22   A.  Well, energy is your acute energy to do
23  something, to get up and go, to think, to move a muscle.
24  Stamina, in my mind, would be the ability to continue to
25  do something, to continue to exercise, have enough

1  stamina to make it up the hill.  It's a different thing.
2      Q.  And stamina is going to be important for
3  purposes of exercise, correct?
4      A.  Well, stamina might be a result of exercise.
5      Q.  Well, increased stamina would be something
6  that an individual might be looking for for purposes of
7  exercise?
8      A.  As a result of exercise.
9      Q.  All right.  And then what is the role of
10  energy for exercise?
11      A.  Energy, as I said, is your immediate ability
12  to go, your immediate feeling to get up out of a chair,
13  the immediate feeling to flex your muscle.  It can be --
14  the perceived energy can be mental perception.  So
15  energy can be equated to burning calories.  Not
16  necessarily, but it can be.
17      Q.  Do you agree that caffeine does not make
18  someone have a better workout and burn more calories?
19      MR. STEARNS:  Object to the form.
20      THE WITNESS:  No, I don't believe that.
21  BY MR. McCOY:
22      Q.  Why not?
23      A.  It just will do it.  Caffeine gives you the
24  ability to go.  It gives you some energy.  It gives you
25  a thought process where you can focus on your exercise,

1  whether it's treadmill or running, and it increases your
2  perceived energy, whether or not you burn more calories.
3  But caffeine can be very important for that type of
4  thing.
5      MR. STEARNS:  And speaking of caffeine, I'm
6  going to need a coffee break in a couple of
7  minutes, Kevin.  So whenever you get to a good
8  point, let me know.
9      MR. McCOY:  Okay.  Great.
10      MR. STEARNS:  In the next five minutes or so
11  would be nice.
12      MR. McCOY:  Yeah.
13  BY MR. McCOY:
14      Q.  And have you always held the opinions that you
15  just expressed, Dr. Heuer, or are those new?
16      A.  No.  I've always held those opinions, yes.
17      Q.  Now, going back to what we talked about
18  before, would you agree that caffeine, as just an
19  ingredient in any type of product, does not necessarily
20  increase muscle mass?
21      A.  That's a real vague question.  I don't think
22  the intent is they increase muscle mass.  They can help
23  it.  And it can help, as I said, the perceived exercise,
24  which might make you go two minutes longer on a
25  treadmill which might result in muscle mass.  So somehow

1  it could be indirectly related.  It's not going to your
2  muscle and, say, make more cells.
3      Q.  I see.
4      Does caffeine, as just a standalone
5  ingredient, have any calories?
6      A.  Caffeine anhydrous?  No, not that I have
7  knowledge.  Other forms of caffeine, guarana, berries,
8  from fruit and stuff can certainly have calories with
9  whatever you're eating it with.
10      Q.  But just natural caffeine, you agree, has no
11  calories?
12      A.  No, I didn't say that.  Caffeine anhydrous,
13  which is chemically made in a vat, has no calories.
14  Caffeine from plants, fruits, leaves, wherever, may
15  have -- may certainly have calories.
16      MR. McCOY:  Okay.  Let's get that coffee
17  break.  Five minutes?  Ten minutes?  What do you
18  guys need?
19      MR. STEARNS:  We'll do ten.  We'll come back
20  at 10:05.
21      THE WITNESS:  Yeah, ten is fine.  Okay.
22  Thanks, guys.
23      MR. McCOY:  Thanks.
24      VIDEOGRAPHER:  We're going off the record.
25  The time is 9:56 a.m.

1      (A recess was taken.)
2      VIDEOGRAPHER:  We're back on the record.  The
3  time is 10:09 a.m.
4  BY MR. McCOY:
5      Q.  All right.  Dr. Heuer, I want to ask you about
6  a couple of hypotheticals here.  I want you to assume
7  you have a 63-year-old male has a sedentary job, does
8  lots of reading and writing for a living every day,
9  okay?
10      A.  Okay.
11      Q.  Drinks one to two cups of coffee every
12  morning, and those cups of coffee have caffeine in them.
13  Are you with me so far?
14      A.  Okay.
15      Q.  Physical activity during the day may include,
16  you know, your normal trips to lunch, using an elevator
17  to get up and down from the office, driving a car to and
18  from work.  Is this individual a bodybuilder?
19      A.  Because he's drinking caffeine?  Is that your
20  assumption?
21      Q.  Well, also thinking very deeply every day,
22  using his brain, working in that --
23      A.  You --
24      Q.  -- capacity, but using a stimulant like
25  caffeine.  Is this -- would that person fit your

Page 41

1  definition of a bodybuilder?
2      A.  Possibly, if he's using the caffeine to
3  stimulate himself and stimulate his brain and getting
4  going in the morning.  He's supplementing, for sure.
5  He's not necessarily building muscle, but he's
6  supplementing his body.
7      Q.  I see.
8          So if the purpose of the caffeine was to get
9  some energy to get going in the morning, then the person
10  I just described to you would be a bodybuilder in your
11  opinion?
12     A.  Not necessarily.  As you described, his
13  alertness and so on.  So he's supplementing.  He's using
14  a bodybuilding supplement possibly.
15         But I don't know if I would qualify him as a
16  bodybuilder.  I'd have to see him as a patient.  But if
17  he's taking something, as you said, to get going and to
18  help him think and so on, that's supplementation.
19     Q.  I see.
20         So is your definition of a bodybuilding
21  supplement different than what you would associate the
22  definition of a bodybuilder?
23     A.  They're different things.  As I said, a
24  bodybuilder, if you're talking about the niche sport
25  people, they're very different.  The people in the

Page 42

1  general population, they're more like body builder, like
2  two words.  You don't need to put them together.  And
3  those are different things.
4          But supplementation, bodybuilding supplements
5  by a bodybuilding supplement company can be a whole
6  gamut.
7      Q.  I see.
8          So what does the -- what does the difference
9  between body and builder as two words and bodybuilder as
10  one word, does that have a difference to your opinions
11  in this case?
12     A.  It's the same thing except you keep trying to
13  associate bodybuilder with muscle builders.  And it's
14  not.  I'm associating it with the general population.
15     Q.  I see.
16         So your definition of bodybuilder is because
17  you associate the term with just the general population
18  as opposed to the typical image of a bodybuilder that
19  has bigger muscles than maybe the general population?
20         MR. STEARNS:  Objection, Kevin.
21         THE WITNESS:  Can you repeat that?  I'm sorry.
22  BY MR. McCOY:
23     Q.  Yes, sir.  You are using the term
24  "bodybuilder" to refer to just the general population as
25  opposed to a bodybuilder who is engaged in what someone

Page 43

1  would typically understand to be the sport of
2  bodybuilding, to increase muscle size and gain?
3          MR. STEARNS:  Object to the form.
4          THE WITNESS:  The thing I'm talking about is
5  the general term "body building," okay?  Building
6  the body in any way, whether it's building a torn
7  down muscle, building a debilitated old man,
8  building muscle in a physique contest.  Building
9  your body is what I'm discussing, and that is
10  including what we talked about earlier,
11  supplements.  So it's a general term.  It's not
12  a -- you're trying to make it a niche term, and it
13  is not.
14  BY MR. McCOY:
15     Q.  Do you understand -- well, let me ask you --
16  let me start it a different way.  Strike that.
17         What industry did your client, Steel
18  Supplements, start out in in terms of selling products?
19         MR. STEARNS:  Object to the form.
20         THE WITNESS:  I know very little about its
21  history.  I've only read that he was a bodybuilder
22  at one time.
23  BY MR. McCOY:
24     Q.  Well, when you say "bodybuilder," is that like
25  the person who is engaged in the sport with large

Page 44

1  muscles or is that somebody like the 63-year-old man
2  that I described in my hypothetical?
3      A.  All I know is what I read in Wikipedia, is
4  that sometime he started building his muscles; he did
5  some training.  I believe he had entered some
6  competition.  I don't know if it was physique or what.
7  So I don't know his background.  I don't know him.  But
8  his interest was in building muscles and health, and he
9  started a -- as far as I know, a supplement company
10  selling bodybuilding supplements.
11     Q.  And the "he" that you're talking about there
12  is Jason Huh, the founder of Steel?
13     A.  I believe so.  If you are, yes.
14     Q.  And when you say he started a company selling
15  bodybuilding supplements, do you know what line of
16  products he was selling in 2017?
17     A.  I have some photos of some products.  I don't
18  know his full line from them, but I have photos of some
19  of the products.
20     Q.  Do you know if everything he was selling in
21  2017 would have been considered a bodybuilding
22  supplement?
23     A.  From what I saw, they were bodybuilding
24  supplements, protein, creatine, amino acids, meaning
25  general bodybuilding supplements.  I'm sure he sold --

Page 45

1    is selling to general population.
2        Q.   When you say "I'm sure that he is selling," do
3    you mean now or do you mean in 2017?
4        A.   Both.
5        Q.   And why are you sure of that?
6        A.   I believe that's the intent.  As I said, I
7    haven't talked to him.  But a company selling
8    supplements like this usually sells the gamut, and they
9    try to sell to general population.
10       Q.   But the general population, you would still
11   call body builders as opposed to the specific niche of
12   bodybuilders?
13           MR. STEARNS:  Objection.
14           THE WITNESS:  Body, body builders, yes, people
15       that want to improve their bodies in any small way
16       or improve their mental acuity or alertness.  I
17       think those all fit into this category of body
18       building.  You can make it in two separate words if
19       you want.  And not just the niche.  Maybe he wanted
20       to sell to the niche but he also wanted to sell,
21       I'm sure, where the money is, the general
22       population.
23   BY MR. McCOY:
24       Q.   And you say you're sure of that.  Are those
25   assumptions that you're making because you have not

Page 46

1    actually spoken with Mr. Huh?
2        A.   Those -- that's my perception based on what
3    I've seen on his website and what I've read on his
4    website and what I know of this type of company selling
5    these type of items.
6        Q.   And did you look at any of the pages from
7    Steel's website that were from the time period of 2017
8    to see what products and statements were being made at
9    that time as opposed to now in 2021?
10       A.   I did see some of those, yes.
11       Q.   When I look at the -- when I look at the -- if
12   I go back here to your list -- give me a moment.
13           So do you have a copy of your report with the
14   exhibits in front of you?
15       A.   With the -- which exhibit?  I have a report
16   with the references.
17       Q.   The copy that I have starts on page 24.  This
18   would be of my PDF, and it says "Materials Considered".
19   It has a list of items like Steel Supplement label,
20   Steel Supplement warning labels, SteelSupplements.com.
21           Do you have a copy of that "Materials
22   Considered" -- "Materials Reviewed" page?
23       A.   Let me look here.  What I have, there's no
24   labels.  Hold on.  I have the listing, but I don't see
25   those labels.

Page 47

1        I do have a binder that has some labels in it.
2    Steel ADALoad, Alpha-AF.  I don't know, maybe they are
3    here.
4        Q.   So I think my original question, you indicated
5    that you saw materials from the 2017 era as part of your
6    materials reviewed.  Is that right?
7        A.   Right.
8        Q.   And what were the product offerings of Steel
9    Supplements in 2017?
10       A.   I don't have that as a list here.  I said I
11   don't have the date of the labels I have here.  Do you
12   want to put them on the board?  I can look at them.
13           MR. STEARNS:  I'm going to object to the form.
14       I was on mute, so I objected to that last question,
15       but I was muted.
16   BY MR. McCOY:
17       Q.   Does the type of product offering from Steel
18   change in your view whether or not it is a bodybuilding
19   supplement company?
20           MR. STEARNS:  Objection.
21           THE WITNESS:  The gamut of products, no, it
22       doesn't change.
23   BY MR. McCOY:
24       Q.   You mentioned earlier something about even, I
25   think, bags or merchandise would be included in

Page 48

1    bodybuilding supplements.
2            MR. STEARNS:  Objection.
3            THE WITNESS:  Those are listings on a website.
4        They're not necessarily supplements, but they're
5        certainly part of what a supplement company would
6        offer.
7    BY MR. McCOY:
8        Q.   So going back to now another hypothetical, you
9    would agree that you and I have been using our brains
10   here for the purposes of this exam today?
11       A.   I hope, yes.
12       Q.   And I will represent to you that I've had two
13   cups of coffee this morning, one while we've been on the
14   record speaking.
15           And you can see me through the video, correct?
16       A.   Right.
17       Q.   And would you classify me as a bodybuilder?
18       A.   I don't know you well enough to know if you
19   meet the definition of what you do, you know, out of
20   your office or if you go to the gym or -- I don't know.
21   Just because you drink two cups of coffee, I don't know
22   that it makes you a bodybuilder.  It certainly makes you
23   a supplement user.
24       Q.   Well, would that mean that I was using
25   bodybuilding supplements?

Page 49

1    A. Possibly. It depends on how much you're using
2  and why.
3    Q. Well, I just told you. I've had two cups of
4  coffee, and I've been thinking while you and I have been
5  engaging in the question and answer that we've been
6  doing here today.
7       Have I been using a bodybuilding supplement?
8    A. You're using a supplement.
9    Q. But it would not be a bodybuilding supplement?
10   A. That, I can't -- I can't relate until I know
11 more what all you're doing.
12   Q. What else would you need to know?
13   A. I need to know more about you. But just the
14 fact that somebody drinks coffee -- I'm drinking water,
15 I'm having a supplement also. So we're both doing
16 supplements for different purposes. You know, you're
17 maybe, if you're trying to have more mental acuity, then
18 maybe you are doing a bodybuilding supplement with that.
19   Q. So does the purpose for which somebody is
20 using a product dictate whether it's a bodybuilding
21 supplement or not?
22      MR. STEARNS: Objection.
23      THE WITNESS: You know, I think that's --
24   that's up for interpretation. I think the fact
25   that you're supplementing means that you're adding

Page 50

1    into your body for a reason. I don't know too many
2    people that just go around drinking coffee other
3    than to wake up or to be more alert or to have some
4    diuresis or whatever. So yes, it's a supplement of
5    sorts.
6  BY MR. McCOY:
7    Q. What if somebody uses -- drinks a cup of
8  coffee before they go on a jog, is coffee then a
9  bodybuilding supplement?
10   A. These are really odd questions. Yeah, it
11 might be if they think they're going to have a better
12 jog. Once again, it's the perceived exercise. So maybe
13 they perceive they jog 2 miles, then they jog a mile and
14 a half. If so, they supplemented.
15   Q. Well, what I'm trying to get at is, how does
16 your definition of bodybuilding supplement apply in the
17 real world? I'm trying to understand how you apply it
18 to any particular scenario.
19      So would the person who had a cup of coffee
20 that is caffeinated before they went on a 1-mile jog be
21 consuming a bodybuilding supplement in that scenario?
22   A. Possibly, yes.
23   Q. When you say "possibly," what else would you
24 need to know to say either yes or no using your
25 definition?

Page 51

1    A. Well, as I say, if they take something to
2  supplement their body, water even to hydrate, it's a
3  supplement. That's my point. Whether it's building
4  their body or alert -- alertness or whether it's
5  perceived energy expenditure, it's supplementing their
6  body. That's the point --
7    Q. I see.
8    A. That's the point of this contract.
9    Q. And why do you say "that's the point of the
10 contract"?
11   A. Bodybuilding supplements is a very general
12 term, as I'm describing to you, and it can be that
13 caffeine. It can be that extra amino acid.
14   Q. I see.
15      So it would -- it would also encompass then
16 the scenario if the same person drank a water for the
17 purposes of being hydrated before they went on their
18 1-mile run, that would then qualify in your opinion as a
19 bodybuilding supplement, the fact that they drank the
20 water?
21   A. Yes.
22   Q. And it's your opinion that that would be
23 encompassed within the contract between Blitz and Steel
24 as a competing bodybuilding supplement product?
25      MR. STEARNS: I'm going to object to the form

Page 52

1    of that question.
2  BY MR. McCOY:
3    Q. Go ahead, sir.
4    A. Phrase that again. You know, is anybody
5  selling water? I guess a lot of people are but -- yeah,
6  rephrase that.
7    Q. Yeah, I'm not asking about -- you to worry
8  about who may or who may not be selling water. I'm
9  asking would water, if I drank water before I go for a
10 1-mile run for the purpose of being hydrated during the
11 run, does that qualify in your opinion as a bodybuilding
12 supplement?
13   A. Yes.
14   Q. And so it follows through, it would -- you
15 would hold the opinion that water would be a
16 competing product under Section 3.1.1 that you cited in
17 your report?
18      MR. STEARNS: Objection.
19      THE WITNESS: Yes, it's possible, depending on
20   were they sold or advertised or what the situation
21   was.
22 BY MR. McCOY:
23   Q. Well, what's the now new factor on depending
24 on whether it was sold or advertised or what the
25 situation was? What does that mean?

Page 53

1      MR. STEARNS:  Objection, Kevin.  Come on.
2      THE WITNESS:  You're getting off point, Kevin.
3      But the whole issue is, yes, if someone sells
4      water and they sell it as a supplement in a
5      supplement company, it's a -- it's a supplement.
6  BY MR. McCOY:
7      Q.  And so does that -- whether it qualifies as --
8  water qualifies as a supplement would then depend upon
9  how it is sold or marketed?
10     A.  No.  It's a supplement.  So you're --
11     Q.  Water --
12     A.  -- that somebody is selling it.  I didn't add
13 that part.  You added that part.  Water is a supplement.
14 Water hydrates.  Water does lots of things.
15     Q.  So you expressed the opinion in here that
16 Mr. Bilzerian promoted competing products under the
17 agreement.
18         Would it be your opinion that Mr. Bilzerian
19 could or could not have promoted Starbucks coffee under
20 the agreement?
21     MR. STEARNS:  Objection.
22     THE WITNESS:  Under the agreement, that's a
23     supplement.  I'd have to look at the full agreement
24     terms because it's talking about Steel supplements
25     in the agreement.

Page 54

1  BY MR. McCOY:
2      Q.  Well, let's go back to 3.1.1 that you cited in
3  paragraph 20 of your opinion.  And you then quoted
4  Section 3.1.1 in paragraph 20.  We talked about that
5  earlier, Dr. Heuer.
6      A.  Okay, yes.
7      Q.  And it says, "Celebrity shall not promote,
8  publicize, or endorse the services or products of any
9  competitor of Steel Supps," and that is defined as "a
10 provider, seller, manufacturer, or distributor of
11 bodybuilding supplement products."
12         Do you see that?
13     A.  Okay.
14     Q.  And then what I understand you've been asked
15 to do is provide a definition of bodybuilding supplement
16 products.  That's what you have and I have been talking
17 about for roughly an hour and a half, right?
18     A.  Okay, uh-huh.
19     Q.  And so I want you to use your definition of
20 bodybuilding supplement products that we've been talking
21 about and help me understand whether Mr. Bilzerian
22 promoting Starbucks coffee would have been a competing
23 bodybuilding supplement product using your definition.
24     A.  If he's advertising Starbucks, I don't think
25 Starbucks meets this definition as a provider or seller

Page 55

1  or manufacturer or distributor of bodybuilding
2  supplement products.  Certainly, Starbucks coffee has a
3  lot of caffeine, and certainly is a supplement of some
4  sort.  But I'm not sure if Starbucks meets the other
5  definition of this contract.
6      Q.  And what is -- why would you except out
7  Starbucks coffee as a product as not being within the
8  definition?
9      A.  I just gave you that.
10     MR. STEARNS:  Objection.
11     THE WITNESS:  It's defined as a provider,
12     seller, manufacturer, or distributor of
13     bodybuilding supplement products.  Is that
14     Starbucks?  Do they have supplements?  If they do,
15     then it's a problem.
16 BY MR. McCOY:
17     Q.  You can't --
18     A.  But I don't know if Starbucks has bodybuilding
19 products.
20     Q.  Well, assume that Starbucks sells an energy
21 shot.
22     A.  Let's -- do they?  I mean, I'm not assuming
23 anything here.  Do they?  I mean, if they do or if they
24 sell bodybuilding supplements, then they are -- he is
25 entrenching.

Page 56

1      But you're the attorney.  Read the sentence.
2  It's pretty -- pretty self explanatory.
3      Q.  So I will represent to you that Starbucks
4  sells Starbucks energy drinks.  I'm going to go to
5  Walmart.com, okay?
6      A.  Okay.  Okay.
7      Q.  And let's do this so you can keep me honest,
8  and we've got the video running.  I'm going to share my
9  screen with you, Dr. Heuer.
10     A.  Okay.
11     Q.  All right.  Can you see my screen?
12     A.  There we go.  Okay, yep.
13     Q.  Okay.  This one right here with my cursor over
14 it is a Starbucks Tripleshot Energy.  Do you see that?
15     A.  Right.
16     Q.  Is that a bodybuilding supplement under your
17 definition?
18     A.  It is a bodybuilding supplement product, yes.
19     Q.  And why is that?
20     A.  It's an energy shot.  It's meant purposely to
21 give a lot of caffeine.  My guess is it's used to get
22 you going in the morning, to help you with your exercise
23 routine.  You know, it says "energy" on it.  It's
24 basically a supplement.
25     Q.  What about a Red Bull energy drink, are you

14  (Pages 53 to 56)

Page 57

1  familiar with those?
2      A.  Somewhat, yes.
3      Q.  Is a Red Bull energy drink -- you know, the
4  slogan "Red Bull gives you wings"?
5      A.  Uh-huh.
6      Q.  Is that a bodybuilding supplement product in
7  your opinion?
8      A.  Yes.
9      Q.  And why is Red Bull energy drink a
10  bodybuilding supplement to you?
11      A.  You just explained it.  It gives you wings.
12  It's to give you energy.  It's to give you that
13  mental -- I mean, I don't analyze what Red Bull is
14  meaning by that, but they're advertising it to do
15  something to a body.
16      Q.  And you would hold the opinion that a Red Bull
17  energy drink is a bodybuilding supplement even if it has
18  zero calories?
19      A.  Yes.
20      Q.  And even if at zero calories, it would not
21  promote muscle growth?
22      MR. STEARNS:  Object to the form.
23      THE WITNESS:  Muscle growth is not the issue.
24  We don't know that it won't promote muscle growth.
25  Maybe by giving energy and letting you run longer

Page 58

1      with the perception of energy and muscle use,
2      you're going to increase your muscles.  You don't
3      know that.
4  BY MR. McCOY:
5      Q.  Does the label that's on a particular product
6  matter to your opinion of whether or not it is a
7  bodybuilding supplement product?
8      A.  The label to some degree can have some
9  influence, but it's not the sole factor.
10      Q.  What influence does the label on a product
11  have on your opinion of what is a bodybuilding
12  supplement?
13      A.  Well, if the label is saying that it does
14  something, increases energy, focus, mental acuity, you
15  know, protein and creatine can have muscle things on it,
16  strength and endurance.  Those certainly help take these
17  as bodybuilding products.
18      Q.  Well, out of those factors, is there anything
19  that weighs more or less in terms of your opinion of
20  what is a bodybuilding supplement, meaning stuff -- the
21  items that are on the label?
22      A.  You know, each label is different.  Each
23  company is trying to advertise or promote something
24  else.
25      What you can say on the label is different

Page 59

1  from a drink and a beverage than what you can say on a
2  label if you list it as a supplement.  It's more what's
3  in the beverage or the food or the supplement that
4  determines where you place it.
5      Q.  Is Ignite ZRO a drink beverage or a
6  supplement?
7      A.  I believe he's selling it as a beverage.
8      Q.  And that is based upon the label?
9      A.  That's based upon the fact that I believe it
10  has the nutrition facts on it.
11      Q.  And you agree that the Ignite ZRO drink has
12  zero calories?
13      A.  I have not tested it.  I believe they
14  advertise it as zero calories.
15      Q.  Do you have any reason to dispute that it is a
16  zero-calorie drink?
17      A.  Not unless you want me to prove it.
18      Q.  And so you agree that at zero calories, Ignite
19  ZRO would not be a product designed to build muscle
20  mass?
21      MR. STEARNS:  Objection.
22      THE WITNESS:  It's clearly a bodybuilding
23  supplement.
24  BY MR. McCOY:
25      Q.  I have a different question.  My question is

Page 60

1  do you agree that at zero calories, Ignite ZRO is not a
2  product designed to build muscle mass?
3      MR. STEARNS:  Objection.
4      THE WITNESS:  I have no idea why they -- or
5      how they designed it.  It might well build muscle
6      mass.  As I said, it has some ingredients that
7      could stimulate focus and acuity.  And once again,
8      maybe, if you drink it and you're exercising, you
9      could go a little longer; it might build a few
10      fibers.  It's a possibility.
11  BY MR. McCOY:
12      Q.  Go longer in terms of energy because of the
13  caffeine?
14      A.  Because of the caffeine, because of mental
15  focus, maybe from the Alpha-GPC.  So as soon as you put
16  those ingredients in, you're supplementing.
17      Q.  But if you drink Ignite ZRO and you just were
18  going to sit and play video games, would that change
19  your opinion on whether Ignite ZRO is a bodybuilding
20  supplement?
21      A.  No.
22      Q.  So your opinion would not change depending on
23  how someone uses the product?
24      A.  No.  You still have mental acuity.  You play
25  the game.  You probably would build a brain cell.

15 (Pages 57 to 60)

Page 61

1    Maybe.  But it's a possibility.
2        Q.   Does the gamer that I just described, would
3    that person be a bodybuilder in your opinion?
4        A.   Possibly, in their own way, yes.  Possibly.
5        Q.   Are there any particular ingredients that are
6    in Ignite ZRO that influence your opinion that it is a
7    bodybuilding supplement?
8        A.   Number one, the fact that it has ingredients
9    makes it a supplement.  The fact that it has caffeine,
10   and I understand a fairly high level, makes it a
11   supplement, possibly more so.  Alpha-GPC makes it a
12   supplement.  I'm trying -- from memory, I don't know
13   what else, there's taurine or whatever.  If it has
14   ingredients, it's a supplement.
15       Q.   And I guess maybe where we're missing each
16   other here, what -- are there any ingredients?  I get
17   that you would say it's a supplement.  I want to focus
18   on the bodybuilding piece of bodybuilding supplement.
19   Are there any ingredients in Ignite ZRO that you point
20   to to make it a bodybuilding supplement as opposed to
21   just a -- just a supplement, just a general supplement?
22       A.   There is no such thing as a general
23   supplement.  If it has ingredients, it's bodybuilding
24   supplements.  You give the example of a gamer.  That
25   gamer -- this has caffeine, it has Alpha-GPC, it has

Page 62

1    whatever else.  If the caffeine gives you more
2    alertness, he goes longer, he goes all night, he plays
3    all night, may have memory, cognitive enhanced.  These
4    guys get really good dexterity.  They're building
5    muscles in their hands.  Body building.
6        Q.   So what about vitamins?  Obviously, vitamins
7    are a form of supplement?
8        A.   Exactly.
9        Q.   And are vitamins also a bodybuilding
10   supplement in your opinion?
11       A.   Yes, for sure.
12       Q.   And why would vitamins qualify as a body
13   building supplement as opposed to just a supplement in
14   your view?
15       A.   I'm not sure that you have a difference there.
16   A supplement is a supplement.  If it has ingredients,
17   especially vitamins, your body uses them.
18            If they're excess, your body might dump it.
19   But I take a multivitamin every day.  My body uses, I
20   know, parts of that.  And, you know, it's a bodybuilding
21   supplement in some form.  But any -- anything with
22   ingredients is a supplement.
23       Q.   And anything with ingredients is a
24   bodybuilding supplement, are you -- you're using the
25   two --

Page 63

1        A.   Body --
2        Q.   -- terms synonymously?
3        A.   Body building, yes.  Possibly, yes.
4            MR. STEARNS:  Sorry, I was on mute, Kevin.  I
5    object to the form, I'm sorry.  I'll keep my thing
6    unmuted.
7    BY MR. McCOY:
8        Q.   Does the marketing for Ignite ZRO influence
9    your opinions on whether it is a bodybuilding supplement
10   at all?
11       A.   The marketing?  No.  It's the ingredients.
12       Q.   I see.
13            So whatever is in the can is what you're going
14   by as opposed to how something could be marketed
15   irrespective of the ingredients itself?
16       A.   Well, as I recall, they certainly say things
17   like "performance" on it, which makes you think of that.
18   You know, as soon as you start putting adjectives or
19   descriptions or -- on a regular supplement, you know,
20   structured function claims, that certainly leads you
21   into that territory where people think of it as a
22   supplement.
23       Q.   And I'm not asking just from the general
24   population standpoint.  I'm asking just from your
25   professional opinion.  You are going by a review of the

Page 64

1    ingredients that are in a product in order to determine
2    whether it satisfies the definition you've provided of a
3    bodybuilding supplement?
4        A.   Based on the ingredients, yes.
5        Q.   You mentioned in paragraph 31 of your report
6    that you understand Ignite ZRO was intended to launch as
7    a pre-workout at the Arnold Sports Festival in Ohio.
8            Are you with me at that portion of your
9    report?
10           MR. STEARNS:  I'm sorry, Kevin, what number?
11           MR. McCOY:  Paragraph 31.
12           THE WITNESS:  Okay.  I have it here.  Yes, go
13   ahead.
14   BY MR. McCOY:
15       Q.   Do you know if Ignite ZRO did, in fact, launch
16   at the Arnold Sports Festival in Ohio?
17       A.   I don't know.  I don't believe it did.
18       Q.   Does that change your opinions concerning
19   Ignite ZRO in any way?
20       A.   No.
21       Q.   And that's because your opinions are focused
22   on the ingredients that are in the can?
23           MR. STEARNS:  Objection.
24           THE WITNESS:  The ingredients in the can and
25   the -- you know, I guess if you're going to launch

16 (Pages 61 to 64)

Page 65

1    at Arnold, my perception is that you're looking at
2    bodybuilding.
3    BY MR. McCOY:
4        Q.  Well, are there other sports that are
5    showcased at Arnold besides the sport of bodybuilding?
6        MR. STEARNS:  Object to the form.
7        THE WITNESS:  I mentioned before.  There are
8    lots of them.  There is probably 20 or more these
9    days.  Everything from archery to mixed martial
10   arts to table tennis to badminton to women's dance,
11   to free-form dance, to I think rope climbing.  I
12   don't have Arnold's full list, but he adds things
13   every year.
14       He considers these to be all related.
15   BY MR. McCOY:
16       Q.  Are you saying Arnold Schwarzenegger considers
17   women's dance, rope climbing, mixed martial arts,
18   traditional dance, archery to all be encompassed within
19   bodybuilding?
20       A.  Within sports, within bodybuilding, yes.
21       Q.  I see.
22       A.  Your body building, tiny definition, is a
23   sport.  All these other things are sports for
24   bodybuilding.
25       Q.  Body building meaning two -- the two separate

Page 66

1    words that you're using?
2        A.  No, meaning I'm just emphasizing to build the
3    body.  It can be, as I mentioned before, any format.
4    Whether it's an IV -- anything we're doing to build
5    humans, to build the body fit, by definition.  And if
6    you're supplementing, it's a bodybuilding supplement.
7        I'm just trying to distinct -- make your
8    definition, which is a miniscule fraction of the overall
9    definition, a little separate.
10       Q.  Meaning when you talk about my definition,
11   we're talking about the traditional sport of
12   bodybuilding as a subset of just all sports, right?
13       MR. STEARNS:  Objection.
14       THE WITNESS:  That's what you seem to be
15   talking about, yes.
16   BY MR. McCOY:
17       Q.  And then your definition would be the more
18   expansive unit we're talking about using the term body,
19   space, building as a more general concept?
20       A.  Bodybuilding.  It doesn't have to have a
21   space.  But I'm talking about body -- human bodybuilding
22   generally, yes.
23       Q.  Well, then how do you differentiate when you
24   read the word "bodybuilding"?  Do you read it as one
25   word?  How do you know if somebody is talking about my

Page 67

1    definition or your definition?
2        A.  It depends on what follows, I guess.  You
3    know, but I consider them all one.  Your definition is
4    part of my definition.  It's not excluded.  So it's all
5    one.  And then what anybody says afterwards tells me
6    where it goes in the gamut of all of the bodybuilding.
7        Q.  I'm sorry, say that last part again.  What
8    happens afterwards what?
9        A.  When people follow up the word with the text
10   tells me where I go, you know, depending on the concept.
11   And where I go anywhere in the bodybuilding concept of
12   mine, whether it's your niche or whether it's my global
13   building the body.
14       Q.  Do you recognize the category of energy drinks
15   as being separate from bodybuilding supplements or is
16   that all one and the same to you?
17       A.  Basically, I consider them all one.
18       Q.  And that's despite the fact that the FDA would
19   consider drinks as a different category?
20       MR. STEARNS:  Objection.
21       THE WITNESS:  Well, that's not exactly true.
22   Yeah, drinks are a different category.  The FDA
23   looks at them differently.  They have different
24   regulations.  Supplements have their own
25   regulations in these.

Page 68

1    But drinks are still -- they're food, but
2    they're still a category of supplementation, and
3    the FDA still looks at that.  The FDA still looks
4    at the amount of caffeine.  In fact, they're
5    concerned on some of the drinks, and they look at
6    the other ingredients.
7        The other ingredients can be in there like
8    Alpha-GPC based on GRAS, generally recognized as
9    safe, to put an ingredient in there, whether it's
10   caffeine or Alpha-GPC.  For a beverage, you must
11   have a GRAS certificate, which means you studied
12   that ingredient, a particular ingredient, and done
13   some pathology, some toxicology, some reproductive
14   toxicology, and some dosing in humans, and you
15   determine a safe dose which might be, you know,
16   1/1,000th of an effect dose in amounts.  So you
17   come up with a safe dose.  Alpha-GPC is
18   196 milligrams.  ZRO has 250 milligrams.  So it's
19   not exactly GRAS, but FDA doesn't act on it at this
20   moment.
21       But so, you know, those ingredients, caffeine
22   is one of those.  Caffeine actually, in beverages,
23   was initially allotted very low levels.  Now,
24   because it's gotten GRAS status, companies are
25   bumping up the amounts.

888.909.2720        Anthem Reporting        813.272.2720
anthemreporting.com

Page 69

1    So there are different things that are
2    regulated differently. The FDA looks at them
3    differently. They have different rules. They have
4    the same issues. They're ingredients in a drink,
5    and it's a supplement.
6    BY MR. McCOY:
7    Q. What is the name of the regulatory scheme that
8    applies to beverages?
9    A. It's just, I think, Food and Beverage law.
10   It's food law, and GRAS. GRAS means the ingredients.
11   Generally recognized as safe, as I mentioned, is for
12   each individual ingredient required.
13   The issue today is that a drink such as ZRO or
14   any -- the FDA wants them to test the whole drink for
15   safety and do GRAS on the whole drink, which isn't done
16   these days. But anyway, it's a different regulation.
17   And there is DSHEA, Dietary Supplement Health
18   Education Act, which works on supplements. There are a
19   lot of different labels. They're regulated differently.
20   The supplement needs a preregistration of the claims,
21   structured -- claims you intend to make. And you know,
22   there's just a difference between the two regulated by
23   the same -- by the same FDA.
24   Q. So if I understand it, energy drinks as
25   beverages must comply with the Nutrition Labeling and

Page 70

1    Education Act of 1990; is that right?
2    A. Okay, yes.
3    Q. And then the labeling requirements for
4    supplements, dietary supplements, have to comply with
5    the Dietary Supplement Health and Education Act of 1994?
6    A. That's correct.
7    Q. All right. And so those would be at least the
8    two regulatory frameworks that you would look at in
9    trying to evaluate a drink, like an energy drink, versus
10   a dietary supplement?
11   MR. STEARNS: Objection to form.
12   BY MR. McCOY:
13   Q. Is that correct?
14   A. Those would be the two basic regulations, yes.
15   Q. I want to talk about some of the other
16   products that are in your report. You have in
17   paragraph, here, 36, "Mr. Bilzerian has promoted,
18   publicized, and endorsed a product from Treigning Lab,
19   which is also a direct competitor to the Steel
20   Supplement line."
21   Do you see that paragraph, sir?
22   A. Yes.
23   Q. What is it about tryptophan that makes it a
24   bodybuilding supplement?
25   A. The fact that it's -- it's an ingredient, it's

Page 71

1    a dietary ingredient in their product. It can certainly
2    affect mental acuity, it can affect resting, it can
3    affect sleep. The fact that they have it in there makes
4    their product a supplement.
5    Q. And again, going back to bodybuilding
6    supplement, is there anything specific about tryptophan
7    that makes it a bodybuilding supplement in your opinion
8    as opposed to just a generalized supplement?
9    A. They're one and the same.
10   Q. Does tryptophan, as an ingredient by itself,
11   contain calories?
12   A. I doubt it.
13   Q. It's an amino acid, right?
14   A. It's an amino acid. It might, in volume, have
15   calories. I never looked at it in a huge volume. So I
16   would say most likely no calorie.
17   Q. And your opinion that tryptophan as a
18   supplement is a bodybuilding supplement does not depend
19   upon how someone may use the product, correct?
20   MR. STEARNS: Objection.
21   THE WITNESS: That's correct.
22   BY MR. McCOY:
23   Q. So if a parent gives a child a supplement of
24   tryptophan as a sleep aid, that would still qualify as a
25   bodybuilding supplement in your view?

Page 72

1    A. I think you're getting on the fringe, and
2    you're speculating a lot about kind of ridiculous
3    things. But if they give the child tryptophan to help
4    them sleep, it's a supplement.
5    Q. Is it a bodybuilding supplement?
6    A. If that child sleeps -- children probably put
7    on muscle, may even put on a little weight, they burn
8    little calories at night, they're building their body.
9    Q. So if -- I just want to understand here. If
10   the parent gives a child a supplement with tryptophan to
11   sleep and the child goes to sleep, the muscle burning
12   that would happen during sleep would make this a
13   bodybuilding supplement -- make tryptophan a body
14   building supplement in my hypothetical?
15   MR. STEARNS: Objection.
16   THE WITNESS: In your hypothetical, that's
17   part of it. Tryptophan is working essentially, so
18   it's affecting nerve cells. I don't know if that
19   kid got one extra ganglion during the night, maybe
20   one extra muscle fiber.
21   Yeah, it's a bodybuilding. When you
22   supplement people, babies, children, adults, with a
23   supplement with ingredients, they're bodybuilding
24   supplements.
25   BY MR. McCOY:

18 (Pages 69 to 72)

Page 73

1    Q.  Thank you.
2    A.  You're welcome.
3    Q.  Okay.  I think we can move off of that one
4  with --
5    A.  Okay.
6    Q.  Thank you, sir.
7    A.  You're welcome.
8    Q.  Well, I do have one more about tryptophan.
9    A.  Okay.
10    Q.  Is there any direct metabolic -- metabolic
11  process that tryptophan triggers to build muscle as a
12  standalone ingredient?
13    A.  Maybe a nerve synapse, affecting nerve synapse
14  could have an effect in the nerve transmission and
15  muscle.
16    Q.  So your opinion is that tryptophan, standing
17  alone, could impact nerve synapses that could trigger
18  muscle growth?
19    A.  That's just one feasible thing.  It could be
20  that, essentially, if you're sleeping, you know, your
21  body is moving, you might, as a side effect, be building
22  muscle.  But it's very subjective.  Very subjective.
23    Q.  But you have in paragraph 36, "Like most amino
24  acids, it" -- and I think you're meaning tryptophan, "is
25  utilized in muscle synthesis and is also utilized in the

Page 74

1  brain for neurological activities."  So I'm trying to
2  just understand, what is the basis?  Do you have any
3  kind of peer reviewed literature or articles or
4  scientific studies that would show tryptophan in the
5  body is utilized in muscle synthesis?
6    A.  I think that's a moot point, the fact that
7  tryptophan is a supplement.  It's amino acid.  That sums
8  it up.  I don't think you have to prove muscle synthesis
9  with every little vitamin molecule.  The fact that the
10  body takes it up and utilizes it makes it a supplement.
11    Q.  I understand, and I appreciate that.
12      I would just like to know on the muscle piece
13  of this, if you have any scientific literature, peer
14  reviewed studies, or other authority for the idea that
15  tryptophan is utilized in muscle synthesis as stated in
16  paragraph 36.
17    A.  I haven't looked lately.  Tryptophan is very
18  close to arginine.  Structure-wise, arginine, we know
19  works in muscle synthesis.  It's a big promoter.  So
20  it's possible in the breakdown of tryptophan you may get
21  residual arginine molecules.  It's a feasible thing.
22  But I -- I haven't even bothered looking for that kind
23  of data.
24    Q.  Is it fair to say you did not look for any
25  data of that sort prior to expressing the opinion in

Page 75

1  paragraph 36 that we were just talking about?
2    A.  I reviewed lots of articles on tryptophan and
3  lots of articles on arginine and lots of articles on
4  amino acids.  And my expert opinion is stated in the
5  report.
6    Q.  Did any of the articles that you reviewed
7  support the opinion stated in the report that tryptophan
8  is utilized in muscle synthesis?
9    A.  I don't recall offhand.  I didn't underline
10  that part.
11      MR. STEARNS:  Let me know if you have time,
12  Kevin, to take a break.  I don't know how much
13  longer you have left, but I could use a break.
14      MR. McCOY:  Well, let's take a break.  How
15  much time do you need?
16      MR. STEARNS:  Ten minutes.
17      MR. McCOY:  All right.
18      VIDEOGRAPHER:  We're going off the record.
19  The time is 11:02 a.m.
20      (A recess was taken.)
21      VIDEOGRAPHER:  We're back on the record.  The
22  time is 11:13 a.m.
23  BY MR. McCOY:
24    Q.  Dr. Heuer, what is your understanding of how
25  Mr. Bilzerian is alleged to have promoted products from

Page 76

1  the Treigning Lab?
2    A.  Specifically, what do you mean?
3    Q.  You have in here in paragraph 36,
4  "Mr. Bilzerian also promoted, publicized, and endorsed a
5  product from Treigning Lab."
6      What is the source of your information about
7  whatever Mr. Bilzerian did or didn't do to promote a
8  product from the Treigning Lab?
9    A.  I believe I saw some pictures.  And I'm not
10  sure if it was a YouTube video where a product was
11  mentioned or shown.
12    Q.  Where the tryptophan product was shown?
13    A.  I believe so, yes.
14    Q.  And do you know why Mr. Bilzerian posted the
15  video that you saw?
16      MR. STEARNS:  Objection.
17      THE WITNESS:  No, I don't know why.  I assume
18  that's what he does since that's how he promotes
19  things.
20  BY MR. McCOY:
21    Q.  Do you know if Mr. Huh was involved in
22  Mr. Bilzerian posting the video involving L-tryptophan?
23    A.  I do not.
24    Q.  Do you know if Mr. Huh approved the video that
25  Mr. Bilzerian posted showing L-tryptophan?

Page 77

1    A.  I do not.
2    Q.  Does that matter to any of your opinions
3  whether or not Mr. Huh approved that particular post?
4    A.  I'm just looking at the fact that there was a
5  post.  And according to what I read in the contract,
6  there wasn't supposed to be any posting of other
7  supplement company products.
8    Q.  So then the answer would be "no," for purposes
9  of your opinions, whether or not Mr. Huh approved the
10  particular post that you saw showing L-tryptophan would
11  not matter?
12    A.  In my opinion, Mr. Huh has very little to do
13  with it.  The fact that something was shown was all I
14  have to deal with.  And based on the fact that this was
15  shown, I made my decision that it went against the
16  contract.
17    Q.  In paragraph 38, you say, "Another product
18  promoted by Mr. Bilzerian is a product line called,
19  quote/unquote, Full Send launched by the Nelk Boys,
20  which is a group with a large YouTube channel
21  following."
22        Do you see that paragraph, sir?
23    A.  Yes.
24    Q.  And what product line called, quote/unquote,
25  Full Send do you understand Mr. Bilzerian actually

Page 78

1  promoted?
2    A.  The product line, Full Send, lists the BCAA
3  and the creatine.  I've seen pictures of those products.
4  But based on that.
5    Q.  Have you seen any documents that would show
6  Mr. Bilzerian promoting creatine from Full Send?
7    A.  Creatine in particular, no.
8    Q.  Have you seen any document in which
9  Mr. Bilzerian promoted BCAA from Full Send?
10    A.  That BCAA in particular, no.
11    Q.  And what product then is it your understanding
12  Mr. Bilzerian promoted that would be a problem under the
13  contract?
14        MR. STEARNS:  I'm going to object, Kevin.
15        THE WITNESS:  Full Send call themselves a
16  supplement company.  I did see, I believe it was, a
17  trunk of a car with a Full Send gym bag visible.
18  That's advertising.  It doesn't have to be a
19  product.  I don't think the contract says it has to
20  be a specific product.  I think it's a supplement
21  company.  And maybe it's subliminal, whatever you
22  want to call the advertising, but it's advertising
23  for Full Send.
24  BY MR. McCOY:
25    Q.  Do you know what company actually sends the

Page 79

1  red Full Send bag that you saw in the image in the back
2  of the truck?
3    A.  No, I don't.
4    Q.  Does that matter to your opinions that you are
5  expressing concerning Full Send as it relates to that
6  bag?
7    A.  No, not to mention themselves and the fact
8  that it says Full Send, and Full Send has said they have
9  supplements and are selling supplements makes it
10  advertising and --
11    Q.  And what -- have you reviewed any testimony or
12  other evidence in the case besides the picture of the
13  red bag in the back of the truck that is the factual
14  basis for the opinions you're giving on Full Send?
15    A.  I have not reviewed any other testimony in
16  this case.
17    Q.  So the sum and substance of the testimony --
18  or let me back up.
19        The total facts that you're using for your
20  opinions concerning Full Send relate solely to the
21  picture of the red bag that said "Full Send" in the back
22  of the truck in terms of the products that Mr. Bilzerian
23  would have promoted; is that right?
24        MR. STEARNS:  Objection, Kevin.
25        THE WITNESS:  It's Full Send advertising, yes.

Page 80

1  BY MR. McCOY:
2    Q.  What is it about creatine that -- well, let me
3  start over, sorry.
4        Do you consider creatine to be a bodybuilding
5  supplement?
6    A.  Creatine is a bodybuilding supplement, yes.
7    Q.  Why?
8    A.  Because of its actions in the body.  The body
9  needs it, the body utilizes it, the body converts it and
10  utilizes it for many things.
11    Q.  Is there anything unique about creatine that
12  makes it a bodybuilding supplement as opposed to a
13  supplement in your opinion?
14    A.  They're one and the same.
15    Q.  Is creatine primarily used for the purpose of
16  exercise?
17    A.  No, not necessarily.
18    Q.  And why do you say "not necessarily"?
19    A.  It has many uses.
20    Q.  Like what?
21    A.  It's used a lot in mental acuity, it's used a
22  lot in brain, and you know, memory.  It has uses in
23  aging, whether it's muscle or just senile synapses.
24  Creatine is very important for the body.
25    Q.  How is creatine important?  I think you said

Page 81

1  something about the brain, the brain function or
2  brain --
3      A.  No, yeah, creatine is used throughout your
4  body.  There are lots of studies that show mental
5  acuity, anti-aging effects.  Lots of effects.  It's a
6  supplement.
7      Q.  If someone takes creatine as a supplement,
8  let's say they take the powdered form, and then they do
9  not exercise, does creatine supplement, alone, add
10  muscle mass?
11      A.  Creatine supplement alone with normal daily
12  activity may add some muscle mass, yes.
13          As I say, it has other uses.  It's used for
14  mental acuity, memory, and cognition.  So it's a
15  supplement working in several ways.
16      Q.  Well, I'm asking just as an isolated
17  supplement.  If you take creatine as a supplement and
18  then say you lay in bed all day, you don't engage in
19  activity, does creatine in that circumstance in the body
20  build muscle mass?
21      A.  It may help reserve muscle mass.  I haven't
22  studied it myself.  But we use creatine in debilitated
23  patients at bedrest to help preserve their muscle
24  because they lose muscle very rapidly when they're not
25  using it.  So something is happening with the muscles.

Page 82

1      Q.  And then you mention here BCAA.  What is that?
2      A.  Amino acid, branch chain amino acids.
3      Q.  And do BCAAs, on their own, build muscle?
4      A.  They probably help in muscle replenishment.
5  They're probably -- usually your body's constantly
6  tearing muscle down, building muscle up.  You have
7  anabolic stages, you have catabolic stages of daily
8  activity, and even stress can cause you to go into
9  catabolism where you're breaking down some tissues,
10  muscle tissues.  Having BCAAs and creatine and protein
11  helps restore those muscles.
12      Q.  Is creatine a substance that, standing alone,
13  has calories?
14      A.  I don't believe creatine has calories.
15      Q.  Do BCAAs, standing alone, have calories?
16      A.  I don't believe, alone, they have calories.
17      Q.  So both creatine and BCAAs would not typically
18  be considered a product that would provide muscle mass?
19      MR. STEARNS:  Objection.
20      THE WITNESS:  I don't know how you come to
21  that conclusion.  Can you run through the thinking
22  on that?
23  BY MR. McCOY:
24      Q.  Sure.  I thought we talked earlier about
25  muscle mass is associated with calories, correct?

Page 83

1      A.  No.
2      MR. STEARNS:  Objection.
3  BY MR. McCOY:
4      Q.  Do you disagree --
5      A.  We didn't talk about that.  Wait, I didn't
6  agree that calories were important.
7      Q.  You did not agree that calories are important
8  to building muscle mass?
9      A.  Calories is good, exercise is better.  Yeah,
10  no, I didn't agree to that.
11      Q.  All right.  So separate -- I don't want to
12  talk about exercise right now.  I want to talk about
13  things that you ingest, okay?  So separate activity for
14  the moment.
15          To build muscle mass, assume there's going to
16  be some activity, all right, somebody is going to move
17  at some point, what does the body need to build muscle
18  mass?
19      MR. STEARNS:  Kevin, I thought you told him to
20  not think about activity.  Are we -- I don't
21  understand your question, Kevin.
22      MR. McCOY:  All right.  I'll clarify.
23      MR. STEARNS:  Two instructions.  Which one do
24  you want him to follow?
25      MR. McCOY:  Fair enough.  Fair enough.

Page 84

1  BY MR. McCOY:
2      Q.  So I want you to assume that somebody is going
3  to -- let's take your word, "normal daily activity,"
4  okay?  I don't know what that is, but whatever that is.
5  Normal daily activity, you get up, there's no crazy
6  exercise.  You're going to get up, you're going to go to
7  work, you're going to come home, whatever you do in a
8  normal day, okay?
9      MR. STEARNS:  Objection.
10      THE WITNESS:  Okay.
11  BY MR. McCOY:
12      Q.  What does the body need in a normal daily
13  activity to build muscle mass?
14      MR. STEARNS:  Objection.
15      THE WITNESS:  It's kind of an odd question.
16  The body is, as I mentioned, you're anabolic where
17  you're building muscle, you're catabolic where
18  you're breaking it down.  You and I and Jason,
19  throughout the day, go through all of those phases,
20  even if we don't do much.  If I just get up and go
21  to the office, I'm using some muscles, which is
22  doing the catabolic.
23          So, you know, to have something that builds
24  the muscle.  You know, typically, we ingest food or
25  something in the diet or a dietary supplement.  In

Page 85

1    my case, I take a multivitamin in the morning
2    because I know my vitamins are coming and going all
3    day long. I drink drinks so I stay hydrated. And
4    all of that is involved in building muscle.
5        If you look at just getting to the car and
6    coming into the office was catabolic for a while,
7    so I broke down some muscles. Sitting here, I hope
8    I'm a little anabolic, building some of those
9    muscles back. It's a dynamic thing.
10       So all day long, you need lots of different
11   things.
12   BY MR. McCOY:
13       Q. In the absence of calories, does the body
14   build muscle?
15       A. Yes.
16       Q. Would you say that muscle gain -- would you
17   say that calories are unimportant to muscle gain?
18       A. No.
19       Q. Okay. What role do calories --
20       (Court reporter clarification.)
21   BY MR. McCOY:
22       Q. Yes. What role do calories play in muscle
23   gain?
24       A. Well, you know, calories and carbohydrates
25   help give energy. But in muscle gain, I don't think you

Page 86

1    have to have, you know, calories all the time. You're
2    talking like a second in time, and bodybuilding isn't
3    that way. It's a dynamic process.
4        Q. Well, let's talk about just for a minute the
5    sport of bodybuilding that I've been talking about, all
6    right?
7        A. The miniscule, the miniscule sport of
8    bodybuilding? Okay.
9        Q. The little miniscule sport that --
10       A. Yeah.
11       Q. -- has no bearing to anything --
12       A. That's right.
13       Q. -- that's right. In that little tiny sport,
14   is it important that bodybuilders have calories?
15       A. At times. They time it.
16       And you know, I've worked closely and trained
17   and worked on supplementation of some of the best
18   bodybuilders. There are times when they totally fast.
19   There are times when they go days without even drinking
20   water. It's all part of their process, and they cycle.
21   They cycle parts of the year. When they're off season,
22   they eat a lot, eat a lot of calories, store a lot.
23   When they're in season, they're working hard, working
24   hard. And then before a competition, they'll probably
25   go several days, up to five or so, without any water and

Page 87

1    fast for probably the last three days. No calories.
2    That's a bodybuilder.
3        Q. Have you worked with Jay Cutler in the past?
4        A. Yes.
5        Q. And Jay Cutler would be an example of a
6    bodybuilder, somebody who engages in the sport?
7        A. In the sport, yes.
8        Q. And in order to gain the size that Jay Cutler
9    has, did he have to increase his daily caloric intake?
10       A. One of the things, yes.
11       Q. And did he have to increase the amount of
12   protein that he would have over a normal diet?
13       A. In season, yes, he's very high in protein.
14       Q. And did caffeine contribute to Mr. Cutler's
15   muscle growth during his regimen?
16       A. Very likely.
17       Q. In what way?
18       A. Perception, exercise perception, perceived to
19   stimulating him. He goes to the gym a lot, to keep
20   awake and alert. He needs a lot of caffeine to keep --
21       Q. But did --
22       A. -- to keep going.
23       Q. I'm sorry.
24       MR. STEARNS: He was in the middle of
25   answering a question.

Page 88

1    BY MR. McCOY:
2        Q. Yeah, I apologize. Go ahead. Please finish.
3        A. Yeah, so he uses a lot of caffeine to keep
4    going, to keep his energy up, to keep his mental focus
5    up, and you know, just to help him with his strength.
6    So once again, the perceived exercise is that he is
7    really working hard, caffeine really helps that.
8        Q. But did caffeine contribute to his muscle
9    mass?
10       A. Very possibly in the outside way that I
11   described it: By increased perception, increased maybe
12   stamina, increased grip at any one time. It's possible.
13       Q. You go on in paragraph 39 to address -- well,
14   let me back up to 38.
15       Am I correct that your opinions concerning
16   paragraph -- Full Send and the BCAA and creatine in a
17   product called Pre, you hold those opinions irrespective
18   of what amounts of any kind of ingredients are involved
19   in those three products? Like it doesn't matter what
20   the level of ingredients are, your opinion is, just
21   overall, that those are competing products with Steel's
22   products?
23       A. Well, they are -- they're definitely qualified
24   as supplements if they have the ingredients. The amount
25   of ingredients may indicate the amount of activity for

Page 89

1    those products, but the fact that they sell the products
2    and advertise them, basically it fits into my opinion.
3         Q.   Let's go on to paragraph 39.  And you have an
4    opinion here, "Whether Ignite ZRO could be used in
5    conjunction with, or in other words, stacked with Steel
6    products," and then you go on to talk about the amount
7    of caffeine.
8         What was the issue in terms of using Ignite
9    ZRO with Steel's Pre product, for example?
10        A.   It's the caffeine.  As I mentioned there,
11   Steel, from what I read, basically says do not -- you
12   know, do not use other products with this.  We know,
13   from formulas, that Steel has very potent formulas.  And
14   you can see, the caffeine in ZRO, which is 250, you look
15   at the Pre for -- for Steel, 250.  You're getting up
16   there in caffeine.
17        Basically, you know, in looking at all of
18   these things, a safe limit would be 400 milligrams
19   total, and that's high.  Certainly, I don't think the
20   FDA likes you up there.
21        There is kind of an overall FDA stop limit of
22   600 milligrams.  But I don't think you want to be up
23   there.
24        So just looking -- or if someone is looking to
25   take a ZRO and then take another product, especially one

Page 90

1    of Steel's, they're going to get very high levels of
2    caffeine and I think approach unsafe levels.
3         Q.   What -- when you say "unsafe levels," is there
4    some physical outcome that would happen if someone took
5    ZRO and, say, Steel Pre together for a combined -- well,
6    you say 600 milligrams of product here.  ZRO is Steel's
7    product.  Pre, one would ingest a total of
8    600 milligrams of caffeine.  What is -- what would
9    happen to an individual if they consumed 600 milligrams
10   of caffeine?
11        A.   Well, you know, we all know caffeine is a
12   stimulant.  And caffeine stimulates lot of things, your
13   brain maybe, your muscle activity.  But it also
14   increases blood pressure.  It can seriously increase
15   blood pressure and cause a very serious side effect.
16        There have been side effects recorded.  We can
17   go back to look at Monster.  There were deaths reported
18   on Monster.  And then Monster reformulated and lowered
19   their caffeine and changed it to a beverage, to a drink.
20   But as you go up in any of these ingredients, you kind
21   of go beyond a possible safe level.
22        Q.   Are you aware of what levels of caffeine were
23   involved in the Monster situation that you just
24   described?
25        A.   I haven't reviewed that in a long time.  I was

Page 91

1    familiar in the past.  I haven't looked now.
2         Q.   Are you aware of any studies that would
3    indicate any adverse human interactions at -- with
4    levels of caffeine at 600 milligrams as you've described
5    in your report?
6         A.   There's a very complete -- and I didn't
7    include it in here because caffeine didn't seem to be
8    the main issue.  There is a very thorough report by the
9    military on caffeine and caffeine levels.  I believe
10   they studied up to 1250 milligrams, and they did -- they
11   studied soldiers; they studied soldiers, keeping them
12   awake multiple nights, multiple levels of caffeine.  And
13   based on that, the military limits the caffeine in what
14   you can sell at their PX bases.
15        So there is literature.  There is more than
16   that out there.  But there is a very thorough military
17   report.
18        Q.   And was that report focused on the impact of
19   caffeine in terms of energy versus stamina?
20        A.   That report, I think, was solely based on
21   safety.  And they did look at trying -- because they
22   were trying to see if soldiers could stay awake longer
23   in the battlefield and so on.  They did look at that.
24   But I don't believe it was energy versus stamina.
25        Q.   Well, did the report that you're referencing

Page 92

1    relating to the military and caffeine, did that have any
2    reports of adverse health consequences, meaning somebody
3    had a heart attack or had a reaction, a severe reaction,
4    to high doses of caffeine?
5         A.   Yes.
6         Q.   And what was the outcome that was reported in
7    the study?  What happened --
8         A.   I don't have that report here, but I can
9    furnish it to you if you'd like to read it.
10        Q.   I don't -- were you done, Doctor?
11        A.   Yes.  Go ahead.
12        Q.   Okay.  Are you familiar with the drink,
13   Coca-Cola?
14        A.   Yes.
15        Q.   Is that a bodybuilding supplement?
16        A.   It can be.
17        Q.   In what way?  Why?
18        A.   Coca-Cola has caffeine.  A lot of it does.
19   They have caffeine-free.  Coca-Cola is hydrating.  So it
20   can be, depending on use of.
21        Q.   I'm sorry, did you say depending on use?
22        A.   Depending on use, yeah.
23        Q.   All right.  If I drink a Coca-Cola before I
24   take that 1-mile run, is it now a bodybuilding
25   supplement?

23 (Pages 89 to 92)

Page 93

1    A.  Yes.  If it had -- if it has caffeine and
2  hydrated, yes.
3    Q.  What about -- what about Budweiser, are you
4  familiar with Budweiser?
5    A.  I know of it, yes.
6    Q.  American lager beer?
7    A.  I've heard of it.
8    Q.  Okay.  You don't disagree that it's a -- it's
9  a beer, right?
10   A.  I would guess.  That was in the name, yes.
11   Q.  Well, if I drink a 12-ounce Budweiser before I
12 go on my 1-mile run, is that Budweiser a bodybuilding
13 supplement?
14   A.  Well, you know, that's really esoteric again.
15 You're drinking -- and I don't know the alcohol content
16 because I don't drink beer, but I'm assuming it's got
17 alcohol.  So it's also got some fluid in it.  So for one
18 thing, it's hydrating.  But if it has alcohol, it's also
19 dehydrating.
20      So I don't know why you would drink it before
21 a run, but you know, it depends whether you got more
22 hydrating effect or more dehydrating effect.
23   Q.  Well, is it, under your definition, a
24 bodybuilding supplement?
25   A.  The hydrating part is.  The dehydrating part

Page 94

1  may not be.
2    Q.  So within one beverage, it can be both a
3  bodybuilding supplement and not a bodybuilding
4  supplement?
5    A.  Well, if you put an ingredient like alcohol in
6  there that is possibly detrimental to the body, you may
7  be negating a positive bodybuilding effect.  I don't
8  know, I'm not a beer expert.  But you know, if you had
9  more data on it, I'd love to see it.
10   Q.  Well, I'm trying to -- I'm trying to
11 understand the methodology of how you apply the
12 definition we've been talking about here.  And I hadn't
13 appreciated that within one can of one beverage, it can
14 be both bodybuilding and not bodybuilding.  So I'm
15 trying to understand what factors you would use in the
16 Budweiser beer scenario to determine whether or not,
17 when I drink the beer before my run, I was consuming a
18 bodybuilding supplement or not.
19   A.  Was your intent to have a bodybuilding
20 supplement?  That's not a good choice, and probably
21 would want a different choice.
22      But as I said, supplements have ingredients
23 you should take in.  Water can be a supplement, the
24 tryptophan can be a supplement.  When you take something
25 like a beer and you get water, I'll grant you that, but

Page 95

1  you have a negative substance in there, alcohol, which
2  we know decreases perception, probably decreases
3  muscles, synapse function.  And it has, I think, a
4  negating effect.  I think you negated the positive
5  supplement effect of the beer by drinking the beer with
6  alcohol.
7       Now, if you do an alcohol-free beer, it's
8  probably a supplement.
9    Q.  All right.  Yet, we'll set aside alcohol-free
10 and O'Douls for a second.  I want to come back to
11 Budweiser.  Is the Budweiser, in your final analysis, a
12 bodybuilding supplement under your definition?
13   A.  The hydration part is.  I think the alcohol
14 part is negating bodybuilding.
15   Q.  And have you ever published in any kind of
16 peer review article or anywhere outside of what you just
17 expressed to me the idea that certain drinks could be
18 both bodybuilding supplements and have -- and at the
19 same time not be a bodybuilding supplement?
20      MR. STEARNS:  Kevin, that's not what he said.
21      MR. McCOY:  I'm asking if he's ever expressed
22 that.
23      MR. STEARNS:  Right, but you just misstated
24 what he's told you.
25      MR. McCOY:  That's fine.  You object to form,

Page 96

1  and then you can argue that later.
2       MR. STEARNS:  Well, why don't you ask, you
3  know, fair questions and stop trying to mix stuff
4  up.
5       MR. McCOY:  Okay, Jason.  Thanks.
6  BY MR. McCOY:
7    Q.  Go ahead, Dr. Heuer.
8    A.  Okay.  What was the question again?
9    Q.  Yeah.  Outside of this engagement, have you
10 ever expressed in any kind of reviewed literature that
11 has been peer reviewed or subject to criticism the idea
12 that a beverage, like a Budweiser, could have both
13 bodybuilding and non-bodybuilding components?
14      MR. STEARNS:  Same objection.
15      THE WITNESS:  I personally am of the opinion
16 that that's not a very good combination.  And I
17 personally have not and would not publish anything
18 like that.
19 BY MR. McCOY:
20   Q.  Is there some kind of standard or list of
21 ingredients that you would point to that would take a
22 beverage out of being a bodybuilding supplement?
23      MR. STEARNS:  Objection.
24      THE WITNESS:  I don't know what you're
25 referring to.  My whole intention is when you're

Page 97

```
1    putting ingredients in there, you're changing and
2    you're supplementing.  So, you know, when you're
3    supplementing, you're supplementing the body.
4    BY MR. McCOY:
5        Q.  I understand that, but we just -- we were
6    going through -- we've gone through a series of drinks
7    here today, starting with water.  We just ended with
8    Budweiser.  You've been with me through that journey and
9    discussion of drinks, right?
10       A.  I guess, yes.
11       Q.  And we just got to one where you indicated
12   that one component of it, alcohol, would maybe give you
13   pause on calling a Budweiser a bodybuilding supplement.
14   Is that fair?
15       A.  No, the alcohol itself doesn't because
16   certainly the hydration makes it a bodybuilding.  I'm
17   just saying the alcohol may negate the positive effects
18   of hydration.
19       Q.  Well, what is the final position using your
20   definition of whether the drink itself is a bodybuilding
21   supplement, meaning the Budweiser?
22       A.  That's really such a weird question.  It's
23   hydrating, so yes, it's a supplement.  It's also got
24   negative things in it.  I mean, if you put benzyne in,
25   those would be negative things.  So it's got a positive
```

Page 98

```
1    effect as a supplement, it's got a negative effect as
2    alcohol.  It's still a supplement.
3        Q.  Well, I thought we've been talking throughout
4    this definition that bodybuilding supplement and
5    supplement were one and the same.  Were we not?
6        A.  They are, yes.
7            MR. STEARNS:  Objection.
8    BY MR. McCOY:
9        Q.  Okay.  So if it's a supplement, then it's
10   also, under your definition, a bodybuilding supplement,
11   meaning the Budweiser, correct?
12       A.  A portion of it could be bodybuilding.  I'm
13   speculating because we have not studied what you're --
14   what you're proposing.
15       Q.  And is that because you have never tested the
16   definition of bodybuilding supplement that you've
17   expressed in the report that we've been talking about
18   here today?
19           MR. STEARNS:  Objection.
20           THE WITNESS:  I don't know how you got to
21   that.  Have you been listening?  Because
22   bodybuilding supplement, bodybuilding supplement,
23   anything you're putting in -- we talked about
24   hydration, we talked about amino acid, we talked
25   about ingredients, those are bodybuilding
```

Page 99

```
1    supplements.
2    BY MR. McCOY:
3        Q.  Yeah, I understand that.  I'm asking now
4    about -- I gave you the example of the Budweiser for a
5    reason.  Is there a list, like alcohol, that you would
6    then put on kind of a bad list of ingredients for drinks
7    that would take it out of being a bodybuilding
8    supplement under your definition because perhaps it has
9    negative impacts on the body?
10           MR. STEARNS:  Objection.
11           THE WITNESS:  It's such a moot point.  The
12   fact that you get some hydration, okay.  Alcohol
13   drinks, like Budweiser beer, is probably lower
14   alcohol.  It's a supplement.
15   BY MR. McCOY:
16       Q.  Okay.  You say in paragraph 41 -- I'll give
17   you a moment to flip over there.
18       A.  All right.
19       Q.  "Thus, use of ZRO as a pre-workout (as it was
20   intended and marketed to be used) will prevent a
21   consumer from using safely Steel pre-workout
22   supplements."
23           Do you see that sentence?
24       A.  Okay.
25       Q.  What is the basis for your expression in the
```

Page 100

```
1    first part that "ZRO as a pre-workout (as it was
2    intended and marketed to be used)"?
3        A.  The advertising that was done prior to and
4    around the Arnold, which placed ZRO into kind of a
5    performance category.  And the thought that people used
6    drinks like ZRO, which has a lot of caffeine and other
7    mental acuity things, they use them as pre-workouts or,
8    you know, to get them in the mood.
9            And the second part, Steel already warns don't
10   mix things because they have a lot of caffeine.  But the
11   fact that we looked at the amount of caffeine, if you
12   combine the two, and it comes out very high, goes into
13   that conclusion.
14       Q.  Does your conclusion here that ZRO as a
15   pre-workout, as it was intended and marketed to be used,
16   will prevent a consumer from using safely Steel
17   pre-workout supplements assume that every pre-workout
18   from Steel would have to have caffeine in it?
19       A.  Well, repeat that.  What's your point there?
20       Q.  Well, you had done this analysis here.  We
21   were talking about in paragraph 39, and you ultimately
22   come to the conclusion on paragraph 41 that if somebody
23   drinks ZRO, they would prevent them from using a Steel
24   pre-workout.  And I'm asking, does that assume that
25   every pre-workout from Steel has caffeine?
```

Page 101

1      MR. STEARNS: Objection.
2      THE WITNESS: No, that doesn't assume that.
3   They could have other pre-workouts.
4   BY MR. McCOY:
5      Q.  Well, if there are Steel pre-workouts that
6   don't have caffeine, would that change your conclusion
7   regarding the use of ZRO in conjunction with a Steel
8   product?
9      A.  I believe Steel has the warning on their
10  products to not stack based on that.  That would be my
11  assumption.
12     Q.  I'm not sure I understood what your assumption
13  is.  Is your assumption that because of the labels on
14  Steel products, all of them contain caffeine?
15     A.  Steel products with a warning.  And I don't
16  know if they all have warnings.  But if they have a
17  warning and they use ZRO or any other caffeine drink,
18  you're going against their warning.  And I think the
19  whole idea of the warning is safety.
20     MR. McCOY:  All right.  I'll tell you what, I
21  think we're almost done.  Let's take another little
22  five minutes here, and I'm going to gather up my
23  notes, and then we should be done in the next -- in
24  the next session.
25     THE WITNESS:  Okay, perfect.

Page 102

1      VIDEOGRAPHER:  We're going off the record.
2   The time is 11:53 a.m.
3      (A recess was taken.)
4      VIDEOGRAPHER:  Back on the record.  The time
5   is 12:08 p.m.
6   BY MR. McCOY:
7      Q.  All right.  Dr. Heuer, I just want to close
8   the loop on a few things.  In your view, could
9   Mr. Bilzerian have promoted Coca-Cola pursuant to the
10  agreement?
11     MR. STEARNS:  Objection.
12     THE WITNESS:  I mean, I'm not the lawyer on
13  this.  But if Coca-Cola, with caffeine, is a
14  supplement of sorts, no.
15  BY MR. McCOY:
16     Q.  What about vodka, just a straight vodka?
17     A.  There, again, I think you need a lawyer's
18  interpretation.  I don't personally think of vodka as a
19  supplement.
20     Q.  Why not?
21     A.  Well, what are you supplementing?  I guess
22  in -- if some attorney is interpreting that agreement,
23  it's possible it could be called a supplement.
24     Personally, I don't think of it as a
25  supplement.  I think of it as a deterrent, whatever you

Page 103

1   want to call it.
2      Q.  Well, I'm asking using your -- I just want to
3   know using your definition of a bodybuilding supplement
4   whether vodka would qualify.
5      A.  I just --
6      MR. STEARNS:  He just told you, Kevin.  He
7   just told you, like literally said those words,
8   sir.
9      THE WITNESS:  Yeah.
10     MR. McCOY:  I know a lot of words were spoken.
11  I didn't hear a clear answer.
12     MR. STEARNS:  He said, and I quote him, I
13  personally don't consider it a supplement, but
14  you're the lawyer.  That's what he said, Kevin.  I
15  don't know what you're trying to do, but come on,
16  man.
17     MR. McCOY:  Okay.  Thanks.  Thanks, Jason.
18     MR. STEARNS:  Yeah, no, it's getting
19  ridiculous.  But let's go.
20  BY MR. McCOY:
21     Q.  Okay.  All right.  What about cannabis as a
22  substance, Dr. Heuer, is that a supplement?
23     A.  As a substance?
24     Q.  Yes, sir.
25     A.  I think it's not a supplement personally.  I

Page 104

1   don't think it's federally legal, and that's part of my
2   decision.  But I don't think it's a supplement.
3      Q.  Is there a difference to any of the opinions
4   that you've expressed today -- well, let me start over.
5      What is a therapeutic dose of a substance?
6      MR. STEARNS:  Objection.
7      THE WITNESS:  Well, that's a broad question.
8   What do you mean, of benzyne?  Of -- you know of
9   what?  A supplement?
10  BY MR. McCOY:
11     Q.  Well, for example --
12     A.  An amino acid.
13     Q.  Sure, amino acid, let's go with that one.
14     A.  What's the therapeutic dose?  I think it's any
15  dose that you use.  If you, you know, put it in your
16  body from whichever way, it's a supplement.
17     Vitamins are in tiny, tiny, tiny doses.  Other
18  things, people like bigger doses, but anything you're
19  putting in your body, you know, is a supplement.
20     Q.  I see.  Okay.  So we don't need to worry about
21  distinctions like therapeutic dose.  Dose really doesn't
22  matter.  If it's something you're adding to your body,
23  then it would fall just within the general supplement
24  category?
25     MR. STEARNS:  Object to form.

26 (Pages 101 to 104)

Page 105

1    THE WITNESS:  Well, are you medically
2  treating, or how?  I mean, where did you come up
3  with therapeutic dose?
4    There are supplement infective doses.  In
5  medicines, we do therapeutic dose, which is a
6  different thing.  Effective therapeutic dose of an
7  antibiotic.
8    I don't think there is such a thing as a
9  therapeutic dose of creatine.  I know there is a
10  dose that is recommended, but I don't think there
11  is such a thing as therapeutic as such.
12  BY MR. McCOY:
13    Q.  Is there --
14    A.  Two different areas.  Two different areas.
15  You're mixing medicine and you're mixing nutraceuticals
16  and supplements, and getting them all confused.
17    Q.  I see.
18    So the issue of therapeutic dose would have no
19  application on the issues of nutraceuticals or
20  supplements; that would be more on the line of medical,
21  of medicine?
22    MR. STEARNS:  Objection, Kevin.
23    THE WITNESS:  That's more in the line of
24  medicine.  As I said, there is more in the line of
25  nutraceuticals and infective dose.  I don't know of

Page 106

1  any area of nutraceuticals where I've seen a
2  no-effect dose.
3    The fact that you put something in costs
4  money, you know, for these companies.  So they must
5  have a reason for putting something in there.
6    So my guess is they would likely put it in a
7  dose that they think is, quote, active, would be
8  more what I would call.
9  BY MR. McCOY:
10    Q.  I see.  Okay.
11    There we go.  What was the matter of Hi Tech
12  Pharmaceuticals v. Dynamic Sports Nutrition about that I
13  saw on your expert consulting work list?
14    A.  I don't recall anymore.  That was a long time
15  ago.
16    Q.  Do you recall giving a deposition in that
17  case?
18    A.  I most likely did, yes.
19    Q.  And you prepared a report in that case?
20    A.  Most likely, yes.
21    Q.  But sitting here today, you don't recall what
22  testimony or opinion you expressed in that particular
23  case?
24    A.  Well, I gave a lot of depositions, a lot of
25  court cases.  I don't memorize all of them.  I can pull

Page 107

1  it up for you.  I have the reports, I have the data.  I
2  can give you the list of depositions and so on, but I
3  don't try to remember that stuff.  I have enough to
4  remember.
5    Q.  All right.  Have you ever conducted any
6  commissioned research about vitamin B6?
7    A.  Have I conducted commissioned research
8  about --
9    Q.  Yes, sir.
10    A.  -- vitamin B6?  No.
11    Q.  Have you conducted any research about vitamin
12  B12?
13    A.  I have not conducted commissioned research
14  about vitamin B12.
15    Q.  Have you conducted any research of your own
16  about caffeine, or are the opinions that you've been
17  expressing today just based upon the materials that were
18  attached to your report that you cited or included, I
19  should say?
20    A.  Yeah, the opinions are based upon the
21  materials included, but also as mentioned in my report,
22  on the thousands of articles I read, about the multiple
23  areas where I talk, about the multiple societies that I
24  belong to, the people I talk to, reading articles all
25  year long.  So those all influenced my professional

Page 108

1  expert opinion.
2    Q.  Have you studied any of the products on
3  Steel's website to determine whether they would be
4  considered adulterated?
5    MR. STEARNS:  Objection.
6    THE WITNESS:  I have not studied them for
7  that.  I did run a search, and I don't see any
8  regulatory letters, which might be an indication.
9  So in my opinion, nobody has objected to any of the
10  ingredients or claims for that matter.
11  BY MR. McCOY:
12    Q.  You ran a search to see if there were any
13  letters from the FDA?
14    A.  I just ran a quick search of warning letters.
15  I don't see any for Steel products.  I didn't come up
16  with any in a quick search.
17    What makes you think they might be
18  adulterated?
19    Q.  Have you read the report of Dr. Kalman?
20    A.  Right.  I discard that.
21    What makes you think they might be
22  adulterated?
23    Q.  Are there any ingredients in Steel's products
24  on the website in which it has not listed them?  Let me
25  ask you a different question, I'm sorry.

27 (Pages 105 to 108)

Page 109

1    A.  Yeah.
2    Q.  Are there any undisclosed ingredients in
3  Steel's products that are not disclosed to the consuming
4  public?
5    A.  I wouldn't know that if they're not disclosed.
6    Q.  Did you do anything to investigate whether
7  Steel has any ingredients in its products that are not
8  disclosed to the consuming product -- public?
9    A.  No, I didn't see that at all as part of this
10  assignment or complaint.
11    Q.  In the ingredients that you did review, did
12  you see any that were on any list from the FDA as being
13  illegal?
14    A.  No.
15    MR. STEARNS:  Objection.
16  BY MR. McCOY:
17    Q.  When you say you did not see any such
18  ingredients, did you look for that type of ingredient?
19  Was that part of your analysis, or is that outside of
20  the scope of what you were asked to do?
21    MR. STEARNS:  Objection.  I think those are
22    two questions, but -- maybe three.
23    THE WITNESS:  Well, I'm sorry, what was your
24    question then?
25  BY MR. McCOY:

Page 110

1    Q.  Were you asked to evaluate the ingredients in
2  Steel's products for compliance with the FDA
3  regulations?
4    A.  I was not asked to evaluate the ingredients.
5    Q.  And so when you say you're not aware of any
6  that would be problematic from an FDA standpoint, that
7  is because you have not actually investigated that
8  issue; is that correct?
9    A.  I only am aware of some items that were
10  mentioned in the Kalman report, which is wrong.
11    Q.  And what part of the Kalman report is wrong in
12  your opinion?
13    MR. STEARNS:  Object to the form.
14    THE WITNESS:  Most of them.  Most of them.
15    But anyway, I think one he mentions was the
16    DHEA.  And Kalman mentioned, I believe, another in
17    his accusations.
18    And these certainly are items that might be on
19    a lot of lists of abandoned sports, I'll give you
20    that.  They might have received an FDA warning
21    letter.  The FDA warning list -- but Steel, to my
22    knowledge, has not received a FDA warning list so
23    it's probably a moot point.  But the warning
24    letters basically will say, come back and explain
25    your point.

Page 111

1    DHEA is legal.  You know, we can discuss that
2    in whatever you want.  I've seen nothing there that
3    is touted by FDA as banned, illegal, recalled, and
4    an immediate issue.
5  BY MR. McCOY:
6    Q.  You do agree that the FDA maintains a list of
7  illegal products or illegal ingredients?
8    MR. STEARNS:  Objection.
9    THE WITNESS:  I'm aware that the FDA has
10    several lists.  They have some that are illegal,
11    they have some that are questionable.  And I
12    believe some of the ingredients mentioned by Kalman
13    might fall on that list.  If that's the case, if
14    the company receives a letter, they can be argued.
15    I've argued that the ingredients from plants and so
16    on do fall under DSHEA, but I see nothing illegal.
17    Any ingredient that I see in these products is not
18    on an illegal list.
19  BY MR. McCOY:
20    Q.  Is DHEA, in all forms, a legal substance or a
21  supplement?
22    A.  DHEA is carved out by Congress.  It was the
23  one exception to a steroid that's allowed.  DHEA, the
24  minute you put it in your body, is metabolized in
25  multiple forms.  That's not illegal.  So I guess that

Page 112

1  answers your question.
2    Q.  I see.
3    So your view is that DHEA would be legal?
4    A.  Yes.
5    Q.  The fact that Steel Supplements has not
6  received an FDA letter to date is the reason why you
7  conclude that their products did not contain any illegal
8  substances?
9    MR. STEARNS:  Objection.
10    THE WITNESS:  That's one of the factors.  I
11    have not evaluated every ingredient in the
12    products.  But from what I see and looking at the
13    Kalman report, which seems to try to pick the
14    products apart, I see nothing there that is truly
15    illegal.
16  BY MR. McCOY:
17    Q.  Can we go to -- just quickly, I just want to
18  go through a couple more things.  If you'll go to
19  paragraph 26 of your report real quick.
20    A.  26?
21    Q.  And I just want to make sure we covered -- we
22  may have covered this, and I'm sorry.  Is the
23  bodybuilding supplement drink market different in your
24  opinion than just general supplement drinks?  Is that
25  its own category or is it all the same to you?

28 (Pages 109 to 112)

Page 113

1    MR. STEARNS: Objection.
2    THE WITNESS: It's a portion of a supplement
3    category. Drinks, whether they're food drinks or
4    supplement drinks, are a portion of the overall
5    bodybuilding supplement category.
6    BY MR. McCOY:
7    Q. You go on to say, "Companies and other persons
8    in the market then began to alter the formulas to
9    enhance or alter the effect of the drink on the human
10   body in an attempt to differentiate the drink from other
11   bodybuilding drinks."
12   What -- what are you talking about in terms of
13   differentiating the drink, which I think there was still
14   talking about Gatorade, from other bodybuilding drinks?
15   MR. STEARNS: Objection.
16   THE WITNESS: Well, it started out -- I mean,
17   you can talk about Coke with caffeine, probably the
18   first -- the legal amount of caffeine actually was
19   very low, .02 percent. Companies that is -- that
20   would give you like 35 milligrams of Coke -- of
21   caffeine in a Coke. Very low.
22   So companies, long ago, decided that wasn't
23   enough, so they began increasing the caffeine.
24   They added other things. They add -- sometimes
25   tryptophan might be added, Alpha-GPC. And they're

Page 114

1    looking at selling these in certain markets. The
2    gamer market wants certain things. As we talked
3    about, might want mental acuity, more than caffeine
4    but a high dose of caffeine. So we went from a low
5    dose allowable initially in Coke to some very high
6    doses of caffeine to Alpha-GPC, to taurine, to
7    tryptophan.
8    And now, if you look at that market, there are
9    drinks for sleep; there are drinks, you know, for
10   gamers, all with probably just variations of
11   caffeine. Maybe a sprinkling of one or two other
12   things, but aiming at a market to broaden the
13   sales.
14   BY MR. McCOY:
15   Q. And aiming to a market for bodybuilders?
16   A. Bodybuilders. The gamers, yoga, ping pong,
17   tennis, rope climbing, dance, martial arts, and physique
18   and muscle builders.
19   Q. Is theophylline a legal dietary supplement?
20   A. Theophylline?
21   Q. Theophylline, I'm sorry.
22   A. I think in certain forms, it's legal and in
23   certain amounts. I'd have to look it up.
24   Q. Do you know what amounts are in the
25   Shredded-AF product offered by Steel?

Page 115

1    A. No, I don't.
2    Q. Depending upon the amount that is in the
3    Shredded-AF product, could that potentially be an
4    illegal substance?
5    MR. STEARNS: Objection.
6    THE WITNESS: Not necessarily. I believe
7    theophylline is one of those -- I know it's one of
8    those things, that is approved as a drug. It can
9    be sold by -- to physicians to be used in pulmonary
10   patients. Theophylline, in a lower dose, can also
11   be used in low dose supplementation. I don't
12   remember that offhand dose, but that has a double
13   use.
14   It was approved initially and used as a
15   supplement, which allows it to remain as a
16   supplement on the market.
17   BY MR. McCOY:
18   Q. Did you review any of the hormones that are
19   included in the Steel Supplement products?
20   A. I looked at some of the names. I didn't
21   review them in detail.
22   Q. Is beta phenethylamine, beta phenethylamine,
23   phenethylamine, are you familiar with that supplement,
24   that ingredient?
25   A. Oh, phenylalanine?

Page 116

1    Q. Phenylalanine? I was way off. Samsonite.
2    A. It's -- it's a supplement, yeah.
3    Q. And is that a legal or illegal supplement in
4    your view?
5    A. That's legal.
6    Q. That would not be on a list of problematic
7    ingredients, to your knowledge, from the FDA?
8    MR. STEARNS: Objection, Kevin.
9    THE WITNESS: That's two separate things,
10   Kevin. It may be on a list, but I haven't looked
11   lately. But it's a legal supplement. And if
12   anything, the FDA would give a warning letter.
13   You'd have to argue it. I'd go down and argue it,
14   and I think we would win.
15   BY MR. McCOY:
16   Q. I may have -- I may have messed it up. Is --
17   are we talking about the same thing if I call it beta
18   PEA?
19   A. Oh, PEA? That's different, yeah. Okay.
20   Q. And what -- and why is beta PEA different? Is
21   that --
22   A. It's a different structure, yeah. It's a
23   different substance. It's not necessarily amino acid.
24   It's still legal. It definitely might be on the FDA
25   list.

29 (Pages 113 to 116)

Page 117

1        Once again, I'd gladly go down and show the
2    FDA where I found it in a plant and show how it fits
3    under DSHEA.
4        Q.  Okay.
5        A.  I don't think you'd need to, but...
6        MR. McCOY:  Okay.  I appreciate your time.
7    That's all I've got for you today, Dr. Heuer.
8    Thank you.
9        And I don't know if Mr. Stearns has something,
10   but otherwise, we're done.
11       THE WITNESS:  Okay.  Thanks a lot.  I
12   appreciate it.
13       MR. STEARNS:  Have a good day, guys.
14       THE WITNESS:  Okay, all set?
15       MR. STEARNS:  Yep, all set.
16       THE WITNESS:  Okay.  Have a good weekend.
17       VIDEOGRAPHER:  Okay.  So we are off the record
18   at 12:31 p.m.
19
20       (Witness excused.)
21       (Deposition was concluded.)
22
23
24
25

Page 118

1            CERTIFICATE OF OATH
2    THE STATE OF FLORIDA
3
4
5        I, the undersigned authority, certify that
6    DR. MARVIN HEUER remotely appeared before me and was
7    duly sworn on the 21st day of December, 2021.
8
9        Dated this 21st day of December, 2021.
10
11
12
13
14       _____
15       Jeana Kim, CRR, RMR, FPR, FPR-C, CLR
         Notary Public - State of Florida
16       My Commission Expires:  2/15/2025
         My Commission No.:  HH 093721
17
18
19
20
21
22
23
24
25

Page 119

1            C E R T I F I C A T E
2    THE STATE OF FLORIDA
3
4        I, Jeana Kim, Registered Realtime Reporter and
5    Notary Public in and for the State of Florida at large,
     do hereby certify that I was authorized to and did
6    report said deposition in stenotype; and that the
     foregoing pages are a true and correct transcription of
7    my shorthand notes of said deposition.
8        I further certify that said deposition was
     taken at the time and place hereinabove set forth and
9    that the taking of said deposition was commenced and
     completed as hereinabove set out.
10       I further certify that I am not an attorney or
11   counsel of any of the parties, nor am I a relative or
     employee of any attorney or counsel of party connected
12   with the action, nor am I financially interested in the
     action.
13       The foregoing certification of this transcript
     does not apply to any reproduction of the same by any
14   means unless under the direct control and/or direction
     of the certifying reporter.
15
         Dated this 24th day of December, 2021.
16
17
18
19
20       _____
21       Jeana Kim, CRR, RMR, FPR, FPR-C, CLR
22
23
24
25

Page 120

1        WITNESS NOTIFICATION LETTER
2    DATE:    December 24, 2021
3    TO:    DR. MARVIN HEUER
             c/o Jason P. Stearns
4            FREEBORN & PETERS, LLP
             201 North Franklin Street
5            Suite 3550
             Tampa, Florida  33602
6
7    IN RE: Steel Supplements vs. Blintz NV
             Deposition taken on December 21, 2021
8            Anthem Reporting Job No. 123940
9
10   The transcript of the above-referenced proceeding has
     been prepared and is being provided to your office for
11   review by the witness.
12   We respectfully request that the witness complete their
     review within 30 days and return the errata sheet to our
13   office at the below address or via email to:
     production@anthemreporting.com.
14
15
16   Sincerely,
17   Jeana Kim, CRR, RMR, FPR, FPR-C, CLR
     Anthem Reporting
18
19   CC via transcript:
20   Kevin P. McCoy, Esquire
     Jason P. Stearns, Esquire
21
22
23
24
25

30 (Pages 117 to 120)

Page 121

1
2           E R R A T A   S H E E T
3      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
4          IN RE: STEEL SUPPLEMENTS v. BLITZ NV
            DEPOSITION OF: DR. MARVIN HEUER
5            TAKEN: December 21, 2021
             Anthem Reporting Job No. 123940
6
7    PAGE #  LINE #  CHANGE          REASON
        _____
8       _____
9       _____
10      _____
11      _____
12      _____
13      _____
14      _____
15      _____
16      _____
17      _____
18
     Under penalty of perjury, I declare that I have read the
19   foregoing document, and that the facts in it are true.
20
21
22   DATE: _____
23
24   SIGNATURE OF DEPONENT:_____
25

**A**

**A-D-A-B-O-L...**
6:10 8:14
**a.m** 1:19 4:12
19:25 40:3
75:19,22 102:2
**abandoned**
110:19
**ability** 36:24
37:11,24
**above-referen...**
120:10
**absence** 85:13
**Absolutely**
16:10
**accident** 19:1
**accusations**
110:17
**achieve** 18:23
**acid** 6:11 8:15
18:4 51:13
71:13,14 74:7
82:2 98:24
104:12,13
116:23
**acids** 12:15 16:5
33:16,21,24
35:9,10,21,22
44:24 73:24
75:4 82:2
**acknowledge**
12:20
**act** 68:19 69:18
70:1,5
**action** 119:11,12
**actions** 80:8
**active** 106:7
**activities** 74:1
**activity** 15:11
16:12 40:15
81:12,19 82:8
83:13,16,20
84:3,5,13
88:25 90:13
**acuity** 18:5
45:16 49:17

58:14 60:7,24
71:2 80:21
81:5,14 100:7
114:3
**acute** 36:22
**ADAbolic** 6:10
6:11 8:13
**ADALoad** 47:2
**add** 8:13 53:12
81:9,12 113:24
**added** 6:11 32:6
53:13 113:24
113:25
**adding** 49:25
104:22
**addition** 6:9
**additional** 20:22
**additives** 32:6
**address** 88:13
120:13
**adds** 65:12
**adjectives** 63:18
**adulterated**
108:4,18,22
**adults** 72:22
**adverse** 91:3
92:2
**advertise** 32:11
33:18 58:23
59:14 89:2
**advertised** 52:20
52:24
**advertising**
54:24 57:14
78:18,22,22
79:10,25 100:3
**affect** 18:4,5,5,6
71:2,2,3
**affirmed** 5:1
**age** 14:11
**aging** 80:23
**ago** 106:15
113:22
**agree** 17:19 18:8
27:11 37:17
38:18 39:10
48:9 59:11,18

60:1 83:6,7,10
111:6
**agreement** 22:3
30:3 53:17,20
53:22,23,25
102:10,22
**agreements** 22:6
**ahead** 11:10
23:18,20 26:12
52:3 64:13
88:2 92:11
96:7
**aid** 71:24
**aiming** 114:12
114:15
**alcohol** 93:15,17
93:18 94:5
95:1,6,13
97:12,15,17
98:2 99:5,12
99:14
**alcohol-free**
95:7,9
**alert** 50:3 51:4
87:20
**alertness** 16:17
36:10 41:13
45:16 51:4
62:2
**alleged** 75:25
**allotted** 68:23
**allowable** 114:5
**allowed** 13:4
111:23
**allows** 115:15
**Alpha-AF** 47:2
**Alpha-GPC**
60:15 61:11,25
68:8,10,17
113:25 114:6
**alter** 113:8,9
**American** 93:6
**amino** 6:10 8:15
12:15 16:5
18:4 33:16,21
33:24 35:9,10
35:21,22 44:24

51:13 71:13,14
73:23 74:7
75:4 82:2,2
98:24 104:12
104:13 116:23
**amount** 18:20
34:19 35:3,10
35:12,18,22
68:4 87:11
88:24,25 89:6
100:11 113:18
115:2
**amounts** 35:16
68:16,25 88:18
114:23,24
**anabolic** 82:7
84:16 85:8
**analysis** 95:11
100:20 109:19
**analyze** 57:13
**and/or** 25:24
119:14
**anhydrous** 39:6
39:12
**answer** 15:18
49:5 77:8
103:11
**answering** 87:25
**answers** 112:1
**Anthem** 1:23
2:18 120:8,17
121:5
**anti-aging** 81:5
**antibiotic** 105:7
**anybody** 21:18
52:4 67:5
**anymore** 106:14
**anyway** 69:16
110:15
**apart** 112:14
**apologize** 88:2
**APPEARAN...**
2:1
**appeared** 118:6
**appears** 7:1
**appetite** 13:25
**application**

105:19
**applies** 24:22
69:8
**apply** 50:16,17
94:11 119:13
**appreciate**
74:11 117:6,12
**appreciated**
94:13
**approach** 90:2
**approved** 76:24
77:3,9 115:8
115:14
**archery** 15:5
65:9,18
**area** 106:1
**areas** 105:14,14
107:23
**arginine** 74:18
74:18,21 75:3
**argue** 96:1
116:13,13
**argued** 111:14
111:15
**Arnold** 15:1,2
15:14,19 64:7
64:16 65:1,5
65:16 100:4
**Arnold's** 65:12
**article** 27:24
95:16
**articles** 21:3
28:9,12 74:3
75:2,3,3,6
107:22,24
**arts** 65:10,17
114:17
**aside** 95:9
**asked** 9:4 22:23
54:14 109:20
110:1,4
**asking** 15:16
24:17 52:7,9
63:23,24 81:16
95:21 99:3
100:24 103:2
**aspects** 18:6

assignment
  109:10
associate 41:21
  42:13,17
associated 21:18
  30:22 82:25
associating
  42:14
assume 40:6
  55:20 76:17
  83:15 84:2
  100:17,24
  101:2
assuming 55:22
  93:16
assumption
  40:20 101:11
  101:12,13
assumptions
  45:25
athlete 14:15
athletes 36:12
attach 8:18
attached 7:13
  107:18
attack 92:3
attempt 113:10
attorney 9:7
  56:1 102:22
  119:10,11
attorneys 21:21
  31:22
augment 14:12
authored 7:17
authority 28:22
  74:14 118:5
authorized
  119:5
awake 87:20
  91:12,22
aware 11:18
  90:22 91:2
  110:5,9 111:9

― B ―
B 3:8
B12 107:12,14

B6 107:6,10
babies 72:22
back 11:19 16:1
  16:6 17:17
  25:11 28:7
  34:9 35:17
  38:17 39:19
  40:2 46:12
  48:8 54:2 71:5
  75:21 79:1,13
  79:18,21 85:9
  88:14 90:17
  95:10 102:4
  110:24
background
  10:14,15 12:19
  25:4,6 27:14
  44:7
bad 99:6
badminton 15:5
  65:10
bag 78:17 79:1,6
  79:13,21
bags 47:25
balance 18:3,4
banned 111:3
Barlow 2:18
  4:15
based 11:13
  12:19 21:5
  22:8,19 29:23
  29:24 46:2
  59:8,9 64:4
  68:8 77:14
  78:4 91:13,20
  101:10 107:17
  107:20
bases 91:14
basic 31:12
  70:14
basically 11:16
  34:25 35:8
  36:20 56:24
  67:17 89:2,11
  89:17 110:24
basis 26:24 30:1
  74:2 79:14

99:25
battlefield 91:23
BCAA 78:2,9,10
  82:1 88:16
BCAAs 82:3,10
  82:15,17
bearing 86:11
bed 81:18
bedrest 81:23
beer 93:6,9,16
  94:8,16,17,25
  95:5,5,7 99:13
began 113:8,23
behalf 2:2,8 4:21
  5:13
believe 17:16
  23:24 24:13
  37:20 44:5,13
  45:6 59:7,9,13
  64:17 76:9,13
  78:16 82:14,16
  91:9,24 101:9
  110:16 111:12
  115:6
belong 107:24
benzyne 97:24
  104:8
berries 39:7
best 86:17
beta 115:22,22
  116:17,20
better 21:8
  37:18 50:11
  83:9
beverage 11:6,7
  11:15 59:1,3,5
  59:7 68:10
  69:9 90:19
  94:2,13 96:12
  96:22
beverages 10:19
  10:22,25 11:2
  11:3,21 68:22
  69:8,25
beyond 90:21
bicycle 17:1
big 10:12 14:4,4

31:20 36:11
  74:19
bigger 42:19
  104:18
bike 17:1
Bilzerian 22:25
  53:16,18 54:21
  70:17 75:25
  76:4,7,14,22
  76:25 77:18,25
  78:6,9,12
  79:22 102:9
binder 47:1
bit 19:1
Blintz 120:7
Blitz 1:9 4:9,21
  5:7,14 22:15
  22:25,25 51:23
  121:4
blood 18:5 90:14
  90:15
board 47:12
bodies 35:3
  45:15
body 13:7 14:9
  14:17,24 15:12
  16:18 30:7
  34:2,8 35:14
  36:9 41:6 42:1
  42:9 43:5,6,9
  45:11,14,14,17
  50:1 51:2,4,6
  57:15 62:5,12
  62:17,18,19
  63:1,3 65:22
  65:25 66:3,5
  66:18,21 67:13
  72:8,13 73:21
  74:5,10 80:8,8
  80:9,9,24 81:4
  81:19 83:17
  84:12,16 85:13
  94:6 97:3 99:9
  104:16,19,22
  111:24 113:10
body's 82:5
bodybuilder

14:10,13 15:2
  15:13,21,23
  16:9,24 40:18
  41:1,10,16,22
  41:24 42:9,13
  42:16,18,24,25
  43:21,24 48:17
  48:22 61:3
  87:2,6
bodybuilders
  15:6,9 29:11
  45:12 86:14,18
  114:15,16
bodybuilding
  14:8 15:14
  16:6 17:3,6,10
  17:13,18,19
  18:1,7 19:5,11
  19:17,25 20:3
  20:7 22:2,6,13
  23:10,24 24:4
  24:7,15,21
  25:12,20 26:3
  26:25 27:18
  29:7,20 30:1
  30:16 31:2,6
  32:10,15 33:10
  33:22,25 34:6
  34:20,22 35:2
  35:7,11 36:4,7
  36:14 41:14,20
  42:4,5 43:2
  44:10,15,21,23
  44:25 47:18
  48:1,25 49:7,9
  49:18,20 50:9
  50:16,21 51:11
  51:19,24 52:11
  54:11,15,20,23
  55:1,13,18,24
  56:16,18 57:6
  57:10,17 58:7
  58:11,17,20
  59:22 60:19
  61:7,18,18,20
  61:23 62:9,20
  62:24 63:9

64:3 65:2,5,19
65:20,24 66:6
66:12,20,21,24
67:6,11,15
70:24 71:5,7
71:18,25 72:5
72:13,21,23
80:4,6,12 86:2
86:5,8 92:15
92:24 93:12,24
94:3,3,7,14,14
94:18,19 95:12
95:14,18,19
96:13,22 97:13
97:16,20 98:4
98:10,12,16,22
98:22,25 99:7
103:3 112:23
113:5,11,14
**boost** 24:24
**bothered** 74:22
**Boulevard** 2:10
**Boy** 2:10
**Boys** 77:19
**brain** 34:2 40:22
41:3 60:25
74:1 80:22
81:1,1,2 90:13
**brains** 48:9
**branch** 82:2
**break** 38:6
39:17 75:12,13
75:14
**breakdown**
74:20
**breaking** 82:9
84:18
**broad** 10:16
24:11 29:20
30:7 104:7
**broaden** 114:12
**broke** 85:7
**Budweiser** 93:3
93:4,11,12
94:16 95:11,11
96:12 97:8,13
97:21 98:11

99:4,13
**build** 14:17 16:6
24:24 34:2,8
59:19 60:2,5,9
60:25 66:2,4,5
73:11 81:20
82:3 83:15,17
84:13 85:14
**builder** 42:1,9
**builders** 14:25
42:13 45:11,14
114:18
**building** 15:12
16:1,12 18:24
30:7 33:25
35:2 41:5 43:5
43:5,6,7,8,8
44:4,8 45:18
51:3 62:4,5,13
63:3 65:22,25
66:19 67:13
72:8,14 73:21
82:6 83:8
84:17 85:4,8
**builds** 84:23
**Bull** 56:25 57:3
57:4,9,13,16
**bumping** 68:25
**burn** 37:18 38:2
72:7
**burning** 37:15
72:11
**BURT** 2:9

### C

**C** 4:1 119:1,1
**c/o** 120:3
**Cade** 30:24 31:1
**caffeinated**
50:20
**caffeine** 12:15
14:3 33:16,21
34:14,15,16,19
34:25 35:3,5
35:17,18 36:1
36:3,6,13,14
37:17,23 38:3

38:5,18 39:4,6
39:7,10,12,14
40:12,19,25
41:2,8 51:13
55:3 56:21
60:13,14 61:9
61:25 62:1
68:4,10,21,22
87:14,20 88:3
88:7,8 89:7,10
89:14,16 90:2
90:8,10,11,12
90:19,22 91:4
91:7,9,9,12,13
91:19 92:1,4
92:18 93:1
100:6,10,11,18
100:25 101:6
101:14,17
102:13 107:16
113:17,18,21
113:23 114:3,4
114:6,11
**caffeine's** 35:6
**caffeine-free**
92:19
**calcium** 18:4
34:4
**call** 45:11 78:15
78:22 103:1
106:8 116:17
**called** 6:1 31:21
77:18,24 88:17
102:23
**calling** 97:13
**calm** 34:1
**caloric** 87:9
**calorie** 71:16
**calories** 18:9,16
18:19 34:11
37:15,18 38:2
39:5,8,11,13
39:15 57:18,20
59:12,14,18
60:1 71:11,15
72:8 82:13,14
82:15,16,25

83:6,7,9 85:13
85:17,19,22,24
86:1,14,22
87:1
**cannabis** 103:21
**capacity** 16:17
40:24
**car** 40:17 78:17
85:5
**carbohydrate**
16:5
**carbohydrates**
85:24
**care** 28:13
**CARLTON** 2:9
**carved** 111:22
**case** 1:3 9:2,8
15:17 16:23
21:11,13,19
29:21 42:11
79:12,16 85:1
106:17,19,23
111:13
**cases** 106:25
**catabolic** 82:7
84:17,22 85:6
**catabolism** 82:9
**categories** 32:17
32:21
**category** 10:23
12:17 14:14
45:17 67:14,19
67:22 68:2
100:5 104:24
112:25 113:3,5
**cause** 4:5 82:8
90:15
**CC** 120:19
**Celebrity** 54:7
**cell** 60:25
**cells** 39:2 72:18
**certain** 95:17
114:1,2,22,23
**certainly** 29:15
35:15 39:8,15
48:5,22 55:2,3
58:16 63:16,20

71:1 89:19
97:16 110:18
**certificate** 68:11
118:1
**certification**
119:13
**Certified** 1:23
**certify** 118:5
119:5,7,10
**certifying**
119:14
**chain** 82:2
**chair** 37:12
**change** 5:16
32:8 47:18,22
60:18,22 64:18
101:6 121:7
**changed** 11:18
31:25 90:19
**changes** 8:17,22
121:3
**changing** 97:1
**channel** 77:20
**check** 8:8
**chemically**
39:13
**child** 71:23 72:3
72:6,10,11
**children** 72:6,22
**chloride** 31:12
34:5
**choice** 94:20,21
**circumstance**
81:19
**citation** 27:22
28:5 29:12
**citations** 29:1
**cite** 23:3 28:12
**cited** 23:7 52:16
54:2 107:18
**citing** 28:19,23
**claims** 10:6,10
63:20 69:20,21
108:10
**clarification**
85:20
**clarify** 83:22

clarifying 26:23
classification 11:19
classified 12:13 32:7
classify 11:17 48:17
clear 28:21 103:11
clearly 59:22
client 43:17
climbing 65:11 65:17 114:17
close 74:18 102:7
closely 32:1 86:16
clothing 24:8,9
CLR 1:22 118:14 119:20 120:17
Coca-Cola 92:13,18,19,23 102:9,13
coffee 38:6 39:16 40:11,12 48:13,21 49:4 49:14 50:2,8,8 50:19 53:19 54:22 55:2,7
cognition 81:14
cognitive 62:3
Coke 113:17,20 113:21 114:5
combination 31:9 96:16
combine 100:12
combined 27:8 90:5
come 39:19 53:1 68:17 82:20 84:7 95:10 100:22 103:15 105:2 108:15 110:24
comes 26:25 27:4 100:12

coming 25:4,6 85:2,6
commenced 119:8
comments 9:8
Commission 118:15,16
commissioned 107:6,7,11
common 28:1 29:2
community 17:15
companies 11:17 13:3 23:1 24:1 31:22 68:24 106:4 113:7,19 113:22
company 1:9 19:22 24:4 31:24 32:3 33:17 42:5 44:9,14 45:7 46:4 47:19 48:5 53:5 58:23 77:7 78:16,21,25 111:14
compare 8:12
compared 31:18
competing 22:19 51:24 52:16 53:16 54:22 88:21
competition 6:7 44:6 86:24
competitive 30:3
competitor 23:8 54:9 70:19
complaint 109:10
complete 91:6 120:12
completed 119:9
compliance 110:2

comply 69:25 70:4
component 18:8 18:11,12 97:12
components 33:12 96:13
comprehensive 21:1
concentration 18:6
concept 24:21 66:19 67:10,11
concerned 68:5
concerning 9:5 9:11 10:6,9,10 13:10 21:18 22:6 35:6 64:18 79:5,20 88:15
conclude 112:7
concluded 117:21
conclusion 82:21 100:13 100:14,22 101:6
conducted 4:12 107:5,7,11,13 107:15
confused 9:21 105:16
Congress 111:22
conjunction 89:5 101:7
connected 119:11
connotation 12:21
consequences 92:2
consider 20:6 30:16 67:3,17 67:19 80:4 103:13
considered 11:7 19:4 20:23 22:2 44:21

46:18,22 82:18 108:4
considers 65:14 65:16
consistent 12:8
constantly 82:5
constitute 24:6
consulting 106:13
consumed 90:9
consumer 33:19 99:21 100:16
consuming 50:21 94:17 109:3,8
consumption 35:25
contain 71:11 101:14 112:7
contains 6:10 8:14
content 8:20 9:18 31:11 93:15
contest 15:8,9 43:8
context 16:25
continue 36:24 36:25
continuing 26:19
contract 22:14 22:20,24 23:4 23:15,22 24:3 24:12 51:8,10 51:23 55:5 77:5,16 78:13 78:19
contribute 87:14 88:8
control 20:10 119:14
conversations 21:22
converts 80:9
copy 5:8 6:18,19 6:20 7:5,7,8,10

7:12,16,22,24
8:2 46:13,17 46:21
core 17:19 18:8 18:12
Corporation 1:5
correct 5:15 8:1 8:22 10:23 21:19 23:15 26:4 30:4 37:3 48:15 70:6,13 71:19,21 82:25 88:15 98:11 110:8 119:6
correctly 21:11
costs 106:3
counsel 4:16 119:10,11
couple 38:6 40:6 112:18
course 15:22 34:12
court 1:1 4:14 4:17 85:20 106:25
covered 112:21 112:22
craze 30:15,22
crazy 84:5
creatine 18:14 44:24 58:15 78:3,6,7 80:2,4 80:6,11,15,24 80:25 81:3,7,9 81:11,17,19,22 82:10,12,14,17 88:16 105:9
criticism 96:11
CROSS 3:3
CRR 1:22 118:14 119:20 120:17
cup 50:7,19
cups 40:11,12 48:13,21 49:3
cursor 56:13
Cutler 87:3,5,8

**Cutler's** 87:14
**cycle** 86:20,21

_____

**D**

**D** 3:1 4:1
**daily** 81:11 82:7
  84:3,5,12 87:9
**dance** 65:10,11
  65:17,18
  114:17
**data** 74:23,25
  94:9 107:1
**database** 29:3
**date** 47:11 112:6
  120:2 121:22
**dated** 5:9 7:14
  118:9 119:15
**day** 40:8,15,21
  62:19 81:18
  84:8,19 85:3
  85:10 117:13
  118:7,9 119:15
**days** 65:9 69:16
  86:19,25 87:1
  120:12
**deal** 77:14
**deaths** 90:17
**debilitated**
  24:23 43:7
  81:22
**December** 1:17
  4:11 118:7,9
  119:15 120:2,7
  121:5
**decided** 113:22
**decision** 77:15
  104:2
**declare** 121:18
**decreased** 13:24
**decreases** 95:2,2
**deeply** 40:21
**Defendant** 1:10
  2:8
**Defendant's**
  3:11 8:23
**defined** 23:8
  54:9 55:11

**definitely** 16:19
  17:3 88:23
  116:24
**definition** 22:2
  22:17 23:7,14
  23:22 24:14
  25:3 26:5,7,16
  26:18,19,24
  27:14 30:1,5,7
  41:1,20,22
  42:16 48:19
  50:16,25 54:15
  54:19,23,25
  55:5,8 56:17
  64:2 65:22
  66:5,8,9,10,17
  67:1,1,3,4
  93:23 94:12
  95:12 97:20
  98:4,10,16
  99:8 103:3
**definitions** 22:7
  22:12,16 28:4
**degree** 58:8
**dehydrating**
  93:19,22,25
**depend** 53:8
  71:18
**depending** 18:22
  52:19,23 60:22
  67:10 92:20,21
  92:22 115:2
**depends** 49:1
  67:2 93:21
**DEPONENT**
  121:24
**deposition** 1:14
  4:3,8,12 21:10
  106:16 117:21
  119:5,6,7,8
  120:7 121:4
**depositions**
  106:24 107:2
**describe** 32:23
**described** 41:10
  41:12 44:2
  61:2 88:11

  90:24 91:4
**describing** 51:12
**DESCRIPTION**
  3:10
**descriptions**
  63:19
**designed** 59:19
  60:2,5
**despite** 67:18
**detail** 16:15
  115:21
**determine** 34:20
  34:22 35:11,19
  35:22 64:1
  68:15 94:16
  108:3
**determines** 59:4
**determining**
  11:13
**deterrent** 102:25
**detrimental** 94:6
**develop** 29:15
**developed** 30:25
**development**
  25:23 31:23
**devise** 33:24
**dexterity** 62:4
**DHEA** 110:16
  111:1,20,22,23
  112:3
**dictate** 49:20
**diet** 12:16 13:6
  13:17,22 14:7
  14:12,20 19:3
  19:4,8,15
  20:10 25:24
  84:25 87:12
**dietary** 10:1,2,6
  10:10,19 11:1
  11:3,8,15,24
  12:5,10,17
  27:6 69:17
  70:4,5,10 71:1
  84:25 114:19
**difference** 6:22
  10:18,21 11:16
  12:4 30:21

  36:15 42:8,10
  62:15 69:22
  104:3
**different** 7:2
  11:1,4,7,11,20
  11:23 12:10,12
  12:20 19:4,15
  19:19 22:13
  26:20 31:5
  32:17,21,22,23
  33:1,3 36:1,20
  37:1 41:21,23
  41:25 42:3
  43:16 49:16
  58:22,25 59:25
  67:19,22,23
  69:1,3,16,19
  85:10 94:21
  105:6,14,14
  108:25 112:23
  116:19,20,22
  116:23
**differentiate**
  66:23 113:10
**differentiating**
  113:13
**differently** 12:1
  67:23 69:2,3
  69:19
**digressed** 16:2
**direct** 3:3 5:4
  70:19 73:10
  119:14
**direction** 119:14
**disagree** 83:4
  93:8
**discard** 108:20
**disclosed** 109:3
  109:5,8
**discovery** 21:10
**discuss** 111:1
**discussing** 43:9
**discussion** 97:9
**discussions** 9:7
  21:17 29:16
**dispute** 59:15
**distinct** 66:7

**distinctions**
  104:21
**distributor** 23:9
  54:10 55:1,12
**DISTRICT** 1:1
  1:1
**diuresis** 50:4
**DIVISION** 1:2
**doctor** 25:5,7
  26:7 27:1
  92:10
**document** 78:8
  121:19
**documents** 78:5
**doing** 13:5 15:25
  16:8 17:10
  49:6,11,15,18
  66:4 84:22
**dose** 68:15,16,17
  104:5,14,15,21
  104:21 105:3,5
  105:6,9,10,18
  105:25 106:2,7
  114:4,5 115:10
  115:11,12
**doses** 92:4
  104:17,18
  105:4 114:6
**dosing** 68:14
**double** 115:12
**doubt** 71:12
**DOUGLAS** 2:17
**Dr** 1:14 2:17 3:4
  3:11 4:25 5:6
  6:2,19 7:9 9:1
  9:5,11 13:11
  20:14 26:13
  28:5 30:24
  31:1 38:15
  40:5 54:5 56:9
  75:24 96:7
  102:7 103:22
  108:19 117:7
  118:6 120:3
  121:4
**drank** 51:16,19
  52:9

**drink** 10:22
11:15,23 12:9
12:16,20,23
30:14 31:13
32:7 33:13,20
34:10,14,19
35:10,18,22
48:21 56:25
57:3,9,17 59:1
59:5,11,16
60:8,17 69:4
69:13,14,15
70:9,9 85:3
90:19 92:12,23
93:11,16,20
94:17 97:20
101:17 112:23
113:9,10,13
**drinking** 40:19
49:14 50:2
86:19 93:15
95:5
**drinks** 10:25
11:19,21 12:1
12:6 13:3,3,18
24:5,6 30:15
32:14,14,14,15
32:15,16 33:2
40:11 49:14
50:7 56:4
67:14,19,22
68:1,5 69:24
85:3 95:17
97:6,9 99:6,13
100:6,23
112:24 113:3,3
113:4,11,14
114:9,9
**driving** 40:17
**drug** 115:8
**DSHEA** 69:17
111:16 117:3
**duly** 5:1 118:7
**dump** 62:18
**dynamic** 85:9
86:3 106:12

**E**

**E** 3:1,8 4:1,1
119:1,1 121:1
121:1,1
**earlier** 43:10
47:24 54:5
82:24
**early** 17:22
**eat** 86:22,22
**eating** 39:9
**eccentric** 18:14
**edit** 8:16
**Education** 69:18
70:1,5
**effect** 36:9,9,10
68:16 73:14,21
90:15 93:22,22
94:7 95:4,5
98:1,1 113:9
**Effective** 105:6
**effectiveness**
35:19,23
**effects** 12:5,6
81:5,5 90:16
97:17
**either** 6:18 21:9
23:17,21 27:22
50:24
**electrolyte** 18:3
**electrolytes**
31:14 32:5
33:16
**elements** 31:12
**elevator** 40:16
**email** 7:5,18
120:13
**emergency**
28:13
**emphasizing**
66:2
**employee** 119:11
**encompass**
51:15
**encompassed**
51:23 65:18
**encompasses**

15:10
**encompassing**
27:18 29:21
**ended** 97:7
**endorse** 54:8
**endorsed** 70:18
76:4
**ends** 7:13
**endurance**
58:16
**energy** 13:18,25
14:1,5 19:9,16
31:17 32:14
33:12,13,20
34:10,14,19
35:2,6 36:15
36:22,22 37:10
37:11,14,15,24
38:2 41:9 51:5
55:20 56:4,14
56:20,23,25
57:3,9,12,17
57:25 58:1,14
60:12 67:14
69:24 70:9
85:25 88:4
91:19,24
**engage** 81:18
**engaged** 29:21
42:25 43:25
**engagement**
96:9
**engages** 87:6
**engaging** 49:5
**enhance** 113:9
**enhanced** 62:3
**ensures** 16:5
**ENTER** 121:3
**entered** 44:5
**entrenching**
55:20
**equated** 37:15
**era** 47:5
**errata** 120:12
**esoteric** 93:14
**especially** 62:17
89:25

**Esquire** 2:3,9
120:20,20
**essential** 34:3
**essentially** 72:17
73:20
**evaluate** 70:9
110:1,4
**evaluated**
112:11
**evidence** 79:12
**EX** 3:11
**exactly** 30:6
62:8 67:21
68:19
**exam** 48:10
**EXAMINATI...**
5:4
**examined** 5:1
16:15
**example** 22:21
34:18 61:24
87:5 89:9 99:4
104:11
**exception**
111:23
**excess** 62:18
**exchanged**
21:11
**excluded** 67:4
**excused** 117:20
**executed** 23:15
**exercise** 18:14
25:24 36:12,13
36:13,25 37:3
37:4,7,8,10,25
38:23 50:12
56:22 80:16
81:9 83:9,12
84:6 87:18
88:6
**exercising** 60:8
**exhibit** 8:18,23
9:19,20 46:15
**exhibits** 8:21
46:14
**expand** 13:16
**expansive** 66:18

**expenditure**
51:5
**experience**
10:16 11:14
25:7,7,8 26:25
27:4 28:20,23
29:23,24
**experienced**
9:25
**expert** 10:5
15:16 22:17
24:12 27:5,5,6
27:7,9 28:10
28:16 75:4
94:8 106:13
108:1
**expertise** 21:5
**Expires** 118:15
**explain** 27:13
110:24
**explained** 57:11
**explanation**
25:3
**explanatory**
56:2
**express** 9:4 35:4
**expressed** 9:12
16:22 17:4,9
17:12 22:18
27:23 28:22
29:7 38:15
53:15 95:17,21
96:10 98:17
104:4 106:22
**expressing** 22:5
74:25 79:5
107:17
**expression** 29:18
99:25
**extra** 51:13
72:19,20
**extravaganza**
15:2,3,15

**F**

**F** 119:1
**fact** 16:18 32:22

49:14,24 51:19
59:9 61:8,9
64:15 67:18
68:4 70:25
71:3 74:6,9
77:4,13,14
79:7 89:1
99:12 100:11
106:3 112:5
**factor** 11:13
52:23 58:9
**factors** 58:18
94:15 112:10
**facts** 21:18
59:10 79:19
121:19
**factual** 21:25
79:13
**fair** 74:24 83:25
83:25 96:3
97:14
**fairly** 31:10
61:10
**fall** 104:23
111:13,16
**familiar** 57:1
91:1 92:12
93:4 115:23
**far** 40:13 44:9
**fast** 86:18 87:1
**FDA** 10:5,9,15
10:21,25 11:14
12:9 67:18,22
68:3,3,19 69:2
69:14,23 89:20
89:21 108:13
109:12 110:2,6
110:20,21,22
111:3,6,9
112:6 116:7,12
116:24 117:2
**feasible** 73:19
74:21
**feature** 17:19,23
**features** 17:25
**federally** 104:1
**feel** 28:12

**feeling** 16:16
37:12,13
**felt** 28:1
**Festival** 64:7,16
**fiber** 72:20
**fibers** 60:10
**FIELDS** 2:9
**figure** 29:17
**final** 7:9 95:11
97:19
**financially**
119:11
**find** 5:19 28:14
**fine** 39:21 95:25
**finish** 88:2
**first** 5:1 9:19
24:15 25:12,19
25:25 26:17
27:16 29:18
100:1 113:18
**fit** 22:17 40:25
45:17 66:5
**fits** 89:2 117:2
**five** 38:10 39:17
86:25 101:22
**flex** 37:13
**flip** 99:17
**Florida** 1:1,5 2:5
2:11 4:5 30:23
30:25 31:3,10
31:21 118:2,15
119:2,4 120:5
**fluid** 93:17
**focus** 16:17 35:2
37:25 58:14
60:7,15 61:17
88:4
**focused** 64:21
91:18
**follow** 31:23
67:9 83:24
**followed** 32:1
**following** 31:1
77:21
**follows** 5:2
52:14 67:2
**food** 11:2,6,20

11:21,22 12:13
59:3 68:1 69:9
69:10 84:24
113:3
**football** 31:3
**foregoing** 119:6
119:13 121:19
**form** 11:9 12:11
12:22 16:13
17:21 18:10,18
19:18 23:16
26:8,14 27:3
27:15 28:6
32:18 36:17
37:19 43:3,19
47:13 51:25
57:22 62:7,21
63:5 65:6
70:11 81:8
95:25 104:25
110:13
**format** 66:3
**forms** 39:7
111:20,25
114:22
**formulas** 13:16
89:13,13 113:8
**formulate** 19:11
**formulated** 9:10
20:3
**formulating**
10:1
**formulation**
10:6,10 14:3
31:25 32:1
**forth** 5:17 9:5
30:8 119:8
**found** 5:23 6:24
27:14 117:2
**founder** 44:12
**FPR** 1:22 118:14
119:20 120:17
**FPR-C** 1:22
118:14 119:20
120:17
**fraction** 66:8
**frameworks**

70:8
**Franklin** 2:4
120:4
**free-form** 65:11
**FREEBORN**
2:3 120:4
**fringe** 72:1
**front** 5:8 6:6
46:14
**fruit** 39:8
**fruits** 39:14
**FTC** 10:5,15
**full** 28:17 31:22
44:18 53:23
65:12 77:19,25
78:2,6,9,15,17
78:23 79:1,5,8
79:8,14,20,21
79:25 88:16
**function** 63:20
81:1 95:3
**furnish** 92:9
**further** 119:7,10

_____

**G**

**G** 4:1
**gain** 16:12 17:20
18:1,2,3,9,13
18:17 43:2
85:16,17,23,25
87:8
**gained** 34:7
**game** 60:25
**gamer** 61:2,24
61:25 114:2
**gamers** 114:10
114:16
**games** 60:18
**gamut** 24:2 42:6
45:8 47:21
67:6
**ganglion** 72:19
**gather** 101:22
**Gatorade** 30:12
30:15,16,18
31:1,6,9,21,23
31:23,25 32:3

32:9 113:14
**general** 14:10,17
14:21,22,23
19:21 23:23
29:3,22 42:1
42:14,17,19,24
43:5,11 44:25
45:1,9,10,21
51:11 61:21,22
63:23 66:19
104:23 112:24
**generalized** 71:8
**generally** 25:22
66:22 68:8
69:11
**getting** 41:3
53:2 72:1 85:5
89:15 103:18
105:16
**give** 24:14 29:1
46:12 56:21
57:12,12 61:24
72:3 85:25
97:12 99:16
107:2 110:19
113:20 116:12
**gives** 37:23,24
37:24 57:4,11
62:1 71:23
72:10
**giving** 13:5 16:4
23:22 28:13
57:25 79:14
106:16
**gladly** 117:1
**global** 67:12
**glycerol** 31:10
31:14
**go** 9:16,18 10:4
11:10,22 13:4
17:17 19:10
23:3,18,20
26:12 28:7
30:10,11 31:17
31:17 33:13,16
33:16 36:23
37:12,24 38:24

46:12 48:20
50:2,8 52:3,9
54:2 56:4,12
60:9,12 64:12
67:10,11 82:8
84:6,19,20
86:19,25 88:2
88:13 89:3,6
90:17,20,21
92:11 93:12
96:7 103:19
104:13 106:11
112:17,18,18
113:7 116:13
117:1
goals 18:22
goes 6:6 62:2,2
67:6 72:11
87:19 100:12
going 16:20 19:1
35:13,14,17
37:2 38:6,17
39:1,24 41:4,9
41:17 47:13
48:8 50:11
51:25 56:4,8
56:22 58:2
60:18 63:13,25
64:25 71:5
75:18 78:14
83:15,16 84:2
84:6,6,7 85:2
87:22 88:4
90:1 97:6
101:18,22
102:1
good 5:6 38:7
62:4 83:9
94:20 96:16
117:13,16
Google 15:4
gotten 68:24
Gracely 6:24
grant 94:25
GRAS 32:6 68:8
68:11,19,24
69:10,10,15

Great 38:9
greatly 13:16
32:3
grip 88:12
group 77:20
growth 57:21,23
57:24 73:18
87:15
guarana 39:7
guess 24:7 52:5
56:21 61:15
64:25 67:2
93:10 97:10
102:21 106:6
111:25
guys 14:10,13
29:14,14 39:18
39:22 62:4
117:13
gym 48:20 78:17
87:19

H

H 3:8 121:1
hairs 13:1
half 50:14 54:17
hands 62:5
happen 72:12
90:4,9
happened 92:7
happening
81:25
happens 67:8
hard 86:23,24
88:7
health 24:20
29:3,8 32:15
44:8 69:17
70:5 92:2
healthy 24:22
hear 103:11
heard 93:7
heart 92:3
held 22:14 35:5
38:14,16
help 38:22,23
41:18 54:21

56:22 58:16
72:3 81:21,23
82:4 85:25
88:5
helped 29:14
31:14
helps 31:15 34:2
35:2 82:11
88:7
hereinabove
119:8,9
Heuer 1:14 3:4
4:8,25 5:6 6:19
7:9 13:11
20:14 26:13
28:5 38:15
40:5 54:5 56:9
75:24 96:7
102:7 103:22
117:7 118:6
120:3 121:4
HEUER'S 3:11
HH 118:16
Hi 106:11
high 31:11 34:16
61:10 87:13
89:19 90:1
92:4 100:12
114:4,5
hill 37:1
history 31:8
43:21
hold 5:25 6:20
9:24 46:24
52:15 57:16
88:17
home 84:7
honest 56:7
hope 48:11 85:7
hormones
115:18
hospital 16:2
hospitalized
18:24
hour 54:17
huge 71:15
Huh 21:23,23

22:1,8,10,14
23:14 44:12
46:1 76:21,24
77:3,9,12
human 13:7
15:6 66:21
91:3 113:9
humans 66:5
68:14
hydrate 51:2
hydrated 31:16
51:17 52:10
85:3 93:2
hydrates 53:14
hydrating 92:19
93:18,22,25
97:23
hydration 24:20
29:8 30:15
31:13 32:14
33:2,8 95:13
97:16,18 98:24
99:12
Hydroxycut
13:10,17,21,22
14:1,7,8,9 19:3
19:4,9,15,20
19:22,24 20:2
20:7
hypothetical
44:2 48:8
72:14,16
hypotheticals
40:6

I

idea 17:5,12
23:14 60:4
74:14 95:17
96:11 101:19
identification
8:24
identified 8:19
19:3 21:17
Ignite 59:5,11
59:18 60:1,17
60:19 61:6,19

63:8 64:6,15
64:19 89:4,8
illegal 109:13
111:3,7,7,10
111:16,18,25
112:7,15 115:4
116:3
image 42:18
79:1
immediate
37:11,12,13
111:4
immediately
16:2,3
impact 73:17
91:18
impacts 99:9
important 12:25
37:2 38:3
80:24,25 83:6
83:7 86:14
impression
29:22
improve 45:15
45:16
improvement
24:23 25:23
improving 24:20
29:8
include 10:22
13:18 19:9
21:20 23:14
33:8 40:15
91:7
included 47:25
107:18,21
115:19
includes 11:21
including 8:21
19:24 20:2
43:10
inclusive 21:4
increase 14:1
38:20,22 43:2
58:2 87:9,11
90:14
increased 13:25

37:5 88:11,11
88:12
**increases** 36:13
38:1 58:14
90:14
**increasing**
113:23
**indicate** 88:25
91:3
**indicated** 47:4
97:11
**indication** 108:8
**indicators** 14:4
**indices** 36:11
**indirectly** 39:1
**individual** 37:6
40:18 69:12
90:9
**individuals**
15:10 24:23
31:19
**industry** 19:12
19:13 20:3
43:17
**infective** 105:4
105:25
**influence** 58:9
58:10 61:6
63:8
**influenced**
107:25
**information**
21:6,20 22:1,8
22:9 76:6
**informative** 6:24
**infusion** 18:4
**ingest** 83:13
84:24 90:7
**ingredient** 36:3
36:5,6 38:19
39:5 68:9,12
68:12 69:12
70:25 71:1,10
73:12 94:5
109:18 111:17
112:11 115:24
**ingredients** 10:2

12:2,14 19:13
60:6,16 61:5,8
61:14,16,19,23
62:16,22,23
63:11,15 64:1
64:4,22,24
68:6,7,21 69:4
69:10 72:23
88:18,20,24,25
90:20 94:22
96:21 97:1
98:25 99:6
108:10,23
109:2,7,11,18
110:1,4 111:7
111:12,15
116:7
**initial** 30:14
31:8
**initially** 68:23
114:5 115:14
**instruction**
28:14
**instructions**
83:23
**intake** 87:9
**intend** 8:17
69:21
**intended** 23:14
64:6 99:20
100:2,15
**intent** 30:24
38:22 45:6
94:19
**intention** 96:25
**interactions**
91:3
**interest** 44:8
**interested**
119:11
**interesting**
10:20
**interpret** 24:12
**interpretation**
49:24 102:18
**interpreting**
102:22

**interviews** 21:17
**introduce** 4:16
**introduced** 5:6
**investigate**
109:6
**investigated**
110:7
**involved** 76:21
85:4 88:18
90:23
**involves** 18:9
33:21
**involving** 5:14
76:22
**Iovate** 20:4,8
**irrespective**
63:15 88:17
**isolated** 81:16
**issue** 13:2 53:3
57:23 69:13
89:8 91:8
105:18 110:8
111:4
**issued** 5:9,12,18
**issues** 69:4
105:19
**Item** 13:16
**items** 22:19 46:5
46:19 58:21
110:9,18
**iterations** 23:2
32:2
**IV** 28:13 66:4
**IVs** 16:4

_____
**J**
**James** 6:24
**Jason** 2:3 4:19
21:23 44:12
84:18 96:5
103:17 120:3
120:20
**Jay** 87:3,5,8
**Jeana** 1:22 4:3
4:14 118:14
119:4,20
120:17

**job** 40:7 120:8
121:5
**jog** 50:8,12,13
50:13,20
**joined** 6:2
**JORDEN** 2:9
**journal** 27:24
**journals** 21:3
28:9
**journey** 97:8
**jstearns@free...**
2:6

_____
**K**
**Kalman** 2:17
6:2 9:1,5,11
108:19 110:10
110:11,16
111:12 112:13
**keep** 42:12 56:7
63:5 87:19,20
87:22 88:3,4,4
**keeping** 91:11
**kept** 32:5
**Kevin** 2:9 4:21
6:14 7:19 27:3
28:24 38:7
42:20 53:1,2
63:4 64:10
75:12 78:14
79:24 83:19,21
95:20 103:6,14
105:22 116:8
116:10 120:20
**kid** 72:19
**Kim** 1:22 4:3,14
118:14 119:4
119:20 120:17
**kind** 14:14
27:23 31:15
72:2 74:3,22
84:15 88:18
89:21 90:20
95:15 96:10,20
99:6 100:4
**kinds** 10:1 15:3
15:7 32:15

**kmccoy@carlt...**
2:12
**know** 5:20 10:13
10:13 14:16
15:11,19 16:14
16:17 18:4
20:11 21:2
22:11 23:17,21
23:25 24:6
28:16 30:5,21
31:12 33:23
34:12,18 35:9
35:12,13,16,18
35:22 38:8
40:16 41:15
43:20 44:3,6,7
44:7,9,15,18
44:20 46:4
47:2 48:18,18
48:19,20,21
49:10,12,13,16
49:23 50:1,24
52:4 55:18
56:23 57:3,24
58:3,15,22
61:12 62:20,20
63:18,19 64:15
64:17,25 66:25
67:3,10 68:15
68:21 69:21
72:18 73:20
74:12,18 75:11
75:12 76:14,17
76:21,24 78:25
80:22 82:20
84:4,23,24
85:2,24 86:1
86:16 88:5
89:12,12,17
90:11,11 93:5
93:14,15,20,21
94:8,8 95:2
96:3,24 97:2
98:20 100:8
101:16 103:3
103:10,15
104:8,15,19

105:9,25 106:4
109:5 111:1
114:9,24 115:7
117:9
**knowledge**
22:16 28:2
39:7 110:22
116:7

**L**

**L-tryptophan**
76:22,25 77:10
**Lab** 6:1 70:18
76:1,5,8
**label** 11:24,25
46:19 58:5,8
58:10,13,21,22
58:25 59:2,8
**labeling** 9:20
11:23 69:25
70:3
**labels** 46:20,24
46:25 47:1,11
69:19 101:13
**lager** 93:6
**large** 4:5 43:25
77:20 119:4
**lately** 74:17
116:11
**launch** 64:6,15
64:25
**launched** 77:19
**law** 69:9,10
**lawyer** 102:12
103:14
**lawyer's** 102:17
**lay** 81:18
**leads** 63:20
**leaves** 39:14
**left** 75:13
**legal** 19:12
104:1 111:1,20
112:3 113:18
114:19,22
116:3,5,11,24
**let's** 7:21 9:14
10:17 20:12

22:20 30:10,11
30:21 39:16
54:2 55:22
56:7 75:14
81:8 84:3 86:4
89:3 101:21
103:19 104:13
**letter** 110:21
111:14 112:6
116:12 120:1
**letters** 108:8,13
108:14 110:24
**letting** 57:25
**level** 34:14 61:10
88:20 90:21
**levels** 68:23 90:1
90:2,3,22 91:4
91:9,12
**liability** 1:9
**likes** 89:20
**limit** 89:18,21
**limited** 1:9
**limits** 91:13
**line** 44:15,18
70:20 77:18,24
78:2 105:20,23
105:24 121:7
**list** 21:2,7,12,15
46:12,19 47:10
59:2 65:12
96:20 99:5,6
106:13 107:2
109:12 110:21
110:22 111:6
111:13,18
116:6,10,25
**listed** 15:1 20:21
20:24 21:9
23:25 28:20
33:13 108:24
**listening** 98:21
**listing** 33:2
46:24
**listings** 48:3
**lists** 78:2 110:19
111:10
**literally** 103:7

**literature** 27:23
74:3,13 91:15
96:10
**little** 31:17 43:20
60:9 66:9 72:7
72:8 74:9
77:12 85:8
86:9,13 101:21
**living** 40:8
**LLC** 1:9 4:10,22
5:7,14
**LLP** 2:3 120:4
**long** 14:2 31:8
85:3,10 90:25
106:14 107:25
113:22
**long-term** 25:6
**longer** 31:17,18
38:24 57:25
60:9,12 62:2
75:13 91:22
**look** 22:20 32:12
46:6,11,11,23
47:12 53:23
68:5 70:8
74:24 85:5
89:14 90:17
91:21,23
109:18 114:8
114:23
**looked** 71:15
74:17 91:1
100:11 115:20
116:10
**looking** 6:19 7:1
9:17,19 19:7
24:11 37:6
65:1 74:22
77:4 89:17,24
89:24 112:12
114:1
**looks** 67:23 68:3
68:3 69:2
**loop** 102:8
**lose** 81:24
**loss** 18:3 20:10
**lot** 32:7 52:5

55:3 56:21
69:19 72:2
80:21,22 86:22
86:22,22 87:19
87:20 88:3
90:12 92:18
100:6,10
103:10 106:24
106:24 110:19
117:11
**lots** 21:1 29:1
33:15 40:8
53:14 65:8
75:2,3,3 81:4,5
85:10
**love** 94:9
**low** 34:4,5,5,15
68:23 113:19
113:21 114:4
115:11
**lower** 19:20
99:13 115:10
**lowered** 90:18
**lunch** 40:16

**M**

**M.D** 4:8 28:5
**main** 91:8
**maintains** 111:6
**making** 45:25
**male** 40:7
**man** 43:7 44:1
103:16
**manufacturer**
23:9 54:10
55:1,12
**marked** 8:23
**market** 112:23
113:8 114:2,8
114:12,15
115:16
**marketed** 53:9
63:14 99:20
100:2,15
**marketing** 63:8
63:11
**markets** 114:1

**martial** 65:9,17
114:17
**Marvin** 1:14 3:4
3:11 4:8,25
118:6 120:3
121:4
**mass** 38:20,22
38:25 59:20
60:2,6 81:10
81:12,20,21
82:18,25 83:8
83:15,18 84:13
88:9
**match** 34:7
**materials** 20:17
20:20,23 21:1
21:10,12 46:18
46:21,22 47:5
47:6 107:17,21
**matter** 4:9 5:13
34:13 58:6
77:2,11 79:4
88:19 104:22
106:11 108:10
**McCOY** 2:9 3:5
4:21,21 5:5 6:3
6:17 7:23 8:25
11:12 12:18
13:8 16:21
17:24 18:15,21
19:23 23:19
25:16 26:11,22
27:10,19 28:18
29:5 32:20
33:7 36:18
37:21 38:9,12
38:13 39:16,23
40:4 42:22
43:14,23 45:23
47:16,23 48:7
50:6 52:2,22
53:6 54:1
55:16 58:4
59:24 60:11
63:7 64:11,14
65:3,15 66:16
69:6 70:12

71:22 72:25
75:14,17,23
76:20 78:24
80:1 82:23
83:3,22,25
84:1,11 85:12
85:21 88:1
95:21,25 96:5
96:6,19 97:4
98:8 99:2,15
101:4,20 102:6
102:15 103:10
103:17,20
104:10 105:12
106:9 108:11
109:16,25
111:5,19
112:16 113:6
114:14 115:17
116:15 117:6
120:20
**mean** 7:19 8:14
9:20 19:6 22:2
24:3 29:10,13
34:3,15 45:3,3
48:24 52:25
55:22,23 57:13
76:2 97:24
102:12 104:8
105:2 113:16
**meaning** 12:21
24:11 44:24
57:14 58:20
65:25 66:2,10
73:24 92:2
97:21 98:11
**means** 49:25
68:11 69:10
119:14
**meant** 21:4
56:20
**media** 23:2
**medical** 25:5,7
26:7,19,25
27:8 28:13
105:20
**medically** 105:1

**medicine** 24:19
25:7,10 26:2
27:1,7,13 29:3
105:15,21,24
**medicines** 105:5
**meet** 48:19
**meeting** 23:22
**meetings** 10:15
10:15
**meets** 54:25 55:4
**memorize**
106:25
**memory** 61:12
62:3 80:22
81:14
**men** 15:10
**mental** 16:16
18:5 37:14
45:16 49:17
57:13 58:14
60:14,24 71:2
80:21 81:4,14
88:4 100:7
114:3
**mention** 79:7
82:1
**mentioned**
20:25 31:2
47:24 64:5
65:7 66:3
69:11 76:11
84:16 89:10
107:21 110:10
110:16 111:12
**mentions** 110:15
**merchandise**
47:25
**messed** 116:16
**metabolic** 73:10
73:10
**metabolized**
111:24
**methodology**
94:11
**middle** 1:1 87:24
**mile** 50:13
**miles** 50:13

**military** 91:9,13
91:16 92:1
**milligrams**
68:18,18 89:18
89:22 90:6,8,9
91:4,10 113:20
**mind** 20:13
30:10 36:24
**mine** 6:15,25
67:12
**miniscule** 66:8
86:7,7,9
**minute** 13:12
20:15 86:4
111:24
**minutes** 38:7,10
38:24 39:17,17
75:16 101:22
**missing** 61:15
**misstated** 95:23
**mix** 96:3 100:10
**mixed** 65:9,17
**mixing** 105:15
105:15
**molecule** 35:14
74:9
**molecules** 74:21
**moment** 17:18
46:12 68:20
83:14 99:17
**money** 45:21
106:4
**Monster** 11:18
90:17,18,18,23
**mood** 100:8
**moot** 74:6 99:11
110:23
**morning** 5:6
40:12 41:4,9
48:13 56:22
85:1
**move** 20:12
36:23 73:3
83:16
**moving** 73:21
**multiple** 31:22
32:2 91:12,12

107:22,23
111:25
**multivitamin**
62:19 85:1
**muscle** 6:8 8:13
15:8 16:12,12
17:20 18:1,2,2
18:8,12,17
19:11,16,25
36:23 37:13
38:20,22,25
39:2 41:5
42:13 43:2,7,8
57:21,23,24
58:1,15 59:19
60:2,5 72:7,11
72:20 73:11,15
73:18,22,25
74:5,8,12,15
74:19 75:8
80:23 81:10,12
81:20,21,23,24
82:3,4,6,6,10
82:18,25 83:8
83:15,17 84:13
84:17,24 85:4
85:14,16,17,22
85:25 87:15
88:8 90:13
114:18
**muscles** 15:25
16:3 33:25
42:19 44:1,4,8
58:2 62:5
81:25 82:11
84:21 85:7,9
95:3
**mute** 47:14 63:4
**muted** 47:15

_____
**N**

**N** 3:1 4:1
**name** 15:6 69:7
93:10
**names** 115:20
**narrow** 10:17
**natural** 39:10

**necessarily**
14:10 21:7
37:16 38:19
41:5,12 48:4
80:17,18 115:6
116:23
**need** 28:1,12
33:23 34:18
35:9,12,16,18
35:21 38:6
39:18 42:2
49:12,13 50:24
75:15 83:17
84:12 85:10
102:17 104:20
117:5
**needing** 24:24
**needs** 69:20 80:9
87:20
**negate** 97:17
**negated** 95:4
**negating** 94:7
95:4,14
**negative** 95:1
97:24,25 98:1
99:9
**negotiated** 22:14
**Nelk** 77:19
**nerve** 72:18
73:13,13,14,17
**neurological**
74:1
**neurotransmit...**
34:1
**Nevada** 1:9
**never** 22:9 71:15
98:15
**new** 36:11 38:15
52:23
**nice** 38:11
**niche** 41:24
43:12 45:11,19
45:20 67:12
**night** 62:2,3
72:8,19
**nights** 91:12
**no-effect** 106:2

non-bodybuil... 96:13
non-Gatorade 31:18
normal 14:12 40:16 81:11 84:3,5,8,12 87:12
North 2:4 120:4
Notary 4:4 118:15 119:4
notes 101:23 119:6
notice 7:14
NOTIFICATI... 120:1
notion 16:23
number 3:10 61:8 64:10
numbered 9:15
nutraceutical 10:14
nutraceuticals 105:15,19,25 106:1
nutrition 11:24 59:10 69:25 106:12
nutritional 27:5
NV 1:9 4:9,21 5:7,14 120:7 121:4

_____
O
_____
O 4:1
O'Douls 95:10
OATH 118:1
Oats 31:21
object 11:9 12:11,22 16:13 17:21 18:10,18 19:18 23:16 26:8 27:3,15 28:6 32:18 37:19 43:3,19 47:13 51:25 57:22 63:5

65:6 78:14 95:25 104:25 110:13
objected 47:14 108:9
objecting 26:14
objection 25:13 28:24 32:25 36:17 42:20 45:13 47:20 48:2 49:22 52:18 53:1,21 55:10 59:21 60:3 64:23 66:13 67:20 70:11 71:20 72:15 76:16 79:24 82:19 83:2 84:9,14 96:14,23 98:7 98:19 99:10 101:1 102:11 104:6 105:22 108:5 109:15 109:21 111:8 112:9 113:1,15 115:5 116:8
obtained 22:8
obvious 33:23
Obviously 62:6
October 3:11 5:10,18 7:14 8:20
odd 50:10 84:15
offer 48:6
offered 114:25
offering 14:7 47:17
offerings 13:17 19:8 47:8
offhand 75:9 115:12
office 40:17 48:20 84:21 85:6 120:10,13
Oh 23:21 25:21 115:25 116:19

Ohio 64:7,16
okay 6:4 7:1,12 7:15,22 8:12 8:16 9:22 13:20 20:5,16 20:19 22:22 24:16,18 25:18 25:21,21 26:1 38:9 39:16,21 40:9,10,14 43:5 54:6,13 54:18 56:5,6,6 56:10,12,13 64:12 70:2 73:3,5,9 83:13 84:4,8,10 85:19 86:8 92:12 93:8 96:5,8 98:9 99:12,16,24 101:25 103:17 103:21 104:20 106:10 116:19 117:4,6,11,14 117:16,17
old 43:7
once 50:12 60:7 88:6 117:1
one's 25:23
opine 22:23
opinion 25:1 27:9,9 28:11 28:16 29:7,18 33:22 36:8 41:11 51:18,22 52:11,15 53:15 53:18 54:3 57:7,16 58:6 58:11,19 60:19 60:22 61:3,6 62:10 63:25 71:7,17 73:16 74:25 75:4,7 77:12 80:13 88:20 89:2,4 96:15 106:22 108:1,9 110:12

112:24
opinions 5:17,19 5:22 8:2,3 9:4 9:5,10,11 22:5 22:12,17,18 30:2 35:4,6 38:14,16 42:10 63:9 64:18,21 77:2,9 79:4,14 79:20 88:15,17 104:3 107:16 107:20
opportunity 17:7
opposed 19:16 42:18,25 45:11 46:9 61:20 62:13 63:14 71:8 80:12
order 64:1 87:8
original 47:4
outcome 90:4 92:6
outside 16:22 17:4,9 29:6 88:10 95:16 96:9 109:19
overall 66:8 88:21 89:21 113:4
overlook 27:24

_____
P
_____
P 2:3,9 4:1 120:3 120:20,20
P.A 2:9
p.m 1:19 102:5 117:18
page 3:10 9:14 9:15 46:17,22 121:7
pages 46:6 119:6
paper 29:23
paragraph 5:25 6:12,21,23,25 8:6,10,13,16 9:16,18,19,23

9:24 13:10,13 17:18 19:2,8 20:13 21:9,16 22:21 24:14 25:10,15,17 27:21 28:4,7 30:8,10,12 32:13 33:14 54:3,4 64:5,11 70:17,21 73:23 74:16 75:1 76:3 77:17,22 88:13,16 89:3 99:16 100:21 100:22 112:19
paragraphs 7:13 7:17,20,25 8:3 8:20 20:22,24 21:19
parent 71:23 72:10
part 19:20 20:7 22:22 25:1 47:5 48:5 53:13,13 67:4 67:7 72:17 75:10 86:20 93:25,25 95:13 95:14 100:1,9 104:1 109:9,19 110:11
particular 21:7 50:18 58:5 61:5 68:12 77:3,10 78:7 78:10 106:22
parties 119:10
parts 62:20 86:21
party 119:11
patents 30:25
pathology 68:13
patient 16:2 18:25 41:16
patients 81:23 115:10
pause 97:13

**PDF** 46:18
**PEA** 116:18,19
  116:20
**peer** 17:14 27:23
  74:3,13 95:16
  96:11
**penalty** 121:18
**people** 13:2
  14:12,16,17,19
  24:22 28:14
  34:4 41:25,25
  45:14 50:2
  52:5 63:21
  67:9 72:22
  100:5 104:18
  107:24
**Pepsi** 31:22
**perceive** 50:13
**perceived** 36:12
  36:13 37:14
  38:2,23 50:12
  51:5 87:18
  88:6
**percent** 34:3
  113:19
**perception**
  36:10 37:14
  46:2 58:1 65:1
  87:18,18 88:11
  95:2
**perfect** 101:25
**performance**
  63:17 100:5
**period** 46:7
**perjury** 121:18
**person** 40:25
  41:9 43:25
  50:19 51:16
  61:3
**personal** 28:23
**personally** 96:15
  96:17 102:18
  102:24 103:13
  103:25
**persons** 113:7
**pertained** 26:7
**PETERS** 2:3

120:4
**pharmaceutical**
  10:14
**pharmaceutic...**
  10:3,7,11
  106:12
**pharmaceutics**
  27:7
**phase** 18:25
**phases** 84:19
**phenethylamine**
  115:22,22,23
**phenylalanine**
  115:25 116:1
**Phone** 2:5,11
**photos** 44:17,18
**Phrase** 52:4
**physical** 24:22
  24:24 25:23,24
  26:17 29:3
  40:15 90:4
**physicians** 115:9
**physique** 15:9
  43:8 44:6
  114:17
**pick** 35:15
  112:13
**picture** 79:12,21
**pictures** 76:9
  78:3
**piece** 61:18
  74:12
**ping** 114:16
**place** 59:4 119:8
**placed** 100:4
**Plaintiff** 1:6 2:2
**plant** 117:2
**plants** 39:14
  111:15
**play** 60:18,24
  85:22
**players** 30:23
  31:3,4
**playing** 15:13
  17:5
**plays** 62:2
**please** 4:16 88:2

**point** 29:4 38:8
  51:3,6,8,9 53:2
  61:19 74:6
  83:17 96:21
  99:11 100:19
  110:23,25
**pong** 114:16
**population**
  14:21,22,23
  42:1,14,17,19
  42:24 45:1,9
  45:10,22 63:24
**portion** 64:8
  98:12 113:2,4
**portions** 26:21
**position** 29:20
  33:18 97:19
**positive** 94:7
  95:4 97:17,25
**possibility** 60:10
  61:1
**possible** 17:11
  17:22,25 18:2
  18:3 52:19
  74:20 88:12
  90:21 102:23
**possibly** 17:11
  18:13 41:2,14
  49:1 50:22,23
  61:4,4,11 63:3
  88:10 94:6
**post** 77:3,5,10
**posted** 76:14,25
**posting** 76:22
  77:6
**potassium** 31:11
  34:5
**potent** 19:11,12
  19:16,24 20:2
  89:13
**potentially**
  115:3
**powdered** 81:8
**powders** 24:5
**Pre** 88:17 89:9
  89:15 90:5,7
**pre-workout**

64:7 99:19,21
  100:1,15,17,17
  100:24,25
**pre-workouts**
  100:7 101:3,5
**precisely** 10:18
**prepared** 106:19
  120:10
**preponderance**
  21:6
**preregistration**
  69:20
**present** 2:16
  32:9
**presentation**
  29:12
**preserve** 81:23
**pressure** 90:14
  90:15
**pretty** 23:23
  28:1 29:13
  33:23 56:2,2
**prevent** 99:20
  100:16,23
**primarily** 80:15
**primary** 33:15
**principle** 33:6
**print** 7:6,11
**printed** 7:21
**prior** 29:21
  74:25 100:3
**probably** 7:4
  12:25 60:25
  65:8 72:6 82:4
  82:5 86:24
  87:1 94:20
  95:2,8 99:13
  110:23 113:17
  114:10
**problem** 55:15
  78:12
**problematic**
  110:6 116:6
**proceeding**
  120:10
**proceedings** 6:2
**process** 31:15

37:25 73:11
  86:3,20
**product** 6:1,7,7
  6:8 13:17,22
  19:3,4 20:10
  20:10 36:7
  38:19 47:8,17
  49:20 51:24
  52:16 54:23
  55:7 56:18
  57:6 58:5,7,10
  59:19 60:2,23
  64:1 70:18
  71:1,4,19 76:5
  76:8,10,12
  77:17,18,24
  78:2,11,19,20
  82:18 88:17
  89:9,25 90:6,7
  101:8 109:8
  114:25 115:3
**production@...**
  120:13
**products** 13:17
  14:7 19:8,12
  19:15,17,21,25
  20:3,7 22:19
  23:10,24 24:1
  30:2,3 43:18
  44:16,17,19
  46:8 47:21
  53:16 54:8,11
  54:16,20 55:2
  55:13,19 58:17
  70:16 75:25
  77:7 78:3
  79:22 88:19,21
  88:22 89:1,1,6
  89:12 101:10
  101:14,15
  108:2,15,23
  109:3,7 110:2
  111:7,17 112:7
  112:12,14
  115:19
**professional**
  63:25 107:25

**promote** 54:7
57:21,24 58:23
76:7
**promoted** 23:1
53:16,19 70:17
75:25 76:4
77:18 78:1,9
78:12 79:23
102:9
**promoter** 74:19
**promotes** 76:18
**promoting**
54:22 78:6
**proposing** 98:14
**protein** 16:5
18:13 44:24
58:15 82:10
87:12,13
**prove** 59:17 74:8
**provide** 54:15
82:18
**provided** 8:4 9:2
22:1,12 28:4
64:2 120:10
**provider** 23:9
54:10,25 55:11
**providing** 22:7
25:4 26:5
27:13
**provisions** 22:20
**public** 4:4 109:4
109:8 118:15
119:4
**publicize** 54:8
**publicized** 70:18
76:4
**publish** 96:17
**published** 95:15
**pull** 106:25
**pulmonary**
115:9
**purpose** 41:8
49:19 52:10
80:15
**purposely** 13:5
56:20
**purposes** 37:3,6

48:10 49:16
51:17 77:8
**pursuant** 102:9
**put** 13:2,3 35:13
42:2 47:12
60:15 68:9
72:6,7 94:5
97:24 99:6
104:15 106:3,6
111:24
**puts** 12:17
**putting** 63:18
97:1 98:23
104:19 106:5
**PX** 91:14

**Q**
**Quaker** 31:21
**qualified** 10:5
30:2 88:23
**qualifies** 12:9
53:7,8
**qualify** 15:23
33:21 36:7
41:15 51:18
52:11 62:12
71:24 103:4
**question** 10:12
10:16,20 21:8
36:2 38:21
47:4,14 49:5
52:1 59:25,25
83:21 84:15
87:25 96:8
97:22 104:7
108:25 109:24
112:1
**questionable**
111:11
**questions** 50:10
96:3 109:22
**quick** 108:14,16
112:19
**quickly** 112:17
**quote** 103:12
106:7
**quote/unquote**

24:15,24 25:11
25:20 77:19,24
**quoted** 54:3

**R**
**R** 4:1 119:1
121:1,1
**ran** 108:12,14
**rapidly** 81:24
**reaction** 92:3,3
**read** 13:12 21:19
23:23 29:25
43:21 44:3
46:3 56:1
66:24,24 77:5
89:11 92:9
107:22 108:19
121:18
**reading** 6:22,23
29:19 40:8
107:24
**real** 38:21 50:17
112:19
**really** 10:16
12:23 35:20,24
50:10 62:4
88:7,7 93:14
97:22 104:21
**Realtime** 1:23
4:4 119:4
**reason** 50:1
59:15 99:5
106:5 112:6
121:7
**rebuilding** 16:19
**rebuilds** 16:19
**recall** 16:25 17:7
63:16 75:9
106:14,16,21
**recalled** 111:3
**received** 110:20
110:22 112:6
**receives** 111:14
**recess** 40:1
75:20 102:3
**recognize** 10:18
12:8 14:14

67:14
**recognized** 68:8
69:11
**recommended**
105:10
**record** 4:7 39:24
40:2 48:14
75:18,21 102:1
102:4 117:17
**recorded** 90:16
**recovery** 6:9
8:13 18:25
**RECROSS** 3:3
**red** 56:25 57:3,4
57:9,13,16
79:1,13,21
**REDIRECT** 3:3
**reduce** 32:3
**refer** 24:20 29:7
42:24
**reference** 28:1,3
**references** 46:16
**referencing**
91:25
**referring** 19:20
19:21 25:11
26:3,17,18
30:6 96:25
**refers** 25:22
**reformulated**
90:18
**regarding** 10:6
10:10 22:24,25
101:7
**regimen** 87:15
**Registered** 4:3
119:4
**regular** 63:19
**regularly** 20:25
**regulated** 10:21
12:1 69:2,19
69:22
**regulates** 10:25
**regulation** 12:4
69:16
**regulations** 10:5
10:9 11:20,20

11:22 13:4
67:24,25 70:14
110:3
**regulatory** 69:7
70:8 108:8
**relate** 49:10
79:20
**related** 18:13
39:1 65:14
**relates** 79:5
**relating** 92:1
**relative** 119:10
**relaxation** 16:17
16:18
**relied** 21:5
**remain** 115:15
**remember** 107:3
107:4 115:12
**REMOTE** 1:14
2:1
**remotely** 4:13
118:6
**repair** 18:2
**repeat** 42:21
100:19
**rephrase** 52:6
**replace** 31:13
**replacement**
34:8
**replenishment**
82:4
**report** 3:11 5:9
5:12,17,20,24
7:9,17,24 8:3,7
8:11,18 9:1,6,8
9:12,21 22:19
26:6 28:25
29:19,25 46:13
46:15 52:17
64:5,9 70:16
75:5,7 91:5,8
91:17,18,20,25
92:8 98:17
106:19 107:18
107:21 108:19
110:10,11
112:13,19

119:5
**reportable** 12:5
**reported** 1:22
    90:17 92:6
**reporter** 1:23
    4:4,14,17
    85:20 119:4,14
**reporting** 1:23
    2:18 12:6
    120:8,17 121:5
**reports** 7:2 92:2
    107:1
**represent** 5:7
    48:12 56:3
**reproduction**
    119:13
**reproductive**
    68:13
**request** 120:12
**require** 12:6
**required** 18:16
    18:17,19 69:12
**requirements**
    70:3
**research** 107:6,7
    107:11,13,15
**reserve** 81:21
**residual** 74:21
**respectfully**
    120:12
**rest** 34:1,2
**Rested-AF** 6:8
**resting** 71:2
**restore** 82:11
**result** 37:4,8
    38:25
**retain** 31:15,16
**retention** 16:23
    17:5,10 29:6
**return** 120:12
**review** 20:25
    21:3,11 63:25
    95:16 109:11
    115:18,21
    120:11,12
**reviewed** 9:1
    17:14 20:17,21

20:23 21:2
    27:23 28:9
    46:22 47:6
    74:3,14 75:2,6
    79:11,15 90:25
    96:10,11
**reviewing** 8:7
    10:2
**ridiculous** 72:2
    103:19
**right** 5:23 7:24
    9:14,23 10:17
    13:19 18:23
    20:8 21:25
    22:11 23:13
    25:12,25 26:3
    27:11,21 32:19
    33:9 35:4 37:9
    40:5 47:6,7
    48:16 54:17
    56:11,13,15
    66:12 70:1,7
    71:13 75:17
    79:23 83:11,12
    83:16,22 86:6
    86:12,13 92:23
    93:9 95:9,23
    97:9 99:18
    101:20 102:7
    103:21 107:5
    108:20
**RMR** 1:22
    118:14 119:20
    120:17
**role** 35:6 37:9
    85:19,22
**rope** 65:11,17
    114:17
**roughly** 54:17
**routine** 56:23
**rules** 69:3
**run** 51:18 52:10
    52:11 57:25
    82:21 92:24
    93:12,21 94:17
    108:7
**runner** 15:24

16:23
**runners** 14:18
**running** 15:6,20
    17:2,13 34:5
    38:1 56:8

—————————
**S**
—————————
**S** 3:8 4:1 121:1
**sachets** 13:19
**safe** 68:9,15,17
    69:11 89:18
    90:21
**safely** 99:21
    100:16
**safety** 69:15
    91:21 101:19
**sales** 114:13
**Samsonite** 116:1
**satisfies** 64:2
**saw** 44:23 47:5
    76:9,15 77:10
    79:1 106:13
**saying** 25:10
    58:13 65:16
    97:17
**says** 23:8 46:18
    54:7 56:23
    67:5 78:19
    79:8 89:11
**scenario** 50:18
    50:21 51:16
    94:16
**scheme** 69:7
**Schwarzenegger**
    65:16
**scientific** 17:15
    21:6 74:4,13
**scientists** 28:10
**scope** 109:20
**Scout** 2:10
**screen** 56:9,11
**search** 108:7,12
    108:14,16
**season** 86:21,23
    87:13
**second** 7:10 9:24
    25:9,14 26:18

27:17 86:2
    95:10 100:9
**section** 9:8
    22:24 23:3
    52:16 54:4
**sedentary** 40:7
**see** 6:5,16,20,21
    7:3,21 11:5
    12:3 13:10
    15:4 16:7 20:5
    21:9,16 22:20
    23:5,11 24:10
    24:17 25:1,20
    27:21 32:17
    39:3 41:7,16
    41:19 42:7,15
    46:8,10,24
    48:15 51:7,14
    54:12 56:11,14
    63:12 65:21
    70:21 77:22
    78:16 89:14
    91:22 94:9
    99:23 104:20
    105:17 106:10
    108:7,12,15
    109:9,12,17
    111:16,17
    112:2,12,14
**seen** 34:4 46:3
    78:3,5,8 106:1
    111:2
**self** 56:2
**sell** 24:4,8 45:9
    45:20,20 53:4
    55:24 89:1
    91:14
**seller** 23:9 54:10
    54:25 55:12
**selling** 43:18
    44:10,14,16,20
    45:1,2,7 46:4
    52:5,8 53:12
    59:7 79:9
    114:1
**sells** 23:25 45:8
    53:3 55:20

56:4
**Send** 77:19,25
    78:2,6,9,15,17
    78:23 79:1,5,8
    79:8,14,20,21
    79:25 88:16
**sends** 78:25
**senile** 80:23
**sense** 24:21 29:2
    29:8,10,16
**sentence** 24:15
    25:9,12,19,25
    26:17 27:16,17
    56:1 99:23
**separate** 14:14
    26:9,15 45:18
    65:25 66:9
    67:15 83:11,13
    116:9
**series** 97:6
**serious** 90:15
**seriously** 90:14
**services** 54:8
**session** 101:24
**set** 5:17 30:8
    95:9 117:14,15
    119:8,9
**sets** 9:5
**severe** 92:3
**share** 56:8
**sheet** 120:12
**shorthand** 119:6
**shot** 55:21 56:20
**shots** 13:18 19:9
    19:16
**show** 74:4 78:5
    81:4 117:1,2
**showcased** 65:5
**showing** 6:6
    76:25 77:10
**shown** 76:11,12
    77:13,15
**Shredded-AF**
    114:25 115:3
**sic** 8:20
**sick** 24:23
**side** 12:5,6 73:21

90:15,16
**signature** 7:12
  7:25 8:19
  121:24
**signed** 5:9 7:9
  7:10,16
**signor** 23:18,21
**similar** 17:2
**Sincerely** 120:16
**single-serving**
  13:18 19:9
**sir** 13:14 15:16
  20:18 21:14
  42:23 52:3
  70:21 73:6
  77:22 103:8,24
  107:9
**sit** 22:11 23:13
  60:18
**sitting** 85:7
  106:21
**situation** 52:20
  52:25 90:23
**size** 43:2 87:8
**sleep** 6:8 16:18
  18:6 71:3,24
  72:4,11,11,12
  114:9
**sleeping** 73:20
**sleeps** 72:6
**slogan** 57:4
**small** 45:15
**social** 23:2
**societies** 107:23
**sold** 11:2,3,6,7
  14:11 44:25
  52:20,24 53:9
  115:9
**soldiers** 91:11
  91:11,22
**sole** 58:9
**solely** 79:20
  91:20
**somebody** 44:1
  49:14,19 50:7
  53:12 66:25
  83:16 84:2

87:6 92:2
  100:22
**Somewhat** 57:2
**soon** 60:15
  63:18
**sorry** 6:15,16
  23:18 26:10,13
  30:19 42:21
  63:4,5 64:10
  67:7 80:3
  87:23 92:21
  108:25 109:23
  112:22 114:21
**sort** 27:24 55:4
  74:25
**sorts** 50:5
  102:14
**source** 76:6
**space** 66:19,21
**speaking** 38:5
  48:14
**specific** 34:15
  45:11 71:6
  78:20
**specifically**
  10:13 11:22
  17:17 30:6
  76:2
**speculating** 72:2
  98:13
**split** 13:1 32:21
**spoken** 46:1
  103:10
**sport** 41:24 43:1
  43:25 65:5,23
  66:11 86:5,7,9
  86:13 87:6,7
**sports** 15:1,3
  30:15 32:14
  64:7,16 65:4
  65:20,23 66:12
  106:12 110:19
**sprinkling**
  114:11
**stack** 101:10
**stacked** 89:5
**staff** 7:11 17:11

**stages** 82:7,7
**stamina** 36:16
  36:24 37:1,2,4
  37:5 88:12
  91:19,24
**standalone** 39:4
  73:12
**standard** 96:20
**standing** 73:16
  82:12,15
**standpoint**
  63:24 110:6
**Starbucks** 53:19
  54:22,24,25
  55:2,4,7,14,18
  55:20 56:3,4
  56:14
**start** 16:3,3 25:9
  43:16,18 63:18
  80:3 104:4
**started** 5:7 9:16
  30:14,22 44:4
  44:9,14 113:16
**starting** 97:7
**starts** 6:23 46:17
**State** 4:4 118:2
  118:15 119:2,4
**stated** 26:6
  74:15 75:4,7
**statement** 28:17
**statements** 46:8
**STATES** 1:1
**status** 24:25
  25:23 68:24
**stay** 85:3 91:22
**stayed** 31:16
**Stearns** 2:3 4:19
  4:19 6:14 7:18
  11:9 12:11,22
  16:13 17:21
  18:10,18 19:18
  23:16 25:13
  26:8,13 27:3
  27:15 28:6,24
  32:18,25 36:17
  37:19 38:5,10
  39:19 42:20

43:3,19 45:13
  47:13,20 48:2
  49:22 51:25
  52:18 53:1,21
  55:10 57:22
  59:21 60:3
  63:4 64:10,23
  65:6 66:13
  67:20 70:11
  71:20 72:15
  75:11,16 76:16
  78:14 79:24
  82:19 83:2,19
  83:23 84:9,14
  87:24 95:20,23
  96:2,14,23
  98:7,19 99:10
  101:1 102:11
  103:6,12,18
  104:6,25
  105:22 108:5
  109:15,21
  110:13 111:8
  112:9 113:1,15
  115:5 116:8
  117:9,13,15
  120:3,20
**Steel** 1:5 4:9,19
  5:13 6:7 21:18
  22:24 23:1,8
  23:25 43:17
  44:12 46:19,20
  47:2,8,17
  51:23 53:24
  54:9 70:19
  89:5,11,13,15
  90:5 99:21
  100:9,16,18,23
  100:25 101:5,7
  101:9,14,15
  108:15 109:7
  110:21 112:5
  114:25 115:19
  120:7 121:4
**Steel's** 46:7
  88:21 89:9
  90:1,6 108:3

108:23 109:3
  110:2
**SteelSupplem...**
  46:20
**Stenographic...**
  1:22
**stenotype** 119:5
**steroid** 111:23
**stimulant** 40:24
  90:12
**stimulate** 14:4
  41:3,3 60:7
**stimulates** 90:12
**stimulating**
  87:19
**stop** 89:21 96:3
**store** 86:22
**straight** 102:16
**Street** 2:4 120:4
**strength** 24:20
  29:8 58:16
  88:5
**stress** 82:8
**Strike** 43:16
**strive** 19:10
**strong** 14:10,13
**structure** 116:22
**Structure-wise**
  74:18
**structured** 63:20
  69:21
**studied** 68:11
  81:22 91:10,11
  91:11 98:13
  108:2,6
**studies** 17:2
  74:4,14 81:4
  91:2
**study** 36:11,12
  92:7
**stuff** 39:8 58:20
  96:3 107:3
**subject** 96:11
**subjective** 73:22
  73:22
**subliminal** 78:21
**subsequent**

31:24
**subset** 14:16,19
  14:21 66:12
**subsets** 14:24
**substance** 79:17
  82:12 95:1
  103:22,23
  104:5 111:20
  115:4 116:23
**substances**
  112:8
**sugar** 31:11 32:4
**sugar-free** 32:4
**suit** 34:6
**Suite** 2:4,10
  120:5
**sum** 79:17
**sums** 74:7
**supplement** 5:17
  11:8,15,24,25
  12:10,17,21,24
  12:25 13:6,6
  13:24 14:8,9
  14:19 19:5
  23:10,24 24:1
  24:1,4 27:5
  30:17 31:2,7
  32:10 33:10,22
  34:8,21,23
  35:1,11 36:4,8
  36:14 41:14,21
  42:5 44:9,22
  46:19,20 47:19
  48:5,23 49:7,8
  49:9,15,18,21
  50:4,9,16,21
  51:2,3,19,24
  52:12 53:4,5,5
  53:8,10,13,23
  54:11,15,20,23
  55:2,3,13
  56:16,18,24
  57:6,10,17
  58:7,12,20
  59:2,3,6,23
  60:20 61:7,9
  61:11,12,14,17

61:18,20,21,21
61:23 62:7,10
62:13,13,16,16
62:21,22,24
63:9,19,22
64:3 66:6 69:5
69:17,20 70:5
70:10,20,24
71:4,6,7,8,18
71:18,23,25
72:4,5,10,13
72:14,22,23
74:7,10 77:7
78:16,20 80:5
80:6,12,13
81:6,7,9,11,15
81:17,17 84:25
92:15,25 93:13
93:24 94:3,4
94:18,20,23,24
95:5,8,12,19
96:22 97:13,21
97:23 98:1,2,4
98:5,9,10,16
98:22,22 99:8
99:14 102:14
102:19,23,25
103:3,13,22,25
104:2,9,16,19
104:23 105:4
111:21 112:23
112:24 113:2,4
113:5 114:19
115:15,16,19
115:23 116:2,3
116:11
**supplementati...**
  16:4,4 25:8
  29:15 41:18
  42:4 68:2
  86:17 115:11
**supplemented**
  50:14
**supplementing**
  12:14,16 41:4
  41:6,13 49:25
  51:5 60:16

66:6 97:2,3,3
102:21
**supplements** 1:5
  4:9,20 5:13
  10:1,2,7,11,19
  11:1,3 12:5
  22:6,13,25
  23:1 25:8 27:6
  33:4 42:4
  43:11,18 44:10
  44:15,24,25
  45:8 47:9 48:1
  48:4,25 49:16
  51:11 53:24
  55:14,24 61:24
  67:15,24 69:18
  70:4,4 72:24
  79:9,9 88:24
  94:22 95:18
  99:1,22 100:17
  105:16,20
  112:5 120:7
  121:4
**support** 28:3
  75:7
**supposed** 77:6
**Supps** 23:8 54:9
**sure** 7:8 9:17
  13:19 20:6,20
  41:4 44:25
  45:2,5,21,24
  55:4 62:11,15
  76:10 82:24
  101:12 104:13
  112:21
**swear** 4:17
**sweat** 14:11 34:6
**sweating** 34:6
**sworn** 5:1 118:7
**synapse** 73:13
  73:13 95:3
**synapses** 73:17
  80:23
**synonymously**
  63:2
**synonyms** 33:4
**synthesis** 73:25

74:5,8,15,19
75:8

———————
**T**
**T** 3:8 119:1,1
  121:1,1
**table** 15:4,13
  17:5,12 65:10
**take** 51:1 58:16
  62:19 75:12,14
  81:8,17 84:3
  85:1 89:25,25
  92:24 94:23,24
  96:21 99:7
  101:21
**taken** 4:3,8
  29:19 40:1
  75:20 102:3
  119:8 120:7
  121:5
**takes** 74:10 81:7
**talk** 11:22 13:9
  17:17 20:12
  28:8 30:12,22
  66:10 70:15
  83:5,12,12
  86:4 89:6
  107:23,24
  113:17
**talked** 22:9
  29:10,13 38:17
  43:10 45:7
  54:4 82:24
  98:23,24,24
  114:2
**talking** 19:2,17
  19:25 41:24
  43:4 44:11
  53:24 54:16,20
  66:11,15,18,21
  66:25 75:1
  86:2,5 94:12
  98:3,17 100:21
  113:12,14
  116:17
**talks** 28:10
**Tampa** 1:2 2:5

2:11 120:5
**target** 33:19
**taurine** 61:13
  114:6
**tearing** 15:25
  16:3 82:6
**Tech** 106:11
**tell** 101:20
**tells** 67:5,10
**ten** 39:17,19,21
  75:16
**tennis** 15:4,13
  17:5,13 65:10
  114:17
**term** 19:15
  24:14,20 25:10
  25:20 26:3
  27:2,18 42:17
  42:23 43:5,11
  43:12 51:12
  52:1,12
  66:18
**terms** 10:9 27:12
  28:3 30:2
  43:18 53:24
  58:19 60:12
  63:2 79:22
  89:8 91:19
  113:12
**territory** 63:21
**test** 69:14
**tested** 59:13
  98:15
**testified** 5:2
**testimony** 79:11
  79:15,17
  106:22
**text** 67:9
**Thank** 73:1,6
  117:8
**Thanks** 39:22,23
  96:5 103:17,17
  117:11
**theophylline**
  114:19,20,21
  115:7,10
**therapeutic**
  104:5,14,21

105:3,5,6,9,11
105:18
**therapy** 28:13
**thing** 31:20
  33:15 37:1
  38:4 42:12
  43:4 61:22
  63:5 73:19
  74:21 85:9
  93:18 105:6,8
  105:11 116:17
**things** 13:2,3
  14:4 15:3 28:8
  33:5,15,24
  34:7,8 41:23
  42:3 53:14
  58:15 63:16
  65:12,23 69:1
  72:3 76:19
  80:10 83:13
  85:11 87:10
  89:18 90:12
  97:24,25 100:7
  100:10 102:8
  104:18 112:18
  113:24 114:2
  114:12 115:8
  116:9
**think** 6:14 7:21
  9:15 13:1
  16:25 18:11,12
  18:12 28:14
  29:1,2 32:2
  36:23 38:21
  41:18 45:17
  47:4,25 49:23
  49:24 50:11
  54:24 63:17,21
  65:11 69:9
  72:1 73:3,24
  74:6,8 78:19
  78:20 80:25
  83:20 85:25
  89:19,22 90:2
  91:20 95:3,4
  95:13 101:18
  101:21 102:17

102:18,24,25
103:25 104:1,2
104:14 105:8
105:10 106:7
108:17,21
109:21 110:15
113:13 114:22
116:14 117:5
**thinking** 34:17
  40:21 49:4
  82:21
**thorough** 91:8
  91:16
**thought** 26:20
  27:17 33:17
  37:25 82:24
  83:19 98:3
  100:5
**thoughts** 19:19
  26:15 27:22
**thousands**
  107:22
**three** 87:1 88:19
  109:22
**tie** 16:11
**time** 4:11 14:2
  39:25 40:3
  43:22 46:7,9
  75:11,15,19,22
  86:1,2,15
  88:12 90:25
  95:19 102:2,4
  106:14 117:6
  119:8
**times** 86:15,18
  86:19
**tiny** 65:22 86:13
  104:17,17,17
**tissues** 82:9,10
**title** 31:4
**titrate** 19:1
**today** 4:11 20:11
  48:10 49:6
  69:13 97:7
  98:18 104:4
  106:21 107:17
  117:7

**told** 49:3 83:19
  95:24 103:6,7
**Tony** 2:18 4:15
**torn** 43:6
**total** 27:9 28:10
  79:19 89:19
  90:7
**totally** 86:18
**touted** 111:3
**toxicology** 68:13
  68:14
**traditional**
  65:18 66:11
**trained** 29:14
  86:16
**trainers** 14:18
**training** 44:5
**transcript**
  119:13 120:10
  120:19 121:3
**transcription**
  119:6
**transmission**
  73:14
**treadmill** 31:18
  38:1,25
**treating** 105:2
**Treigning** 6:1
  70:18 76:1,5,8
**trigger** 73:17
**triggers** 73:11
**Tripleshot** 56:14
**trips** 40:16
**truck** 79:2,13,22
**true** 34:10,12,13
  67:21 119:6
  121:19
**truly** 112:14
**trunk** 78:17
**Trust** 31:21
**try** 45:9 107:3
  112:13
**trying** 6:21 13:1
  19:14 29:17
  32:3 42:12
  43:12 49:17
  50:15,17 58:23

61:12 66:7
70:9 74:1
91:21,22 94:10
94:10,15 96:3
103:15
**tryptophan** 6:7
  6:11 8:15
  70:23 71:6,10
  71:17,24 72:3
  72:10,13,17
  73:8,11,16,24
  74:4,7,15,17
  74:20 75:2,7
  76:12 94:24
  113:25 114:7
**Tuesday** 1:17
**turn** 9:14 24:13
**two** 7:2 20:24
  21:19 26:9,15
  26:20 38:24
  40:11 42:2,9
  45:18 48:12,21
  49:3 62:25
  65:25,25 69:22
  70:8,14 83:23
  100:12 105:14
  105:14 109:22
  114:11 116:9
**type** 38:3,19
  46:4,5 47:17
  109:18
**types** 21:17
**typical** 42:18
**typically** 43:1
  82:17 84:24
**typo** 5:20,23,25
  8:6,9,10

---

**U**

**uh-huh** 24:18
  25:21 54:18
  57:5
**ultimately**
  100:21
**undergone** 32:7
**underline** 75:9
**undersigned**

118:5
**understand** 5:8
  19:14 26:23
  29:4 43:1,15
  50:17 54:14,21
  61:10 64:6
  69:24 72:9
  74:2,11 77:25
  83:21 94:11,15
  97:5 99:3
**understanding**
  75:24 78:11
**understood**
  27:20 101:12
**undisclosed**
  109:2
**unimportant**
  85:17
**unique** 80:11
**unit** 66:18
**UNITED** 1:1
**University** 30:23
  30:25 31:10,20
**unmuted** 63:6
**unsafe** 90:2,3
**update** 5:16,19
  5:21
**use** 10:2 24:19
  25:10 26:2,7
  27:1 54:19
  58:1 71:19
  75:13 81:22
  89:12 92:20,21
  92:22 94:15
  99:19 100:7
  101:7,17
  104:15 115:13
**user** 48:23
**uses** 50:7 60:23
  62:17,19 80:19
  80:22 81:13
  88:3
**usually** 45:8
  82:5
**utilize** 35:15
**utilized** 73:25,25
  74:5,15 75:8

**utilizes** 74:10
80:9,10

**V**

**v** 106:12 121:4
**vague** 38:21
**variations**
114:10
**variety** 23:25
**various** 23:2
33:5
**vary** 18:20 33:17
**vat** 39:13
**versus** 4:9 11:15
70:9 91:19,24
**video** 48:15 56:8
60:18 76:10,15
76:22,24
**videographer**
2:18 4:7,15
39:24 40:2
75:18,21 102:1
102:4 117:17
**VIDEOTAPED**
1:15
**view** 32:9 47:18
62:14 71:25
102:8 112:3
116:4
**visible** 78:17
**vitamin** 74:9
107:6,10,11,14
**vitamins** 62:6,6
62:9,12,17
85:2 104:17
**vodka** 102:16,16
102:18 103:4
**volume** 71:14,15
**vs** 120:7
**vs-** 1:7

**W**

**Wait** 83:5
**wake** 50:3
**Walmart.com**
56:5
**want** 5:20 7:5,19

9:21 10:13,13
11:17 17:17
18:22 20:6,12
20:20 28:21
29:11,11,12
33:18,19 40:5
40:6 45:15,19
47:12 54:19
59:17 61:17
70:15 72:9
78:22 83:11,12
83:24 84:2
89:22 94:21
95:10 102:7
103:1,2 111:2
112:17,21
114:3
**wanted** 45:19,20
**wanting** 24:22
**wants** 69:14
114:2
**warning** 46:20
101:9,15,17,18
101:19 108:14
110:20,21,22
110:23 116:12
**warnings** 101:16
**warns** 100:9
**wasn't** 77:6
113:22
**water** 12:24,24
12:24 31:16
33:8,10 34:3,4
49:14 51:2,16
51:20 52:5,8,9
52:9,15 53:4,8
53:11,13,14,14
86:20,25 94:23
94:25 97:7
**way** 11:4,19
16:11 36:21
43:6,16 45:15
61:4 64:19
86:3 87:17
88:10 92:17
104:16 116:1
**ways** 33:2 81:15

**we'll** 8:18 9:17
17:17 39:19,19
95:9
**we're** 9:17,20
29:18 34:3
39:24 40:2
49:15 61:15
66:4,11,18
75:18,21
101:21 102:1
117:10
**we've** 48:13 49:5
54:20 56:8
94:12 97:6
98:3,17
**wearing** 34:6
**website** 46:3,4,7
48:3 108:3,24
**weekend** 117:16
**weighs** 58:19
**weight** 18:2,3
20:9 72:7
**weird** 97:22
**welcome** 73:2,7
**well-being** 24:21
29:9
**went** 50:20
51:17 77:15
114:4
**West** 2:10
**whereabouts**
13:15,15
**whichever**
104:16
**Wikipedia** 44:3
**win** 31:4 116:14
**wings** 57:4,11
**wish** 29:1
**witness** 3:3 4:18
5:3 6:15 7:20
11:10 12:12,23
16:14 17:22
18:11,19 19:19
23:17 25:14
26:9,15 27:4
27:16 28:7,25
32:19 33:1

37:20 39:21
42:21 43:4,20
45:14 47:21
48:3 49:23
52:19 53:2,22
55:11 57:23
59:22 60:4
64:12,24 65:7
66:14 67:21
71:21 72:16
76:17 78:15
79:25 82:20
84:10,15 96:15
96:24 98:20
99:11 101:2,25
102:12 103:9
104:7 105:1,23
108:6 109:23
110:14 111:9
112:10 113:2
113:16 115:6
116:9 117:11
117:14,16,20
120:1,11,12
**women** 14:11
15:10
**women's** 65:10
65:17
**word** 12:20 19:7
26:19 42:10
66:24,25 67:9
84:3
**words** 27:12
32:23 42:2,9
45:18 66:1
89:5 103:7,10
**work** 7:6,22
10:8 13:9
16:16 40:18
84:7 106:13
**worked** 14:2
30:24 31:9
86:16,17 87:3
**working** 35:19
35:23 40:22
72:17 81:15
86:23,23 88:7

**workout** 35:6
37:18
**works** 69:18
74:19
**world** 50:17
**worry** 52:7
104:20
**wouldn't** 109:5
**wrestling** 34:7
**WRITE** 121:3
**writing** 40:8
**written** 5:9 9:8
9:11
**wrong** 110:10,11

**X**

**X** 3:1,8

**Y**

**yeah** 7:3,5,18
11:10 14:19
17:11 20:9
38:12 39:21
50:10 52:5,7
67:22 72:21
81:3 83:9
86:10 88:2,3
92:22 96:9
99:3 103:9,18
107:20 109:1
116:2,19,22
**year** 21:3 31:4
65:13 86:21
107:25
**years** 10:16
29:24
**years'** 29:22
**yep** 56:12
117:15
**yoga** 14:18,25
15:5 16:8,14
17:10,13 28:13
114:16
**YouTube** 76:10
77:20

**Z**

**zero** 57:18,20
  59:12,14,18
  60:1
**zero-calorie**
  59:16
**Zoom** 4:13
**ZRO** 59:5,11,19
  60:1,17,19
  61:6,19 63:8
  64:6,15,19
  68:18 69:13
  89:4,9,14,25
  90:5,6 99:19
  100:1,4,6,14
  100:23 101:7
  101:17

**0**

**0** 34:11
**02** 113:19
**093721** 118:16

**1**

**1** 3:11 8:18,23
  9:19,20 35:14
**1-mile** 50:20
  51:18 52:10
  92:24 93:12
**1/1,000th** 68:16
**10:05** 39:20
**10:09** 40:3
**1000** 2:10
**11:02** 75:19
**11:13** 75:22
**11:53** 102:2
**12-ounce** 93:11
**12:08** 102:5
**12:31** 1:19
  117:18
**123940** 120:8
  121:5
**1250** 91:10
**15** 10:16
**18** 20:13,22 21:9
  21:16
**19** 20:22 21:9,16
**196** 68:18

**1990** 70:1
**1994** 70:5

**2**

**2** 50:13
**2/15/2025**
  118:15
**20** 22:21 54:3,4
  65:8
**201** 2:4 120:4
**2017** 23:15
  44:16,21 45:3
  46:7 47:5,9
**2020** 8:20
**2021** 1:17 3:11
  4:11 5:10,18
  7:14 46:9
  118:7,9 119:15
  120:2,7 121:5
**21** 1:17 4:11
  24:14 25:4,10
  25:17 26:6
  27:21 28:4,22
  30:8 120:7
  121:5
**21st** 118:7,9
**24** 30:12 46:17
  120:2
**24th** 119:15
**25** 30:10 32:13
  33:14
**250** 68:18 89:14
  89:15
**26** 112:19,20

**3**

**3,000** 21:3
**3.1.1** 23:3 52:16
  54:2,4
**30** 6:25 120:12
**31** 64:5,11
**33** 5:25 6:13,15
  6:20,21,23
**33602** 2:5 120:5
**33607** 2:11
**35** 113:20
**3550** 2:4 120:5

**36** 6:12,14,18
  8:6,10,13,16
  70:17 73:23
  74:16 75:1
  76:3
**38** 77:17 88:14
**39** 88:13 89:3
  100:21

**4**

**400** 89:18
**41** 99:16 100:22
**4221** 2:10
**43** 7:13,17,20,25
  8:3,20

**5**

**5** 3:5
**50** 14:11

**6**

**6** 9:19,23,24
**600** 89:22 90:6,8
  90:9 91:4
**63-year-old** 40:7
  44:1

**7**

**8**

**8** 3:11,11 5:10
  5:18 7:14 8:20
  13:10,13,16
  19:2
**8:20-cv-2971-...**
  1:3
**813.229.4272**
  2:11
**813.488.2920**
  2:5

**9**

**9:02** 1:19 4:12
**9:56** 39:25
**98** 34:3

```
 1                    CERTIFICATE OF OATH

 2     THE STATE OF FLORIDA

 3

 4

 5            I, the undersigned authority, certify that

 6     DR. MARVIN HEUER remotely appeared before me and was

 7     duly sworn on the 21st day of December, 2021.

 8

 9            Dated this 21st day of December, 2021.

10

11

12

13

14     _____

15     Jeana Kim, CRR, RMR, FPR, FPR-C, CLR
       Notary Public - State of Florida
16     My Commission Expires:  2/15/2025
       My Commission No.:  HH 093721

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2      THE STATE OF FLORIDA

 3

 4               I, Jeana Kim, Registered Realtime Reporter and
        Notary Public in and for the State of Florida at large,
 5      do hereby certify that I was authorized to and did
        report said deposition in stenotype; and that the
 6      foregoing pages are a true and correct transcription of
        my shorthand notes of said deposition.
 7
                 I further certify that said deposition was
 8      taken at the time and place hereinabove set forth and
        that the taking of said deposition was commenced and
 9      completed as hereinabove set out.

10               I further certify that I am not an attorney or
        counsel of any of the parties, nor am I a relative or
11      employee of any attorney or counsel of party connected
        with the action, nor am I financially interested in the
12      action.

13               The foregoing certification of this transcript
        does not apply to any reproduction of the same by any
14      means unless under the direct control and/or direction
        of the certifying reporter.
15
                 Dated this 24th day of December, 2021.
16

17

18

19

20      _____
        Jeana Kim, CRR, RMR, FPR, FPR-C, CLR
21

22

23

24

25
```

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**STEEL SUPPLEMENTS, INC.**,
a Florida corporation

      Plaintiff,

v.                              **CASE NO.  8:20-cv-02971-WFJ-AEP**

**BLITZ NV, LLC,** a Nevada limited
Liability company

      Defendant.

_____/

## <u>PLAINTIFF STEEL SUPPLEMENTS, INC.'S DISCLOSURE OF EXPERT WITNESS MARVIN HEUER, M.D.</u>

Plaintiff, STEEL Supplements, Inc. ("STEEL"), by and through its undersigned counsel and pursuant to Federal Rule of Civil Procedure 26(a)(2), discloses the following expert witness who may be called to testify at trial.

      Marvin Heuer, M.D.
      Heuer M.D. Research
      6001 Vineland Road
      Suite 104
      Orlando, FL 32819
      (407) 574-5650

Attached hereto as **Exhibit A** is a copy of Dr. Heuer's report, including, without limitation, a statement of his opinions and reasons for them and a statement of compensation, a copy of a list of the facts and data considered by Dr. Heuer in forming his opinions, a copy of Dr. Heuer's qualifications, including a list of publications, and a copy of Dr. Heuer's expert consulting work in which he testified as an expert at trial or by deposition.

Respectfully submitted,


/s/ Sarah A. Gottlieb
Jason P. Stearns (Florida Bar No. 59550)
Sarah A. Gottlieb (Florida Bar No. 125232)
**FREEBORN & PETERS LLP**
201 North Franklin Street, Suite 3550
Tampa, FL  33602
Phone:  813-488-2920
Fax:  813-488-2960
E-mail:  jstearns@freeborn.com
E-mail:  sgottlieb@freeborn.com
Secondary E-mail:
ckitchell@freeborn.com
mbennett@freeborn.com

Brian D. Goodrich (Florida Bar No. 106948)
**BENTLEY GOODRICH KISON, P.A.**
783 S. Orange Ave., Third Floor
Sarasota, FL  34239
Phone:  941-556-9030
Fax:  941-312-5316
E-mail: bgoodrich@bgk.law
Secondary:  jbradley@bgk.law

*Attorneys for Plaintiff STEEL Supplements, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2021, a true and correct copy of the

foregoing was served via e-mail on all counsel of record as listed below.

Kevin P. McCoy, Esq.
Luis Orengo, Esq.
**CARLTON FIELDS, P.A.**
4221 W. Boy Scout Boulevard, Suite 1000
Tampa, FL  33607

2

kmcoy@carltonfields.com
lorengo@carltonfields.com
dwilson@carltonfields.com
fuller@carltonfiels.com

Kimberly Stein, Esq.
**FLANGAS DALACAS LAW GROUP**
3275 S. Jones Boulevard, Suite 105
Las Vegas, NV  89146
kps@fdlawlv.com
Attorney for

*Attorneys for Blitz NV, LLC*

/s/   *Sarah A. Gottlieb*
Attorney

3

# EXHIBIT A

## <u>DECLARATION OF DR. MARVIN HEUER</u>

I am Marvin A. Heuer, M.D., and I have been retained as a consultant in this case and pursuant to Title 28, United States Code, Section 1746, I certify under the penalty of perjury that the contents of the following declaration are true to the best of my knowledge, information and belief:

**Introduction**

1.      I have been retained by the Law Offices of Freeborn & Peters LLP, to perform consulting activities on behalf of Steel Supplements, Inc. ("Steel" or "Steel Supplements") and to act as an expert consultant in the current litigation. I am being compensated at the rate of $400 per hour for consulting and research and at the rate of $1,000 per hour for testimony. I have been retained as an expert and testified in numerous prior litigation matters for the past several years, including in depositions, hearings and at trials. I have never been rejected as an expert in any matter. I have been qualified as an expert witness on medicine, dietary supplements, advertising, pharmaceuticals, weight loss, clinical trials, and Federal Trade Commission ("FTC") and Food and Drug Administration ("FDA") compliance, including Dietary Supplement Health and Education Act ("DSHEA") compliance and safety, by a federal court. I was also qualified as an expert chemist by a federal court.

**My Qualifications**

**Education and Experience as a Medical Doctor**

2.      I graduated *cum laude* from the University of Minnesota, Mankato, MN, in 1969 with a Baccalaureate of Science (BSc) with majors in Biology and Chemistry and minors in mathematics and psychology. I earned my doctorate of medicine from the University of Minnesota Medical School, Minneapolis, MN, in 1973.  I completed an R-0 internship in the Family Medicine program at St. John's Hospital in St. Paul Minnesota in 1974. I then became Family Medicine Board eligible and completed the Family Medicine Board Exam. I was Board certified on Oct. 30, 1977 through Jul. 07, 1983, then Jul. 08, 1983 through Dec. 31, 1990, then Jul. 08, 1994 through Dec. 31, 2001. I became eligible as a member of the first group offered fellowship and became a Fellow of the American Academy of Family Physicians. I was elected to Fellowship in 1978. I am a family medicine doctor, licensed to practice medicine in the states of Florida and Minnesota.  My qualifications and experience are detailed in my *curriculum vitae* attached hereto. Included in my CV is a list of my publications for the past 10 years.

3.      I have practiced medicine for more than 40 years and continue to do so to this day. I practice as a family medicine doctor and see patients at my office in Orlando, Florida every week.  I am three times Board certified and currently Board eligible in family practice. I am experienced as an associate physician member of the International Olympic Committee and I help with the training of athletes and provide diet, supplement and medical advice, and sometimes medical care, for the athletes of the Federation of International Gymnastics for the Bahamas delegation. I have attended the Olympic Physicians Committee on safety, equipment and drugs

and anti-doping at Gymnastic Worlds competitions. I am a certified Department of Transportation ("DOT") medical and commercial vehicle physician and I am listed in the National Registry of Certified Medical Examiners.

4.      I am an adjunct professor at the University of Central Florida. I am appointed in the College of Graduate Studies, University of  Central Florida, Orlando, FL.

5.      I work part-time at Walt Disney World in Orlando, Florida as an on-site occupational medicine medical doctor. At Walt Disney Company, I conduct occupational health exams and coordinate with staff and the Occupational Safety and Health Administration ("OSHA") regarding workman's compensation decisions, emergent care, travel immunizations, workplace safety programs and urgent care medicine.

6.      I have also worked in both the dietary supplement and pharmaceutical and research and development industries for 30 years and continue to do so today. I am the Chief Executive Officer ("CEO") and Chief Scientific Officer ("CSO") of Heuer M.D. Research, Inc. ("Heuer M.D. Research"). Heuer M.D. Research provides consulting work for companies that sell dietary supplements and pharmaceuticals and foods in the United States and around the world. I am experienced in formulating all kinds of dietary supplements and in reviewing all ingredients for use in dietary supplements and pharmaceuticals. I have also been qualified as an expert in FTC and FDA regulations concerning formulation and claims regarding dietary supplements and pharmaceuticals.

**Iovate Health Sciences International**

7.      Prior to forming Heuer M.D. Research, I served as the Chief Science Officer for Iovate Health Sciences International ("Iovate") in Toronto, Canada from early 2004 to late 2009. I moved to Canada to work with Iovate for 5 years. Iovate is best known for its weight loss dietary supplement, Hydroxycut, and also its sports nutrition products sold under Muscle-Tech, Six Star and other brands. Today, the Iovate conglomerate is one of the largest dietary supplement companies in the world.

8.      While I was at Iovate, I was responsible for launching new bodybuilding lines under Muscle-Tech. At Iovate, I created a consumer-oriented muscle line, "Six Star," for mainstream consumers, which was sold through mainstream channels (e.g., Walmart and CVS). We developed and launched a supplement line, called The MD Products, which was directed to more general health issues. The line had approximately eight products, all relatively general consumer-oriented rather than muscle or strength-oriented. I also created somewhat more aggressive product lines that were more potent, such as Muscle Asylum Project. These products had higher levels of caffeine and higher levels of other ingredients. At Iovate, we greatly expanded the formulas and product offerings for diet products like Hydroxycut to include single serving energy shots, drinks, and sachets. We introduced diet supplement lines including Xenedrine, Rapid Slim, Accelis, Diet Tech and others. We strived to formulate the most potent muscle and bodybuilding products in the industry with the most potent

legal ingredients in the industry.

**Heuer M.D. Research, Inc.**

9.     Heuer   M.D.   Research   provides   regulatory   consulting   to pharmaceutical and dietary supplement companies, manufacturers and researchers. Heuer M.D. Research also provides consulting services for current Good Manufacturing Practice ("cGMP") compliance under the Federal Food, Drug, and Cosmetic Act ("FDCA")

10.     Heuer M.D. Research advises dietary supplement companies on issues related to FTC laws and regulations, along with the Electronic Retailing Self-Regulation Program ("ERSP") and the National Advertising Division ("NAD"). In my capacity as CEO/CSO of Heuer M.D. Research, Inc., I have experience meeting with and testifying before the FDA, FTC, ERSP, NAD, etc. I have consulted for multiple clients regarding ingredient and product reviews pertaining to advertising and marketing, including in-store, print, and online, presented to consumers. I have been a consultant to various nutraceutical companies regarding FDA and FTC matters including on issues involving evaluation of possible structure function claims and ingredients. Heuer M.D. Research also formulates dietary supplements and drinks, researches ingredients, and conducts and oversees clinical trials for dietary supplements. I have formulated well over 500 nutraceutical and dietary supplements including drinks.

11.     Heuer M.D. Research reviews individual ingredients and product

formulations and provides opinions as to safety and/or efficacy based on careful chemical analysis, toxicology reviews and literature and science.

**Memberships, Trade Shows, and Journals**

12.    I am a member of the American Society of Clinical Research Professionals ("ASCRP"), Natural Products Association ("NPA"), American Herbal Products Association ("AHPA"), Gehrson Leherman Group, Professional ("GLG"), and International Society of Sports Nutrition ("ISSN"). I routinely attend industry trade shows such as SupplySide West, SupplySide East, ISSN, the Arnold Sports Festival, Mr. Olympia, American Heart Association ("AHA"), North American Menopause Society ("NAMS"), Drug Information Association ("DIA"), Pharmaceutical Manufacturers Association ("PMA"), Expo West Trade Show, American Academy of Family Physicians ("AAFP"), American Society of Clinical Pharmacology and Therapeutics ("ASCPT"), International League of Associations for Rheumatology ("ILAR"), Interscience Conference of Antimicrobial Agents and Chemotherapy ("ICAAC"), European Alliance of Associations for Rheumatology ("EULAR"), Asian Pacific League of Associations for Rheumatology ("APLAR") and many more. I have also presented and lectured at many of these conferences. Heuer M.D. Research has had a booth at some of these conferences in the past, discussing and presenting various capabilities.

13.    I am on the advisory committee for Muscle Insider magazine. I am the science advisor for Muscle Media magazine. I also am a science advisor for Proliant Labs. I consult for many other dietary supplement companies.

14.     I am a member of the ISSN and am on the ISSN's advisory board as a medical advisor.  I have spoken at ISSN conferences and attend their annual conference and some of the regional conferences every year. The ISSN is a non-profit academic society dedicated to promoting the science and application of evidence- based sports nutrition and supplementation.  The ISSN also has a peer reviewed journal, the JISSN.  The ISSN has been recognized by the American Dietetic Association, National Strength and Conditioning Association, American College of Sports Medicine, American Council on Exercise, American Physical Therapy Association, National Association of Athletic Trainers, and other organizations. My attendance at ISSN helps keep me abreast of the latest in muscle, strength, hormone, muscle diseases e.g., MD (muscular dystrophy), MS (multiple sclerosis), and aging conditions such as sarcopenia. In this light I am very familiar with Steel's products, as well as the products of Treigning Lab, Full Send, and Ignite's ZRO.

15.     I am one of the peer reviewers for articles submitted to the JISSN for publication.  JISSN has a history of publishing new or experimental research in the sports and muscle enhancing areas.

16.     I have also written, submitted and reviewed articles on behalf of individuals or corporations to other scientific journals and medical journals. I have assisted in the writing of several papers and been an unnamed writer on others.

17.     I have been invited to speak at various conferences around the world to discuss such things as new drugs, dietary supplements, muscle building,

sarcopenia, hormone treatments and regulation, weight loss, clinical study results, and multiple medical treatments. I have worked with pharmaceutical companies around the world and discussed new drugs and new treatments and safety and development ideas in the pharmaceutical and nutraceutical industry trials and have been the principal investigator or co or sub-principal investigator on over 75 sponsored clinical pharmaceutical or nutraceutical trials. I have worked with the World Health Organization ("WHO") and World Anti-Doping Agency ("WADA") and the Olympic medical committee.

**Materials Reviewed**

18.   I have reviewed the websites ignite.com, treigninglab.com, steelsupplements.com, fullsendfitness.com and others as well as pertinent literature. The labels I reviewed, listed in the attached "Materials Reviewed", include: Steel Supplements labels, a Treigning Lab label, Full Send labels, and other comparative industry companies making the usual muscle, athletic, bodybuilding supplement claims. In addition to my years of caffeine and ingredient experience I included some pertinent literature on caffeine research, also attached.

19.   In addition to all the materials listed above, I conducted my own online research, including on Medline/PubMed to locate scientific data related to the products in questions. I also reviewed pertinent regulations related to the marketing, advertisement and legality of those products. A list of some of those materials is attached. Those documents are only a portion of the total scientific data used for

the opinions presented in this declaration. In order to write this opinion, I relied on my expertise which is based on the preponderance of scientific information and experience with the relevant regulatory authorities. I have acquired this information in my day-to-day reading of journal articles. Since the information required to present my opinions are based on multiple years of experience, it would be impractical to list all the articles considered. However, this list covers most articles, scientific literature and relevant regulations reviewed in the course of drafting this expert declaration. I reviewed and used the searches to refresh my memory on things I had seen or discussed with experts, scientists and regulators. I also looked for new relevant research.

**Opinion Analysis**

20.     I have been asked to opine regarding a section of the contract between Steel Supplements and Blitz. Regarding Blitz, Mr. Bilzerian promoted supplements from companies other than Steel Supplements on his social media in various iterations.   Section 3.1.1 of the contract states: "Celebrity shall not promote, publicize or endorse the services or products of any Competitor of STEEL SUPPS (defined as a provider, seller, manufacturer or distributer of bodybuilding supplement products), or grant any Competitor the right to use the BLITZ marks, without the written consent of STEEL SUPPS".  In this lawsuit, I understand that Steel is alleging that Mr. Bilzerian breached this agreement on several occasions by promoting, publicizing, or endorsing Treigning Labs, Full Send and even Mr. Bilzerian's own newly launched drink, Ignite ZRO.  My opinion is that Treigning

Lab's products, Full Send's products, and the Ignite ZRO drink are bodybuilding supplement products that compete with Steel.

21. The term "bodybuilding" generally refers to any development or improvement in one's physical status with physical exercise and/or diet. In medicine we use the term to refer to improving health, hydration, strength and sense of wellbeing. The concept of bodybuilding applies to healthy people just wanting physical improvement and also to sick or debilitated individuals needing to boost or "build" their physical status. Some of the processes used by patients and general or elite athletes include aerobic exercise, heavy eccentric exercise, light exercise, yoga, and other activities involving mental focus and alertness. More intense athletes will go on to use gym equipment such as weights, bars, dumbbells and a variety of equipment intended to work on specific individual muscle groups.

22. Generally, a "supplement" is intended to supplement or enhance something in the body. Supplements typically include vitamins and minerals and they also can contain ingredients like caffeine to add energy.

23. Gym goers will often use certain products to prepare for their workout. "Pre-workout" is a generic term for a range of bodybuilding supplement products used by weightlifters and other athletes (i.e., bodybuilders) to enhance athletic performance. The name "pre-workout" describes the concept of use—i.e., using the supplement prior to or before the workout. Pre-workouts are used to increase hydration, endurance, energy, and focus during a workout. Pre-workouts can contain ingredients not solely for hydration. For example, manufacturers add ingredients to

enhance their product and provide additional effects beyond just water hydration. As ingredients are added, these "water" drinks become classified as supplements.

24.     An initial drink that started a craze for hydration and sports drinks was Gatorade. The initial version of this drink, used by the University of Florida football players, was very high in sugar and had some glycerol in it for osmotic effect. When the team won a championship, a new period in sports and nutrition was initiated.

25.     Put another way, bodybuilding supplement drinks can be and are characterized in a number of ways, such as hydration drinks, energy drinks, sports drinks, bodybuilding drinks, health drinks and all kinds of other drinks that are used by athletes and non-athletes to improve the physical status of their bodies.

26.     The bodybuilding supplement drink market expanded significantly when the market realized that these products would sell like crazy due to advertising and promotion, novelty and hype. Companies and other persons in the market then began to alter the formulas to enhance or alter the effect of the drink on the human body and in an attempt to differentiate the drink from other bodybuilding drinks. Most bodybuilding drink products use common additives.

27.     I have developed and formulated hundreds of bodybuilding supplement drinks and products in this area. After reviewing the Ignite ZRO product information, I have determined that the Ignite products referenced under the name ZRO contain ingredients that are common to many bodybuilding supplement drinks. For example, the Ignite ZRO labels show ingredients including Alpha-GPC, L-tyrosine, Caffeine, a sprinkling of typical vitamins, and citric and malic acid, a minor

preservative and flavor item.

28.     ZRO makes claims that are typical of pre-workout bodybuilding supplements. Ignite markets its ZRO drink by building upon terms that are frequently used in the bodybuilding supplement space. Ignite describes ZRO as having "feel good" energy and "supporting production of key brain neurotransmitters, serotonin, and dopamine, for improved mood". This is what the Alpha-GPC is touted to do by the supplier. Ignite also describes ZRO as including "Proven brain-boosting nutrients that support focus and motivation while reducing stress and nervousness" and to "Control adrenal response lessening "'fight or flight syndrome' so zero jitters and zero crash".

29.     Ignite has an Instagram account (@ignitezro – identified as the "official page for @ignite ZRO Performance Drink Founded by @danbilzerian 18+ only") that appears dedicated to Ignite ZRO, which I reviewed as recently as October 7, 2021. The majority of the posts are targeted at fitness and exercise (i.e., bodybuilding). For example:

- On August 23, 2021, there is a post with a model in workout attire drinking a ZRO product that states "Play hard, recover harder. Is ZRO in your lineup?"

- On July 12, 2021, there is a post with the ZRO product that includes, among others, the hashtags #fitness, #healthylifestyle, #workout, and #nutrition.

- On July 3, 2021, there is a post with several ZRO products with store locations where ZRO can be purchased, such as Golds Gym and Anytime Fitness.

- On June 24, 2021, there is a post with a model in workout attire stretching that

states "Stretching into the weekend with #ignitezro."

- On June 18, 2021, there is a post with a model in workout attire holding a ZRO product that states "ZRO is key for your morning cardio. Grab one to make it through your next workout."

- On May 6, 2021, there is a post with a ZRO product that includes, among others, the hashtags #meditation, #health, #yoga, #fitness, #motivation, #strength, #gymlife, #workout, #trainhard.

- On April 13, 2021, there is a post with a model in workout attire in a gym drinking a ZRO product that includes, among others, the hashtags #energydrink, #preworkout, #danbilzerian.

- On March 30, 2021, there is a post with a ZRO product that includes, among others, the hashtags #energy, #fitness, #healthylifestyle.

- On December 29, 2020, there is a post with a ZRO product outside of a storefront for the Vitamin Shoppe that states "Head into your local @vitaminshoppe and grab a ZRO today."

- On November 27, 2020, there is a post with a ZRO product that includes, among others, the hashtags #danbilzerian, #fitness, #workout, #athlete, #performancedrink.

- On November 16, 2020, there is a post of a model in workout attire at a gym that includes, among others, the hashtags #danbilzerian, #energy, #fitness, #workout, #athlete, #performancedrink.

- On November 5, 2020, there is a post with a ZRO product that includes, among

others, the hashtags #danbilzerian, #fitness, #workout, #athlete, #performancedrink.

- On October 21, 2020, there is a post with Dan Bilzerian in a gym hitting a punching bag that states "ZRO delivers an eye-opening burst of smooth, sustained, and controlled 'feel good' energy."

- On October 14, 2020, there is a post of several cases of the ZRO product stacked in front of a store shelf of other bodybuilding supplements that states "Head into @foundationrx_carmelny and grab your ZRO." Foundation RX has a website (https://foundationrxstores.com/) and it states that it is a "Vitamin & Sports Supplements" retailer. The post also includes, among others, the hashtags #danbilzerian, #fitness, #workout, #athlete, #energydrink.

- On September 27, 2020, there is a post with the ZRO product that states "Last chance to head into your local @vitaminshoppe and take advantage of our buy 3 get 1 free promo." The post also includes, among others, the hashtags #danbilzerian, #fitness, #workout, #athlete, #energydrink.

- On September 22, 2020, there is a post of a model in workout attire holding a ZRO product that includes, among others, the hashtags #danbilzerian, #energy, #fitness, #workout, #athlete, #energydrink.

- On September 14, 2020, there is a video post showing a woman training in a gym that includes, among others, the hashtags #danbilzerian, #fitness, #workout, #athlete. There appears to be a post by a follower that states "I love this stuff my new go before I train."

30.     These claims target fitness and exercise (i.e., bodybuilding) enthusiasts, because these are people who want to hear these claims because ads, publications, and social media tell them these benefits are important to bodybuilding. Ignite ads for ZRO describe "workout," "pre-workout," "fitness," "athlete" and "performance drink," indicating that Ignite wants ZRO in the performance bodybuilding market. Also, Ignite ZRO advertises that its ZRO product can be purchased at bodybuilding supplement stores, as well as bodybuilding gym facilities, such as Gold's Gym and Anytime Fitness. Ignite's marketing efforts confirm that ZRO is (and is marketed as) a bodybuilding supplement product.

31.     I also understand Ignite ZRO was intended to launch as a pre-workout at the Arnold Sports Festival in Ohio (the "Arnold"). The Arnold is an annual multisport event and expo including professional bodybuilding, strongman, and fitness competitions. It is named after Arnold Schwarzenegger, one of the most vocal and visible promoters of bodybuilding, which was a major part of his career. The current Arnold caters to bodybuilders, including both competitive bodybuilders and other bodybuilders that are simply seeking to improve their bodies through exercise and diet. The Arnold typically includes hundreds of booths exhibiting products relevant to the bodybuilding community, including exhibitors relating to sports equipment, apparel, nutrition and bodybuilding supplement products. Ignite's intended placement of this product in the bodybuilding supplement arena is further confirmed given that Ignite's advertising refers to ZRO as a performance product and Ignite intended to announce the launch of ZRO at the Arnold.

32.    All indicators make the Ignite ZRO product a bodybuilding supplement product. Thus, my expert opinion, based on years of experience in drinks and hydration and supplements, is that ZRO is a bodybuilding supplement product, aimed exactly at the group of consumers who are wanting Steel products.

33.    I find it also informative that Mr. James Gracely headed the Ignite ZRO product marketing and sales and he also claimed to be a formulator. His title was President of Beverage at Ignite. He confirms that on his podcast interview with Supplement Engineer #126. (YouTube).

34.    Mr. Gracely purports to have experience in the supplement and bodybuilding area and that appears consistent with Ignite's marketing and formulating ZRO as a bodybuilding supplement.

35.    There are also other products Steel alleges in its complaint were endorsed or promoted by Mr. Bilzerian.

36.    Mr. Bilzerian also promoted, publicized, and endorsed a product from Treigning Lab", which is also a direct competitor to the Steel Supplement line. A product shown is a Treigning Lab's "tryptophan" product in competition with Steel product Rested-AF, which is a product for sleep and muscle recovery and which also contains the amino acid tryptophan. This essential amino acid is very commonly used in bodybuilding supplements. Tryptophan in the body has many important functions. Like most amino acids, it is utilized in muscle synthesis and is also utilized in the brain for neurologic activity. In the brain, the tryptophan is converted to serotonin. Serotonin help nerves and brain cells communicate. Serotonin helps

with mood, sleeping and concentration.

37.    Treigning Lab also sells a full line directly competing with Steel. Treigning Lab's products contain ingredients like creatine, glycine, arginine, BCAAs and other known ingredients commonly used in the bodybuilding supplement area. Thus, Treigning Lab is a competitor of Steel, competing with Steel's ATP-Fusion and other supplements.

38.    Another product promoted by Mr. Bilzerian is a product line called "Full Send" launched by the Nelk Boys which is a group with a large YouTube channel following. Full Send is a general full product supplement line, thus, competing with Steel Supplements products. Full Send has a BCAA, Creatine, and a product called PRE, which promotes focus and energy.

39.    I was also asked to provide an opinion as to whether Ignite ZRO could be used in conjunction with, or in other words, "stacked" with Steel products. Having reviewed the ingredients in Ignite ZRO, specifically the caffeine content, it has a very high dose (250 mg) of caffeine per drink. If someone looked to combine ZRO with Steel's product PRE, one would ingest a total of 600 mg (250 mg of caffeine from ZRO plus up to 350 mg (2 scoops) of caffeine from the Steel product). That is a massive dose and reaching the ultimate limits of safety for caffeine. Looking at other Steel products for caffeine, Steel Charged has 260 mg, Steel Amped-AF has 260 mg, Steel Shredded-AF has 300 mg and Steel Focused-AF has 200 mg. The FDA advises keeping the total ingested dose of caffeine at under 400 mg total per day.

40.     For safe supplement usage, it is critical for consumers to read the labels and ingredient listing very carefully and follow the supplement provider's product directions. Steel products have significant warnings on the labels, including for example, a warning that says "Start with 1/4 to 1/2 Scoop to assess tolerance." The products are also labeled to advise: "DO NOT EXCEED RECOMMENDED DOSING." The products have the statement, "FOR STEEL STACKING SUGGESTIONS, VISIT OUR WEBSITE", for those who would consider adding other supplements. Steel advises that individuals do not stack unknown items with the Steel products.

41.     It would be unsafe to combine ZRO with Steel products containing caffeine such as those referenced above. Such Steel products and ZRO cannot be safely taken at the same time. Thus, use of ZRO as a pre-workout (as it was intended and marketed to be used) will prevent a consumer from using safely Steel pre-workout supplements.

**Summary Conclusions**

42.     After carefully weighing all the information available and with my knowledge and experience in the field, it is my expert opinion that the Ignite ZRO, Treigning Lab, and Full Send products identified above are bodybuilding supplement products.

43.     Also, after carefully weighing all the information available and with my knowledge and experience in the field, it is my expert opinion that the Ignite ZRO product cannot be safely combined or "stacked" with Steel's pre-workout

supplement PRE or other Steel products that contain significant levels of caffeine.

_____ m.o.

Marvin Heuer, M.D.

## MATERIALS REVIEWED

Steel Supplements Labels bates numbered STEEL_0000765-770; STEEL_0000772-776; STEEL_0000884-890 and STEEL_0001438-1498

Steel Supplements Warning Labels bates numbered STEEL_0002586-2592

Steelsupplements.com

Ignite ZRO products and ingredient lists

Ignite.co

Ignite's Instagram account @ignitezro, including various posts dated between 2020 and 2021
The Treigning Lab Label

Treigninglab.com

Fullsendfitness.com

Bang Energy _ Fuel Your Destiny

Best Drinks By Bang _ VPX Sports _ Meltdown _ Redline _ Bang-Energy.com

VPX Sports - Products _ Energy _ Nutrition _ Supplements _ Protein

In Pursuit of a Better Tomorrow for Everyone. _ Iovate Health Sciences Intl_

Hi-Tech Pharmaceuticals_ Health, Weight Loss, Bodybuilding Supplements

Optimum Nutrition _ Homepage

Glanbia Performance Nutrition _ Glanbia

CELSIUS® Fitness Drinks – Essential Energy for An Active Lifestyle

Warning Letters Related to Food, Beverages, and Dietary Supplements _ FDA

FDA takes step to protect consumers against dietary supplements containing dangerously high levels of extremely concentrated or pure caffeine _ FDA

REDCON1 - Fastest Growing Sports Supplement Brand In History

Caffeine intake and its sources_ A review of national representative studies

FDA Energy Drink Regulation in the News_ Health Experts Push for Regulatory Changes and Monster Moves to Market as a Beverage Instead of as a Dietary Supplement

Youtube – Ignite's ZRO Performance Beverage
https://www.youtube.com/watch?v=_aWh52lw6UI

Does the FDA regulate energy drinks?

GAO-13-244 Dietary Supplements FDA May Have Opportunities to Expand Its Use of Reported Health Problems to Oversee Products
Guidance-for-Industry--Highly-Concentrated-Caffeine-in-Dietary-Supplements

Caffeine Safety Laws

Spilling the Beans_ How Much Caffeine is Too Much_ _ FDA

Youtube – How much caffeine is too much?
https://www.youtube.com/watch?v=4Yy6jKPBC3U&t=5s

https://ignitebeverages.co/pages/performance

The effect of 6 days of alpha glycerylphosphorylcholine on isometric strength

Acute supplementation with alpha-glycerylphosphorylcholine augments growth hormone response to, and peak force production during, resistance exercise

What Is Alphasize And Why Is It A Beneficial Supplement_ - MRI Performance

AlphaSize A-GPC brain-health and muscle-support ingredient now non-GMO verified, says Chemi Nutra

ZRO drink from Ignite and Dan Bilzerian built for energy and focus

Youtube - Dan Bilzerian's Ignite ZRO Energy Drink REVIEW | Better Than Bang?
https://www.youtube.com/watch?v=nRMAVrhsJw8

Youtube - Dan Bilzerian on women, guns, and Trump | Full Episode
https://www.youtube.com/watch?v=OCDvsjymcg0

Supplement Engineer Podcast Episode #126: James Gracely & Ignite ZRO Performance Energy Drinks
https://supplementengineer.com/blogs/podcasts/supplement-engineer-podcast-episode-126

Try out **PMC Labs** and tell us what you think. **Learn More.**    ✖



J Int Soc Sports Nutr. 2008; 5(Suppl 1): P15.
Published online 2008 Sep 17. doi: 10.1186/1550-2783-5-S1-P15

PMCID: PMC3313098

# Acute supplementation with alpha-glycerylphosphorylcholine augments growth hormone response to, and peak force production during, resistance exercise

Tim Ziegenfuss,[1] Jamie Landis,[1] and Jennifer Hofheins[1]

[1] The Center for Applied Health Science Research, Division of Sports Nutrition and Exercise Science, Fairlawn, OH 44333, USA

✉ Corresponding author.

Tim Ziegenfuss: tziegenfuss@wadsnet.com

**Supplement**

Proceedings of the Fifth International Society of Sports Nutrition (ISSN) Conference and Expo

Paul LaBounty and Jose Antonio

**Conference**

2008 International Society of Sports Nutrition Conference and Expo

9-10 June 2008

Las Vegas, NV, USA

Copyright ©2008 Ziegenfuss et al; licensee BioMed Central Ltd.

## Background

Many of the positive adaptations resulting from resistance exercise training (i.e., increased muscle mass and strength, decreased fat mass) are thought to be mediated, in part, by exercise-induced increases in growth hormone (GH). One ingredient that has shown clinical promise in elevating GH is the acetylcholine precursor alpha-glycerylphosphorylcholine (A-GPC). The purpose of this study was to examine the effects of a supplement containing primarily A-GPC on serum GH levels, explosive performance, and post-exercise substrate oxidation.

## Methods

Using a randomized, placebo-controlled, crossover design, seven men (mean ± SD age, height, weight, body fat: 30.1 ± 7.3 y, 179.2 ± 7.4 cm, 87.3 ± 11.6 kg, 18.1 ± 5.9%) with at least two years of resistance training experience ingested 600 mg A-GPC (as AlphaSize™) or a placebo 90-minutes prior to completing 6 sets × 10 repetitions of Smith Machine squats at 70% of their pre-determined 1-repetition maximum. At 30-minutes post-exercise, resting metabolic rate (RMR) and respiratory exchange ratio (RER) were measured with indirect calorimetry to assess post-exercise caloric expenditure and carbohydrate and fat oxidation, respectively. Immediately following RMR and RER measurements, subjects performed three sets of bench press throws at 50% of their pre-determined 1-repetition maximum to assess peak force, peak power, and rate of force development. All trials were performed after an overnight fast, a 48-hour abstention from intense exercise, and during the same time of day to minimize diurnal variation. Serum samples were obtained prior to exercise and again 0, 5, 15, 30, 60, 90 and 120 minutes post-exercise. Hormone concentrations were analyzed in duplicate by Quest Diagnostics® via immunoassay. Statistical evaluation of the data was accomplished using dependent t-tests (peak force, peak power, rate of force development) and repeated measures ANOVA (GH, RMR, RER). Differences were considered "significant" at $P \leq 0.05$.

## Results

Compared to baseline (pre) values, peak GH increased 44-fold during A-GPC (from 0.19 ± 0.06 to 8.4 ± 2.1 ng/mL) vs. 2.6-fold during placebo (from 1.9 ± 0.8 to 5.0 ± 4.8 ng/mL, $P < 0.03$) (Figure 1). Peak bench press force was 14% greater in A-GPC (933 ± 89 N) vs. placebo (818 ± 77 N, $P < 0.02$). Trends toward higher peak bench press power ($P < 0.13$) and lower post-exercise RER ($P < 0.12$) were noted in the A-GPC trial.



◡ J Int Soc Sports Nutr ◡ J Int Soc Sports Nutr ◡ J

Figure 1

## Conclusion

These data indicate that a single 600 mg dose of A-GPC (as AlphaSize™), when administered 90 minutes prior to resistance exercise, increases post-exercise serum GH and peak bench press force. In contrast, A-GPC had no statistically significant effect on peak power, rate of force development, RMR, or cardiovascular hemodynamics (i.e., heart rate and blood pressure). Future work should examine how resistance exercise + A-GPC affect the GH-IGF axis and their associated family of binding proteins.

## Acknowledgements

Supported in part by a research grant from Chemi Nutra (White Bear Lake, MN). None of the authors has any conflict of interest.

Articles from Journal of the International Society of Sports Nutrition are provided here courtesy of **BioMed Central**



≡  **Nutritional** OUTLOOK  🔍



**Spotlight**

Science

Delivery Systems

Food & Beverage

Herbs & Botanicals

Sports & Energy

Industry Insights

**Topics**                    See All >

Beauty

Blood Sugar

Brain Health

Delivery Systems

Digestive Health

Food & Beverage

Heart Health

Herbs & Botanicals

Immune Support

Joint & Bone Health

Omega-3

Protein

Science

Sports & Energy

# AlphaSize A-GPC brain-health and muscle-support ingredient now non-GMO verified, says Chemi Nutra

February 22, 2019
Jennifer Grebow

  

*AlphaSize A-GPC has earned non-GMO certification by the International GMO Evaluation and Notification Program (IGEN), says AlphaSize's supplier, Chemi Nutra (Austin, TX).*



Photo © AdobeStock.com/monsitj

AlphaSize alpha-glyceryl phosphoryl choline (A-GPC), an ingredient recognized in the cognitive health, sports nutrition, and healthy aging supplements market, has earned non-GMO certification by the International GMO Evaluation and Notification Program (IGEN), says AlphaSize's supplier Chemi Nutra (Austin, TX).

IGEN certification was developed by testing laboratory Nutrasource Diagnostics Inc. (Guelph, ON, Canada), which the lab describes as "the only third-party testing and certification program that evaluates the presence or absence of genetically modified organisms (GMOs) in products and the ingredients used to make them, using validated analytical methods."

Scott Hagerman, president of Chemi Nutra, said in a company press release: "We selected the IGEN program because we were very impressed with the testing integrity this organization provides and stands behind. Verification assures our customers that our specialty AlphaSize A-GPC ingredient products have been thoroughly tested by a certified third party and that our customers as well as final consumers can be assured of our complete transparency, demonstrating the lack of GMOs."

Chemi Nutra says AlphaSize A-GPC is the only branded A-GPC ingredient with a Generally Recognized as Safe dossier submitted to FDA for review. And, the company says, unlike some generic, synthetic A-GPC ingredients that are manufactured using "genotoxic raw materials" and which most likely are not recognized as legal dietary supplement ingredients under the Dietary Supplement Health and Education Act (DSHEA) in the United States, Alpha-Size APC is 100% natural and made without any synthetic chemicals.

About Us

Advertise

Contact Us

Editorial Submissions

Editorial Advisory Board

Do not sell my Information

Terms and Conditions

Privacy

   



© 2021 MJH Life Sciences™ and Nutritional Outlook. All rights reserved.







A-GPC has gained a reputation as a dietary supplement ingredient, including for cognitive and muscular support. AlphaSize's highly bioactive component is choline, which Chemi Nutra describes as playing a "critical role in liver function, brain development, muscle movement, nervous system function, and metabolism."

"Numerous published papers state that A-GPC is considered the most active of choline-containing phospholipids in increasing acetylcholine levels in the brain (cognitive functioning) and in motor units that activate fast muscle contraction (power and strength)," Chemi Nutra explains. For a refresher on A-GPC and phospholipid ingredients, click here. Alpha-Size A-GPC has been studied in dozens of published human studies for its mental and physical performance benefits, Chemi Nutra says.

"AlphaSize A-GPC is rapidly absorbed as choline and readily crosses the blood-brain barrier," the company says. "In contrast, there are several published studies demonstrating that common choline salts, choline chloride, and choline bitartrate are not effective in brain metabolism as detected by proton magnetic resonance spectroscopy (MRS) and had no effect on memory in healthy, young human adults."

AlphaSize A-GPC is said to be 100% water soluble, tasteless, and odorless and "extremely stable and nonreactive" in a variety of products, including beverages, shots, bars, chewing gum, gummies, food, and pet supplements.

"Nearly 20 years ago, Chemi Nutra introduced our branded AlphaSize A-GPC to the supplement industry, and it is proven safe and legal for use, unlike synthetic A-GPC, and is patented and produced in our own plant in Italy," said Hagerman, noting the plant of parent company Chemi S.p.A. (Milan). "In fact, I am not aware of any other A-GPC brand ever being investigated in any study, let alone having published safety studies, being fully FDA GRAS, and having a long history of safe use."

**Chemi Nutra Hires Sales Manager**

In other company news, Chemi Nutra announced recently that it has hired a new sales manager, Alfredo "Al" Reyna. Reyna will focus on growing the company's U.S. and global business. His background is in the health and hospice field, where, the company says, he "saw firsthand that alternative, complementary, and nutritional supplement intervention played an increasing role in this health sector."

**Related Content:**
Brain Health | Sports & Energy | Trends & Business

**GNC enters meal delivery space by partnering with RealEats**

**Combating counterfeiting in the dietary supplements industry**

**Good Catch and Long John Silver's partner, put two new plant-based seafood items on the menu**



## Brands





**Bang**



**Meltdown**



**VPX Sports**



**Redline**

Apparel



### Women's Apparel

Fun, fit, fabulous. That's a Bangster! Decked out in the latest tops, bottoms, and accessories, she shines.

Shop



### Men's Apparel

The same Bang that fuels your rep max powers your style and keeps you looking fresh.

Shop

## Instagram



bangenergy

❀BANGIN' JULY SALES ARE HERE!❀
.
Throughout July we'll be featuring som…



meltdown.beverage















SEE FULL DETAILS TO ENTER FOR YOUR CHANCE TO WIN AT

🔗 KICK ASS COLLEGIATE CONFIDENCE

📄

...

## Company

Shop
Articles
About
Careers
FAQs
Contact

### Follow Us



## Account

My Account
Returns
Cart

## Policies

Terms and Conditions
Privacy Policy
Shipping Policy
Giveaways Policy
Bang® Points Policy



## THE BANG® ANTI-DIET

Sign up for early notifications for the launch of Jack Owoc's New Book.

First Name *

Last Name *

Email Address *

Send

Copyright © 2021 Bang Energy | Bang Energy

All Rights Reserved Bang Energy





Search … [🔍]   [🛒] 0   👤 **Log In / Register**

## Drinks

Home / Shop / Drinks

### Best Drinks By Bang!

View our line of drinks from Bang, Meltdown, Redline, and VPX.

Showing 1–12 of 22 results

Default sorting ▾



**Product Categories**

Accessories

Apparel

Brands

Drinks
> Caffeine Free
> Coffee Flavor
> Energy
> Shots

Gift Card

Goals

July Sale

Ketonz

Military

Pristine Protein

Stacks

Supplements

Workout



#### Bang® Energy Drinks — 4-pack

**$8.99**

[Select options]



#### Bang Keto Coffee Birthday Cake 4pk

**$13.33**

[Add to cart]



#### Bang® Military Energy Drinks — 12-pack

**$26.99**

[Select options]



#### Bang® Energy Drinks — 12-pack

**$26.99**

[Select options]



#### Natural Bang® Energy Drinks — 12-pack

**$26.99**

[Select options]



#### Bang® Caffeine-Free 12-pack

**$26.99**

[Select options]





Search ... 🔍   🛒 0   👤 Log In / Register







### Bang Energy Variety – Bangin' Blue pack

**$26.99**

Add to cart

### Bang Energy Variety – Original Bangster

**$26.99**

Add to cart

### Bang Energy Variety – Poolside Pack

**$26.99**

Add to cart







### Bang Energy Variety – Mystery Pack

**$26.99**

Add to cart

### Bang Keto Coffee — 12-pack

**$39.99**

Select options

### Redline® Cognitive Candy™ — 12 Pack

**$34.99**

Select options



1  2  →

**Company**

🧍 Shop

**Account**

My Account





FAQs

Contact

**Follow Us**



**Policies**

Terms and Conditions

Privacy Policy

Shipping Policy

Giveaways Policy

Bang® Points Policy

launch of Jack Owoc's New Book.

**First Name ***          **Last Name ***

**Email Address ***

Send

Copyright © 2021 Bang Energy | Bang Energy                    All Rights Reserved Bang Energy



Open access

27,971 | 48 | 23
Views | CrossRef citations to date | Altmetric

Listen

Articles

# Caffeine intake and its sources: A review of national representative studies

Joris C. Verster ✉ & Juergen Koenig

Pages 1250-1259 | Accepted author version posted online: 16 Feb 2017, Published online: 12 Jun 2017

Download citation   https://doi.org/10.1080/10408398.2016.1247252   Check for updates

Full Article | Figures & data | References | Citations | Metrics | Licensing | Reprints & Permissions | PDF

## ABSTRACT

Aim of this review is to summarize current daily caffeine intake of children, adolescents, and adults, and trends in caffeine intake over the past decade. A literature search was conducted (1997–2015) which yielded 18 reports on nationally representative studies, describing caffeine consumption of over 275,000 children, adolescents and adults. The data revealed that mean total daily caffeine intake in children, adolescents, and adults is below caffeine intake recommendations such as those stated by Health Canada (2.5 mg/kg bw/day for children and adolescents, and 400 mg/day for adults) and the European Food Safety Authority, EFSA (3 mg/kg bw/day for children and adolescents, and 400 mg/day for adults). Total caffeine intake has remained stable in the last 10–15 years, and coffee, tea and soft drinks are the most important caffeine sources. Across all age groups, energy drinks contribute little to total caffeine intake. The highest potential for reducing daily caffeine intake is by limiting coffee consumption, and in some countries and age groups, by reducing tea and soft drink consumption.

**KEYWORDS:** Caffeine  consumption  intake  coffee  tea  cola  energy drink

❮ Previous article          View issue table of contents          Next article ❯

## Introduction

Despite various statements from health authorities (e.g. EFSA, Health Canada, US FDA) that the general population of healthy adults is not at risk for potential adverse effects of caffeine, there is continuous concern that caffeine intake would increase in the general population and particularly in children, adolescents and pregnant or lactating women, and that these caffeine intakes would result in adverse health effects.

Based on an extensive review of the scientific literature on caffeine (Nawrot et al., 2003), Health Canada concluded that the general population of healthy adults is not at risk for potential adverse effects from caffeine at daily consumption levels up to 400 mg caffeine (Health Canada, 2010). Regarding children, Health Canada advised that 10–12 year olds should not consume more than 85 mg caffeine per day, and not more than 2.5 mg/kg body weight (i.e., 125–175 mg caffeine for 50–70 kg) for adolescents 13–18 years old. The European Food Safety Authority (EFSA) recently also examined the safety of caffeine intake (European Food Safety Authority, 2015). They concluded that for adults habitual caffeine consumption up to 400 mg per day, and 3 mg/kg bw per day for children and adolescents, does not give rise to safety concerns. For pregnant women, maximum daily intake levels of caffeine were set at 200 mg per day.

Although the general population typically is not identified as a vulnerable group in terms of caffeine intake, some authorities consider children, adolescents and pregnant women as groups at risk for adverse effects resulting from caffeine consumption. The introduction of new caffeinated



In this article ☰

...g the past decades has triggered these concerns, since these new sources of caffeine could be consumed in addition ...source like coffee, tea, colas and chocolate. Whether this indeed is the case, however, has rarely been studied in

caffeine consumption surveys, as most surveys focus only on few sources of caffeine. Assessing the current caffeine intake from all sources therefore is crucial to estimate the contribution of new caffeinated foods and beverages to the total caffeine intake and to identify the potential of single categories of caffeine sources in our diet for a reduction of total caffeine consumption, if this is required from a public health point of view.

To determine whether overall caffeine intake indeed is increasing, or whether new caffeine sources are substituting the more traditional sources, standardized studies on consumption of all caffeine containing foods and beverages on a nationally representative level are required. Summarizing the available data, this review therefore provides an overview of the current status on global caffeine intake from all sources.

## Methods

A literature search was conducted (October 2nd, 2015) in PubMed/Medline and Embase to identify relevant literature, using the keywords "caffeine", and "consumption" or "intake" (limit: human studies). Data collected between 1997 and 2015 was considered, and only studies stating to be nationally representative were included in the current review. To be included, data on caffeine intake from all sources should have been reported. Studies that did not include information on caffeine consumption from all (beverage) sources were omitted (e.g., studies only reporting on one specific caffeine containing product category, but not on other sources of caffeine).

Abstracts were screened, and full text articles were obtained for papers that were likely to meet the inclusion criteria. Cross-references were checked for additional references, and the Internet was searched for other nationally representative reports on caffeine consumption. Fig. 1 shows the PRISMA flow diagram of the literature search.

Figure 1. PRISMA Flow Diagram.



Display full size

The literature search revealed 3883 papers (Embase: 1688, Pubmed: 2278). After removing 1059 duplicates, the initial search comprised 2824 papers. Of these papers, the abstracts were screened for relevance. As we used very general search terms in order to not omit any relevant paper on caffeine consumption and its sources, many of the papers of the search were not relevant. Of potential relevant papers full text articles were obtained. Cross references were checked for additional publications. A total of 18 articles and reports were eligible for inclusion in this review.

## Results

Data from nationally representative studies, summarized in 18 articles and reports, were included in the review. These studies came from different regions around the world, including the USA, Europe, Australia, and Asia.

In this article ☰

the results on caffeine intake reported in these articles and reports, Table 1 lists the total mean caffeine intakes for and years as provided. It has to be noted though that these figures are heterogeneous in respect to different factors

including sampling frame, sample design, and method to measure food and/or beverage consumption. Therefore, the potential to compare caffeine intakes between different studies is limited. Some details from the different studies are presented below, but it has to be noted that there is inconsistent level of details across studies due to the varying focus of the results reported in the published data.



Table 1. Overview of main findings of caffeine intakes (mg/day) from different age groups as reported by selected studies.

 

## USA

In the USA, two large national representative surveys monitor caffeine intake from food and beverages: The Kantar Worldpanel (KWP) and the National Health and Nutrition Examination Survey (NHANES).

Mitchell et al. (2014) examined caffeine consumption in a nationally representative sample of 37,602 caffeine consumers aged 2 years and older from the Kantar Worldpanel (KWP) Beverage Consumption Panel survey. For the selection of participants, U.S. Census demographic data were used to guide the selection of the participants to form a representative "Beverage Consumption Panel." Age, gender, race, Hispanic origin, geographic region, market size, household income, household size, and presence of children in the household were included as sample selection characteristics. Data were collected 2010 to 2011 using a 7-day online beverage diary. Coffee, carbonated soft drinks, tea and energy drinks together comprise approximately 98% of daily caffeine intake (Mitchell et al. 2014). Energy shots were excluded altogether from the analysis due to very low frequency of consumption in the overall survey ($n < 100$). Sixty-three percent of those who consume caffeinated beverages consume carbonated soft drinks, 55% consume coffee, 53% consume tea, and 4% consume energy drinks. The overall proportion of participants that consume caffeinated beverages increased with age from about 43% of 2–5 year olds to almost 100% in those 65 years of age and older.

Also, the amount of caffeine intake increased with age and was highest among 50–64 years old consumers (on average 165 mg/day (2.2 mg/kg bw/day) across all age groups; 50–64 years old: 226 mg per day (2.9 mg/kg bw/day)). For all age groups, the average total caffeine consumption was below the levels recommended by Health Canada. There were some small differences between men and women. However, these were absent when correcting the data for body weight. The 90th percentile (P90) data showed a similar trend across ages with a mean daily caffeine intake of 380 mg/day (5.0 mg/kg bw/day), of which 80% was contributed via coffee consumption.

Coffee was the primary source of caffeine in all age groups (64%; 105.4 mg/day), followed by carbonated soft drinks (17%; 27.9 mg/day) and tea (17%; 27.9 mg/day). Energy drinks contributed less than 2% to total caffeine intake (2.6 mg/day). The greatest prevalence of energy drink consumers was found among 13–24 years old (around 10% of caffeine consumers versus 4.3% across all age groups). In this age group, 5–7% of total caffeine intake was by means of consuming energy drinks (6.1/day among 13–17 year olds, and 6.2 mg/day among 18–24 year olds). Across age groups, chocolate milk, cocoa and energy shots together contributed only to 1–2% of total caffeine intake. Among children and adolescents, greatest caffeine intake came from carbonated soft drinks, followed by tea and coffee. For adults 18 years and older, coffee was by far the greatest contributor to daily caffeine intake, whereas energy drinks contributed very little to daily caffeine intake.

An earlier study (Knight et al., 2004) examined data collected via the Share of Intake Panel (SIP), a marketing research program monitoring the consumption beverages. Data from 10,712 caffeinated beverage consumers, collected in 1999, revealed a daily caffeine intake from beverages ranging from 106 to 170 mg/day (P90: 227–382 mg/day) for adults, 14 mg/day (P90: 37 mg/day) in children aged 1 to 5 years old, and 22 mg/day (P90: 45 mg/day) in children aged 6 to 9 years old. Daily caffeine intake was highest among 35 to 49 year olds (170 mg/day, P90: 382 mg/ day). Coffee was the primary source of caffeine intake in adults. In children, caffeinated soft drinks were the main source of caffeine, followed by tea.

Mitchell et al. (2014) reported that a trend over the period 1999–2010 was seen in that overall caffeine consumption increased from 120 mg/day in 1999 to 165 mg/day in 2010; i.e. an increase comparable to about half a cup of coffee. Regarding the contribution to total caffeine intake, an increase was seen for coffee (53% to 64%), a reduction for carbonated soft drinks (29% to 17%), whereas the contribution of tea remained stable. The substitution of carbonated soft drinks by coffee may possibly account for the slight increase in total daily caffeine consumption from 1999 to 2010.

In this article ≡

utrition Examination Survey (NHANES) comprises an interview at home followed by a telephone interview. Trained d and beverage intake of the past day (24-hour dietary recall). To obtain data from children (< 6 years old) caregivers

are interviewed, children 6–12 years old have assistance to complete the dietary recall, others (>12 years old) complete the dietary recall interview unassisted. The response rate for the NHANES 24-hour dietary recall data typically is between 75 and 80%. NHANES surveys are held every 2 years among approximately 10.000 respondents.

Somogyi (2010) examined caffeine intake data from the national representative NHANES (1999–2000, 2001–2002, 2003–2004, 2005–2006), as well as the NPD Group's Food Consumption surveys, conducted in 2008 (Somogyi, 2010). The NHANES 2005–2006 reported data from 24-hour dietary recalls of 2 consecutive days by approximately 9,500 participants. Among all subjects 2 years and older, total daily caffeine intake remained stable from 2001–2002 (142.1 mg/day) to 2003–2004 (150.8 mg), and 2005–2006 (149.8 mg/day). The 2006 data revealed that caffeine consumption increases with age, and that men consume more caffeine (mg/day) than women. The highest caffeine intake (295.6 mg/day) was seen in men of the 50–59 years old group.

The NPD Group Survey consists of a national representative sample of 2,000 US households (about 5,000 people). For 14 days in 2008, a daily food and beverage diary was completed. Overall, on a typical day, caffeine consumption of participants aged 2 years and older was 131.9 mg/day. In adults, 22 years and older, daily caffeine intake was highest (161.9 mg/day). In children 2–13 years old caffeine intake was 28.7 mg/day. In adolescents (14–21 years old), caffeine intake was slightly higher among men (74.9 mg/day) when compared to women (62.0 mg/day). Most caffeine came from beverages (92.3% in children and 98.6% in adults). For children and adolescents, carbonated soft drinks (about 38%) and tea (25–31%) were major sources of caffeine; in adults, coffee (55.8%) was the major source of caffeine, followed by tea (16.9%) and carbonated soft drinks (16.1%).

Taking into account the NHANES data, NPD Group Survey data and trade information, Somogyi calculated that the mean daily caffeine intake of adults aged 22 and older in 2008 was 300.7 mg. Children had a daily caffeine intake of 43.5 mg/day, which increased in adolescence (14–22 years old) to 110.5 mg/day for men and 103.4 mg/day for women. For females in childbearing age (16–45 years old) daily caffeine intake was 208.2 mg/day. Total daily caffeine remained unchanged between 2003 and 2008. Most caffeine came from beverages (94.9% in children and 99.2% in adults). For children, carbonated soft drinks (39.1%), other beverages (32.0%) and tea (18.2%) were major sources of caffeine; in adolescent men and women, carbonated soft drinks (41.0% and 35.1%, respectively) and coffee (22.9% and 32.6%, respectively) were major caffeine sources. In adults, coffee (68.7%) was the major source of caffeine, followed by carbonated soft drinks (13.5%) and tea (9.5%).

Fulgoni III presented caffeine intake data from NHANES 2007–2010 ($N = 17,387$), and trend data from 2001 to 2010 ($N = 42,154$) at the Caffeine in Food and Dietary Supplements Workshop of the Institute of Medicine (Institute of Medicine, 2014). Among caffeine consumers ($N = 13,923$), daily caffeine intake increased with age from approximately 25 mg/day (P90: 90 mg/day) in 2–11 year olds, 75 mg (P90: 180 mg/day) in 12–17 year olds, to over 250 mg/day (P90: 515 mg/day) in 50–59 year olds. For single consumption sessions, the average caffeine intake was 65 mg (15 mg among children (P90: 25 mg), 35 mg among adolescents (P90: 60 mg), and 70–80 mg among adults (P90: 140 mg)). From 2001–2010 caffeine intake remained stable, although small but significant decreases in caffeine intake were found for 2–11 year olds (−2.5 mg) and 35–39 year olds (−19 mg). Regarding sources of caffeine, among 2–11 year olds carbonated soft drinks are the major contributor to caffeine intake. However, over the period 2001–2010 a significant reduction in carbonated soft drink consumption was seen for this age group, whereas consumption of coffee, tea and energy drinks remained stable. Among adolescents (12–17 years old), carbonated soft drinks were the main source of caffeine, and also in this age group a significant decline in consumption was seen from 2001 to 2010. Coffee was the greatest source of caffeine in adults. Among 18–35 year olds, a significant decrease in carbonated soft drink consumption and a small but significant increase in energy drink consumption was seen. Fulgoni concluded that overall caffeine intake remained stable from 2001 to 2010, but that new caffeine sources (e.g. RTD coffees, energy drinks) may be replacing traditional ones (e.g. carbonated soft drinks).

Fulgoni et al. further examined NHANES data covering 2001 to 2010 of $N = 24,808$ adults (≥ 19 years old) (Fulgoni et al., 2015). Of them, 89% reported regular caffeine consumption. Among caffeine users, usual daily intake was 211 ± 3 mg (P90 = 436 mg/day). Men (240 ± 4 mg/day) had a significant higher usual caffeine intake than women (183 ± 3 mg/day). About half of the caffeine intake (46%, 85 mg) was consumed in a single session.

Almost all caffeine (98%) came from beverages. Most important caffeine sources were coffee (64%), soft drinks (18%), and tea (16%). Caffeine intake was stable from 2001 to 2010. There was however a small but significant decrease in soft drink consumption (−3 mg for each subsequent 2 years), and a small but significant increase in energy drink consumption (+0.5 mg per 2 years) between 2001 and 2010. To put this into perspective, it should be noted that energy drinks contribute less than 1% to daily caffeine intake.

In this article ☰  he NHANES database (2009–2010) to examine trends in caffeine intake of a national representative sample of $N =$ the years 2001–2010(Ahluwalia et al., 2014). A small but significant decline in caffeine intake was found for children

aged 2–5 years (−3.0 mg/day) and 6–11 years (−4.6 mg/day). Also caffeine intake among 12–19 years old adolescents remained stable over the 10-year study period. In 2009–2010, 71% of US children and adolescents consumed caffeine. Average daily caffeine intake increased with age from 4.7 mg/day (2–5 years old), to 9.1 mg/day (6–11 years old) and 40.6 mg/day (12–19 years old). The analyses revealed that 90–95% of children 12 years old or younger and 75–90% of 12–19 years old have daily caffeine intakes below the levels recommended by Health Canada. The 90th percentile of caffeine consumers among 12–19 years old had an average daily caffeine intake of 2.45 mg/kg body weight and day (186.3 mg/d), equal to the recommended consumption limit of Health Canada for this age group.

Branum et al. examined trends in caffeine intake among US children, using NHANES data from 1999 to 2010 (Branum et al., 2014). Dietary recall data (Day 1 of NHANES) were analyzed for different age categories (2–5, 6–11, 12–16, 17–18, and 19–22 years olds), and the authors further looked at race/ethnicity and poverty status. About 73% of children reported caffeine intake. A clear effect of age was seen: among 2–5 year olds 63% consumed caffeine which increased to around 75% of older children and adolescents. Caffeine consumers were more frequently found among non-Hispanic white children, when compared to non-Hispanic black or Mexican-American children. Males consumed significantly more caffeine than females.

Over the years 1999–2010, a significant decline in total daily caffeine intake was seen for 2–5 year olds, 6–11 year olds, and Mexican-American children. For other groups, total daily caffeine intake (mg/day) remained stable.

Overall, carbonated soft drinks accounted for the majority of caffeine intake in children. However, a significant decline was seen from 62% in 1999–2000 to 38% in 2009–2010. Tea consumption remained stable over the years and was the second greatest contributor to daily caffeine intake. On the other hand, a significant increase in coffee consumption was seen from 1999 to 2010. Coffee contributed 10% to daily caffeine intake in 1999–2000 and 24% in 2009–2010. Regarding different age groups, tea was the greatest caffeine source in children 2–5 years old, and coffee was the greatest caffeine contributor among 19–22 years olds. Energy drinks were absent in 1999–2000, and in 2009–2010 energy drinks contributed to 6% to daily caffeine intake. The number of children reporting energy drink consumption in 2009–2010 was however small (N = 111, 0.7%). The highest contribution to daily caffeine intake was found among 19–22 years olds (10%).

## Canada

Knight et al. compared caffeine intake of children 1 to 5 years old from Canada and USA (Knight et al., 2006). Data from two nationally representative household surveys, the 2001 Canadian Facts Study (N = 658) and the 1999 United States Share of Intake Panel Study (N = 619) were compared. Of 1 to 5 years old children, 36% in Canada and 58% in USA consume caffeinated beverages. Daily caffeine consumption of Canadian children was on average 7 mg/day (0.42 mg/kg/day) versus 14 mg/day (0.82 mg/kg/day) in US children. The 90th percentile of daily caffeine consumption of Canadian children was 26.7 mg/day (1.71 mg/kg/day) versus 37.3 mg/day (2.32 mg/kg/day) in US children. Most common source of caffeine was carbonated soft drinks followed by tea. The higher daily intake of caffeinated beverages among US children is due to a higher consumption of carbonated soft drinks. Caffeine intake of both Canadian and US children was well within the Health Canada safety limits for children.

## Europe

The EFSA Scientific Opinion on the Safety of Caffeine combined data from 39 European surveys conducted between 1997 and 2012 (European Food Safety Authority, 2015). The surveys were conducted in 22 different European countries and included a total of 66,531 participants. Combined data were presented for toddlers (12–<36 months, N = 4,103), other children (3–<10 years old, N = 8,755), adolescents (10–<18 years old, N = 8,709), adults (10–<65 year olds, N = 31,818), elderly (65–<75 years old, N = 5,119), and very elderly (≥75 years old, N = 2,381). Minimum and maximum total daily caffeine intake was 0.3–30.3 mg (0.0–2.1 mg/kg bw) for toddlers, 3.5–47.1 mg (0.2–2.0 mg/kg bw) for other children, 17.6–69.5 mg (0.4–1.4 mg/kg bw) for adolescents, 36.5–319.4 mg (0.5–4.3 mg/kg bw) for adults, 22.6–362.1 mg (0.3–4.8 mg/kg bw) for elderly, and 21.8–416.8 mg (0.3–6.0 mg/kg bw) for very elderly. The minimum and maximum P95 of total daily caffeine intake was 0.8–45.4 mg (0.1–3.5 mg/kg bw) for toddlers, 19.8–102.6 mg (1.2–4.6 mg/kg bw) for other children, 60.5–211.6 mg (1.5–4.1 mg/kg bw) for adolescents, 108.6–742.4 mg (1.5–10.0 mg/kg bw) for adults, 96.3–715.7 mg (1.5–10.4 mg/kg bw) for elderly, and 174.0–454.5 mg (2.3–6.1 mg/kg bw) for very elderly.

In this article ≡

elderly, coffee was the most important source of caffeine, accounting for 40–94% of daily caffeine intake. In Ireland tea was the major source of caffeine intake. Cola beverages, energy drinks and chocolate drinks were negligible sources of

caffeine among adults and elderly.

Among adolescents, main contributors of caffeine varied between countries, and included cola beverages, coffee, tea and chocolate. The contribution of energy drinks to daily caffeine intake was minor across the EU, with highest values in the UK (11%), the Netherlands (8.1%) and Belgium (5.3%). For toddlers, chocolate and tea were the main contributors to daily caffeine intake (except for Belgium where cola beverages were the main contributing caffeine source). For children aged 3–10 years, chocolate was the main caffeine source, followed by tea and cola beverages. Energy drinks were a negligible source of caffeine among toddlers and other children.

Zucconi et al. conducted a study commissioned by EFSA on the prevalence of energy drink consumption (Zucconi et al., 2013). Data were collected between February and November 2012 in 16 EU member states. A total of $N$ = 50,587 participants were interviewed, of which $N$ = 14,557 were adults (18–65 years old), $N$ = 31,070 were adolescents (10–18 years old), and $N$ = 4,960 were children (3–10 years old). It has to be noted, that of the total sample about 19% were from Italian origin ($N$ = 9,609). Adults were interviewed using computer assisted web interviews (CAWI [80%]) or computer assisted telephone interviews (CATI [20%]), adolescents completed a web based questionnaire, and children completed a questionnaire at school with help of teachers or parents.

Among all adults ($N$ = 14,557), total daily caffeine consumption from all sources was not recorded. Adult energy drink consumers ($N$ = 4,180) had a daily caffeine intake of 271.7 mg/day (3.87 mg/kg bw/day), of which 22.4 mg/day (0.32 mg/kg bw/day) comes from energy drinks (about 8%). Among the P90 of adult energy drink consumers ($N$ = 486), daily caffeine intake was 381.91 mg/day (5.78 mg/kg bw/day), of which 48.32 mg/day (0.70 mg/kg bw /day) comes from energy drinks (about 12%). Regarding single session consumption, adult energy drink consumers ($N$ = 4,180) had a caffeine intake from energy drinks only of 155.07 mg (2.16 mg/kg bw); among the P90 of adult energy drink consumers ($N$ = 486), caffeine intake from energy drinks on a single session was 373.70 mg (5.14 mg/kg bw).

Daily caffeine consumption from all sources of adolescents ($N$ = 31,070) was 149.20 mg/day (2.45 mg/kg bw/day), of which 15.91 mg/day (0.26 mg/kg bw/day) comes from energy drinks. Among adolescent energy drink consumers ($N$ = 20,713), daily caffeine consumption from all sources was 184.92 mg/day (3.01 mg/kg bw/day), of which 23.51 mg/day (0.38 mg/kg bw/day) comes from energy drinks (about 13%). Among P90 adolescent energy drink consumers ($N$ = 2,077), daily caffeine intake from all sources was 476.99 mg/day (7.30 mg/kg bw/day), of which 75.08 mg/day (1.18 mg/kg bw/day) comes from energy drinks (about 16%).

Regarding single session consumption, adolescent energy drink consumers ($N$ = 20,713) had a caffeine intake from energy drinks only of 175.62 mg (2.92 mg/kg bw); among the P90 of adult energy drink consumers ($N$ = 2,170), caffeine intake from energy drinks on a single session was 457.98 mg (7.21 mg/kg bw).

Daily caffeine consumption from all sources of children ($N$ = 4,960) was 23.35 mg/day (1.08 mg/kg bw/day), of which 3.98 mg/day (0.18 mg/kg bw/day) comes from energy drinks. Among energy drink consumers ($N$ = 930), daily caffeine consumption from all sources was 51.38 mg/day (2.37 mg/kg bw/day), of which 21.97 mg/day (1.01 mg/kg bw/day) comes from energy drinks (about 42%). Among P90 adolescent energy drink consumers ($N$ = 154), daily caffeine intake from all sources was 90.24 mg/day (4.16 mg/kg bw/day), of which 42.90 mg/day (1.98 mg/kg bw/day) comes from energy drinks (about 47%). No data on single session consumption was collected.

Regarding the sample of children, the data of Zucconi et al. has several limitations. First of all, it can be questioned if the sample is representative for Europe. About one third of children came from Italy. Other countries such as Germany (0.6%), U.K. (2.6%) and France (4.2%) were clearly underrepresented, as they together make up about 42% of the European population. Also, males were overrepresented in the survey sample. Further, there was an overlap between the children sample (3–10 years old) and adolescent sample (10–18 years old: 10 year olds were included in both categories). There are several potential sources of recall bias. For example, children had to recall consumption up to one year. Also, the fact that they were assisted by teachers while completing the survey may have biased the outcome.

Taking into account these limitation, Zucconi et al. confirmed that the contribution from energy drink consumption to total caffeine consumption in Europe is only modest: 8% for adults and 13% for adolescents. The key contributors to daily caffeine intake are coffee (65% in adults and 33% in adolescents), cola (12% in adults and 30% in adolescents) and tea (9% adults and 11% in adolescents).

In Germany, Lachenmeier et al. examined the caffeine intake of caffeine consuming children and adolescents (10–18 years old) and adults (Lachenmeier et al., 2013). For $N$ = 316 children and adolescents (9–19 years old), data from the Dortmund Nutritional and Anthropometric Longitudinally Designed (DONALD) study were used, conducted between 2007 and 2011. The average caffeine consumption based on 3 day

For $N$ = 15,371 adolescents and adults (14–80 years old), data from a representative national nutrition survey was studie II). conducted in 2005 and 2006.

In this article ≡

7/20/2021 Full article: Caffeine intake at levels below Health Canada recommendations based on sources and daily occasional representative studies

Case 8:20-cv-02971-WFJ-TGW Document 139-14 Filed 03/10/22 Page 98 of 343 PageID 5389

The average daily caffeine intake for children and adolescents was 0.9 mg/kg bw/day and 2.1 mg/kg bw/day for adults, both below the Health Canada recommendations. Percentile data showed that more than 95% of children and adolescents consume caffeine at levels below Health Canada recommendations. The data confirmed that caffeine intake increases when people grow older until the age group of 35–50 years. Caffeinated soft drinks (48.9%) and tea (38.0%) were the greatest contributors to total caffeine intake in children and adolescents, whereas coffee (5.4%), and energy drinks (0.6%) only had a small contribution to daily total caffeine intake. In adults, coffee and tea were the biggest contributors to total caffeine intake.

In the U.K. Fitt et al. examined caffeine intake in a national representative sample of $N$ = 2,126 UK inhabitants, 1.5 years and older (Fitt et al., 2013). The data were collected between 2008 and 2010. In adults, total caffeine intake ranged from 122 to 143 mg/day. Coffee (49.5 mg/day) and tea (36.2 mg/day) were the greatest contributors to daily caffeine intake, followed by the in this study combined category of soft drinks and energy drinks (34.5 mg/day). Caffeine intake of children of 45 mg/day (4–6 years old) to 85 mg/day (10–12 years old) was below the recommendations of Health Canada. Overall, more than 95% of caffeine consumers ingest caffeine in amounts below the limits set by Health Canada.

In Austria, Rudolph et al. examined a national representative sample of $N$ = 700 Austrians aged 14 to 39 years old (Rudolph et al., 2014). This age range was chosen as energy drinks are most popular in this age group. Their mean daily caffeine intake was 357 mg/day (5.3 mg/kg bw/day). Caffeine intake at the 95th percentile (P95) was 957 mg/day (14.5 mg/kg bw/day). Most important sources of caffeine were coffee (60.8%), energy drinks (11.9%) and cola (9.5%). No significant differences were seen between men and women, or between BMI groups on a kg/bw basis. The age group 26–39 years old had a significantly higher daily caffeine intake when compared to younger participants. The data are of particular interest since Austria has a traditionally high caffeine consumption, and energy drinks have been on the market since 1987.

## Australia

The 2007 Australian National Children's Nutrition and Physical Activity Survey was commissioned by the Department of Health and Ageing, and completed by $N$ = 4,487 randomly selected children from across Australia, aged 2 to 16 years old. Although children of indigenous origin were not included, this can be regarded as a representative national sample. The data were collected on two occasions between February and August 2007, using a computer assisted personal interview (CAPI), i.e. a face to face interview conducted in the children's home, followed 7–21 days later by a computer assisted telephone interview (CATI) with the child or its caregiver.

A first report by the Commonwealth of Australia used CAPI data to assess daily caffeine consumption (Commonwealth of Australia, 2008). They found that daily caffeine consumption (mg/day) increased with age: 3.4 mg/day (2–3 years old), 8.1 mg/day (4–8 years old), 19.2 mg/day (9–13 years old), 41.7 mg/day (14–16 years old). Boys consumed more caffeine than girls. Major sources of caffeine for children 2–3 years old was chocolate (21.7%), soft drinks for children 4–13 years old (25.7–36.7%), and coffee (32.2%) and soft drinks (29.6%) for 14–16 year olds.

Overall ($N$ = 4,487 children, 2–16 years old),19% of daily caffeine intake comes from food, 81% from beverages (Beckford et al. 2015). Regarding beverages, soft drinks and flavored mineral waters contributed most to daily caffeine intake (31%), followed by coffee (21%), tea (17%), milk beverages (5%), and other beverages (4%). Energy drinks and sports drinks combined contributed 3% to daily caffeine intake.

Beckford et al. reanalyzed data from the 2007 Australian National Children's Nutrition and Physical Activity Survey to specifically look at consumption of beverages to which caffeine is added (i.e. cola type beverages and energy drinks) (Beckford et al., 2015). The results showed that 69% of daily caffeine intake of children comes from caffeine formulated beverages (CBFs). Of $N$ = 4,487 children, $N$ = 642 (14.3%) consume CBFs. Almost all CBFs (97%) consumed by Australian children were non energy drinks. Total daily caffeine intake was 18 mg (0.43 mg/kg bw/day). Consumers of CBFs had higher total daily caffeine intake (61 mg, 95%CI: 55–67 mg) when compared to children that do not consume CBFs (11 mg, 95%CI: 10–12 mg). Children with lower socioeconomic background were significantly more likely to consume CBFs.

In conclusion, in 2007 the total daily caffeine intake per kg bw of Australian children was below the recommended maximum daily intake level of 95 mg for children aged 5–12 years old (Food Standards Australia and New Zealand (FSANZ), 2015). The most important source of caffeine was soft drinks, followed by coffee and tea.

In 2013, the Australian Beverage Council commissioned a study on caffeinated beverage consumption and attitudes towards energy drinks. A national representative sample of $N$ = 1,105 Australians, aged 15–49 years old, completed the corresponding survey. In the past week they

In this article ≡

coffee drinks, 3.2 colas, 2.9 cups of green/black tea, and 0.7 energy drinks. Examining the relative contribution of the revealed that 51% of caffeine intake comes from coffee drinks (33% for 15–19 years olds, 48% for 20–29 year olds),

18% from colas, 16% from tea, and 5% from energy drinks (6% for 15–19 year olds, 7% for 20–29 year olds).

## New Zealand

The 2013 Food Regulatory Policy Options Paper, prepared for the Food Regulation Standing Committee (FRSC) by the FRSC Caffeine Working Group discussed New Zealand data on caffeine consumption.

In 2002, New Zealand National Children's Nutrition Survey, found that the mean daily caffeine intake of children, 5–12 years old, was 20 mg/day (0.6 mg/kg body weight). The P95 was 74 mg/day. For 5–12 year olds, main caffeine sources were tea (32%) and soft drinks (30%), followed by biscuits, cakes, muffins, pastries (11%), chocolate drinks (7%), chocolate (6%), energy drinks (2%). For 13–15 year olds in addition to soft drinks (32%) and tea (29%), coffee (23%) was an important caffeine source. Biscuits, cakes, muffins, pastries (6%), chocolate drinks (4%), chocolate (4%), and energy drinks (3%) had a limited contribution to daily caffeine intake.

The 2008–2009 National Adults Nutrition Survey by the New Zealand Ministry for Primary Industries reported that the average daily caffeine intake of New Zealanders 15 years and older was 216 mg/day (2.8 mg/kg bw) The P95 was 557 mg/day, and overall 37.3% of participants consumed > 3 mg/kg body weight caffeine per day. The latter were most frequently participants aged 31 and older. Data were presented per age group and gender. Among 15–18 year olds, caffeine intake was 75 mg/day (1.1 mg/kg bw/day, P95: 258 mg/day) for males and 77 mg/day (1.2 mg/kg bw/day, P95: 288 mg/day) for females. Among 19–30 year olds, caffeine intake was 194 mg/day (2.4 mg/kg bw/day, P95: 634 mg/day) for males and 144 mg/day (2.2 mg/kg bw/day, P95: 413 mg/day) for females. Among 31–50 year olds, caffeine intake was 253 mg/day (3 mg/kg bw /day, P95: 614 mg/day) for males and 252 mg/day (3.5 mg/kg bw/day, P95: 614 mg/day) for females. Among 51–70 year olds, caffeine intake was 264 mg/day (3.1 mg/kg bw/day, P95: 573 mg/day) for males and 212 mg/day (3 mg/kg bw/day, P95: 468 mg/day) for females. Among those 71 and older, caffeine intake was 216 mg/day (2.7 mg/kg bw/day, P95: 433 mg/day) for males and 179 mg/day (2.7 mg/kg bw/day, P95: 360 mg/day) for females.

Overall, the highest contributors to daily caffeine intake were coffee (47%) and tea (32%). Soft drinks (7%), biscuits (3%), chocolate (4%), chocolate drinks (1%), and energy drinks (3%) only had a small contribution to daily caffeine intake. Again, data were presented for different age groups and by gender. No gender differences were found in the relative intake of different sources of caffeine. For adolescents, 15–18 year old, soft drinks followed by biscuits and coffee were the major caffeine sources. From 19 years old, coffee is the main source of caffeine across age groups (38%–56%), followed by tea (13%–58%). Highest consumption of energy drinks was found among men 19–30 years old. In this group, energy drinks contributed to 8% of daily caffeine intake.

## Asia

In South Korea, Lim et al. determined the caffeine content of 1202 food and beverage products (Lim et al., 2015). Data from the Korean National Health and Nutrition Examination Survey (KNHNES), conducted in 2010–2012 were used to calculate daily caffeine intake of a national representative sample of $N$ = 21.573 Koreans. Mean daily caffeine intake for the total general Korean population was 67.75 mg/day (77.24 mg/day for men and 58.23 mg/day for women), and 81.91 mg/day for adults 19 years and older. In adolescents of 15–18 years old daily caffeine intake was 30.04 mg/day (0.52 mg/kg bw/day). In children, daily caffeine intake ranged from 1.38 mg/day (0.11 mg/kg bw/day) for up to 3 year olds to 10.05 mg/day (0.19 mg/kg bw/day) for 12–14 year olds. Highest caffeine intake was seen among 30–49 year olds (101.83 mg/day, 1.55 mg/kg bw/day). Main sources of caffeine intake were coffee (89%), followed by tea, and carbonated soft drinks. For young adults (15–19 year olds), carbonated soft drinks were the main caffeine source (30%). For heaviest caffeine consumers (30–49 year olds) coffee was the main caffeine source.

## Pregnant and lactating women

Data on daily caffeine intake in pregnant or lactating women is scarce. From the 39 surveys summarized in the EFSA caffeine opinion only one study looked at pregnant women. This study, conducted in Latvia among $n$ = 1 002 pregnant women revealed a mean (95th percentile) daily

In this article ☰
...urces of 109 mg (206 mg). Another small study conducted in Greece among $n$ = 65 lactating women reported a mean ...eine intake from all sources of 31 mg (97 mg). The daily caffeine intake observed in these studies is below the EFSA

safety recommendation of not exceeding 200 mg caffeine per day for pregnant and lactating women.

In 1999, Knight et a. 2004 examined data collected via the Share of Intake Panel (SIP), which also included a subset of pregnant women. Average daily caffeine intake from beverages in pregnant women was 58 mg/day (P90: 157 mg/day). Women of reproductive age ingested 91–109 mg/day (P90: 229–247 mg/day).

## Discussion

National representative studies from across the globe consistently show that average daily caffeine intake is below the recommendations of Health Canada (400 mg per day for adults and 2.5 mg/kg bw/ day for children and adolescents) and EFSA (400 mg per day for adults and 3 mg/kg bw/day for children and adolescents). Over the past decade, daily caffeine intake remained stable, despite the introduction of new caffeinated beverages. For adults, major sources of caffeine are coffee and tea, followed by carbonated soft drinks. For children, carbonated soft drinks and tea are major contributors, followed by coffee. Across all age groups, other caffeinated beverages (e.g., energy drinks) or foods (e.g., chocolate) do not significantly contribute to daily caffeine intake (together usually less than 5% to 10%).

While average daily caffeine intake from the studies presented here is below the recommendations of Health Canada, it has to be also noted that in some groups of the population and in some countries, high consumption of foods and beverages containing caffeine lead to intakes of caffeine at the 90th or 95th percentile which are above these recommendations.

It should be taken into account that there can be large differences between countries in both caffeine intake and its sources. For example, according to EFSA (2015), the main source of caffeine in the UK and Irish adult population is tea, compared to coffee in all other investigated EU countries.

Regarding consumption trends, for adults the total caffeine intake has remained stable. The introduction of energy drinks as a new caffeinated product to the beverage market has not led to an increase in total daily caffeine consumption. Total caffeine consumption of children below 12 years old has significantly declined over the past 10 years, whereas adolescent caffeine consumption remained stable. However, interesting trends over the past 15 years include a reduction of caffeinated soft drink consumption and an increase of coffee consumption among children and adolescents.

Generally, it has to be pointed out that the studies selected from the literature are of limited comparability for several reasons:

- sampling frame and sample design of the studies to achieve national representativeness are different. In some studies, weighting procedures where applied to adjust the samples to the corresponding sampling frame, while others use a census design. Overall, the information provided on the exact statistical procedures applied is limited and comparison between studies is difficult.

- The methods used to assess food and/or beverage consumption are different in the studies, again limiting their comparability. Data derived by 24-h recalls are different from data derived from food frequency questionnaires and data derived retrospectively are different from prospective food consumption methods (food diaries). This is an inherent source of limited comparability. For exact comparison between different studies and between different time periods of intake estimates, standardized methods to assess food consumption are required.

- The classification of the population into different age groups differs substantially within the studies identified. There is considerable overlap between population groups from different studies as there is no global agreement on different age groups.

These differences have to be considered when comparing the different results and limit the interpretation of the data to some extent. Some trends can still be extracted from the studies available, for ultimate comparison however harmonized approaches would be mandatory.

Although some studies come from large ongoing projects with a fixed methodology (e.g., NHANES), no standardized methodology has been applied in most of the studies summarized in this review. A direct comparison of these studies is therefore difficult. Moreover, data from different methodologies could not be aggregated into one dataset, for example to allow conducting meta-analyses. Ahluwalia and Herrick (2015) summarized the main methodological differences between studies that prevent aggregation of all data (Ahluwalia et al., 2014). First of all, the dietary data collection period varied between studies. Whereas some studies applied a 24-h dietary recall period, other studies recorded caffeine consumption for several days. Second, the data were collected in different ways, including surveys, phone calls, or face-to-face interviews. Third, the year(s) of data collection varies between the studies. Fourth, the varying age categories between the studies make it especially hard to  ome studies presented incomplete data. For example, caffeine intake data for men and women was presented, but no l. Other studies omitted relevant caffeinated products in their study (e.g., energy shots or caffeine pills), combined

more than 1 caffeinated beverage into 1 category (e.g., combining energy drinks and sports drinks), or focused specifically on one beverage category (e.g., energy drinks). Surveys specifically developed to assess consumption of specific foods tend to overestimate their consumption (European Food Safety Authority, 2015). Other studies only reported on caffeinated beverages but not foods (e.g., chocolate). However, the latter may be justified as all studies show that in adults caffeinated foods hardly contribute to total caffeine intake. Also, some studies did not report caffeine intake in mg/kg bw for children and adolescents, making it impossible to compare the study outcome with Health Canada and EFSA recommendations.

It is understandable that the methodological differences between the studies may have an impact on study outcomes in terms of under- or over reporting of caffeine intake. Therefore, harmonization of food intake methodologies is essential to allow for direct comparisons between future studies, and across countries. In addition, databases providing information on typical caffeine concentration in various foods and beverages are required as these can vary substantially in particular for coffee and tea depending on different factors (Rudolph et al., 2014). Ideally, these databases should be based on analytical values from a wide range of frequently consumed beverages and should regularly be updated as consumer trends may change over time.

Finally, although this information is available online to the general public (e.g., EFSA Fact Sheet on Caffeine), studies have shown that most people are not aware of the relative caffeine content of common beverages. For example, the 2013 Galaxy Poll revealed that most people think that energy drink contains most caffeine. Only 4% of Australians correctly believe that coffee from a café contains the highest amount of caffeine. Also, a recent study among US adolescents show that knowledge about whether common beverages contain caffeine or not is limited (Thrake et al., 2015), and recent Dutch data show that students find it hard to correctly rank caffeinated beverages according to their relative caffeine content (Mackus et al., 2016) An important reason for this lack of knowledge may be the fact that caffeine content is not labeled on all caffeine containing beverages. For example, coffee and tea and other natural products containing caffeine often do not have to record caffeine content on their label, while products with added caffeine such as energy drink do. The labeling text on a can of energy drink in Europe that the drink "contains high caffeine content" is in contrast to other unlabeled products with much higher caffeine content. For example, Starbucks coffee contains between 160 mg (Short, 236 mL) and 400 mg of caffeine (Venti, 591 mL) versus 80 mg caffeine in a typical 250 mL can of energy drink. If caffeine daily consumption is a concern, it is important to clearly inform consumers about the caffeine content of each caffeine containing product. The striking unawareness of (relative) caffeine content of common beverages support the suggestion to label caffeine content on *all* caffeine containing beverages, incl. coffee and tea products.

## Conclusions

1. Mean total daily caffeine intake in children, adolescents and adults is below caffeine intake recommendations such as those by Health Canada (2.5 mg/kg bw/day for children and adolescents, and 400 mg/day for adults) and by EFSA (3 mg/kg bw/day for children and adolescents, and 400 mg/day for adults).

2. Total caffeine intake has remained stable in the last 10–15 years

3. Coffee, tea, and soft drinks are the key contributors to daily caffeine intake.

4. Energy drinks contribute little caffeine to total caffeine intake.

5. The highest potential for the reduction in caffeine intake is by reducing coffee consumption, and in some countries and age groups, by reducing tea and soft drink consumption.

## Funding and statements of interest

This review was supported by Red Bull. Red Bull was not involved in the collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and the decision to submit the manuscript for publication. Joris Verster has received grants/research support from the Dutch Ministry of Infrastructure and the Environment, Janssen Research and Development, Nutricia, Takeda, and Red Bull and has acted as a consultant for the Canadian Beverage Association, Centraal Bureau Drogisterijbedrijven, Coleman Frost, Danone, Deenox, Eisai, Jazz, Purdue, Red Bull, Sanofi-Aventis, Sen-Jam Pharmaceutical, Sepracor, Takeda, Transcept, Trimbos Institute, and Vital : has received grants/research support from the Austrian Ministry of Health, the European Food Safety Authority and

# References

1. Ahluwalia, N., Herrick, K., Moshfegh, A. and Rybak, M. (2014). Caffeine intake among children in the United States and 10-year trends: 2001–2010. *Am. J. Clin. Nutr*. **100**:1124–32. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

2. Ahluwalia, N. and Herrick, K. (2015). Caffeine intake from food and beverage sources and trends among children and adolescents in the United States: review of National quantitative studies from 1999 to 2011. *Adv. Nutrition*. **6**:102–111. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

3. Beckford, K., Grimes, C.A. and Riddell, L.J. (2015). Australian children's consumption of caffeinated, formulated beverages: a cross-sectional analysis. *BMC Public Health*. **15**:70. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

4. Branum, A.M., Rossen, L.M. and Schoendorf, K.C. (2014). Trends in caffeine intake among US children and adolescents. *Pediatrics* **133**:386–393. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

5. Commonwealth of Australia. (2008). ISBN: 1-74186-756-8. Available at: http://www.ag.gov.au/cca [Google Scholar]

6. EFSA Fact Sheets on caffeine. Available online: http://www.efsa.europa.eu/en/corporate/pub/efsaexplainscaffeine150527 [Google Scholar]

7. EFSA NDA Panel (EFSA Panel on Dietetic Products, Nutrition and Allergies). (2015). Scientific Opinion on the safety of caffeine. *EFSA J*. **13**:4102, doi:10.2903/j.efsa.2015.4102 [Crossref], [Google Scholar]

8. Fitt, E., Pell, D. and Cole, D. (2013). Assessing caffeine intake in the United Kingdom diet. *Food Chem*. **140**:421–426. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

9. Food Regulatory Policy Options Paper, prepared for the Food Regulation Standing Committee (FRSC) by the FRSC Caffeine Working Group, August 2013. [Google Scholar]

10. Food Standards Australia New Zealand (FSANZ). (2015). Caffeine. Available at: http://www.foodstandards.gov.au/consumer/generalissues/Pages/Caffeine.aspx [Google Scholar]

11. Fulgoni III, V. L, Keast, D.R. and Lieberman, H.R. (2015). Trends in intake and sources of caffeine in the diets of US adults: 2001–2010. *Am. J. Clin. Nutr*. **101**:1081–1087. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

12. Galaxy Poll. (2013). Caffeinated drinks, and attitudes to energy drinks—Australia. Galaxy Poll for the Australian Beverage Council, August 2013. [Google Scholar]

13. Health Canada. (2010). *Caffeine*. Ministry of Health, Ottawa. Originally available at http://www.galaxyresearch.com.au/ [Google Scholar]

14. Institute of Medicine (IOM). (2014). *Caffeine in food and dietary supplements: examining safety: workshop summary*. The National Academies Press, Washington, DC.. [Google Scholar]

15. Knight, C.A., Knight, I., Mitchell, D.C. and Zepp, J.E. (2004). Beverage caffeine intake in US consumers and subpopulations of interest: estimates from the Share of Intake Panel survey. *Food Chem. Toxicol* **42**:1923–30. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

16. Knight, C.A., Knight, I. and Mitchell, D.C. (2006). Beverage caffeine intakes in young children: In Canada and the US. *Can. J. Dietetic Pract. Res*. **67**:96–99. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

17. ...ert, K., Kuballa, T., Schneider, R., Ruge, W., Reusch, H., Alexy, U. and Kersting, M. (2013). Caffeine intake from ...ildren, adolescents, and adults. *J. Caffeine Res*. **3**:47–53. [Crossref], [Google Scholar]

In this article ☰

18. Lim, H.S., Hwang, J.Y., Choi, J.C. and Kim, M. (2015). Assessment of caffeine intake in the Korean population. *Food Additives Contaminants: Part A Chem. Anal. Control Expo. Risk Assess.* **32**:1786–1798. [Taylor & Francis Online], [Web of Science ®], [Google Scholar]

19. Mackus, M., van de Loo, A.J.A.E., Benson, S., Scholey, A. and Verster, J.C. (2016). Consumption of caffeinated beverages and the awareness of their caffeine content among Dutch students. *Appetite* **103**:353–357. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

20. Mitchell, D.C., Knight, C.A., Hockenberry, J., Teplansky, R. and Hartman, T.J. (2014). Beverage caffeine intakes in the U.S. *Food Chem. Toxicology* **63**:136–142. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

21. Nawrot, P., Jordan, S., Eastwood, J., Rotstein, J., Hugenholtz, A. and Feeley, M. (2003). Effects of caffeine on human health. *Food Addit.Contam.* **20**:1–30. [Taylor & Francis Online], [Web of Science ®], [Google Scholar]

22. Rudolph, E., Faerbinger, A. and Koenig, J. (2014). Caffeine intake from all sources in adolescents and young adults in Austria. *Eur. J. Clin. Nutr.* **68**:793–798. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

23. Somogyi, L.P. (2010). *Caffeine intake by the U.S. population.* Report prepared for the Food and Drug Administration Oakridge National Laboratory. Kensington, California. [Google Scholar]

24. Thrake, T.P., Deoras, K., Griffin, C., Vemana, A. and Podmore, P. (2015). Caffeine awareness in children: insight from a pilot study. *J. Clin. Sleep Med.* **11**:741–746. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

25. Zucconi, S., Volpato, C., Adinolfi, F., Gandini, E., Gentile, E., Loi, A. and Fioriti, L. (2013). External Scientific Report. *Gathering consumption data on specific consumer groups of energy drinks.* Supporting Publications: EN-394, [190pp.].Available online: www.efsa.europa.eu/publications [Google Scholar]



## Related research ⓘ

| People also read | Recommended articles | Cited by 48 |
| --- | --- | --- |

Effects of caffeine on human health  ›

P. Nawrot et al.
Food Additives & Contaminants
Published online: 10 Nov 2010

Coffee and Health: A Review of Recent Human Research  ›

Jane V. Higdon et al.
Critical Reviews in Food Science and Nutrition
Published online: 18 Jan 2007

Coffee and its Consumption: Benefits and Risks  ›

Masood Sadiq Butt et al.
Critical Reviews in Food Science and Nutrition
Published online: 22 Mar 2011

In this article  ≡

View more

In this article ≡

In this article    ≡

In this article ☰

Case 8:20-cv-02971-WFa TGW : Document 139-14 Filed 02/10/22 Page 107 of 343 PageID 5398

In this article ☰

In this article ☰

In this article ≡

Case 8:20-cv-02971-WFJ-TGW  Document 139-14  Filed 02/10/22  Page 110 of 343 PageID 5401

In this article  ≡

In this article ≡

Case 8:20-cv-02971-WFa-TGW Document 189-14 Filed 02/10/20 Page 114 of 343 PageID 5405

In this article ☰

Case 8:20-cv-02971-WFJ-TGW Document 139-14 Filed 02/10/22 Page 115 of 343 PageID 5406

In this article ≡

Case 8:20-cv-02971-WFJ-TGW Document 139-14 Filed 02/10/20 Page 116 of 343 PageID 5407

In this article ≡

7/20/2021
Case 8:20-cv-02971-WFJ-TGW  Document 139-14  Filed 02/10/22  Page 117 of 343 PageID
5408
Full article: Cadmium fate and sources: A review of analytical representative studies



Information for

Authors
Corporate partners
Editors
Librarians
Societies

Opportunities

Reprints and e-prints
Advertising solutions
Accelerated publication
Corporate access solutions

Keep up to date

Register to receive personalised research and resources by email
Sign me up

Open access

Overview
Open journals
Open Select
Dove Medical Press
F1000Research

Help and information

Help and contact
Newsroom
All journals
Books

Copyright © 2021 Informa UK Limited    Privacy policy    Cookies    Terms & conditions    Accessibility

Registered in England & Wales No. 3099067
5 Howick Place | London | SW1P 1WG

Taylor & Francis Group
an informa business



Caffeine**informer**

Caffeine Basics ⌄    Coffee ⌄    Energy Drinks ⌄    Soft Drinks ⌄    Tools ⌄   🔍

**RESEARCH**

# Caffeine Intake Safety Laws



## Food Governing Agencies Weigh In

The safety of caffeine intake is constantly debated, especially in light of the recent controversy surrounding [teens and energy drink consumption](#).

*What is the official stance on the safety of caffeine intake according to the food governing and health agencies around the world?*



This article will give you the gist of what each of the organizations believe regarding the use of caffeine as a food or beverage additive.

## The Food and Drug Administration

The FDA's official stance is that caffeine is safe for consumers up to 400mg/ daily. To date, they allow caffeine to be added to beverages and food as long as it is listed in the ingredients panel. 

*However, products are not required to list the amount of caffeine that they contain.*

**The FDA is currently investigating the use of caffeine in food**, especially as it relates to the consumption of these foods by minors. Michael R. Taylor, the Deputy Commissioner of the FDA says that their current laws are outdated.



IQ Test: What Is Your IQ? ❯

The Food and Nutrition Board division of the [Institute of Medicine](#) was recently commissioned by the FDA to study the issue of caffeine safety as a food and dietary supplement additive. The FDA is currently reviewing the IOM's findings.

[Read more about the FDA's stance here.](#)



**10x More Precise**
Two key readings in one minute. Critical Control and Critical Quality from the same sample
AQUALAB 3    Open ❯


Central Florida's Heart Care Leader   Request a
Advent


**Caffeine During Pregnancy: How Much is Safe?**
Research


**Caffeine Metabolism**
Research


**Caffeine Safe Limits: Calculate Your Safe Daily Dose**
Research


**Caffeine in the Breast Milk of Breastfeeding Mothers**
Research


**Caffeine Anxiety and Panic Attacks**
Caffeine Side Effects / Research


**Caffeine and Dehydration: What the Research Says**
Research

## European Commission – Food Safety

The current laws in Europe require any food or beverage that doesn't naturally contain caffeine  to list the ingredient on the label and identify the amount it contains.



Here's what The EC says about caffeine safety.

> As far as caffeine is concerned, the Scientific Committee for Food, in its opinion of 21 January 1999 on caffeine and other substances used as ingredients in "energy drinks", concluded that, for adults, apart from pregnant women, the contribution of "energy drinks" to the total consumption of caffeine did not appear to be a cause for concern, assuming that "energy drinks" replace other sources of caffeine. However, for children, an increase in the daily intake of caffeine to a certain level of consumption per day may bring about temporary changes in behavior, such as increased excitability, irritability, nervousness or anxiety. In addition, for pregnant women, the Committee's view is that moderation of caffeine intake is advisable.

[Read more here.](#)

The **European Food Safety Authority** recently released the following [research](#) regarding caffeine in consumer products and the safety there of.

- They found that adults can safely consume up to 5.7 mg of caffeine per kg of body weight.
- Healthy adults should have no more than 200 mg of caffeine in a single dose.
- They found that there isn't enough data to establish a safe level for children and adolescents.
- Pregnant woman should have no more than 200 mg of caffeine per day.

## Food Standards Australia New Zealand


Manage Stress by Understanding Your Health Data
Ad By Oura Ring                    See More

These two countries perhaps have **some of the strictest caffeine restrictions** with Australia being even more restrictive than New Zealand.

Their expert working group issued a report on caffeine safety and found the following conclusions.

> Drawing on two decades of research on the effects of caffeine in humans, the present author is led to the following conclusions:

- Habitual use of caffeine leads to physical dependence (as evidenced by the existence of a well characterized abstinence-induced 'withdrawal syndrome').

- Habitual use has no demonstrated benefits.

- Dietary caffeine has harmful physical and behavioral effects.

- The harmful effects of caffeine probably extrapolate to children.

Read Their Guidelines Here.

## Health Canada

Canadian caffeine laws are stricter than that of the USA. In fact, caffeine cannot be added to a food or beverage unless it is from a natural source.

At one time the only soft drinks that could contain caffeine were cola beverages, however, this restriction has since been lifted. Energy drinks were once considered health supplements, but now are under their food guidelines.

*Their website also states this:*

> Currently, pure caffeine and caffeine citrate may be added to cola-type beverages and it must be declared in the ingredients list on the product label. Caffeine may not be added to any other food.

But, this is clearly no longer relevant since other soft drinks contain caffeine as well as energy drinks, which are now considered food.

Here's what Health Canada states about the safety of caffeine.

> A review undertaken by Health Canada scientists has considered the numerous studies dealing with caffeine and its potential health effects. It has re-confirmed that for the average adult, moderate daily caffeine intake at dose levels of 400 mg/day is not associated with any adverse effects.

Read more about Health Canada's guidelines here.

## The International Food Information Council

The IFIC has published a large review of caffeine research. It's conclusion:

> Moderate intake of 300 mg/day (about three cups of coffee per day) of caffeine does not cause adverse health effects in healthy adults, although some groups, including those with hypertension and the elderly, may be more vulnerable. Also, regular consumers of coffee and other caffeinated beverages may experience some undesirable, but mild,

short-lived symptoms if they stop consuming caffeine, particularly if the cessation is
abrupt. However, there is little evidence of health risks of caffeine consumption.

*Overall, they conclude that* _moderate caffeine intake is safe_ *and can even be beneficial to
one's health.*

You can view their fact sheet here.

**Are these government agencies on the right track as far as caffeine safety is concerned?**

# Related

### Red Bull on Caffeine Safety and Transparency

**Energy Drinks**

Red Bull's stance on caffeine safety, transparency, and consumer marketing.
What we uncovered during our tour of their corporate headquarters.

### Caffeine Myths and Facts

**Research**

Is caffeine harmful or not? There is still much debate surrounding the safety of
caffeine, but what does the research...



### Caffeine Safe Limits: Calculate Your Safe Daily Dose

**Research**

Caffeine safe limits for adults, children, and those with medical conditions.
Includes a safe dose calculator and guidelines for consuming...

### Caffeine: Facts, Usage, and Side Effects

**Research**

Caffeine: history, plant sources, chemical structure, metabolism, positive &
negative effects, use in beverages & food as well as its...

### Energy Drinks and Caffeine: A Gateway Drug

**Caffeine Addiction**

Some believe energy drinks and caffeine increase the risk of substance abuse.
Here are the studies that support caffeine being...

### Caffeine and Dehydration: What the Research Says

**Research**



What the research says about the dehydrating effect of caffeine. It can act as a diuretic, but only in certain...

---

Any advice posted on our website is for informational purposes only and is not intended to replace any medical advice. Caffeine Informer makes no representations or warranties and expressly disclaim any and all liability concerning any treatment, action by, or effect on any person following the information offered through the website. If you have specific concerns or a situation arises in which you require medical advice, you should consult with an appropriately trained and qualified medical services provider.

Written by James Foster, last updated on August 10, 2017

**Caffeine Informer** - Obsessed with caffeine since 2005.

About · Contact · Terms · Privacy

© 2021 Caffeine Informer is a participant in the Amazon Associates Program and may receive a portion of revenues if you purchase a product using a link on this site.



BUY
ONLINE

SCROLL DOWN FOR MORE

01 – 03

We use cookies, and not the delicious ones, to personalize your site experience. By continuing to use and browse this site you agree to our Privacy Policy





BUY
ONLINE

# IN AN
# ACTIVE LIFESTYLE

## CLINICALLY PROVEN TO FUNCTION

Stay active and energized all day long with CELSIUS by your side. CELSIUS powers active lives every day with essential, functional energy. We're different from other energy drinks because we focus on movement. When combined with exercise, our formula is clinically proven to boost your metabolism and help you burn body fat. Whether you need an extra boost at the gym or a delicious pick-me-up to help you hustle through your workday, CELSIUS is here to help you stay active and focused on your goals. Made with only the best ingredients, CELSIUS has no artificial preservatives or flavors, no aspartame or high fructose corn syrup, and it's very low in sodium.



We use cookies, and not the delicious ones, to personalize your site experience. By continuing to use and browse this site you agree to our Privacy Policy

✕



OUR PRODUCTS | STOP US



BUY ONLINE



We use cookies, and not the delicious ones, to personalize your site experience. By continuing to use and browse this site you agree to our Privacy Policy







A FITNESS DRINK THAT IS CLINICALLY

# PROVEN TO **FUNCTION.**

    

**BURNS CALORIES**

A study conducted by the Division of Exercise Science and Sports Nutrition at the Ohio Research Group found that when comparing drinks, a serving of CELSIUS has calorie-burning properties, while diet soda does not.

VIEW STUDY 

We use cookies, and not the delicious ones, to personalize your site experience. By continuing to use and browse this site you agree to our Privacy Policy 





BUY ONLINE



## JOIN OUR COMMUNITY ON INSTAGRAM!



@CELSIUSOFFICIAL 



#CELSIUSLIVEFIT

We use cookies, and not the delicious ones, to personalize your site experience. By continuing to use and browse this site you agree to our Privacy Policy









PRODUCTS, EVENTS AND MORE.

ENTER EMAIL

SUBMIT

AMBASSADORS      FAQ      BLOG

ACCESSIBILITY STATEMENT

© 2021 CELSIUS. ALL RIGHTS RESERVED.

CORPORATE                    |                    PRIVACY

SITE BY MOVETIC

We use cookies, and not the delicious ones, to personalize your site experience. By continuing to use and browse this site you agree to our Privacy Policy







BUY ONLINE



SCROLL DOWN FOR MORE

01 — 03

We use cookies, and not the delicious ones, to personalize your site experience. By continuing to use and browse this site you agree to our
Privacy Policy








We use cookies, and not the delicious ones, to personalize your site experience. By continuing to use and browse this site you agree to our Privacy Policy





BUY
ONLINE

**CELSIUS**
CELSIUS HEAT
CELSIUS BCAA
CELSIUS-STEVIA
CELSIUS ON-THE-GO



We use cookies, and not the delicious ones, to personalize your site experience. By continuing to use and browse this site you agree to our
**Privacy Policy**







    

## BURNS CALORIES

A study conducted by the Division of Exercise Science and Sports Nutrition at the Ohio Research Group found that when comparing drinks, a serving of CELSIUS has calorie-burning properties, while diet soda does not.

**VIEW STUDY** +

We use cookies, and not the delicious ones, to personalize your site experience. By continuing to use and browse this site you agree to our Privacy Policy 










@CELSIUSOFFICIAL 



We use cookies, and not the delicious ones, to personalize your site experience. By continuing to use and browse this site you agree to our Privacy Policy





☰

BUY
ONLINE



ENTER EMAIL

SUBMIT

   

AMBASSADORS          FAQ          BLOG

ACCESSIBILITY STATEMENT

© 2021 CELSIUS. ALL RIGHTS          CORPORATE          |          PRIVACY          SITE BY
RESERVED.                                                                                              MOVETIC

We use cookies, and not the delicious ones, to personalize your site experience. By continuing to use and browse this site you agree to our
Privacy Policy





(https://www.energydrinkslawsuit.com/)

Home (https://www.energydrinkslawsuit.com/)    Products ▾    Lawsuits ▾

FAQs (https://www.energydrinkslawsuit.com/faqs/)

# Does the FDA regulate energy drinks?

Not as much as it should. Incredibly, it is not the FDA but the energy drink companies themselves that decide whether to label their products as beverages or dietary supplements. Manufacturers that designate their energy drinks as beverages must comply with the **Nutrition Labeling and Education Act of 1990 (https://en.wikipedia.org/wiki/Nutrition_Labeling_and_Education_Act_of_1990)** (NLEA) and label the drinks with conventional Nutrition Facts panels. Manufacturers of energy drinks designated as dietary supplements must comply with the labeling requirements of the Dietary Supplement Health and Education Act of 1994, which are significantly laxer. Instead of the Nutrition Facts panels, these products are labeled with Supplement Facts panels, on which manufacturers can list ingredients that aren't permitted on beverage labels under the NLEA. Thus, labeling is inconsistent across companies.

⬤ (https://twitter.com/EnergyDrinksLaw) ⬤ (https://www.facebook.com/energydrinkslawsuit)

Most **energy drinks (https://www.energydrinkslawsuit.com/)** were originally classified as "dietary supplements" in order to sidestep the U.S. Food and Drug Administration (FDA)'s caffeine ceilings for beverages. When energy drinks first came under fire a few years ago— with doctors and lawmakers pushing for more transparency and regulation in response to the deaths of 19-year-old Alex Morris and 14-year-old Anais Fournier, among others—most manufacturers agreed to disclose their ingredients and add labels displaying the quantity of caffeine, sugar, and other stimulants.

Around the same time, because dietary supplements have to inform the FDA when their products are linked to injury or death (i.e., Serious Adverse Events), companies like Monster **reclassified their products as "beverages." (https://www.energydrinkslawsuit.com/3-reasons-why-fda-should-test-energy-drinks/)** To do so, all they had to do was self-affirm that all of their individual ingredients are "generally regarded as safe" (GRAS). These companies had and have the option of filing a GRAS petition to get the official approval of the FDA, but none have done so, which means the FDA has not thoroughly researched or explicitly approved these beverages—only their individual ingredients. Closer scrutiny, of course, might lead to the type of energy drink ban that exists in places like Uruguay, or a caffeine cap akin to Canada's.

In January 2014, in response to the rising popularity and threat of energy drinks, the FDA issued a series of industry guidances "to help dietary supplement and beverage manufacturers determine whether a liquid food product is properly classified as a dietary supplement or as a beverage, and to remind the industry of legal requirements regarding the substances that may be added to either type of product." Though the FDA's heart was in the right place, these were guidances—not regulations. By its own admission (emphasis ours), "This guidance represents the Food and Drug Administration's (FDA's) current thinking

on this topic. It *does not create or confer any rights for or on any person and does not operate to bind FDA or the public*. You may use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations."

Compared to the way the FDA regulates sodas and soda consumption in the U.S., the energy drink industry is the Wild West.

 (https://www.energydrinkslawsuit.com/fda-regulate-energy-drinks/?share=facebook&nb=1)

 (https://www.energydrinkslawsuit.com/fda-regulate-energy-drinks/?share=twitter&nb=1)

 (https://www.energydrinkslawsuit.com/fda-regulate-energy-drinks/?share=linkedin&nb=1)

 (https://www.energydrinkslawsuit.com/fda-regulate-energy-drinks/?share=google-plus-1&nb=1)

 (https://www.energydrinkslawsuit.com/fda-regulate-energy-drinks/?share=reddit&nb=1)

# Join The Lawsuit

## (877) 937-9899 (tel:+18779379899)

**Name** *

**Email** *

**Phone** *

**Injury** *

Afib

By submitting this form I agree to the Terms of Use (/terms-of-use/).

## Submit

Super Lawyers

---

# Recent News

> FTC Blocks Vemma Nutrition from Targeting College Students (https://www.energydrinkslawsuit.com/ftc-blocks-vemma-nutrition/)

> Energy Drinks Could Cause Hypertension, Hepatitis C (https://www.energydrinkslawsuit.com/energy-drinks-cause-hypertension-hepatitis-c/)

> Energy Drinks May Trigger Risky Behavior (https://www.energydrinkslawsuit.com/energy-drinks-trigger-risky-behavior/)

› Energy Drinks Linked to Enlarged Hearts (https://www.energydrinkslawsuit.com/energy-drinks-linked-enlarged-hearts/)

› Caffeine Casualty: Cory Terry (https://www.energydrinkslawsuit.com/caffeine-casualty-cory-terry/)

Questions? Call us at **(877) 937-9899** (tel:+18779379899)

THIS IS AN ADVERTISEMENT

(https://www.facebook.com/energydrinkslawsuit)    (https://twitter.com/EnergyDrinksLaw)

Home (https://www.energydrinkslawsuit.com/) |

Terms of Use (https://www.energydrinkslawsuit.com/terms-of-use/) |

Privacy Policy (https://www.classaction.com/privacy-policy/) |

Contact Us (https://www.energydrinkslawsuit.com/contact-us/) |

Class Action Lawsuits (https://www.classaction.com)

© 2021 All rights reserved. Morgan & Morgan, PA.

20 North Orange Avenue • Suite 1600 • Orlando, FL 32801

7/20/2021    FDA Energy Drink Regulation in the News: Health Experts Push for Regulatory Changes and Monster Moves to Market as a Beverage In...

Case 8:20-cv-02971-WFJ-TGW Document 139-14 Filed 03/10/22 Page 138 of 343 PageID 5429

## FUERST ITTLEMAN
## DAVID & JOSEPH

PROFILE          PEOPLE          PRACTICE          🔍

# FDA Energy Drink Regulation in the News: Health Experts Push for Regulatory Changes and Monster Moves to Market as a Beverage Instead of as a Dietary Supplement

APR 08, 2013     🖶 PRINT    ⤴ SHARE

Home / Blog / Government Compliance / FDA / FDA Energy Drink Regulation in the News: Health Experts Push for Regulatory Changes and Monster Moves to Market as a Beverage Instead as a Dietary Supplement

On March 19, 2013, a group of doctors, researchers, and public health experts sent a joint letter to the Commissioner of the U.S. Food and Drug Administration ("FDA") urging the FDA to make changes to the regulation of energy drinks. In its letter, the group concluded that there is a "robust correlation between the caffeine levels in energy drinks and adverse health and safety consequences," especially where children, adolescents and young adults are concerned. Furthermore, the group claims that "there is neither sufficient evidence of safety nor a consensus of scientific opinion to conclude that the high levels of added caffeine in energy drinks are safe under the conditions of their intended use." As a result of these findings, the group is pushing the FDA to require manufacturers to label energy drinks with the product's caffeine content and demonstrate that the levels of caffeine in those products are generally recognized as safe ("GRAS") and comport with existing GRAS standards for beverages.

The FDA has previously dismissed public concerns about the safety of caffeine levels in energy drinks. In an unpublished response to Senator Dick Durbin's 2012 investigation of dietary supplements, which included energy drinks, the FDA explained that the amount of caffeine in energy drinks is not significantly different from the levels of caffeine in commonly consumed beverages like coffee or carbonated soda. (For more information, please see Natural Insider's article here.) Furthermore, the FDA noted that most caffeine consumed by Americans comes from what is naturally present in coffee and tea and that a review of the available studies does not indicate any new, previously unknown risks associated with caffeine consumption.

## Monster to Market Energy Drinks as Beverage Instead of Dietary Supplement

In a move unrelated to the letter described above, Monster Beverage, the largest seller of energy drinks, recently announced its plan to discontinue marketing its energy drink products as dietary supplements. Instead, Monster will market its products as conventional beverages. In addition to implementing required changes to its product labeling to reflect nutrition facts instead of supplement facts, Monster disclosed that its energy drink products will now specify caffeine content. (For more information about the change in the marketing of Monster energy drinks, please click here.) Monster's announcement of its plan to shift the marketing of its energy drinks comes just a few months after another energy drink brand, Rockstar, made a similar move.

According to Joseph Cannata, an executive vice president at Rockstar, Rockstar made its decision to market energy drinks as beverages because consumers found food labels easier to read than dietary supplement labels. A spokesperson for Monster, Michael Sitrick, explained that Monster's decision was influenced by several factors. Specifically, Mr. Sitrick stated that a major reason for the change was to stop the "misguided criticism" that Monster was selling its energy drinks as dietary supplements because dietary supplements are more lightly regulated than beverages. Additionally, Mr. Sitrick explained that "Monster Energy drinks could equally satisfy the regulatory requirements" for either dietary supplements or beverages. (For more information, please read the New York Times article here.)

These announcements from Rockstar and Monster Beverage come after a year of close public scrutiny over energy drinks. In July 2012, the parents of a 14-year-old girl filed a lawsuit against Monster after their daughter died following the consumption of two Monster Energy products. (For more information about this incident, please read CBS's coverage here.) In November 2012, the FDA received several voluntary adverse health reports listing the dietary supplement 5-hour Energy as contributing to an illness or death. Subsequently, the FDA began a routine investigation to determine whether a possible link exists between the hospitalizations and 5-hour Energy. (For more

Case 8:20-cv-02071-WFJ-TGW  Document 139-14  Filed 03/10/22  Page 139 of 343 PageID 5430



## FDA Regulation of Energy Drinks

The FDA does not have a specific category or specific regulations for energy drinks. Typically, energy drinks have been marketed as either dietary supplements or conventional beverages, depending on the product's ingredient, intended use, and labeling. For manufacturers, determining the appropriate regulatory framework for a product has important implications on a product's development, as it can help guide product formulation and establish the limitations on product labeling and marketing, any requirements for pre- or post-market reporting or mandatory adverse event disclosures to the FDA. As we previously explained here, categorizing products as either conventional foods or dietary supplements can be difficult.

The FDA defines conventional foods as "articles used for food or drink for man or other animals, chewing gum, and articles used for components of any such article." All ingredients in conventional foods must be pre-approved by the FDA as a food additive or meet the requirements of the GRAS provisions. Dietary supplements, on the other hand, are defined as products "intended for ingestion that contain a dietary ingredient intended to add further nutritional value to (supplement) the diet." Dietary supplements may be in forms such as tablets, capsules, softgels, gelcaps, liquids, or powder, and may be one, or a combination, of the following substances: vitamins, minerals, herbs or botanicals, amino acids, concentrates, metabolites, constituents, or extracts. Based on these definitions, it may be more difficult to classify certain liquid products where the product is intended to supplement the diet with vitamins or nutrients but resembles a conventional beverage in serving size and taste.

In an attempt to assist manufacturers in properly classifying their products as either liquid dietary supplements or conventional beverages, the FDA issued a draft guidance document in 2009. (The FDA's Guidance document can be accessed here.) This 2009 draft guidance states that the FDA considers a product's name, packaging, serving size, recommended conditions of use, and other representations about the product, to be determinants of whether the product is a conventional food or dietary supplement. This guidance has not been finalized; however, the U.S. Government Accountability Office released a report in March 2012 indicating that the FDA is in the process of developing and reviewing a final guidance document that clarifies when a liquid product should be marketed as a dietary supplement or conventional beverage. (The U.S. Government Accountability Office's report can be accessed here.)

If a product is a conventional food or dietary supplement but improperly marketed as the other type of product, the product could be deemed by the FDA to be misbranded or adulterated in violation of 21 U.S.C. § 331(a) and 21 U.S.C. 342(a)(2)(C). Failure to comply with the appropriate labeling regulations could subject manufacturers to enforcement action. The FDA has issued Warning Letters against manufacturers for mislabeling conventional beverages as dietary supplements. (For more information about the FDA's past enforcement action regarding the labeling of dietary supplements, please read our previous post here.)

## Uncertainty Regarding the Future Regulation of Energy Drinks

Despite the FDA's current position that the elevated caffeine levels in energy drinks do not pose a significant health risk, the public continues to pressure Congress and the FDA to address its concerns about the safety of consuming energy drinks. Now, with the release of this joint letter to the FDA, doctors, researchers, and public health experts seem to support the push for tighter regulation and increased oversight of these products. At this time, it remains to be seen what steps Congress and the FDA will take to address any gaps in the present regulatory scheme.

Fuerst Ittleman David & Joseph, PL will continue to monitor any developments in the regulation of compounding pharmacies. For more information, please feel free to contact our offices by email at contact@fidjlaw.com or by phone at (305) 350-5690.

7/20/2021    FDA Energy Drink Regulation in the News: Health Experts Push for Regulatory Changes and Monster Moves to Market as a Beverage In...

Case 8:20-cv-02071-VFJ-TGW   Document 139-14   Filed 03/10/22   Page 140 of 343 PageID 5431



Copyright © 2021 FIDJ, PLLC

Site designed and developed by Roar Media

Privacy | Sitemap | Careers | Contact

Case 8:20-cv-02071-WFJ-TGW   Document 80-14   Filed 02/10/22   Page 141 of 343 PageID
5432

**FDA NEWS RELEASE**

# FDA takes step to protect consumers against dietary supplements containing dangerously high levels of extremely concentrated or pure caffeine

**For Immediate Release:**

April 12, 2018

Español (/news-events/comunicados-de-prensa/la-fda-toma-medidas-para-proteger-los-consumidores-de-los-suplementos-alimenticios-que-contienen)

Today, the U.S. Food and Drug Administration took an important step to better protect consumers from the dangers of highly concentrated and pure caffeine products. These products present a significant public health threat because of the high risk that they will be erroneously used at excessive, potentially dangerous doses. Highly concentrated and pure caffeine, often sold in bulk packages, have been linked to at least two deaths in otherwise healthy individuals.

The agency issued a new guidance (/food/guidance-documents-regulatory-information-topic/guidance-industry-highly-concentrated-caffeine-dietary-supplements) to clarify that dietary supplements containing pure or highly concentrated caffeine in powder or liquid forms are considered unlawful when sold in bulk quantities directly to consumers. Given the significant public health concern, this guidance is immediately in effect. The FDA is prepared to take steps right away to begin removing illegal products from the market.

"Despite multiple actions against these products in the past, we've seen a continued trend of products containing highly concentrated or pure caffeine being marketed directly to consumers as dietary supplements and sold in bulk quantities, with up to thousands of recommended servings per container. We know these products are sometimes being used in potentially dangerous ways. For example, teenagers, for a perceived energy kick, sometimes mix dangerously high amounts of super-concentrated caffeine into workout cocktails. The amounts used can too easily become deceptively high because of the super-concentrated forms and bulk packaging in which the caffeine is being sold," said Scott Gottlieb, M.D., FDA commissioner. "We're making clear for industry that these highly concentrated forms of caffeine that are being sold in bulk packages are generally illegal under current law. We'll act to remove these dangerous bulk products from the market."

A half cup of a highly concentrated liquid caffeine can contain approximately 2,000 mg of caffeine and just a single teaspoon of a powdered pure caffeine product can contain approximately 3,200 mg of caffeine. This is equivalent to about 20 to 28 cups of coffee, a potentially toxic dose of caffeine. In fact, less than two tablespoons of some formulations of powdered, pure caffeine can be deadly to most adults, while even smaller amounts can be life threatening to children. Risk of overuse and misuse is high when highly concentrated caffeine is sold in bulk quantities, and consumers are expected to measure a very small, precise recommended serving. Regardless of whether the product contains a warning label, such products present a significant and unreasonable risk of illness or injury to the consumer.

The recommended safe serving of highly concentrated or pure caffeine products is often 200 mg of caffeine, which equates to 1/16 of a teaspoon of pure powder or approximately 2.5 teaspoons of a liquid. Yet, despite these small serving sizes, powdered forms of caffeine are sold in large bags and liquid forms are sold online in bottles that can contain a gallon or more. Often, consumers do not have the right tools to correctly measure such a small amount. Even if they do, simple and common errors, such as packing the powder too tightly or using a "heaping scoop" instead of a "level scoop," can increase the amount of caffeine in a single dose, with harmful results. Consumers could also make similar errors with highly concentrated liquid caffeine products. For comparison, a can of caffeinated soda contains about 35 mg of caffeine, which would equate to less than half a teaspoon of highly concentrated liquid caffeine.

Additionally, these products often closely resemble safe household items, potentially leading to accidental and dangerous ingestions. Highly concentrated caffeine in a clear liquid form could be easily confused with commonly available liquids, such as water or distilled vinegar, and pure powdered caffeine could be easily confused with flour or powdered sugar. The consequences of a consumer mistakenly confusing one of these products could be toxic or even lethal.

When formulated and marketed appropriately, caffeine can be an ingredient in a dietary supplement. For example, the guidance describes how dietary supplements containing caffeine in certain forms are less likely to present the same safety risks, including those sold in premeasured packets or containers, or in solid dosage forms such as tablets or capsules, or when sold in formulations that are not highly concentrated.

Moreover, this guidance does not affect other types of products that might also contain caffeine, such as prescription or over-the-counter drugs or conventional foods, like traditionally caffeinated beverages.

In 2015 and 2016, the FDA issued warning letters to seven distributors of pure powdered caffeine, with several of the letters citing that the products were dangerous and presented a significant or unreasonable risk of illness or injury to consumers. Since that time, the FDA has continued to see a proliferation of similar products being sold online. The FDA intends to carefully review any dietary supplement products that contain potentially dangerous amounts of caffeine in any form, and the agency will continue to take action when products put consumers at risk.

The FDA, an agency within the U.S. Department of Health and Human Services, protects the public health by assuring the safety, effectiveness, security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency is also responsible for the safety and security of our nation's food supply, cosmetics, dietary supplements, products that give off electronic radiation, and for regulating tobacco products.

## Related Information

- Guidance for Industry: Highly Concentrated Caffeine in Dietary Supplements (/food/guidance-documents-regulatory-information-topic/guidance-industry-highly-concentrated-caffeine-dietary-supplements)
- Pure and Highly Concentrated Caffeine (/food/products-ingredients/pure-and-highly-concentrated-caffeine)
- FDA Warns Consumers About Pure and Highly Concentrated Caffeine (/food/products-ingredients/fda-warns-consumers-about-pure-and-highly-concentrated-caffeine)

### #

---

# Inquiries

**Media:**

✉ Theresa Eisenman (mailto:theresa.eisenman@fda.hhs.gov)

📞 301-796-2969

**Consumer:**

📞 888-INFO-FDA

⊕ More Press Announcements (/news-events/newsroom/press-announcements)



HOME    SHOP    ABOUT    CONTACT US    ACCOUNT

## FULL SEND SUPPLEMENTS





**FULL SEND PRE**

**$45.00**

VIEW





## FULL SEND BCAA

### $30.00

VIEW

SIGN UP FOR OUR NEWSLETTER TODAY AND RECEIVE 10% OFF YOUR
FIRST ORDER!

First Name | Last Name

Enter your email | Subscribe

**INFO**

SHOP

ABOUT

CONTACT US

PRIVACY POLICY

COOKIE POLICY

TERMS OF SERVICE

FULL SEND SUPPLEMENTS

*FULL SEND:* ANY ACTIVITY YOU CAN DO WHOLEHEARTEDLY WITH CONFIDENCE AND AN ABSOLUTE PASSION.

**NEWSLETTER**

Register your email address below to receive special offers, restock updates and more!

| your-email@example.com | JOIN |

© FULL SEND SUPPLEMENTS 2021

**FULL SEND FITNESS LLC**
323-207-0220
6455 DE SOTO AVE
WOODLAND HILLS, CA 91367

 



**United States Government Accountability Office**

# GAO

Report to Congressional Requesters

March 2013

# DIETARY SUPPLEMENTS

# FDA May Have Opportunities to Expand Its Use of Reported Health Problems to Oversee Products



**Accountability ★ Integrity ★ Reliability**

GAO-13-244

March 2013

**GAO Highlights**

Highlights of GAO-13-244, a report to congressional requesters

# DIETARY SUPPLEMENTS

## FDA May Have Opportunities to Expand Its Use of Reported Health Problems to Oversee Products

## Why GAO Did This Study

Dietary supplements, such as vitamins and botanical products, are a multibillion dollar industry; national data show that over half of all U.S. adults consume them. FDA regulates dietary supplements and generally relies on postmarket surveillance, such as monitoring AERs, to identify potential concerns. Since December 2007, firms receiving a serious AER have had to report on it to FDA within 15 days. In January 2009, GAO reported that FDA had taken several steps to implement AER requirements and had recommended actions to help FDA identify and act on safety concerns for dietary supplements. GAO was asked to examine FDA's use of AERs in overseeing dietary supplements. This report examines the (1) number of AERs FDA has received since 2008, their source, and types of products identified; (2) actions FDA has taken to ensure that firms are complying with AER requirements; (3) extent to which FDA is using AERs to initiate and support its consumer protection efforts; and (4) extent to which FDA has implemented GAO's 2009 recommendations. GAO analyzed FDA data, reviewed FDA guidance, and interviewed FDA officials.

## What GAO Recommends

GAO recommends, among other things, that FDA explore options to obtain poison center data, if determined to be useful; collect information on how it uses AERs; provide more information to the public about AERs; and establish a time frame to finalize guidance related to GAO's 2009 recommendations. FDA generally concurred with each of GAO's recommendations.

View GAO-13-244. For more information, contact J. Alfredo Gómez at (202) 512-3841 or gomezj@gao.gov.

## What GAO Found

From 2008 through 2011, the Department of Health and Human Services' Food and Drug Administration (FDA) received 6,307 reports of health problems—adverse event reports (AER)—for dietary supplements; 71 percent came from industry as serious adverse events as required by law, and most of these AERs were linked with supplements containing a combination of ingredients, such as vitamins and minerals or were otherwise not classified within FDA's product categories. However, FDA may not be receiving information on all adverse event reports because consumers and others may not be voluntarily reporting these events to FDA, although they may be contacting poison centers about some of these events. From 2008 to 2010, these centers received over 1,000 more reports of adverse events linked to dietary supplements than did FDA for the same period. FDA officials said that they are interested in determining whether the poison center data could be useful for their analysis and have held discussions with American Association of Poison Control Centers representatives, but cost is a factor.

To help ensure firms are complying with AER requirements (i.e., submitting serious AERs, maintaining AER records, and including firms' contact information on product labels), FDA increased its inspections of supplement firms and took some actions against noncompliant firms. Specifically, FDA increased firm inspections from 120 in 2008 to 410 from January 1 to September 30, 2012. Over this period, FDA took the following actions: 3 warning letters, 1 injunction, and 15 import refusals related to AER violations, such as not including contact information on the product label or submitting a serious AER.

FDA has used AERs for some consumer protection actions (e.g., inspections and warning letters) but may be able to expand their use. FDA officials said that most AERs do not initiate or support such actions because it is difficult to establish causality between the product and the health problem based on the limited information in an AER. However, FDA does not systematically collect information on how it uses AERs for consumer protection actions; by collecting this information, it may be able to assess whether AERs are being used to their fullest extent. In addition, FDA is not required to provide information to the public about potential safety concerns from supplement AERs as it does for drugs. Making such information public, if consistent with disclosure provisions in existing law, could expand FDA's use of AERs and improve consumer awareness and understanding of potential health events associated with dietary supplements.

FDA has partially implemented all of GAO's 2009 recommendations, such as issuing guidance for new dietary ingredients, clarifying the boundary between dietary supplements and conventional foods, and expanding partnerships to improve consumer understanding. Specifically, FDA developed draft guidance in 2009, 2011, and 2012 to address three GAO recommendations about dietary supplement oversight and formed new partnerships to conduct consumer outreach. However, FDA has not issued final guidance in two cases. FDA officials said that they plan to complete implementation, but they have provided no time frame to do so. With final guidance in place, firms may be able to make more informed product development and marketing decisions, which could ultimately reduce FDA's enforcement burden in these areas.

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 7 |
| | FDA Received More than 6,000 AERs Over 4 Years, but Consumers and Others May Not Be Voluntarily Reporting All Adverse Events to FDA | 15 |
| | FDA Has Increased Its Compliance Monitoring of Firms and Taken Some Advisory and Regulatory Actions | 24 |
| | FDA Has Used AERs for Some Actions but May Have Opportunities to Expand its Use of AERs | 32 |
| | FDA Has Partially Implemented All of Our 2009 Recommendations | 40 |
| | Conclusions | 43 |
| | Recommendations for Executive Action | 45 |
| | Agency Comments | 45 |
| Appendix I | Objectives, Scope, and Methodology | 47 |
| Appendix II | Data on FDA's Consumer Protection Actions Related to Dietary Supplements | 52 |
| Appendix III | Comments from the Department of Health and Human Services | 59 |
| Appendix IV | GAO Contact and Staff Acknowledgments | 63 |

**Tables**

| | Table 1: Examples of FDA Surveillance Actions in Addition to AERs | 13 |
|---|---|---|
| | Table 2: Examples of FDA Consumer Protection Actions in Response to Identified Potential Safety Concerns for Dietary Supplements | 14 |
| | Table 3: Identified Advisory and Regulatory Actions on AER Requirement Violations, 2008 through 2011 | 30 |

Table 4: Mandatory AERs Preceding Certain FDA Consumer Protection Actions Related to Dietary Supplements, 2008 through 2011                                                                 35

Table 5: Examples of FDA Data Management Systems to Monitor Consumer Protection Actions Related to Dietary Supplements                                                                             37

Table 6: 2009 GAO Recommendations on Dietary Supplements and FDA or Congressional Action                                                                 41

Figures

Figure 1: Process for Reporting a Health Problem as an Adverse Event for Dietary Supplements                                                     10

Figure 2: Process for Reviewing AERs and Using AERs for Consumer Protection Actions                                                                 12

Figure 3: The Number of Voluntary and Mandatory Industry AERs Related to Dietary Supplements FDA Received, 2008 through 2011                                                                             16

Figure 4: Most Commonly Reported Types of Supplements Associated with Adverse Events, 2008 through 2011         19

Figure 5: Number of Foreign and Domestic Inspections of Dietary Supplement Firms FDA or Its State Partners Conducted, January 1, 2008 through September 30, 2012                         26

Figure 6: Proportion of Dietary Supplement Inspections for Which FDA Identified Problems or Concerns, 2008 through 2011      28

Figure 7: Voluntary and Mandatory AERs Related to Dietary Supplements Received by FDA, 2003 through September 30, 2012                                                                             52

Figure 8: Dietary Supplement-Related Consumer Complaints with Adverse Event Results or Reported Symptoms Received by FDA, 2002 through 2011                                                     53

Figure 9: Proportion of Dietary Supplement Inspections for Which FDA Identified Problems or Concerns, 2002 through 2011      54

Figure 10: Type of Dietary Supplement Inspections, 2008 through 2011                                                                             55

Figure 11: Number of Warning Letters Related to Dietary Supplements, 2002 through 2011                                                 56

Figure 12: Number of Class I, Health Fraud, and Other Safety-Related Dietary Supplement Recalls, 2008 through 2011    57

Figure 13: Dietary Supplement Import Refusals by Product Type, 2008 through 2011                                                             58

## Abbreviations

| | |
|---|---|
| AAPCC | American Association of Poison Control Centers |
| AER | adverse event report |
| CAERS | CFSAN Adverse Event Reporting System |
| CDC | Centers for Disease Control and Prevention |
| CGMP | Current Good Manufacturing Practices |
| CFSAN | Center for Food Safety and Applied Nutrition |
| DSHEA | Dietary Supplement Health and Education Act |
| FDA | Food and Drug Administration |
| FSMA | FDA Food Safety Modernization Act of 2011 |
| GRAS | generally recognized as safe |
| HHS | Department of Health and Human Services |
| NDI | New Dietary Ingredient |
| OEI | Official Establishment Inventory |
| RSS | Really Simple Syndication |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

March 18, 2013

The Honorable Henry A. Waxman
Ranking Member
Committee on Energy and Commerce
House of Representatives

The Honorable Richard J. Durbin
United States Senate

From 2009 to 2010, almost half of all U.S. adults consumed dietary supplements—including vitamins, minerals, and herbals—according to the Centers for Disease Control and Prevention, and dietary supplement sales surpassed $30 billion in 2011.[1] Furthermore, the number of supplements on the market has grown exponentially, from an estimated 4,000 products in 1994[2] to an estimated 55,000 products in 2009, according to officials from the U.S. Department of Health and Human Services' (HHS) Food and Drug Administration (FDA). In some cases, these products have caused serious health effects, as in the case of botanical ephedrine alkaloids—an herbal ingredient used in weight loss supplements that was linked to several deaths and banned from the dietary supplement market in 2004 and about which we reported in July 2003.[3]

FDA regulates dietary supplements under the Federal Food, Drug, and Cosmetic Act, as amended by the Dietary Supplement Health and Education Act of 1994 (DSHEA). Under DSHEA, FDA regulates dietary supplements, including vitamins, minerals, herbals and other botanicals, amino acids, certain other dietary substances, and derivatives of these items. DSHEA directs FDA to require in regulation that dietary

---

[1]Nutrition Business Journal, *NBJ's Supplement Business Report 2012* (Boulder, CO: Penton Media Inc: 2012) at http://newhope360.com/research/supplement-business-report (accessed December 12, 2012).

[2]According to the Dietary Supplement Health and Education Act of 1994, the estimated 600 dietary supplement manufacturers in the United States produced approximately 4,000 products, with total annual sales of such products alone reaching at least $4 billion at that time.

[3]GAO, *Dietary Supplements Containing Ephedra: Health Risks and FDA's Oversight,* GAO-03-1042T (Washington, D.C.: July 23, 2003).

supplement labels include a list of ingredients present in significant amounts and the quantity of such ingredients in the product.[4] Also, under DSHEA, FDA does not have the authority to require dietary supplements to be approved for safety and effectiveness before they enter the market, as it does for prescription drugs.[5] To identify potential safety concerns related to dietary supplements, FDA primarily relies on postmarket surveillance efforts, such as monitoring reports of health problems or adverse event reports (AER) it receives from industry, health care practitioners, and individuals; reviewing consumer complaints; and conducting inspections of dietary supplement firms. Once FDA identifies a safety concern, it may take an advisory action—such as sending a warning letter to a firm that manufactures, distributes, or packs a dietary supplement—or a regulatory action, including refusing entry to an imported product, seeking an injunction in federal court against a firm, or initiating a prosecution of a firm. FDA may also ban an ingredient through the rule-making process, as it did for botanical ephedrine alkaloids. If FDA decides to remove a product from the market using a regulatory action, it must demonstrate that the dietary supplement presents a significant or unreasonable risk of illness or injury[6] or is otherwise adulterated before it can do so. Collectively, in this report, we are referring to FDA's surveillance, advisory, and regulatory actions as consumer protection actions.

Since botanical ephedrine alkaloids were banned from dietary supplements in 2004, two major regulatory changes have occurred to address the oversight of dietary supplements. First, since December 2007, the Federal Food, Drug, and Cosmetic Act, as amended by the 2006 Dietary Supplement and Nonprescription Drug Consumer Protection Act (the 2006 act), has required dietary supplement manufacturers, distributors, or packers (dietary supplement firms) with their names

---

[4]Products may include "proprietary blends," which must list all ingredients but do not need to list the amount of each ingredient.

[5]Although FDA does not approve dietary supplements, a dietary supplement manufacturer or distributor of a supplement with a "new dietary ingredient"—an ingredient that was not marketed in the United States before October 15, 1994—may be required to notify FDA at least 75 days before marketing the product, depending on the history of use of the ingredient.

[6]The significant risk of illness or injury standard applies under conditions of recommended or suggested use, or if no conditions are recommended or suggested, under conditions of ordinary use.

appearing on the supplement label to report information about any serious AERs they receive to FDA within 15 business days of receiving the AER.[7] As defined in the act, serious adverse events include any health-related events that result in, for example, a death, life-threatening experience, inpatient hospitalization, or birth defect, or that require, based on reasonable medical judgment, a medical or surgical intervention to prevent these serious outcomes. The act does not require firms to report moderate or mild adverse events, such as gastrointestinal distress or headaches, but firms may do so voluntarily. Under the act, firms are also required to maintain records on each report of an adverse event (i.e., serious, moderate, and mild) for 6 years and allow HHS officials access to these records during an inspection or other limited circumstances, and firms must include a domestic address or domestic phone number on the dietary supplement product label for individuals to submit AERs. According to a report by the Senate Committee on Health, Education, Labor, and Pensions on the act, these AER requirements are intended to enhance FDA's ability to identify and act on public health issues associated with the use of dietary supplements.[8] Second, FDA established Current Good Manufacturing Practice (CGMP) regulations describing the conditions under which supplements must be manufactured, packed, and held. These requirements were implemented in phases, according to company size, and became fully effective in 2010.

In January 2009, we reported that FDA had taken several steps in response to the new mandatory AER requirements,[9] and we made the following four recommendations to enhance FDA's oversight of dietary supplements with which HHS generally agreed:

- FDA should request additional authority to (1) require dietary supplement firms to self-identify as dietary supplement firms and provide information on the products they sell annually as part of the existing process for firm registration and (2) require firms to report all

---

[7]Firms are required to report serious adverse events to FDA that occur on or after December 22, 2007, but since the law allows firms 15 days to file a report with FDA, the agency did not receive its first mandatory report until January 2008. Firms are also required to report follow-up medical information received about serious adverse events within 1 year after the initial report.

[8]S. Rep. No. 109-324 (2006).

[9]GAO, *Dietary Supplements: FDA Should Take Further Actions to Improve Oversight and Consumer Understanding,* GAO-09-250 (Washington, D.C.: Jan. 29, 2009).

mild and moderate adverse events to FDA. This recommendation addressed our finding that FDA's ability to identify safety concerns was hindered by a lack of information in three key areas: the identity and location of dietary supplement firms; the types and contents of products on the market; and product safety information, such as adverse event data.

- FDA should issue new dietary ingredient guidance clarifying when an ingredient is considered a new dietary ingredient, the evidence needed to document the safety of new dietary ingredients, and appropriate methods for establishing ingredient identity. This recommendation addressed our finding that FDA recognized the need to develop guidance on the new dietary ingredient provisions of DSHEA, but FDA had yet to issue this guidance—an omission previously highlighted in a report we issued in 2000.[10]

- FDA should issue guidance to industry clarifying when products should be marketed as dietary supplements or conventional foods formulated with added dietary ingredients.[11] This recommendation addressed our finding that the boundary between dietary supplements and foods containing added dietary ingredients, such as a beverage with kava, was not always clear.

- FDA should coordinate with stakeholder groups involved in consumer outreach to identify, implement, and assess the effectiveness of additional mechanisms for educating consumers about dietary supplements. This recommendation addressed our finding that consumers remained largely uninformed about the safety, efficacy, and labeling of dietary supplements and that FDA could leverage its limited consumer outreach resources through partnerships with stakeholder groups.

---

[10]GAO, *Food Safety: Improvements Needed in Overseeing the Safety of Dietary Supplements and "Functional Foods*," GAO/RCED-00-156 (Washington, D.C.: July 11, 2000).

[11]The Federal Food, Drug, and Cosmetic Act generally requires that when a company adds an ingredient to a food product, that ingredient must either be generally recognized as safe (GRAS) or go through FDA's review and approval process as a food additive. The GRAS standard is defined as a general recognition among qualified experts that the substance is reasonably certain to be safe under the conditions of its intended use (21 U.S.C. §§ 321(s), 348). See GAO, *FDA Should Strengthen Its Oversight of Food Ingredients Determined to Be Generally Recognized as Safe (GRAS)*, GAO-10-246 (Washington, D.C.: Feb. 3, 2010) for more information.

You asked us to report on FDA's use of AERs in overseeing dietary supplements. We examined the (1) number of AERs FDA has received since 2008, the source of these reports, and the types of products identified; (2) actions FDA has taken to help ensure that firms are complying with the 2006 act's AER requirements; (3) extent to which FDA is using AERs to initiate and support its consumer protection actions; and (4) extent to which FDA has implemented our 2009 recommendations for enhancing FDA oversight of dietary supplements.

For this report, dietary supplement refers to a product intended for human consumption as defined in DSHEA—products that, among other things, are intended for ingestion to supplement the diet, labeled as a dietary supplement and not represented as a conventional food or as a sole item of a meal or diet. They must also contain one or more dietary ingredients. We did not examine FDA's oversight of products that would otherwise meet the definition of a dietary supplement in DSHEA but are intended for veterinary use. We also did not examine FDA's oversight of products that would otherwise meet the definition of a dietary supplement in DSHEA but are available only by prescription. We did include products that are marketed as dietary supplements but have been deliberately adulterated (e.g., tainted with active ingredients in FDA-approved drugs or their analogues to increase their potency). Although such products may not meet the legal definition of a dietary supplement because they contain prescription drug ingredients, we included them in our review because these products are often marketed as dietary supplements and can cause serious health problems. To identify how many AERs FDA has received since 2008, and the types of problems reported, we obtained and analyzed FDA data on the number and type of AERs received from January 2008 through December 2011. We supplemented our initial analysis with updated data on the number of AERs FDA received between January 1 and September 30, 2012. To assess the reliability of these data, we reviewed related documentation, examined data to identify obvious errors or inconsistencies, and worked with agency officials to identify any data problems. We determined the data to be sufficiently reliable for the purposes of this report. To examine FDA's actions to help ensure that firms are complying with the new reporting requirements, we reviewed the 2006 act, as well as FDA's procedures, planning documents, and guidance and obtained and analyzed data on FDA's oversight actions, such as inspections and regulatory activities, to identify which of these actions were related to monitoring or enforcing firms' compliance. To examine the extent to which FDA is using AERs for its consumer protection efforts, we used statistical software to match firm and product names from serious AERs against firm and product names

from other FDA consumer protection actions from January 1, 2008, through December 31, 2011, such as inspections and warning letters, to identify which FDA actions were associated with a serious AER. We established a threshold for matching that gave us confidence we were capturing most of the potential matches and excluding those that were definitely not a match. The matches were then manually reviewed to confirm or reject potential matches. We verified the appropriateness of this approach with FDA officials. To determine the extent to which FDA has implemented GAO's 2009 recommendations for enhancing FDA oversight of dietary supplements, we reviewed relevant laws, planning documents, and guidance. We also reviewed proposed legislation to expand FDA's oversight authority for dietary supplements. In addition, to address all of our objectives, we reviewed relevant studies related to dietary supplements, adverse event reporting, industry compliance, and using poison center data for public health surveillance, among others. We reviewed the methodology for each of these studies and assessed them for reasonableness in accordance with our objectives. We interviewed officials from FDA's Center for Food Safety and Applied Nutrition (CFSAN) who receive and analyze AERs, officials from FDA's Division of Dietary Supplement Programs, officials from FDA's Office of Regulatory Affairs familiar with the agency's field operations and regulatory actions, and officials from FDA's Center for Drug Evaluation and Research. We also interviewed a wide range of stakeholders, including officials from HHS' Centers for Disease Control and Prevention and National Institutes of Health; and representatives of industry and trade organizations, consumer advocacy groups, and the American Association of Poison Control Centers. A more detailed description of our objectives, scope, and methodology is presented in appendix I.

We conducted this performance audit from December 2011 to March 2013 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

Responsibility for dietary supplement oversight is shared among several offices at FDA:

- FDA's Center for Food Safety and Applied Nutrition (CFSAN) manages the CFSAN Adverse Event Reporting System (CAERS), which collects and stores AERs related to foods and dietary supplements.[12] CFSAN also houses the Division of Dietary Supplement Programs, within its Office of Nutrition, Labeling and Dietary Supplements, which is responsible for developing guidance, providing scientific and technical expertise, and directing dietary supplement priorities across the agency. Additionally, CFSAN's Office of Compliance has primary responsibility for compliance and enforcement of FDA regulations and federal laws within FDA's jurisdiction with respect to foods—such as dietary supplements—including coordinating compliance and regulatory actions within the center and with other FDA components.[13] Among other responsibilities, the Office of Compliance reviews incoming investigational findings and recommendations to determine if a proposed action or remedy is supported by the documented observations and other evidence; assesses the integrity and relevance of the evidence; and obtains necessary scientific verification from appropriate subject matter experts.

- FDA's Office of Regulatory Affairs is responsible for managing the agency's field operations in 25 regional and district offices for each of FDA's centers, including CFSAN. Among other responsibilities, the Office of Regulatory Affairs supports FDA centers by performing inspections and import operations. The Office of Regulatory Affairs also takes advisory and regulatory actions for dietary supplements, but generally these actions are coordinated with CFSAN's Office of Compliance.[14]

---

[12]According to FDA officials, CAERs also collects data on adverse events related to cosmetics.

[13]Other responsibilities include managing reviews of regulatory actions recommended by field offices and guiding field offices' activities, when necessary, in developing scientifically and legally supportable actions.

[14]According to FDA officials, the Office of Regulatory Affairs also coordinates with FDA's Office of Chief Counsel for advisory and regulatory actions.

- FDA's Center for Drug Evaluation and Research is responsible for oversight of over-the-counter and prescription drugs, including generic drugs and some biological therapeutics. Center for Drug Evaluation and Research officials work with other FDA offices to identify products that are marketed as dietary supplements but that have been deliberately adulterated with active ingredients in FDA-approved drugs or their analogues. Once identified, FDA alerts the public and takes action to protect the public through a variety of consumer protection actions, such as working with firms on voluntary product recalls. Table 2 provides examples of consumer protection actions FDA may take in response to identified safety concerns.

According to FDA officials, the estimated resources for all dietary supplement activities across FDA grew slightly from $14.6 million in fiscal year 2009 to a projected $18.9 million in fiscal year 2012. These activities include regulatory and technical review, policy and guidance development, research, education and outreach, compliance and inspection activities, and associated administrative support activities, including infrastructure costs.

There are three different paths consumers, health care practitioners, or others can follow for reporting any serious, moderate, or mild health problem related to a dietary supplement to FDA. First, consumers, health care practitioners, or others can complete an electronic voluntary AER form at FDA's MedWatch webpage—FDA's agencywide safety information and adverse event reporting program—and submit it to FDA. The information is then sent to CFSAN via fax.[15] Second, consumers, health care practitioners, or others can report the health problem to the dietary supplement firm listed on the product label. The firm evaluates the problem and, if it determines it to be serious in accordance with the 2006 act, it is to complete a hard copy mandatory AER form and submit the form to FDA by mail, along with a copy of the product label. If the firm determines the problem is not serious, it can complete and submit a voluntary AER form at its discretion. Third, consumers, health care practitioners, or others can report the health problem to an FDA Consumer Complaint Coordinator. The coordinators are located in FDA district offices and document and follow up on a variety of health and nonhealth-related complaints about FDA-regulated products.

---

[15]Individuals may also call or e-mail health problems directly to CFSAN; however, CFSAN officials told us relatively few do so.

Coordinators enter health problems reported by consumers into a database from which the health problems are later uploaded into the CAERS database as voluntary AERs, as shown in figure 1.[16]

Alternatively, consumers, health care practitioners, or others can call a poison center about a health problem.[17] Poison centers are independently operated and provide free medical advice from health care professionals who are trained in the toxicological management of poison exposures and can address toxic exposure situations and adverse events.[18] Poison exposures can result from a variety of circumstances and substances, including adverse reactions to dietary supplements under use as directed.[19] Calls received at the 57 poison centers covering the United States and its territories are uploaded into a national database for analysis. However, the 57 poison centers are not an adverse event reporting system. Consequently, individual health problems involving dietary supplements and managed as poison exposure cases by poison centers are generally not sent to CFSAN.[20]

---

[16]Consumer complaints are not limited to health problems but may include problems with products, such as foul odors or bottles containing a pill that is different than the other pills in the container.

[17]These centers were formerly known as poison control centers. In addition to receiving calls about poison exposures where there is an identifiable exposed person, poison centers also receive calls where there is no identifiable exposed person, which poison centers treat as information cases.

[18]Poison centers are typically affiliated with state government agencies or academic medical centers, according to American Association of Poison Control Centers (AAPCC) representatives.

[19]The AAPCC manages a 24-hour hotline that provides free medical advice from toxicology specialists including nurses, pharmacists, physicians, and poison information providers. All local poison centers can be reached through the 24-hour hotline.

[20]According to AAPCC representatives, poison centers have shared information with FDA and other public health agencies, such as the Centers for Disease Control and Prevention, when they detect potential signals of an outbreak, such as a foodborne illness, based on a pattern of calls to their centers.

**Figure 1: Process for Reporting a Health Problem as an Adverse Event for Dietary Supplements**



Source: GAO.

[a]Dietary supplement manufacturer, packer, or distributor identified on product label as the contact for AERs.

[b]As defined by the Federal Food, Drug, and Cosmetic Act, as amended by the 2006 act, serious adverse events include any health-related events that result in, for example, a death, life-threatening experience, inpatient hospitalization, or birth defect or that require, based on reasonable medical judgment, a medical or surgical intervention to prevent these serious outcomes. As provided in the 2006 act, the manufacturer, packer, or distributor of a dietary supplement with their name appearing on the label of a dietary supplement marketed in the United States, shall submit to the Secretary of HHS any report received of a serious adverse event associated with such dietary supplement when used in the United States, accompanied by a copy of the label on or within the retail packaging of such dietary supplement. The 2006 act does not require firms to report moderate or mild adverse events, such as gastrointestinal distress or headaches, but firms may do so voluntarily.

When reporting a health problem to FDA, individuals are asked to provide a short description of the reported health problem; a brief description of the affected person, such as age, gender, weight, and any preexisting medical conditions; and information about the dietary supplement, such as the product name and manufacturer, as well as dosage associated with the health problem. Firms submitting mandatory AERs are also asked to provide the above information. However, to avoid duplication in

its database, FDA asks for the following five data elements at a minimum for mandatory AERs: (1) an identifiable patient, (2) an identifiable individual who is reporting the health problem to the firm, (3) identity and contact information for the responsible firm submitting the serious AER to FDA, (4) a suspect dietary supplement, and (5) a serious adverse event or fatal outcome.

Once FDA receives an AER for a serious, moderate, or mild health problem, contractors enter the information into the CAERS database, either electronically or manually, and record information by product, industry code, ingredient(s), medical symptom(s) and other information.[21] CAERS staff review the AERs for accuracy and then distribute them to subject matter experts within CFSAN's program offices, including the Division of Dietary Supplement Programs, for their review.[22] These subject matter experts review the AERs to determine the extent of the relationship between the reported health problem and the product. In addition, CAERS data analysts use statistical tools to analyze relationships across all AERs to detect potential indicators of unsafe products, including patterns or relationships among health problems, products, and ingredients that are found to be significant, according to CFSAN officials. These officials said that, if CFSAN's subject matter experts find that a product in an AER contains active ingredients in FDA-approved drugs or their analogues, the AER is shared with FDA's Center for Drug Evaluation and Research, which shares oversight responsibility for supplement products that have been deliberately adulterated with active ingredients in FDA-approved drugs or their analogues. If an issue related to compliance with dietary supplement regulations is identified—such as CGMPs describing the conditions under which supplements must be manufactured, packed, and held—CFSAN's subject matter experts

---

[21]FDA uses product codes to classify the products it regulates. For dietary supplements, these codes contain information about the industry, the type of ingredient, the delivery mechanism (e.g., capsule, topical), and whether the product is intended for human or animal use. The general categories for types of supplement ingredients are vitamin, mineral, protein, herbal and botanical, animal byproducts and extracts, fats and lipid substances, fiber, and a category for products that either combine different types of ingredients, such as vitamins and botanicals, or are otherwise not classified into one of the other categories. A vitamin C supplement with Echinacea is an example of a combination product that would fall into this category. Royal jelly—a byproduct of honey bees—is an example of a not elsewhere classified supplement that would fall into this category.

[22]CFSAN officials noted that the program subject matter experts in the Division of Dietary Supplement Programs are medical officers.

pass the AER or cluster of AERs to CFSAN's Office of Compliance, which works with FDA's Office of Regulatory Affairs to determine if consumer protection actions are needed, as shown in figure 2.

**Figure 2: Process for Reviewing AERs and Using AERs for Consumer Protection Actions**



Source: GAO.

Note: Consumer complaints that involve health problems and are entered into CAERS as voluntary AERs, are sent directly to the Office of Compliance. Additionally, foreign inspections of firms are coordinated through the Office of Regulatory Affairs' headquarters, according to FDA officials.

FDA uses other postmarket surveillance approaches in addition to AERs to identify potential safety concerns and conduct oversight related to dietary supplements. Examples of these approaches are listed in table 1.

**Table 1: Examples of FDA Surveillance Actions in Addition to AERs**

| Type of action | Description |
|---|---|
| Consumer complaints | Consumers or other parties can contact FDA to submit complaints about FDA-regulated products by phone. Complaints may address any aspect of a product including, but not limited to, an adverse event. In one instance, a complaint indicated that the dropper dispenser in a liquid dietary supplement broke during use. In another instance, a fish oil dietary supplement had a rotten fish smell. |
| Import screening | FDA reviews imported dietary supplement products and ingredients entering the country. There were approximately 546,603 dietary supplement shipments entering the country from 2008 to 2011. A small percentage of these products is examined or sampled.[a] |
| Inspections | FDA inspects firms that manufacture, pack, or hold dietary supplements. There are four general types of inspections: routine surveillance, consumer complaint investigations, for-cause compliance inspections, and follow-up to a regulatory action. An inspection may include product examinations, sampling and testing, as well as the inspection of the firm and facility involved with dietary supplements, according to FDA officials. |
| Internet monitoring | FDA monitors the Internet to identify products that purport to be dietary supplements but may be fraudulently promoted as drugs for treating disease. |

Source: GAO.

[a]We did not collect data on the percentage of dietary supplement import entries that FDA examined, sampled, or tested for this report. However, in our prior work on dietary supplements (GAO-09-250), we found that FDA sampled or examined, on average, approximately 3 to 5 percent of dietary supplement import entries from fiscal year 2002 through March 24, 2008. According to FDA, an import entry line is each portion of an import shipment that is listed as a separate item on an entry document. Items in an import entry having different tariff descriptions must be listed separately.

According to FDA officials, inspections of dietary supplement firms constitute the agency's primary method for monitoring compliance with requirements to report adverse events. According to CFSAN guidance, FDA investigators take several steps during inspections to monitor compliance with AER requirements, including determining whether a firm has a process in place to report serious adverse events, determining whether the firm has any serious AERs that it did not submit to FDA, and reviewing labels to determine if the product has contact information for reporting AERs.

As table 2 shows, once FDA has identified a potential safety concern or a violation for dietary supplements, it has a range of consumer protection actions available, from advisory actions, such as issuing a warning letter, to regulatory actions, such as seizing adulterated dietary supplements.

**Table 2: Examples of FDA Consumer Protection Actions in Response to Identified Potential Safety Concerns for Dietary Supplements**

| Type of action | Description |
|---|---|
| **Advisory** | |
| Warning letter | FDA issues a letter to a firm citing violations of statute or regulations. FDA may bring an enforcement action if a firm does not correct violations in response to a warning letter. |
| Consumer alert | FDA issues a public alert about types of products, ingredients, unlawful marketing practices, or other areas of concern. |
| Industry advisory | FDA issues an industrywide advisory urging firms not to market products containing certain ingredients or to address other areas of concern. |
| **Regulatory** | |
| Product recall | FDA works with firms to voluntarily remove a product from the market through a recall. According to FDA officials, the agency may also use its new mandatory recall authority for dietary supplement products when there is a reasonable probability that the dietary supplement is adulterated or misbranded because they contain a major food allergen. FDA received this authority in 2011 with the passage of the FDA Food Safety Modernization Act.[a] |
| Refusal of imported product | Imported products can be detained and subsequently refused entrance into the U.S. market at the port of entry. |
| Legal action | FDA can take legal action against firms, such as seeking seizures or injunctions, and the initiating of criminal charges against responsible parties. |
| Ban ingredient | FDA may issue a regulation banning an ingredient from the dietary supplement market.[b] |

Source: GAO.

Note: This table is not an exhaustive list of potential consumer protection actions FDA could take. For example, FDA could hold a regulatory meeting with a firm to discuss voluntary action. However, we focused on these actions for the purposes of this report because (a) FDA maintained data on these actions or data were publicly available, or (b) we had reviewed these actions as part of our prior work on FDA's oversight of dietary supplements, GAO-09-250.

[a]In January 2011, the FDA Food Safety Modernization Act amended the Federal Food, Drug, and Cosmetic Act to give FDA authority to order the recall of food products (other than infant formula) that present a reasonable probability of being adulterated or misbranded, with regard to a major food allergen, when a company fails to voluntarily recall the products. FDA already had authority to order the recall of infant formula.

[b]To date, FDA has banned one ingredient—botanical ephedrine alkaloids—in 2004.

According to FDA officials, products or ingredients of greatest concern for public health are subject to regulatory actions. In addition, FDA may pursue a regulatory action against a firm if the firm does not correct violations in response to an advisory action, such as a warning letter.

## FDA Received More than 6,000 AERs Over 4 Years, but Consumers and Others May Not Be Voluntarily Reporting All Adverse Events to FDA

FDA received more than 6,000 AERs from 2008 through 2011, primarily from industry, and most of these AERs were for supplements containing a combination of different types of ingredients (e.g., vitamins and minerals) or supplements that were otherwise not classified into one of FDA's existing product categories, according to our analysis of FDA data. However, FDA may not have received information on all adverse events that are associated with dietary supplements because consumers and others may not be voluntarily reporting them to FDA—either directly or through firms—although they may be contacting poison centers about some of these events. Specifically, poison centers received over 1,000 more reports of adverse events from 2008 through 2010 than FDA did.

### FDA Received 6,307 AERs from 2008 through 2011, Primarily from Industry, and Mostly for Combination Products or Unclassified Products

From 2008 through 2011, FDA received a total of 6,307 AERs related to dietary supplements; 71 percent of these AERs came from industry for serious health problems (i.e., based on consumer, health care practitioner, or others' reports), and most of these AERs were linked with dietary supplements containing a combination of ingredients—such as products containing both vitamins and minerals or otherwise unclassified dietary supplements—according to our analysis of FDA data. Specifically, the total number of AERs FDA received annually more than doubled over the period, from 1,119 in 2008 to 2,480 in 2011. This rise in AERs was driven by a large increase in the number of mandatory industry AERs, according to our analysis. As shown in figure 3, mandatory AERs almost tripled from 2008 through 2011, from 689 in 2008 to 2,040 in 2011. During the same period, AERs submitted voluntarily by consumers, industry, health care practitioners, and others remained relatively stable, averaging 461 annually.[23] All mandatory AERS from industry involved serious health problems, and FDA classified roughly 64 percent (1,179) of all voluntary AERs (1,844) as "serious as reported." "Serious as reported" means that the adverse event met the criteria to be classified as serious as it was reported to FDA (based on the reporter's responses to standard questions about it), whether or not FDA's later medical review classified it as serious. Appendix II incorporates data on AERs from our 2009 report

---

[23]This average does not include cases where both a voluntary and a mandatory AER were submitted independently for the same adverse event. To avoid double-counting, we included these cases in our mandatory AER total.

to provide information on AERs FDA received from January 1, 2003, through September 30, 2012.[24]

**Figure 3: The Number of Voluntary and Mandatory Industry AERs Related to Dietary Supplements FDA Received, 2008 through 2011**



Source: GAO analysis of FDA data.

Note: In some cases, FDA received both voluntary and mandatory AERs for the same adverse event. To avoid double-counting, we included these cases in the mandatory AER total. FDA received from 12 to 24 AERs per year as both mandatory and voluntary from 2008 through 2011.

According to FDA officials, two factors are driving the increase in mandatory AERs. First, FDA has increased its enforcement efforts against AER noncompliance. For example, FDA has taken advisory actions, such as issuing warning letters, against firms that have not reported serious AERs or failed to include contact information to report an adverse event on the product label. Second, lawsuits have publicized the consequences of adverse events and a firm's decision not to report these events. Specifically, a number of lawsuits have been filed against firms that produced and distributed Hydroxycut™—a weight loss supplement

[24]GAO-09-250.

linked to serious liver damage—that cite FDA's request for a recall because of AERs as evidence.[25] In addition, in 2011, the Supreme Court ruled in favor of investors suing a publicly traded drug manufacturing firm for securities fraud, allowing shareholders to rely on the firm's decision not to report, among other things, AERs as grounds for a claim in their suit.[26] FDA officials stated that these lawsuits have raised firms' sensitivity to the risk involved in noncompliance with AER requirements, leading to the increase in mandatory AERs.

The 6,307 AERs FDA received from 2008 to 2011 reported the following serious outcomes:

- 53 percent (3,370) resulted in unspecified important medical events of a serious nature,
- 29 percent (1,836) resulted in hospitalization,
- 20 percent (1,272) resulted in serious injuries or illnesses,
- 8 percent (512) resulted in a life-threatening condition, and
- 2 percent (92) resulted in death.[27]

When interpreting AERs, FDA officials said that it is important to understand that an AER by itself does not demonstrate a causal relationship between the dietary supplement and the reported health problem.[28] Rather, the officials said that there are several other factors that must be considered to determine causality, such as the role of other products consumed at the same time and preexisting health conditions. Some demographic information on the individuals affected by these and

---

[25]See e.g., *In re Hydroxycut Marketing and Sales Practices Litigation*, No. 09 2087 (S.D. Cal. Oct. 16, 2009).

[26]The case considered whether a plaintiff could state a claim for securities fraud under §10(b) of the Securities Exchange Act of 1934, as amended, and Securities and Exchange Commission Rule 10b-5, based on a pharmaceutical firm's not disclosing reports of adverse events and pending lawsuits associated with a product if the plaintiff did not allege statistically significant evidence linking adverse effects to the use of the product. *Matrixx Initiatives, Inc. v. Siracusano*. 563 U.S. ___, No. 09 Civ.1156. (Mar. 22, 2011).

[27]Because each AER can report multiple outcomes, numbers and percentages of outcomes should not be totaled.

[28]Specifically, under the Federal Food, Drug, and Cosmetic Act, the submission by a firm of an AER in compliance with the requirements of the statute is not to be construed as an admission that the dietary supplement involved caused or contributed to the adverse event.

other outcomes in the AERs was available. Specifically, of the 6,307 AERs, 63 percent (3,980) affected females; however, the age of the individual affected was missing in about one-third (2,029) of the AERs. According to FDA officials, the absence of such information can hinder the agency's ability to determine whether there is a causal relationship between the product and the reported health problem.

As shown in figure 4, the vast majority (5,248) of the supplements identified in the AERs were a combination of different types of dietary ingredients (e.g., vitamins and minerals) or supplements that were not otherwise classified by FDA into one of the agency's existing supplement categories. Vitamins were the second most frequently reported supplement, included in 952 AERs, followed by minerals, included in 619 AERs. According to FDA officials, the predominance of combination and unclassified supplements in AERs reflects the growing number of complex supplements on the market. These officials said that these supplements are challenging for FDA because of limited scientific knowledge on how different supplement ingredients interact and their effect on consumers' health. Although product names are not standardized within CAERS, we matched firm and product names across AERs data to estimate which types of products were associated with the most mandatory AERs.[29] According to our analysis, 6 of the 10 supplements receiving the most mandatory AERs were multivitamins; 2 were weight-loss supplements; 1 was an energy supplement, and 1 was an herbal concentrate. Three supplements were associated with over roughly 100 AERs; 7 were associated with about 51 to 100 AERs; and 24 were associated with about 26 to 50 AERs. Most of the supplements

---

[29]FDA officials told us they are in the process of standardizing product names across AER records.

identified in the mandatory AERs were associated with approximately one AER from 2008 to 2011.[30]

**Figure 4: Most Commonly Reported Types of Supplements Associated with Adverse Events, 2008 through 2011**



Product types

☐ Combination products and products not elsewhere classified

☐ Vitamins

☐ Minerals

☐ Fats and lipid substances

☐ Animal by-products and extracts, protein, or fiber

☐ Herbal and botanical

Source: GAO analysis of FDA data.

Note: Combination products included were a combination of different types of ingredients, such as vitamins and minerals.

---

[30]These numbers are approximate for the following reasons. First, product names may change over time, as firms alter their labeling without changing the underlying product. For example, a firm may decide to relabel its product line by age ranges (e.g., children, adults, seniors). Although we incorporated these changes into our analysis to the extent they were identifiable within the product names themselves, we did not conduct extensive research to verify these changes were not present otherwise. Second, FDA officials told us that their method for determining how many AERs are associated with a particular product varies depending on the purpose of the analysis. In some cases, it might be appropriate to consider products with the same active ingredients but different flavors to be the same product. In other cases, FDA would consider products with different flavor formulations to be separate products.

**Consumers and Others May Not Be Voluntarily Reporting All Adverse Events to FDA, but May Be Contacting Poison Centers about Some Events**

FDA relies on consumers, health care practitioners, and others to voluntarily report adverse events associated with dietary supplements to FDA and to firms and, in turn, FDA relies on firms to submit to it any serious AERs it receives from these individuals, as required by law. However, FDA may not receive information on all adverse events that are associated with dietary supplements because consumers and others may not be voluntarily reporting these AERs—either directly or through firms, as indicated by our analysis and interviews with FDA officials. We found several potential reasons for this underreporting based on our review of relevant studies and our prior work. For example, we and others have reported that consumers, health care practitioners, or others may not recognize the chronic or cumulative toxic effects of a dietary supplement, or they may broadly assume dietary supplements to be safe and not attribute negative effects to them.[31] Additionally, in an October 2012 report, the HHS Office of Inspector General found that 20 percent of a judgmental sample of 127 weight loss and immune support dietary supplements did not have contact information that would enable consumers and health care practitioners to report adverse events.[32] The HHS Inspector General study is not representative of the dietary supplement industry but indicates that some firms may not be providing consumers with the necessary information to report adverse events to firms, which could lead to underreporting if consumers do not report the adverse event directly to FDA. FDA officials said that they receive fewer AERs than they would expect to given the number of dietary supplements on the market and their widespread use. However, they said that, similar to other voluntary reporting systems, the extent of underreporting is unknown because the agency can only know about those adverse events that are reported to it.[33]

---

[31]J.K. Glisson and L.A. Walker, "How physicians should evaluate dietary supplements," *American Journal of Medicine* 123, No. 7 (2010):577-582. M. Cellini et al., "Dietary Supplements: Physician Knowledge and Adverse Event Reporting," *Medicine and Science in Sports and Exercise*, 45, No. 1 (2013): 23-28. GAO-09-250.

[32]Department of Health and Human Services, Office of Inspector General, *Dietary Supplements: Companies May Be Difficult To Locate in an Emergency* (Washington, D.C.: Oct. 2012).

[33]Underreporting to adverse event systems is not unique to dietary supplements. In our prior work, we noted that similar problems exist for FDA's adverse event reporting system for pharmaceutical drugs. See GAO, *Drug Safety: FDA Has Begun Efforts to Enhance Postmarket Safety, but Additional Actions Are Needed,* GAO-10-68 (Washington, D.C.: Nov. 9, 2009).

One potential measure of underreporting is the number of dietary supplement-related health problems managed as poison exposure cases by poison centers. According to annual reports by the American Association of Poison Control Centers (AAPCC), poison centers received 145,775 calls from consumers or others related to dietary supplements from 2008 through 2010.[34] These include cases in which the consumer took more than the directed amount of a product, accidentally ingested the product, or used the product as directed but experienced an adverse event.[35] According to AAPCC reports, there were 4,863 cases of adverse events from 2008 to 2010, over 1,000 more than the 3,827 AERs FDA received during the same period.[36] We could not estimate how much overlap, if any, occurred between cases reported to FDA and the poison centers or determine whether some of the cases managed by poison centers were serious and might have also been reported to firms. However, the greater number of calls received by poison centers suggests that consumers, health care practitioners, and others may have contacted poison centers without reporting the adverse event to FDA.

FDA officials said that they are interested in reviewing the poison center data related to dietary supplements and have held discussions with AAPCC representatives. Specifically, CFSAN officials said that they want to review the raw poison center data on dietary supplements to understand what it includes and whether it would be useful for their analysis. However, these officials said that they were unable to review the raw dietary supplement data without purchasing it and said that FDA should have access to the data at no additional cost given the current

---

[34]Poison centers do not define dietary supplements according to the Federal Food, Drug, and Cosmetic Act. Therefore, we worked with AAPCC representatives and FDA officials to make the appropriate adjustments to the data to make them comparable to FDA's AERs. For more information on our scope and methodology, see appendix I.

[35]Based on discussions with FDA officials, we focused our analysis on adverse events under use as directed, since these types of cases were most similar in nature to the types of AERs FDA received.

[36]Because FDA officials told us that AERs are primarily associated with product use as directed, we adjusted the poison center data to include only those cases where an individual experienced an adverse reaction when using the product as directed and excluded reports resulting from misuse, abuse, or accidental ingestion.

level of federal support for poison centers.[37] For example, a 2012 study commissioned by the AAPCC, federal funding accounted for an estimated 13 percent (about $17 million) of poison centers' annual operating budget in 2011.[38] An FDA official noted that, in a 2004 report, the Institute of Medicine recommended that poison center data become available to all appropriate local, state, and federal public health units on a real-time basis and at no additional cost.[39] In this report, the Institute of Medicine also recommended that poison centers receive sufficient federal funding to cover core activities, which at the time were estimated to cost approximately $100 million annually.[40] According to AAPCC representatives, AAPCC does not receive federal appropriations to cover cost of collecting, maintaining, and sharing poison center data at the national level and generally charges federal agencies to access the data.[41]

AAPCC representatives also said that they were willing to work with FDA on reduced pricing. Specifically, based on a May 2012 quote, accessing 4 years' worth of AAPCC data of about 5,400 product codes would have

---

[37]AAPCC representatives said that they had offered to provide FDA with a smaller, targeted analysis of the dietary supplement data at no charge to temporarily meet FDA's needs while a longer-term agreement was negotiated, but CFSAN officials told us that they needed to see the raw data for such an analysis to be informative and prior to agreeing to a longer-term arrangement. AAPCC representatives told us that since they do not own the poison center data—only the national database where it is stored—they cannot release it without the 57 poison centers' permission.

[38]The Lewin Group, *Final Report on the Value of the Poison Center System,* (Falls Church, VA: The Lewin Group: 2012) http://production-aapcc.dotcloud.com/about/lewin-group-report/ (accessed January 7, 2013). The report notes that its findings do not include recent reductions in federal funding to poison centers. Additionally, according to AAPCC representatives, AAPCC funding and data management costs were not included in this report.

[39]National Academy of Sciences, Institute of Medicine, *Forging a Poison Prevention and Control System* (Washington, D.C.: 2004).

[40]According to the 2012 Lewin Group Report, total expenditures to maintain the poison center services nationwide were an estimated $136 million in 2011.

[41]According to AAPCC representatives, AAPCC does not own the data collected by poison centers, but owns and operates the national database where the data are stored. These representatives said that there are large costs for collecting, maintaining, analyzing, organizing and reporting on the national data which are borne by AAPCC and its members, and that the sales of the national data support these costs. As of February, 2013, the annual operating budget for the national database was approximately $3 million, according to an AAPCC representative.

cost almost $76 million prior to the AAPCC discount, and $800,000 after the discount. However, even with the significant AAPCC discount, access to the data remained more than twice the nearly $400,000 budgeted to process and perform surveillance of dietary supplement adverse events in fiscal year 2011.[42] According to CFSAN officials, as of October 2012, negotiations with AAPCC had stalled at the CFSAN level. CFSAN officials said that the cost of accessing the data was a factor. They also said that, although negotiations had stalled at the CFSAN level, as of December, 2012, they were ongoing at the department level, but from their perspective, progress remained difficult.

According to CFSAN officials, the greatest challenge for identifying potential safety concerns from AERs is the small number of AERs that FDA receives related to dietary supplements.[43] Specifically, these officials said that it is difficult to establish a baseline of doses and responses to help the agency detect anomalies that might indicate a potential safety concern using such a small number of AERs. These officials also said that they could not determine whether the poison center data would be useful for such signal detection until they could access it. However, researchers and the HHS Inspector General have concluded that accessing poison center data may help FDA detect and monitor potential safety concerns.[44] For example, a 2008 study performed in conjunction with CFSAN and the San Francisco Division of the California Poison Control System concluded that active surveillance of poison center reports of dietary supplement adverse events could enable rapid

---

[42]This number does not include resources for CAERS staff, as they perform center-wide surveillance activities and are budgeted separately. FDA officials said that there is also a concurrent negotiation effort underway at the department level to obtain access to AAPCC data for multiple HHS components, including CDC and FDA.

[43]FDA received more than 1.8 million AERs related to prescription drugs from 2008 to 2010, in comparison to the 3,827 FDA received related to dietary supplements from 2008 to 2010. Prescription drug AERs include those that are submitted directly to FDA and four types of AERs submitted to FDA by manufacturers for health problems, depending on the nature of the health problem, whether the health problem is described as a potential side effect in the product labeling, and the type of product.

[44]Wolkin et al., "Using Poison Center Data for National Public Health Surveillance for Chemical and Poison Exposure and Associated Illness," *Annals of Emergency Medicine* 59, no. 1 (2011): 56-61. Department of Health and Human Services, Office of Inspector General, *Adverse Event Reporting for Dietary Supplements: An Inadequate Safety Valve* (Washington, D.C.: April 2001).

detection of potentially harmful products and may facilitate oversight.[45] Additionally, under contract with the AAPCC, the Centers for Disease Control and Prevention (CDC)—like FDA, an HHS component—has used national poison center data to identify and track adverse events related to dietary supplements. For example, in March 2008, poison centers in three states (Florida, Georgia, and Tennessee), state health departments, and FDA began receiving voluntary AERs of muscle cramps, hair loss, and joint pain related to Total Body Formula and Total Body Mega Formula. On FDA's behalf, CDC scientists used national poison center data to identify which states were reporting similar cases and to track the geographical extent of the outbreak.[46] If FDA can access more information about dietary supplement-related adverse events that are reported to poison centers, FDA may be able to analyze the increased data on doses and responses to help it identify potential safety concerns.

# FDA Has Increased Its Compliance Monitoring of Firms and Taken Some Advisory and Regulatory Actions

To help ensure firms are complying with AER requirements for submitting serious AERs, maintaining AER records, and including AER contact information on supplement labels, from 2008 through 2011, FDA increased its monitoring of firms through inspections and has taken some advisory and regulatory actions against noncompliant firms.

## FDA Has Increased its Monitoring of Firms through Inspections Since 2008

FDA has increased its compliance monitoring of firms through inspections to help ensure that dietary supplement firms are complying with AER requirements for (1) reporting serious AERs within 15 business days, (2) maintaining AER records for 6 years, and (3) including domestic contact information on product labels for individuals to submit AERs, according to

---

[45]Haller et al., "Dietary Supplement Adverse Events: Report of a One-Year Poison Center Surveillance Project," *Journal of Medical Toxicology* 4, no. 2 (2008): 84-92. This paper considered active surveillance to include prompt follow-up of symptomatic cases, laboratory analysis, and a causality assessment by a case review panel. CFSAN officials said that they will contact firms and voluntary reporters to follow up on incomplete AERs, but often they are unable to obtain the missing information.

[46]According to CDC officials, CDC has also performed limited, targeted surveillance of poison center data for adverse events related to Hydroxycut™ and "Miracle Mineral Solution" products.

our analysis of FDA data. Specifically, in 2008, FDA inspected 120 dietary supplement firms, which represented at least 6 percent of FDA's total inventory of dietary supplement firms at the beginning of 2008.[47] In contrast, from January through September 2012, FDA inspected 410 dietary supplement firms, which represented at least 18 percent of FDA's total inventory of dietary supplement firms at the beginning of 2012. FDA also increased the number of foreign firms it inspected over this period, from conducting no inspections in 2008 to conducting 35 from January through September 2012. Figure 5 shows the number of foreign and domestic inspections of dietary supplement firms FDA or its partners at the state level conducted annually from January 1, 2008 to September 30, 2012.[48]

---

[47]For the purposes of this report, we requested data on inspections of firms that produce dietary supplements for human food use. FDA officials told us that they do not distinguish between firms that produce dietary supplements for human food use as opposed to dietary supplement firms that produce products that otherwise meet the statutory definition of dietary supplements but are for animal or drug uses, within their firm inventory database. Accordingly, the number of dietary supplement firms in the inspection inventory includes firms that produce such products for animal and drug uses. Consequently, the percent of dietary supplement firms for human food use represented by the inspections is presented as a minimum estimate.

[48]FDA contracts with states to conduct domestic facility inspections for foods and other regulated products. From January 1, 2008, to September 30, 2012, states conducted 35 domestic inspections of dietary supplement firms on FDA's behalf.

**Figure 5: Number of Foreign and Domestic Inspections of Dietary Supplement Firms FDA or Its State Partners Conducted, January 1, 2008 through September 30, 2012**



Source: GAO analysis of FDA data.

Note: FDA contracts with states to conduct domestic facility inspections for foods and other regulated products. During this period, states conducted 35 dietary supplement inspections on FDA's behalf.

According to FDA officials, the key factors underlying this increase in inspections were the full implementation of dietary supplement CGMP regulations in 2010 (i.e., describing the conditions under which supplements must be manufactured, packed, and held) and an increase in field investigators available to conduct inspections. The dietary supplement CGMP regulations established new quality control standards for dietary supplement firms and new compliance criteria for FDA investigators to use during dietary supplement inspections. The CGMPs were phased in by firm size starting in 2008, with full implementation completed in 2010. Additionally, an FDA official said that new field investigators became available to conduct inspections in 2010 and 2011. These investigators had been hired following higher appropriations for FDA in fiscal years 2008 and 2009, but they did not become available to conduct inspections until 2010 and 2011 because it takes 1 to 2 years of training before an investigator is ready to perform inspections, according to this official.

As the CGMPs were being phased in, FDA identified problems or concerns during inspections, such as a manufacturer not maintaining, cleaning, or sanitizing equipment.[49] The percentage of inspections where FDA identified problems or concerns increased from 51 percent in 2008 to 73 percent in 2011, largely resulting from CGMP inspections, according to our analysis. See figure 6 for the proportion of dietary supplement inspections where FDA identified problems or concerns from 2008 to 2011.

---

[49]Investigators from FDA district offices conduct inspections. For our determination for whether FDA identified a problem or concern during an inspection, we included all cases with a district decision of Official Action Indicated—OAI (A); Voluntary Action Indicated—VAI (E); and Referred to Center (P)—for dietary supplements, CFSAN—plus all cases where the investigator completed an inspectional observation form—a form used by FDA to document concerns observed during inspections. Concerns identified on the inspectional observation forms are preliminary findings and vary in severity. Each inspection was counted only once.

**Figure 6: Proportion of Dietary Supplement Inspections for Which FDA Identified Problems or Concerns, 2008 through 2011**



Source: GAO analysis of FDA data.

Note: Dietary supplement CGMPs were phased in by firm size from 2008 to 2010. For firms with 500 or more full-time equivalent employees, they became effective in June 2008; for firms with at least 20 but fewer than 500 full-time equivalent employees, they became effective in June 2009; and for firms with fewer than 20 full-time equivalent employees they became effective in June 2010.

According to our analysis of FDA inspection results from fiscal years 2008 through 2012, FDA identified 20 problems related to AER requirements during inspections. In 3 of these instances, FDA found that the firm did not submit a mandatory AER within the required 15 days. In the 17 other instances, FDA found that a firm did not submit a mandatory AER. When FDA identifies a problem during an inspection, firms may decide to take voluntary corrective action, or FDA may choose to take an advisory or regulatory action against the firm for the observed violations.

**FDA Took a Total of 19 Advisory and Regulatory Actions Related to AER Noncompliance from January 2008 through December 2011**

We identified a total of 19 advisory and regulatory actions that FDA initiated from 2008 to 2011 for noncompliance with AER requirements. Specifically, we found three warning letters (advisory actions), one injunction (regulatory action) to prevent the sale of a firm's products, and 15 import refusals (regulatory actions). All three of the warning letters stated that the supplement label did not include domestic contact information so that individuals could report an adverse event. The injunction against the dietary supplement manufacturer cited noncompliance with several sections of the Federal Food, Drug and Cosmetic Act, including the failure to report serious adverse events as required by law. It prohibited the firm from producing and distributing over 400 products; this was the first time FDA had taken legal action against a large manufacturer for CGMP noncompliance, according to FDA documents. All of the 15 import refusals—spanning nine supplement companies—that we identified cited violations of supplement labeling requirements for domestic contact information so that individuals can report an adverse event. Table 3 provides more information on the 19 advisory and regulatory actions related to noncompliance with AER requirements that we identified.

**Table 3: Identified Advisory and Regulatory Actions on AER Requirement Violations, 2008 through 2011**

| Initiation date[a] | Action date | Firm | AER violation[b] |
|---|---|---|---|
| **Advisory actions (warning letters)** | | | |
| 2/25/11 | 6/17/11 | BioSan | Did not include domestic contact information to report an adverse event on product label and did not submit mandatory AER to FDA within 15 days. |
| 7/13/11 | 10/11/11 | Nordimex | Did not include contact information to report an adverse event on product label. |
| 12/7/2011 | 4/2/12 | Theta Brothers Sports Nutrition | |
| **Regulatory actions (injunction)** | | | |
| 4/22/11 | 3/9/12 | ATF Fitness Products and Manufacturing ATF Dedicated Excellence, Inc. | Did not report serious AERs to FDA. |
| **Regulatory actions (import refusals)[c]** | | | |
| 6/27/11 | 9/7/11 | Bio-minerals | Did not include domestic contact information to report an adverse event on product label. |
| 6/22/11 | 9/15/11 | Hayashi Industria E Comercio D | |
| 5/31/11 | 9/20/11 | Forza Vitale Italia SRL | |
| 5/9/11 | 10/4/11 | Guangzhou Tian Yi Import & Export Company Limited | |
| 10/9/11 | 12/5/11 | Metabolics Limited: FDA refused 7 different imported product shipments from this firm on this date. | |
| 4/20/11 | 12/12/11 | Tatsuhiko Kono | |
| 4/19/11 | 12/12/11 | Hipernatural.Com | |
| 1/31/11 | 8/12/11 | Hersol Manufacturing Laboratories | |
| 12/29/09 | 6/16/10 | Stephen Health Agency | |

Source: GAO analysis of FDA data.

[a]For warning letters and injunctions, the initiation date is the date the shipment was offered for entry into U.S. commerce. For import refusals, the initiation date is the date that the import shipment was processed by the U.S. Customs Service.

[b]Data provided to GAO as of April 13, 2012.

[c]The refusals shown in this table are those for which FDA specifically cited an AER-related violation, not other more general types of violations, such as labeling.

According to FDA officials, inspections are the primary way FDA identifies and develops direct evidence of noncompliance with AER requirements. However, FDA and others have identified noncompliant firms through other surveillance actions. Specifically, FDA can also identify and act on noncompliance with some AER requirements through Internet monitoring. For example, in March 2012, after reviewing a product label on a firm's website, FDA sent a warning letter to the firm for failing to include

domestic contact information to report an adverse event on the product label. In addition, in October 2012, the HHS Inspector General reported that 20 percent of a judgmental sample of 127 dietary supplement products purchased from retail stores or online lacked contact information to report adverse events.[50] This study is not representative of the dietary supplement industry, but it indicates that compliance with AER requirements remains an issue for some firms. According to Inspector General officials, the Inspector General provided a list of the noncompliant firms to FDA for the agency's review.[51]

FDA can estimate noncompliance to some extent using its known advisory and regulatory actions specific to AER requirements, but the actual number of noncompliant firms may not be fully reflected by these data. For example, an FDA official said that companies that deliberately adulterate supplement products with active pharmaceutical ingredients to increase their potency probably are also noncompliant with AER requirements, but FDA can only act on those violations for which it has direct evidence. Specifically, FDA may be able to identify a supplement adulterated with such ingredients from voluntary AERs submitted by consumers, health care practitioners, or others, but it would need to perform an inspection to determine noncompliance with most AER requirements.[52] FDA may also have difficulty targeting such firms for inspections because they may not register with FDA as required by law. For example, in its October 2012 report, the HHS Inspector General found that 28 percent, or 22 of the 79 companies in its sample, had not

---

[50]Department of Health and Human Services, Office of Inspector General, *Dietary Supplements: Companies May Be Difficult To Locate in an Emergency* (Washington, D.C.: October 2012).

[51]According to Office of Inspector General officials, they asked FDA if retail-based product surveillance was a viable method for monitoring firms' compliance with AER requirements. According to these officials, FDA officials said that FDA would need too many staff resources to do the same type of study.

[52]For example, FDA officials said that supplements adulterated with active pharmaceutical ingredients or their analogues can become apparent through AER surveillance because of telltale symptoms associated with adverse reactions to these ingredients, such as cardiovascular issues and color blindness associated with the presence of prescription male sexual enhancement medications.

registered with FDA as required.[53] FDA officials believe that the rate of noncompliance is greater than the regulatory action data indicate, but these officials told us that they have not estimated what the noncompliance rate might be because they cannot make assumptions about the behavior of firms.

## FDA Has Used AERs for Some Actions but May Have Opportunities to Expand its Use of AERs

FDA has used AERs for some consumer protection actions (i.e., surveillance, advisory, and regulatory actions), although the exact number is largely unknown. FDA officials said that most AERs do not initiate or support consumer protection actions because it is difficult to establish causality based on the limited information in an AER. However, FDA does not collect information on how it uses AERs for its consumer protection actions; FDA could draw on such information to assess whether AERs are being used to their fullest extent for consumer protection. FDA could also expand electronic reporting to firms for mandatory AERs, which could reduce data entry costs and make more program funds available for analysis. FDA is not required to provide information to the public about potential safety concerns from dietary supplement AERs as it is for drugs. Making such information public, if consistent with disclosure provisions in existing law, could expand FDA's use of AERs and improve consumer awareness and understanding of potential health problems associated with supplements.

## FDA Has Used AERs to Initiate or Support Some Consumer Protection Actions

FDA has used AERs to initiate or support some consumer protection actions, but the exact number of reports used and actions taken is largely unknown. According to FDA officials, FDA uses AERs to initiate or support certain consumer protection actions on a case-by-case basis, such as inspections, consumer alerts, and recalls. FDA officials said they also use AERs to provide data for general research on products and ingredients. However, it is difficult to identify the full extent to which FDA uses AERs to initiate or support consumer protection actions because FDA does not have mechanisms in place to systematically monitor the relationship between AERs and these actions.

---

[53]In addition, of the 57 companies with registered facilities, 16 had inaccurate addresses listed in the registry. According to FDA officials, FDA identifies facilities for inspection from its Official Establishment Inventory (OEI), not the food facility registry. However, new or updated information about facilities entered into the food facility registry does inform FDA's maintenance of its OEI.

According to FDA officials, most AERs that are received by FDA do not initiate or support consumer protection actions because it is difficult to establish a causal link between supplements and reported health problems based on the limited information available within an individual AER.[54] Specifically, AERs typically do not include details on the consumer's medical history or other products, such as prescription drugs that the consumer may have consumed simultaneously. Details such as underlying medical conditions and allergies are requested as part of the reporting process, but FDA officials said that there is generally a lot of missing information in both voluntary and mandatory AERs.[55] For example, age was not available in 32 percent of the dietary supplement AERs that FDA received, and pregnancy status was not available in 98 percent of the AERs involving females. Additionally, because AERs represent a reported association in time between a supplement and a health problem, FDA must first establish the likelihood that the supplement caused the health problem before considering it in the context of consumer protection actions. However, FDA officials told us that AERs may contain inconclusive and often inconsistent data from which it may be impossible to draw consistently strong inferences. For example, FDA was only able to establish a "certain" relationship between the supplement and reported health problem in 3 percent (212 of 6,307) of the AERs. For 67 percent (4,211 of 6,307) of the AERs, FDA could not determine whether the supplement caused the reported health problem because the AER contained insufficient information.[56] Additionally, FDA officials told us that AERs may be complete but contain little evidence necessary for FDA to take action. For example, FDA needs to demonstrate a known effect from the timing and dosage of the supplement product in question.

---

[54]The Federal Food, Drug, and Cosmetic Act establishes that a firm's submission of an AER cannot be construed as an admission that the dietary supplement product caused the adverse event.

[55]According to FDA guidance, these details are not part of the minimum data elements required for submitting a serious adverse event report.

[56]The causality determinations are based on a World Health Organization classification system. During the course of our review, FDA revisited prior reviewer evaluations for consistency—which reduced the causality determinations from: certain – 14 percent; probable – 14 percent; and possible – 35 percent. Most of these cases were moved to the insufficient information category for the final evaluations.

Because FDA has the burden of proof to demonstrate that a product carries a significant or unreasonable risk of injury or illness for dietary supplement products on the market prior to 1994 under current law, the limited information available to FDA based on an individual AER does not usually provide enough evidence to take action. FDA officials said it is more common to identify potential problems after analyzing a cluster of AERs, along with evidence from other sources, such as published research. For example, a subject matter expert in the Division of Dietary Supplement Programs may track a cluster of AERs separately in a spreadsheet and then forward the information to CFSAN's Office of Compliance if the expert believes that a regulatory compliance issue or potential health issue may be present.[57] The Office of Compliance, in turn, may initiate an advisory or regulatory action, or coordinate with FDA's Office of Regulatory Affairs to conduct additional surveillance, such as an inspection prior to taking an advisory or regulatory action. However, accumulating enough evidence to discern a clear relationship between a specific product or ingredient and a reported health problem may take receiving a number of AERs over a span of months or years. For example, because liver-related problems associated with Hydroxycut™ were reported infrequently, it took 7 years for FDA to establish a clear relationship between the Hydroxycut™ products and liver disease.[58] After establishing a causal relationship in 2009, FDA discussed a voluntary recall with the manufacturer of Hydroxycut™ products and issued a consumer advisory against using these products.

To estimate the extent to which FDA uses AERs to initiate or support consumer protection actions, we compared firm and product names identified in both mandatory AERs and FDA actions to determine if an AER preceded a consumer protection action related to a dietary supplement. Out of the roughly 4,700 consumer protection actions related to dietary supplements that we reviewed, we found 61 actions (about 1 percent) where FDA received a mandatory AER for the same firm or product prior to taking action, as detailed in table 4, which supports FDA

---

[57]Consumer complaints that involve health problems are entered into CAERS and sent directly to the Office of Compliance, according to FDA officials. Additionally, if a medical reviewer believes that a dietary supplement associated with an AER might be adulterated with an FDA-approved drug or its analogue, the reviewer will forward the report to FDA's Center for Drug Evaluation and Research.

[58]FDA received more than 20 reports over the 7-year period leading up to the firm's voluntary recall of Hydroxycut.™

officials' assessment that most AERs do not support consumer protection actions.[59] However, we could not verify that all of the 61 actions we identified were necessarily initiated or supported by AERs because FDA does not systematically monitor this information, and officials could not verify a relationship between the AERs and the actions taken prior to the issuance of this report.[60] Additionally, our analysis does not include situations where FDA used AERs to inform its decisions but did not take formal action.

**Table 4: Mandatory AERs Preceding Certain FDA Consumer Protection Actions Related to Dietary Supplements, 2008 through 2011**

| Type of action | Description |
| --- | --- |
| Surveillance | We identified 47 inspections for firms also listed in an AER, representing 6 percent of all dietary supplement inspections from 2008 through 2011. These inspections included compliance, surveillance, and follow-up inspections. |
| Advisory | We identified 3 advisory actions for firms or products also listed in an AER, representing less than 1 percent of dietary supplement advisory actions from 2008 through 2011. The advisory actions included two warning letters and 1 consumer alert for firms or products also listed in an AER. |
| Regulatory | We identified 11 regulatory actions for firms or products also listed in an AER, representing less than 1 percent of dietary supplement regulatory actions from 2008 through 2011. The regulatory actions included 8 import refusals and 3 voluntary product recalls initiated by firms. |

Source: GAO analysis of FDA data.

Note: We also reviewed seizures, injunctions, criminal investigations, and industry alerts to identify consumer protection actions that might have been preceded by a mandatory AER. However, we did not find any matches between mandatory AERs and these actions.

According to our analysis, we identified 47 inspections for firms also listed in an AER, representing 6 percent of all dietary supplement inspections from 2008 and 2011. Similarly, we found 3 advisory actions for firms also listed in an AER, which represent less than 1 percent of all such actions. Two of the advisory actions were warning letters for noncompliance with CGMP requirements, and another was a consumer alert on Hydroxycut™

---

[59]Outside of trying to establish whether or not an AER was part of the basis for taking a consumer protection action, we did not identify the individual basis for each of the roughly 4,700 consumer protection actions we reviewed.

[60]In 2001, the HHS Inspector General reported that it was able to document only 32 safety actions based on FDA's adverse event reporting system for dietary supplements between January 1994 and June 2000. According to the Inspector General, this number was strikingly low given that more than 100 million people were using dietary supplements at the time. Department of Health and Human Services, Office of Inspector General, *Adverse Event Reporting for Dietary Supplements: An Inadequate Safety Valve* (Washington, D.C.: April 2001).

products. We also identified 11 regulatory actions for firms also listed in an AER, representing less than 1 percent of all such actions. The regulatory actions included 8 import refusals and 3 product recalls, most of which were for Hydroxycut™ products. (See app. II for more information on consumer protection actions.) FDA officials told us they also use AERs to monitor the results of these actions. For example, if FDA issued a warning letter to a firm based on violations of CGMP requirements during an inspection, receipt of subsequent AERs may indicate that the firm has not rectified its practices. Similarly, if FDA receives an AER for a product that FDA has removed from the market by a regulatory action such as a recall, FDA's receipt of AERs subsequent to the initial action indicates to FDA that further action may be needed.

## More Information on How FDA Uses AERs May Help FDA Expand Their Use

FDA has limited information on how it uses AERs to initiate and support its consumer protection actions; such information could improve FDA's ability to assess whether the agency is using AERs to their fullest extent in this capacity and make improvements as needed. For example, prior work has shown that agencies can use data on performance to identify and mitigate problems, allocate resources, and improve effectiveness.[61] Currently, FDA uses six separate data management systems to monitor the consumer protection actions we reviewed apart from AERs, as outlined in table 5.

---

[61]GAO, *Managing for Results: Enhancing Agency Use of Performance Information for Management Decision Making*, GAO-05-927 (Washington, D.C.: Sept. 9, 2005). For information on using performance data to improve IT strategic planning and investment management, see GAO-12-346, *Information Technology: FDA Needs to Fully Implement Key Management Practices to Lessen Modernization Risks* (Washington, D.C.: Mar. 15, 2012).

**Table 5: Examples of FDA Data Management Systems to Monitor Consumer Protection Actions Related to Dietary Supplements**

| Data management system | Action monitored[a] | FDA office |
|---|---|---|
| Automated Investigative Management System | Criminal investigations | Office of Regulatory Affairs |
| CFSAN Adverse Event Reporting System (CAERS) | AERs | CFSAN |
| Compliance Management System | Warning letters, seizures, and injunctions | Office of Regulatory Affairs |
| Field Accomplishments and Compliance Tracking System | Consumer complaints and inspections | Office of Crisis Management and Office of Regulatory Affairs |
| Operational and Administrative System for Import Support | Import screenings and refusals | Office of Regulatory Affairs |
| Recall Enterprise System | Product recalls | Office of Regulatory Affairs |

Source: GAO analysis of FDA documents.

[a]This column includes those consumer protection actions that we reviewed as part of this report and not necessarily all of the activities monitored by the data management systems.

FDA can track each type of action in its respective data management system and tracks certain identifying information, such as firm name, across all the systems. However, FDA generally does not track AERs across these systems. Specifically, within the six data management systems we reviewed, we found that FDA only tracks the relationship between consumer complaints and AERs. Without having a mechanism to follow an AER through to other actions, FDA misses the opportunity to assess how frequently AERs initiate or support consumer protection actions and to identify ways to potentially broaden their use. For example, FDA internal guidance states that AERs can be used to demonstrate potential health risks associated with violative conditions found during other surveillance activities, such as inspections, and be part of the evidence gathered to support regulatory actions. Establishing the potential for harm is particularly important for dietary supplements because the burden of proof to demonstrate a significant or unreasonable risk of illness or injury prior to removing a product from the market through a regulatory action falls upon FDA. However, by not tracking the relationship between AERs and its other data management systems, FDA cannot systematically identify the extent to which AERS were used in this capacity. Having such information could improve FDA's and policymakers' abilities to make fully informed decisions about resource allocation and AERs' future role in FDA's consumer protection activities related to dietary supplements.

Furthermore, unlike other FDA-regulated products, dietary supplement firms cannot submit mandatory AERs electronically. Rather, they must

submit these AERs in hard copy by mail. FDA's requirement that firms submit mandatory AERs in hard copy form by mail—which must be entered manually into the CAERS database by CAERS staff—may reduce the AER system's effectiveness by diverting resources to data entry rather than analysis. According to CFSAN officials, FDA has plans to expand electronic reporting to mandatory AERs for dietary supplements in mid-2014 as part of its Safety Reporting Portal Program. However, FDA had similar plans at the time of our prior report in 2009 that have not been realized yet.

## Providing Information to the Public on Dietary Supplement AERs May Improve Consumer Understanding

Communicating effectively about risks related to dietary supplements is a key part of FDA's mission to protect and promote public health, according to FDA's strategic plan. Specifically, helping consumers better understand the risks and benefits of regulated products is a key part of FDA's responsibilities, as described in the agency's 2009 *Strategic Plan for Risk Communication*. This plan outlines a number of strategies to improve communication, including identifying and filling gaps in key areas of risk communication and improving the effectiveness of FDA's website and web tools. In addition, guidance from the Office of Management and Budget and HHS, as well as our prior work, has emphasized providing greater transparency and participation of federal agencies in publishing government information online.[62] However, unlike drugs and certain biologic products—where FDA is required to provide information about identified potential safety concerns by law—little information on potential safety concerns from dietary supplement AERs is publicly available and accessible to consumers, health care practitioners, and others.[63] Specifically, for dietary supplement AERs, FDA generally provides information on its website on the number of mandatory AERs it received and the number of unique firm names from all mandatory AERs on a monthly basis. This aggregated information, which is located under FDA's performance measures for CFSAN and is not directly linked with the

---

[62]OMB, *Memorandum for the Heads of Executive Departments and Agencies: Open Government Directive, M-10-06* (Washington, D.C.: Dec. 8, 2009); HHS *Open Government Plan Version 2.0* (Washington, D.C.: Apr. 9, 2012); GAO, *Information Technology: OMB's Dashboard Has Increased Transparency and Oversight, but Improvements Needed,* GAO-10-701 (Washington, D.C.: July 16, 2010); and GAO, *Electronic Government Act: Agencies Have Implemented Most Provisions, but Key Areas of Attention Remain,* GAO-12-782 (Washington, D.C.: Sept. 12, 2012).

[63]21 U.S.C. § 355(k)(5).

dietary supplement web pages, does not provide any indication to consumers of potential risks associated with specific dietary supplements.[64] In November 2012, FDA also posted information on its website about individual AERs the agency had received from January 2004 through October 2012 associated with four types of "energy drinks"—three of which were sold as dietary supplements, one as a conventional food. Individuals may also request information about adverse events related to dietary supplements by submitting a Freedom of Information Act request to FDA.

According to FDA officials, there are certain disclosure provisions within the Federal Food, Drug, and Cosmetic Act that limit FDA's ability to provide unredacted information on AERs related to dietary supplements.[65] However, FDA provides detailed aggregated analysis, including a list of products with potential safety concerns, and raw disaggregated data on AERs related to drugs and certain biologic products on its website, even though some of the same and similar disclosure provisions may apply to such products. Specifically, in the disaggregated data on prescription drugs, FDA redacts names and other information that would identify the individual reporting the adverse event and, occasionally, information on any ongoing clinical studies or other pending actions, if applicable. The publicly available disaggregated data, including product names and health problems, are then used for health and medical research. For example, researchers have used data available from prescription drug AERs to study cardiovascular risk,[66] bladder cancer,[67] and tachycardia

---

[64]Information on AERs related to dietary supplements is found on FDA's performance measures webpage for CFSAN, under the archived version of performance measures for CFSAN's Office of Food Defense, Communication, and Emergency Response at http://www.fda.gov/AboutFDA/Transparency/track/ucm240881.htm (accessed December, 11, 2012).

[65]One such example provided by FDA officials is the "Protected Information" provision of section 761 of the Federal Food, Drug, and Cosmetic Act, as added by the 2006 act and codified at 21 U.S.C. § 379aa-1(f).

[66]Navin K. Kapur and Kiran Musunuru, "Clinical efficacy and safety of statins in managing cardiovascular risk," *Vascular Health and Risk Management* 4, no. 2 (2008): 341-353.

[67]Carlo Piccinni et al., "Assessing the association of pioglitazone use and bladder cancer through drug adverse event reporting," *Diabetes Care* 34, no. 6 (2011): 1,369-71.

(accelerated heart rate).[68] FDA officials told us that they use dietary supplement-related AERs to conduct safety-related research on dietary supplement ingredients, and other government researchers have used AERs in a similar capacity. According to agency officials, FDA already applies a redaction approach to prescription drug AERs that meets the nondisclosure provisions within the Federal Food, Drug, and Cosmetic Act that apply to dietary supplement AERs. An FDA official has stated publicly that the agency is exploring ways to expand the amount of publicly available information about AERs for dietary supplements.[69] To the extent that FDA can do so under existing law—providing greater information about dietary supplement AERs to the public, such as potential safety concerns and redacted data on its website—could create opportunities for external researchers to use AERs and to improve consumer awareness and understanding of potential health problems associated with dietary supplements.

## FDA Has Partially Implemented All of Our 2009 Recommendations

FDA has partially implemented each of our four recommendations from our 2009 report on dietary supplements.[70] Table 6 summarizes our 2009 recommendations and FDA or congressional action.

---

[68]Elisabetta Poluzzi et al., "Antimicrobials and the risk of Torsades de Pointes: The contribution from data mining of the U.S. FDA Adverse Event Reporting System," *Drug Safety* 33, no. 4 (2010): 303-314.

[69]Increasing the amount of publicly-available information on its website about AERs for all FDA-regulated products was also the focus of a draft proposal under FDA's Transparency Initiative in May, 2010. We asked FDA officials if expanding public access to dietary supplement AERs was under consideration as part of this initiative, and they said it was not.

[70]GAO-09-250.

**Table 6: 2009 GAO Recommendations on Dietary Supplements and FDA or Congressional Action**

| GAO recommendation | FDA or congressional action |
|---|---|
| FDA should request additional authority to: (1) require firms to self-identify as dietary supplement firms as part of existing registration requirements, provide information on the products they sell, and update this information annually and (2) require firms to report all adverse events. | (1) FDA officials told us they requested additional authority as part of the FDA Food Safety and Modernization Act of 2011 (FSMA) to modify the list of required food categories that FDA uses to identify firms by industry as part of existing registration requirements. In August 2012, FDA published draft guidance expanding the list of food categories required at registration to include dietary supplement categories that were previously optional. FDA issued final guidance in October 2012. Requiring dietary supplement firms to provide information on the products they sell has been part of multiple proposed legislative efforts but has not become law.[a]<br><br>(2) Mandatory reporting of all adverse events for dietary supplement firms was proposed in S. 3002, the Dietary Supplement Safety Act of 2010, sponsored by Senators McCain and Dorgan, but did not pass the Senate. |
| FDA should issue new dietary ingredient (NDI) notification guidance. | As part of FSMA, FDA was required to issue draft NDI notification guidance no later than 180 days after enactment. FDA published its draft guidance in July 2011. An FDA official said the agency is still reviewing the more than 7,000 comments it received in response to the draft guidance. |
| FDA should issue guidance to industry clarifying when products should be marketed as dietary supplements or conventional foods formulated with added dietary ingredients. | FDA issued draft guidance to industry clarifying when liquid products may be marketed as dietary supplements or conventional foods with novel ingredients in December 2009.[b] FDA has indicated it is developing final guidance but has not set a time frame for its issuance. |
| FDA should coordinate with stakeholder groups involved in consumer outreach to identify, implement, and assess the effectiveness of additional mechanisms for educating consumers about dietary supplements. | FDA coordinated with stakeholder groups by expanding its partnership with the website WebMD™ to include vitamin- and supplement-specific pages and formed new stakeholder partnerships with EverydayHealth™ and Drugs.com™ websites to educate consumers about dietary supplements.<br><br>FDA also expanded the consumer education content on its own website and implemented new mechanisms for reaching consumers, such as a Really Simple Syndication (RSS) feed on tainted (i.e., adulterated) products marketed as dietary supplements and consumer updates. FDA collects information about the number of RSS feed subscribers and page views that can be used to measure distribution.[c] |

Source: GAO.

[a]The Food Safety Enhancement Act of 2009, H.R. 2749, 111th Cong. (passed by the House of Representatives July 30, 2009); the Dietary Supplement Safety Act of 2010, S.3002, 111th Cong. (sponsored by Senators McCain and Dorgan); the Dietary Supplement Labeling Act of 2011, S. 1310, 112th Cong.(sponsored by Senators Durbin and Blumenthal). In addition to these efforts, individual legislators have also introduced amendments with provisions regarding product registration to other legislation under consideration.

[b]The Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 321(s), 348(a) generally requires that when a company adds an ingredient to a food product, that ingredient must either be generally recognized as safe (GRAS) or go through FDA's review and approval process as a food additive. The GRAS standard is defined as a general recognition among qualified experts that the substance is reasonably certain to be safe under conditions of its intended use. See GAO, *FDA Should Strengthen Its Oversight of Food Ingredients Determined to Be Generally Recognized as Safe (GRAS)*, GAO-10-246 (Washington, D.C.: Feb. 3, 2010) for more information.

[c]According to FDA data, as of July 31, 2012, the number of page views for the dietary supplement pages ranged from 22,687 views for the "Tainted Sexual Enhancement Products" page to 249,783 views for the "Overview of Dietary Supplements" page. There are 58,633 subscribers to the tainted products marketed as dietary supplements govdelivery e-mail subscription service. There are 135 subscribers to the tainted products RSS feed and 828 subscribers to the consumer update RSS feed. According to FDA officials, FDA is precluded from collecting similar metrics for content on its partnership pages owing to Freedom of Information Act restrictions on the release of commercial confidential information.

FDA officials said that the agency is planning to issue final guidance and complete implementation for most of our recommendations, but they do not have a time frame for completion. Specifically, FDA officials said they plan to issue final NDI guidance, but they are still reviewing more than 7,000 distinct comments they received in response to the draft NDI guidance issued in July 2011. Furthermore, although FDA officials have indicated they intend to issue final guidance clarifying whether a liquid product may be labeled and marketed as a dietary supplement and possibly issuing similar guidance for non-liquid products, they have not indicated to us where they are in this process. Regarding our recommendation on consumer outreach, FDA officials said that assessing the effectiveness of its outreach efforts through the WebMD™ and other partnerships, consumer updates, and fact sheets on dietary supplement safety issues would require extensive consumer research, which would have to be considered in light of FDA's limited resources and competing priorities.

Consequently, regulatory uncertainty remains an issue for areas covered only by draft guidance. As we have previously reported, without final NDI guidance in place, firms may not notify FDA before marketing products with ingredients that have drastically different safety profiles than their historical use.[71] In addition, "energy drinks"—some of which are marketed as beverages and others as dietary supplements—have raised concerns about potential health risks among consumer advocacy groups,

[71]GAO-09-250. For example, bitter orange—historically used as a flavoring—could be reformulated into a product that is 95 percent synephrine, a powerful stimulant. FDA officials said that even without guidance, firms must meet their statutory obligation to notify FDA. However, the preamble to the draft NDI guidance states that the purpose of the guidance is to assist industry in deciding when a premarket safety notification for an NDI is necessary; the chemical alteration of historical ingredients is one of the questions addressed.

academics, government agencies, and members of Congress.[72] Specifically, concerns raised by these groups include the potential health risks associated with the level of caffeine in these products, the combination of caffeine and botanical ingredients with stimulant properties in these products, and their popularity with youth. Two of the four top-selling brands of energy drinks in 2012, as identified by a market research firm, were marketed as dietary supplements, while the others were marketed as beverages. As we noted in our 2009 report, this boundary matters because the safety standard for a certain ingredient in food is different than that for the same ingredient when it is used as a dietary ingredient in a dietary supplement. The differences in how products are regulated may lead to circumstances when an ingredient would not be allowed to be added to a product if it was labeled as a conventional food but would be allowed in the identical product if it was labeled as a dietary supplement. Even without final guidance to industry, the agency has issued warning letters to firms for violations related to NDI notifications and the distinction between liquid dietary supplements and conventional foods on a case-by-case basis. With clear guidance to industry about these issues, firms may have the information necessary to guide appropriate product development—including the development of safety information—and marketing, and FDA's enforcement burden in these areas may be reduced as a result. Moreover, by assessing its outreach efforts, FDA would have information on whether its new approaches are effective, which could help FDA target future efforts, particularly in the area of increasing voluntary adverse event reporting.

## Conclusions

Because of an increase in mandatory AERs, the number of AERs FDA has received since 2008 for dietary supplements has more than doubled, and FDA has used AERs to initiate and support some consumer protection actions. However, consumers and others may not be voluntarily reporting information to FDA on all adverse events that occur, although they may be contacting poison centers about some of these events. FDA officials said that their greatest challenge to identifying

---

[72]*Consumer Reports*, "The Buzz on Energy-Drink Caffeine" at http://www.consumerreports.org/cro/magazine/2012/12/the-buzz-on-energy-drink-caffeine/index.htm (accessed December 10, 2012); Higgins et al., "Energy Beverages: Content and Safety," *Mayo Clinic Proceedings* 85, no. 11(2010); and Substance Abuse and Mental Health Services Administration, Center for Behavioral Health Statistics and Quality, *The Dawn Report*: *Emergency Department Visits Involving Energy Drinks (*Rockville, MD: Nov. 22, 2011).

potential safety concerns from AERs is the relatively small number of AERs the agency receives, and that—depending on its review of the poison center data—FDA may benefit from obtaining access to these data for analysis. According to FDA officials, negotiations to access the data are ongoing at the HHS level but, as of December 2012, the results of these negotiations were still pending.

Furthermore, although FDA has used AERs for some consumer protection actions, FDA may have opportunities to expand its use of AERs. FDA does not systematically collect information on how it uses AERs; such information could improve FDA's ability to assess whether the agency is using AERs to their fullest extent in consumer protection actions and make improvements as needed. For example, FDA guidance states that AERs can be used to demonstrate potential health risks associated with violations found during other surveillance activities, such as inspections, and be part of the evidence gathered to support regulatory actions. However, by not tracking the relationship between AERs and its other data management systems, FDA cannot identify the extent to which AERS were used in this capacity. Having such information may also improve FDA's and policymakers' abilities to make fully informed decisions about resource allocation and AERs' future role in FDA's consumer protection activities related to dietary supplements.

In addition, FDA's process for collecting and managing mandatory AERs could be more efficient because dietary supplement firms, unlike other FDA-regulated products, cannot submit mandatory AERs electronically. Rather, they must submit these AERs in hard copy by mail. FDA officials said that they have plans to expand electronic reporting; however, FDA had similar plans in place at the time we issued our 2009 report that were never realized. To the extent that FDA can do so under existing law, providing greater information about dietary supplement AERs to the public—such as identified potential safety concerns and redacted data on its website—could create opportunities for external researchers to use AERs and to improve consumer awareness and understanding of potential health problems associated with dietary supplements.

Moreover, regulatory uncertainty remains an issue in two key areas of dietary supplement regulation because FDA has not set a time frame for issuing final guidance for draft NDI notification guidance and draft guidance clarifying when liquid products may be marketed as dietary supplements or conventional foods with added ingredients or for issuing similar guidance for nonliquid products. With final guidance in these areas, firms may be able to make more informed marketing and product

development decisions, including the development of safety information, and ultimately FDA's enforcement burden in these areas may be reduced as a result.

# Recommendations for Executive Action

To enhance FDA's ability to use AERs and to oversee dietary supplement products, we recommend that the Secretary of the Department of Health and Human Services direct the Commissioner of FDA to take the following five actions:

- Continue efforts to explore all possible options to obtain poison center data if the agency determines that the data could inform FDA's ability to identify potential safety concerns from adverse event reports for dietary supplements.

- Incorporate a mechanism to collect information on when AERs are used to support and inform consumer protection actions (i.e., surveillance, advisory, and regulatory actions).

- Implement the agency's efforts to facilitate industry reporting of mandatory AERs electronically.

- Determine what additional information FDA can provide to the public about dietary supplement AERs consistent with existing law and make the information publicly available and readily accessible on its website.

- Establish a time frame for issuing final guidance for the draft (1) NDI guidance and (2) guidance clarifying whether a liquid product may be labeled and marketed as a dietary supplement or as a conventional food with added ingredients.

# Agency Comments

We provided the Secretary of Health and Human Services with a draft of this report for review and comment. We received a written response from the Assistant Secretary for Legislation that included comments from FDA and is reprinted in appendix III. FDA generally agreed with each of the report's recommendations. HHS also sent us technical comments on behalf of FDA, which we incorporated as appropriate.

We are sending copies of this report to the Secretary of the Department
of Health and Human Services, the appropriate congressional
committees, and other interested parties. In addition, the report is
available at no charge on the GAO website at http://www.gao.gov.

If you or your staff members have any questions about this report, please
contact me at (202) 512-3841 or gomezj@gao.gov. Contact points for our
Offices of Congressional Relations and Public Affairs may be found on
the last page of this report. GAO staff who made key contributions to this
report are listed in appendix IV.

J. Alfredo Gómez
Director, Natural Resources and Environment

# Appendix I: Objectives, Scope, and Methodology

Our objectives were to determine the (1) number of adverse event reports (AER) the Food and Drug Administration (FDA) has received since 2008, the source of these reports, and the types of products identified; (2) actions FDA has taken to ensure that firms are complying with new reporting requirements; (3) extent to which FDA is using AERs for its consumer protection actions; and (4) extent to which FDA has implemented GAO's 2009 recommendations for enhancing FDA oversight of dietary supplements.

For this report, dietary supplement refers to a product intended for consumption as defined in the Dietary Supplement Health and Education Act of 1994 (DSHEA)—products that, among other things, are intended for ingestion to supplement the diet, labeled as a dietary supplement and not represented as a conventional food or as a sole item of a meal or diet. They must also contain one or more dietary ingredients. This definition covers supplements for human consumption. We did not examine FDA's oversight of products that would otherwise meet the definition of a dietary supplement in DSHEA but are intended for veterinary use. We also did not examine FDA's oversight of products that would otherwise meet the definition of a dietary supplement in DSHEA but are available only by prescription. We did include products that are marketed as dietary supplements but that have been deliberately adulterated (e.g., tainted with active ingredients in FDA-approved drugs or their analogues to increase their potency). Although such products may not meet the legal definition of a dietary supplement because they contain prescription drug ingredients, we included them in our review because these products are often marketed as dietary supplements and can cause serious health problems.

To determine the number of AERs that FDA received, the source of the reports, and the types of products identified, we obtained and analyzed FDA data on the number and type of AERs received since the reporting requirements went into effect in January 2008 through December 2011. Some of the data and analyses were provided by FDA in aggregate form, although FDA also provided us with disaggregate data on serious AERs. We supplemented our initial analysis with updated data on the number of AERs that FDA received between January 1 and September 30, 2012. To count the number of AERs associated with a unique firm or product, we sorted the data by firm name then manually reviewed the names to identify firms with similar or related names. We used the same approach

for products, reasoning that products with similar formulations and active ingredients should be grouped together because they would cause similar reactions in consumers and may be manufactured in the same facility.[1] In some cases, we performed additional Internet research to verify the accuracy of a match between a firm or product name. We also reviewed and analyzed data on calls about adverse events related to dietary supplements to poison centers from annual reports of the American Association of Poison Control Centers (AAPCC) from 2008 through 2010. Because poison centers classify certain dietary supplement products differently than FDA, such as including homeopathic agents as dietary supplements, we worked with AAPCC and FDA officials to make the appropriate adjustments to the data to make them comparable to FDA AERs. Similarly, because FDA officials told us that AERs are primarily associated with product use as directed, we adjusted the poison center data to include only those cases where an individual experienced an adverse reaction when using the product as directed and excluded reports resulting from misuse, abuse, or accidental ingestion. To assess the reliability of these data, we reviewed related documentation, reviewed internal controls, and worked with agency or AAPCC officials to identify any data problems. For the FDA data on serious AERs, which we received in disaggregate form, we examined the data to identify obvious errors or inconsistencies. We also reviewed FDA's laws, rules, and regulations relevant to collecting and maintaining AERs. We determined the data to be sufficiently reliable for the purposes of this report.

To determine actions FDA has taken to ensure that firms are complying with new reporting requirements, we reviewed FDA's procedures, planning documents, and guidance and obtained and analyzed data on FDA's oversight activities, such as inspections, advisory, and regulatory actions, to identify which of these actions were related to monitoring or enforcing firms' compliance. Specifically, we obtained aggregate data on the number of dietary supplement inspections from January 1, 2008, through September 30, 2012 and analyzed record-level data on the type and results of dietary supplement inspections FDA conducted from 2008 through 2011 from FDA's Field Accomplishments and Compliance Tracking System. To determine the number of AER violations observed

---

[1]FDA officials told us their basis for grouping products together depends on the particular analytical need. For example, in some cases, products with the same active ingredient but different flavors would be grouped similarly and, in other cases, products with different flavors would be grouped separately.

during inspections, we obtained and analyzed aggregate data from FDA's Turbo EIR system on inspection observations from fiscal year 2008 through fiscal year 2012. To determine the number of advisory and regulatory actions related to AER violations from January 1, 2008 through December 31, 2011, we obtained and analyzed data and documents on warning letters, seizures, and injunctions from FDA's Compliance Management System and FDA's online warning letter database; Class I recalls[2] from FDA's Recall Enterprise System and other safety-related recalls identified from press releases on FDA's Recalls - Health Fraud web page and Recalls, Market Withdrawals, and Safety Alerts web page[3]; import refusals from FDA's Operational and Administrative System for Import Support; and prosecutions with charges filed, convictions, or settlements reached in FDA's Automated Investigative Management System. We also reviewed individual firm inspection reports for examples of specific observations found during dietary supplement inspections, and accompanied FDA investigators on an inspection of a dietary supplement manufacturing facility. To assess the reliability of data supporting this objective, we reviewed related documentation, internal controls, examined the data to identify obvious errors or inconsistencies, traced data back to source documents, and identified and removed data that were outside the scope of our review, such as data related to products for animal or prescription uses, or data that did not meet the definition of dietary supplement used for this report, as described above. We determined the data to be sufficiently reliable for the purposes of this report.

To determine the extent to which FDA is using AERs to initiate and support its consumer protection actions, we matched firm and product

---

[2]*Class I* recalls involve a reasonable probability that the use of or exposure to a violative product will cause serious adverse health problems or death. *Class II* recalls involve violative products that may cause temporary or medically reversible adverse health problems or where the probability of serious adverse health problems is remote. *Class III* recalls involves violative products not likely to cause adverse health problems.

[3]We collected data on Class II and Class III recalls from FDA's Recall Enterprise System related to dietary supplements. However, we could not verify that the data were complete because of inconsistencies in how tainted supplement products are classified within the database. In some cases, they are classified as drugs, in other cases; they are classified as dietary supplements. We were able to verify the universe for Class I recalls against FDA press releases on its Recalls, Market Withdrawals, and Safety Alerts web page and Recalls - Health Fraud web page, but did not verify Class II and Class III recalls because according to FDA they are less likely to cause a serious health problem.

names from mandatory AERs against firm and product names in the following FDA consumer protection actions from January 2008 through December 2011: inspections, consumer alerts, industry advisories, warning letters, seizures and injunctions, import refusals, safety-related recalls, and prosecutions.[4] The matching process was necessary because FDA does not track how it uses AERs to initiate or support consumer protection actions across its other data systems. Because CFSAN officials told us that product and firm names are not standardized within the CFSAN Adverse Event Reporting System (CAERS) or across FDA's systems, we used statistical software to build wild-card searches to identify potential matches and then reviewed each potential match to confirm or reject potential matches. Specifically, we used an analytical software function that measures spelling differences between words to determine the likelihood that firm and product names from two data sets matched and to generate possible matches between AERs and actions. The statistical software returns a numeric value indicating how closely related the names are. After reviewing the initial results, we established a threshold for matching that gave us confidence we were capturing most of the potential matches and excluding those that were definitely not a match. The matches were then manually reviewed to confirm or reject potential matches. For matched records, we determined whether an AER was received prior to the consumer protection action, as an indicator that the AER may have contributed to FDA's decision to take action. For matched records, we tabulated both the number of AERs that contributed to each action, and the number of actions that matched AERs. We verified the appropriateness of this approach with FDA officials prior to conducting the analysis and provided a list of matches to FDA for their verification. We also reviewed FDA's guidance and procedures relevant to using AERs to initiate or support surveillance, advisory, and regulatory actions.

To determine the extent to which FDA has implemented GAO's 2009 recommendations for enhancing FDA oversight of dietary supplements, we reviewed FDA's laws, planning documents, and guidance. We reviewed proposed legislation to expand FDA's oversight authority for dietary supplements. We also obtained data on the extent to which FDA's web-based consumer outreach initiatives were distributed.

[4]We did not include consumer complaints in this analysis because consumer complaints with adverse events are uploaded into the CAERS database as voluntary AERs and thus the matching process would yield false positives.

In addition, to address all of our objectives, we reviewed relevant studies related to dietary supplements, adverse event reporting, industry compliance, and using poison center data for public health surveillance, among others. We reviewed the methodology for each of these studies and assessed them for reasonableness in accordance with our objectives. We also interviewed officials from several FDA offices, including FDA's Center for Food Safety and Applied Nutrition (CFSAN) who receive and analyze AERs, officials from FDA's Division of Dietary Supplements Program, officials from the Office of Regulatory Affairs familiar with FDA's field operations and regulatory actions related to dietary supplements, and officials from the Center for Drug Evaluation and Research. We interviewed a wide range of stakeholders, including officials from federal agencies, industry and trade organizations, and consumer advocacy groups. At the federal level outside of FDA, we met with officials from the Department of Health and Human Services' (HHS) Centers for Disease Control and Prevention, the National Institutes of Health, and the Federal Trade Commission. At the industry level, we spoke with representatives from the American Herbal Products Association, the Council for Responsible Nutrition, and the Natural Products Association. At the consumer advocacy level, we met with representatives from the Center for Science in the Public Interest, Consumers Union, and Public Citizen. We also spoke with representatives from the American Association of Poison Control Centers.

We conducted this performance audit from December 2011 to March 2013 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: Data on FDA's Consumer Protection Actions Related to Dietary Supplements

This appendix combines data collected during this review with data from our prior report to provide additional detail on FDA's actions to identify and respond to safety concerns related to dietary supplements.[1]

## Data on FDA's Surveillance Actions Related to Dietary Supplements

FDA actions to identify safety concerns related to dietary supplements include receiving and analyzing adverse event reports and consumer complaints and conducting inspections.

### Data on Adverse Event Reports Related to Dietary Supplements

Incorporating data from our prior report, figure 7 shows the number of dietary supplement-related AERs entered into FDA's database from January 1, 2003, through September 30, 2012. As shown in 2008, mandatory reporting had an immediate impact on the number of dietary supplement-related AERs FDA received.

**Figure 7: Voluntary and Mandatory AERs Related to Dietary Supplements Received by FDA, 2003 through September 30, 2012**



Source: GAO analysis of FDA data.

Note: Although mandatory reporting went into effect on December 22, 2007, FDA did not receive its first mandatory report until January 2008. In some cases, FDA received both voluntary and

[1]GAO-09-250.

Appendix II: Data on FDA's Consumer
Protection Actions Related to Dietary
Supplements

mandatory AERs for the same adverse event. To avoid double-counting, we included these cases in the mandatory AER total. FDA received from 12 to 24 AERs per year as both mandatory and voluntary from January 1, 2008, through September 30, 2012.

## Data on Consumer Complaints Related to Dietary Supplements

Incorporating data from our prior report, figure 8 shows the number of dietary supplement-related consumer complaints with adverse event results or reported symptoms FDA received from January 1, 2002, through December 31, 2011. Consumer complaints are not limited to adverse events. For example, consumers may report a complaint if one or more pills in a product are discolored.



**Figure 8: Dietary Supplement-Related Consumer Complaints with Adverse Event Results or Reported Symptoms Received by FDA, 2002 through 2011**

Source: GAO analysis of FDA data.

## Data on Inspections Related to Dietary Supplements

Incorporating data from our prior report, figure 9 shows the number of dietary supplement inspections conducted by FDA or its state partners and the proportion of these inspections where the investigator identified problems from January 1, 2002, through December 31, 2011. For our determination for whether FDA identified a problem during an inspection, we included all inspections where the district determined that: (1) official action is indicated, (2) voluntary action is indicated, and (3) the case should be referred to CFSAN's Office of Compliance. We also included all cases where the investigator completed an inspectional observation form—a form used by FDA to document concerns observed during

inspections. The items listed on these forms are preliminary and vary in severity. Each inspection was counted only once.

**Figure 9: Proportion of Dietary Supplement Inspections for Which FDA Identified Problems or Concerns, 2002 through 2011**



Source: GAO analysis of FDA data.

Note: Current good manufacturing practices (CGMP) specific to dietary supplement firms were phased in by firm size from 2008 to 2010. For firms with 500 or more full-time equivalent employees, they became effective in June 2008; for firms with at least 20 but fewer than 500 full-time equivalent employees, they became effective in June 2009; and for firms with fewer than 20 full-time equivalent employees they became effective in June 2010. According to FDA officials, prior to the establishment of dietary supplement-specific CGMPs, FDA inspected dietary supplement firms according to food CGMPs.

Figure 10 shows the type of dietary supplement inspections conducted from January 1, 2008, through December 31, 2011. Complaint inspections are conducted to investigate consumer complaints about a firm. Follow-up inspections are conducted to assess a firm's progress after an advisory or regulatory action such as a warning letter or recall. Compliance inspections are "for-cause" inspections to investigate specific compliance issues. Surveillance inspections are routine inspections that generally assess whether a firm is following dietary supplement good manufacturing practices, as applicable. An inspection may include product examinations, sampling and testing, as well as the inspection of

the firm and facility involved with dietary supplements, according to FDA officials.

**Figure 10: Type of Dietary Supplement Inspections, 2008 through 2011**



Source: GAO analysis of FDA data.

Note: Complaint inspections are conducted to investigate consumer complaints about a firm. Follow-up inspections are conducted to assess a firm's progress after an advisory or regulatory action such as a warning letter or recall. Compliance inspections are "for-cause" inspections to investigate specific compliance issues. Surveillance inspections are routine inspections that generally assess whether a firm is following dietary supplement good manufacturing practices, as applicable.

## Data on FDA's Advisory and Regulatory Actions Related to Dietary Supplements

FDA actions to respond to safety concerns related to dietary supplements include issuing warning letters to dietary supplement firms, working with firms on recalls, and refusing imports.

**Data on Warning Letters Related to Dietary Supplements**

Incorporating data from our prior report, figure 11 shows the number of warning letters related to dietary supplements FDA issued from January 1, 2002, through December 31, 2011. The relatively low number of letters issued in 2007 is in part due to the timing of the letters—if we calculated the number of letters issued by fiscal year, the number would be 43.

**Figure 11: Number of Warning Letters Related to Dietary Supplements, 2002 through 2011**



Source: GAO analysis of FDA data.

**Data on Recalls Related to Dietary Supplements**

Figure 12 shows the number of Class I, health fraud, and other safety-related voluntary recalls related to dietary supplements from January 1, 2008, through December 31, 2011. We focused on these three types of recalls because FDA determined they (1) are the most likely to cause a serious health problem, (2) could cause a serious health problem, or (3) considered them to be of sufficient concern to issue a safety alert press release.

**Appendix II: Data on FDA's Consumer Protection Actions Related to Dietary Supplements**

**Figure 12: Number of Class I, Health Fraud, and Other Safety-Related Dietary Supplement Recalls, 2008 through 2011**



Source: GAO analysis of FDA data.

**Data on Imports Related to Dietary Supplements**

Figure 13 shows the number of import refusals by product type from January 1, 2008, through December 31, 2011.

**Figure 13: Dietary Supplement Import Refusals by Product Type, 2008 through 2011**



Source: GAO analysis of FDA data.

Note: To be consistent with our prior report, GAO-09-250, these data only include products classified as dietary supplements and do not include products that were initially classified as dietary supplements, then reclassified as drugs by FDA. (FDA reclassifies dietary supplements as drugs if the products contain an active pharmaceutical ingredient or if their labeling contains claims or other evidence that would cause them to be regulated as drugs.) FDA did not provide information on how many dietary supplements were reclassified as drugs and, therefore, refused entry to the United States. These data are current as of April 13, 2012.

# Appendix III: Comments from the Department of Health and Human Services



DEPARTMENT OF HEALTH & HUMAN SERVICES

OFFICE OF THE SECRETARY

Assistant Secretary for Legislation
Washington, DC 20201

FEB 2 5 2013

J. Alfredo Gomez
Director, Natural Resources and Environment
U.S. Government Accountability Office
441 G Street NW
Washington, DC 20548

Dear Mr. Gomez:

Attached are comments on the U.S. Government Accountability Office's (GAO) report entitled, "Dietary Supplements: FDA May Have Opportunities to Expand Its Use of Reported Health Problems to Oversee Products" (GAO-13-244).

The Department appreciates the opportunity to review this report prior to publication.

Sincerely,

Jim R. Esquea
Assistant Secretary for Legislation

Attachment

GAO-13-244 Dietary Supplements

**GENERAL COMMENTS OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS) ON THE GOVERNMENT ACCOUNTABILITY OFFICE'S (GAO) DRAFT REPORT ENTITLED, "DIETARY SUPPLEMENTS: FDA MAY HAVE OPPORTUNITIES TO EXPAND ITS USE OF REPORTED HEALTH PROBLEMS TO OVERSEE PRODUCTS" (GAO-13-244)**

The Department appreciates the opportunity to review and comment on this draft report.

HHS acknowledges that the current AER system is inherently limited. The core limitation of this system—and all post market passive surveillance systems for consumer products—is the challenge in determining whether reports in the system reflect cause-and-effect relationships between specific products and specific harms. Because of this limitation, AER data are only one component of the evidence the Agency uses when assessing a potential safety problem with a dietary supplement or supporting regulatory action against an adulterated product. FDA will continue to use AER data as one basis for investigating potentially unsafe products, and will track whether the AER signal turns out to be valid and leads to regulatory action.

**GAO Recommendation**

Continue efforts to explore all possible options to obtain poison control center data if the agency determines that the data could inform FDA's ability to identify potential safety concerns from adverse event reports for dietary supplements.

**HHS Response:** HHS and the American Association of Poison Control Centers (AAPCC) will continue to discuss the feasibility and costs of sharing data from AAPCC's system. Additional high-quality data could enhance FDA's ability to accurately estimate background rates of illnesses and injuries, establish temporal relationships where signals of a possible safety problem exist, and detect more subtle safety signals. Additionally, FDA is working with both the U.S. Substance Abuse and Mental Health Services Administration's Drug Abuse Warning Network and the Centers for Disease Control and Prevention on whether data on CFSAN-regulated products in their systems could be integrated with the FDA system.

**GAO Recommendation**

Incorporate a mechanism to collect information on when AERs are used to support and inform consumer protection actions (i.e., surveillance, advisory, and regulatory actions).

**HHS Response:** HHS strongly agrees that establishing whether and when AERs are being used to support and inform the Agency's consumer protection actions is useful. Such assessments can be divided into two types: (1) assessments that use analytical criteria to evaluate whether a signal from the AER system is more or less likely to reflect illness or injury from a specific product or type of product; and (2) assessments that measure the extent to which AER collection and analysis end up supporting FDA actions to protect public health, including surveillance, advisory, and regulatory actions. These measurements should provide important information to HHS, GAO, and the public on the value of the system over time. For example, last year, FDA issued a press release informing consumers how it investigates adverse event reports allegedly related to energy drinks and supplements.

**GAO Recommendation**

1

**GENERAL COMMENTS OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS) ON THE GOVERNMENT ACCOUNTABILITY OFFICE'S (GAO) DRAFT REPORT ENTITLED, "DIETARY SUPPLEMENTS:  FDA MAY HAVE OPPORTUNITIES TO EXPAND ITS USE OF REPORTED HEALTH PROBLEMS TO OVERSEE PRODUCTS" (GAO-13-244)**

Implement the agency's efforts to facilitate industry reporting of mandatory AERs electronically.

**HHS Response**:  FDA is building a Web-based data entry form, similar in content to the MedWatch 3500A paper form for adverse event reporting.  This electronic form will allow industry to submit mandatory adverse event reports online, and the data will automatically populate the Center for Food Safety and Applied Nutrition's Adverse Event Reporting System (CAERS).  HHS expects the data entry form to be available for online submissions by mid-2014.  We are confident that Web-based data entry can be implemented within this timeframe.

**GAO Recommendation**

Determine what additional information FDA can provide to the public about dietary supplement AERs consistent with existing law, and make the information publicly available and readily accessible on its website.

**HHS Response:**  FDA will continue to make available dietary supplement adverse event data in response to FOIA requests from the public.  To promote transparency and user-friendliness, FDA is streamlining the process for locating and processing documents for Freedom of Information Act (FOIA) requests in order to provide the requested documents as quickly as possible.  The Agency has contracts in place to implement a number of changes to its CAERS business processes and IT systems.  These changes will free up resources for processing FOIA requests as quickly and as accurately as possible.

**GAO Recommendation**

Establish a time frame for issuing final guidance for the draft (1) NDI guidance, and (2) guidance clarifying whether a liquid product may be labeled and marketed as a dietary supplement or as a conventional food with added ingredients.

**HHS Response:**  HHS regards the completion of both guidances as a priority. The comments received on the NDI draft guidance revealed that certain parts of the draft guidance were widely misinterpreted; therefore, FDA concluded that the best course of action would be for the Agency to reissue the guidance as a second draft containing key clarifications on certain matters, and seek public input on the revised draft before proceeding to issue final guidance.  A revised draft NDI guidance is currently being developed.  The final liquid product guidance is currently undergoing Agency review.

**Links to additional information:**
**Draft Guidance on NDI:**
**http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/DietarySupplements/ucm257563.htm**
**Draft Guidance on Liquid dietary supplements:**

2

**Appendix III: Comments from the Department of Health and Human Services**

**GENERAL COMMENTS OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS) ON THE GOVERNMENT ACCOUNTABILITY OFFICE'S (GAO) DRAFT REPORT ENTITLED, "DIETARY SUPPLEMENTS:  FDA MAY HAVE OPPORTUNITIES TO EXPAND ITS USE OF REPORTED HEALTH PROBLEMS TO OVERSEE PRODUCTS" (GAO-13-244)**

http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/DietarySupplements/ucm196903.htm

3

# Appendix IV: GAO Contact and Staff Acknowledgments

## GAO Contact

J. Alfredo Gómez, (202) 512-3841 or gomezj@gao.gov

## Staff Acknowledgments

In addition to the individual named above, Anne K. Johnson, Assistant Director; Robin Ghertner; Cathy Hurley; Esther Toledo; and Lisa van Arsdale made key contributions to this report. Important contributions were also made by Kevin Bray, Michele Fejfar, Dan C. Royer, Carol Herrnstadt Shulman, and Kiki Theodoropoulos.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (http://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to http://www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Website: http://www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |



Please Print on Recycled Paper.



<span style="float:right">🔍</span>

# Glanbia Performance Nutrition

ABOUT  ❯  OUR BUSINESS  ❯  GLANBIA PERFORMANCE NUTRITION

The Glanbia Performance Nutrition family has a portfolio of leading brands in sports and lifestyle nutrition. Our mission is to inspire people everywhere to achieve their performance and healthy lifestyle goals. We're an agile business, led by brands and inspired by consumers.



BRANDS

**9**

REVENUE

€**1.13**bn

EBITA MARGIN

**8**%

This site uses cookies. To see how cookies are used, please review our **cookie notice**. If you agree to our use of cookies, please continue to use our site.

CONTINUE        CHANGE COOKIE PREFERENCES

# Our market

Glanbia Performance Nutrition brands are sold in more than 100 markets around the world. The growing global interest in healthy, active lifestyles means our portfolio appeals to a variety of sports performance, active and healthy-lifestyle consumers with a wide range of fitness motivations. They demand new product formats and have a growing appetite for healthy snacking and plant-based protein. Increasingly, they shop online for their health and fitness needs.

# Our portfolio

Our brand portfolio encompasses performance and lifestyle nutrition as well as weight management.

/ 8

This site uses cookies. To see how cookies are used, please review our **cookie notice**. If you agree to our use of cookies, please continue to use our site.

CONTINUE          CHANGE COOKIE PREFERENCES

Glanbia Performance Nutrition, Glanbia

## Growth strategy

We're taking our brands to new consumers, new
markets and new channels worldwide. We're also
looking beyond our core, to new products and
formats for active consumers. Direct-to-consumer is
a major focus, as we invest in and expand our digital
capabilities, and take our ecommerce channel
worldwide.

# Our
# expertise

We create products that enhance
sports performance — from muscle
gain to endurance and recovery —
and support general fitness, health
and wellbeing.

**PERFORMANCE & LIFESTYLE
BRANDS**

This site uses cookies. To see how cookies are used, please review our **cookie notice**. If you agree to our use of cookies, please continue to use our site.

CONTINUE          CHANGE COOKIE PREFERENCES

**LATEST STORIES**



**think! introduces High Protein Crisp Bars**

READ STORY



**Bajrang Punia associates with Optimum Nutrition**

READ STORY



**Optimum Nutrition 'Better Than Before'**

This site uses cookies. To see how cookies are used, please review our **cookie notice**. If you agree to our use of cookies, please continue to use our site.

CONTINUE    CHANGE COOKIE PREFERENCES

READ STORY



Delivering better
nutrition for every step
of life's journey

ANNUAL REPORT



ABOUT        OUR EXPERTISE        SUSTAINABILITY        INVESTORS        OUR STORIES

Results & Reports

ALL DOWNLOADS

2020 ANNUAL REPORT

FY20 PRESENTATION

FY20 RESULTS

Quick Links

PROCUREMENT

CAREERS

MEDIA

CONTACT

SHAREHOLDER ADVISORY

SITE SERVICES

Keep in touch

Stay up to date, register for our alerts service

INVESTOR RELATIONS APPS

This site uses cookies. To see how cookies are used, please review our **cookie notice**. If you agree to our use of cookies, please continue to use our site.

CONTINUE        CHANGE COOKIE PREFERENCES

INVESTOR RELATIONS APPS

SIGN UP TO ALERTS

 

in

Copyright © Glanbia PLC 2021. All rights reserved.

Terms of Use    Privacy notice    Cookie policy    Cookie Settings    Accessibility

Modern Slavery Act    Site Map

This site uses cookies. To see how cookies are used, please review our **cookie notice**. If you agree to our use of cookies, please continue to use our site.

CONTINUE     CHANGE COOKIE PREFERENCES

# Highly Concentrated Caffeine in Dietary Supplements: Guidance for Industry

Additional copies are available from:
Office of Dietary Supplement Programs
Center for Food Safety and Applied Nutrition
Food and Drug Administration
5001 Campus Drive
College Park, MD  20740
Tel: 240-402-2375
https://www.fda.gov/FoodGuidances

You may submit electronic or written comments regarding this guidance at any time.
Submit electronic comments to https://www.regulations.gov.  Submit written comments
on the guidance to the Dockets Management Staff (HFA-305), Food and Drug
Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852.  All comments
should be identified with the docket number [FDA-2018-D-1189] listed in the notice of
availability that publishes in the Federal Register.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Food Safety and Applied Nutrition**

**April 2018**

*Contains Nonbinding Recommendations*

# Table of Contents

I. Introduction ..................................................................................1

II. Background ..................................................................................2

III. Product Types .............................................................................2

   A. Powdered Dietary Supplements Containing Highly Concentrated Caffeine ....................................................................................2

   B. Liquid Dietary Supplements Containing Highly Concentrated Caffeine..5

IV. Guidance on Producing Safer Dietary Supplements Containing Caffeine..6

V. References ...................................................................................7

*Contains Nonbinding Recommendations*

# Highly Concentrated Caffeine in Dietary Supplements: Guidance for Industry[1]

> This guidance represents the current thinking of the Food and Drug Administration (FDA or we) on this topic.  It does not establish any rights for any person and is not binding on FDA or the public.  You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations.  To discuss an alternative approach, contact the FDA staff responsible for this guidance as listed on the title page.

## I.    Introduction

Products consisting of or containing only pure or highly concentrated caffeine have been linked to at least two deaths in the United States in the last few years, and continue to present a significant public health threat.  Many products that consist of only or primarily pure or highly concentrated caffeine are sold as dietary supplements.  FDA considers some such products to be adulterated under section 402(f)(1)(A) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) [21 U.S.C. § 342(f)(1)(A)], because they are dietary supplements that present a significant or unreasonable risk of illness or injury under the conditions of use recommended or suggested in the labeling or, if no conditions for use are suggested or recommended, under ordinary conditions of use.

This document is intended to provide guidance to firms that manufacture, market, or distribute dietary supplement products that contain pure or highly concentrated caffeine, or are considering doing so.  This guidance should help such parties determine whether their products are or would be adulterated under section 402(f)(1)(A) of the FD&C Act.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities.  Instead, guidances describe our current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited.

---

[1] This guidance has been prepared by the Office of Dietary Supplement Programs in the Center for Food Safety and Applied Nutrition (CFSAN) at the Food and Drug Administration.

*Contains Nonbinding Recommendations*

The use of the word *should* in FDA guidances means that something is suggested or recommended, but not required.

# II.    Background

Caffeine (1, 3, 7-trimethylxanthine) is a naturally-occurring member of the methylxanthine class of compounds (Ref 1).  Even though it is not an essential nutrient, caffeine is one of the most commonly consumed stimulants world-wide due to its abundant presence in food products, as well as over-the-counter and prescription drugs.  While caffeine content varies in different products, a typical eight-ounce cup of ground coffee contains approximately 95 milligrams (mg) of caffeine.

Caffeine is rapidly absorbed into the bloodstream after ingestion, reaching peak serum concentration in less than two hours (Ref 4, 7, 8, 9, 10, 11).  Its metabolism is slowed after consumption of more than 500 mg, leading to symptoms being experienced for an extended period of time (Ref 8, 12, 13).  In short, this means that when an individual consumes a high dose of caffeine, he or she will experience the effects quickly and for a longer period of time.  Toxic effects (including tachycardia, ventricular arrhythmia, and seizures) are observed at approximately 1200 mg, or 1.2 grams (0.15 tablespoons of caffeine) (Ref 2, 3, 4, 5, 6).  A life-threatening dose of caffeine is typically estimated at between 10,000 and 14,000 mg, or 10 and 14 grams (g) (1.2 – 1.7 tablespoons of caffeine), although smaller doses can be life-threatening in certain individuals (such as children or other sensitive populations) (Ref 5, 14, 15, 16, 17).

In recent years, dietary supplement products containing pure or highly concentrated caffeine in powder or liquid forms have been increasingly marketed to consumers, often through online retailers.  These products are often marketed in bulk packaging with up to thousands of servings per container, requiring the consumer to measure out a safe serving (often estimated at 1/16 of a teaspoon or less for powdered products) from what can be a toxic or even lethal amount of bulk product.  For example, just one teaspoon of a powdered pure caffeine product can contain approximately 3200 mg (or 3.2 g) of caffeine, or the equivalent of 28 cups of coffee – in other words, two and a half times a toxic dose.  And a half cup of a representative liquid concentrated caffeine product contains approximately 2,000 mg of caffeine, which is the equivalent to more than twenty typical cups of coffee and is well more than a toxic dose.  Many of these products can present a significant or unreasonable risk of illness or injury.

# III.   Product Types

## A.    Powdered Dietary Supplements Containing Highly Concentrated Caffeine

One product type that has appeared on the market in recent years is powdered caffeine-containing products labeled as dietary supplements.  FDA has issued warning letters to

*Contains Nonbinding Recommendations*

manufacturers of some of these products based on our finding that the products are adulterated.[2,3,4,5,6]

Pure or highly concentrated powdered caffeine is often sold in packages containing enough powder for thousands of recommended servings.  Large or "bulk" packages like these contain hundreds of potentially lethal doses.

The package labeling for these products often includes directions suggesting that a consumer consume 50 to 200 mg of caffeine multiple times daily.  To obtain quantities such as these from a bulk container, a consumer must be able to accurately and precisely measure out a recommended serving in the range of 1/64 of a teaspoon (50 mg of powder) to 1/16 of a teaspoon (200 mg of powder).  While we do not rule out the possibility that a powdered caffeine product sold in bulk could be permissible under the FD&C Act (for example, if it were sufficiently diluted), in general we consider these types of products – i.e., products containing amounts of pure or highly concentrated powdered caffeine that could be toxic or even lethal several times over, sold in bulk such that the consumer is required to separate out a safe serving from a potentially lethal amount – to meet the standard for adulteration under section 402(f)(1)(A) of the FD&C Act.  Under section 301(a) of the FD&C Act [21 U.S.C. § 331(a)], adulterated products may not be introduced or delivered for introduction into interstate commerce.

Some of the pure or highly concentrated powdered caffeine products bear warning statements on their package labeling and/or websites.  However, FDA considers many of these products to be sufficiently dangerous such that a warning cannot remedy the adulteration.  Bulk powdered caffeine products are sold to consumers in packages as large as 10 kilograms, which contains the equivalent to more than 10,000 recommended servings of the product.  A bulk product of that size contains hundreds of potentially lethal doses.  For a number of reasons, no warning statement on the labeling of these products is adequate to prevent the products from being adulterated under section 402(f)(1)(A) of the FD&C Act.

Through surveillance we have observed discussions and comments on caffeine product websites and other fora indicating that these products are frequently shared by or dispensed to multiple users, increasing the risk of the product being separated from the warning statement.  In many cases there is enough product in the package to last for years beyond the labeled expiration date, unless the product is shared among multiple consumers.

---

[4] https://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2015/ucm460201.htm
[5] https://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2015/ucm460204.htm
[6] https://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2015/ucm460208.htm
[7] https://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2015/ucm460200.htm
[8] https://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2015/ucm460203.htm

*Contains Nonbinding Recommendations*

Additionally, some consumers who are familiar with caffeine and have not encountered safety problems when consuming it in other ways (e.g., in coffee or soft drinks), might incorrectly assume they are personally able to disregard a warning statement and safely consume the product without careful attention to the precise serving and measurement recommendations. The volume of the product available and the labeled expiration date (which, taken together, could imply that a single consumer can finish the product before it expires) might further promote the misconception that the warning can be disregarded.

The serving size measurement can also limit the effectiveness of any warning statement. Some products specify that a serving is a non-standard measure, such as 1/16 of a teaspoon (the smallest standard kitchen measuring spoon is usually 1/4 teaspoon) or 200 mg (most household scales measure in kilograms and grams, not milligrams). Because consumers are unlikely to have the correct tools to accurately measure these amounts, even a consumer who reads the warning statement and attempts to measure a safe serving might inadvertently consume an unsafe amount. A simple mistake, such as measuring a serving in grams rather than milligrams, could result in a toxic dose being consumed.

Some pure or highly concentrated powdered caffeine products are packaged with tiny measuring scoops that purport to measure a single serving. However, FDA still considers many of these products to be adulterated. As discussed above, we are aware that these products are frequently shared among multiple users. If the product is physically divided up to be shared by multiple people living separately, some consumers will not have the benefit of the measuring scoop.

Furthermore, reasonably foreseeable measurement errors, such as packing the powder too tightly or use of a "heaping scoop" instead of a "level scoop," can increase the amount of caffeine in a single dose by more than 200%, resulting in the ingestion of a toxic quantity of caffeine. These scoops can also easily be lost, in which case consumers might substitute common household measuring tools or even just regular spoons without realizing the possible impact.

For these reasons, in general we consider products containing potentially lethal amounts of pure or highly concentrated powdered caffeine, sold in bulk such that the consumer is required to separate out a safe serving from a potentially lethal amount, to meet the standard for adulteration under section 402(f)(1)(A) of the FD&C Act. Even if the product label specifies a serving size that could be considered safe for many healthy adult consumers, a scoop is provided that can approximate that serving size, and a warning statement urges the consumer not to exceed the serving size, this type of product can still present a significant or unreasonable risk of illness or injury under the conditions of use recommended or suggested in the labeling. An inherent feature of the conditions of use for such products is that the consumer must separate out a very small, precise serving from a potentially lethal amount of product – a task that poses a significant or unreasonable risk of illness or injury.

*Contains Nonbinding Recommendations*

### B.      Liquid Dietary Supplements Containing Highly Concentrated Caffeine

We have also begun to see liquid products containing highly concentrated caffeine that are labeled as dietary supplements. These products are often sold in containers holding enough liquid for hundreds of recommended servings. As with the powdered bulk caffeine products, large or "bulk" containers of liquid like these contain multiple toxic or potentially lethal doses. While we do not rule out the possibility that a liquid dietary supplement product containing highly concentrated caffeine, sold in bulk, could be permissible under the FD&C Act (for example, if its concentration were sufficiently low), in general, we consider the types of products described here – i.e., products containing amounts of highly concentrated liquid caffeine that could be toxic or even lethal several times over, sold in bulk such that the consumer is required to separate out a safe serving from a potentially lethal amount – to meet the standard for adulteration under section 402(f)(1)(A) of the FD&C Act. Under section 301(a) of the FD&C Act, adulterated products may not be introduced or delivered for introduction into interstate commerce.

The package labeling for these highly concentrated liquid caffeine products often includes directions suggesting that a consumer consume one teaspoon, which is equivalent to approximately 80 mg of caffeine. These products are often sold to consumers in packages as large as a gallon, which contains the equivalent of more than 750 recommended servings of the product. A product of that size contains multiple potentially lethal doses.

These products are typically meant to be diluted before being consumed, and not consumed "as is." An amount of highly concentrated liquid caffeine that would be safe for a given individual to consume in a properly diluted solution could nonetheless be unsafe for the same individual if the highly concentrated liquid were consumed directly. In the reasonably foreseeable scenario where a consumer makes an error diluting the product, or does not dilute it at all, that consumer could ingest a toxic quantity of caffeine. For example, a consumer who pours a representative liquid product from its bulk container into an empty container from a commonly-available single serving "energy shot," would consume approximately five times the amount of caffeine contained in the original product – a potentially toxic amount.

Some highly concentrated liquid caffeine products bear warning statements on their package labeling and/or websites. However, FDA considers many of these products to be sufficiently dangerous such that a warning cannot remedy the adulteration. The high concentration of these products is such that reasonably foreseeable measurement errors, such as using a tablespoon instead of a teaspoon, could result in consumption of a toxic amount. Moreover, because many consumers are familiar with caffeine and have not encountered safety problems when consuming it in other ways, often as a beverage (e.g., in coffee or soft drinks), consumers might incorrectly assume that they are personally able to disregard a warning statement and safely consume the product without diluting it properly, or without careful attention to the precise measurement and serving recommendations.

*Contains Nonbinding Recommendations*

Additionally, similar to their powdered counterparts, highly concentrated liquid caffeine products are often sold in containers so large that they contain enough recommended serving sizes to last beyond the labeled expiration date, which suggests that the products are meant to be consumed by multiple users.  It is reasonable to infer that liquid dietary supplements containing highly concentrated caffeine are being shared by or dispensed to multiple users, thereby increasing the risk of the product being separated from the warning statement and the directions for use.

Some highly concentrated liquid caffeine products are packaged with measuring devices that purport to measure a single serving.  However, FDA still considers many of these products to be adulterated.  These measuring devices are typically not accurate enough to prevent measurement errors, such as accidentally overpouring the liquid caffeine product, that can increase the amount of caffeine in a single dose, resulting in the ingestion of a toxic quantity of caffeine.  Also, as discussed above, consumers who frequently consume caffeine in other contexts (e.g., in coffee or soft drinks) might incorrectly assume that they are personally able to exceed the serving size recommendation, without understanding the extent to which even a small dose of these highly concentrated products can be toxic or even lethal.

Furthermore, these products are often sold as clear liquids that could be relatively easily confused with commonly-available safe, clear liquids (e.g., water or white vinegar).  A consumer could mistakenly confuse one of these products with water and quickly ingest enough highly concentrated liquid caffeine to cause toxic or even lethal consequences.  Some highly concentrated liquid caffeine products are sweetened with a flavoring agent, which could increase the likelihood that a consumer would quickly ingest a toxic or even lethal amount.

For these reasons, in general we consider products containing potentially lethal amounts of highly concentrated, liquid caffeine, sold in bulk such that the consumer is required to separate out a safe serving from a potentially lethal amount, to meet the standard for adulteration under section 402(f)(1)(A) of the FD&C Act.  Even if the product label specifies a serving size that could be considered safe for many healthy adult consumers, a measuring device is provided that can approximate that serving size, and a warning statement urges the consumer not to exceed that serving size, this type of product can still present a significant or unreasonable risk of illness or injury under the conditions of use recommended or suggested in the labeling.  An inherent feature of the conditions of use for such products is that the consumer must separate out a small, precise serving from a potentially lethal amount of product – a task that poses a significant or unreasonable risk of illness or injury.

## IV.   Guidance on Producing Safer Dietary Supplements Containing Caffeine

When formulated and marketed appropriately, caffeine can be an ingredient in a dietary supplement that does not present a significant or unreasonable risk of illness or injury.

6

*Contains Nonbinding Recommendations*

Assuming that the product otherwise complies with all applicable legal requirements, we do not expect to consider the following types of dietary supplements to be adulterated:

A.   Dietary supplements sold in solid dosage forms, such as tablets or capsules that do not provide an excessive amount of caffeine per item.  Products in these forms eliminate the need for a consumer to accurately measure the appropriate serving.

B.   Dietary supplements containing powdered or liquid caffeine (either diluted or undiluted) that are sold in premeasured packets or containers, with each premeasured unit containing an amount of caffeine that is not excessive.  Products that are sold in pre-measured quantities eliminate the need for a consumer to measure the appropriate amount.

C.   Bulk powdered or liquid caffeine dietary supplement products that have been significantly diluted to low enough concentrations of caffeine, such that a reasonably foreseeable measurement error, misreading of the directions, or misunderstanding about the nature of the product would not normally be expected to lead to toxic or life-threatening symptoms.

All dietary supplements are required to comply with the adulteration provisions of the FD&C Act, and we intend to carefully review any dietary supplement products that contain potentially dangerous amounts of caffeine in any form.

# V.   References

Ref. 1. Artin B, Singh M, Richeh C, Jawad E, Arora R, Khosla S. 2010. Caffeine-related atrial fibrillation Am J Ther 17: e169-171.

Ref. 2.   Bonsignore A, Sblano S, Pozzi F, Ventura F, Dell'Erba A, Palmiere C. 2014. A case of suicide by ingestion of caffeine. Forensic Sci Med Pathol 10 :448-451.

Ref. 3.   Holmgren P, Norden-Pettersson L, Ahlner J. 2004. Caffeine fatalities--four case reports. Forensic Sci Int 13971-73.

Ref. 4.   Jabbar SBH, M.G. 2013. Fatal caffeine overdose: A case report and review of literature. American Journal of Forensic Medicine and Pathology 34: 321-324.

Ref. 5.   Bannerjee PA, Z.; Levine, B.; Fowler, D.R. 2014.Fatal caffeine intoxication: A series of eight cases from 1999 to 2009. Journal of Forensic Sciences 59: 865-868.

Ref. 6.   Riesselmann BR, F.; Roscher, S.; Schneider, V. 1999. Fatal caffeine intoxication. Forensic Science International 103: S49-S52.

Ref. 7.   Nawrot P, Jordan S, Eastwood J, Rotstein J, Hugenholtz A, Feeley M. 2003. Effects of caffeine on human health. Food Addit Contam 20: 1-30.

Ref. 8.   Kaplan GB, Greenblatt DJ, Ehrenberg BL, Goddard JE, Cotreau MM, Harmatz JS, Shader RI. 1997. Dose-dependent pharmacokinetics and psychomotor effects of caffeine in humans. J Clin Pharmacol 37: 693-703.

*Contains Nonbinding Recommendations*

Ref. 9.   Fredholm BB, Battig K, Holmen J, Nehlig A, Zvartau EE. 1999. Actions of caffeine in the brain with special reference to factors that contribute to its widespread use. Pharmacol Rev 51: 83-133.

Ref. 10.   Mandel HG. 2002. Update on caffeine consumption, disposition and action. Food and Chemical Toxicology 40: 1231-1234.

Ref. 11.   Zulli AS, R.M.; Kubatka, P.; Novak, J.; Uehara, Y.; Loftus, H.; Qaradakhi, T.; Pohanka, M.; Kobyliak, N.; Zagatina, A.; Klimas, J.; Hayes, A.; La Rocca, G.; Soucek, M.; Kruzliak, P. 2016. Caffeine and cardiovascular diseases: Critical review of current research. European Journal of Nutrition 55: 1331-1343.

Ref. 12.   Dalvi RR. 1986. Acute and chronic toxicity of caffeine: A review. Vet Hum Toxicol 28: 144-150.

Ref. 13.   Magkos FK, S.A. 2006. Caffeine use in sports, pharmacokinetis in man, and cellular mechanisms of action. Critical Reviews in Food Science and Nutrition 45:535-562.

Ref. 14.   Shum S, Seale C, Hathaway D, Chucovich V, Beard D. 1997. Acute caffeine ingestion fatalities: management issues. Vet Hum Toxicol 39: 228-230.

Ref. 15.   Thelander G, Jonsson AK, Personne M, Forsberg GS, Lundqvist KM, Ahlner J. 2010. Caffeine fatalities--do sales restrictions prevent intentional intoxications? Clin Toxicol (Phila) 48: 354-358.

Ref. 16.   Laskowski LK, Henesch JA, Nelson LS, Hoffman RS, Smith SW. 2015. Start me up! Recurrent ventricular tachydysrhythmias following intentional concentrated caffeine ingestion. Clin Toxicol (Phila) 53: 830-833.

Ref. 17.   Ammar R, Song JC, Kluger J, White CM. 2001. Evaluation of electrocardiographic and hemodynamic effects of caffeine with acute dosing in healthy volunteers. Pharmacotherapy 21: 437-442.







**Hi-Tech Family of Brands**



**POPULAR PRODUCTS**



**News**

September 29, 2020

## Hi-Tech Earns Certificate of Excellence in Manufacturing

Read now ›

December 5, 2018

## Hi-Tech Pharmaceuticals Wins Appeal at 11th Circuit against AllMax for Protein Spiking

Read now ›

June 28, 2018

## Hi-Tech Pharmaceuticals, Inc. Renews its GMP Certification

Read now ›

See more ›

## Main Menu ⌄

Home

Products

Find a Retailer

News

About

Athletes

Manufacturing

Contact

## Customer Care ⌄

About Us

Contact Us

Shipping & Returns

Privacy & Security

Terms of Use

## Raw Materials ⌄

Popular Raws

Specialty Ingredients

Vitamins & Minerals

Herbal Extracts

Amino Acides

Pharma-Grade Excipients

Sweeteners

Take A Tour

## Follow us





\* Statements on this website have not been evaluated by the Food and Drug Administration. Products are not intended to diagnose, treat, cure, or prevent any disease.



---

Copyright © 2021 Hi-Tech Pharmaceuticals.

Powered by Shopify





In Pursuit of a Better Tomorrow for Everyone

Motivated by possibility, inspiring active lives through nutrition and wellbeing.

Learn More

7/20/2021 Case 8:20-cv-02971-WFJ-TGW Document 129-14 Filed 02/10/23 Page 238 of 343 PageID
5529

Unwavering in our quest for a better tomorrow for everyone. | Iovate Health Sciences Inter...



About Us    Brands    Culture    Innovation    Press    Careers





About Us    Brands    Culture    Innovation    Press    Careers





iovate

About Us    Brands    Culture    Innovation    Press    Careers



# In The Press

July 19, 2021

June 29, 2021

**PURELY INSPIRED PARTNERS WITH GOLD MEDALIST DOMINIQUE M...**

Moceanu Helps Celebrate the Purely Inspired "Do What Makes You ...

Read More

**Six Star Pro Nutrition® To Advocate For "Shaking Up" Co...**

"Six Star Pro Nutrition is excited to be part of ...

Read More

June 9, 2021

May 8, 2021



7/20/2021    Iovate Documents | In Pursuit Of A Better Tomorrow for Everyone. | Iovate Health Sciences Inc.

Case 8:20-cv-02971-WFJ-TGW   Document 139-14   Filed 02/10/23   Page 241 of 343 PageID 5532



About Us    Brands    Culture    Innovation    Press    Careers

**Iovate Health Sciences Announces Launch Of Purely Inspi...**

The Purely Inspired Superfoods product line includes Superfood Greens, Healthy ...

Read More

**The Purely Inspired Brand Celebrates Mother's Day**

Iovate employees and influencers help the nutrition brand celebrate the ...

Read More

View All

## Join Our Team

Do the best work of your career, while being your most authentic self, in a dynamic, challenging and rewarding environment.

Service Desk Analyst (Mac Specialty)

**View Role**

Demand Analyst

**View Role**

Opportunity For Formulation Associate

**View Role**

Customer Service Coordinator, International

**View Role**

View All Openings



7/20/2021 Iovate | Driving a Better Tomorrow for Everyone. | Iovate Health Sciences Int...

Case 8:20-cv-02971-WFJ-TGW Document 130-14 Filed 02/10/23 Page 242 of 343 PageID 5533



About Us    Brands    Culture    Innovation    Press    Careers

## Contact Us

We want to hear from you. We offer exciting and attractive opportunities in many areas. Join our engaged, highly skilled, passionate, and united workforce.

**Name**

**Email**

**Message (optional)**

Submit

### Connect With Us

in    f

### About Us

Our Story

Our Campus

Contact Us

### Quick Links

Brands

Culture

Innovation

Press

Careers

Job Postings

### Contact Us

381 North Service Road West
Oakville, ON, L6M 0H4
Canada
Phone: 1.888.334.4448
Email: info@iovate.com

Privacy Policy | Terms of Use | Accessibility Statement | Accessibility Policy

© 2021 Iovate Health Sciences International Inc. All Rights Reserved.

We use cookies to give you the best online experience. Please let us know if you agree to all of these cookies.

ACCEPT ALL COOKIES

MANAGE COOKIES

🚚 Free delivery for orders over $40

Search for products 🔍



Save **15% On All Top Selling Items** With Code: **TOPSELLER**
*Not valid in combination with other promotions or bundles*



## BUILDING BETTER LIVES

Optimum Nutrition is committed to helping address fitness disparities in underserved populations so that everyone can experience the transformative power of fitness in their life.

LEARN MORE

## BEST SELLERS





**GOLD STANDARD 100% CASEIN**

★★★★★ (189)

From **$35.99** .

**OPTIMUM NUTRITION GOLD STANDARD 100%...**

★★★★★ (1207)

From **$9.99** .



For over 30 Years, Optimum Nutrition® has been the brand professional athletes and gym enthusiasts trust. Everybody has goals - let us help you reach yours.



**PROTEIN**

LEARN MORE



**ENERGY**

LEARN MORE



**WEIGHT GAINERS**

LEARN MORE



**PREPARE BEFORE TRAINING**



**KEEP GOING DURING TRAINING**



**RECOVER AFTER TRAINING**



**WEIGHT GAIN**

# OPTIMUM QUALITY

We believe you get out what you put in — which is why our certified manufacturing facilities only use high quality ingredients and strict quality control when making our products.



## HIGH QUALITY RAW MATERIALS



## TOP RATED AND REVIEWED



## WE TEST & RE-TEST FOR QUALITY

LEARN ABOUT OUR QUALITY







**GO INSTA, GET INSPIRED**

## SIGN UP FOR WEEKLY OFFERS, NEWS AND ADVICE

Plus 15% off your first order

| Email address |
| --- |

**SIGN UP**

### CUSTOMER SUPPORT
Customer Support
Delivery Information
Payment Options
Ordering
Returns Policy
FAQ
Contact

### ABOUT OPTIMUM NUTRITION
Authentic Products
Our Quality
Privacy Policy
Where to Buy
Newsletter
Terms
Cookies
CA Supply Chains Act

### EXPLORE
Articles
Athletes
Recipes

### FOLLOW US
Instagram
Facebook
Twitter
YouTube

### NEED HELP?
1-800-705-5226

    

OPTIMUM
NUTRITION | **PROVEN**

© 2021 Optimum Nutrition

1. These statements have not been evaluated by the food and drug administration. This product is not intended to diagnose, treat, cure or prevent any disease.

2. No significant difference has been shown between RBST treated and non-RBST treated cows.

3. When used over time in combination with regular resistance exercise.





# America's #1 Supplement Brand

**REDCON1 is a mission-based company founded on a simple principle – create the highest quality supplements for people that need to get the most out of their workout and workday.**


**Brand of the Year**


**Brand of the Year**


**Best Selling Preworkout**


**Top Selling Brand**


**Brand of the Year**



## PRE WORKOUTS AND FAT BURNERS

Total War – Vice City

Total War – Preworkout (30 Servings)
$39.99

Big Noise – Unflavored

Big Noise – Pump Formula (30 Servings)
$39.99

Double Tap – Cola

Double Tap Powder – Fat Burner (40 Servings)
$49.99

Moab – Grape

MOAB – Muscle Builder (30 Servings)
$64.99

Supplement – All

Silencer – Stimulant Free Fat Burner (30 Servings)
SOLD OUT

Supplement – All

Double Tap – Fat Burner (30 Servings)
$49.99

Supplement – All

RPG – Glucose Disposal (60 Servings)
SOLD OUT

RTD – Rainbow Candy 12
Servings

RTD Total War Preworkout (Ready To Drink) Case

$39.99

Supplement – All

Mental Trigger – Focus Formula (30 Servings)

$49.99

Supplement – All

CLA (90 Servings)

$21.99

FUBAR – Cherry Lime (Box of 12)

FUBAR Energy Shot

From $3.99

L Carnitine – Orange Crush

L-Carnitine (30 Servings)

$29.99

SALE

Waterboard | Natural Diuretic (10 Servings)

Waterboard | Natural Diuretic (10 Servings)

SOLD OUT


Total War 50 Servings- Firecracker

TOTAL WAR 50 Servings
$59.99

# POWERFUL MUSCLE BUILDERS


Supplement-All

WAR ZONE
$64.99


Supplement – All

Halo – Muscle Builder (60 Servings)
$64.99


Supplement – All

11 Bravo – Muscle Builder (30 Servings)
$64.99


Supplement – All

BOOM STICK – Testosterone Support (30 Servings)
$64.99



## ON THE GO SUPPLEMENTS

MRE Bar – Blueberry Cobbler

MRE Bar – Meal Replacement Bar (1 Box / 12 Bars)
$34.99

MRE Rtd–Vanilla Milkshake

MRE RTD, Ready To Drink, Protein Shake (Case of 12)
$39.99

MRE Bar – Variety Pack (1 Box / 12 Bars)

MRE Bar – Variety Pack (1 Box / 12 Bars)
SOLD OUT

MRE Bar – Sprinkled Donut

MRE Bar – Meal Replacement Bar (Single)
$3.49

Big Noise–Blue Lemonade

Big Noise Single Serving
$2.99

War Games – Peach Power Up

War Games Single Serving
$2.99

Double Tap–Strawberry Mango

Double Tap Single Serving
$2.99

Total War–Rainbow Candy

Total War Single Serving
$2.99

Redcon1 Bars– Peanut Butter

Redcon1 Bars Boxes
$34.99

Redcon1 Bars–Peanut Butter

Redcon1 Bars–Pack of 3
SOLD OUT

# HEALTH AND RECOVERY

Supplement – All

Vitamin C – Boost Immune System (120 Servings)
$19.99

GI Juice – Pineapple Banana

GI Juice – Digestive Enzymes (30 Servings)
$39.99

Fade Out – Black Currant

Fade Out – Sleep Formula (30 Servings)
$49.99



Foxtrot – All

Foxtrot – Joint Support (60 Servings)
$59.99

## WAR GAMES PROFESSIONAL GRADE GAMING SUPPLEMENT

Supplement – All

War Games Bundle
$49.99

War Games – Peach Power Up

War Games
$39.99

Apparel – All

War Games Super Bros Shirt
SOLD OUT

Apparel – All

War Games Streaming Shirt
SOLD OUT

Apparel – All

War Games Nite Shirt
SOLD OUT

Apparel – All

War Games Gen1 Shirt
SOLD OUT

Privacy - Terms



## BASIC TRAINING SERIES

Basic Training–Collagen Peptides

Basic Training – Collagen Peptides
$34.99

Basic Training–Apple Cider Vinegar

Basic Training – Apple Cider Vinegar
$19.99

Basic Training–Vitamin D3

Basic Training – Vitamin D3
$14.99

Supplement – All

CLA (90 Servings)

$21.99

L Carnitine – Orange Crush

L-Carnitine (30 Servings)

$29.99

Supplement – All

Fish Oil (90 Servings)

$16.99

Supplement – All

Creatine Monohydrate (60 Servings)

SOLD OUT

Supplement – All

Vitamin C – Boost Immune System (120 Servings)

$19.99

Supplement – All

Glutamine (60 Servings)
$26.99



## PROTEIN POWDER

MRE Lite – Banana Nut
Bread

MRE Lite – Animal Based Protein (2 LB)
$44.99

MRE – Peanut Butter Cookie

MRE – Meal Replacement, Animal Based Protein (7 LB)
$79.99

Isotope – Peanut Butter
Chocolate

Isotope – 100% Whey Isolate Protein (2 LB)
$44.99

Isotope – Peanut Butter

Isotope - Peanut Butter Chocolate

Isotope - 100% Whey Isolate Protein (5 LB)
$89.99

Green Beret-Chocolate

Green Beret - Vegan Protein (2 LB)
$44.99

Ration - Vanilla

Ration - Whey Protein (5 LB)
$79.99

MRE Rtd-Vanilla Milkshake

MRE RTD, Ready To Drink, Protein Shake (Case of 12)
$39.99



# WHAT IS YOUR FITNESS GOAL?
# SHOP BY BUNDLE

(https://redcon1.com/pages/bundle-builder?bundle=default)
### CREATE YOUR OWN
## BUNDLE
Shop Bundle
(https://redcon1.com/pages/bundle-builder?bundle=default)

(https://readinesstrials.redcon1.com/bundles/weight)
### YOUR GOAL IS TO
## LOSE WEIGHT
Shop Bundle
(https://readinesstrials.redcon1.com/bundles/weight)

(https://readinesstrials.redcon1.com/bundles/muscle)
### YOUR GOAL IS TO
## BUILD MUSCLE
Shop Bundle
(https://readinesstrials.redcon1.com/bundles/muscle)

(https://readinesstrials.redcon1.com/bundles/fit)
### YOUR GOAL IS TO
## GET FIT
Shop Bundle
(https://readinesstrials.redcon1.com/bundle)

(https://readinesstrials.redcon1.com/bundles/huge)
### YOUR GOAL IS TO
## GET HUGE
Shop Bundle
(https://readinesstrials.redcon1.com/bundle)

(https://readinesstrials.redcon1.com/bundles/results)
### YOUR GOAL IS TO
## GET RESULTS
Shop Bundle
(https://readinesstrials.redcon1.com/bundle)

(https://readinesstrials.redcon1.com/bundles/recomp)
### YOUR GOAL IS TO
## RECOMP
Shop Bundle
(https://readinesstrials.redcon1.com/bundle)

(https://readinesstrials.redcon1.com/bundles/healthier)
### YOUR GOAL IS TO
## BE HEALTHIER
Shop Bundle
(https://readinesstrials.redcon1.com/bundle)

## Real Reviews From Real Customers

★★★★★ 12298 Reviews ‹ ›



★★★★★ 07/19/21
I have been using several

*I have been using several products for the last few years and have seen some dramatic change in strength.*

Jordan S.



★★★★★ 07/19/21
Love this company!

*New Tier Operator, love this company and their products and will be continuing to use them for a long time!*

Dominick M.

Powered by 

## SIGN UP

Receive the latest news, offers, and promotions from

Privacy • Terms

REDCON1

| Email address | > |

DOWNLOAD OUR APP



**MAIN MENU**

Home

Supplements

Apparel

Deals

Blog

Tier Operators

Athletes

Redcon1 Foundation

**INFO MENU**

Search

About Us

Contact Us

Customer Service

Careers

Gym

Press

Privacy Policy

Security Policy

Terms and Conditions

Shipping and Returns











Privacy · Terms

© Redcon1, LLC 2021. All Rights Reserved.





Spilling the Beans: How Much Caffeine is Too Much? | FDA

# Spilling the Beans: How Much Caffeine is Too Much?

*According to scientists at the FDA, caffeine can be part of a healthy diet for most people, but too much caffeine may pose a danger to your health.*



How Much Caffeine is Too Much?

Español (/consumers/articulos-en-espanol/al-grano-cuanta-cafeina-es-demasiada)

Do you drink just one cup of coffee or tea first thing in the morning, hoping the caffeine in it will jump-start your day? Do you follow it up with a caffeinated beverage or two and then drink several more cups of coffee throughout the day?

Does it matter?

According to scientists at the FDA, caffeine can be part of a healthy diet for most people, but too much caffeine may pose a danger to your health. Depending on factors such as body weight, medications you may take, and individual sensitivity, "too much" can vary from person to person.

Learn more about caffeine in the following questions and answers.

## 1. Which kinds of foods and beverages contain caffeine?

Caffeine can be found naturally in the plants we use to make coffee, tea and chocolate. It's also found in some plants used as flavorings, such as guarana, or alternative teas popular in South American, such as yerba mate *(Ilex paraguariensis)* and *Ilex guayusa*.

Caffeine may also be added as an ingredient to foods and beverages.

## 2. How do you know how much caffeine a food or beverage contains?

Many packaged foods, including beverages and dietary supplements containing caffeine, voluntarily provide information on the label as to how much caffeine they contain. Consumers should take care when consuming for the first time a new packaged food containing added caffeine if the amount of caffeine in the food is not declared on the label.

There are several online databases that provide estimates of caffeine content of certain foods and beverages such as coffee and tea. However, the amount in these brewed beverages can vary depending on such factors as how and where the coffee beans and tea leaves were grown and processed and how the beverage product is prepared.

For reference, a 12 ounce can of a caffeinated soft drink typically contains 30 to 40 milligrams of caffeine, an 8-ounce cup of green or black tea 30-50 milligrams, and an 8-ounce cup of coffee closer to 80 to 100 milligrams. Caffeine in energy drinks can range from 40-250 mg per 8 fluid ounces.

## 3. If a coffee or tea says "decaffeinated," does that mean it contains no caffeine?

No. Decaf coffees and teas have less caffeine than their regular counterparts, but they still contain some caffeine. For example, decaf coffee typically has 2-15 milligrams in an 8-ounce cup. If you react strongly to caffeine in a negative way, you may want to avoid these beverages altogether.

## 4. How much caffeine is too much?

For healthy adults, the FDA has cited 400 milligrams a day—that's about four or five cups of coffee—as an amount not generally associated with dangerous, negative effects. However, there is wide variation in both how sensitive people are to the effects of caffeine and how fast they metabolize it (break it down).

Certain conditions tend to make people more sensitive to caffeine's effects, as can some medications. In addition, if you're pregnant, trying to become pregnant, or breastfeeding, or are concerned about another condition or medication, we recommend talking to your health care provider about whether you need to limit caffeine consumption.

The FDA has not set a level for children, but the American Academy of Pediatrics discourages the consumption of caffeine and other stimulants by children and adolescents.

## 5. How do you know if you've consumed more caffeine than you can tolerate?

Over-consuming caffeine can cause:

- insomnia
- jitters
- anxiousness
- fast heart rate
- upset stomach
- nausea
- headache
- a feeling of unhappiness (dysphoria)

## 6. Does caffeine pose a danger to your health?

The FDA estimates toxic effects, like seizures, can be observed with rapid consumption of around 1,200 milligrams of caffeine, or 0.15 tablespoons of pure caffeine.

Pure and highly concentrated caffeine products present a significant public health threat and have contributed to at least two deaths in the United States in the last few years. (In April, the FDA took action (https://www.fda.gov/Food/DietarySupplements/ProductsIngredients/ucm460095.htm) to protect consumers from these products.)

These products, often labeled as dietary supplements, consist of pure or highly concentrated caffeine in powder or liquid forms and are often marketed in bulk packaging with up to thousands of servings per container, requiring the consumer to measure out a safe serving from what can be a toxic or even lethal amount of bulk product.

The risk of caffeine overdose increases as the concentration of caffeine in the product increases, meaning even small dosages of a highly concentrated product could lead to dangerous effects. Just one teaspoon of pure powdered caffeine can contain the same amount of caffeine as 28 cups of coffee, and a half cup of a liquid highly concentrated caffeine product contains the equivalent of more than 20 cups of coffee. These are toxic amounts that can have serious health consequences, including death.

## 7. Is it okay for kids to consume caffeine?

We recommend you consult with your health care provider for advice regarding your child's caffeine consumption.

## 8. Is drinking a lot of caffeine a substitute for sleep?

No. Caffeine is a stimulant, which may cause you to be more alert and awake, but it is not a substitute for sleep. Typically, it can take 4 to 6 hours for your body to metabolize half of what you consumed. So, a cup of coffee at dinner may keep you awake at bedtime.

## 9. How can I cut back on caffeine without causing unpleasant side effects?

If you're used to drinking caffeine-containing beverages every day, and want to cut back, it's best to do so gradually. Stopping abruptly can cause withdrawal symptoms such as headaches, anxiety, and nervousness. Unlike opioid or alcohol withdrawal, caffeine withdrawal is not considered dangerous, but it can be unpleasant. You may want to talk to your health care provider about how to cut back.

7/20/2021    Case 8:20-cv-02971-WFJ-TGW   Document 139-14  Filed 02/10/23  Page 278 of 343 PageID
5569
The effect of 6 days of alpha glycerylphosphorylcholine on isometric strength

✳  **Try out PMC Labs** and tell us what you think. **Learn More.**    ✖

J Int Soc Sports Nutr. 2015; 12: 42.                                                                    PMCID: PMC4650143
Published online 2015 Nov 17. doi: 10.1186/s12970-015-0103-x                                             PMID: 26582972

# The effect of 6 days of alpha glycerylphosphorylcholine on isometric strength

David Bellar,✉ Nina R. LeBlanc, and Brian Campbell

School of Kinesiology, University of Louisiana at Lafayette, Lafayette, LA 70503 USA
David Bellar, Phone: (337) 482-6615, Email: dbellar@louisiana.edu.
✉Corresponding author.

Received 2015 Aug 16; Accepted 2015 Nov 10.

Copyright © Bellar et al, 2015

**Open Access** This article is distributed under the terms of the Creative Commons Attribution 4.0 International License (http://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons license, and indicate if changes were made. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated.

## Abstract

### Background

Ergogenic aides are widely used by fitness enthusiasts and athletes to increase performance. Alpha glycerylphosphorylcholine (A-GPC) has demonstrated some initial promise in changing explosive performance. The purpose of the present investigation was to determine if 6 days of supplementation with A-GPC would augment isometric force production compared to a placebo.

### Methods

Thirteen college-aged males (Means ± SD; Age: 21.9 ± 2.2 years, Height: 180.3 ± 7.7 cm, Weight: 87.6 ± 15.6 kg; VO₂ max: 40.08 ± 7.23 ml O$_2$*Kg$^{-1}$*min$^{-1}$, Body Fat: 17.5 ± 4.6 %) gave written informed consent to participate in the study. The study was a double blind, placebo controlled, cross-over design. The participants reported to the lab for an initial visit where they were familiarized with the isometric mid thigh pull in a custom squat cage on a force platform and upper body isometric test against a high frequency load cell, and baseline measurements were taken for both. The participant then consumed either 600 mg per day of A-GPC or placebo and at the end of 6 days performed isometric mid thigh pulls and an upper body isometric test. A one-week washout period was used before the participants' baseline was re-measured and crossed over to the other treatment.

### Results

The A-GPC treatment resulted in significantly greater isometric mid thigh pull peak force change from baseline (t = 1.76, $p = 0.044$) compared with placebo (A-GPC: 98.8. ± 236.9 N vs Placebo: −39.0 ± 170.9 N). For the upper body test the A-GPC treatment trended towards greater change from baseline force production (A-GPC: 50.9 ± 167.2 N Placebo: −14.9 ± 114.9 N) but failed to obtain statistical significance (t = 1.16, $p = 0.127$).

### Conclusions

A-GPC is effective at increasing lower body force production after 6 days of supplementation. Sport performance coaches can consider adding A-GPC to the diet of speed and power athletes to enhance muscle performance.

**Keywords:** Alpha glycerylphosphorylcholine, Strength, Human performance, Sport supplements

## Background

Performance in sport is often determined by moments of extreme force production and power output [1]. While much of this can be attributed to muscular strength [2, 3], some adaptations to training can be neural in nature [4]. A study by Pensini, Martin and Maffiuletti [5] demonstrated that increases in torque associated with 4 weeks of eccentric exercise were likely the result of central (or neural) adaptation. Based upon current knowledge it appears that both central and peripheral adaptations are necessary to enhance performance in athletes. Therefore, it is important to study nutritional interventions that have the potential to augment either potential site of adaptation.

α Glycerylphosphorylcholine (A-GPC) is a substance that could potentially augment human performance by facilitating neuro-muscular interaction. A-GPC has been shown to augment acetylcholine levels in neurons in rat CNS [6], and has been shown to maintain reaction time in humans following exhaustive exercise [7]. Additionally A-GPC is generally considered safe for consumption in moderate to high doses [8, 9]. Ingested A-GPC is converted to phosphatidylcholine, a source of choline [10]. Dietary choline levels are linked to the rate of biosynthesis of acetylcholine [11]. Given that cholinergic nerves trigger muscle contraction, and that choline availability is linked to acetylcholine synthesis substances that could augment choline availability might have the potential to influence muscular performance. To date some work has been done examining the ability of phospholipids to restore choline levels after exercise, but there is a dearth of information regarding the ability of compounds like A-GPC to acutely enhance performance [11]. The purpose of this study was to examine the effects of 6 days of supplementation with A-GPC on measures of isometric force production in the upper and lower body.

## Methods

The Institutional Review Board at the University of Louisiana at Lafayette reviewed the present investigation for ethics. The study was a double-blind, placebo-controlled crossover with a 1-week washout period that included 13 healthy, college-aged males (Means ± SD; Age: 21.9 ± 2.2 years, Height: 180.3 ± 7.7 cm, Weight: 87.6 ± 15.6 kg; VO₂ max: 40.08 ± 7.23 ml O$_2$*Kg$^{-1}$*min$^{-1}$, Body Fat: 17.5 ± 4.6 %). Subjects reported to the lab and give informed consent, which

included consent to publish, prior to baseline assessments which included height and weight, an assessment of maximum aerobic capacity via a COSMED CPET system (COSMED, Rome ITL) with integrated electronically braked cycle ergometer as outlined in previous studies [12], and body fat percentage via air displacement plethysmography (Bod Pod Gold Standard System, COSMED Rome, ITL) . The following week trial one (random order: either placebo or 600 mg of A-GPC) began. For the trials baseline performance testing was done and they were given an initial dose (placebo or A-GPC) while in the lab, 1 h later the performance testing (isometric mid thigh pull, upperbody isometric test) was repeated. The subjects were then given 6 days of additional pre-packaged supplement to take (morning and evening). The subjects reported back on day 6 of this period to repeat performance testing after the final dose of supplement. After a 1-week washout period, the subjects repeated the trial with the other treatment. (see Fig. 1).



Fig 1

Flowchart of Experimental Procedures

## Treatments

The treatments consisted of 600 mg daily of A-GPC (AlphaSize®, ChemiNutra, Austin, TX) or a placebo. Both treatments were administered in the same capsules (gel caps) and were the same color (white). The A-GPC capsules were supplied with a certificate of analysis from a third party lab confirming the amount of active ingredient. The placebo capsule consisted of microcrystalline cellulose and magnesium stearate (Nature's Supplements, Carlsbad, CA USA). Both the participant and researcher were unaware of the identity of either treatment until the end of the study.

The participants were instructed to take doses in the morning and evening that would deliver a total of 600 mg of A-GPC per day and were given the pills in a non-distinct plastic bottle marked only with a code. The participants returned the bottles at the end of the study. The participants reported 100 % compliance with taking the required doses.

## Isometric mid thigh pull (IMTP)

The isometric mid-thigh pull test (IMTP) is a well-validated strength measure [13]. Testing was conducted in a customized power rack (Rogue Fitness, Columbus, USA) that is secured to a concrete laboratory floor surrounding a AMTI Force Plate (Advanced Materials Technologies Inc., Watertown USA). The power rack allows for small incremental adjustments in height for a steel bar that is secured via two large tubular steel members.

The participant was instructed to stand with the feet shoulder width apart above the force plate. The height of the bar was adjusted so that the participant was in a position where the torso was upright (assessed via a contractors box level), the knees achieved between 120–130° of flexion (measured via a goniometer) and the arms were straight while holding the bar. The participants were told to "drive straight up" and to pull as hard as they could against the chain until the force began to noticeably decline. The peak force was assessed at a sampling rate of 2000 Hz using an AMTI Force Plate. Subjects were familiarized with the IMTP during the initial lab visit. Measurements were taken in triplicate with a five-minute rest.

## Upper body isometric test (UBIST)

The participants were positioned on three elevated platforms with the chest directly suspended over a load cell anchored into the concrete floor of the lab (iLoad Pro, Loadstar Sensors, Fremont CA). The load cell had a capacity of greater than 5000 N and a listed accuracy of 0.25 % for the full scale of measurement. The participants were placed in a push-up style position, with the hands at 150 % of biacromial width, and the elbows at 90° of extension (measured via a goniometer). A thick, non-elastic strap was run over one shoulder and under the opposite shoulder and connected with metal rings to a chain that was tethered to the load cell.

The participants were instructed to keep their backs flat, and push with their hands maximally until told to stop by the researcher. Prior to data capture the load cell was tared to ensure the weight of the load cell and apparatus were accounted for. The researcher started data collection and verbally instructed the participant to "push as hard as possible". The participants were verbally encouraged during data collection, which was terminated when the force production declined by 50 N from the peak value registered. The load cell was set to capture data at maximum rate (150Hz) and the data was exported and analyzed in JMP 11.0 (SAS Institute Inc, Cary NC). Peak force values were isolated from the data and used for subsequent analysis. The test was performed three times with 5 min rest between assessments. The validity and reliability of this test have been reported in the literature [14].

J Int Soc Sports Nutr — J Int Soc Sports Nutr — J Int Soc Sports Nutr — J Int Soc Sports Nutr — J Int Soc Sp

The effect of 6 days of alpha glycerylphosphorylcholine on isometric strength

### Statistical analysis

Reliability was assessed for the isometric tests via Intra Class Correlation Coefficients (ICC). Repeated measures Ancovas were used to examine acute (baseline and 1 h post) and chronic (baseline and day 6) changes in performance between treatments. Order of administration (Placebo first, A-GPC first) was entered into the model as a covariate. G*Power software [15] was used to determine effect size (Cohen's d), all other analyses were performed using a modern statistical software package (JMP, version 11.0 SAS Institute Inc., Cary, NC). Magnitude based inferences were calculated to assist with interpretation of results [16]. The use of magnitude based inference is an attempt to expand the interpretation of findings to include harmful, trivial and beneficial as interpretations, rather than just significant, non-significant [17]. This interpretations in not without controversy [18], as such the authors have chosen to include it alongside a more traditional statistical approach.

## Results

### Reliability of isometric tests

The isometric tests demonstrated reliability when the triplicate measurements were examined via ICC (range: 0.969–0.984). Measurements were not different at any time points ($p > 0.05$). Therefore in subsequent analysis the peak value from the set of three measures was used.

### Treatment effects—acute

Repeated measures Anova did not reveal any main effects (F = 0.003, $p = 0.9584$) nor interaction effects of treatment*time (F = 0.114, $p = 0.738$) for IMTP performance 1 h after the initial dose of A-GPC or Placebo. Similar results were revealed when UBIST performance was analyzed.

### Treatment effects—chronic

Repeated measures Anova revealed a significant interaction effect for treatment (A-GPC vs Placebo) by time (baseline, day 6) for IMTP peak performance (F = 3.12, $p = 0.04$; change from baseline A-GPC: 98.8 ± 236.9 N vs Placebo: −39.0 ± 170.9 N, ES = 0.961). See Fig. 2.



**Fig 2**

Mean change in Isometric Mid Thigh Pull Peak force after 6 days of supplementation with A-GPC. Error bars represent +/− 1 SEM

For the upper body test the A-GPC treatment trended towards greater change from baseline force production (A-GPC: 50.9 ± 167.2 N Placebo: −14.9 ± 114.9 N) but the interaction effect of treatment by time failed to obtain statistical significance (F = 1.36, $p = 0.127$). However, this data (see Fig. 3) demonstrated a large effect size (ES = 0.714). This suggests that the variability of the subject's upper body strength limited the statistical power, however, it if likely that a real effect exists in this data. Magnitude based inferences suggest that the A-GPC was 68.3 % likely beneficial for increasing upper body isometric force and 86.5 % likely beneficial for increasing lower body isometric force production.

7/20/2021    Case 8:20-cv-02971-WFJ-TGW   Document 139-4   Filed 02/10/22   Page 281 of 343 PageID
5572
The effect of 6 days of alpha glycerylphosphorylcholine on isometric strength



Fig 3

Mean change in Upperbody Isometric Test force after 6 days of supplementation with A-GPC. Error bars represent +/− 1 SEM

## Discussion

The results of this study support the use of A-GPC to enhance strength, particularly in the lower body after 6 days of administration of a 600 mg dose. The literature does not contain controlled experimental data regarding the effects of A-GPC on aspects of human performance directly related to isometric strength, and thus this study represents a first step in the evaluation of this product for such use. The literature does contain some evidence that choline itself is important to consider in regard to endurance performance [19, 20]. The current literature does contain some information about A-GPC and performance measurements. Jagim et al. [21] reported that a multi-ingredient supplement that contained A-GPC enhanced mean power during a maximal effort sprint test on a non-motorized treadmill but did not produce any changes in counter movement jumping performance peak or mean power. Parker et al. [22] reported acute supplementation with 200 mg or 400 mg of A-GPC did not statistically enhance performance, thought the authors did note a non-significant trend in vertical jump peak power. Acute supplementation with 600 mg of A-GPC has been shown to augment bench press power in a small sample of men with 2 years of training experience [23]. This study is similar in finding to the present investigation in dose of A-GPC administered (600 mg) and suggests enhancements in performance. These previously reported studies on A-GPC vary greatly in design, measurements and administrations. The lack of consistency of doses (200–600 mg) and time of administration (30–90 min prior to activity) may explain the lack of consistent findings. Given the present evidence in the literature, further studies will be needed to confirm the results reported from this experiment, the data represent a promising start and suggest alternative uses for A-GPC.

The potential mechanism by which A-GPC could confer enhanced strength and power performance involves increased bio-available choline, which may result in augmented acetylcholine synthesis in neurons. A-GPC has been shown to augment acetylcholine levels in CNS neurons [6]. Evidence suggests that when administered intramuscularly A-GPC can increase plasma choline levels [24]. A-GPC has also been shown to increase growth hormone secretion though the action of acetylcholine stimulated catecholamine release [25]. This increase in cholinergic tone and associated increased growth hormone release was also reported in old and young subjects after administration of growth hormone releasing hormone in conjunction with A-GPC [26]. In the present investigation it is unlikely a moderate increase in growth hormone over the course of 7 days would have impacted maximum strength although this evidence suggests that longer chronic studies of A-GPC may be warranted as chronic elevations in growth hormone could potentially further augment performance.

While the present study presents positive preliminary findings for A-GPC augmenting strength, it is not without limitation. The present investigation is limited by sample size. The study will need to be replicated with larger study populations and alternative measures of human performance, likely those that have the capacity to measure power not just peak force. Additionally, different does of A-GPC need to be explored to determine any potential dose-response, or lower limit for meaningful effect. We suggest that in vitro studies may also be warranted to demonstrate that A-GPC has the potential to augment neurotransmitter levels in motor neurons. These studies can help to clarify the timing of A-GPC administration, which may in turn result in studies with a more targeted and informed dosing scheme.

## Conclusions

The results of the study suggest that A-GPC is effective at increasing lower body force production after 6 days of supplementation. A similar trend was noted in upper body isometric strength, however; this failed to attain statistical significance. Given that in many sports it is understood that a very small change in performance, often times less than 2 %, can significantly affect outcomes it is important to note that the 6 days of A-GPC resulted in greater than a 3 % increase in lower body isometric strength. Sport performance coaches can consider adding A-GPC to the diet of speed and power athletes to potentially enhance muscle performance.

## Acknowledgments

The authors would like to thank Chemi Nutra, Austin, TX USA for funding this research.

## Abbreviations

| A-GPC | Alpha glycerylphosphrylcholine |
| IMTP | Isometric mid thigh pull |
| UBIST | Upper body isometric test |

## Footnotes

**Competing interests**

The authors declare they have no competing financial interests. No person employed by or affiliated with Chemi Nutra had any role in the design of the study, interpretation of the data or development of the manuscript.

**Authors' contributions**

DB contributed to study design, data collection, data analysis and manuscript development and editing. NRL contributed to data collection, data analysis and manuscript editing. BC contributed to study design and manuscript editing.

## References

1. Paul DJ, Nassis GP. Testing strength and power in soccer players: the application of conventional and traditional methods of assessment. *J Strength Cond Res.* 2015;**29**(6):1748–1758. doi: 10.1519/JSC.0000000000000807. [PubMed] [CrossRef] [Google Scholar]

2. Judge LW, Bellar D, McAtee G, Judge M. Predictors of personal best performance in the hammer throw for U.S. Collegiate Throwers. *Int J Perform Anal Sport.* 2010;**10**(1):54–65. [Google Scholar]

3. Judge LW, Bellar D, Turk M, Judge M, Gilreath E, Smith J. Relationship of squat one repetition maximum to weight throw performance among elite and collegiate athletes. *Int J Perform Anal Sport.* 2011;**11**(2):209–219. [Google Scholar]

4. Judge LW, Moreau B, Burke JR. Neural adaptations with sport-specific training in highly skilled athletes. *J Sports Sci.* 2003;**21**(5):419–427. doi: 10.1080/0264041031000071173. [PubMed] [CrossRef] [Google Scholar]

5. Pessini M, Martin A, Maffiuletti NA. Central versus peripheral adaptations following eccentric resistance exercise. *Int J Sports Med.* 2002;**23**(8):567–574. doi: 10.1055/s-2002-35558. [PubMed] [CrossRef] [Google Scholar]

6. Traini E, Bramanti V, Amenta F. Choline alphoscerate (alpha-glyceryl-phosphoryl-choline) and old choline-containing phospholipid with a still interesting profile as cognition enhancing agent. *Curr Alzheimer Res.* 2013;**10**(11):1070–1079. doi: 10.2174/15672050113106660173. [PubMed] [CrossRef] [Google Scholar]

7. Hoffman JR, Ratamess NA, Gonzalez A, Beller NA, Hoffman MW, Olsen M, Purpura M, Jäger R. The effects of acute and prolonged CRAM supplementation on reaction time and subjective measures of focus and alertness in healthy college student. *J Int Soc Sport Nutr.* 2010;**7**:39. doi: 10.1186/1550-2783-7-39. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

8. Brownawell AM, Carmines EL, Montesano F. Safety assessment of AGPC as a food ingredient. *Food Chem Toxicol.* 2011;**49**(6):1303–15. doi: 10.1016/j.fct.2011.03.012. [PubMed] [CrossRef] [Google Scholar]

9. Parnetti L, Mignini F, Tomassoni D, Traini E, Amenta F. Cholinergic precursors in the treatment of cognitive impairment of vascular origin: Ineffective or need for re-evaluation? *J Neuro Sci.* 2007;**257**:264–269. doi: 10.1016/j.jns.2007.01.043. [PubMed] [CrossRef] [Google Scholar]

10. Zeisel SH. A brief history of choline. *Ann Nutr Metab.* 2012;**61**(3):254–8. doi: 10.1159/000343120. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

11. Jäger R, Purpura M, Kingsley M. Phospholipids and sport performance. *J Int Soc Sports Nutr.* 2007;**4**:5. doi: 10.1186/1550-2783-4-5. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

12. Ryan EJ, Kim CH, Muller MD, Bellar DM, Barkley JE, Bliss MV, Jankowski-Wilkinson A, Russell M, Otterstetter R, Macander D, Glickman EL, Kamimori GH. Low-dose caffeine administered in chewing gum does not enhance cycling to exhaustion. *J Strength Cond Res.* 2012;**26**(4):1154–1161. doi: 10.1519/JSC.0b013e31822e008b. [PubMed] [Google Scholar]

13. Beckham G, Mizuguchi S, Carter C, Sato K, Ramsey M, Lamont H, Horsby G, Haff G, Stone M. Relationship of isometric mid-thigh pull variables to weightlifting performance. *J Sports Med Phys Fitness.* 2010;**35**:573–581. [PubMed] [Google Scholar]

14. Bellar D, Marcus L, Judge LW. Validation and Reliability of a novel test of upper body isometric strength. *J Hum Kinet.* 2015;**47**:185–195. [PMC free article] [PubMed] [Google Scholar]

15. Faul F, Erdfelder E, Lang A-G, Buchner A. G*Power 3: A flexible statistical power analysis program for the social, behavioral, and biomedical sciences. *Behavior Research Methods.* 2007;**39**:175–191. doi: 10.3758/BF03193146. [PubMed] [CrossRef] [Google Scholar]

16. Batterham AM, Hopkins WG. Making meaningful inferences about magnitudes. *Int J Sports Physiol Perform.* 2006;**1**(1):50–57. [PubMed] [Google Scholar]

17. Hopkins WG, Marshall SW, Batterham AM, Hanin J. Progressive statistics for studies in sports medicine and exercise science. *Med Sci Sports Exerc.* 2009;**41**:3–12. doi: 10.1249/MSS.0b013e31818cb278. [PubMed] [CrossRef] [Google Scholar]

18. Welsh AH, Knight EJ. "Magnitude-based inference": a statistical review. *Med Sci Sports Exerc.* 2015;**47**:874–884. doi: 10.1249/MSS.0000000000000451. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

19. Conlay LA, Wurtman RJ, Blusztajn JK, Coviella ILG, Maher TJ, Evoniuk GE. Decreased plasma choline concentrations in marathon runners. *N Engl J Med.* 1986;**315**:982. [PubMed] [Google Scholar]

20. Penry JT, Manore MM. Choline: an important micronutrient for maximal endurance-exercise performance? *Int J Sport Nutr Exerc Metab.* 2008;**18**:191–203. [PubMed] [Google Scholar]

21. Jajim AR, Wright G, Schultz K, Antoine CS, Jones MT, Oliver JM. Effects of acute ingestion of a mult-ingredient pre-workout supplement on lower body power and anaerobic sprint performance. *J Int Soc Sport Nutr.* 2015;**12**(Suppl 1):49. [Google Scholar]

22. Parker AG, Byars A, Purpura M, Jäger R. The effect of alpha-glycerylphosphorylcholine, caffeine or placebo on markers of mood, cognitive function, power, speed and agility. *J Int Soc Sport Nutr.* 2015;**12**(Suppl 1):41. [Google Scholar]

23. Ziegenfuss T, Landis J, Hofheins J. Acute supplementation with alpha-glycerylphosphorylcholine augments growth hormone response to, and peak force production during, resistance exercise. *J Int Soc Sport Nutr.* 2008;**5**(Suppl 1):15. doi: 10.1186/1550-2783-5-S1-P15. [CrossRef] [Google Scholar]

24. Gatti G, Barzaghi N, Acuto G, Abbiati G, Fossati T, Perucca E. A comparative study of free plasma choline levels following intramuscular administration of L-alpha-glycerylphosphorylcholine and citicoline in normal volunteers. *Int J Clin Pharmacol Ther Toxicol.* 1992;**30**(9):331–335. [PubMed] [Google Scholar]

25. Kawamura T, Okubo T, Sato K, Fujita S, Goto K, Hamaoka T, Iemitsu M. Glycerophosphocholine enhances growth hormone secretion and fat oxidation in young adults. *Nutrition.* 2012;**28**:1122–1126. doi: 10.1016/j.nut.2012.02.011. [PubMed] [CrossRef] [Google Scholar]

J Int Soc Sport

26. Ceda GP, Ceresini G, Denti L, Marzani G, Piovani G, Banchini A, Tarditi E, Valenti G. alpha-Glycerylphosphorylcholine administration increases the GH responses to GHRP of young and elderly subjects. *Horm Metab Res*. 1992;**24**(3):119–121. doi: 10.1055/s-2007-1003272. [PubMed] [CrossRef] [Google Scholar]

---

Articles from Journal of the International Society of Sports Nutrition are provided here courtesy of **BioMed Central**



The Treigning Lab

HOME (/)
ABOUT
WHAT WE DO (/WHAT-WE-DO)
FOUNDERS (/FOUNDERS)
TEAM (/TEAM)
ASSOCIATES (/PARTNERS-1)
PODCAST (/PODCAST)
PROGRAMS
YOUTH AND HIGH SCHOOL WRESTLING (/YOUTHWRESTLING)
SMALL GROUP AND PRIVATE INSTRUCTION (/UNLIMITEDMEMBERSHIP)
TEAM REIGN MMA (/TEAM-REIGN-MMA)
SERVICES
NUTRITION (/NUTRITION)
METABOLIC TESTING (/NEW-PAGE-46)
RECOVERY- O2 HEALTH LAB (/RECOVERY-O2-HEALTH-LAB)
RECOVERY FITNESS APP (HTTPS://TREIGNINGLAB.FIT/DOWNLOAD/)
EVENTS
CALENDAR (/CALENDAR)
REGISTRATION (/REGISTRATION)
STORE (/STORE)
CONTACT (/CONTACT-1)





(https://www.treigninglab.com/registration)

Olympic, World and National Champs are SO Cal bound!

Kyle Snyder, David Taylor, Thomas Gilman, Bo Nickal, and Anthony Cassar in one place at the same time!

This clinic will be held in 3 sessions - be sure to register into one today - learn from the BEST of the BEST and meet 4 of our

2021 USA Wrestling Olympians! This is an opportunity you won't want to miss!

REGISTER TODAY!

(https://www.treigninglab.com/store/power-pack)

We call it a POWER PACK - because it is. Packed with all the Amino Acids your body needs to build muscle, endurance, and just overall wellness, tap into your POWER today!

Available in our store ... BUY TODAY!!

All of our programs are not yet opened due to the 2021 COVID-19 closures in Orange County. We will update on our social media sites and here as we re-open. We are planning to run small group programs as well as private training sessions to avoid any large

group training and comply with restrictions set forth by state agencies.

If you have any questions or would like to be placed on a waiting list to be contacted when we have openings, please click on our contact tab to submit info.

## JOIN THE TREIGNING LAB FAMILY TODAY!

Home to the best prepared Athletes in History and all people striving to become the best that they can be.

LEARN NEW SKILLS OR COME IN TO JOIN YOUR FAVORITE SMALL GROUP!

**The Treigning Lab offers MMA small group training, private wrestling, striking, and juijitzu sessions.**

ALL levels (14+) Beginners- Experienced

**I'M READY!
(HTTPS://WWW.TREIGNINGLAB.COM/UNLIMITEDMEMBERSHIP)**

()

*"GIVING YOUR CHILD A SKILL IS BETTER THAN GIVING THEM ONE THOUSAND PIECES OF*

The Treigning Lab

**COMPREHENSIVE YOUTH MMA**
WRESTLING - JIU JITSU - STRIKING

*GOLD" -CHINESE PROVERB*

## YOUTH WRESTLING

AGES 5+ BEGIINNERS- ADVANCED

**SIGN US UP! (HTTPS://WWW.TREIGNINGLAB.COM/REIGNWRESTLING)**

## TEAM REIGN MMA

Professional & Ameteur Mixed Martial Artists. This is a private class designed with the MMA athlete in mind. Come join the family!

**Now building Team Reign with Head Coach Mark Munoz!

**JOIN TEAM REIGN (HTTPS://WWW.TREIGNINGLAB.COM/TEAM-REIGN-MMA)**

## The Treigning Lab is pleased to work with **O2 Health Lab** to provide our members and community with services to compliment your training and wellness!

Here you will find Hyperbaric Oxygen Therapy, Cryotherapy, Infrared Saunas, Recovery Boots, Avecen, PEMF, and more.

**READ MORE (HTTPS://WWW.TREIGNINGLAB.COM/RECOVERY-O2-HEALTH-LAB)**

# O2 HEALTH LAB

Injury & Surgery Recovery. Beauty & Anti Aging. Sports Performance.

## The Treigning Lab's Former & Current Athletes

### David Taylor, Wrestling

4x NCAA All-American

4x Big 10 Champion

2x NCAA Champion

2x Hodge Trophy Winner

2017 US Open Champion and Outstanding Wrestler

2018 Yarygin Tournament Champion

2x Hodge Trophy Winner

2018 USA World Team Member

THE TREIGNING LAB, 1025B ORTEGA WAY, PLACENTIA, CA, 92870, UNITED

STATES  (657) 220-4511   THETREIGNINGLAB@YAHOO.COM (MAILTO:THETREIGNINGLAB@YAHOO.COM)

(http:    (http:    (http:

# SUBSCRIBE

Sign up with your email address to receive news and updates.

| Email Address |          SIGN UP

We respect your privacy.

Copyright © 2013-2021 The Treigning Lab. All rights reserved.



Search …  |  0  |  🔒 Log In / Register

# VPX

Home / Shop / Brands / VPX

**Product Categories**

Accessories

Apparel

Brands
> Bang
> Meltdown
> Redline
> VPX
>> Multivitamin
>> VPX Weight Loss

Drinks

Gift Card

Goals

July Sale

Ketonz

Military

Pristine Protein

Stacks

Supplements

Workout

## VPX Nutrition

View our line of VPX Sports products from 100% whey protein powder, energy drinks, weight loss, pre-workout, protein bars and more. Shop All Product Bands. BANG. MELTDOWN. BANG. REDLINE. Take a look at each VPX nutrition facts sheet on every product. Every VPX Sports product displays a supplement or nutrition fact sheet.

Showing 1–12 of 13 results

Default sorting ▾



### Noo Fuzion™ | Potent Mind & Muscle Fuel!™

**$34.99**

Select options



### 8Keto™ Zero Carb®

**$24.99**

Add to cart



### Cell Swell®

**$34.99**

Select options





**Sale!**

### Medivin® Multivitamin –





Giant Gains®

**$49.99**

Medivin® Multivitamin 30 Packets

~~$29.99~~ **$22.49**

Meltdown® Liquid Caps

**$19.99**

Add to cart

Add to cart

Add to cart







MPS-X10™ — Muscle Protein Synthesizer™

**$37.99**

Pristine Protein 100% WPC

**$34.99**

PROPLEX® Protein – 4.4lb

**$69.99**

Select options

Select options

Select options







Shotgun® 5X™

Synthesize®

Zero Carb® Pristine Protein®



**$35.99**

Select options

**$44.99**

Select options

**$44.99 – $69.99**

Select options

(1) (2) (→)

**Company**

Shop
Articles
About
Careers
FAQs
Contact

**Follow Us**

   

**Account**

My Account
Returns
Cart

**Policies**

Terms and Conditions
Privacy Policy
Shipping Policy
Giveaways Policy
Bang® Points Policy



**THE BANG® ANTI-DIET**

Sign up for early notifications for the launch of Jack Owoc's New Book.

**First Name ***  **Last Name ***

**Email Address ***

Send

Copyright © 2021 Bang Energy | Bang Energy

All Rights Reserved Bang Energy



# Warning Letters Related to Food, Beverages, and Dietary Supplements

When FDA finds that a manufacturer has significantly violated FDA regulations, FDA notifies the manufacturer. This notification is often in the form of a Warning Letter.

**Search for Warning Letters:** Recently posted Warning Letters and an archive dating back to 1996 (/warning-letters-1)

---

## Additional Resources

- FDA Warns Jimmy John's and Sprouts Unlimited After Outbreak (February 25, 2020) (/food/cfsan-constituent-updates/fda-warns-jimmy-johns-and-sprouts-unlimited-after-outbreak)

- Front-of-Package Labeling Initiative Warning Letters (http://wayback.archive-it.org/7993/20170406011343/https://www.fda.gov/Food/ComplianceEnforcement/WarningLetters/ucm202859.htm) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

- Alcoholic Beverages
  During the press call on November 13, 2009 FDA provided 3 examples of alcoholic beverages to which caffeine is added. FDA has posted the letters associated with these products on its web site. The inclusion of these examples is not intended to suggest that these products differ in significance from the other beverages identified in the nearly 30 letters FDA has sent to manufacturers as part of its efforts on this issue.

- Caffeinated Alcoholic Beverages Sample Letter #1 -November 13, 2009 (http://wayback.archive-it.org/7993/20170406024538/https://www.fda.gov/Food/ComplianceEnforcement/WarningLetters/ucm190387.htm) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

- Caffeinated Alcoholic Beverages Sample Letter #2 -November 13, 2009 (http://wayback.archive-it.org/7993/20170406024540/https://www.fda.gov/Food/ComplianceEnforcement/WarningLetters/ucm190389.htm) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

- Caffeinated Alcoholic Beverages Sample Letter #3 -November 13, 2009 (http://wayback.archive-it.org/7993/20170406024543/https://www.fda.gov/Food/ComplianceEnforcement/WarningLetters/ucm190391.htm) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

- Questions and Answers: BOOST Kid Essentials Nutritionally Complete Drink (December 3, 2009) (http://wayback.archive-it.org/7993/20170406165240/https://www.fda.gov/Food/ComplianceEnforcement/WarningLetters/ucm195525.htm) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

- List of Firms Receiving Warning Letters for Marketing Unproven Dietary Supplements for Diabetes with Illegal Drug Claims (October 19, 2006) (http://wayback.archive-it.org/7993/20170406024545/https://www.fda.gov/Food/ComplianceEnforcement/WarningLetters/ucm081813.htm) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

- List of Firms Receiving Warning Letters Regarding Cherry and other Fruit-Based Products with Disease Claims in Labeling (October 17, 2005) (http://wayback.archive-it.org/7993/20170406024549/https://www.fda.gov/Food/ComplianceEnforcement/WarningLetters/ucm081724.htm) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

- List of Distributors and Manufacturers Receiving Warning or Advisory Letters for Unsubstantiated Weight Loss Claims (November 4, 2004) (http://wayback.archive-it.org/7993/20170406024556/https://www.fda.gov/Food/ComplianceEnforcement/WarningLetters/ucm189675.htm) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

- List of Distributors Receiving Warning Letters for Weight Loss Products (April 1, 2004) (http://wayback.archive-it.org/7993/20170406024607/https://www.fda.gov/Food/ComplianceEnforcement/WarningLetters/ucm188136.htm) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

- Questions and Answers: Androstenedione - *HHS crackdown on companies that manufacture, market and distribute products containing androstenedione* (March 11, 2004) (http://wayback.archive-it.org/7993/20170406024609/https://www.fda.gov/Food/ComplianceEnforcement/ucm081788.htm) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

- Companies Marketing Ephedra Dietary Supplements that Received FDA's Letter (December 30, 2003) (http://wayback.archive-it.org/7993/20170406024611/https://www.fda.gov/Food/ComplianceEnforcement/WarningLetters/ucm081856.htm) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

PRODUCTS ▾    GIFT CERTIFICATES    BLOG    AMBASSADORS    **MRI** PERFORMANCE    MY ACCOUNT ▾    NEWSLETTER    ABOUT    CONTACT US    🔍    🛒

**FREE STANDARD SHIPPING ON ORDERS OVER $50**

HOME  /  BLOG  /  WHAT IS ALPHASIZE AND WHY IS IT A BENEFICIAL SUPPLEMENT?



## WHAT IS ALPHASIZE AND WHY IS IT A BENEFICIAL SUPPLEMENT?

Posted by MRI Performance on Mar 4th 2020

AlphaSize® (Alpha-Glyceryl Phosphoryl Choline (A-GPC) is an advanced choline compound that can enhance brain metabolism to improve focus, memory, cognitive response, and sports performance. This unique compound works effectively because it efficiently reaches the brain.

Choline is an organic, water-soluble compound that is an essential nutrient.

*Choline is often grouped with the vitamin B complex due to its similarities. In fact, this nutrient affects a number of vital bodily functions. It impacts liver function, healthy brain development, muscle movement, your nervous system, and metabolism. Therefore, adequate amounts are needed for optimal health.* - Healthline.Com

In addition, choline enhances the secretion of human growth hormone (HGH) which aids in regulating basal metabolism.

Research demonstrates the potential benefit of including the AlphaSize compound in pre-

**SAVE 25%**
with code
**BLOG25**

🏋 BUY NOW



SHOP PRODUCTS                                                                    +

GIFT CERTIFICATES

ABOUT US

BLOG

AMBASSADORS

CONTACT US

MY ACCOUNT                                                                        +

alpha gpc

AlphaSize® is a compound branded and manufactured by CHEMI Nutra.

Alpha-Glyceryl Phosphoryl Choline (A-GPC) helps the brain rapidly absorb choline to actively increase cognitive performance, memory, and mental acuity.

AlphaSize® A-GPC is safe, legal, full FDA GRAS, 100% natural (not synthetic), water-soluble, tasteless, odorless, extremely stable and nonreactive, and IGEN™ Non-GMO Certified.

Because of its compounded form, AlphaSize A-GPC is a better choline donor than other sources because it has higher bioavailability rates. This compound is naturally present in the brain and can increase acetylcholine levels. Therefore, it is also considered a brain nutrient.

## HOW DOES ALPHASIZE A-GPC WORK?

AlphaSize A-GPC crosses the blood-brain barrier to increase choline levels directly in the brain to provide more resources to produce acetylcholine. After entering the body it provides a highly absorbable form of choline proven to increase free plasma choline more quickly than other choline sources. The result triggers improved cognitive functioning quickly.

Choline is an essential nutrient for phospholipids in the body and goes through a process called acetylation. Acetylation converts choline into acetylcholine, which is a neurotransmitter in the central nervous system responsible for neuron communication.

During intense exercise, stress, or physical activity low levels of choline can directly impact muscle cell communication. AlphaSize can help increase choline within your body so that your physical performance is at optimal output.

## ALPHASIZE BENEFITS AND USES

AlphaSize® A-GPC is considered to be an effective "GH secretagogue", meaning, through sophisticated metabolic processes, choline increases the secretion of human growth hormone (HGH), a master hormone that in part regulates basal metabolism and body composition. Therefore, AlphaSize has the potential to be one of the most significant agents to help maintain healthy body composition, retain lean muscle mass and strength, reduce fat mass, and help maintain youthful vigor.



## ALPHASIZE A-GPC BENEFITS CAN HELP:

•Improve key brain functions, including memory, concentration, learning, recall, and focus

•Promote the formation of acetylcholine (AC), a vital neurotransmitter compound involved in all key brain functions and mental sharpness

•Help speed cell to cell communication through neuromuscular optimization, providing enhanced muscular power output and agility for active and athletic individuals

SHOP PRODUCTS                                                                                    +

GIFT CERTIFICATES

ABOUT US

BLOG

AMBASSADORS

CONTACT US

MY ACCOUNT                                                                                       +

and focused longer while working out.

The AlphaSize® Alpha-Glyceryl Phosphoryl Choline (A-GPC) has particular application in mental performance, anti-aging, and sports supplements and nutrition.

The MRI Performance Black Powder formula is all about helping you build, focus on, and endure your next workout. We chose to include AlphaSize in the Lock & Load Focus matrix within the Black Powder pre-workout because we are committed to quality products with superior ingredients. **Black Powder Pre-Workout** has a 100% transparent label with no fillers or proprietary blends.



To view the amount of AlphaSize included in our pre-workout and the fully transparent supplement label **Click HERE!**



#alphasize   #mri performance   #black powder   #alpha gpc   #alphasize alpha gcp   #alphasize pre workout   #alphasize benefits

**MRI**
**PERFORMANCE**

**COMPANY**
About Us
Blog
Affiliate
Contact Us
(888) 922-5567
Shipping & Returns

**ACCOUNT**
Sign In | Sign Up
Order Status

**CONNECT**

© 2021 MRI Performance | Terms & Conditions | Privacy Policy

SAVE 25%
with code
BLOG25

BUY NOW

STACK3D

**Dan Bilzerian's Ignite reveals its ZRO performance drink debuting at the Arnold**

Feb 13th, 2020



When Dan Bilzerian's Ignite announced the opening of a beverages division and introduced its alkaline water, it left open the possibility for other types of drinks down the line. This week, the company has confirmed the kind of beverage we thought we might be seeing from Bilzerian and Ignite, with a carbonated performance drink.

Ignite has previewed its upcoming ZRO beverage that's formulated with ingredients to provide a more comprehensive experience than your typical energy drink. The formula packed into the product aims to help with mental focus, mood enhancement, vitality, performance, and of course, energy thanks to its inclusion of 250mg of caffeine per can.

The caffeine in Ignite ZRO drink actually comes from two sources, with 220mg from regular caffeine anhydrous and 30mg from AMATEA, which is a patented form of organic guayusa. Alongside that solid hit of caffeine, the product also includes the focus and cognition ingredients AlphaSize alpha-GPC and tyrosine at 300mg and 250mg, respectively.

Ignite is going to be debuting its ZRO functional beverage in just a few weeks at this year's Arnold Expo in Columbus, Ohio, on the 6th of March through to the 8th. Dan Bilzerian's Ignite ZRO energy drink is launching in a traditional 16oz can with four flavors to choose from in Peach Crisp, Purely Passion, a sour sounding Tartbreaker, and Bluerasp Bilz.

In this post: ignite, zro, energy drink, alpha-gpc, alphasize, amatea, caffeine, tyrosine





19 hours ago



Clash Of The Cans round one goes live with over 60 energy drinks in the running
22 hours ago

Bang's Sweet Ice Tea Series gets two new tastes in Wyldin' Watermelon and Blackberry Blast
1 day ago

© 2021 Stack3d®

Contact   FAQ   Disclaimer

# MARVIN A. HEUER, M.D. F.A.A.F.P.

6001 Vineland Road Suite 104
Orlando, Florida 32819
Phone: 407-574-5650
Email: mheuer@heuermd.com

---

## CHIEF EXECUTIVE OFFICER ~ CHIEF SCIENCE OFFICER ~ MEDICAL PHYSICIAN

Internationally Accomplished Medical Research Physician and Executive.  More than 30 years' experience in international and domestic clinical research, pharmaceutical and nutraceutical development.  Extensive experience and interaction with FDA and FTC in pharmaceutical and nutraceutical industries. Along with the practice of medicine has served as Chief Science Officer for Iovate Health Sciences, VP of Clinical Research, IntegraMed America, VP & Director Worldwide of R&D, SmithKline Beecham Pharmaceuticals (now GlaxoSmithKline), VP of R&D, Wallace Laboratories (now Meda AB), and VP & Medical Director Worldwide, Ayerst Laboratories (now Pfizer).

Expert Consultant providing support for litigation involving FTC, FDA, product liability, class action and related.  Certified Expert in FDA regulations.  Certified Expert as a chemist.

- *Clinical Trials / R&D*
- *Expert Consultant*
- *FDA / FTC / Regulatory Compliance*
- *Litigation Support*

- *Product Formulation and Development*
- *Expert Report Technical Writing*
- *Preventative Medicine*
- *Public and Media Relations*

**Medical Licenses**     Florida ▪ Minnesota

**DOT** ▪ NRCME DOT

**MD Degree** ▪  University of Minnesota Medical School 1973,  Board Certified Family Practice Oct. 30, 1977-Jul 07, 1983; Jul 08, 1983 – Dec 31, 1990; Jul 08, 1994- Dec31, 2001; Recertified x 2, current on all CME requirements for State medical licensure in all States listed.  Presently Board eligible in Family Medicine, Sports Medicine, Geriatric Medicine if elect to re-enter.

**Bachelor of Science** ▪  Biology / Chemistry ▪  Mankato State University ▪  Graduated Cum Laude 1969

Heuer M.D. Research, Inc.                                                    June 2002 to Present
Orlando, FL
***Chief Executive Officer***
Founder and Chief Executive
- Founder of a private SMO clinical research organization.
- Principal Investigator for ongoing pharmaceutical clinical research trials.
- Consultant to nutraceutical / pharmaceutical / cosmetic industries.
- Nutraceutical / cosmetic research and product development company, formulation, studies, author
- Nutraceutical / cosmetic product testing and clinical trial development.
- GRAS / NDI dossiers and submission.
- FDA / FTC, regulatory reviews and representation.


HMD Consulting, LLC                                                    November 2017 to Present
Orlando, FL
***Executive Director***
Expert Witness services
- Certified Expert in FDA Regulations
- Certified Expert as a Chemist
- Technical writing and preparation of expert witness reports
- Expert witness for depositions and trial testimony
- Counsel support for litigation involving FTC, FDA, product liability, class action and related
- Expert regulatory consultant for pharmaceutical, dietary supplement, food and cosmetic industries


Walt Disney World Resorts                                                    August 2014 to Present
Orlando, FL
***Physician***
Occupational Health and Safety Physician
- Perform DOT commercial driver medical examinations.
- Assess employees with medical illnesses and emergencies and take appropriate action per established protocol.
- Maintain HIPAA and Occupational Safety and Health Administration (OSHA) compliance standards.
- Administer the company's Drug-Free Workplace Program.


BlueOcean NutraSciences, Inc. (TSX-V: BOC)                          February 2017 to November 2017
Toronto, ON
***Chief Executive Officer***
- Develop all aspects of BOC's business plan and advance the company's vision to execute on a global basis
- Support the Board of Directors in monitoring and evaluating BOC's relevancy to various stakeholders, its effectiveness and results
- Support the Board in high-quality investing decisions to advance the business through M&As

- Develop strategic partnerships and ensure overall revenue and profit goals are achieved and shareholder value is delivered
- Oversee legal and regulatory compliance with relevant laws and regulations
- Oversee fiscal activities of the organization, devise solutions or improvements
- Manage marketing strategies to meet goals, continue current and develop new PR

Iovate Health Sciences Inc.                                                        February 2004 to December 2008
Oakville, ON
*Chief Scientific Officer*
Senior Operating Executive with full strategic planning and product development responsibility.
- Formulated over 70 new nutraceutical and health products increasing annual revenues from $50 million to over $500 million in under five years.
- Fostered small inexperienced R&D into highly productive unit generating extensive novel IP and finished products totaling over 200 applied and approved patents.
- Transformed young bodybuilding supplement company into the industry leader in nutraceuticals and homeopathic and OTC development.
- Anticipated external legislative, regulatory policy and political environments in short, mid, long term.
- Championed, structured and initiated first pharmacovigilance oversight in the nutraceutical industry.
- Liaison with FTC, FDA, Health Canada and other various regulatory agencies.
- Oversaw product manufacturing and quality control, monitor plant facilities domestically and abroad to ensure U.S. federal regulations are met and instructed on manufacturing processes.

Clin Sci International, Inc. (CRO)                                                     October 1998 to July 2003
Gainesville, FL
*Sole Owner / Chief Executive Officer*
- Founder of a private mini SMO clinical research and family practice organization / clinic.
- Consultant to several major pharmaceutical companies and regulatory agencies.
- Principal investigator on over 13 clinical trials in diverse therapeutic areas.

Florida Medical and Research Institute                                          September 1998 to May 2001
Gainesville, FL and Ocala, FL
 *President*
- Revived a failing clinical research organization increasing it from 6 studies to 21 studies.
- Transformed organization from severe financial peril to profitable position in less than three years.
- Conducted clinical trials Phases I through IV on up to 24 clinical research studies at a time.

IntegraMed America Women's Health Fertility and Family Medicine            March 1997 – August 1998
Gainesville, FL
*Vice President*

Women's Medical and Diagnostic Center                                      March 1997 – August 1998
Gainesville, FL and Ocala, FL
***Director of Family Practice and Clinical Research***

Heuer Associates                                                                          1991 - 1996
***President***
- Consultant to medical practitioners and researchers for developing and running clinical trials for pharmaceutical and device research, and IND and NDA submissions.
- Coordinator of plans, facilities and financing for important Phase I, II trials unit in Minneapolis / St. Paul area.

Medical Valley Biotechnology Westview Clinic, PA                 November 1991 – March 1997
West St. Paul, Minnesota
***Executive Consultant/Family Practice Physician***
- Managed medical care of the entire patient and family unit.
- Conducted research on devices and drugs in multi-center trials.

SmithKline Beecham Pharmaceuticals (now GlaxoSmithKline)     April 1989 – December 1991
King of Prussia, Pennsylvania
***Vice President & Director Worldwide Clinical Investigation, Therapeutic Unit***
***Research & Development Pharmaceuticals***
- Managed activities of clinical representatives worldwide in the formulation and execution of the overall product development plans.
- Cultivated corporate process and implemented necessary systems to allow rapid worldwide product development with an R&D budget of over $40 million.
- Supervised the safety of compounds with worldwide databases for Phases I, II, III, and IV.
- Fostered drug development skills and raised morale to 40 + direct reports.

Wallace Laboratories Division of Carter -Wallace, Inc.              September 1987 – March 1989
(now Midpoint Pharmaceuticals)
Cranbury, New Jersey
***Vice President Research & Development***
- Led the development of the new cardiovascular, pulmonary, analgesics, central nervous system and antibiotic compounds with staff of 200+ and a budget of $25 million.
- Directed all preclinical and clinical research, including bench chemistry and manufacturing.
- Revived the R&D organization with new talent infusion, project management controls, revised budgets, and state-of -the-art communication, database systems and equipment.

Ayerst Laboratories Division of American Home Products Corp.          July 1986 – September 1987
(now Wyeth Pharmaceuticals)
New York, New York
***Vice President Clinical Research Worldwide and Medical Director***
- Directed clinical programs of all drugs in development with staff of 200+ and a budget of $47 million.
- Implemented and managed worldwide systems for rapid development of Tolrestat and other drugs in diabetes, cardiovascular disease, and HRT.
- Launched major campaign to protect the Inderal franchise against generics.


SmithKline and French laboratories                                   1980 - 1986
Philadelphia, Pennsylvania
***Vice President & Director of Operations R&D Clinical Investigations Worldwide***
***Group Director R&D Clinical Investigations***
***Associate Director R&D Clinical Investigations***

- Managed Phase I, II, III drug development, IND and NDA submissions, worldwide safety and data network for all clinical trials and protocols.
- Successfully brought an arthritis drug to market.
- Developed and mentored staff who now occupy senior industry positions.


General Medicine and Surgery and OB                                  1974-1980
Park Rapids, Minnesota
Family Practice


## TEACHING APPOINTMENTS


University of Central Florida                                        2010 – Present
Orlando, Florida
***Adjunct Clinical Faculty***


University of Florida Department of Family Medicine                  1998 - 2004
Gainesville, Florida
***Adjunct Clinical Associate Professor***


University of Minnesota Department of Family Medicine                1992 - 2005
Minneapolis, Minnesota
***Clinical Associate Professor***

University of Iowa Physician Assistant Programs                    1993-1999
Iowa City, Iowa
***Assistant Professor/Preceptor***

Rutgers Biomedical and Health Sciences                            1984-1992
(University of Medicine and Dentistry of New Jersey)
Department of Family Medicine
Camden, New Jersey
***Clinical Associate Professor***

Cooper Medical Center Department of Family Medicine               1981-1992
Camden, New Jersey

University of Minnesota School of Nursing                         1977-1979
Minneapolis, Minnesota

## PATENTS AND PATENT APPLICATIONS

**Accelis**                          Compositions and Methods for Weight-loss and Weight-loss maintenance

**Adistat**                          Composition and method for weight loss

**Adistat**                          Composition and method for weight loss

**Allergy HP**                       Homeopathic Composition for Alleviating Allergy Symptoms

**Allergy MD**                       Composition and Method for Reducing Inflammation

**Anthocyanins**                     Nutritional Composition for Increasing Muscle Mass and Strength, Improving Athletic Performance and/or Recovery, and/or Reducing Body fat in an Individual

**Aplodan H Blocker**                Nutritional Composition for Promoting Muscle Performance and Acting as a Hydrogen (H+) Blocker

**BUGBITE MD**                       Oral composition for warding off insects

**Caplet with holes**                Solid Oral Dosage Form with Increased Surface Area

| | |
|---|---|
| **Capsule Shell** | Capsule Shell with Incorporated Active Agent |
| **CEE-Pro** | Supplemental dietary Composition for Increasing Muscle Size, Strength, Athletic Performance and/or Exercise Capacity |
| **Cell Tech RTD** | Dietary Supplement Having Improved Efficacy at Time of Consumption |
| **CellTech Hardcore** | Nutritional Composition and Method for Increasing Creatine Uptake and Retention in Skeletal Muscle, Increasing Muscle Mass and Strength, Increasing Exercise Capacity and for Aiding Recovery Following Exercise. |
| **Cholesterol MD** | Composition for improving blood cholesterol levels |
| **Cirsimarin** | Cirsimarin for lipolytic pathway signaling support |
| **Cold HP** | Composition for Treatment of Colds and Associated Symptoms |
| **Creatine Hydroxycitric Acid AKA Tricreatine HCA** | Creatine Hydroxycitric Acid Salts and Methods for Their Production and Use in Individuals |
| **Creatinol Aplodan** | Composition and Method for Increasing Lean Muscle Mass, Decreasing Muscle Loss, Increasing Muscle Strength and Improving Athletic Performance |
| **Creatinol Fatty Acid Ester** | Creatinol Fatty acid ester |
| **Cylaris** | Diet Supplement for Causing Weight Loss |
| **Diet Effervescent** | Method for enhancing delivery and uniformity of concentration of dietary ingredients |
| **Everslim** | Supplemental Dietary Compositions for Causing Rapid Weight Loss, Improving Day-Time Energy, Promoting Night-Time Relaxation and Sleep, Controlling Appetite, and/or Increasing Metabolism |
| **GAKIC Improve** | Supplemental Dietary Composition for Enhancing Muscle Performance and/or Recovery from Fatigue |
| **Gelcap Beads OTC** | Particles in a capsule |

| | |
|---|---|
| **Geranylgeranylacetone & Glutamine** | Compositions and methods for enhancing protein accretion in skeletal muscle |
| **Germ MD Immune** | Composition for Improving Immune System Health |
| **Germ MD Vitamin C** | Composition for Enhancing Immunity and Reducing Inflammation Related to Infections |
| **GLUT4** | Nutritional Composition for Enhancing Skeletal Muscle Mass, Increasing Muscle Fatigue Resistance and Recovery, Augmenting Muscle Glycogen Deposition Rate, Preventing Skeletal Muscle Protein Catabolism and/or Reducing Muscle Soreness and Inflammation |
| **Hammerhead** | Supplemental Dietary Composition Including Caffeine, Taurine and Ginseng<br>Supplemental Dietary Composition Including Caffeine, Taurine and Antioxidant |
| **Hydroxycut** | Nutritional Composition Which Promotes Weight Loss, Burns Calories, Increases Thermogenesis, Supports Energy Metabolism and/or Suppresses Appetite |
| **Hydroxycut Hardcore** | Compositions and Methods for Increasing Adipose Metabolism or Lipolysis or Lipolytic Metabolism via Thermogenesis |
| **Improved ALA** | Alpha Lipoic Acid Based Food Supplement for Increasing Lean Muscle Mass and Strength |
| **Inositol & Theanine** | Composition and methods for reducing stress |
| **Insulinogen (NitroTech Hardcore)** | Composition and Method for enhancing or promoting the activity of insulin, enhancing skeletal muscle growth, reducing skeletal muscle loss, and increasing the energy supply to skeletal muscle |
| **Joint MD** | Compositions and Methods for the Alleviating Joint Pain and Improving Joint Flexibility |
| **Leanbalance** | Supplemental Dietary Compositions for Promoting Weight Loss |

| | |
|---|---|
| **Leukic** | Supplemental Dietary Composition for Turning on Anabolic Switches in Muscle, Stimulating and/or Optimizing Protein Synthesis, and/or Potently Signaling Muscle Building and/or Growth |
| **Melatonin** | Composition for Increasing Growth Hormone, Muscle Development, Fat Loss, Protein Synthesis IGF-I and Improving Exercise Performance and Recovery |
| **Melatonin** | Method of Increasing Growth Hormone Secretion |
| **Musclebuilding Kit** | Kit Comprising Three Independent Compositions and Methods for Building Muscle, Increasing Strength, Increasing Muscle Size and Increasing Muscle Performance and Reducing Muscle Fatigue |
| **Nano Experiments - Amino Acids** | Fast Dissolution Amino Acid Composition |
| **NanoDiffuse** | Compositions and method for increasing bioavailability of compositions for performance improvement. |
| **NanoDiffuse** | Method for Increasing the Rate and Consistency of Bioavailability of Supplemental Dietary Ingredients |
| **NanoDiffuse Multi-Phase** | Method for a Supplemental Dietary Composition Having a Multi-Phase Dissolution Profile |
| **NanoSlim** | Fat β-oxidation Enhancing and Carbohydrate Absorption Inhibition Supplement |
| **NanoSlim** | Fat β-oxidation Enhancing and Carbohydrate Absorption Inhibition Supplement |
| **naNOvaopr Nitric Oxide** | Composition for improving blood flow in working muscles |
| **naNOvaopr Nootropic** | Composition for promoting cognitive attributes |
| **naNOvaopr Sensory-Stimulating Effect** | Method for producing a sensory stimulating effect |
| **naNovapor Thermo** | Composition and method for supporting thermogenesis and lipid oxidation |

| | |
|---|---|
| **NanoX9** | Rapidly Dissolving Solid Oral Dosage Form for Delivery of Composition for Increasing Nitric Oxide Activity |
| **No Fast Loss - GBB + Cissus** | Composition and Method for Increasing the Metabolism of Free Fatty Acids and Facilitating a Favorable Blood Lipid Profile |
| **No Fast Loss - GBB + Cissus** | Composition and Method for Increasing the Metabolism of Free Fatty Acids and Facilitating a Favorable Blood Lipid Profile |
| **No Fast Loss GBB + Green Tea** | Composition and Method for Inducing Lipolysis and Increasing the Metabolism of Free Fatty Acids |
| **No Fast Loss GBB + Green Tea** | Composition and Method for Inducing Lipolysis and Increasing the Metabolism of Free Fatty Acids |
| **Orlistat** | Composition and Methods for Weight Loss in a Mammal |
| **ProCho** | Compositions and Methods for Activating Protein Synthesis and Deactivating Catabolic Processes in Skeletal Muscle |
| | Optimization of Whole Body Creatine Retention in Healthy Human Subjects |
| **Pump-Tech** | Nutritional Composition for Enhancing Lean Muscle Stimulus, Growth, Strength and Recovery, Creating and Prolonging Muscle Pumps, Supporting Endurance, Strength, Performance, Size and Stamina, Providing a Transducer Effect for Nitric Oxide, Increasing Nutrient Delivery and or Promoting Increased Vascular Response in an Individual |
| | NUTRITIONAL COMPOSITION FOR FACILITATING MUSCLE PUMPS |
| | Nutritional Composition for Promoting Lean Muscle Mass - Pump/Nitroxy3/Six Stat NO |
| **Red Wine** | Compositions and Methods for Increasing Muscle Mass and Strength. Improving Athletic Performance, and or Reducing Body Fat Mass |
| **Resveratrol MD** | Resveratrol Containing Compositions for General Health and Vitality |

| | |
|---|---|
| **Satellite Cell** | Composition for Promoting the Maintenance and Function of Muscle-Specific Progenitor Cells |
| **Six Star Protein** | Supplemental Dietary Composition for Supporting Muscle Growth, Recovery and Strength |
| **Sleep MD** | Compositions and Methods for the Induction and Maintenance of Quality Sleep |
| **SleepGel** | Melatonin-based Composition for Improved Sleep |
| **SmartBurn** | Supplemental Dietary Compositions for Causing Rapid Weight Loss, Controlling Appetite, Managing Stress, Supporting Relaxation, Combating Fatigue and or Supporting Mental Well-Being |
| | Diet supplement comprising Hoodia Gordonii for weight loss and mental well-being |
| **Thermogain** | Nutritional Composition for Increasing Creatine Uptake in Skeletal Muscle |
| **ThermoShred** | Compositions and Methods for Increasing Metabolism, Thermogenesis and/or Muscular Definition |
| **TriSleep Calm** | Composition for a Feeling of Calmness |
| **TriSleep Relaxing** | Composition for a Feeling of Relaxation |
| **TriSleep Sleep** | Composition for Supporting Restful Sleep |
| **Trometamol ALA** | Method for Improving the Oral Administration of Alpha-Lipoic Acid |
| **VivaBody** | Supplemental Dietary Composition for Burning Additional Calories, Providing sustained Energy, Supporting Weight Loss, and/or Improving Mental Focus |

# HONORS AND AWARDS

**Fellow of the American Academy of Family Physicians**
1981-present

**Diplomat American Board of Family Physicians**
1977
Re-certified 1983
Re-certified 1994
Re-certified 2001

**AMA Physicians Recognition Award**
1976, 1979, 1982, 1983, 1984, 1987, 1990, 1992, 1993, 1994, 1997, 2000, 2003, 2010

**University of Minnesota Residency Teaching Award**
1977, 1979, 1980, 1993, 1994

**Graduated Cum Laude with Honors**
Mankato State University 1969

**Marquis Who's Who in the US**
1998, 2000, 2001, 2003, 2006

**Marquis Who's Who in Science and Engineering**
1992-1993, 1993-1994, 1995-1997, 2000

**Marquis Who's Who of Emerging Leaders in America**
1993-1994, 1994-1995, 2000, 2003, 2006

---

# ASSOCIATIONS

Academy of Pharmaceutical Physicians and Investigators
American Academy of Family Physicians
American Association for the Advancement of Science
American Society Clinical Pharmacology Therapeutics
Arizona Medical Board

Association of Clinical Research Professionals
Canadian Health Food Association
Council for Responsible Nutrition
Drug Information Association
Florida Department of Health
GLG Council Gehrson Leherman Group, Professional
International Bone & Mineral Society
ISSN - International society of sports Nutrition
Medical Board of California
Minnesota Board of Medical Practice
National Strength and Conditioning Association
Natural Products Association
North American Menopause Society
Pennsylvania State Board of Medicine
ProLiant Scientific Advisory Board

---

## ADMINISTRATIVE SERVICES

International Olympic Committee (IOC)                          2003 to 2014
Federation International Gymnastics (FIG)
Associate Physician Member
Bahamas Delegation

Medical Director                                             1999 to present
Fertility Services
Clear Passage Physical Therapy
Gainesville, FL

Pharmacy Committee                                           2001 to 2006
Nature Coast Regional Hospital
Williston, FL

Clinical Associate Professor                                 1992 to 2005
University of Minnesota Medical School
Minneapolis, MN

Mankato State University                                     1986 to 2015
Biotechnology Advisory Council
Mankato, MN

Member, HealthSpan Integrated Provider Steering Committee          1992 to 1997
LifeSpan/Health One Provider Network
Minneapolis, MN

Minnesota State Board of Medical Examiners          1995 to 1997
Physician Assistant Advisory Committee
St. Paul, MN

Minnesota Medical Association          1992 to 1997
Drug Utilization Review Board
Minneapolis, MN

Minnesota Academy of Family Physicians          1993 to 1995
Practice Research Steering Committee
PRN Monthly Newsletter
St. Paul, MN

Chair Education & Research Committee          1994
United Hospital
St. Paul, MN

Chair Pharmacy and Therapeutics Committee          1995
United Hospital
St. Paul, MN

Member Executive Committee          1994 to 1995
United Hospital
St. Paul, MN

Member IPN Finance Committee          1993 to 1997
Allina IPN
Minneapolis, MN

Medical Alley          1994 to 1997
Committee on Research
Minneapolis, MN

Clinical Associate Professor          1983 to1992
University of Medicine and Dentistry
Camden, NJ

Mayo Medical School          1977 to 1983, 1997 to 2014
Curriculum Advisor
Rochester, NY

Minnesota Academy of Family Physicians Credentials Committee      1977 to 1996

Minnesota Academy of Family Physicians Delegate      1977 to 1980, 1995

President – Elect      1978, 1980
Upper Mississippi Medical Association

St. Joseph's Hospital
Park Rapids, Minnesota
Chief of Staff      1979 to 1980
Chief of Obstetrics      1975 to 1980
Chief of Pediatrics      1976 to 1980
Joint Commission Committee      1977 to 1980

## COMMUNITY SERVICES

Harn Museum Committee      1998 to 2003
University of Florida
Gainesville, FL

Chamber Orchestra Committee      1998 to 2003
Gainesville, FL

Gainesville Area Innovation Network      2000 to 2003
Gainesville, FL

Finance Committee      1993 to 1997
Incarnation Lutheran Church
St. Paul, MN

Property Committee      1992 to 1997
Incarnation Lutheran Church
St. Paul, MN

Youth Committee      1992 to 1997
Incarnation Lutheran Church
St. Paul, MN

Trustee Committee      1983 to 1992
St. Matthews Lutheran Church
Morristown, NJ

| | |
|---|---|
| Pulpit Committee<br>St. Matthews Lutheran Church<br>Moorestown, NJ | 1983 to 1985 |
| Church Council<br>St. Matthews Lutheran Church<br>Morristown, NJ | 1981 to 1985 |
| Youth Advisor<br>(Junior and Senior High)<br>St. Matthews Lutheran Church<br>Moorestown, NJ | 1981 to 1985 |
| Member, Advisory Board<br>Wadena Vo-Tech Institute<br>Medic and Paramedic Training<br>Park Rapids, MN | 1977 to 1980 |
| City Health Officer<br>Park Rapids, MN | 1978 to 1980 |
| City Health Officer<br>Nevis, MN | 1977 to 1980 |
| Deputy Country Coroner<br>Hubbard County, MN | 1977 to 1980 |
| Civil Air Patrol Advisor<br>Hubbard County, MN | 1977 to 1980 |
| Parents Prenatal Classes Instructor<br>Hubbard County, MN | 1976 to 1980 |
| Hubbard County Emergency Service Advisor<br>Hubbard County, MN | 1977 to 1980 |
| Hubbard County Law Enforcement Committee<br>Hubbard County, Minnesota | 1977 to 1980 |

## MEDICAL LICENSURE

California        G-46189
Florida           ME 72101
Minnesota         021412-6

## DOT CERTIFICATION

NRCME             6151028149

---

## GRADUATE TRAINING

St. John's Hospital ▪ St. Paul, Minnesota ▪ Internship 1974

## CERTIFICATION

American Board of Family Practice 1976 Re-certified x 2, Currently Board Eligible to re-enter Active and current on CME for all State licensures

## BIBLIOGRAPHY

Wurn, B., Wurn, L., King, R., Heuer, M., Roscow, A., Scharf, E., Shuster, J.  "Treating Female Infertility and Improving IVF Pregnancy with a Manual Physical Therapy Technique".  Medscape 6/18/04

Heuer, M., Pietrusko, R., Morris, R., Scheffler, B., "An Analysis of Worldwide Safety Experience with Auranofin", The Journal of Rheumatology 12:4 (1985), pp. 474-503

Heuer, M., Morris, R., "SmithKline and French Worldwide Clinical Experience with Auranofin: A Review: Excerota Medica of Amsterdam, Excerpta", Medica (1983)

Flagg, A., Stokes, A., Pietrusko, R. Heuer, M., Blodgett, R. "Infrequent Occurrence of Thrombocytopenia During Auranofin Internal Therapy", Seminars in Arthritis and Rheumatism, Volume 13, Issue3, pages 229-303, February 1984

PRN Practice Research Network, Research Newsletter of MAFP Steering and Editorial Committee 1993

Heuer, M., Auranofin, Early Clinical Experience, "Bioinorganic Chemistry of Gold Coordination Compounds", (1983) – Symposium Proceeding

---

## ABSTRACTS

Wurn, L., Heuer, M., Massage Therapy for Infertility.  Journal of American Medical Society. (2001)

Heuer, M.A. Intravenous Immunoglobulin Therapy: Review of Clinical Applications, Efficacy and Safety. Clin Sci International, Inc.  Gainesville, Fl. (2001)

Heuer, M., Wright, C. Trough Serum Levels of Estradiol, Estrone, and FSH Following Topical Application of ESTRASORB™ in a Phase III Clinical Trial. (2002)

D. Craig Wright, D; Joan Brisker, BS (ASCP); Larry R. Muenz, PhD; Harold Boyenbaum, PhD; Marvin A. Heuer, MD Maria Gutierrez, MD.  A Phase I Safety and Pharmacokinetic Study in Estradiol and Testosterone Deficient Postmenopausal Women of MaxANDRASORB™ - A Topical Sustained-Release Testosterone Emulsion. (2001)

Heuer, M., MD; Wright, D.C., MD.  A Phase I Pharmacokinetic Study of ESTRASORB™ Lotion, a Topical, Sustained-Release Estradiol Emulsion for Treatment Relief of Postmenopausal Vasomotor Symptoms. (2001)

Heuer, M., MD; Brisker, J.; Micellar Nanoparticles: A New Novel Topical Drug Delivery System for Systemic Delivery of Estradiol and Testosterone. (2001)

Wright, DC, MD; Brisker, J; Heuer, M: The Safety of ESTRASORB™, a New Topical Emulsion Technology for Systemic Delivery of Estradiol. (2001)

Brisker, J; Heuer, M, MD: Clinical Response as an Endpoint in Studies of Estrogen Replacement Therapy in Postmenopausal Women. (2001)

Pietrusko, R., Blodgett, R., Heuer, M., Proteinuria in Gold Treated Rheumatoid Arthritis. Submitted for Publication

Scheffler, B., Pietrusko, R., Heuer, M., Blodgett, R., Safety Profile Auranofin in the Elderly, Submitted for Publication

Scheffler, B., Hurley, J., Heuer, M., X-Ray Evaluation of Erosion Progression in RA: Double-Blind Study of Auranofin vs. Placebo, Submitted for Publication

Pietrusko, R., Shirley, D., Heuer, M., Blodgett, R.: Blood Gold Levels During Chronic Auranofin Therapy. Submitted for Publication.

Schumacher, H, Heuer, M., Blodgett, R., Friedman, R. Effect of IM Gold and Other Disease Modifying
      Agents for Rheumatoid Arthritis After Treatment Failure on Auranofin.  Submitted for Publication.

---

## PRESENTATIONS

BIT Annual World Congress of Nutrition and Health 2013.  Sports and Health Nutrition, The Need for Human
Clinical Trials.
Dalian, China 2013

Lectures in Research and Medicine General Topics (Arthritis, HRT, Osteoporosis, Hypertension, Erectile
Dysfunction, OC, etc.) Women's Health
Gainesville, Florida        1997 to present

      Conducting Clinical ResearchCME Allina Health Systems Course Phillips Eye Institute
Minneapolis, Minnesota     1995 - 1997

Clinical Research from Start to Finish CME Allina Health Systems Course
St. Paul, MN        1994

Lectures in Research and Medicine General Topics Allina and Health East and Local Groups
St. Paul, MN        1992 to 1997

Presentations Covering Research and Development and New Drug Approvals SmithKline Beecham
Pharmaceuticals
Philadelphia, PA       1990 to 1992

Presentations Covering Development and Research Projects Wallace Laboratories
Cranbury, NJ        1987 to 1989

Multiple Presentations Covering Development Projects Ayerst Laboratories
New York, NY       1984 to 1987

Press Launches for New Ayerst Products (as required) Ayerst Laboratories
New York, NY                    1984 to 1987


DIA Labeling Workshop How to Unify Adverse Reaction Listings on Product Labels
Philadelphia, PA                January 1986


"The Medical Degree – A Golden Ticket!" Cooper Medical School, University of Medicine and Dentistry of New Jersey
Camden, NJ                      1985, 1986, 1987, 1988, 1992


Multiple Presentations Covering Development Projects SmithKline and French Laboratories
Philadelphia, PA                1984


"The Development of New Pharmaceuticals" University of Minnesota, Alumni Meeting
Minneapolis, MN                 1984


"Experience with Auranofin Therapy: A Review of Worldwide Date, European Congress of Rheumatology"
Moscow, Russia                  1983


"Safety Profile of Auranofin in the Elderly" Western Regional American Rheumatism Association
Tucson, AZ                      1983


"X-Ray Evaluation of Erosion Progression in RA: Double-Blind Study of Auranofin vs. Placebo"
Philadelphia, Pennsylvania      1983


"Auranofin – Worldwide Safety Review"
Portugal                        1983


"The Clinical and Safety Profile of Auranofin"
Singapore, Thailand, Malaysia          1983


"Auranofin, Early Clinical Experience"
Philadelphia, PA         1982

# FUNDED RESEARCH SUPPORT

1.  SmithKline Beecham, 1981-1984
    Diagnostic Bioequivalence Studies and Reformation
    Monoacid Injectable Antibiotic Development Protocols
    Paxil Antidepressant Studies UK and US
    Obsessive Compulsive Studies US
    Relafen Full Development Plan and All Protocols
    RA and OA; Pain
    Pharmacokinetic Studies
    Ridawra – OA and RA Study Program
    Topical Use Eczema Program
    Tagamet – Ulcer Peptic and Gastric Studies
    Various Ophthalmologic Topical – Antibiotics, Steroids

2.  Ayerst Laboratories, 1982-1986
    Altromid-S Protocols
    Inderal – Product Line Extension Hypertension
    Effexor – Antidepressant Study Program
    Lodine Development RA, OA Protocols
    PremPro Development Plan and Protocols
    Premarin Osteoporosis Program Development
    Prem Phase Development Plan and Protocols
    Various Oral Contraceptive Studies

3.  Wallace Laboratories, 1987-1990
    Felbamate Development Program for Lennox Gasteau Syndrome, Seizures Organidin Reformulation
    Studies – cough / cold

4.  SmithKline Beecham, 1990-1991
    Paxil, Carvedelol, Asthma, Arthritis

5.  Scherrng Laboratories, 1981-1982
    Topical and Transdermal Delivery Systems

6.  Upjohn Laboratories, 1981-1983
    Depression, Hypertension

7.  Nautilus, Inc. 1982-1990
    Exercise Physiology and Osteoporosis

8.  Ayerst Laboratories 1982
    Premarin, GNRH

9.  FL Dept. of Health & Rehabilitative Services I, 1983

10. FL Dept. of Health & Rehabilitative Services II, 1983-1984

11. Bruner Foundation, 1983-1985

12. Schering Laboratories, 1983-1984

13. Ciba-Geigy, 1983-1984
    Opthalmologics, Antihypertensives

14. Ayerst Laboratories, 1985

15. Wyeth Laboratories, 1985

16. Nuclear Data, 1985-1986

17. Lederle Laboratories, 1986

18. Florida Department of Health and Rehabilitative Services III, 1986

19. Abbott Laboratories, 1986

20. Ayerst Laboratories, 1987

21. NIH (Co-Investigator with Dan Martin, Ph.D.)  Walking and Bone Mass, 1988-1990

22. Ayerst Estrogen, Exercise and Lipid Study, 1988-1990

23. Reid-Rowell Estratab and Estratest and Effects on Lipids and Bone Mass, 1988-1990

24. Bartor Estrapel and Effects of Estradiol Production Levels, 1989

25. Columbia Laboratories, Inc. Vaginal Moisturizing Gel Study, 1989

26. Organon, Inc. Desogestrel O.C. CTR-04 Study, 1990

27. Health & Sciences Research, Inc. Noven Patch Study, 1990

28. 3M/Bio –Pharm Estradiol Patch Study, 1990

29. Wyeth-Ayerst Laboratories: Trigonitis, 1992

30. Miles, Inc.: Clotrimazole 2% Vaginal Cream, 1993

# RESEARCH EXPERIENCE

**Acne**

Smith Kline French. Retin-A. Two studies Phase III

**Acute Exacerbation of Chronic Bronchitis**

Abbott Laboratories, Inc. (Protocol M97-766) "Comparative Study of the Efficacy of Clarithromycin and Azithromycin for the Treatment of Patients with Acute Exacerbation of Chronic Bronchitis."

**Alzheimer's**

Alchem International. Alzheimer's and early dementia. Vinpocetine. Two studies Phase III

Aricept Eisai. Alzheimer's and early dementia. Three studies Phase II and III

**Anemia**

Pharmacosmos A/S (Protocol -Monofer-IDA-05) A randomized, open-label, comparative trial comparing the in-cidence of hypophosphatemia in relation to treatment with iron isomaltoside and ferric carboxymaltose in subjects with iron deficiency anaemia. 2017

**Ankle Strain / Sprain**

Kowa (Protocol K-103-IP-3.01US) Randomized, double-blind, placebo-controlled study to evaluate the efficacy and safety of K-103-IP compared with placebo for the treatment of mild to moderate acute pain associated with ankle strain or sprain. 2014

**Arthritis**

AbbVie Inc. (Protocol M20-466) A Randomized, Double-Blind, Placebo-Controlled Study to Evaluate the Safety and Efficacy of ABBV-154 in Subjects with Moderately to Severely Active Rheumatoid Arthritis with Inadequate
Response to Biologic and/or Targeted Synthetic Disease-Modifying Anti-Rheumatic Drugs (b/tsDMARDs). 2021

AbbVie Inc. (Protocol M20-370) A Phase 2, Randomized, Double-Blind, Placebo-Controlled, Dose-Ranging Study to Evaluate the Safety and Efficacy of ABBV-154 in Subjects with Polymyalgia Rheumatica (PMR) Dependent on Glucocorticoid Treatment. 2021

Gilead Sciences, Inc. (Protocol GS-US-431-4566) A Phase 3, Randomized, Double-blind, Placebo and Adalimumab-controlled Study to Evaluate the Efficacy and Safety of Filgotinib in Subjects with Active Psoriatic Arthritis Who Are Naïve to Biologic DMARD Therapy. 2020

Eli Lilly (Protocol IV4-MC-JAJD(b)) A Randomized, Controlled Pragmatic Phase 3b/4 Study of Baricitinib in Patients with Rheumatoid Arthritis. 2020

AbbVie, Inc. (Protocol M15-998) A Phase 3, Randomized, Double-Blind Study Comparing Risankizumab to Placebo in Subjects with Active Psoriatic Arthritis Including Those Who Have a History of Inadequate Response or Intolerance to Biologic Therapy(ies)  2018

AbbVie, Inc. (Protocol M16-011) A Phase 3, Randomized, Double-Blind, Study Comparing Risankizumab to Placebo in Subjects with Active Psoriatic Arthritis (PsA) Who Have a History of Inadequate Response to or Intolerance to at Least One Disease Modifying Anti-Rheumatic Drug (DMARD) Therapy  2018

AbbVie, Inc. (Protocol M16-063) A Phase 2 Study to Investigate the Safety and Efficacy of ABBV-105 Given Alone or in Combination With Upadacitinib (ABBV-599 Combination) With a Background of Conventional Synthetic DMARDs in Subjects With Active Rheumatoid Arthritis With Inadequate Response or Intolerance to Biologic DMARDs  2018

AbbVie, Inc. (Protocol M14-465) A Phase 3, 48 Week Randomized, Double-Blind Study Comparing ABT-494 to Placebo and to Adalimumab in Subjects with Moderately to Severely Active Rheumatoid Arthritis  2017

Merck Industries (Protocol 088-001) "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUB's During Chronic Treatment with MK-0966 or Naproxen in Patients with Rheumatoid Arthritis."

GD Searle & Company (Protocol N49-98-02-102) "Clinical Protocol for a Multicenter, Double-Blind, Parallel Group Study Comparing the Incidence of Clinically Significant Upper Gastrointestinal Adverse Events Associated with SC-58635 400 mg BID to That of Diclofenac 75 mg BID in Patients with Osteoarthritis or Rheumatoid Arthritis, IND # 48,395."

Ayerst.  Etodolac NSAID.  Rheumatoid, Osteo, Psoriatic.  Six studies Phase II, III, IV

Smith Kline French.  Injectable Gold.  Rheumatoid, Osteo, Psoriatic.  Four studies

## Aspergillosis

Pulmatrix Inc. (Protocol 603-0014P-00) A Randomized, Double-Blind, Multi-Center, Placebo-Controlled Study to Evaluate the Safety, Tolerability, and Pharmacokinetics of Itraconazole Administered as a Dry Powder for Inhalation (PUR1900) in adult asthmatic patients with Allergic Bronchopulmonary Aspergillosis (ABPA)  2019

**Asthma**

GlaxoSmithKline (Protocol 206785 ) A 52-week, randomised, double-blind, double-dummy, parallel group, multi-centre, non-inferiority study assessing exacerbation rate, additional measures of asthma control and safety in adult and adolescent severe asthmatic participants with an eosinophilic phenotype treated with GSK3511294 compared with mepolizumab or Benralizumab. 2021

TEVA Branded Pharmaceutical Products R&D, Inc. (Protocol TV53275-AS-20033) A Phase 2, Multicenter, Randomized, Double-Blind, Placebo-Controlled, Parallel-Group Study to Assess the Safety, Efficacy and Pharmacodynamics of TEV-53275 Administered Subcutaneously in Adult Patients with Persistent Eosinophilic Asthma.  2021

Avillion LLP (Protocol AV004) A 12-week, Randomized, Double-blind, Placebo-controlled, Multicenter, Parallel Group, Phase III Study Evaluating the Efficacy and Safety of PT027 Compared to PT008 and PT007 Administered QID in Adults and Children 4 Years of Age or Older with Asthma (DENALI) 2019

Avillion LLP (Protocol AV003) A Long-term, Randomized, Double-blind, Multicenter, Parallel-group, Phase III Study Evaluating the Efficacy and Safety of PT027 Compared to PT007 Administered as Needed in Response to Symptoms in Symptomatic Adults and Children 4 Years of Age or Older with Asthma (MANDALA)  2018

West-Ward Columbus, Inc. (Protocol FLSA-P100/50-PVCL-2 ) A Randomized, Parallel-Group, Placebo-Controlled, Clinical Endpoint Bioequivalence Study of Generic Fluticasone Propionate 100 μg and Salmeterol Xinafoate 50 μg Inhalation Powder Compared with Advair Diskus® 100/50 in Subjects with Asthma.  2018

TEVA Branded Pharmaceutical Products R&D, Inc. (Protocol C38072AS30066) An Open-Label Extension Study of Reslizumab 110-mg Fixed, Subcutaneous Dosing in Patients 12 Years of Age and Older with Severe Eosinophilic Asthma. 2017

TEVA Branded Pharmaceutical Products R&D, Inc. (Protocol C38072AS30064) A 12-Week, Open-Label Study to Evaluate the Relationship Between Use of Albuterol eMDPI, an Inhaled Short-Acting Beta Agonist "Rescue" Agent with an eModule, and Exacerbations in Patients (18 Years of Age or Older) with Asthma. 2017

TEVA Branded Pharmaceutical Products R&D, Inc. (Protocol C38072AS30025) A 52-Week Double-Blind, Placebo-Controlled, Parallel-Group Efficacy and Safety Study of Reslizumab110mgFixed, Subcutaneous Dosing in Patients with Uncontrolled Asthma and Elevated Blood Eosinophils. 2016

AstraZeneca (Protocol D3250C00037) A Multicenter, Open-label, Safety Extension Study with Benralizumab (MEDI-563) for Asthmatic Adults on Inhaled Corticosteroid Plus Long-acting β2 Agonist (MELTEMI).  2016

TEVA (Study Number C38072-AS-30025) A 52-Week Double-Blind, Placebo-Controlled, Parallel-Group Efficacy and Safety Study of Reslizumab 110 mg Fixed, Subcutaneous Dosing in Patients with Uncontrolled Asthma and Elevated Blood Eosinophils.  2015

AstraZeneca (Protocol D3250C00021) A Multicentre, Randomized, Parallel Group, Phase 3 Safety Extension Study to Evaluate the Safety and Tolerability of Benralizumab (MEDI-563) in Asthmatic Adults and Adolescents on Inhaled Corticosteroid Plus Long-acting β2 Agonist.  2015

AstraZeneca (Protocol D2210C00008) A 52-Week, Multicentre, Randomized, Double-Blind, Parallel Group, Placebo Controlled, Phase 3 Study to Evaluate the Efficacy and Safety of Tralokinumab in

Adults and Adolescents with Asthma Inadequately Controlled on Inhaled Corticosteroid Plus Long-Acting β2-Agonist.  2015

AstraZeneca (Protocol D3250C00017) "A 62 week, Randomized, Double-blind, Parallel Group, Placebo-controlled, multicenter, multinational, Phase III Efficacy and Safety Study of Benralizumab (MEDI-563) Added to High-dose Inhaled Corticosteroid Plus Long-acting β2 Agonist in Patients with Uncontrolled Asthma." 2014

AstraZeneca (Protocol D5896C00027) "A 26 week, randomized, double-blind, parallel-group, active controlled, multicenter, multinational safety study evaluating the risk of serious asthma-related events during treatment with Symbicort®, a fixed combination of inhaled corticosteroid (ICS) (budesonide) and

a long acting β2-agonist (LABA) (formoterol) as compared to treatment with ICS (budesonide) alone in adult and adolescent (≥12 years of age) patients with asthma."  2013

AstraZeneca (Protocol D3250C00016) "A 62 week, Randomized, Double-blind, Parallel Group, Placebo-controlled, multicenter, multinational, Phase III Efficacy and Safety Study of Benralizumab (MEDI-563) Added to Medium-dose Inhaled Corticosteroid Plus Long-acting β2 Agonist in Patients with Uncontrolled Asthma."  2014

Carter Wallace.  Azelastine.  Five studies Phase II, III, IV

## Back Pain

AbbVie, Inc. (Protocol M16-098) A Multicenter, Randomized, Double-Blind, Placebo-Controlled Study Evaluating the Safety and Efficacy of Upadacitinib in Subjects with Active Ankylosing Spondylitis. 2018

Smith Kline Beecham. Ankylosing Spondylitis.  Two studies Phase III.

Eli Lilly.  Ankylosing Spondylitis. Phase III.

## Candidiasis

Bayer Corporation (Protocol S95-003) "A Multicenter, Prospective, Randomized, Single-Blind, Parallel-Group Comparison of the Clotrimazole 1-Day (One 500 mg Vaginal Insert) and the Clotrimazole 3-Day Regimens (One 200 mg Vaginal Insert Daily for 3 Days) with Clotrimazole 7-Day

Regimen (One 100 mg Vaginal Insert Daily for 7 Days) for the Treatment of Vulvovaginal Candidiasis."

Advance Care Products, Ortho Pharmaceutical Corporaqtion (Protocol 94-007P) "Phase III Study Comparing Micanzole Nitrate (4%) Vaginal Cream and Mixanozole Nitrate (2.8%) Vaginal Cream to MONISTAT® 7 (2%) Vaginal Cream in the Treatment of Vulvovaginal Candidiasis."

## Cardiovascular

AstraZeneca (Protocol D513BC00001) Multinational, Randomized, Double-Blind, Placebo-Controlled Trial to Evaluate the Effect of Ticagrelor 90 mg twice daily on the Incidence of Cardiovascular Death, Myocardial Infarction or Stroke in Patients with Type 2 Diabetes Mellitus. 2014

## Cholesterol

Merck.  Mevacor.  Two studies Phase III

## Clostridium Difficile

Summit (Oxford) Limited (Protocol SMT19969C006) A Randomized, Double Blind, Active Controlled Study to Evaluate the Safety and Tolerability of Ridinilazole Compared with Vancomycin and to Assess the Pharmacokinetics of Ridinilazole in Adolescent Subjects (Aged 12 to <18 years) with Clostridioides difficile Infection. 2021

Summit (Oxford) Limited (Protocol SMT19969C004)  A Phase 3, randomized, double-blind, active controlled study to compare the efficacy and safety of ridinilazole (200 mg, bid) for 10 days with vancomycin (125 mg, qid) for 10 days in the treatment of Clostridium difficile infection (CDI). 2018

SERES Therapeutics (Protocol SERES-012) ECOSPOR III: A Phase 3 Multicenter, RandomizeEd, Double Blind, -Placebo COntrolled, -Parallel Group- Study to Evaluate the Safety, Tolerability, and Efficacy of SER-109 vs. Placebo to Reduce Recurrence of Clostridium difficile Infection (CDI) in Adults Who Have Received Antibacterial Drug Treatment for Recurrent CDI (RCDI)  2017

SERES Therapeutics (Protocol SERES-013) SERES-013: ECOSPOR IV: An open-label extension of study SERES-012 evaluating SER-109 in adult subjects with recurrent Clostridium difficile infection (RCDI)  2017

Pfizer, Inc. (Protocol B5091007) A Phase 3, placebo-controlled, randomized, observer-blinded study to evaluate the efficacy, safety, and tolerability of a clostridium difficile vaccine in adults 50 years of age and older. 2017

## Common Cold

Romark (Protocol RM08-3005) A Phase III, Randomized, Double-Blind, Placebo Controlled Trial to Evaluate the Efficacy and Safety of Nitazoxanide in the Treatment of Colds Due to Enterovirus/Rhinovirus Infection.  2018

## Community Acquired Pneumonia

Abbott Laboratories, Inc. (Protocol M98-939) "Comparison of the Safety of Clarithromycin IR (250 mg) BID to Levofloxacin (500 mg OD) for the Treatment of Community-Acquired Pneumonia."

TAP Holdings (Protocol CEF-97-002) "A Comparative Study on the Safety and Efficacy of CefditorenPivoxil and Cefpodoxime Proxetil in the Treatment of Community-Acquired Pneumonia."

## Concussion

University of Florida.  Closed Head Injury.  Phase II.

## Congestive Heart Failure

Ayerst.  Smith Kline Beecham.  Inderal, Carvedilol.  Two studies

## Constipation

Smith Kline Beecham / GlaxoSmithKline.  Three studies Phase III

## Contraceptives

Evofem, Inc. (AMP002) A Phase III, multicenter, open-label, randomized, controlled study of the contraceptive efficacy and safety of amphora® vaginal gel compared with conceptrol® vaginal gel. 2017

Organon, Inc./Pharmaco LSR (Protocol 086-001) "An Open Label, Multicenter, Non-Comparative Safety and Efficacy Study of the Desogestrel Containing Oral Contraceptive CTR 25." Organon, Inc./Pharmaco LSR (Protocol 092-001) "An Open-Label, Randomized, Parallel, Comparative, Multicenter, Safety and Efficacy Study of Triphasic Combination Oral Contraceptives, CTR 99 and CTR 77, versus Ortho-Novum 777).

Organon, Inc./Quintiles, Inc. (Protocol 069-001) "An Open-Label Noncomparative Efficacy and Safety Study of Implanon, a One-Rod Contraceptive Implant Containing 3-Ketodesogestrel in Healthy Female

Volunteers, With subsets For Pharmacokinetic Measurements, Ophthalmological Assessments, Carbohydrate Metabolism, Lipid Metabolism and Endometrial Morphology."

Ortho-McNeil Pharmaceutical (Protocol CAPSS022) "A Comparison of Two Oral Contraceptives: Oral Tri-Cyclen® vs. Loestrin® Fe 1/20."RW Johnson Pharmaceutical Research Institute (Protocol NRGEEP-CONT-004) "An Open-Label Study to Evaluate Contraceptive Efficacy and Safety of the

Transdermal Contraceptive System of 17-Deacetylnorgestimate and Ethinyl Estradiol with the Oral Contraceptive Triphasil."

Organon, Inc. (Protocol 147-001) "A Randomized, Open-Label, Comparative, Multicenter Trial to Evaluate Contraceptive Efficacy, Cycle Control, Safety and Acceptability of a Monophasic COC Containing 200µg EE, compared to a COC Containing 100µg Levonorgestrel and 20µg EE."

Ayerst.  Gels / Hormones.  Eight Studies Phase III and IV.

Ayerst.  Loestrin.  Four studies Phase III and IV.


**COPD**

Verona Pharma PLC (Protocol RPL554-CO-302) A Phase III Randomized, Double-Blind, Placebo-Controlled Study to Evaluate the Efficacy and Safety of Ensifentrine over 24 Weeks in Patients with Moderate to Severe Chronic Obstructive Pulmonary Disease.

Chiesi Farmaceutici S.p.A (Protocol CLI-06001AA1-04) A 52-week, randomized, double-blind, placebo-controlled, parallel-group, study to evaluate the efficacy and safety of two doses of CHF6001 DPI add-on to maintenance triple therapy in subjects with Chronic Obstructive Pulmonary Disease (COPD) and Chronic Bronchitis. 2021

Sanofi (Protocol EFC16819) Study to assess the efficacy, safety, and tolerability of SAR440340/REGN3500/itepekimab in chronic obstructive pulmonary disease (COPD) (AERIFY-2). 2021

Astrazeneca (Protocol D3251C00014) A Multicenter, Randomized, Double-blind, Chronic-dosing, Parallel-group, Placebo-controlled Phase 3 Study to Evaluate the Efficacy and Safety of Benralizumab

100 mg in Patients with Moderate to Very Severe Chronic Obstructive Pulmonary Disease (COPD) with a History of Frequent COPD Exacerbations and Elevated Peripheral Blood Eosinophils (RESOLUTE) 2019

Astrazeneca (Protocol D5241C00001) A Randomized, Double-blind, Placebo-controlled, Parallel Group, Multicenter, Phase 2a Study to Explore the Efficacy and Safety of Tezepelumab in Patients with Moderate to Very Severe Chronic Obstructive Pulmonary Disease (COPD) (COURSE) 2019

AstraZeneca (Protocol D3251C00003) A randomized, double-blind, placebo-controlled, parallel group, multicentre, phase III study to evaluate the efficacy and safety of 2 doses of Benralizumab (MEDI-563) in patients with severe to very severe Chronic Obstructive Pulmonary Disease (COPD) with a history of COPD exacerbations. 2014

Carter Wallace.  Azelastine.  Four studies Phase II and III

## Crohn's Disease

Pfizer. Phase 2a, Double-Blind, Randomized, Placebo-Controlled, Parallel Group Study to Evaluate the Efficacy and Safety of Oral PF-06651600 and PF-06700841 as Induction and Open Label Extension Treatment in Subjects with Moderate to Severe Crohn's Disease. 2018

Celgene International. A Phase 3, Multicenter, Randomized, Double-Blind, Placebo-Controlled Study of Oral Ozanimod as Induction Therapy for Moderately to Severely Active Crohn's Disease.  2018

Smith Kline French.  Cimetidine.  Four studies Phase 2B

## Dermatomyositis

Octapharma (Protocol GAM10-8) Prospective, Double-blind, Randomized, Placebo-Controlled Phase III Study Evaluating Efficacy and Safety of Octagam 10% in Patients With Dermatomyositis ("ProDERM study") 2018

## Dementia

Ayerst.  Mild Dementia.  Ibuprofen high dose.  Two studies Phase III.

## Depression

GlaxoSmithKline.  Two studies Phase III

Merck.  Phase III

Eli Lilly.  Phase III

## Diabetes

Novo Nordisk (Protocol NN2211-4232) LIRA-PRIME: Efficacy in controlling glycaemia with Victoza® (liraglutide) as add-on to metformin vs. OADs as add-on to metformin after up to 104 weeks of treatment in subjects with type 2 diabetes inadequately controlled with metformin monotherapy and treated in a primary care setting. 2016

Johnson and Johnson (Study #28431754DIA4002) A Randomized, Double-Blind, Placebo-Controlled, Parallel-Group, Multicenter Study to Evaluate the Blood Pressure Reduction with Ambulatory Blood

Pressure Monitoring (ABPM), Safety, and Tolerability of Canagliflozin in the Treatment of Subjects with Hypertension and Type 2 Diabetes Mellitus.  2014

Insmed Pharmaceuticals (Protocol INS1-DM-28) "A Randomized, Multicenter, Double-Blind, Parallel-Group Clinical Study to Compare the Effects of INS1 (D-Chiro-Inositol) Versus Placebo as Initial Oral

Therapy in Subjects with Type 2 Diabetes Mellitus Who Fail to Achieve Adequate Glycemic Control with Diet and Exercise Alone."

Eli Lilly.  Diabetic Neuropathy.  Cymbalta vs. Lyrica.  Phase III
Eli Lilly.  Type I diabetes.  Four studies Phase III.

Novo Nordisk.  Type I diabetes.  Four studies Phase III.

Ayerst.  Type I diabetes.  Four studies Phase III

Bristol-Myers Squibb US Pharmaceuticals (Protocol CV 138-002) "Comparative Outcomes Study of Metformin Invention Versus Conventional Approach: The Cosmic Approach Study."

Ayerst.  Type 2 diabetes.  Basement membrane inhibitor.  Three studies Phase III.

Ayerst.  Diabetic Neuropathy.  Tolrestat.  Two studies Phase III.

## Eczema

Novartis.  Two studies Phase III

**Endometriosis**

IBAH / Searle Research and Development (Protocol N65-97-02-001) "Clinical Protocol for a Dosing Optimazation Study of Syneral® for Endometriosis: Safety and Efficacy of a Single 400µG Daily Dose for 6 Months and a Step-Down Dose from 200µG BID for 2 Months to 200µG

Daily for 4 Months.  A Double-Blind, Placebo-Controlled, Randomized Comparison to the Currently Recommended Regimen of 200µG BID Daily for 6 Months, IND # 18,138."

Eli Lilly.  Three studies Phase III

Ayerst.  Three studies Phase III

**Epilepsy**

Carter Wallace.  Lennox-Gastaut Syndrome.  Felbamate.  Three studies Phase II and III

**Esophageal Ulcers**

Smith Kline French.  Cimetidine.  Phase 2B

**GI Ulcers**

Smith Kline French.  Cimetidine.  Six studies Phase III and IV

**Gastric Ulcers**

GlaxoSmithKline.  Ranitidine.  Three studies Phase III and IV

Smith Kline Beecham.  Three high dose Tagamet.  Six Studies Phase III.

**Gout**

Smith Kline French.  Colchicine, Allopurinol.  Acute.  Three studies Phase III

**Heart**

Ayerst.  Exercise.  Premarin.  Three studies Phase III

## Hormone Replacement Therapy

Mead Johnson Laboratories: Evaluation of the Effect of the 0.5 mg Estrace Compared to Placebo on Biochemical Markers of Bone Resorption in Postmenopausal Women, 1994

Kabi Pharmacia: Comparison of a Continuous Low Dose of Estradiol Released from a Vaginal Ring vs. Conjugated Equine Estrogen in a Vaginal Cream in the Treatment of Postmenopausal Women with Signs and Symptoms of Urogenital Atrophy, 1992.

Zeneca Pharmaceuticals Group: Comparison of 3.6 mg ZOLADEX therapy with or without hormone replacement therapy for the treatment of endometriosis, 1992.

Novo Nordisk Pharmaceuticals, Inc.: Evaluation of Estrofem® 0.25, 0.5, 1.0, and 2.0 mg on relief of vasomotor and other symptoms of the menopause, 1993.

Solvay Pharmaceuticals, Inc.: Investigation of Three Doses of Esterifield Estrogens (Estratab®) on Bone Mineral Density and Parameters of Bone Metabolism in Postmenopausal Women, 1992.

Solvay Pharmaceuticals, Inc.: Study of the Effects of Estratest H.S.®,

Estratest®, and Premarin® in Surgically Menopausal women, 1992.

Solvay Pharmaceuticals, Inc.: Study of Estrafied Estrogens Plus Methyltesterone (Estratest®) and Esterified Estrogens (Estratab® 1.25 mg) in Surgically Postmenopausal Women: Symptoms, Psychometric  Assessments, Serum and Saliva Hormone Levels, 1993.

ClinTrials Research Inc./TheraTech, Inc.: Comparison of Two Doses of an Estradiol Matrix Transdermal Delivery System (EMTDS) with Placebo Matrix Transdermal Delivery System I the Treatment of women with Postmenopausal Symptom, 1994.

Novo Nordisk Pharmaceuticals, Inc. (Protocol VAG/PD/9/USA) "A Randomized, Double-Blind, Placebo-Controlled, Parallel Group   Multicenter Study Comparing the Efficacy and safety of Vagifem 10 µg  and 25 µg doses in Treatment of Estrogen Deficiency Derived Atrophic     Vaginitis."

Ostex International, Inc. (Protocol OST-C2): A Study of the Use of Osteomark in the Quantitation of Cross-Linked N-telopeptides of a Type I Collagen as an Aid in Monitoring the Effect of Therapies Used for the Prevention and Management of Bone Loss in Postmenopausal Women"

ClinTrials Research, Inc. TheraTech, Inc. (Protocol E94001A) "An Open-Label, Multicenter Extension of Protocol No. E94001 to Describe the Use of Two Doses of an Estradiol Matrix Transdermal Delivery System (EMTDS) in the Treatment of Women with Postmenopausal Symptoms."

Novo Nordisk Pharmaceuticals, Inc. (Protocol KLIM/PD/7/USA) "A Double-Blind, Randomized, Parallel Group, Multicenter, Dose Finding Study Comparing the Efficacy and Safety of 1 mg 17β-Estradiol in Combination with Low Doses of Norethindrone Acetate with that of 1 mg 17β-Estradiol Alone on the Endometrium in Postmenopausal Women."

Rhone-Poulace Rorer (Protocol RPR 106522-303) "A Randomized, Double-Blind, Multicenter, Placebo-Controlled, Menopausal Symptom study of Three Doses of RPR Estradiol Norethisterone Acetate (NETA) Patches in a Sequential Wear Hormone Replacement Therapy (HRT) Regimen."

Sterling Winthrop Pharmaceuticals (Protocol SR41319B-004) "A Phase III Study of Intermittent Cyclical Tiludronate in the Treatment of Established Post-Menopausal Osteoporosis."

The Upjohn Company (Protocol M5410/0336) "Evaluation of Endometrial Histology and Bone Mineral Density (BMD) in Postmenopausal Women Receiving (OGEN/PROVERA) Hormone Replacement Therapy (HRT)."

Eli Lilly & Company (Protocol H3S-MC-GGHG) "Comparison of Raloxifene HCl, Estrogen and Placebo on the Uterus in Healthy Postmenopausal Women."

R.W. Johnson PRI (Protocol ESTNRG-CHRT-102) "A Multicenter, Randomized, Double-Blind, Parallel Group, Dose-Ranging Study to Evaluate the Safety of a CYCLOPHASIC Hormone Replacement Therapy Regimen of Estradiol and Norgestimate and its Effects on Endometrial Histology, Vaginal Bleeding and Metabolic Parameters in Postmenopausal Women."

R.W. Johnson (Protocol ESTNRG-CHRT-104) "A Multicenter, Double-Blind, Randomized Parallel Group, Placebo Controlled Study to Evaluate the Safety and Efficacy of Oral 17β-Estradiol for the Treatment of Vasomotor Symptoms and Genital Atrophy in Postmenopausal Women."

Eli Lilly & Company (Protocol H3S-MC-GGHD) "Comparison of Raloxifene HCL, Continuous Combined Hormone Replacement Therapy and Placebo in Early Postmenopausal Women: Once a Week Estradiol-Levonorgestrel Combination Transdermal System (TDS).

Novo Nordisk Pharmaceuticals, Inc. (Protocol KLIM/USA/1/USA) "Bleeding Profile with Continuous0Combined Hormone Replacement Therapy:  A Randomized, Double-Blind, Multicenter, Comparative Trial of 1 mg 17B-Estradiol in Combination with 0.25 mg or 0.5 mg Norethindrone Acetate and Prempro®."

Procter & Gamble Pharmaceuticals (Protocol 1996023) A Randomized, Double-Blind, Placebo-Controlled 24 Month, Dose Ranging, Multicenter Study Protocol Comparing EMTDS to Placebo in the Prevention of Bone Loss in Hysterectomized Postmenopausal Women."
Ethical Pharmaceuticals (UK) Ltd.  (Protocol EPCOUS02) "A Clinical Evaluation of the Effects of Estradiol TD and Combi TD, Used Continuously, on Estradiol-Induced Endometrial Hyperplasia."

Berlex Laboratories, Inc. (Protocol 96097) "A Multicenter, Double-Blind, Randomized Comparison of Continuous Oral Estradiol-Drospirnone Combinations and Continuous Oral Estradiol, Examining the Effects on the Endometrium, Symptom, and Bleeding Patterns in Postmenopausal Women."

RW Johnson Pharmaceuticals Research Institute (Protocol ESTRNG-CHRT-106) "A Multicenter, Randomized, Double-Blind Exploratory Study Investigating the Pharmacodynamic Profile of Two Different Hormone Replacement Therapy Regimens:  Conjugated Estrogens plus

Medroxyprogesterone Acetate vs. Micronized Estradiol plus Cyclophasic Addition of Norgestimate
(Cyclophasic HRT) vs. Placebo in Postmenopausal Women."

Procter & Gamble Pharmaceuticals / TheraTech (Protocol 1998049) "A 12-week, Randomized, Parallel
Group, Multicenter, Wear Study to Assess Skin Tolerance With a 40-Week Safety Extension Period
Comparing Three Continuous Dose Regimens (0.1, 0.2, and 0.4 mg/day NETA Combined with 0.05
mg/day Estradiol) Under Condition of Routine Clinical Use."

Wyeth-Ayerst Research (Protocol 0802D1-324-US) "A Randomized, Double-Blind, Placebo and
Active-Controlled, Parallel, Multicenter Study to Assess the Safety and Efficacy of 3 ½ Day
Combinations of 17β-Estradiol/Norethindrone Acetate Transdermal Delivery Systems for Relief
of Menopausal Vasomotor Symptoms and Reduction of Endometrial Hyperplasia."

## Hypertension

GD Searle & Company (Protocol IE3-98-02-01) "A Double-Blind, Placebo-Controlled, Randomized
Study to Evaluate the safety and Efficacy of Ranging Doses of Eplernone Relative to Placebo,

Hydrochlorothiazide and Daily Dose Combinations of Eplernone and Hydrochlorothiazide for the
Treatment of Mild to Moderate Hypertension."

ALLHAT National Trial on Hypertension Agents and Heart Disease.  5-year NIH trial

Smith Kline French. Carvedilol CHF.  Four studies Phase II, III, IV

Smith Kline French. Ayerst. Norvasc. Diltiazem, Carvedilol, Inderal.  Eight studies Phase II, III, IV

## Immune Globulin (IVIG)

May Co.  Three studies Phase II and III

## Irritable Bowel Syndrome

Ayerst.  Two studies Phase III

GlaxoSmithKline.  Phase III

Pfizer.  Phase III

## Inflammatory Bowel Disease

Smith Kline French.  Cimetidine.  Four studies Phase II, III, IV

**Libido**

University of Florida.  Male and Female sexual enhancement. Erectile Dysfunction.  Melanocortin peptide.  Phase III

Pfizer.  Male.  Viagra.  Three studies Phase III.

Eli Lilly.  Male.  Cialis compared to Viagra.  Six studies Phase II and IIII

Pfizer.  Female sexual enhancement.  Viagra.  Two studies Phase III

**Lipid Lowering**

Pharmacia Corporation (Protocol NB4-00-02-009) "Clinical Protocol for a Randomized, Double-blind, Placebo-controlled Study of SD-5613 as Monotherapy in Patients with Primary Hypercholesterolemia (Monotherapy Assessment of Reducing Cholesterol [MONARCH]), IND #58,482."

**Lupus**

Amgen (Protocol 20170588)  A Phase 2b Dose Ranging Study to Evaluate the Efficacy and Safety of Rozibafusp Alfa (AMG 570) in Subjects With Active Systemic Lupus Erythematosus (SLE) With Inadequate Response to Standard of Care (SOC) Therapy. 2020

Smith Kline Beecham. Etodolac and Auranofin.  Two studies Phase III

Wyeth Ayerst.  Relafen.  Two studies Phase III

**Menopause**

Wyeth Ayerst.  Prem/Pro, Provera.  10 studies Phase III and IV

TEVA.  Four studies Phase III.

**Menopause Symptoms**

Ayerst.  Premarin.  10 studies Phase III and IV.

**Migraine**

Wyeth-Ayerst Inderol LA in Chronic Severe Migraine.  Inderol LA 160mg vs. Inderol 40mg TID vs. Calcium Channel Blocker.

Glaxo Welcome. Imitrex Injection in the Treatment of Acute Migraine and Cluster Migraine.

Glaxo Welcome. Imitrex Injection vs. Imitrex Tablets in Chronic Severe Migraine.

Smith Kline French.  Cluster Migraine.  Sumatriptan.  Naproxen + Sumatriptan – Imitrex.  Three studies Phase III.

Smith Kline French.  Cluster Migraine.  Etodolac.

Smith Kline French. Regular Migraine.  Sumatriptan.  Two studies Phase III

**Muscle Physiology**

Iovate.  Phase III

**Multiple Sclerosis**

Smith Kline Beecham.  Phase III

**NASH**

Smith Kline French.  Cimetidine.  Four studies Phase 2 and 2B

**Osteoporosis**

Procter & Gamble Pharmaceuticals/G.H. Besselaar Associates (Protocol RPE 002494) "A Randomized, Double-Blind, Placebo-Controlled, Multicenter, Parallel Group Study to Compare the Efficacy and Safety of Risedronate (NE-58095) plus Estrogen versus Estrogen Only in the Prevention of Bone Mineral Mass and No Vertebral Fractures."

Sterling Winthrop Pharmaceuticals (Protocol SR 41319B-005) "A Phase III Study of Intermittent Cyclical Tiludronate in the Treatment of Post-Menopausal Women with Low Bone Mineral Mass and No Vertebral Fractures."

Ostex International, Inc. (Protocol OST-C2): A Study of the Use of Osteomark in the Quantitation of Cross-Linked N-telopeptides of a Type I Collagen as an Aid in Monitoring the Effect of Therapies Used for the Prevention and Management of Bone Loss in Postmenopausal Women"

Mead Johnson Laboratories: Evaluation of the Effect of the 0.5 mg Estrace Compared to Placebo on Biochemical Markers of Bone Resorption in Postmenopausal Women, 1994

Solvay Pharmaceuticals, Inc.: Investigation of Three Doses of Esterifield Estrogens (Estratab®) on Bone Mineral Density and Parameters of Bone Metabolism in Postmenopausal Women, 1992.

Sterling Winthrop Pharmaceuticals (Protocol SR41319B-004) "A Phase III Study of Intermittent Cyclical Tiludronate in the Treatment of Established Post-Menopausal Osteoporosis."

Organon, Inc. (Protocol 010-006) "A Dose-Finding Efficacy & Safety Study of Tibolone (Org OD 14) for Prevention of Osteoporosis in Postmenopausal Women."

The Upjohn Company (Protocol M5410/0336) "Evaluation of Endometrial Histology and Bone Mineral Density (BMD) in Postmenopausal Women Receiving (OGEN/PROVERA) Hormone Replacement Therapy (HRT)."

Procter & Gamble Pharmaceuticals/G.H. Besselaar Associates (protocol RVN008993) "A Randomized, Double-Blind, Placebo-Controlled, Multicenter, Parallel Group Study to Determine the Efficacy and Safety of Risedronate (NE-58095) in the Treatment of Postmenopausal Women with Established Osteoporosis-Related Vertebral Deformities."

Procter & Gamble Pharmaceuticals / Quintiles Inc. (Protocol RHN009193) "A Multicenter, Randomized, Double-Blind, Placebo-Controlled, Parallel Group study to Determine the Efficacy and Safety of Risedronate in the Treatment of Osteoporosis in Elderly Women."

Novo Nordisk Pharmaceuticals, Inc. (Protocol LEV/PD/15/USA) "A Double-Blind, Randomized Placebo Controlled Trial of Three Doses of Levormeloxifene and Prempro® for the Prevention of Postmenopausal Osteoporosis."

Novo Nordisk Pharmaceuticals, Inc. (Protocol LEV/PD/16/USA) "A Double Blind, Randomized, Multicenter, Placebo-Controlled Trial of 1.25 and 2.5 mg of Levormeloxifene for the Treatment of Postmenopausal Osteoporosis."

Novo Nordisk Pharmaceuticals, Inc. (Protocol LEV/PD/17/USA) "A Double-Blind, Placebo Controlled Trial to Study the Safety and Efficacy of 2.5, 10, and 40 mg of Levormeloxifene for the Prevention of Postmenopausal Bone Loss."

Boehringer Manheim Pharmaceuticals Corporation (Protocol MF4380) "Double-Blind, Placebo-Controlled, Randomized, Multicenter Study on the Efficacy and Safety of Ibandronate (BM 21.0955)

During Three Years Treatment in Patients with Postmenopausal Osteoporosis Using an Intermittent (every 3 months) I.V. Injection Regimen of 1 mg."

Roche Pharmaceuticals (Protocol MF4492) "Double-Blind, Placebo-Controlled, Randomized, Multicenter Study on the Efficacy and Safety of Ibandronate During an Extended Two Year Partial Crossover Study of Patients Enrolled in MF4380 Using an Intermittent I.V. Injection Regimen of 0.5 mg and 1 mg Every 3 Months."

Eli Lilly & Company (Protocol H3S-MC-GGGK) "Comparison of Raloxifene HCl and Placebo in the Treatment of Postmenopausal Women with Osteoporosis."

Eli Lilly & Company (Protocol H3S-MC-GGHF) "Raloxifene HCl Versus Placebo Versus Hormone Replacement Therapy: Histomorphologic Effects in Bone Loss."

Eli Lilly.  Evista.  Six studies Phase III.

Pfizer, Inc.  (Protocol 174-106) "A Randomized, Double-Blind, Placebo Controlled Study of the Effects of Droloxifene 40 mg/d, 60 mg/d, and 80 mg/d on BMD in Osteopenic, Postmenopausal Women."

Procter & Gamble Pharmaceuticals (Protocol 1996023) A Randomized, Double-Blind, Placebo-Controlled 24 Month, Dose Ranging, Multicenter Study Protocol Comparing EMTDS to Placebo in the Prevention of Bone Loss in Hysterectomized Postmenopausal Women."

Pfizer, Inc. (Protocol 174-113) "A Study of the Safety and Efficacy of Droloxifene for Preventing Bone Loss in Normal, Early Postmenopausal Women."

Pfizer, Inc. (Protocol A2181003-5045) "A Study of the Safety and Efficacy of Lasofoxifene for the Prevention of Bone Loss and for Lipid Lowering in Postmenopausal Women at Risk for Osteoporosis."

## Overactive Bladder and Urinary Incontinence

Eli Lilly & Company (Protocol H3S-MC-SAAL) "Duloxetine Versus Oxybutnin in Patients with Urge Incontinence: A Multiple-Dose Study for Efficacy and Safety."

Pharmacia & Upjohn Pharmaceuticals (Protocol 97 OATA 039) "Dose Escalation Study with Tolterodine in Patients with Overactive Bladder.  A Single-Blind Study in Patients with Symptoms of Overactive Bladder Including Urinary Urgency and Frequency with or Without Urge Incontinence."
Pharmacia & Upjohn Pharmaceuticals (Protocol 98-TOCR-007) "Long-Term Safety and Efficacy of Tolterodine Prolonged Release Capsules.  An Open-Label, Uncontrolled, Multinational Study in Patients with Symptoms of Overactive Bladder."

Pharmacia & Upjohn Pharmaceuticals (Protocol 98-TOCR-007B) "Long-Term Safety and Efficacy of Tolterodine Prolonged Release Capsules.  An Open-Label, Uncontrolled, Multinational Study in Patients with Symptoms of Overactive Bladder."

**Pain**

    Smith Kline Beecham.  Non-narcotic vs. codeine.  Two studies Phase III

**Parkinson's Disease**

    Smith Kline French.  Aldomet.  Two studies Phase III

**Plaque Psoriasis**

    Sun Pharma Global FZE (Protocol TILD-19-12) A Multicenter, Randomized, Placebo and Active Comparator-Controlled Clinical Trial to Study the Efficacy, Safety and Pharmacokinetics (PK) of Tildrakizumab in Pediatric Subjects from 6 to <18 Years of Age with Moderate to Severe Chronic Plaque Psoriasis. 2020

**Pneumonia**

    Merck.  Cephalosporins and Azithromycin – original vs. generic.  Phase III

    Smith Kline French.  Cephalosporins and Azithromycin – original vs. generic.  Phase III

    TEVA.  Cephalosporins and Azithromycin – original vs. generic.  Phase III

**Restless Legs Syndrome**

    Smith Kline French.  Auranofin.  Phase III

**Rubella**

    Merck.  Vaccine.  Two studies Phase III

**Rotavirus**

    Smith Kline Beecham.  Vaccine.  Pediatric.  Three studies Phase III

**Seizures**

    Carter Wallace.  Felbamate.  Four studies Phase III.

**Sinusitis**

Abbott Laboratories (Protocol M00-225) "Comparative Study of the Safety and Efficacy of ABT-773 150 mg QD vs. 150 mg BID for the Treatment of Acute Bacterial Sinusitis."

Smith Kline French.  Cephalosporins.  Six studies Phase III.

**Steatorrhea**

Ayerst.  Five studies Phase 2 and 2A

**STDs**

Evofem.  (Protocol EVO-003) Phase 2B/3 double-blinded placebo-controlled efficacy trial of AMPHORA® gel for the prevention of acquisition of urogenital Chlamydia trachomatis infection. 2018

**Ulcerative Colitis**

Protagonist Therapeutics (Protocol PN-943-03)  A Phase 2 Randomized, Double-blind, Placebo-controlled, Parallel-group, Multi-center Study to Evaluate the Safety and Efficacy of Oral PN-943 in Subjects with Moderate to Severe Active Ulcerative Colitis. 2020

Pfizer. (Protocol B7981005) A Phase IIb/III, Randomized, Double-Blinded, Placebo-Controlled, Multicenter Study Evaluating the Efficacy and Safety of Amiselimod in the Induction and Maintenance of Remission in Subjects with Moderate to Severely Active Ulcerative Colitis.  2018

Smith Kline Beecham.  Two studies Phase III

**Urinary Tract Infection**

Bayer (Protocol 100398) "Prospective, randomized, double-blind, multicenter, comparative trial to evaluate the efficacy and safety of ciprofloxacin once daily extended release 500mg tablets QD for 3 days *versus* conventional ciprofloxacin 250mg tablets BID for 3 days in the treatment of patients with uncomplicated urinary tract infections".

Eli Lilly.  Smith Kline Beecham.  GlaxoSmithKline.  Multiple antibiotics, azithromycin, cephalosporins. Eight studies Phase II, III, IV

**Urine Incontinence**

    Ayerst.  Women.  Premarin, Urecholine.  Six studies Phase II, III and IV

    Merck.  Men.  Two studies Phase III and IV

    Eli Lilly.  Men.  Two studies Phase III and IV

**Urticaria**

    Smith Kline French.  Auranofin and Injectable Gold.  Phase III

**Uterine Bleeding**

    Ayerst.  Pre- Menopause.  Four studies Phase II and III.

    Novo Nordisk.  Dysfunctional Uterine Bleeding.  Four studies Phase III

    Eli Lilly.  Dysfunctional Uterine Bleeding.  Four studies Phase III.

    Ayerst.  Dysfunctional Uterine Bleeding.  Six studies Phase II, III and IV

**Uterine Bleeding**

    Ayerst.  Post- Menopause.  Eight studies Phase II and III.

**Uterine Myoma**

    Ayerst.  Two studies.  Phase III

**Weight Loss**

    Ayerst.  Six studies.  Phase II and III.

    Ayerst. Mayo Clinic.  Fenfluramine/phentermine.  Four studies Phase IV

    Iovate.  Two studies Phase III.

    Iovate.  Melanocortin. Phase III.

## Expert Consulting Work of Marvin Heuer, M.D.

Qualified as an Expert Witness on medicine, dietary supplements, dietary supplement advertising, pharmaceuticals, weight loss, clinical trials, FTC and FDA compliance, including DSHEA and supplement safety by a Federal Court

Qualified as an Expert Chemist by a Federal Court

- Hi Tech Pharmaceuticals, Inc. v. Dynamic Sports Nutrition, LLC, Civil Action File No. 1:16-CV-00949-MHC, District Court Northern District of Georgia Atlanta Division, June 2021, retained as an Expert Witness on the validity of dietary supplement ingredients, misbranded / mislabeled products

- Jolene Henderson v. Tribravus Enterprises, LLC d/b/a iForce Nutrition; and DOES 1-30, Case No. 34-2016-00194434-CU-PL-GDS, Superior Court of the State of California, for the County of Sacramento, July 2018, retained as an Expert Witness on the validity of dietary supplement ingredients, misbranded / mislabeled products.

- Shawn M. Smith, *Individually and on behalf all others similarly* situated v. Hi-Tech Pharmaceuticals, Inc., Case No. 2016CA 006862 B, In the Superior Court for the District of Columbia, Civil Division, April 2018, retained as an Expert Witness on the validity of dietary supplement ingredients, misbranded / mislabeled products.

- Hi-Tech Pharmaceuticals, Inc. and Intellectual Wellness, LLC, v. Hodges Consulting, Inc. d/b/a Double Dragon Labs d/b/a/ Double Dragon Pharmaceuticals; and John Does I-V, Civil Action No. 1:16-CV-00906-AT, District Court Northern District of Georgia Atlanta Division, July 2017, retained as an Expert Witness on the validity of dietary supplement ingredients, misbranded / mislabeled products.

- Hi-Tech Pharmaceuticals, Inc. v. Dynamic Sports Nutrition, LLC, Civil Action No. 1:16-CV-00949-MHC, District Court for the Northern District of Georgia Atlanta Division, deposition on April 28, 2017 (retained and deposed as an Expert Witness on the validity of dietary supplement ingredients, misbranded / mislabeled products, deposition in Orlando, FL)

- *Federal Trade Commission v. National Urological Group, Inc.*, Civil Action No. 1:04-CV-03294-CAP, District Court for the Northern District of Georgia Atlanta Division, testimony on April 4, 2017 (retained and testified as an Expert Witness on the validity of dietary supplement ingredients, misbranded / mislabeled products)

- *United States Of America v. Hi Tech Pharmaceuticals, Inc.*, Civil Action No. 1:13-CV-3675-WBH-JCF, District Court For The Northern District Of Georgia Atlanta Division, Deposition on November 1, 2016 (retained and deposed as an Expert Witness on validity of dietary supplement ingredients, misbranded / mislabeled products, deposition in Washington, D.C.)

- *Hi-Tech Pharmaceuticals, Inc. v. Pieter A. Cohen*, Civil Action No. 1:16-cv-10660-WGY, District Court of Massachusetts, testimony on October 26 and 27, 2016 (retained and testified as an Expert Witness on defamation and libel claims on dietary supplements)

- *Hi-Tech Pharmaceuticals, Inc. v. Pieter A. Cohen*, Civil Action No. 1:16-cv-10660-WGY, District Court of Massachusetts, deposition on September 28, 2016 (retained and deposed as an Expert Witness on defamation and libel claims on dietary supplements, deposition in Orlando, FL)

- *United States Of America v. Chenhsin Chan a/k/a Paul Chan, Wholesale Source LLC*, Criminal Indictment No. 1:14-CR-203-ODE-AJB, Department of Justice, U.S. Attorney's Office, Northern District of Georgia, testimony on May 25, 2016 (retained and testified as an Expert Witness on distribution of adulterated dietary supplements)

- *Federal Trade Commission v. National Urological Group, Inc.*, Civil Action No. 1:04-CV-3294-CAP, Northern District Court of Georgia Atlanta Division, deposition on May 17, 2016 (retained and deposed as an Expert Witness on FTC advertising on a dietary supplement, deposition in Orlando, FL)

- *Beauty Science Group Hair La Vie – ERSP Complaint*, multiple technical Expert reports provided during 2016 (retained as an Expert on ERSP/ASRC advertising on a dietary supplement)

- *Thermolife International, LLC v. Dymatize Enterprises, LLC.*, Case No. 13-cv-04527 (C.D. Ca.), deposition on October 3 and 4, 2014 (retained and deposed as an Expert Witness on patent infringement on a dietary supplement, deposition in Orlando, FL)

- *Jane Doe v. DSM Nutritional Products, Inc.*, Case No. 30-2011-00510631 (Superior Court for the State of California, Orange County), deposition on September 29, 2014 (retained and deposed as an Expert Witness on advertising claims on dietary supplements, deposition in Orlando, FL)

- *Harcol Research, LLC v. Europa Sports Products, Inc., d/b/a Europa Southwest DC*, Civil Action No. 2:13-cv-228, Technical Expert report submitted on August 12, 2014 (retained as an Expert on patent infringement)

- *Bio-Engineered Supplement & Nutrition, Inc. f/k/a Winchester, Inc. vs. Muscle Elements Inc., d/b/a Muscle Elements, Casey Crane, James Tracy, Eric Tomko, Kevin Ramos and Marcus Smalls,* Palm Beach County Circuit Court Case No. 502013CA013954XXXXMBAB, scheduled testimony on May 7, 2014 (retained as an Expert Witness on contract violation, case settled during court session before scheduled testimony)

- *Kahru v. Vital Pharmaceuticals, Inc.*, Case No. 13-60768-CIV-COHN/SELZER (S.D. Fla.), deposition on March 3, 2014 (retained and deposed as an Expert on FTC advertising on a dietary supplement, deposition in Orlando, FL)

- *Gravity Defyer Inc. v. Global Clinicals, Inc.,* Superior Court Of The State Of California For The County Of Los Angeles. Case No. L0098179, provided Expert support 2013-2014 (retained as an Expert for a clinical trial on specialty shoes)

- NBC TV – FTC Compliance regarding Pounds Lost LLC commercials, provided support to NBC for regulatory approval of commercials, 2011