# EXHIBIT 4

Redacted Deposition Transcript of Jason Huh

CONFIDENTIAL

## Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEEL SUPPLEMENTS, INC.,
a Florida Corporation,

    Plaintiff,

-vs-         CASE NO. 8:20-cv-2971-T-02AEP

BLITZ NV, LLC, a Nevada
limited liability company,
    Defendant.
_____/

VIDEOTAPED
VIDEOCONFERENCE
DEPOSITION OF:    JASON HUH
DATE TAKEN:    Thursday, September 16, 2021
TIME:    9:14 a.m. to 6:18 p.m.
PLACE:    All participants appearing
    remotely via Zoom videoconference

REPORTED BY:    Beverly Replogle, RPR
    Notary Public

CONFIDENTIAL TRANSCRIPT

## Page 2

1  APPEARANCES:
2  JASON P STEARNS, ESQUIRE
    Freeborn & Peters LLP
3      201 North Franklin Street, Suite 3550
    Tampa, Florida 33602
4      813-488-2920
    jstearns@freeborn.com
5      -and-
    BRIAN D. GOODRICH, ESQUIRE
6      Bentley Law Firm, P A
    783 South Orange Avenue, Floor 3
7      Sarasota, Florida 34236-4702
    941-556-9030
8      bgoodrich@thebentleylawfirm com
9          Appearing via Zoom videoconference on
    behalf of the Plaintiff
10
11  KEVIN P McCOY, ESQUIRE
12      Carlton Fields Jorden Burt, P A
    4221 West Boy Scout Boulevard, Suite 1000
13      Tampa, Florida 33607
    813-223-7000
    kmccoy@carltonfields com
14
15      Appearing via Zoom videoconference on
    behalf of the Defendant
16
17  ALSO PRESENT VIA ZOOM VIDEOCONFERENCE:
18      Dan Bilzerian
    Mehdy Karbid
19      Duke Stephenson, videographer
20
21
22
23
24
25

## Page 3

1      I N D E X
2  TESTIMONY OF JASON HUH:    PAGE
3      Direct Examination by Mr. McCoy............. 5
4  CERTIFICATE OF REPORTER......................... 318
5  CERTIFICATE OF OATH............................. 319
6  ERRATA SHEET................................... 320
7  LETTER TO ATTORNEY............................. 321
8      - - - - -
9
10      E X H I B I T S
11          PAGE
    Exhibit Number 1
12      12/14/20 letter............................. 10
13  Exhibit Number 3
    Amended complaint........................... 105
14
    Exhibit Number 5
15      Answer and defenses to the second
    amended counterclaim........................ 123
16
    Exhibit Number 6
17      2/2/21 filing of 3/17/17 agreement.......... 127
18  Exhibit Number 8
    3/18/21 letter to Kevin McCoy from
19      Sarah Gottlieb.............................. 230
20  Exhibit Number 9
    Text messages............................... 130
21
    Exhibit Number 11
22      Redcon1 media file.......................... 287
23  Exhibit Number 13
    12/15/17 email from Rex Raymond............. 306
24
25

## Page 4

1      THE VIDEOGRAPHER:  Good morning.  We're
2  going on the record at 9:14 a.m. on Thursday,
3  September 16, 2021.
4      This is Media Unit Number 1 of the video
5  deposition of Jason Huh taken in the matter of
6  STEEL Supplements versus Blitz NV, LLC.
7      This deposition is being conducted remotely
8  via Zoom.  My name is Duke Stephenson.  I'm
9  the videographer, and our court reporter is
10  Bev Replogle.  We both represent Anthem
11  Reporting.
12      Will the court reporter please swear in the
13  witness.
14      THE COURT REPORTER:  Before I swear in the
15  witness, I need for the attorneys participating
16  in this deposition to acknowledge that I, the
17  court reporter, am not present with the witness
18  and that I will be reporting the proceedings and
19  administering the oath remotely.  This
20  arrangement is pursuant to the Florida Supreme
21  Court Administrative Order AOSC20-16 (and
22  extended by AOSC20-23).  The parties and their
23  counsel consent to this manner of reporting and
24  waive any objections.
25      Please indicate your agreement by stating

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 5

1     your name and your agreement on the record,
2     starting with counsel for the plaintiff.
3          MR. STEARNS:  Good morning.  Jason Stearns,
4     counsel for STEEL, and no objection.
5          MR. McCOY:  Good morning.  Kevin McCoy, on
6     behalf of Blitz NV, LLC; no objection.
7          THE COURT REPORTER:  Sir, would you raise
8     your right hand for me, please.
9          Mr. Huh, do you swear or affirm that the
10    testimony you're about to give in this cause
11    will be the truth, the whole truth, and nothing
12    but the truth?
13         THE WITNESS:  Yes, ma'am.
14              JASON HUH,
15    having been first duly sworn, was examined and testified
16    upon his oath as follows:
17         DIRECT EXAMINATION
18    BY MR. McCOY:
19    Q    All right.  Good morning, Mr. Huh.  How are you
20    today?
21    A    Sorry.  The audio cut out.
22         MR. STEARNS:  I can't hear you.
23    BY MR. McCOY:
24    Q    Oh.  There we go.  Okay.
25         I'm well.  Sorry.  We had a delay there.  I

Page 6

1     don't know --
2     A    I experienced the same delay.
3     Q    Is it better now?
4     A    Yeah.
5     Q    Okay.  Where are you at today?
6     A    I am in my office at the STEEL headquarters.
7     Q    And is there anybody in the office with you?
8     A    No, sir.
9     Q    Will you agree that during this deposition,
10    except for when we're on breaks, that you'll not use any
11    kind of devices to communicate, whether verbally,
12    inverbally, electronically, texts, emails, Skype, chat,
13    anything of that sort?
14    A    Absolutely.
15    Q    And you understood that you took an oath to
16    tell the truth here today?
17    A    Yes, sir.
18    Q    Any reason you wouldn't be able to do that due
19    to any kind of medical issue?  Medication?  Underlying
20    condition?  Religious objection?  Anything of that sort?
21         THE COURT REPORTER:  I didn't hear an answer.
22    A    No, sir.
23    BY MR. McCOY:
24    Q    All right.  Who are your lawyers in this case,
25    Mr. Huh?  Who are the lawyers -- let me rephrase.

Page 7

1          Who are the lawyers for STEEL Supplements?
2     A    The lawyers for STEEL Supplements in general or
3     just regarding this case?
4     Q    Just regarding this case.
5     A    Jason Stearns, Brian Goodrich, Sarah -- I'm --
6     forgive me, Sarah.  I forgot your last name.  It escapes
7     me.
8     Q    Is that Gottlieb?
9     A    Gottlieb, yeah.  And I think that's it.
10    Q    And Mr. Stearns and Ms. Gottlieb, they're at
11    the Freeborn firm, Freeborn & Peters?
12    A    Yes, sir.
13    Q    And Mr. Goodrich is over at the Bentley Law
14    Firm?
15    A    Yes.
16    Q    And between Mr. Stearns, Mr. Gottlieb [sic],
17    and Mr. Goodrich, they've been authorized to prosecute
18    this action on behalf of STEEL; is that correct?
19    A    Yes, sir.
20    Q    And who do they report to inside of STEEL
21    concerning any issues with the case?  Is there a general
22    counsel for STEEL?
23    A    No, sir.  It's just -- they report to myself
24    and Mehdy.
25    Q    Is that Mehdy Karbid?

Page 8

1     A    Yes.
2     Q    Who has ultimate decision-making authority for
3     any of the actions that are taking -- taken in this case
4     inside of STEEL?
5     A    Myself and Mehdy.
6     Q    And as between the two of you, is it 50/50, or
7     do you have the final say as between decisions
8     concerning this litigation when it comes to you and
9     Mr. Karbid?
10    A    It will -- we like to converse on decisions
11    that we make to come to an agreement.  I don't -- I've
12    never tooken -- taken the approach that I have the final
13    say.
14    Q    Fair to say that any positions that have been
15    taken in this case by the lawyers that STEEL has hired,
16    you have approved?
17    A    Yes, sir.
18    Q    And there was a letter issued on December 14,
19    2020 purporting to terminate the agreement with Blitz.
20    Are you familiar with that letter?
21    A    Yes, sir.
22    Q    Did you approve the content of that letter?
23    A    Yes, sir.
24    Q    Prior to the letter on December 14, 2020 being
25    issued, had you ever communicated any of the grounds for

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                                        49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

| Page 9 | Page 10 |
|---|---|

**Page 9**

1  termination stated in the letter to anyone at Blitz?

2      A  No, sir.

3      Q  Had anyone at STEEL ever communicated any of

4  the grounds for termination stated in the December 14,

5  2020 letter to anyone at Blitz?

6      A  No, sir.

7      Q  Had you ever communicated any of the grounds

8  for termination in the December 14, 2020 letter to

9  Dan Bilzerian?

10      MR. STEARNS:  Object to the form.

11      A  No.  I mean, prior -- prior to the 14th?

12  BY MR. McCOY:

13      Q  Yes, sir.

14      A  No, sir.

15      Q  Had anyone at STEEL ever communicated any of

16  the grounds for termination set forth in the

17  December 14, 2020 termination letter to Dan Bilzerian?

18      A  (No audible response.)

19      MR. STEARNS:  Object to the form.

20  BY MR. McCOY:

21      Q  What was your answer, sir?

22      A  No, sir.

23      Q  And the letter, let's just -- we've marked this

24  as Exhibit 1.

25      (Exhibit Number 1 marked for identification.)

**Page 10**

1  BY MR. McCOY:

2      Q  And let me go over here.  Can you see my

3  screen, sir?

4      A  Yes, sir.  It's a little small.

5      Q  All right.  Let me see what I can do.  So the

6  other thing that I tried to do so that you would have

7  the ability to look at documents without me scrolling

8  through it, I had sent a box link today so that you can

9  open the exhibits and you can scroll through and, even

10  without the screen share, you can look at things at your

11  convenience.  I sent that right before the deposition.

12  I don't know if you got it.  If you'd like to avail

13  yourself of that, we can.  Otherwise, if you'd like to

14  do it via the screen share or both, I want to

15  accommodate being able to exchange information however

16  you're most comfortable.

17      MR. STEARNS:  Well, Kevin, this is -- you know,

18  this is Jason.  I -- I'm going to need you to send

19  me the exhibits as we've been doing in the past

20  three depositions as you pull them up so I have them

21  so I can view it.  So just -- you know, let's

22  continue to do this the way we've been doing it.

23  Send me the exhibits when you want to call them up

24  or ahead of time, whatever works for you, and then

25  you can scroll through the exhibit on your screen

| Page 11 | Page 12 |
|---|---|

**Page 11**

1  share, and the witness will answer your questions.

2      MR. McCOY:  Okay.  Did you get the box invite

3  that I sent earlier today?

4      MR. STEARNS:  I did not get it --

5      MR. McCOY:  Okay.

6      MR. STEARNS:  -- and I'm not able to open it.

7  I wouldn't be able to open it that way anyway.

8      MR. McCOY:  Okay.  You don't have access to any

9  email where you're at there, Mr. Stearns?

10      MR. STEARNS:  No, you can email it to me,

11  but --

12      MR. McCOY:  Right.

13      MR. STEARNS:  -- the box invite, that's a --

14  I'm working through various network situations with

15  different servers, so I can't -- I can't do that.

16  But I can -- if you email me the exhibit, I'll open

17  up the exhibit, but that's all.

18      MR. McCOY:  Okay.  Well, here's what -- I

19  don't -- I don't at the moment know how to now

20  email.  I was trying to make this actually more

21  simple, but now we're not going to make it more

22  simple, so I don't know how to email out of box --

23      MR. STEARNS:  Okay.

24      MR. McCOY:  -- at the moment; so for -- for the

25  first few here, which are the complaint, the

**Page 12**

1  termination letter, I'm going to ask some questions,

2  and then I'll email you the first nine that we've

3  already marked and they are in the box, and then

4  we'll -- we'll -- we'll do the more cumbersome

5  approach going forward.

6  BY MR. McCOY:

7      Q  So, Mr. Huh, can you see my screen?

8      A  Yes, sir.

9      Q  And so on December 14, 2020, it's fair to say

10  that the first time STEEL raised any of the issues that

11  are expressed in this letter from the Freeborn firm was

12  on December 14th via this written communication; is that

13  true?

14      MR. STEARNS:  You should probably read the

15  letter, Mr. Huh.

16      THE WITNESS:  Okay.  You can scroll to the next

17  page.

18  BY MR. McCOY:

19      Q  All right.

20      A  Could you just increase the size just a bit?

21      Q  Sure.  Yeah.  Is that good?

22      A  Yeah, that's good.

23      Q  Okay.

24      A  Thank you.

25      Q  Yep.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 13

1    A  You can scroll down just a bit.
2    Q  Yes, sir.
3    A  All right.  Good.  Okay.  You can scroll a
4  little bit.  All right.  Right there.  Okay.  You can
5  scroll.  Okay.
6    Q  All good?  And then we have this last paragraph
7  here.
8    A  Understood.
9    Q  All right.  You've now had an opportunity to
10  read in its entirety Exhibit 1; is that correct?
11    A  Yes, sir, as fast as I could.
12    Q  Do you need to read it again any -- in any more
13  detail, or are you satisfied to answer questions about
14  it?
15    A  I feel pretty -- pretty good about answering
16  questions about it.
17    Q  All right.  You agree with me that in no part
18  of Exhibit 1 did STEEL give Blitz the opportunity to
19  cure any of the alleged breaches outlined in the letter?
20    A  "Cure" as in -- as like fix or make right?
21    Q  Yes, sir.
22    A  Yes.
23    Q  "Yes," meaning you agree with me; that is not
24  in the letter?
25    A  Yes, sir.

Page 14

1    Q  In fact, STEEL demanded that Dan Bilzerian, on
2  behalf of Blitz NV, as its manager, agree that the
3  professional services sponsorship/license agreement
4  between STEEL Supplements, Inc., and Blitz NV, LLC, is
5  terminated as of January 13, 2021, 30 days from today's
6  date and wanted that executed that same day; is that
7  correct?
8    A  The day that we spoke?
9    Q  I'm talking about the day of this -- of
10  receiving this letter.
11    A  Oh, yes, sir.  Yes, sir.
12    Q  And if -- it says here, "If we don't hear from
13  you," in this second paragraph of Exhibit 1 -- there was
14  an -- there was already a complaint drafted.  Do you see
15  that?
16    A  Yes, sir.
17    Q  "And if we don't hear from you, we will proceed
18  to file the complaint today."  Do you see that?
19    A  Yes, sir.
20    Q  And, in fact, STEEL did file the complaint that
21  initiated this action on the same day, December 14,
22  2020?
23    A  Yes, sir.
24    Q  Do you agree with me that STEEL did not want
25  Blitz to try to cure any of the alleged breaches in

Page 15

1  Exhibit 1?
2      MR. STEARNS:  Object to the form.  Is this a
3    30(b)(6) question, Kevin?
4      MR. McCOY:  I'm asking in his personal
5    knowledge as the president and CEO of the company.
6      MR. STEARNS:  Oh, okay.
7    A  Could -- can you just repeat that one more
8  time?  I'm sorry, Kevin.
9  BY MR. McCOY:
10    Q  Yes, sir.  Did -- let me ask you:  Did you want
11  Blitz to fix any of the alleged breaches, or had you
12  already concluded that you did not want to be in a
13  relationship any longer?
14      MR. STEARNS:  Objection to the form.  Objection
15    to the form.
16    A  I feel as though the time in which we spent
17  with Dan, we had -- I had done -- I had exhausted every
18  ounce of my soul to try to fix and -- and make it work,
19  and it was -- it was just -- it came to a point where
20  enough was enough.
21  BY MR. McCOY:
22    Q  In terms of to "make it work," what -- what had
23  you done to exhaust every ounce of your soul?
24    A  Communicate as thoroughly as possible with Dan
25  regarding, you know, how to -- you know, let's -- let's

Page 16

1  work together, let's get posts done, let's post on a
2  regular basis, and try to -- you know, try to be as --
3  how do you say it? -- try to work well as possible with
4  somebody that doesn't necessarily -- it's almost like
5  you have to work on his terms rather than anybody else's
6  terms.  So it was -- it was a matter of trying to figure
7  out how to do that.
8    Q  How did you communi--
9    A  It was exhausting.
10    Q  Sorry.  Anything else besides what you just
11  told me about exhausting every ounce of your soul to try
12  to make it work?
13      MR. STEARNS:  Object to the form.
14    A  I'm sorry?
15  BY MR. McCOY:
16    Q  Anything else that you can share with me about
17  what you did in exhausting your soul -- or whatever your
18  phrase was -- in trying to make it work with
19  Mr. Bilzerian?
20    A  I mean, in a nut -- you know, as an overview, I
21  think that kind of encompasses it.
22    Q  And how did you communicate with Mr. Bilzerian?
23    A  Like -- like via text, or are you saying, like,
24  in terms of, like, how did I actually talk to him?
25    Q  It's a fair clarification.  The channels,

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 17

1    whether it was phone --
2        A  Oh.
3        Q  -- text --
4        A  Yes.
5        Q  -- email?
6        A  Text messages and phone calls.
7        Q  Text messages and phone calls?
8        A  Yes, sir.
9        Q  Emails between the two of you directly?
10       A  I don't recall too many emails.  We weren't --
11   you know, Dan -- we weren't big on emails.
12       Q  Fair to say you, Mr. Huh, had a direct line of
13   communication via either text or cell -- direct
14   cellphone access to Dan Bilzerian?
15       A  Yes, sir.
16       Q  And your main method of communicating with
17   Mr. Bilzerian would have been via text messages?
18       A  Yes, sir.
19       Q  At any point from, say, January of 2017 to the
20   present, have you had any instances where your text
21   messages or device where -- that you use for text
22   messages has been hacked?
23       A  No.  No, sir --
24       Q  Have you had --
25       A  -- not to my knowledge.  I don't know.  "Hack"

Page 18

1    can sometimes -- I'm assuming a hacker could get into
2    your device without you knowing.
3        Q  But that hasn't happened to the extent you're
4    aware of?  You're not aware of anybody highjacking your
5    text messages or writing things on your behalf; is that
6    true?
7        A  Yes, sir.
8        Q  So when -- we're going to look at some text
9    messages later today.  Is there any reason that you
10   would have to believe in reading text messages today
11   that the words exchanged between you and Mr. Bilzerian
12   were from anyone other than you, at least on your half
13   of the communication?
14       A  No, sir.
15       Q  All right.  Let's talk a little bit about you,
16   Mr. Huh.  What's your education?
17       A  Graduated from high school in 2003, and I did a
18   couple of semesters at a community college.
19       Q  Did you receive a degree?
20       A  No, sir.
21       Q  Do you have any other formal educational
22   degrees besides a high school diploma?
23       A  I guess you could consider maybe a personal
24   training certification.
25       Q  Are you a certified personal trainer?

Page 19

1        A  I haven't renewed, but I was at one point when
2    I was younger.
3        Q  When did your certification as a personal
4    trainer lapse?
5        A  Gosh, I -- over -- over ten years ago.  I'm not
6    really sure on the date.
7        Q  Do you have any certifications that would
8    qualify you to give nutrition advice to anyone?
9        A  Certifications?  No, sir.
10       Q  Do you have any certifications that would allow
11   you to give health advice to anyone?
12       A  No, sir.
13       Q  Do you have any licenses that would qualify you
14   to give nutrition advice to anyone?
15       A  No, sir.
16       Q  Do you have any licenses that would qualify you
17   to give health advice to anyone?
18       A  No, sir.
19       Q  And same question:  Certifications that would
20   qualify you to be a trainer for anyone?
21       A  Just the certification, the personal training
22   one that I had at that time.
23       Q  That's the one that lapsed?
24       A  Yes, sir.
25       Q  And that was over ten years ago?

Page 20

1        A  It was.
2        Q  So as it stands right now, the only license,
3    certification, or degree that you have is a high school
4    diploma?
5        A  Yes, sir.
6        Q  Let's talk for a minute about your email
7    accounts.  Do you have a personal email account?
8        A  Yes, sir.
9        Q  What is it?
10       A  Gosh, I have a couple of them.  J -- one is
11   jasonhuh84@gmail.com.
12       Q  Any others?
13       A  Yes, sir.  Another one is d-o-c-t-o-r,
14   doctorjhuh@yahoo.com.
15       Q  Any others?
16       A  Not -- not that I -- I actively am --
17   have use -- that I'm using.  I can't -- I don't recall
18   any.  I might have had some from many years ago.
19       Q  Do you actively use jasonhuh84@gmail.com?
20       A  Yes, sir.
21       Q  And do you use that for any STEEL business?
22       A  No, sir.
23       Q  Doctorjhuh@gmail.com, do you actively use that
24   email address?
25       A  Yes, sir.

5 (Pages 17 to 20)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 21

1    Q  Do you use that for any STEEL business?
2    A  No, sir.
3    Q  Do you use either one of those addresses to
4  communicate with anybody about the Blitz relationship or
5  Mr. Bilzerian?
6    A  No, sir.
7    Q  What email accounts do you have associated with
8  your work with STEEL?
9    A  It's the jason@steelsuppsusa.com and
10  jason@steelsupplements com.  It's the same email.  It
11  just gets filtered into -- it's the same box.
12    Q  Those are the only two?
13    A  Well, actually there's a jason@steel.co, but
14  it's just another email that gets filtered into that
15  box.  I just -- I never use it.
16    Q  Are you the individual who is in control of any
17  of the communications that come from the two STEEL email
18  accounts that you just shared with me?
19    A  Yes, sir.
20    Q  Any reason to believe that any communications
21  coming from those accounts, the words were from anyone
22  other than yourself?
23    A  No, sir.
24    Q  Let's talk social media for a minute.  What
25  social media accounts do you have?

Page 22

1    A  My -- my personal one --
2    Q  Yes, sir.
3    A  -- and -- I'm sorry -- Jason Huh on Instagram
4  and Facebook.
5    And are -- are you also asking about the STEEL?
6    Q  We'll -- we'll do -- we'll do STEEL in just a
7  second.  I want to just get -- those are current.
8    Now, have you ever had a different username for
9  either Instagram or Facebook?
10    A  For Instagram, I had Jason Huge Huh, and then
11  it got changed.
12    Q  And when did that get changed?
13    A  Oh, gosh.  I think -- I really -- it's sometime
14  in the last year.  I don't recall the exact date.
15    Q  Do you know if it was before or after
16  December 14, 2020?
17    A  Oh, gosh.  It may have been before.  I -- I
18  really am struggling to recall that one.
19    Q  What happened to the content that was on
20  jasonhugehuh@instagram?
21    A  Nothing.  It's all the same.  It just -- they
22  just changed the name, the handle.
23    Q  So all of the content that's currently on
24  jasonhuff@instagram, it's the same content, but the
25  handle has just changed?

Page 23

1    A  Yes, sir.
2    Q  All right.  Do you have -- are you the one that
3  controls all of the content at Jason Huh on Instagram?
4    A  Yes, sir.
5    Q  Are you the only person who controls the
6  content for Jason Huh on Facebook?
7    A  Well, sometimes -- as far as postings go, yes;
8  but when it comes to ads, our marketing team can run ads
9  via those two platforms actually, so I should have
10  better specified.
11    If it comes to posting on the page itself, then
12  I'm the only one that has the ability to do that; but
13  when it comes to running paid advertising, they -- they
14  do that.
15    Q  And how would -- what would a paid
16  advertisement look like on the page if we were just
17  trying to understand the difference between the two?
18    A  It -- well, a paid advertisement won't show up
19  on the page.  It will -- it will just -- it will show up
20  in other people's feeds, if you will, based upon what it
21  is that they search out --
22    Q  I see.
23    A  -- and you couldn't see it on my page.  You
24  could see it -- if you logged into the marketing
25  department's platform in which they launch ads, you

Page 24

1  could see a collection of ads that are running on behalf
2  of those pages.
3    Q  In terms of either the stories or the posts,
4  though, on Jason Huh on Instagram, you are responsible
5  for that content, correct?
6    A  Yes, sir.
7    Q  Same with Facebook?
8    A  Yes, sir.
9    Q  And have you changed any content on either
10  Facebook or Instagram in the last year in terms of
11  removing content or removing activity on either
12  platform?
13    MR. STEARNS:  Object to the form.
14    A  We -- we -- we constantly kind of -- we look to
15  clean up our Instagram and Facebook pages, as usually
16  fitness influencers do, just because things are maybe no
17  longer relevant; so maybe old, old content from years
18  ago, you can go in and you can -- you can either delete
19  or archive them.
20  BY MR. McCOY:
21    Q  And have you deleted or archived any content on
22  your personal pages in the last year?
23    A  Gosh.  Not -- not that I can recall, no, sir.
24    Q  Have you unliked or removed comments on any
25  posts associated with your Facebook or Instagram

6 (Pages 21 to 24)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 25

1   accounts in the last year?
2       A   No, sir.  Not that I can recall, no.
3       Q   STEEL Supplements, Inc., is the entity that is
4   the plaintiff in this case, correct?
5       A   Yes, sir.
6       Q   You are the owner?
7       A   Yes, sir.
8       Q   You own 100 percent?
9       A   Yes, sir.
10      Q   Do you have a board of directors?
11      A   No.  No, sir.
12      Q   Do you report to anyone?
13      A   No, sir.
14      Q   STEEL Supplements was formed in May of 2016?
15      A   Yes, sir.
16      Q   And what is the -- what does STEEL Supplements
17  do?
18      A   We manufacture supplements in, I guess, you
19  know, the fitness space.  And we -- we also manufacture
20  and sell various items like shirts and cups, things of
21  that nature, proteins, meal replacements, preworkouts,
22  fat burners.  And then we pride ourselves on the -- you
23  know, the messages that we deliver on social media
24  regarding, you know, the -- the -- the brand and the
25  products that we -- that we sell and create and --

Page 26

1   create and sell.
2       Q   And what is the -- do you have a mission
3   statement for STEEL?  Is there some kind of a company
4   mission statement that's the official kind of marching
5   statement of the company?
6       A   Yes, sir.
7       Q   What is it?
8       A   Off the top of my head, it actually escapes me.
9   My -- I'm sorry.  My brain is on depo mode here.  It's
10  kind of embarrassing, to be honest.  I wrote it myself.
11      Q   Is that -- is that something that's written
12  down somewhere?
13      A   Yes, sir.
14      Q   Do you remember any of the concepts or
15  principles that are in the STEEL Supplements' mission
16  statement?
17      A   Yes, sir.
18      Q   What are some of those?
19      A   It's to, you know, provide motivation, service,
20  products in order to improve the lives of everyone that
21  is experiencing the brand and to help to better humanity
22  as a whole.
23      Q   And has that been the same mission statement
24  since STEEL Supplements was formed in May of 2016?
25      A   Not the -- well, that's always been the

Page 27

1   intentions; but the actual statement, word for word,
2   wasn't written until -- oh, gosh -- maybe 20- -- 2017,
3   maybe; 2017, 2018.
4       Q   All right.  And so -- that's fine.  If it
5   was -- whenever it was in maybe 2017, 2018, since that
6   time, whatever the mission statement that was written
7   down, it hasn't changed; is that correct?
8       A   Yes, sir.
9       Q   The purpose of the company has remained largely
10  the same?  There hasn't been a shift in -- in the
11  company's purpose?
12      A   No.  No, no shift.
13      Q   Are there -- besides the mission statement, is
14  there any kind of code of conduct that STEEL Supplements
15  has?
16      A   Not on -- not on paper, no.
17      Q   Is there anything informally that would be part
18  of a code of conduct for STEEL Supplements?
19      A   I think it's just an unspoken.  We -- we -- we
20  treat each other with respect, and we treat everybody
21  else with respect, and we try to do the best for
22  everybody around us and our customers.
23      Q   Treat each other with respect, treat the
24  customers with respect?
25      A   Yes, sir.

Page 28

1       Q   And I'm sorry.  What was the last part?  Do the
2   best for everyone around them?
3       A   Do the best that we can, you know, for our
4   surrounding -- our peers or, you know, each other, our
5   co-workers.  We treat -- you know, we kind of -- we want
6   to treat everybody as you would want to be treated
7   per se.
8       Q   The old Golden Rule?
9       A   Yes, sir.
10      Q   What is the target customer for STEEL?  Is
11  there a -- is there an ideal demographic that -- that
12  STEEL is targeting for its products?
13          MR. STEARNS:  Object to the form.
14      A   You know, well, anybody that's looking to
15  better their body or their mind through physical
16  fitness.
17  BY MR. McCOY:
18      Q   So is there a -- is there an age group that
19  STEEL targets for that -- that group?
20      A   We primarily --
21          MR. STEARNS:  Object to the form.
22      A   -- target 18 and older.  We don't -- we
23  don't -- you know, we don't target younger than 18.
24  BY MR. McCOY:
25      Q   What about gender?  Is there any kind of target

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 29

1  of male versus female?
2      A  Not -- not intentionally, no.  We -- I think
3  naturally we have more male clients than women clients.
4      Q  What about sexual orientation?  Does STEEL
5  target anything concerning sexual orientation or an
6  audience in that regard?
7      A  No.  I don't -- I don't know how you actually
8  could do that on social media.
9      Q  What about income?  Is there a -- is there a
10  specific demographic that STEEL targets as a customer
11  base based on income?
12          MR. STEARNS:  Object to the form.
13      A  No.
14  BY MR. McCOY:
15      Q  Anyone who can afford to buy the product?
16      A  Yes, sir.
17      Q  Okay.
18      A  We have a variety of products that kind of
19  range in price, too; some for more -- some are -- you
20  know, could be considered more affordable and some maybe
21  more expensive.
22      Q  And what about profession?  Are there any
23  particular professions that STEEL targets in terms of
24  its customer base?
25          MR. STEARNS:  Object to the form.

Page 30

1      A  No, sir.
2  BY MR. McCOY:
3      Q  And what about race?  Is there any particular
4  race that STEEL targets with respect to any of its
5  customer base?
6      A  No, sir.
7      Q  So STEEL's goal, then, would be respect for
8  customers across all of those different categories and
9  then would -- the one exception would, I guess, be
10  18-plus on the age; is that fair?
11      A  Yes, sir.
12      Q  Let's talk about marketing.  What types of
13  marketing does STEEL use?
14          MR. STEARNS:  I'm going to object to the form
15      of the question.
16      A  Mainly social media-based marketing; SEO work;
17  and every now and again -- well, prior to the pandemic,
18  we -- we -- we were doing an experiences in gyms.  We
19  have done a couple of expos, fitness expos, and -- but
20  that's -- that's it.
21      Q  So let's start -- no, let me get rid of a few
22  things.
23          Does STEEL use kind of like billboards by the
24  highway?
25      A  We actually -- yeah, we actually just put one

Page 31

1  up a few months ago.
2      Q  And where is that located?
3      A  A few miles from our headquarters.
4      Q  In Sarasota?
5      A  Yes, sir, just -- just that one.
6      Q  Is that the only billboard that STEEL has had?
7      A  Yes, sir.
8      Q  What about TV commercials?  Does STEEL utilize
9  TV commercials?
10      A  On actual TV, no, sir.
11      Q  So social media -- well, let's back -- let's
12  back through a few of these.
13          Appearances in gyms, how often does STEEL --
14  was STEEL doing or is it doing appearances in gyms?
15      A  Weekly, sometimes biweekly.
16      Q  And what does it mean to do an appearance in
17  gyms?  Is there some kind of STEEL spokesperson who goes
18  and sets up a table or a booth?
19      A  Yes, sir, exactly.  And we hand out samples,
20  and we answer questions, things of that nature.
21      Q  So that would be somebody going to a specific
22  gym for a period of time to capture any traffic coming
23  through, give out samples, answer questions?
24      A  Yes, sir.
25      Q  And then the billboard would be capturing

Page 32

1  anybody who happens to drive by and see that billboard
2  on that road in Sarasota?
3      A  Yes, sir.
4      Q  And then what is SEO work?
5      A  SEO work is what we -- we -- we create content
6  via writers, copywriters, that pertain to fitness and --
7  and research -- some research-based articles that were
8  written by a doctor and some written just by bloggers
9  that is used as a means of informing people via the Web;
10  and those people, after being informed, are able to,
11  therefore, purchase the product.  So it's a -- SEO work
12  is a pretty substantial part of our marketing.
13      Q  So is that kind of like people ask questions or
14  you post content about questions or give advice about
15  products type of information?
16      A  No, no questions that they've asked.  It's just
17  we -- we want to write articles based upon maybe things
18  that are trending or are relevant within the space or
19  things that we think people would want to be more
20  informed on, and then we write the articles from there.
21      Q  And the majority of the products, besides --
22  you mentioned some of the shirts and bags and things
23  like that, the bulk of the product line for STEEL are
24  products that you're intending a customer or a consumer
25  to ingest; is that correct?

8 (Pages 29 to 32)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 33

1    A   Yes, sir.
2    Q   And you have actually filmed contents that is
3   part of STEEL's marketing effort discussing various
4   products; is that right?
5    A   Yes, sir.
6    Q   And you have recommended to consumers to buy
7   products and consume them, correct?
8    A   Yes, sir.
9    Q   And you have discussed the ingredients that are
10   in the various products in those videos?
11    A   Yes, sir.
12    Q   And what qualification beyond a high school
13   diploma do you have to provide those recommendations to
14   consumers?
15    A   No -- no qualifications beyond a high school
16   diploma.
17    Q   And in the videos that you have recorded,
18   you've actually told consumers how to use the product?
19    A   Yes, sir.
20    Q   And what they should expect the product to do
21   once they consume it?
22    A   Yes, sir.
23    Q   And have the statements that you have provided
24   to consumers about the consumption of STEEL products
25   ever been vetted by a physician or a medical

Page 34

1   professional?
2    A   Yes, sir.
3    Q   Have all of the statements that you have
4   provided to consumers about how to use STEEL products
5   been vetted by a medical professional?
6    A   Every single one?  I would have to say no, sir.
7    Q   Let's now talk about social media.  Besides
8   Instagram and Facebook, are there other social media
9   platforms that STEEL utilizes that you are aware of?
10    A   Snapchat, TikTok, and YouTube.
11    MR. STEARNS:  Kevin, when you get to a good
12   spot --
13    MR. McCOY:  Sure.  Let me -- let's see.  It's
14   9:57.  Give me just a couple of minutes here real
15   quick.
16    THE WITNESS:  I'm sorry.  You broke up, Jason.
17   What was that?
18    MR. McCOY:  He was asking for a break.
19    MR. STEARNS:  Yeah, I'm having some -- I'm
20   having some connection issues, which is why I want
21   to take a break, because I've been missing some
22   stuff, but I don't think I'm missing much that's
23   important.  Before this goes too further, I need to
24   fix something on the connection, so I'd like to take
25   a break.

Page 35

1    THE WITNESS:  Understood.
2    MR. McCOY:  Okay.  Let's take a break, and you
3   can fix your connection there.
4    MR. STEARNS:  Okay.  Thank you.
5    THE VIDEOGRAPHER:  Okay.  Off the record at
6   9:57 a.m.
7    (Recess taken from 9:57 a.m. to 10:11 a.m.)
8    THE VIDEOGRAPHER:  Back on the record at
9   10:11 a.m.
10   BY MR. McCOY:
11    Q   All right.  Mr. Huh, we were talking before the
12   break about -- I think we were supposed to -- or we were
13   about to start talking about social media.
14    A   Yes, sir.
15    Q   Out of the various forms of marketing that we
16   talked about, billboard, SEO work, and gym appearances,
17   is social media the most wide-reaching marketing effort
18   that you're aware of for STEEL?
19    MR. STEARNS:  Object to the form.
20    A   No.  SEO would be.
21   BY MR. McCOY:
22    Q   SEO would -- would be the most wide-reaching?
23    A   Yes, sir.
24    Q   And why do you say that?
25    A   Well, because when people search general terms

Page 36

1   or are looking to learn about various fitness techniques
2   or dietary supplements, it encompasses anybody that --
3   that gets on Google and is browsing.  And social media
4   is -- it's a smaller -- I mean, it's a very large pool,
5   but it is a smaller pool than Google, if you will.
6    Q   So if I understand, then, SEO would capture the
7   people who are searching for a particular type of
8   product as opposed to social media would just be
9   reaching out to anybody, whether they may have been
10   looking or not?
11    A   Yes, sir.  Kind of like if you're watching TV
12   and you were to see an ad pop up versus people that are
13   actively looking for information.
14    Q   Right.  Like Super Bowl ad hits everybody who's
15   watching the game or watching the ads, but if you
16   were -- and that's whether you were looking for whatever
17   the product is or not, like Pepsi?
18    A   During the Super Bowl, right.
19    Q   Right.  Right.  And is there somebody at STEEL
20   who manages the social media efforts for the company?
21    A   Yes, sir.  Yes, sir.
22    Q   Who's that?
23    A   Well, it's kind of a group effort.  There's Ian
24   who manages ads; Jacob Goodwin.  Mehdy does the data
25   analysis.  We have a data analysis team, if you will.

9 (Pages 33 to 36)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 37

1  And I -- I oversee the creative side of things, creative
2  content, things of that nature.  And then I don't
3  produce it, but there's also a team that does videos and
4  photography work.  There's also a team that manages what
5  gets posted and when.  So it -- it's a -- it's a
6  relatively large group.
7      Q  You built or you started STEEL after a career
8  in bodybuilding?
9      A  Yes, sir.
10     Q  And fair to say -- I'm sorry.  Go ahead.
11     A  Yeah.  I'm -- my bodybuilding career is --
12  earlier you had asked about if I had any qualifications
13  or college degrees or whatnot, but I -- I -- to be
14  clear, I kind of -- I didn't want to go to college, and
15  I knew I wanted to be a professional bodybuilder.  So
16  bodybuilding was my -- that -- I considered that my
17  schooling, if you will, was my time spent as a
18  bodybuilder and the shows that I won.  That would be --
19  you know, that was what I wanted to do rather than to go
20  to college.
21     Q  I understand.  You wanted to pursue
22  professional bodybuilding as a -- as an actual career?
23     A  Yes, sir.
24     Q  And do you draw upon your experiences as a
25  professional bodybuilder for your desire to start STEEL?

Page 38

1      A  Yes, sir.
2      Q  And do you draw upon your experiences as a
3  professional bodybuilder in the creation of STEEL
4  products that go to consumers?
5      A  Yes, sir.
6      Q  You are still actively involved in the
7  formulation of all of STEEL's products; is that correct?
8      A  Yes, sir.
9      Q  And who else is on that formulation team?
10        MR. STEARNS:  Kevin, just to interrupt for a
11     second.  I believe -- (audio distortion) -- some of
12     this stuff --
13        THE COURT REPORTER:  Hold on.  I'm sorry, but
14     there was some interference there.  Would you start
15     over, please, Mr. Stearns?
16        MR. STEARNS:  Yeah.  I apologize.  It sounds
17     like we might be getting into questions that would
18     be deemed confidential, at least from where it
19     sounds like you're going, Kevin, so I'll go ahead
20     and designate the deposition transcript confidential
21     at this point.
22        MR. McCOY:  Okay.  That's fine.
23  BY MR. McCOY:
24     Q  So, Mr. Huh, who else is on the formulation
25  team for products?

Page 39

1      A  Andrew.
2      Q  What's Andrew's last name?
3      A  Oh, my gosh.  I'm sorry.  That escapes me.  I'm
4  not good with names.  I'm -- my apologies.  I don't
5  recall.
6      Q  Anybody besides Andrew?
7      A  Our manufacturers.  There's a team of
8  scientists that help facilitate in putting together
9  products.
10     Q  Those are non-STEEL employees.  They are
11  contractors or consultants?
12     A  Yes, sir.
13     Q  All right.  That's fine.  Let's come back to
14  marketing real quick.
15        We were talking -- I had Ian.  We have
16  Jake Goodwin, Mr. Karbid, and then yourself, Mr. Huh.
17        You -- you approve creative content; is that
18  right?
19     A  Well, I'm a part of -- we've -- I'm not, like,
20  the final say.  The -- we create content, and we kind of
21  all -- the guys that are on the creative team, we all
22  have a good understanding of what content needs to
23  be created, and we all agree on it; but I'm not -- I
24  don't give, like, the final stance of approval.
25        There's a lot of content that gets created that

Page 40

1  I actually -- I never see, but I've instilled, you know,
2  my thoughts.  And my brother's also part of the company,
3  and he instills his artistic background into what he
4  thinks should be portrayed, if you will.
5      Q  Is that Paul Huh?
6      A  Yes, sir.
7      Q  But, as the CEO, if there's ultimately a
8  decision to be made about creative content, you have the
9  final say; is that true?
10     A  Yes, sir.
11     Q  And part of the STEEL brand is actually built
12  around you; is that correct?
13     A  Yes, sir.
14     Q  In many ways you are the face of STEEL?
15     A  I don't know if you could say that anymore.
16  When it -- when it was launched, yes; but now I -- my
17  objectives with launching STEEL was that I necessarily
18  wasn't the face and that over time the customers, the
19  team, STEEL itself, would have -- would be able to walk
20  on its own, if you will.
21     Q  So do you agree or disagree that -- that you
22  are still part of the brand, you personally are part of
23  the STEEL brand?
24     A  Yes, sir, I'm a part of it.
25     Q  And what you do reflects on the STEEL brand,

10 (Pages 37 to 40)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 41

1  correct?
2      A  Yes, sir.
3      Q  Who was the first social media influencer that
4  STEEL associated with?
5      A  My -- myself.
6      Q  So the first influencer for social media would
7  have been you personally, correct?
8      A  Yes, sir.
9      Q  And that would have involved you making posts
10  on behalf of STEEL?
11      A  Yes, sir.
12      Q  And showing STEEL product?
13      A  Yes, sir.
14      Q  And promoting the brand of STEEL?
15      A  Yes, sir.
16      Q  And who was the second social influencer?
17      A  Oh.  My brother was -- you know, he -- he had
18  done some -- little postings here and there.  I can't
19  recall with certainty that -- who -- who -- who else was
20  next.
21      Q  At some point there was a relationship where
22  Mr. Bilzerian would make posts concerning STEEL
23  products?
24      A  Yes, sir.
25      Q  How did you -- how did you first meet

Page 42

1  Mr. Bilzerian?
2      A  "Meet" as in meet in person or just connect?
3      Q  That's a -- you know what?  I don't want to go
4  into that segment yet.  Let's -- I want to finish.  I
5  apologize.  Let me withdraw that.
6          How many in- -- social media influencers does
7  STEEL have now?
8      A  Oh, gosh.  Maybe a couple hundred.
9      Q  And does STEEL maintain a list of -- of the
10  user names or the handles, if you will, of who would be
11  part of the STEEL social media influence list or group?
12      A  Yes, sir.
13      Q  Who would maintain that list inside of STEEL?
14      A  The -- the marketing team.
15      Q  That's the group that you just explained to me
16  with Mr. Goodwin and Mr. Karbid and I think it was Ian?
17      A  Yes, sir.
18      Q  All right.  And does STEEL pay the social media
19  influencers who are on that list?
20      A  Yes, sir.
21      Q  Does it pay them per post?
22      A  Every contract is a little different, and it
23  kind of -- it just depends on the person and the
24  relationship we have with them and what they're
25  comfortable with and how they want to go about posting

Page 43

1  and how frequent or whatnot.  So we kind of work back
2  and forth to create a custom -- a more customized
3  relationship, if you will.
4      Q  So customized based on who the influencer is?
5      A  Yes.
6      Q  And does STEEL require that anybody who's on
7  the list of social media influencers identify that they
8  have a paid relationship with STEEL?
9      A  I'm sorry.  Repeat that one more time.
10      Q  Yes, sir.  Does STEEL require that any of the
11  social media influencers who are on the list that we
12  just talked about reveal that they have a paid
13  relationship with STEEL?
14          MR. STEARNS:  Object to form.
15      A  Off the top of my head, I'm -- I'm not sure.  I
16  don't think so.  I -- I can't say with certainty.
17  BY MR. McCOY:
18      Q  So you can't say with certainty whether STEEL
19  requires that they identify the --
20      A  Well, you know what?  Now that I think about
21  it, we -- we do have them place our domain within their
22  profile as a means of saying that that's kind of how
23  the -- you know, the social media role identifies that I
24  am working with this company.  So, yes, sir.
25      Q  So you have the social media influencers place

Page 44

1  STEEL's domain.  That would be @STEELSupplements?
2      A  Well, the URL, like steelsupplements.com, and
3  the -- and/or the Instagram handle @STEELSupplements.
4      Q  Does it require that the social media
5  influencers identify that the post is a paid promotion?
6          MR. McCOY:  Object to the form.
7      A  I -- I think, yeah.  I'm not sure if it's a
8  requirement.  I can't -- I think it is, and that would
9  be through various hash tags and things of that nature.
10  BY MR. McCOY:
11      Q  So if we were going to try to figure out the
12  answer to that question, it sounds like each one of
13  these various contracts would outline the terms of those
14  particular issues; is that fair?
15          MR. STEARNS:  Object to the form.
16      A  Yes, sir.
17  BY MR. McCOY:
18      Q  Does STEEL have any kind of written policy
19  governing its social-influencer relationships in terms
20  of guidelines for the company or what it requires as
21  part of a relationship?
22          MR. STEARNS:  I'm going to object to the form
23      of that question.
24      A  Yes, sir.  It's in the contract.  There's -- I
25  haven't read it myself.  Like, I don't recall, but

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 45

1   there's a clause -- I'm sure that there's a clause in
2   there or -- I remember -- regarding how to conduct
3   themselves.
4       BY MR. McCOY:
5       Q   In terms of revealing the paid relationship?
6       A   Oh.  I thought it was just in regards to how
7   they conduct themselves as an individual or on social
8   media, how they represented the brand.
9           As far as the -- revealing the -- I'm -- I
10  don't recall.
11      Q   What do you remember about the clause on how
12  they represent the brand?
13      A   I -- I -- honestly, I don't know what was in
14  the clause word for word.
15      Q   Are there restrictions on activities or conduct
16  that they can be associated with?
17      A   I'm -- again, Kevin, I'm not -- I'm not too
18  certain.  I wouldn't want to just speculate on -- on
19  something.  I would imagine there would be, but I don't
20  know what the details of that are.
21      Q   In the complaint, STEEL has alleged that
22  products associated with cannabis or THC are
23  antithetical to STEEL's brand.  Is that -- is that true,
24  sir?
25      A   Antithetical?  Yes, I would -- it really

Page 46

1   depends on the usage of THC, if you will, and how it's
2   being used and whether or not it was prescribed or not.
3   If there's medical purposes behind it, then so be it;
4   but if -- if there's -- if it's legally an issue, then
5   it -- we -- we try to steer away from such matters.
6       Q   And just -- we'll talk about it more later, but
7   paragraph 90, "Ignite's THC-based products are
8   antithetical to STEEL's health-conscious and U.S.-based
9   brand."  That's in paragraph 90.
10          And then in paragraph 91, it says, "Bilzerian's
11  ownership and promotion of such products puts the STEEL
12  brand at risk of dilution and risks isolating STEEL's
13  health-conscious customers who turn to STEEL for fitness
14  products, not illicit drugs."
15      A   Yes, sir.
16      Q   And is that a true statement?
17      A   To the best of my knowledge, yes, sir.
18      Q   STEEL does not want to be associated with any
19  THC-based products; is that right?
20      MR. STEARNS:  Object to the form.  That's not
21  what you just asked him.
22  BY MR. McCOY:
23      Q   Does -- does STEEL, as a brand, want to be
24  associated with any THC-based products?
25      A   No, sir, not -- not -- not -- I should -- not

Page 47

1   at the moment because largely of the legal issues behind
2   it all.
3       Q   "Not at the moment."  So was there a period
4   when STEEL was okay with being associated with THC-based
5   products?
6       A   Not in- -- intentionally associated with it,
7   not -- not -- not that I can recall outside of the
8   relationship with Dan and the sale of THC.  It's mainly
9   the sale, the legality on a federal level, that was a
10  concern for us.
11      Q   And I'm -- I'm not talking about -- I'm not
12  talking about actually selling THC-based products.
13  I'm -- I'm asking about STEEL's brand being associated
14  with THC-based products.  And by "THC," you understand
15  I'm talking about weed, right?
16      MR. STEARN6S:  Well, I'm going to object to the
17  form.  I mean, I --
18  BY MR. McCOY:
19      Q   Okay.  Do you know what THC is, sir?
20      A   It's a compound within the marijuana plant.
21      Q   And that goes sometimes by the name "weed"?
22      A   Yes, sir.
23      Q   All right.  And was there a period of time
24  where STEEL was okay with its brand being associated
25  with weed?

Page 48

1       A   I -- I -- there may have been; but as we've
2   evolved and grown, we -- we've -- you know, we've
3   acquired different customers, and we -- we listen to the
4   customers and, you know, want their feedback and what
5   it is that they're looking for in a brand, and -- and we
6   have, you know, pivoted on multiple occasions in order
7   to do right by the end consumer.
8       Q   Understood.  So as we sit here today, on
9   September 16, 2021, STEEL has pivoted away from any
10  association with a THC-based product?
11      MR. STEARNS:  I'm going to object to the form.
12      A   To just -- yes, sir, that we -- we're not
13  trying to sell or promote or endorse any -- any THC-type
14  product.  Unless the person is using it for medicinal
15  purposes, I don't -- we don't want to -- we don't want
16  to associate with it.
17  BY MR. McCOY:
18      Q   Understood.  And that was -- when we looked at
19  Exhibit 1 earlier, that was actually one of the grounds
20  that was stated in Exhibit 1 in addition to the
21  complaint; is that correct?
22      A   Yes, sir.
23      Q   All right.  And that remains a ground upon
24  which STEEL is going to ask the Court to find that the
25  contract with Blitz was properly terminated; is that

12 (Pages 45 to 48)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 49

1  correct?
2      A  Yes, sir.
3      Q  Now, let's go back for a minute to social
4  media.  Just I want to understand how it -- your
5  understanding of how it works.
6          What -- will you just describe your
7  understanding of -- we'll start with Instagram.  What is
8  a post?
9      A  Posts can mean anything from like an
10  Instagram -- well, just social media in general,
11  correct, not a --
12      Q  Well, I -- I would like to split it out because
13  I don't know if there's a difference between the
14  different platforms.  So if we can just go through them.
15  I have Instagram, but I'm no -- I have like 100 people
16  who follow me, and I don't have Facebook so I'm not -- I
17  don't know --
18      A  Right.
19      Q  -- about all of this stuff.
20      Instagram, let's save that.  A post is what?
21      A  So if you were to go and post a picture or an
22  Instagram story or post a picture within the Instagram
23  story, that would be considered -- that's -- you know,
24  we call that a "post."
25      Q  Okay.  And a post, is -- is that static or is

Page 50

1  that something that's a -- could be a media file, like a
2  video?
3          MR. STEARNS:  Objection.
4      A  Yeah, it could be either.
5  BY MR. McCOY:
6      Q  And then there's something called a "story"; is
7  that right?
8      A  Yes, sir.
9      Q  And what's a story?
10      A  There's a feature in Instagram and -- well,
11  across a lot of platforms where you can video or take a
12  photograph of something that will be available for
13  people to see for a 24-hour period.
14      Q  And then after the 24 hours, it goes -- I don't
15  know if it goes away, but at least the general public
16  can't see the story; is that right?
17      A  Yes, sir.
18      Q  And then for both posts and stories, is one of
19  the goals to get people to interact with the content?
20      A  Well, you know, can you repeat that one more
21  time, because I'm a little confused on -- you said posts
22  in -- posts in the stories itself or posts in general?
23      Q  Yeah.  I was saying for both posts and stories,
24  is one --
25      A  Okay.  Good.

Page 51

1      Q  -- of the purposes to get people to interact
2  with the content?
3          MR. STEARNS:  Objection.
4      A  Yes.  You post on your -- let's say you do a
5  grid post, which is the static post where you can post a
6  video or a picture, people can like or comment on that
7  post.
8  BY MR. McCOY:
9      Q  And so "like" is -- is what it sounds like,
10  that's the little thumbs-up, that means they like it?
11      A  On Facebook, I think it's a thumbs-up.  On
12  Instagram, it's a heart.
13      Q  It's a heart.
14          And then comments are just where they can --
15  they can add a comment or they could even in the comment
16  they could add -- tag someone, right, where they can add
17  someone else to the conversation, if you will?
18      A  Yes, sir.
19      Q  And one of the reasons that STEEL would use
20  social media -- I think we talked about this -- is to
21  catch the bigger audience, maybe not even people who are
22  looking for the product, right?
23          MR. STEARNS:  Object to the form.
24      A  I'm sorry.  Repeat that one more time.
25  BY MR. McCOY:

Page 52

1      Q  Yeah.  Sure.  So in using social media, is --
2  let me ask you a different question.
3          In using social media, is one of the reasons
4  that you use it to get your name and the STEEL brand out
5  to a wider audience?
6          MR. STEARNS:  Object to the form.
7      A  Yeah.  Well, yes, sir.  Yes.
8  BY MR. McCOY:
9      Q  And you have hundreds of thousands of followers
10  yourself; is that correct?
11      A  Yes, sir.
12      Q  And followers are people who would get your
13  content anytime you post something; is that right?
14      A  Repeat that one more time.
15      Q  Yeah.  Well, let me ask you:  What is your
16  understanding of what a follower is?
17      A  A follower is somebody that gen-- you'll
18  follow somebody that you like their content or what --
19  what it is they're posting.
20      Q  Now, let's go back to the different social
21  media influencers.  Are there things called "brand
22  ambassadors" for STEEL?
23      A  Yes, sir.
24      Q  And what's the difference between a brand
25  ambassador or a social media influencer?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 53

1      A  The technicalities of that definition, I'm not
2  sure on; but if I were to assume, it's relatively the
3  same kind of thing.
4      Q  Is there a different list of people who would
5  be considered STEEL brand ambassadors from the people
6  who are social media influencers?
7      A  Not that I'm aware of.  Because -- I'm trying
8  to think.  If you're not on social media -- we don't
9  have any ambassadors outside of social media that I can
10  think of.  It would be -- let's say, there's people that
11  would go to events or something like that because we use
12  employees.
13      Q  Okay.  So what is the criteria to be a -- let's
14  say a social influencer for STEEL?
15      A  Well, we want the person to, you know, be some
16  level of physical or some -- some type of physically
17  active influencer, whether that be a runner, a tennis
18  player, a bodybuilder, a -- we have a -- we have a
19  Motocross.  We have Motocross competitors on our team,
20  and so we had a skateboarder; so anybody that -- it
21  encompasses anybody that's physically active, if you
22  will, and -- yeah.
23      Q  Is there -- do they have to have a certain
24  level of social media following to be considered?
25      A  Absolutely not.  Not that I'm aware of, no,

Page 54

1  because we have influencers as small as a couple of
2  thousand followers.
3      Q  How do you become a social media influencer for
4  STEEL?  Is there like an application, or do you reach
5  out to people?
6      A  No.  They -- there's an application where they
7  can come to the website and read through and fill out
8  their info; and -- but then there's also people that
9  reach out just directly to the STEEL Instagram page or
10  Facebook one of the -- you know, they'll just message
11  one of the platforms.  And we've had people -- I've had
12  people message myself as well to become an influencer;
13  and, you know, some -- the -- the -- we -- we -- I know
14  there's an application process, but there's many -- many
15  of the times I've made rules to the exception where
16  somebody will come on board, and -- and it just feels
17  right, and they really are passionate about the brand
18  and they -- they really want to be a part of it and so
19  I -- I do my best to have a conversation with them and
20  get to know them a little bit better and -- and -- and
21  have them come on board.
22      Q  Is Dan Bilzerian -- does he have the largest
23  following of any social media influencer associated with
24  STEEL?
25      A  Yes, sir.

Page 55

1      Q  And do you know what his social media following
2  was at the time that you first started communicating
3  with him about a relationship?
4      A  Oh.  He was, I think, in the neighborhood of
5  24 million, if I remember correctly.
6      Q  So he --
7      A  I'm sorry.
8      Q  Sorry.  Go ahead.
9      A  That's on Instagram.
10      Q  Got it.  So that's Instagram only?
11      A  Yes, sir.  As far as the other platforms, I --
12  I don't recall that number.
13      Q  All right.  But we know a baseline was roughly
14  24 million followers at the time you first started
15  talking with Mr. Bilzerian?
16      A  I'm -- I'm guessing around there.
17      Q  Was there anybody who was a social media
18  influencer at the time you first started talking to
19  Mr. Bilzerian that even had 100,000 followers?
20      MR. STEARNS:  Object to the form.
21      A  Well, myself.  There were other people that had
22  done -- there were fitness influencers within the
23  industry that were trying our products that had big
24  followings, and they were basically, like, showing love
25  for me in the fitness industry and saying, "Hey, I tried

Page 56

1  this.  And Jason -- you know, the STEEL team did a great
2  job," so on and so forth; but I don't -- they weren't on
3  board as a paid ambassador.
4      The other influencer that we had that has a
5  large following would be Robert Frank, and it's over --
6  he has over a million followers.
7      Q  Did he have over a million back in early 2017?
8      A  No.  I don't recall the number.
9      Q  And Robert Frank is still a social media
10  influencer for STEEL?
11      A  Yes, sir.
12      Q  And STEEL considers the content that Mr. Frank
13  posts to be consistent with the brand?
14      MR. STEARNS:  Object to the form.
15      A  Well, it is consistent with the brand, but --
16  I'm sorry.
17  BY MR. McCOY:
18      Q  Yes?
19      A  Oh, I got some -- some static.  It is
20  consistent with the brand, and -- and -- and Robert
21  Frank is -- like, we consider Robert a comedian for the
22  brand, if you will.  He's kind of -- we -- the fitness
23  industry views Robert Frank as, like, the -- if you're
24  familiar with wrestlers of the, you know -- well,
25  wrestling, WWE-type stars of the '80s and '90s.  He has

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 57

1    a persona and a personality where he likes to intensify
2    things, if you will.
3        Q   He does a Macho Man impersonation?
4        A   You got it.
5        Q   And he likes upper body, not legs?
6        A   Yeah.  Yeah, you got it.  That's -- that's his
7    schtick, if you will, so he makes light of it.  Even
8    though it's advisable if you are trying to bodybuild, we
9    obviously advocate that you pay attention to 50 percent
10   of your body, Robert has garnered a large following by
11   making light of the situation.
12       Q   Okay.  Fair to say that at the time you first
13   met Mr. Bilzerian, his audience was tens of millions
14   greater than any other social influencer that STEEL was
15   associated with?
16       A   Yes, sir.
17       Q   And STEEL was attracted to a relationship that
18   exposed its products to that audience, true?
19       A   Yes, sir.
20       Q   What does "retargeting" mean in marketing?
21       MR. STEARNS:  Object to the form.
22       A   To --
23   BY MR. McCOY:
24       Q   Yeah, let me -- let me -- let me fix it.  I
25   think that's a fair question.

Page 58

1        What does "retargeting" mean in terms of -- in
2    terms of STEEL's marketing?
3        MR. STEARNS:  Well, same objection.
4        MR. McCOY:  That's fine.
5        A   Well, to me, I can't answer with certainty
6    because our ads' guys, that -- that -- the term you're
7    using, I don't know the exact definition; but from what
8    I gathered and understand about retargeting is, let's
9    say you do a social media post and you direct -- and --
10   and people land on the site, you can see an increase in
11   traffic, right?  And depending on who goes to the site,
12   Google has a very intricate way of tracking, if I'm not
13   mistaken, IP addresses; and then when they go back into
14   the social media platforms or Google, you can retarget
15   them with advertisement.
16   BY MR. McCOY:
17       Q   That's data that STEEL monitors in terms of the
18   interaction with the -- with the social media, with the
19   social media posts?
20       A   The social media posts that STEEL puts up or
21   just our affiliates or everybody in general?
22       Q   Well, no.  I'll break it down.  Do you track
23   the interaction with STEEL posts?
24       MR. STEARNS:  Object to the form.
25       A   Yeah.  Well, not -- not in extreme detail.  We

Page 59

1    just kind of -- we -- we monitor the engagement, if you
2    will, on the content and see -- and we focus on whether
3    or not, okay, is this content that people are liking or
4    not?  And then it's also very tricky because there's
5    algorithms in place that don't allow all of your
6    followers to actually see what you're posting.  So it's
7    a very -- it's a very elusive process, I guess, if you
8    will, because --
9    BY MR. McCOY:
10       Q   Do --
11       A   I'm sorry?
12       Q   Go ahead.  I'm sorry.  Yep.
13       A   If I were -- if I have -- you know, I have
14   600-plus-thousand followers and I could put up a post
15   pertaining to, let's say, lifting, and it will get a
16   high engagement in interactivity -- I'm sorry -- in
17   activity; but then I can post a picture of me and my
18   family -- or my family and myself or myself and my son,
19   and it doesn't get the same kind of engagement.  And
20   that's due to the algorithm identifying that people just
21   don't want to see -- they don't want to see you and your
22   family.  They don't -- it doesn't -- you know what I'm
23   saying?  It doesn't -- they're not as active, therefore,
24   the algorithm shows it to less people.
25       Q   I see.  All right.  Well, we can talk about

Page 60

1    that a little more later.
2        In terms of tracking social media posts by
3    social influencers, does STEEL monitor that data?
4        A   Well, we do.
5        MR. STEARNS:  Object to the form.
6        A   My knowledge, we do, and that is via -- they
7    have links that they can implement into their posts.
8    I'm sorry, their -- I should say their Instagram stories
9    where they can add a link and swipe up, and that link is
10   directly associated with that ambassador.
11       And they can -- we have a link in their bio
12   that is also directly correlated with them as well;
13   therefore, we can monitor the amount of clicks and
14   swipe-ups, if you will, that land on the site.
15   BY MR. McCOY:
16       Q   And were you able -- was STEEL able to monitor
17   the clicks and landings on a site for posts made by
18   Mr. Bilzerian?
19       MR. STEARNS:  Object to the form.
20       A   To my knowledge, no.  It was -- it was
21   incredibly hard to do that because Dan initially refused
22   to -- for us to be able to track that.
23   BY MR. McCOY:
24       Q   Was there ever a period of time where you
25   were -- where STEEL was able to track the interactions

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 61

1   with Mr. Bilzerian's posts concerning STEEL?
2       A   We -- when he did --
3           MR. STEARNS:  Object to the form.
4       A   I'm sorry.  When he did --
5           MR. STEARNS:  Sorry.  It was a delay.  I just
6       want to make sure you got that.
7       A   Not directly, no, but we can see via the
8   platforms influxes of traffic.  I'm sorry.  I should
9   specify, the Shopify platform.
10  BY MR. McCOY:
11      Q   The "influx of traffic" meaning interactions
12  with the site or the influx of purchases that are made
13  through the platform?
14      A   The interactions made with the site.
15      Q   But you could also track the purchases that
16  were made around the time of any posts by Mr. Bilzerian
17  as well; is that true?
18      A   Yes, but with certainty that they came from
19  Dan, no.  That, you can't.
20      Q   All right.  In 2017, are you the individual who
21  would have had the approval authority for contracts on
22  behalf of STEEL?
23      A   Yes, sir.
24      Q   Did you negotiate contracts on behalf of STEEL
25  in 2017?

Page 62

1       A   Yes, we -- well, it was a -- it was a group
2   effort, if you will.  I didn't do it by myself.
3       Q   Who else would have been part of any group that
4   would have negotiated contracts on behalf of STEEL in
5   2017?
6       A   My lawyer, Sandy Paderewski, and at the time
7   Paul Costello, who was just a -- they're both friends of
8   the family.  My -- my lawyer was a friend of the family,
9   and so I -- I didn't -- I didn't have anybody else to
10  turn to except somebody that had some business
11  experience and a lawyer that my father knew.
12      Q   Did Mr. Costello and Mr. Pader- --
13  Paderewski --
14      A   Paderewski, yes, sir.
15      Q   -- were they at the same firm?
16      A   Well, no.  Paul was not a lawyer.  He was
17  just -- he was a business guy.  He -- he -- I don't know
18  what business he owned, but he had told me he'd run
19  businesses.  And I just -- I had known him.  Just -- I
20  had met him in the smoothie shop that I was -- that I've
21  had for some time and in and out of the gym.
22      Q   All right.  So Mr. Paul Costello is not a
23  lawyer?
24      A   No, sir.
25      Q   He was involved in negotiating the contract

Page 63

1   with Blitz that is at issue in this case, correct?
2       A   Yes, sir.
3       Q   And Mr. Costello is deceased?
4       A   No.  He's alive.  Mr. Paderewski is deceased.
5       Q   Oh, okay.
6       A   The lawyer -- our lawyer is deceased, yep.
7       Q   All right.
8       A   COVID.
9       Q   And did Mr. Costello have authority to
10  negotiate on behalf of STEEL with respect to the
11  contract with Blitz?
12      A   I'm -- what -- when you say "authority,"
13  what -- like did I give him authority?  Is that -- is
14  that what you mean?
15      Q   Yes, sir.
16      A   Yeah.  I just wanted his advice because I
17  wasn't sure how to go about doing it.
18      Q   Ultimately you are the one who signed the
19  contract with -- between STEEL and Blitz?
20      A   Yes, sir.
21      Q   All right.  I want to ask you -- let's move on
22  to this for a second, and we'll come back to some other
23  things.
24          How -- how did you first get introduced to Dan?
25  We were going to talk about this earlier --

Page 64

1   Dan Bilzerian.
2       A   Oh, yeah.  So Joey Swoll is a friend of
3   Dan Bilzerian's, and I've known Joey Swoll in this
4   social media world, oh, gosh, for a couple of years, and
5   he's an influencer.  He's a bodybuilder, and he's not a
6   professional bodybuilder.  He's just a social media
7   bodybuilder, if you will.  And Joey had made the
8   introduction, if you will.
9       Q   And were you looking to reach out to
10  Mr. Bilzerian, or was he looking to reach out to you or
11  neither?
12      A   So Dan -- Dan and Joey, I guess, were friends;
13  and from what Joey had explained to me at the time, Dan
14  was looking for some advice and guidance on how to put
15  on some extra muscle.  And Joey told him that, you know,
16  there's nobody better in the industry -- I'm not
17  quoting, but that's kind of how he led me to believe
18  what he told Dan is that Jason would be the guy to talk
19  to.
20      Q   And so then did you reach out to Mr. Bilzerian
21  about what he needed, or did Mr. Bilzerian reach out to
22  you?
23      A   Oh.  The initial text message, I -- I -- I
24  can't recall who texted who first.  I just -- I remember
25  Joey -- I think -- you know what?  I think there was a

16 (Pages 61 to 64)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

## Page 65

1    group text message between Joey and us that introduced
2    us.
3        Q   And do you remember approximately when that
4    was?  Was that in 2016 or 2017?
5        A   '16.  Oh, gosh.  I think the fall area,
6    September, October.
7        Q   Of 2016.  So that would have been three to four
8    months after you launched STEEL Supplements?
9        A   Yes, sir.
10        Q   What did you know about Mr. Bilzerian prior to
11    the time you first spoke with him?
12        A   Outside of his social media presence, that's
13    all I knew of Dan.
14        Q   What did you know about his social media
15    presence?
16        A   He was depicting a lifestyle that was at the
17    time very -- it was very viral.  He was traveling.  He
18    was showcasing women and toys and guns and things of
19    that nature.
20        Q   When you say "viral," you mean that in the
21    social media context?
22        A   Yes, sir.
23        Q   And -- and for someone who may not understand
24    what that means, that means content he was creating was
25    getting reactions?

## Page 66

1        A   Exactly.
2        Q   And when something goes viral, that means in a
3    short amount of time a large number of people interact
4    with it in some capacity?
5        A   Yes.  Well, it can.  Viral is -- is -- it's all
6    a matter of relativity, and that I could put up a post
7    and it not get very good engagement, and I could put up
8    a post that gets really good engagement and it gets,
9    let's say, 25,000 likes.
10        But if my following grows over the course of a
11    year or two years, that 25,000 likes, I would no longer
12    consider viral.  So it's kind of -- you kind of
13    guesstimate it in relation to how many people follow you
14    to how many likes or comments you may get.  So that's
15    how you -- how you would approximate that.
16        Q   And one of the goals in social media -- let me
17    start over.
18        Do you agree that one of the goals in social
19    media is to create viral content?
20        A   Yeah.  Yes, sir.
21        Q   And Mr. Bilzerian was good at that at the time
22    when you first met him?  Do you agree?
23        A   Yeah.  Yeah.
24        (Mr. Stearns was disconnected from the
25    videoconference.)

## Page 67

1        THE COURT REPORTER:  We need to stop.  We need
2    to stop.  Mr. Stearns is gone.
3        MR. McCOY:  Oh, okay.
4        THE VIDEOGRAPHER:  Okay.  Let's take this off
5    then.  Off the record at 10:56.
6        (Recess taken from 10:56 a.m. to 11:05 a.m.)
7        THE VIDEOGRAPHER:  This begins Media Unit
8    Number 2, and we're back on the record at 11:05 a.m.
9    BY MR. McCOY:
10        Q   Mr. Huh, the first introduction you had to
11    Mr. Bilzerian was about a relationship for you to help
12    him with his training goals?
13        A   Yes, sir.
14        Q   And do you consider Mr. Bilzerian a
15    bodybuilder?
16        A   Yeah.  Yeah.
17        Q   At the time did you consider him a bodybuilder?
18        A   Yep.  Yeah.
19        Q   What -- and what is a bodybuilder to you?
20        A   In my experience, I mean, my -- let's say my
21    wife is -- was a competitor many years ago.  She didn't
22    compete in -- she competed in the bodybuilding industry,
23    and you can consider her a bodybuilder; but she was -- I
24    mean, not to the -- she wasn't as muscular as, let's
25    say, a male bodybuilder would be.

## Page 68

1        So anybody that's trying to, you know, better
2    their body, be in -- get in better shape, lose weight,
3    you know, put on some muscle, you're -- you're in the
4    process of bodybuilding.
5        Q   So if somebody -- are those all items together,
6    meaning somebody who's trying to lose weight, put on
7    muscle, and get in shape are -- are part of it, or would
8    somebody who's just trying to lose weight, you would
9    consider them a bodybuilder?
10        A   Well, yeah, because if you're trying to lose
11    weight, one of the most effective ways to actually do
12    that is to lift weights and do -- or -- and -- well, the
13    most effective way would be to do a combination of
14    cardiovascular activity and weight training; and by
15    doing that, you would be stimulating muscle growth to
16    increase your beta metabolic rate, therefore,
17    increasing -- another term, that's how you -- how fast
18    your metabolism is moving.
19        So every bit of muscle that you can put on, no
20    matter how small or how big, will help you to increase
21    the rate at which you're able to oxidize fat cells.
22        Q   So you mentioned some of the athletes that are
23    associated with STEEL are runners; is that -- that true?
24        A   Yes, sir.
25        Q   And -- and the runner athletes that are

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 69

1    associated with STEEL, are they bodybuilders?
2        A  I mean, you could -- yeah, you could consider
3    them bodybuilders.  We just -- we typically -- you know,
4    we call them a runner or -- or somebody that does
5    CrossFit, we call them a CrossFitter; but, you know, a
6    CrossFitter could be called -- you know, they're --
7    they're building their body as well.
8        Q  So in your view, anything that would grow any
9    part of the body would be part of bodybuilding, any kind
10   of fitness?
11       A  Yes, sir.
12       Q  And is that something that is part of any kind
13   of standardized definition in the industry that -- that
14   you cite to, or is that just your personal view of the
15   word?
16       A  I don't know of a -- let's say a standard
17   definition -- or let's say that -- like a Webster -- a
18   Webster's dictionary, I don't know of a particular one,
19   no.
20       Q  So that would -- what you just explained to me
21   would be your personal definition of "bodybuilder"; is
22   that true?
23       A  My personal and -- and many others that are --
24   over the years that have been in the industry would --
25   would also agree.

Page 70

1        Q  Let's go back to Mr. Bilzerian.  At the time
2    when you were first introduced to him in 2016, you were
3    aware Mr. Bilzerian had celebrity connections?
4        A  Yes, sir.
5        Q  And he had the established social media
6    audience we've already talked about in the tens of
7    millions?
8        A  Yes, sir.
9        Q  And Mr. Bilzerian was somebody who was involved
10   with physical fitness?
11       A  Yes, sir.
12       Q  You were aware of his antics with women?
13       A  Yes, sir, antics.
14       Q  You were aware of his partying?
15       A  Yes, sir.
16       Q  You were aware of the playboy lifestyle?
17       A  Yes, sir.
18       Q  You were aware that he used drugs?
19       A  Yes, sir.
20       Q  And you were fine still associating the
21   STEEL brand with Mr. Bilzerian, correct?
22       A  On -- because -- regarding all of those points
23   you made, yes.  Let's say -- you know, his drug use, I
24   know he was doctor supervised, so who's to say -- I
25   can't say otherwise.  His lifestyle is very unique, and

Page 71

1    not many -- well, I -- there's not many people on social
2    media that can -- that live that lifestyle.  There's a
3    lot of men that may want to live that lifestyle, and we
4    recognize that males were, you know, more apt to follow
5    him and -- and in general they -- they were -- you know,
6    they're more apt to pay attention to Dan training, if
7    you will and putting on muscle, things like that.
8        Q  Understood.  I just want to make sure that even
9    knowing all of the things that we just went through
10   about Mr. Bilzerian's persona, you were fine associating
11   the STEEL brand with Mr. Bilzerian, true?
12       A  Yes, sir.  At the time, yes, sir.
13       Q  And -- well, you say "at the time."  That --
14   did -- did it change at some point where you did not
15   want the STEEL brand associated with Mr. Bilzerian's
16   persona?
17       A  Well --
18          MR. STEARNS:  Object to form.
19       A  -- you know, part of the -- when terminating
20   the relationship, you know, we looked at the -- there
21   was just some issues regarding the sale of -- like we
22   had talked about THC, and there was some issues
23   regarding the -- the internal workings and legal issues
24   that he had had at Ignite that were -- they were
25   surfacing on our end, if you will, in regards to our

Page 72

1    customers reaching out and expressing that -- their --
2    their disappointment for us being associated with it --
3    with us -- I'm sorry -- their -- discussed and being
4    associated with Dan and regarding the suit and the money
5    that were allegedly misappropriated and things of that
6    nature.
7    BY MR. McCOY:
8        Q  And that was part of what you put in Exhibit 1,
9    right, was the -- the Heffernan lawsuit?
10       A  Yes, sir.
11       Q  And you used the word "misappropriated."  Have
12   you ever even read the allegations that are in that
13   lawsuit, sir?
14       A  Not -- not -- no, sir, not thoroughly, no.
15   Actually, not.  I'm just -- I'm using the word
16   "misappropriated" just based upon my knowledge of
17   some -- some Web-based outlets, news outlets, things of
18   that -- things like that.
19       Q  All right.  So you got some information from
20   the internet about the idea of Mr. Bilzerian
21   misappropriating funds, and that was the basis for what
22   you put in Exhibit 1?
23          MR. STEARNS:  Object to form.
24          Mr. Huh, to the extent you can answer that
25   question without disclosing attorney-client

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

Page   73

1    communications, you can do that.
2        A  Kevin, can you just repeat the question one
3    more time?  I'm sorry.
4    BY MR. McCOY:
5        Q  Yeah.  You mentioned that there was some
6    Web-based content, and I'm asking if that is the factual
7    basis that you are aware of, absent any communication
8    with lawyers, for the claim that Mr. Bilzerian
9    misappropriated or that there's an allegation in the
10   Heffernan lawsuit of misappropriation of funds?
11       A  I'm not --
12       MR. STEARNS:  Same objection; same instruction,
13   Mr. Huh.
14       A  I'm not aware -- I'm not sure about a
15   misappropriation in the allegation.  I'm just -- I'm
16   just going based upon what, you know, we had read in the
17   news outlets and what was, I guess, being speculated on
18   and -- and how our customers were responding to that.
19   BY MR. McCOY:
20       Q  And you understood that the allegations in the
21   Heffernan lawsuit, that was a -- that was a civil action
22   like STEEL has filed here, correct?
23       MR. STEARNS:  Object to the form.
24       A  Yes, sir.
25   BY MR. McCOY:

Page   74

1        Q  And -- and that nothing in that suit had
2    actually been proven; it's just a complaint that had
3    been filed?
4        A  Yes, sir.
5        Q  All right.  And that was still sufficient
6    enough for you to cite that as a basis to terminate the
7    relationship with Blitz, correct?
8        A  I would say, yeah, one of them.
9        Q  And that was largely in part of comments you
10   got from customers concerning their reaction to reading
11   something about the Heffernan lawsuit; is that true?
12       A  Yes, sir.
13       Q  All right.  Would it surprise you to know there
14   is no allegation of misappropriation in the Heffernan
15   lawsuit.
16       MR. STEARNS:  Object to the form.
17       A  Yes, sir.
18   BY MR. McCOY:
19       Q  And do you even care what the -- the facts are
20   that are even alleged in the Heffernan lawsuit?
21       MR. STEARNS:  Object to the form.
22       A  I mean, of course, I care.  I care about --
23   yeah, I'm not one to not care about anything.
24   BY MR. McCOY:
25       Q  But it didn't matter to you at the time when

Page   75

1    you were using it as a basis to terminate the agreement
2    whether the allegations were true or not; is that fair?
3        MR. STEARNS:  Object to the form.
4        A  I'm -- you're saying it didn't matter?  I'm
5    sorry?
6    BY MR. McCOY:
7        Q  Yes, sir.  Do you know if the allegations in
8    the Heffernan lawsuit are true or false?
9        A  I don't know for a fact if they're true or
10   false.
11       Q  All right.  Just the fact that there was an
12   unproven allegation in a lawsuit was sufficient for you
13   to decide to use that as a basis to terminate the
14   agreement with Blitz, true?
15       MR. STEARNS:  Object to the form.
16       A  Well, one of the bases, yes.  There was just
17   a -- there was an accumulation of issues that were
18   taking place; and considering we're, you know, a social
19   media and Web-based company, people have a much easier
20   time with expressing their issues with such things.
21       So we were getting hit left and right, and so
22   it really wasn't -- it wasn't sitting well with us or
23   our customers.
24   BY MR. McCOY:
25       Q  One of the -- you sat through Mr. Karbid's

Page   76

1    deposition, right?
2        A  Yes, sir.  Yes, sir.
3        Q  And you promoted Mr. Karbid to the role of CFO
4    around late 2019, 2020.  Is that true?
5        A  Yes, sir.
6        Q  And one of Mr. Karbid's jobs was to try to grow
7    STEEL?
8        A  Yes, sir.
9        Q  Mr. Karbid was -- I'm sorry?
10       A  I mean, everybody that we bring on is -- it's
11   all of our jobs to try and grow STEEL.
12       Q  And one of Mr. Karbid's criticisms concerned
13   the relationship between STEEL and Blitz, true?
14       A  His criticism?  Which criticism?  Well --
15       Q  Did Mr. Karbid express to you that --
16       A  Oh, in general, a criticism you're saying?
17       Q  Yes, sir.
18       A  I -- I think -- I don't remember our exact
19   conversation, but there were concerns.
20       Q  And, generally, what were Mr. Karbid's concerns
21   he expressed to you?
22       A  That this is -- you know, based upon how our
23   customers are responding, this is not -- this is not
24   good.
25       Q  Well, that was -- that's -- is that specific to

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

| Page 77 | Page 78 |
|---|---|

**Page 77**

1  the Heffernan allegation and the reaction to that?

2       A   No.  That was -- that was everything, you know,

3  in general, as issues that we were facing with that

4  allegation and the -- I guess you could call it the

5  outlets that were voicing or -- or going through

6  financials that Ignite had released and -- and talking

7  regarding these financials.

8       Q   Was there a concern expressed at the time about

9  the STEEL brand being associated with the Ignite brand?

10      A   Yeah.  I don't remember a specific

11  conversation, but I -- I'm sure we could have -- that

12  could have come up, yeah.

13      Q   Did you have a concern about the STEEL brand

14  being associated with the Ignite brand?

15      A   Yes, sir.

16      Q   Did Mr. Karbid ever express to you that he felt

17  that the financial arrangement between Blitz and STEEL

18  was a bad deal financially?

19      A   No.  Mehdy was -- Mehdy was pretty -- he's

20  always optimistic.  He kind of -- I remain -- I always

21  try to remain as optimistic as possible -- as optimistic

22  as possible; and Mehdy took, you know, the same -- the

23  same approach.

24       Because Mehdy came in and Mehdy was new to the

25  situation, and he didn't -- you know, he didn't say or

**Page 78**

1  come to me and express any concerns regarding that.  It

2  was just this is -- this is what we're doing.  This is

3  how we do it, and that was that.

4       Q   Does STEEL keep metrics that would associate

5  the revenues that it estimates that has made in relation

6  to the agreement with Blitz?

7       MR. STEARNS:  Object to the form.

8       A   Metrics?  Like what do you -- I'm sorry,

9  Mr. Friend.  When you say "metrics," like platforms,

10  like apps or programs to keep track of data?

11  BY MR. McCOY:

12      Q   I'm not worried about the programs.  I'm

13  talking more of the data.  Over -- over three years we

14  paid Blitz X, and we estimate that we generated this

15  amount of revenue, so we're either in the black or in

16  the red.

17      A   Understood.  Yeah.  So from what I

18  understand --

19      MR. STEARNS:  Hold on, guys.  Sorry.  Can you

20  guys hear me?

21      MR. McCOY:  Yes.

22      MR. STEARNS:  Can you guys hear me?

23      MR. McCOY:  Yes.

24      MR. STEARNS:  I'm going in and out again.  You

25  guys all froze, so I just wanted to make sure I'm

| Page 79 | Page 80 |
|---|---|

**Page 79**

1  able to object.  As long as we can hear each other,

2  let's keep going.

3       MR. McCOY:  Okay.

4       MR. STEARNS:  But if it keeps going, I'll swap

5  out a computer --

6       MR. McCOY:  All right.

7       MR. STEARNS:  -- but I'm objecting to the form

8  of that question.

9       MR. McCOY:  Okay.

10      A   Yeah, Mehdy keeps -- being the CFO, he keeps

11  tabs on finances, and I'm sure, you know, on top of --

12  he is on top of the metrics of that.

13  BY MR. McCOY:

14      Q   Have you discussed the metrics relating to the

15  amount paid to Blitz versus the estimated sales with

16  Mr. Karbid?

17      A   Yes, sir.

18      Q   And so that's a -- that's a quantified metric

19  that you have discussed with Mr. Karbid where you've

20  done an analysis of what you've paid versus what you

21  think you've generated, true?

22      MR. STEARNS:  Object to the form of the

23  question.

24      A   Yes, sir.  We -- you know, this is a -- that's

25  kind of an ongoing thing where we analyze what -- what

**Page 80**

1  numbers are coming and going with the company.

2  BY MR. McCOY:

3       Q   But I want to be very clear.  You have -- you

4  have something that is specific to the relationship with

5  Blitz; that is true?

6       MR. STEARNS:  Object.  What does "have

7  something" mean, Kevin?  I don't know what that

8  means.

9       MR. McCOY:  Well, the witness very clearly

10  knows what it means.

11      MR. STEARNS:  Well, no.

12      MR. McCOY:  He just -- no, no, no, no, no, no,

13  no, no, no, no.  We did it yesterday, Jason.

14      MR. STEARNS:  Kevin, give me time to object.

15  That's all I'm asking you to do --

16      MR. McCOY:  To the form.

17      MR. STEARNS:  -- because of the delay.

18      MR. McCOY:  All right.

19      MR. STEARNS:  You absolutely did not keep your

20  objections to the form yesterday, but let's -- let's

21  go ahead and ask the question, and we'll get through

22  this, Kevin.

23      MR. McCOY:  Will you read back the question,

24  Beverly, please?

25       (Record read as requested.)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 81

1      MR. McCOY:  And -- and I thought his answer was
2  "yes."
3      THE COURT REPORTER:  I did not hear an answer.
4      A  When you say -- when you say something
5  specific, what do you mean?  Like a -- like a -- some
6  means of calculating?
7  BY MR. McCOY:
8      Q  Yes, sir.  If you wanted to -- if you wanted to
9  look at the return you've had against the payments that
10  you've made to Mr. Bilzerian, do you have that data?
11     A  "The return" meaning like STEEL overall or the
12  return that Dan was able to produce?
13     MR. STEARNS:  I'm objecting to the form of the
14  question.
15     MR. McCOY:  Okay.
16     MR. STEARNS:  And who's "you"?  Are you saying
17  Mr. Huh personally or STEEL?  Because I don't
18  understand.
19     MR. McCOY:  Here we go.  Here we go.  All
20  right.  Let's inject a lot of confusion on something
21  that's simple.
22     MR. STEARNS:  Well, let's -- let's not make
23  this a 30(b)(6), Kevin.  It's not a 30(b)(6).  I'm
24  trying to give you some rope, but you just keep
25  doing it.

Page 82

1      MR. McCOY:  It's fine.  He's the CEO of the
2  company, Jason.
3      MR. STEARNS:  Right.
4      MR. McCOY:  He's the present CEO of the
5  company, sir.
6      MR. STEARNS:  And you deposed Mehdy.  Are you
7  asking him what Mehdy has or what he has?
8      MR. McCOY:  I'm asking his personal knowledge
9  about what people in the company have.
10     MR. STEARNS:  So ask better questions, and I
11  won't object.
12     MR. McCOY:  Well, you just object to the form,
13  and we'll get a ruling at some point over whether my
14  question's fine or not.
15     MR. STEARNS:  All right.  Let's do it.
16     MR. McCOY:  Thanks.  Follow the rules, sir.
17     MR. STEARNS:  You, too.
18  BY MR. McCOY:
19     Q  All right.  Now -- we got that out of the way.
20  Mr. Huh, are you aware of data that would show the
21  amount paid to Blitz against the revenue that you think
22  the work by Mr. Bilzerian or Blitz has generated?
23     A  I am aware of data.  I know there's a chain of
24  emails, you know, that Mehdy had sent to Verona based
25  upon that data.

Page 83

1      Q  And has anyone ever sat down or have you
2  been -- let me start over.
3      Have you ever been part of conversations with
4  anyone within the company to talk about whether STEEL
5  made more money off of the relationship with Blitz than
6  it paid to Blitz?
7      A  No, sir.  Like -- I'm -- made more money off of
8  Blitz than it paid to Blitz?
9      Q  Yeah.  STEEL pays Blitz -- or paid Blitz prior
10  to the termination letter -- on a monthly basis.  It
11  paid a commission?
12     A  Yes, sir.
13     MR. STEARNS:  I just want to interrupt.  I'm
14  going to have to switch out my computer, guys.  I
15  can't -- I don't hear your questions, Kevin.  It's
16  freezing.
17     MR. McCOY:  Where are you today, Mr. Stearns?
18     MR. STEARNS:  Say it again.
19     MR. McCOY:  Yeah, we can take a break.  Where
20  are you located today?
21     MR. STEARNS:  Okay.  So let's go ahead and take
22  a break, guys.
23     THE VIDEOGRAPHER:  Off the record at 11:25.
24     (Recess taken from 11:25 a.m. to 11:36 a.m.)
25     THE VIDEOGRAPHER:  Back on the record at 11:36.

Page 84

1  BY MR. McCOY:
2      Q  All right.  Mr. Huh, I understand you're in
3  your office at STEEL today; that's right?
4      A  Yes, sir.
5      Q  And is Mr. Stearns there in the building with
6  you today?
7      A  Yes, sir.
8      Q  All right.  And did you guys meet to prepare
9  for your testimony this morning?
10     A  Meet, no.  No, not today.
11     Q  Okay.  Did you guys have any discussions today
12  prior to the start of the deposition?
13     A  Yeah.  He called me prior and said that there
14  was a big accident, and that he was running late.
15     MR. STEARNS:  I should say you should never
16  tell Mr. McCoy what we talk about.  I obviously have
17  no problem with you --
18     THE WITNESS:  I'm sorry.
19     MR. STEARNS:  -- mentioning that I had called,
20  but --
21  BY MR. McCOY:
22     Q  Yeah, I don't want to know -- I don't want to
23  know what you talked about.  I just want to know if you
24  two talked in person today?
25     A  No.  No, sir.  I mean, we have when -- when

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 85

1  Mr. Stearns arrived, but it was just to kind of get
2  situated with, you know, the internet, and hopefully
3  it's resolved now.
4  BY MR. McCOY:
5  Q  All right.  So -- so we're doing this
6  deposition via Zoom, but Mr. Stearns is actually in the
7  building there at STEEL headquarters today; is that
8  right?
9  A  Yes, sir.
10  Q  And he's in a conference room or somewhere
11  else?
12  A  It's -- he's in his own office, a closed-off
13  office in a part of the building, yes, sir.
14  Q  All right.  One of the reasons we're doing this
15  via Zoom is I understand you couldn't do this -- have
16  anybody physically present with you; is that true?
17      MR. STEARNS:  Object to the form.  Kevin, come
18  on.
19  BY MR. McCOY:
20  Q  Is that true, sir?
21  A  Yes, sir.
22  Q  And you had objected, in fact, to having me be
23  physically present with you in the room; is that true?
24      MR. STEARNS:  Unless you were wearing a mask
25      and goggles, Kevin.  Move on.

Page 86

1  BY MR. McCOY:
2  Q  Is that true, sir?
3  A  We could have done it.  It's just we would
4  have -- I didn't want to have to -- all of us wear all
5  of that gear.  It seems obnoxious.
6  Q  And I understand that's because you have an
7  issue with COVID; is that correct?
8  A  Yes, sir.
9  Q  And you are not vaccinated.  That's one of the
10  issues?
11  A  Yes.  My doctor -- two of my doctors
12  recommended for me not to.
13  Q  And your wife is pregnant, I understand?
14  A  Yes, sir.
15  Q  And she's also not vaccinated?
16  A  Yes, sir, and her OB-GYN also recommended the
17  same.
18  Q  And I understand on August 28th you and your
19  wife and Mr. Karbid and his wife and Cal Huh and his
20  wife all chartered a private jet to go to a comedy show
21  in Miami?
22  A  Yes, sir.
23  Q  And you had drivers take you to and from the
24  show?
25  A  We had a private driver.

Page 87

1  Q  So it would be one private driver on the front
2  side to the airport in Sarasota and then one in Miami?
3  A  No.  I -- I drove myself to the airport.
4  Q  Okay.  And then you got on the jet?
5  A  Yes, sir.
6  Q  And I was provided a picture from Mr. Stearns
7  of you wearing a mask -- two masks and some goggles.
8  Was that picture taken on August 28, 2021?
9  A  It was taken the night before in preparation.
10  Q  And is it your testimony under oath that you
11  wore that goggle and double mask get-up the entire time
12  you were traveling to and from the show in Miami?
13  A  Absolutely.
14  Q  And were there other pictures taken of the
15  group going to the event?
16  A  No, sir.
17  Q  That's the only picture that would exist of the
18  trip to the comedy show at the Hard Rock on August 28th?
19  A  Yes, sir.
20  Q  And did others that you were traveling with
21  wear masks the entirety of the time?
22  A  Absolutely.
23  Q  Not a period of time where anybody else in the
24  traveling party was without a mask; is that true?
25  A  There was a time, I think, outside where the --

Page 88

1  what do you -- what do you call it -- the run -- the
2  jetway -- or I took off my mask for a brief moment to
3  breathe before getting onto the plane.
4  Q  And as I understand it, that comedy show was an
5  indoor theater?
6  A  Yes, sir.
7  Q  That was Bill Burr?
8  A  Yes, sir.
9  Q  And was it a full theater?
10  A  No.  It was not.  You mean -- when you say
11  "full," you mean -- not sold out?
12  Q  But pretty full?
13  A  No.  It was -- it was pretty -- it was pretty
14  peppered.  There was a lot of seating open everywhere.
15  We had seats in the -- towards the front right side of
16  the show, and many of the seats around us were actually
17  empty.
18  Q  So that the image that I was provided, that is
19  a -- that is an image that was taken the night before
20  the show; is that right?
21  A  Yes, sir.
22  Q  All right.  And there is no image of what you
23  looked like on the day of the show while traveling to
24  and from the show; is that true?
25  A  No, sir.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 89

1    Q   Meaning that's not true or -- we had a double
2    negative there.
3    A   I'm sorry.  There is no image.  I'm sorry.
4    Q   Okay.  Let's go back to Mr. Bilzerian.  Well,
5    no.  Let's go to where we were before we had all of
6    these issues with connectivity.
7    A   Yes, sir.
8    Q   Has the relationship between STEEL and Blitz
9    been profitable for STEEL?
10       MR. STEARNS:  Object to the form.
11   A   I -- I couldn't say without a shadow of doubt
12   yes.  I would rely on the data team and -- and
13   obviously, you know, Mehdy.
14   BY MR. McCOY:
15   Q   And the data team, would that be that marketing
16   team?
17   A   No.  The data team is -- there's two different
18   gentlemen, a guy named Chin-Mae and a guy named Votzell.
19   Q   How do you spell Mae's last name?  Is it M-a-e?
20   A   I'm sorry.  That's his first name.  It's
21   Chin-Mae.
22   Q   Oh.
23   A   I'm not -- I'm not sure on the spelling of it.
24   I'm sorry.
25   Q   Chin-Mae is an employee of STEEL?

Page 90

1    A   Yes, sir.
2    Q   And who's the other person that works with
3    Chin-Mae on the data team?
4    A   His name is Votzell.
5    Q   Any idea how to spell that?
6    A   I don't.
7    Q   And what kind of data do Chin-Mae and Votzell
8    collect for STEEL?
9        MR. STEARNS:  Object to the form.
10   A   To my knowledge, you know, anything that Mehdy
11   would maybe be looking for or the social media marketing
12   team need -- may need maybe a better understanding of.
13   You know, any -- anything data related they -- they --
14   they could -- they could feasibly -- they should be able
15   to do or pull or help out with.
16   BY MR. McCOY:
17   Q   And so would that be the same for any data
18   around the Blitz relationship?
19   A   Yes, sir.
20   Q   And would that be financial data or metrics on
21   social media information?
22       MR. STEARNS:  Object to the form.
23   A   I would -- for -- for Votzell and Chin-Mae, it
24   would be probably metrics on social media, not
25   financial.

Page 91

1    BY MR. McCOY:
2    Q   In terms of financial aspects for the Blitz
3    relationship, who would be the team responsible for
4    that?
5    A   Mehdy.
6        MR. STEARNS:  Object to the form.
7    BY MR. McCOY:
8    Q   So the discussion with Mr. Bilzerian started
9    with the potential for you to coach him in terms of his
10   fitness needs, right?
11   A   Yes, sir.
12   Q   And how did it evolve into a potential
13   relationship concerning STEEL products?
14   A   Let's see here.  That was a -- that could be a
15   long story.  Do you want me to give you as much of a
16   cliff note as I can?
17   Q   Let's start with that.
18   A   All right.  So, in short, we started
19   communicating in, like I said, the fall regarding his --
20   his diet and kind of what he wanted to do with his
21   physical state.  And so I started making suggestions
22   based upon, you know, my experience in the industry, the
23   bodybuilding supplement industry, and what has worked
24   for me and many other athletes that I know.  And that
25   evolved.  And, you know, we started talking about the

Page 92

1    various products on the -- on the supplements line
2    and -- and the purposes behind them and how they could
3    be incorporated into his training.
4        He had tried a few out and was, you know,
5    pretty impressed by how effective they were, and we --
6    he started to feel out the idea of, hey, what do you --
7    what do you think about, you know, being a part of
8    the -- of the STEEL brand?  "I've been thinking -- I
9    remember him saying, I've been thinking about doing a --
10   partnering with a company to endorse them or even
11   potentially start my own white-labeled supplement
12   brand."
13       And so the conversation evolved from there
14   into, you know, "What are your thoughts on that?"  I
15   mean, he kept asking me what -- what are my thoughts on
16   that.
17       And initially I was -- I was a little
18   apprehensive -- apprehensive to the idea of him being a
19   part of the STEEL brand; and I suggested, I think, it
20   would be best if you white-labeled a product and sold
21   it, you know, under your own name, and you promote it
22   and just have it be exclusive to you.  But he -- he took
23   pause to that idea, and he gave -- his reasoning behind
24   it was although it could be a good idea, I don't think
25   it will -- I don't think it will sell in regards to how

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 93

1    STEEL sells. And what he meant -- and he explained in a
2    way that I have STEEL and Jason has credibility within
3    the fitness industry that I don't. So if I'm promoting
4    this particular product and it can -- essentially it
5    falls back on your shoulders that you're the guy that
6    puts the stamp of approval on these products and how
7    effective they are, and I can just kind of promote for
8    you rather than for me to try and start my own brand and
9    promote it and have to also be a viable source of
10   information regarding the products, because his -- what
11   do you -- how do you put it -- the -- his credentials
12   within the fitness industry were limited; therefore,
13   he -- he wanted to put himself in a position that seemed
14   as credible as possible, which mainly pertained to
15   his -- his style, I guess, of marketing but being backed
16   by somebody like -- such as myself because there's --
17   there's not many -- you know, there's very few
18   professional bodybuilders or professional athletes that
19   have released a supplement line and that have very good
20   credibility within the fitness industry to speak on
21   certain products and create more products, if you will.
22       So I had a -- you know, I have a very good --
23   what's the word here I'm looking for? I'm not, you
24   know, trying to toot my own horn, but I have -- I would
25   imagine Dan could see I had a good reputation within the

Page 94

1    fitness industry that people would trust.
2       Q  You mentioned the product line. What was the
3    product line for STEEL in existence in late 2016 when
4    you were having these discussions with Mr. Bilzerian?
5           MR. STEARNS: Object to the form.
6       A  We had preworkouts and a sleeping product,
7    intra, post, and preworkout products that helped
8    facilitate in fueling a muscle as it pertains to, like,
9    building the body, if you will.
10   BY MR. McCOY:
11      Q  What was the name of the preworkout product?
12      A  We had Amped, and there was Charged. Well,
13   there is Charged. Another product called ADABolic.
14      Q  Those were the preworkout products that were in
15   existence at the end of 2016?
16      A  Yes, sir, in existence. Well, we were working
17   on other products, but they were not -- in terms of
18   preworkouts, we had not broughten them to market yet.
19      Q  Meaning other products; but the Amped, the
20   Charged, and the ADABolic were on-the-market products?
21      A  Yes, sir. And I'm sorry. And Shredded and
22   Focused. I forgot those.
23      Q  And exactly what is a preworkout?
24      A  Preworkout is a product that you can take prior
25   to your training to help stimulate your mind, your body

Page 95

1    to perform better during your training session.
2       Q  And who is the preworkout -- who does STEEL
3    market a preworkout to?
4       A  Anybody that, you know, is into physical
5    fitness prior to going to a gym or if you're going to go
6    for a run, CrossFit, you know, Motocross. We -- we have
7    a wide variety of people that we would market to;
8    anybody that's getting ready to get physically active,
9    if you will.
10      Q  So does STEEL have different categories of --
11   of product that it sells?
12      A  Like -- like preworkouts versus proteins,
13   things like that?
14      Q  Well, let me just -- so, for example, fat loss
15   versus muscle building versus performance.
16      A  Yes, sir.
17      Q  Are those various categories of products that
18   STEEL sells?
19      A  Yes, sir.
20      Q  And does -- does STEEL sell products in each
21   category for a different audience?
22      A  No.
23          MR. STEARNS: Object to the form.
24      A  Not -- when you say "audience," like what do
25   you mean by "audience"?

Page 96

1    BY MR. McCOY:
2       Q  Fair question. Let me -- let me ask a
3    different question. I'll withdraw that question.
4       A  Yes, sir.
5       Q  Why does STEEL say select your goal and then
6    there's fat loss, there's muscle building, and then
7    there's performance. What are the differences?
8       A  Well, so --
9           MR. STEARNS: Object to the form.
10      A  All right. So you're asking me what are the
11   differences or you're asking why we do that as it
12   pertains to the audience?
13   BY MR. McCOY:
14      Q  I'm asking why it's split up here. If I just
15   look at the STEEL website, why are those different
16   categories?
17      A  So if -- you know, we try to make it as user
18   friendly as possible when you go on to -- I guess the
19   goals could be intricately more complex and diverse, but
20   we try to keep it simple and narrow it down to those
21   three, so it's not to be too confusing. And most people
22   that go to the site kind of have an idea of what it is
23   they're trying to achieve.
24      Q  And so at least for purposes of what this is,
25   if somebody was looking for performance, the goal would

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 97

1    be to direct them to that category of product as opposed
2    to if they were looking for muscle building?
3         MR. STEARNS: Form.
4         A  Well, it -- yes, but in a sense that if you go
5    to muscle building, it all increases the performance.
6    So it's -- it's -- like I said, it can be intricately
7    more complex if you were -- because performance would
8    encompass it all; but we try to help to narrow down
9    based upon what other people's ideas of what performance
10   may be.  And what I mean by that is performance could
11   mean just performing better in general, not necessarily
12   trying to put on more muscle at a rapid rate than the
13   person that just wants to get in the gym and be a little
14   better than they currently are.
15   BY MR. McCOY:
16        Q  Can we agree that bodybuilding is a -- is a
17   sport?
18        MR. STEARNS: Objection.
19        A  Yeah.
20   BY MR. McCOY:
21        Q  And, in fact, you had pursued bodybuilding as a
22   profession?
23        A  For a bit, yes, sir.
24        Q  And that's different than being a professional
25   CrossFit athlete, true?

Page 98

1         MR. STEARNS: Object to the form.
2         A  Well, it's -- it's -- I mean, when you say,
3    like, professional bodybuilding, you're talking about my
4    career.  I was getting up on a stage and doing poses and
5    whatnot to display the physique that I had built;
6    whereas CrossFitters are -- you know, they're training,
7    but they're getting on a stage to basically perform the
8    movements and -- which built their bodies.
9    BY MR. McCOY:
10        Q  Understood.  I'm just asking whether you'd
11   agree or disagree that bodybuilding is different than
12   CrossFit?
13        MR. STEARNS: Object to the form.
14        A  No, because body -- I'm sorry.  Bodybuilding as
15   a -- you know, it can be many things, especially if
16   you're -- especially if you're trying to build the body
17   in different ways.  There aren't -- you know, there's
18   more ways to do it than one.
19   BY MR. McCOY:
20        Q  The discussions with Mr. Bilzerian, how did
21   they advance into a position of a relationship where he
22   would promote the product?  We talked about the
23   background, but what -- what do you recall about, "Now
24   we're going to talk about a business arrangement"?
25        A  Gosh.  A specific conversation, I don't recall.

Page 99

1    He had -- there was -- there was a time period where we
2    had stopped talking for days or a couple of weeks, and
3    then he reached back out, because me -- I was really
4    busy with -- the company was, you know, just getting
5    started, so I wasn't overly focused on it.  But Dan had
6    reached back out, and he had, I remember, at one point
7    told me he had communicated with some other companies in
8    regards to manufacturing his own products and/or being
9    an ambassador for them.
10        Then he had reached back out, and basically
11   stating that he had spoken to other people and where was
12   I at in regards to him promoting the brand.  I don't
13   remember the exact conversation, but I would -- I would
14   imagine it was like, "Hey, I'm still open to the idea.
15   I've just -- haven't given it much attention, but I'm --
16   I'm open to the idea, and, you know, of course, willing
17   to talk about it."
18        And I think we talked a number of times towards
19   the end of December, early January.  And then as the
20   idea really started to gain some momentum, his -- I'm
21   not sure of the guy's title, but a guy named
22   David Vingiano and Sandy Paderewski and Paul, that's --
23   they started to put the ideas of a contract together.
24   And they shot them back and forth through the -- I'm
25   pretty sure the February area of 2017.

Page 100

1         Q  And do you recall having conversations with
2    Mr. Bilzerian where he discussed getting equity in the
3    company in exchange for promoting product?
4         A  I -- I vaguely recall that.  Are you saying in
5    the beginning or any time period throughout the whole
6    relationship?
7         Q  In the beginning.
8         A  In the beginning, I vaguely recall that, that
9    we did.  I'm sorry.
10        Q  And so at the time when you were talking about
11   forming this relationship, you're aware that he is
12   looking at the possibility of white-labeling some kind
13   of a supplement line or becoming an ambassador for
14   somebody else in the space, true?
15        MR. STEARNS: Object to the form.
16        THE COURT REPORTER:  Wait.  Stop.  I didn't
17   hear the answer.  I'm sorry.
18        MR. STEARNS:  But -- okay.  I also objected to
19   the form.  Did you get that?  Okay.
20        THE WITNESS:  I said -- I said "yes."  I'm
21   sorry.
22   BY MR. McCOY:
23        Q  And so the discussions now start centering
24   around what the relationship would look like, and we're
25   up to, say, February of 2017?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 101

1    A  Yes, sir.

2    Q  And on Mr. Bilzerian's side, David Vingiano was

3  someone who was involved in the discussions?

4    A  Yes, sir.

5    Q  And on your side, it was Mr. Costello?

6    A  Or Sandy, my lawyer.  And Costello offered

7  some --

8       (Mr. Bilzerian joined the videoconference.)

9    A  He tried to -- it was just -- like I said, he

10  was a friend of mine, and he tried to help out where he

11  could, if you will, but between the two of them --

12  what's that?

13       MR. McCOY:  I think we just had someone join

14  the deposition.

15       MR. STEARNS:  Middleclass Dan, who's that?

16       UNIDENTIFIED WOMAN:  That's Dan.  Do you hear

17  them?

18       MR. BILZERIAN:  That's me, but my reception

19  isn't very good, so I'm going to have to back out.

20       MR. STEARNS:  Is that Dan Bilzerian?

21       MR. BILZERIAN:  Yep.

22       MR. McCOY:  Dan, if you'll -- if you'll just

23  mute, if you don't mind.  Thank you.

24  BY MR. McCOY:

25    Q  All right.  So we're up to February of 2017.

Page 102

1  And you vaguely recall that there was a discussion with

2  Mr. Bilzerian concerning him getting equity in STEEL,

3  correct?

4    A  Yes, sir.

5    Q  And do you know why he ultimately did not take

6  equity in STEEL as part of the relationship?

7    A  We -- we -- we didn't -- we weren't looking

8  to -- to do an equity deal.

9    Q  And is it also true that Mr. Bilzerian

10  expressed that he would rather get paid off of the gross

11  sales indefinitely than to take an equity position in

12  the company?

13       MR. STEARNS:  Object to the form.

14    A  I'm sorry.  Repeat that one more time, Kevin.

15  BY MR. McCOY:

16    Q  Yes, sir.  It is true that Mr. Bilzerian

17  expressed to you that he would rather take 10 percent of

18  gross sales indefinitely instead of taking equity in the

19  company?

20       MR. STEARNS:  Object to the form.

21    A  To my knowledge, yes.

22  BY MR. McCOY:

23    Q  And you understood that that is what

24  Mr. Bilzerian wanted to get out of the deal, true?

25    A  Yes, sir.

Page 103

1       MR. McCOY:  All right.  Let's go to -- well, I

2  guess I have a quick question.  We're at 12:00, and

3  I don't know what time you guys want to stop for

4  lunch, but I'm happy to go another half hour --

5       THE WITNESS:  Yeah.

6       MR. McCOY:  -- if everybody's okay?

7       MR. STEARNS:  Let's -- let's take a break now.

8       THE WITNESS:  Really?  I mean, I can --

9       MR. STEARNS:  Let's take a break now.  I

10  just want to fix a few more computer issues, but we

11  should be good, so -- but how long you want, Kevin?

12       MR. McCOY:  I've got snacks.  I wasn't planning

13  to take a lunch break today, so I'm going to eat

14  some Slim Jim's and some pretzels, so I can be done

15  in ten minutes.

16       How long do you want, sir?

17       MR. STEARNS:  Let's do 30 minutes, 30 minutes.

18       MR. McCOY:  Okay.  We'll resume in 30 minutes.

19  It's 12:30 [sic].  We'll -- we'll resume at 12:33.

20  Thanks.

21       THE VIDEOGRAPHER:  Off the record at 12:03.

22       (Recess taken from 12:03 p.m. to 12:35 p.m.)

23       THE VIDEOGRAPHER:  Back on the record at

24  12:35 p.m.

25  BY MR. McCOY:

Page 104

1    Q  And, Mr. Huh, before we left, we were starting

2  to talk about the discussions you had with

3  Mr. Bilzerian.

4       Do you admit that at one point you had offered

5  Mr. Bilzerian 40 percent equity in STEEL for the

6  relationship?

7    A  I don't recall the specific -- I don't recall

8  the specific offering.  I don't, to be honest, because I

9  remember it being a thought in our minds that we -- we

10  just wanted to do away with the equity idea altogether.

11    Q  Do you deny -- if Mr. Bilzerian will testify

12  that you offered him equity at 40 percent, do you deny

13  that that conversation happened?

14    A  I don't deny it.  I just don't recall it.

15    Q  Understood.  And in response to the equity

16  conversation, Mr. Bilzerian told you that he would

17  prefer to have the 10 percent of gross sales in

18  perpetuity, true?

19    A  Yes.  To my knowledge, that is -- that is true.

20    Q  Now I'm going to share with you a screen here

21  which will be -- let me get it organized.  Sorry.

22    A  Okay.

23    Q  All right.  You should be able to see my screen

24  now, Mr. Huh.  Are you able to look at that?

25    A  Yes, sir.  If you don't mind just zooming in a

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

| Page 105 | Page 106 |
|---|---|

**Page 105**

1  bit.

2    Q  No problem.  Let me know when it's good for

3  you.

4    A  If you could a little bit more.

5    Q  Sure.

6    A  That's pretty good right there.

7    Q  Is that good?

8    A  Yes, sir.

9    Q  All right.  This has been marked as Exhibit 3

10  to your deposition.

11    (Exhibit Number 3 marked for identification.)

12  BY MR. McCOY:

13    Q  And some of these will be out of order a little

14  bit, but we'll get to all of them today.  But Exhibit 3,

15  for purposes of the deposition, is the amended complaint

16  that your lawyers filed on behalf of STEEL.

17    Do you see right here at the top here, it shows

18  a filing date of 2/24/21?

19    A  Yes, sir.

20    Q  And what your lawyers alleged in this pleading

21  in paragraph 118 is that "At 8:51 p.m. Eastern on

22  March 7, 2017, Vingiano sent STEEL's attorney an email

23  stating, 'Thanks Sandy.  Do you have a number I can

24  reach you at?  There was one minor typo that I fixed

25  earlier that was in the document Dan (Bilzerian) signed

**Page 106**

1  that didn't make it into this version.  We can probably

2  correct that manually with an initial but wanted to

3  discuss with you first.'"

4    Do you see that?

5    A  Yes, sir.

6    Q  And the "Sandy" that's being referenced here is

7  STEEL's counsel, who was advising STEEL concerning this

8  negotiation, correct?

9    A  Yes, sir.

10    Q  And so was there a lawyer over on the Blitz

11  side that you were aware of, anybody consulting with or

12  being front on the negotiations, or were you dealing

13  directly with Mr. Vingiano?

14    A  It was directly with Mr. Vingiano.  I don't

15  recall the -- I don't recall the -- their legal

16  counsel's name.

17    Q  In any event, we go on from -- to paragraph

18  119, "The following day, on March 18 [sic], 2017, at

19  approximately 6:38 Eastern, Vingiano sent STEEL's

20  attorney an email stating:  'As we discussed, attached

21  is the executed document with the change on page 1 that

22  corrects the previous typo.  Dan [Bilzerian] has

23  initialed all pages in the attached agreement.  Can you

24  send me back the final copy once Jason has initialed

25  next to Dan [Bilzerian] on each page?'"

| Page 107 | Page 108 |
|---|---|

**Page 107**

1    Do you see that?

2    A  Yes, sir.

3    Q  And then we go on to paragraph 120.  It says,

4  "The new agreement contained a revision to Section 1.6,

5  stating, 'Gross sales, shall mean all sales derived by

6  STEEL Supps from all sources, including but not limited

7  to, the sale of products, services and related like

8  items.'"

9    Do you see that?

10    A  Yes, sir.

11    Q  And so we go on to paragraph 121.  "Huh

12  initialed each page of the agreement containing the

13  'gross sales' language, but STEEL did not intend to make

14  any substantive changes."

15    Do you see that?

16    A  Yes, sir.

17    Q  So let's break this down a little bit.

18    You would agree that the last contract that you

19  initialed is the one that states the definition of

20  "Gross Sales" in Section 1.6?

21    MR. STEARNS:  Object to the form.

22    A  I -- I don't remember with precision as to

23  which one was the last one.  In other words, there's

24  two -- there was two different -- there's two different

25  variations with that altered wording, "sales," if I'm

**Page 108**

1  not mistaken (inaudible) --

2  BY MR. McCOY:

3    Q  Well --

4    THE COURT REPORTER:  I'm sorry, sir.  Hold on.

5  I'm sorry, sir.  I didn't hear what you said at the

6  last.  You said -- I'm going to read the whole

7  answer just so I make sure I have what you said.

8    "I -- I don't remember with precision as to

9  which one was the last one.  In other words, there's

10  two -- there was two different -- there's two

11  different variations with that altered wording,

12  'sales,' if I'm not mistaken."

13    Mr. McCoy said, "Well," and then you said

14  something else, sir, and I did not hear it.

15    THE WITNESS:  I don't even recall what I was

16  going to say -- finish that with.

17  BY MR. McCOY:

18    Q  I'll ask you a new question.

19    A  Yes, sir.

20    Q  The paragraphs that we just read from the

21  complaint that STEEL filed --

22    A  Yeah.

23    Q  -- says that the last contract that you

24  initialed is the one with the gross sales definition in

25  Section 1.6; is that true?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 109

1      MR. STEARNS:  Object to the form.
2      A  To my knowledge, it is.
3    BY MR. McCOY:
4      Q  All right.  And the -- the contract that
5    existed prior to the last one that you initialed is the
6    one that had a definition in Section 1.6 that defined
7    "gross profits"; is that correct?
8      MR. STEARNS:  Object to the form.
9      A  To my knowledge, yes.
10   BY MR. McCOY:
11     Q  All right.  And then after you initialed each
12   page of the agreement containing the gross sales
13   language, there were no other agreements that were
14   initialed, signed, or amended; is that true?
15     A  After this signing, no.  There was -- they --
16   they had proposed an amendment, but it was never signed,
17   no, sir.
18     Q  So the parties then started their relationship
19   with the last contract that you signed being the one
20   that had a definition of gross sales; is that true?
21     A  To my knowledge, yes, sir.
22     MR. STEARNS:  Object to the form.
23   BY MR. McCOY:
24     Q  There's a little clause here, "but STEEL did
25   not intend to make any substantive changes."

Page 110

1    What does that mean, sir?
2      MR. STEARNS:  Object to the form.
3      A  I'm not entirely sure, and I -- honestly, I
4    rely on, you know, legal counsel and finance to -- to
5    make sense of a lot of the terminology within the
6    contract.
7    BY MR. McCOY:
8      Q  I have a different question, though, sir.
9      You were the one who was negotiating this at
10   the time; isn't that true?
11     MR. STEARNS:  Object to the form.
12     A  Yes, sir.  I was a part of the negotiations.
13   BY MR. McCOY:
14     Q  All right.  And Sandy, the lawyer, was doing
15   things at your direction or with your input, correct?
16     MR. STEARNS:  Object to the form.
17     A  Yes, sir.  We were all kind of putting input
18   in, because I considered -- you know, he was a friend of
19   the family so it was -- I respected his -- his thoughts
20   and how to go about moving forward on -- on the
21   contract.  So it wasn't all -- you know what I'm saying?
22   We were all kind of putting ideas into the pot as to how
23   to make it work.
24   BY MR. McCOY:
25     Q  I understand that.  But -- but you were the

Page 111

1    officer at STEEL who was --
2      A  Yes.
3      Q  -- executing the contract, true?
4      A  Yes, sir.
5      Q  It says here, "but STEEL did not intend to make
6    any substantive changes."  And I'm not asking you about
7    legal theories of your lawyers.
8      Is there anybody else who would have facts
9    about what STEEL did or didn't intend with respect to
10   this change besides you?
11     A  Not -- not to my knowledge.
12     Q  And so as we sit here today, then, sir, in
13   terms of paragraph 121, are you aware of any facts that
14   would support this allegation that "but STEEL did not
15   intend to make any substantive changes"?
16     MR. STEARNS:  Object to the form, Kevin.
17     And I'll -- I'll instruct you not to answer the
18   question, Mr. Huh, to the extent you would have to
19   rely on communications you had with counsel.
20   BY MR. McCOY:
21     Q  Yeah, and let me be clear.  I don't want to
22   know about what you and counsel cooked up in December of
23   2020.
24     MR. STEARNS:  What did you say, Kevin?
25   BY MR. McCOY:

Page 112

1      Q  That is not --
2      MR. STEARNS:  I'm sorry.  Kevin, what was that
3    that you just said?
4      MR. McCOY:  What you guys cooked up in 2020.  I
5    want to go back --
6      MR. STEARNS:  And what does that mean, "cooked
7    up," like --
8      MR. McCOY:  We'll get to the theory of the case
9    later, Mr. Stearns.  I'm asking Mr. Huh a question
10   right now.  I want to go back in time.
11     MR. STEARNS:  Well, let's not talk to this
12   witness about legal theories, Mr. McCoy.
13     MR. McCOY:  It's not a legal theory.
14     MR. STEARNS:  Let's not talk to this witness
15   about legal theories, please.
16   BY MR. McCOY:
17     Q  Okay.  I don't want to know what you talked
18   about with your lawyers, Mr. Huh.  I want to go before
19   you ever met Mr. Stearns or Mr. Goodrich or
20   Ms. Gottlieb.
21     You never even heard of them in 2017; is that
22   true?
23     A  Yes, sir.
24   BY MR. McCOY:
25     Q  Okay.  So in 2017, the people who were involved

28 (Pages 109 to 112)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 113

1  in this at the time were Mr. Costello, Attorney Sandy,
2  and yourself; true?
3       A  Yes, sir.
4       MR. STEARNS:  Object to the form.
5  BY MR. McCOY:
6       Q  All right.  At the time that you signed the
7  last agreement that we just talked about that said
8  "gross sales," what facts are you aware of that STEEL
9  did not intend to make any substantive changes?
10      MR. STEARNS:  Object to the form, Kevin.
11      MR. McCOY:  And that's fine, sir.
12      A  I'm not --
13  BY MR. McCOY:
14      Q  Go ahead.
15      A  I'm not aware of any -- any facts that I can
16  recall at the moment.
17      Q  Are you aware of anybody else who would have
18  been involved in this negotiation who may have facts
19  besides you, sir?
20      A  On STEEL's behalf or just --
21      Q  Yes, sir --
22      A  -- in general?
23      Q  -- on STEEL's behalf.  That's all I'm concerned
24  with.
25      A  No, sir.

Page 114

1       MR. STEARNS:  Can you -- can you let the
2  witness speak, Mr. McCoy, before you interrupt him?
3  He was talking.
4       MR. McCOY:  Sure.  Sure.
5  BY MR. McCOY:
6       Q  Apologies, Mr. Huh.
7       MR. STEARNS:  Appreciate it.
8       A  No worries.
9       No, sir, I'm not aware.
10  BY MR. McCOY:
11      Q  All right.  So the last -- we have now talked
12  about what the last agreement is that you initialed and
13  signed.
14      A  Yes, sir.
15      Q  It says that there's -- this -- again, this is
16  the pleading that -- that STEEL filed.  You see we're
17  still looking at the amended complaint, Exhibit 3?
18      A  Yes, sir.
19      Q  "The true intent of the parties was that Blitz
20  would receive a commission based on a percentage of
21  STEEL's income, not based on STEEL's sales."
22      A  Yes, sir.
23      Q  What facts are you aware of to support that
24  allegation?
25      MR. STEARNS:  Same instruction.

Page 115

1       A  As far as facts, I mean, that -- that was
2  just -- it was our intent that -- I'm not -- I'm not
3  really sure if I'm aware of any facts to support that,
4  that I can recall.
5  BY MR. McCOY:
6       Q  Are you aware of anybody else at STEEL who
7  would have facts relative to the true intent on STEEL's
8  side in terms of the commission that was owed to STEEL
9  under the agreement?
10      MR. STEARNS:  Same objection; object to form.
11  And same instruction, Mr. Huh.
12      A  Yeah, our thoughts -- you know, our thoughts
13  behind it were we would not be -- we would be paying in
14  such a way that it wasn't including, let's say, when you
15  say -- when you use the words "income and sales," I know
16  there's a difference.  I'm not sure of the actual
17  difference in terms of, like, a precise definition; but
18  we -- we presumed that there -- there's a difference in
19  sales versus, you know, income, revenue, things of that
20  nature, that these terminologies are used for different
21  reasons.
22      And I think our intent was -- or our
23  understanding of the initial contracts was that it was
24  to encompass, you know, moneys coming in but minus
25  certain, obviously, overhead expenditures and returns,

Page 116

1  discounts, things of that nature.
2  BY MR. McCOY:
3       Q  When -- when you say "we," who's the "we"
4  there?  Who's the "we" that you're speaking of?
5       A  Myself and Sandy and Paul Costello, and around
6  that time, Tony Pasquale.
7       Q  But Mr. Pasquale, he was not involved in the
8  negotiations over the terms of the agreement, correct?
9       A  No, sir.
10      Q  Meaning I am correct?  Sorry, I had a double
11  negative.
12      A  Yes.  I'm sorry.  Yes, you're correct.
13      Q  Now, it says here in paragraph 204 -- 204 of
14  STEEL's Exhibit 3 -- this is the same amended complaint
15  filed in the court here -- "Knowing the parties'
16  intention was to have STEEL compensate Blitz on a
17  percentage of STEEL's income, Blitz took advantage of
18  the situation and claimed payment should be based on
19  sales in an effort to misguide STEEL into compensating
20  Blitz based on sales."
21      Do you see that allegation in the pleadings,
22  sir?
23      A  Yes, sir.
24      Q  What facts are you aware of that Blitz took
25  advantage of the situation as stated here in

29 (Pages 113 to 116)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

| Page 117 | Page 118 |
|---|---|

**Page 117**

1  paragraph 204?
2      MR. STEARNS:  Object to the form.
3      Same instruction, Mr. Huh.
4      A  What facts am I aware of?  I don't -- I
5  wouldn't -- I don't know of any fact that pertains to
6  them intentionally saying that they were trying to take
7  advantage, but one -- being in the situation and how the
8  relationship was -- how the relationship worked was
9  certain things, let's say, if I'm not mistaken, or if I
10  can recall correctly, were gone over in regards to how
11  he was compensated and that percentages of sales should
12  have been minus discounts, returns, and things of that
13  nature that didn't necessarily pertain to sales that we
14  would compensate on.  And so I -- but there was pushback
15  in regards to if we didn't compensate this way, then it
16  was very hard to work with the Blitz team in order to
17  continue to post and make the relationship productive.
18  It was -- it was -- it was very -- it was not
19  necessarily an easy thing to do.
20      So we -- we just kind of moved forward with
21  doing the best that we could to make sure that all
22  parties were -- you know, we could be happy and just try
23  to get -- you know, get some work done, if you will.
24  BY MR. McCOY:
25      Q  So as I understand it, then, what -- what you

**Page 118**

1  ultimately did was just move forward in paying a
2  commission on gross sales; is that true?
3      MR. STEARNS:  Object to the form.
4      A  We -- well, my definition -- I don't really --
5  I don't know how to define "gross sales" with accuracy.
6  That's why, you know, I've got the CFO in place.  I
7  have -- or, you know, at the time Tony to kind of help
8  decipher what was gross sales and what that encompassed.
9  So, you know, we just kind of put our heads -- I -- I
10  didn't.  I relied on Tony at the time to decipher what
11  was the right thing to do, and I just wanted to do the
12  right thing in terms of how we compensated.
13  BY MR. McCOY:
14      Q  Understand.  So if Mr. Pasquale was using the
15  term "gross sales," you would defer to whatever his
16  judgment would have been in that regard?
17      MR. STEARNS:  Object to the form.
18      A  Yes, sir.
19  BY MR. McCOY:
20      Q  And do you agree that STEEL's gross sales have
21  increased by millions over the years?
22      A  Yes, sir.
23      MR. STEARNS:  Object to the form.
24  BY MR. McCOY:
25      Q  And in terms of agreeing that STEEL's gross

| Page 119 | Page 120 |
|---|---|

**Page 119**

1  sales have increased by millions over the year -- the
2  years, what are you considering to be gross sales?
3      MR. STEARNS:  Object to the form.
4      A  Are you -- are you asking for, like, a specific
5  number or just -- I'm kind of confused on that one,
6  Kevin.
7  BY MR. McCOY:
8      Q  Yeah.  Well, I'm asking what your definition is
9  in responding to the question of your agreement that
10  gross sales have increased by millions over the years.
11      MR. STEARNS:  Which was -- which was
12  objectionable, as is this one.
13      A  I mean, I agree that the sales are increasing
14  just because I can log into Shopify and I can see the
15  sales have, you know, trended up; but I -- I really rely
16  on the finance guys -- or I'm sorry -- Mehdy and our --
17  you know, our data team to, you know, come to that
18  conclusion.
19  BY MR. McCOY:
20      Q  All right.  Let me -- let me ask you here.
21  Let's go back to Exhibit 1 for a minute.  It's the
22  termination letter.
23      Now, you read this earlier today, remember?
24      A  Yes, sir.
25      Q  And you told me that this was authorized --

**Page 120**

1  your lawyers in this case were authorized to send this
2  out on behalf of STEEL?
3      A  Yes, sir.
4      Q  And let's look at the -- let's -- I want you to
5  read for me, if you will -- or I'll read it for you.
6  Let's make sure we're looking at the same thing.
7      Exhibit 1, this is the letter purporting to
8  terminate the agreement with Blitz?
9      A  Kevin?
10      Q  Yes, sir.
11      A  Can you just zoom in a bit?
12      Q  Oh, yeah.  I'm sorry.  Yeah, let me know --
13  I'll try to do that automatically from now on.  I got
14  this huge monitor right in front of me, but I'm still
15  nose to bark on it.
16      A  Thank you.
17      Q  Is that good?
18      A  Yes, sir.
19      Q  All right.  "As outlined above, your conduct
20  and Blitz's conduct has caused harm to STEEL.  In
21  violation of the agreement, and while taking a
22  10 percent commission of STEEL's gross sales" -- do you
23  see that part?
24      A  Yes, sir.
25      Q  Now, on December 14th, when STEEL purported to

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 121

1   terminate the agreement pursuant to this letter, its
2   lawyers were using the term "gross sales" as part of the
3   10 percent commission, true?
4       A   Yes.  Yes, sir.
5       Q   And -- and they were sending this letter on
6   behalf of your company, STEEL Supplements, Inc.?
7       A   Yes, sir.
8       Q   And do you agree that 10 percent commission on
9   gross sales was, in fact, the metric by which STEEL was
10  supposed to be paying Blitz?
11      MR. STEARNS:  And I will object to the form of
12      that question.
13      A   I -- I agree, but there was -- there's -- there
14  wasn't clarity, I guess, in what "gross sales"
15  encompassed.
16  BY MR. McCOY:
17      Q   There wasn't clarity in your mind or -- or
18  somewhere else?
19      A   I think across all parties, because the term
20  "gross sales" -- by no means am I qualified to define
21  accounting terms.
22          I -- I have come to understand that gross sales
23  is not something that you can -- every -- I guess the
24  definition changes from company to company and
25  establishment to establishment depending on what it is

Page 122

1   they're selling and the various sales involved in gross
2   sales, so I'm not -- I'm just not as -- I'm not
3   proficient in this lingo, if you will.
4       Q   Has the def- -- has your definition of "gross
5   sales" changed over time as between, say, March 7, 2017
6   and now?
7       MR. STEARNS:  I'm going to object.
8           And, Mr. Huh, if you can answer that question
9       without disclosing communications with counsel, you
10      can do so.  Otherwise, don't answer.
11      A   No.  I mean, my -- I never really -- I never
12  consciously thought about a definition of "gross sales."
13  I always relied on the -- you know, my professionals
14  to -- to make sense of all of that, and -- and --
15  BY MR. McCOY:
16      Q   And one of the lawyers -- one of the
17  professionals would have been the lawyer who helped
18  advise you on this deal, correct, Sandy?
19      A   Yes, sir.
20      Q   Right.  Now, let's look at a definition that
21  your current lawyers -- a word that your current lawyers
22  have used again in front of the Court here.  This is
23  Exhibit 5, and this is the answer and defenses to the
24  second amended counterclaim.
25          (Exhibit Number 5 marked for identification.)

Page 123

1   BY MR. McCOY:
2       Q   Do you see that on your screen?  And let me
3   blow it up for you.
4       A   Yes, sir.
5       Q   Now, this is -- you understand this is a
6   pleading that your lawyers filed in this lawsuit in
7   response to the counterclaim allegations by Blitz?  You
8   understand that?
9       A   Yes, sir.
10      Q   "STEEL admits its gross sales have increased
11  over the course of the past year and that it has grown
12  to become a multi-million dollar company."
13          Do you see that?
14      A   Yes, sir.
15      Q   All right.  What are STEEL's gross sales?  What
16  are -- what are the gross sales that it's telling the
17  Court here?
18      MR. STEARNS:  Are you asking Mr. Huh to tell
19      you what I wrote?  Is that what you're asking him?
20      MR. McCOY:  Well, are -- are you -- are you the
21      fact witness in this case, Mr. Stearns, or do we
22      have --
23          (Multiple voices speaking at once.)
24      MR. STEARNS:  Mr. McCoy --
25      MR. McCOY:  (Inaudible) --

Page 124

1       MR. STEARNS:  -- I know that you're
2   grandstanding for your client --
3       THE COURT REPORTER:  Gentlemen, gentlemen,
4   gentlemen, one at a time, please.
5       MR. STEARNS:  Sure.  I'll go.
6       MR. McCOY:  Okay.
7       MR. STEARNS:  Mr. McCoy, I know that you're
8   grandstanding for your client who just showed up for
9   the deposition; but you're asking this witness what
10  the words that I wrote mean, and you know that's
11  inappropriate.
12      MR. McCOY:  Well --
13      MR. STEARNS:  So if you want to ask a fact
14  witness fact questions, that's fine; but you're
15  asking this witness what I meant when I wrote a
16  document, and you know that's not fine.  So ask your
17  next question, sir.
18  BY MR. McCOY:
19      Q   All right.  Let me get -- let me get a clean
20  exchange with you, Mr. Huh, here.
21          We're sitting here on September 16, 2021, yes?
22      A   Yep.
23  BY MR. McCOY:
24      Q   You're the sitting CEO of STEEL.  You are the
25  CEO of STEEL, sir?

31  (Pages 121 to 124)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 125

1    A  Yes, sir.  Sorry.
2    Q  And you're the chief executive officer?  That's
3  what that means.
4    A  Yes, sir.
5    Q  And you are the one who authorized the filing
6  of the pleadings by your lawyers in this case; yes?
7    A  Yes, sir.
8    Q  And in the -- the pleadings that your lawyers
9  have filed, STEEL has admitted that its gross sales have
10  increased over the course of the past few years, and it
11  has grown to become a multi-million dollar company.  Is
12  that true?
13    A  I mean, to my knowledge, yes, sir, it is.
14    Q  So how does STEEL calculate gross sales that
15  would have grown multi-millions of dollars over the past
16  few years?
17    MR. STEARNS:  Object to the form.
18    A  The -- obviously, the Shopify platform and
19  our -- our CFO that -- that just focuses on numbers.  I
20  don't -- I don't really get involved with numbers at
21  all.  I just -- I just -- you know, I trust that they
22  are taken care of and everything is handled in such a
23  way financially that I can just focus on the things that
24  I'm -- I'm -- I'm good at.
25  BY MR. McCOY:

Page 126

1    Q  Do you sign the tax returns on behalf of STEEL
2  Supplements, Inc.?
3    A  Yes, sir.
4    Q  And have you been the signer of the tax returns
5  on behalf of STEEL Supplements, Inc., since it started
6  filing returns?
7    A  Yes, sir.
8    Q  And you signed those under penalty of perjury,
9  correct?
10    A  Yes, sir.
11    Q  And is all of the information that you have
12  signed under penalty of perjury in the tax returns filed
13  for STEEL Supplements since 2017 to 2020 true and
14  correct?
15    A  To my knowledge, yes, sir.  I have my CPAs.
16  They prepare all of this, and I trust that they -- you
17  know, they have very good reputations and they do the
18  right thing and that's -- that's what I -- I hire and
19  pay them for.
20    Q  You've been -- you were in the deposition or
21  sat in the deposition of Mr. Karbid?
22    A  Yes, sir.
23    Q  And we talked about the STEEL 60 spreadsheet
24  with all of the sales in it?
25    A  I -- I don't recall that, because I -- I wasn't

Page 127

1  always tuning in to every word.  My apologies.
2    Q  So you're not familiar with the spreadsheet
3  that contains all of the sales for STEEL Supplements
4  that's been provided in the case?
5    A  If I -- if I saw it, I might recognize it, but
6  I can't -- I don't recall.
7    Q  Did you have any discussions with Mr. Bilzerian
8  or anyone on his behalf about -- let me get this exhibit
9  up -- I'm sorry.
10    (Exhibit Number 6 marked for identification.)
11    A  Okay.
12  BY MR. McCOY:
13    Q  And I'll blow it up.  -- about any of the other
14  specific provisions that were set forth in the
15  agreement?
16    And this Exhibit 6, sir, I will represent to
17  you the one -- do you see this has the initials down
18  at the bottom?
19    A  Yes, sir.
20    Q  All right.  And this has a definition in
21  Section 1.6 of "gross sales"?
22    A  Yes, sir.
23    Q  And at least in this document, that is defined
24  to mean -- "shall mean all sales derived by STEEL Supps
25  from all sources, including but not limited to, the sale

Page 128

1  of products, services, and related like items"?
2    A  Yes, sir.
3    Q  And that's -- this is the agreement that you
4  initialed that we were just talking about as the last
5  agreement between the parties, true?
6    A  Yes.
7    Q  Now, there were some restrictions in here,
8  and -- well, first of all, what did you understand to be
9  the length of the relationship between STEEL and Blitz?
10    A  The length?  Like our -- duration of the
11  relationship?
12    Q  Yes, sir.
13    A  Well, we would -- we -- I think we both
14  understood -- you know, the teams understood that it was
15  to go for as long as -- as -- as we could, but within --
16  in -- in a good relationship where everybody was doing
17  their part and we didn't do anything to, you know, break
18  the contract or -- and they didn't do anything, that
19  Blitz didn't do anything to break the contract.
20    Q  So your understanding was the contract would
21  continue on unless one party or the other did something
22  to breach it; is that correct?
23    MR. STEARNS:  Objection.
24    A  Yes, sir.
25    MR. STEARNS:  That's not what he said.

32 (Pages 125 to 128)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                              49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 129

1   BY MR. McCOY:
2        Q   In fact, you considered the contract to be
3   indefinite; is that true?
4            MR. STEARNS:  Object to the form.
5        A   Yes, as -- as the contract states, you know, it
6   would continuously go on; but if there was an issue
7   that -- that arised, you know, we both understood that
8   the contract was -- you know, we could terminate the
9   contract.
10   BY MR. McCOY:
11       Q   Well, I understand.  Let's set aside there
12   being something that you claim to be a breach.
13           If there wasn't something that either side
14   claimed to be a breach --
15       A   Yes, sir.
16       Q   -- your understanding was that the contract was
17   indefinite; is that correct?
18           MR. STEARNS:  Object to the form of that
19           question, Kevin.
20       A   We -- we would just, you know, continue.  In a
21   perfect world, you know, Blitz would continue to do
22   their thing and -- and -- and be very proactive in
23   promoting, and we would do ours; and we would do it, you
24   know, and be productive as possible.  But I guess in a
25   perfect world, it doesn't always work out that way.

Page 130

1   BY MR. McCOY:
2        Q   All right.  We're going to start working now
3   with Exhibit -- what I've marked as Exhibit 9.
4            (Exhibit Number 9 marked for identification.)
5   BY MR. McCOY:
6        Q   And I've tried to blow it up.  It takes a
7   second because it's rather large.
8        A   I see it, yep.
9        Q   Okay.  But let me give it a minute because the
10   search function here sometimes takes a second to catch
11   up.
12       A   Yes, sir.
13       Q   All right.  Let's go through this here for a
14   minute.
15           MR. STEARNS:  Kevin, just one second.  I don't
16   think Danyele emailed that exhibit, did she?
17           MR. McCOY:  I don't know.  I think this is the
18   one she might have said was large so you had to
19   download it anyway similar to --
20           MR. STEARNS:  Yeah.  Just give me one second.
21   It shouldn't take long.  You can go ahead, Kevin.
22   I'll pull it up.
23   BY MR. McCOY:
24       Q   Okay.  I just want to make sure you were there.
25           So in the -- in the negotiations leading up

Page 131

1   to -- all right.  Let's see.
2            And just so you're acquainted, Mr. Huh, you
3   understand that there were text messages that have been
4   produced in the case between you and Mr. Bilzerian?
5        A   Yes, sir.
6        Q   All right.  And have you reviewed those?
7        A   Some of -- some of them I've -- you know,
8   we've -- when they, you know, extracted our data, I was
9   just going through and seeing how far back they -- they
10   went, but I wasn't able to, because it -- my phone just
11   crashed.  It would keep crashing.
12       Q   All right.  Well, in any event, we're at
13   March 4, 2017, at 8:38 p.m.  Do you see where I'm at?
14       A   Yes, sir.
15       Q   And on the right side, I understand those to be
16   the words of Dan Bilzerian; and on the left side, these
17   are your words.  Do you see that?
18       A   Yes.
19       Q   And you're asking him on March 4th if his guys
20   got a chance to review.  Do you see that?
21       A   Yes, sir.
22       Q   And he said, "Yeah, said it didn't say
23   indefinite and there was a good -- there was a
24   termination clause; but other than that, it was good."
25           And then will you read what you said to

Page 132

1   Mr. Bilzerian in response right here?
2        A   Yes, sir.  "It absolutely is indefinite unless
3   you or I want to part ways due to some major
4   issue/catastrophe."
5        Q   And then what did you say?
6        A   "Bro, I'm not" --
7        Q   Yeah.
8        A   -- "I'm not planning to peace out, and I didn't
9   think you'd be, but God fn knows situation-type crap."
10       Q   Okay.  You were communicating, at least at this
11   point, to Mr. Bilzerian that the agreement, at least in
12   your mind, was intended to be indefinite?
13           MR. STEARNS:  Objection to the form.
14       A   In my mind, yes, unless there was a -- you
15   know, a breach in contract on either parties' part.
16   BY MR. McCOY:
17       Q   And you told this to Mr. Bilzerian, and you
18   intended on him to rely upon this in evaluating the deal
19   between the two companies; is that true?
20           MR. STEARNS:  Object to the form.
21       A   Yes, sir.
22   BY MR. McCOY:
23       Q   Now, let's go to the issue of gross.  All
24   right.  Sorry.  All right.  We're still on Exhibit 9,
25   and we're at Blitz -- we're at Blitz 17.  And here you

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 133

1   all -- let's get our time frame set.  It looks like we
2   are -- let's see if we can find a timestamp somewhere
3   here.
4        Okay.  Well, the next timestamp is February 28,
5   2017 at 4:21 p.m.  So I'm going to presume that what
6   we're going to talk about earlier in this chain is
7   earlier than that.
8        MR. STEARNS:  Are you testifying, Kevin, or is
9   that a question?
10       MR. McCOY:  I'm -- let me ask the question,
11  Mr. Stearns.
12  BY MR. McCOY:
13       Q   Are you -- are you in agreement that that makes
14  sense, Mr. Huh?
15       A   I'm sorry.  Could you repeat it?
16       Q   Yeah.  Do you have any reason to believe that
17  chats that happened earlier in time than the later chats
18  on February 28th happened earlier than February 28th,
19  sir?
20       MR. STEARNS:  Objection.
21       A   Yeah.  We -- we had chats earlier than
22  February 28th, yep.
23  BY MR. McCOY:
24       Q   Okay.  Let's move past that.  Let's just make
25  it simple.

Page 134

1        MR. STEARNS:  Thank you.
2   BY MR. McCOY:
3        Q   You understand here -- can you read what
4   Mr. Bilzerian was writing at the time?  "Yeah I hear ya.
5   Well, I told David to just make it simple and do a
6   10 percent off the top.  Then you can up the price
7   5 percent, and you'll only be effectively paying
8   5 percent."
9        Do you see that?
10       A   Yes, sir.
11       Q   And that was consistent with Mr. Bilzerian's
12  communications to you that he wanted to get 10 percent
13  of gross sales, true?
14       MR. STEARNS:  Object to the form.
15       A   I'm -- off the top, I mean, again, I have
16  relied on, you know, my -- my professionals to kind of
17  make sense of what "off the top" meant.
18       Q   You did not know what that meant at the time?
19       A   Not -- not as -- you know, as I've become more
20  acquainted with the business, I learned that "off the
21  top" could mean a variety of things, you know, that --
22  which include discounts and returns and so on and so on,
23  so that's not very -- it's not very precise, I guess,
24  the use of "off the top."
25       Q   All right.  Let's get down here in Exhibit 9.

Page 135

1   Well, sorry.  I'm a couple of pages off.
2        A   No worries.
3        Q   Okay.  317.  Okay.  Here we go.  We're on
4   page 3 -- 315 of Exhibit 9.  And now at some point
5   you-all are discussing a deal that someone else got.
6   We're now around July of 2017.  Do you see that, sir?
7        A   Yes, sir.
8        Q   And do you recall what deal was being discussed
9   here with Logan Paul?
10       A   Not -- not with accuracy, I -- I don't, and I
11  wouldn't try to -- I wouldn't want to try and speculate
12  because I don't recall.
13       Q   All right.  Well, in any event, you say, "If
14  he's about to endorse a product that's exclusive to him,
15  I get a feeling he about to get a shit end of the
16  stick"; is that right?
17       A   Yes, sir.  My --
18       Q   And then Mr. Bilzerian says, "He couldn't of
19  negotiated a worse deal than me" with the emojis of
20  laughing until you cry.  I don't know what you call
21  that.
22       A   Yes, sir.
23       Q   Do you see that?
24       A   Yes, sir.
25       Q   You respond, "Oh, please.  I guarantee you he

Page 136

1   isn't getting a percentage of gross.  That's unheard of
2   in this industry."
3        Were those your words?
4        A   Yes, sir.
5        Q   And what "gross" were you speaking of there,
6   sir?
7        A   My gross -- my thought process at the time was
8   gross was what was in the -- you know, in the contract;
9   and so I just used that -- that term because that was
10  what I recall being in the contract.
11       Q   And that's the contract we talked about that
12  you and Mr. Bilzerian both initialed, correct?
13       THE COURT REPORTER:  Mr. Stearns, you're on
14  mute.  I believe you're trying to say something.
15       MR. STEARNS:  Yes.  Thank you.
16       I'm objecting to the form of that question.
17  Kevin, which contract?  There's two.
18       MR. McCOY:  The one that he and Mr. Bilzerian
19  both initialed.  That was -- that was actually my
20  question.
21       MR. STEARNS:  Well, I thought they were both --
22  that they were both initialed.  I'm just trying to
23  get clarity, Kevin.  That's all.
24       MR. McCOY:  Yeah, they didn't both.  They
25  didn't initial it.  They signed -- they signed them.

34 (Pages 133 to 136)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 137

1    MR. STEARNS: Oh.
2  BY MR. McCOY:
3    Q  Mr. Huh?  I can't hear Mr. Huh.
4    THE COURT REPORTER:  Me either.
5    MR. STEARNS:  Can't hear you, Mr. Huh.
6    THE VIDEOGRAPHER:  All right.  You guys want to
7  go off and figure it out?
8    MR. McCOY:  Let's --
9    MR. STEARNS:  Sure.
10   MR. McCOY:  I think Mr. Huh is back, maybe.  It
11 looks like he just --
12   MR. STEARNS:  Let's go off.  Give me five
13 minutes, guys.
14   MR. McCOY:  Hold on.  No, hold on.  There's a
15 question pending.  No --
16   MR. STEARNS:  Kevin, relax.
17   MR. McCOY:  -- we're not going off the record.
18   THE WITNESS:  Hello?  Hello?
19   MR. STEARNS:  Kevin, it's going to be okay.
20   MR. McCOY:  Okay.  Thank you.
21   THE WITNESS:  Hello.
22   MR. STEARNS:  Relax.  Are you okay, Kevin?
23   MR. McCOY:  Yeah, I'm good, sir, but we're not
24 going to -- we're not going to do that.  There's a
25 question pending.

Page 138

1    THE WITNESS:  Hello?  Can you guys hear me?
2    MR. STEARNS:  Listen, I'm getting glitches so
3  we are going off the record, Kevin.  I'm getting
4  glitches.  I want to fix the tech, and I know that
5  you --
6    MR. BILZERIAN:  So when I'm doing -- when I'm
7  doing my depo, do I get to just unclick the
8  internet, too or --
9    MR. STEARNS:  And who's speaking?  I'm sorry.
10   MR. BILZERIAN:  Dan Bilzerian.  Do I get to --
11   THE VIDEOGRAPHER:  Let me go off, so we
12 don't -- okay.  Off the record at 1:16.
13   (Recess taken from 1:16 p.m. to 1:18 p.m.)
14   THE VIDEOGRAPHER:  This begins Media Unit
15 Number 3.  We're back on the record at 1:18 p.m.
16 BY MR. McCOY:
17   Q  Mr. Huh, we're looking at Exhibit 9.  I was
18 asking you about page Blitz 315 --
19   A  Yep, yep.
20   Q  -- and you said, "Oh, please, I guarantee you
21 he isn't getting a percentage of gross.  That's unheard
22 of in the industry."
23   Those were your words to Mr. Bilzerian, true?
24   A  Yes, sir.
25   Q  And you indicated that that was consistent with

Page 139

1  the language in the contract; is that true?
2    MR. STEARNS:  That is not true, Kevin.
3    MR. McCOY:  What are we doing here, Jason?
4  What are we doing here?
5    THE WITNESS:  Me?
6  BY MR. McCOY:
7    Q  No, Jason Stearns, your lawyer, who's just
8  testifying now.
9    Mr. Huh, prior to the technology issue that
10 caused the break --
11   A  Yep.
12   Q  -- do you agree that we talked about the
13 language here on "gross" that we're looking at in
14 Exhibit 9?
15   A  Yes, sir.
16   Q  And you indicated that you were trying to use
17 the language from the contract in responding to
18 Mr. Bilzerian?
19   MR. STEARNS:  Objection.
20   A  Yeah.  To my knowledge, that's -- I remember
21 the term being used in the contract, and so I -- I put
22 that in the text message.
23 BY MR. McCOY:
24   Q  And the contract, as we've talked about before,
25 is the last one that you initialed that had the term

Page 140

1  "gross sales" in it.  Isn't that true, sir?
2    A  Yes, sir.
3    MR. STEARNS:  Object to the form.
4  BY MR. McCOY:
5    Q  What was your understanding of how often or not
6  often Mr. Bilzerian had to post about any STEEL product?
7    A  My -- my understanding was, you know, as -- as
8  often as he could to -- you know, to the best of his
9  ability and -- and to post product that, you know, he
10 felt comfortable posting.
11   Q  Posting concerning products that he felt
12 comfortable posting about?
13   A  Yeah, that kind of fit his -- his regimen, if
14 you will.
15   Q  And is that similar to the term of an "organic
16 post"?
17   MR. STEARNS:  Object to the form.
18   A  I mean, the term "organic" -- I guess you
19 could say, yeah, it's kind of flowing naturally and Dan
20 feels good.  He's in a good -- you know, he's feeling
21 good about the product and what he may be training that
22 day or maybe a protein that he's taking and he's posting
23 it.  If you were to say organically, it -- typically
24 we -- we would attribute that to a setting or a
25 scenario/situation as to where he would be posting or

35  (Pages 137 to 140)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 141

1 how he went about posting it and -- and how he
2 communicated to his viewers, you know, the product that
3 he was using.
4 BY MR. McCOY:
5     Q   And your understanding of what Mr. Bilzerian
6 was -- was to promote, those products that he liked and
7 used, correct?
8     A   Yes, sir.
9     Q   And if he didn't like a product, he didn't have
10 to promote it, correct?
11     MR. STEARNS:  Object to the form.
12     A   I mean, he didn't -- no, we didn't -- I don't
13 recall Dan stating that he didn't like a particular
14 product.  It was more so just I -- you know, he would --
15 he would ask for, "Hey, how's this product performing?
16 You know, how did we do when I promoted this product?"
17 And -- and then from there, it was what -- what flowed
18 for him.  And, you know, I respected that because if it
19 flowed for him, then he would appear to be much more
20 honest in what he was posting about and the product that
21 he was, you know, saying he was using.
22 BY MR. McCOY:
23     Q   All right.  Let's go in Exhibit 9 to -- sorry.
24 I thought I had the specific page.
25     A   Yep.

Page 142

1     Q   All right.  Let's go up to Exhibit 9.  We're at
2 Blitz 20.  And now we're at March 1, 2017, and this is
3 before the agreements that we've talked about.
4     And do you recall there being a discussion --
5 it looks like it might have involved somebody on your
6 team -- about there being metrics, specific metrics,
7 around Mr. Bilzerian's posts in order for him to get
8 paid?
9     A   Yes, sir.
10     MR. STEARNS:  Object to the form.
11 BY MR. McCOY:
12     Q   And do you agree that down here, Mr. Bilzerian
13 rejected that idea?
14     A   Yes, sir.
15     Q   And he said here, "I can only stand behind one
16 company if I'm seriously trying to build a brand, so
17 I've got opportunity costs.  I mean, just think about
18 how delusional your friend is to suggest if I 7X your
19 company in a year, I get 0.  I just don't want either of
20 us to waste time with nonsense offers like that."
21     Do you see that?
22     A   I see that.
23     Q   And was it your understanding that in terms of
24 Mr. Bilzerian getting paid, there was no metric of
25 performance that STEEL needed to achieve in order for

Page 143

1 Blitz to get the commission owed under the contract?
2     MR. STEARNS:  Objection.
3     A   Yeah.  We -- there was no metrics within the
4 contract.  Dan -- you know, the Blitz party just refused
5 to have a metric built in or a means of tracking clicks
6 or sales.  And so in order to move forward, they -- they
7 wouldn't -- that wouldn't be something that they would
8 want to do.  They didn't want any kind of trackability
9 in that regard.
10 BY MR. McCOY:
11     Q   Meaning "they wouldn't want to do," that was
12 not something that they would agree to in the contract,
13 correct?
14     A   I'm sorry.  Yes, sir.
15     Q   And in terms of products, Mr. Bilzerian was
16 free to pick which products he would promote and those
17 which he would not promote, true?
18     MR. STEARNS:  Object to the form of the
19 question.
20     A   Yeah.  He -- he was, for the most part, free;
21 but we put our heads together, you know, regarding the
22 products that were being posted and -- and usually, you
23 know, we agreed on that.  Based upon how people
24 responded to certain products we had posted, we -- we --
25 you know, we looked at the engagement, and we kind of --

Page 144

1 we did our best to monitor sales and consult what was
2 selling, and then we kind of analyzed the -- the fitness
3 industry as a whole and what's most popular.
4     You know, fat burners and free workouts, things
5 that give energy are typically the more popular
6 supplements within the industry; and so that's kind of how
7 we brainstormed, if you will, what -- what to post.  But
8 it was never -- it was never built into the contract
9 that he was required to post a certain product.  You
10 know, Dan -- Dan doesn't operate -- I feel, in my
11 opinion, he doesn't operate well when you try to, you
12 know, force him to do something.  And I understand that,
13 and I respect that.  That's a part of -- that's his
14 nature.  And with that being said, we -- you know, any
15 athlete we bring on, we -- we analyze their style, if
16 you will, and we try to, you know, be appreciative of
17 that, and hopefully it works.
18 BY MR. McCOY:
19     Q   And -- oh, I'm sorry.  I didn't mean to cut you
20 off, Mr. Huh.
21     A   Yeah, but in regards to the -- the metrics
22 within this paragraph, I know there was some metrics
23 proposed, but we never -- like I said, the Blitz camp
24 just -- they didn't want this kind of metrics.  And, you
25 know, I agreed with Dan when he said that was a little

36  (Pages 141 to 144)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

| Page 145 | Page 146 |
|---|---|

**Page 145**

1  unrealistic to -- to 7X your company and get 0. I
2  understand that. That's why we didn't work that in.
3  But, you know, it was -- also, within there is when
4  you're stating that he only needs to work -- work for --
5  stand behind one company. That's like, okay, you
6  know -- that's, you know, that's a -- that's a --
7  that's -- Dan was, you know -- well, I perceived was
8  very serious about this one company and -- and doing the
9  best that he possibly could to do what he could do in
10  terms of promoting; and so I -- with that in mind, you
11  know, it made sense that, okay, well, these metrics that
12  we threw out there, you know, I would -- I could see
13  being unrealistic in that, you know, Dan's telling me
14  it's -- he's going to stand behind one company, I -- I'm
15  going to take his word for it.
16      Q  And that company was STEEL ultimately, true?
17      A  Yes, sir.
18      Q  And you also agree that there were no
19  requirements concerning the frequency with which
20  Mr. Bilzerian had to post concerning any STEEL products?
21      MR. STEARNS:  Object to the form of that
22  question.
23      A  Yeah, there was no frequencies built into the
24  contract. It was just, you know, to the best of your
25  abilities. I don't remember -- I can't state the exact,

**Page 146**

1  but -- the exact language; but, in a nutshell, that's --
2  that's what it meant.
3  BY MR. McCOY:
4      Q  And Mr. Bilzerian's initial posts crashed the
5  STEEL website; is that true?
6      A  Oh, we had some traffic issues -- yeah, it --
7  the site went down for a little bit, and the -- I'm
8  not -- I'm not an IT guy, but the platform that we were
9  on, we had not upgraded. We had not upgraded to a
10  platform that could handle -- not large amounts of
11  traffic but traffic that appeared all at once, if you
12  will. They appeared like -- it's like -- how do I
13  describe it? Like when you -- if you're going to a
14  convenience store, like a DG Hardware store, the doors
15  to that store can only handle, you know, so many people
16  through the front door at once. And so it could be a
17  little chaotic if traffic is -- you know, the normal
18  everyday traffic is there and then a little bit extra
19  shows up, that could be a problem. And so we had to
20  make some adjustments.
21      Q  And the STEEL Supplements website is like your
22  store, right; it's a virtual store?
23      A  Yes, sir.
24      Q  And the website that crashed was the STEEL
25  Supplements website after Mr. Bilzerian made a post?

| Page 147 | Page 148 |
|---|---|

**Page 147**

1      A  Yes. It was in and around, shortly thereafter.
2      Q  And, in fact, Mr. Bilzerian expressed concern
3  that you were losing out on sales because you could not
4  get the website back up, true?
5      A  I didn't -- I didn't read it, but I think he
6  may have expressed that. I don't recall off the top of
7  my head.
8      Q  And, in fact, that -- I'm sorry. Go ahead.
9      A  I'm pretty sure he did. I just don't recall
10  the exact conversation.
11      Q  You agree that Mr. Bilzerian, as -- let me
12  start over.
13          Under the arrangement with Mr. Bilzerian, as
14  STEEL growed, the commissions owed to Mr. Bilzerian
15  would grow, correct?
16      MR. STEARNS:  Object to form.
17      A  Yes, sir.
18  BY MR. McCOY:
19      Q  Do you know how many people Mr. Bilzerian
20  directed to STEEL's website?
21      A  I -- there's -- I don't know. Like I said,
22  it's very hard to track that because they -- they
23  refused to -- Dan refused to have any means of tracking
24  that, like a swipe-up link that was coded to know that
25  these users came from that link directly.

**Page 148**

1      Q  Okay. Now, let's go back to Exhibit 6. And I
2  want to focus here -- let me -- let me zoom in. And
3  again, Mr. Huh, this is the contract. You see this
4  has -- those are your initials there at the bottom of
5  page 2?
6      A  Yes, sir.
7      Q  And that has DB for Mr. Bilzerian there at the
8  bottom of page 2 as well?
9      A  Yes, sir.
10      Q  All right.
11          THE VIDEOGRAPHER:  Are you sharing your screen?
12  I don't see it.
13          THE COURT REPORTER:  Who's speaking? Who's
14  speaking, please?
15          THE VIDEOGRAPHER:  This is the videographer.
16          MR. McCOY:  I am sharing. I've been sharing my
17  screen. Has that not --
18          MR. STEARNS:  I can see it. I can see it.
19          THE VIDEOGRAPHER:  That's weird. Okay. Hold
20  on one second. We don't need to go off. Just let
21  me come back.
22          MR. STEARNS:  While you're doing that, Kevin,
23  in the next five minutes or so, if you get to a
24  stopping point, I'd like a break.
25          MR. McCOY:  That's fine. We can get through

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 149

1    this and take another break.
2        MR. STEARNS:  All right.
3        THE VIDEOGRAPHER:  All right.  Sorry, guys.
4    Okay.  Cool.  You can continue.  Sorry about that.
5        MR. McCOY:  Okay.  We're all good?  You got it?
6        THE VIDEOGRAPHER:  Yep, yep.
7    BY MR. McCOY:
8        Q   Okay.  Now, there were other provisions of this
9    agreement, and I want to focus on Section 3.1.1.
10       Do you see that there, Mr. Huh?
11       A   Yes, sir.  If you could just --
12       Q   Zoom?
13       A   Yes, please.
14       Q   Is that good?
15       A   Yep, that works.
16       Q   All right.  The -- do you see here that at the
17   time the social media sites in 3.1 that celebrity was
18   going to promote, publicize, and endorse were -- the
19   platforms included Instagram and Facebook.  Do you see
20   that?
21       A   Yes, sir.
22       Q   Are you aware of any amendment, agreement, or
23   communication of any sort after this document was
24   executed that changed or added additional platforms on
25   which Mr. Bilzerian was going to post content concerning

Page 150

1    STEEL?
2        MR. STEARNS:  Object to the form.
3        A   I'm not aware of any amendments --
4    BY MR. McCOY:
5        Q   All right.
6        A   -- pertaining to adding other platforms.
7        Q   All right.  In Section 3.1.1, it says,
8    "Celebrity shall not promote, publicize, or endorse the
9    services or products of any competitor of STEEL Supps,
10   (defined as a provider, seller, manufacturer or
11   distributor of bodybuilding supplement products.)"
12       Do you see that?
13       A   Yes, sir.
14       Q   What discussions did you have with
15   Mr. Bilzerian or anyone on his behalf of what was a
16   "manufacturer or distributor of bodybuilding supplement
17   products"?
18       A   I don't recall any exact conversation.
19       Q   Do you recall any conversations about what that
20   term was supposed to mean in this agreement?
21       A   Give me a second, Kevin.  I don't recall.
22       Q   And I have not been able to find anywhere in
23   this agreement where that term is defined as a defined
24   term.
25       A   Uh-huh.

Page 151

1        Q   Do you have a definition that you had at the
2    time this was executed?  So back in March of 2017, what
3    definition were you using, as you understood a
4    "bodybuilding supplement product"?
5        A   Well, the definition of "bodybuilding
6    supplement product" and -- and, you know, my personal
7    take on that is anything that's going to help you
8    perform better in and around physical activity in
9    order -- it can even help you perform outside of
10   physical activity if you were -- I mean, there's -- you
11   know, we have consumers that will take preworkouts prior
12   to -- they just want extra energy prior to work.
13       It just depends on the user and everybody's
14   very unique in the sense that one particular person may
15   require a higher level of stimulants.  And we offer a
16   wide variety in products that contain various amounts of
17   stimulants so that one can use this in and out of -- in
18   and out of the gym; but for the most part, anybody that
19   were to be looking into using a stim-based product,
20   usually it's, you know, to perform better physically,
21   mentally and, you know, we consider that to be a
22   bodybuilding aid/supplement, if you will.
23       Q   Was that a -- when you say "we" considered, is
24   that written down, or was that in writing anywhere that
25   you are aware of within STEEL in March of 2017?

Page 152

1        A   No -- no, sir, not that I'm aware of.
2        Q   STEEL has a product called Hard-AF; is that
3    right?
4        A   Yes, sir.
5        Q   What does that product do?
6        A   It's basically -- well, it increases your
7    ability to have an erection and maintain an erection.
8        Q   Is that a bodybuilding -- is that a
9    bodybuilding supplement?
10       A   It can be actually used as a bodybuilding
11   supplement.  It can, because it increases the
12   vasodilation of the vascular system, therefore,
13   increasing the rate at which blood is flowing to a
14   particular area of the body; and so therefore you would
15   increase -- you could -- how do I put this? -- a pump.
16   And a pump where you were to train a particular muscle,
17   and the -- the particular muscle that you're training is
18   engorged with nutrients, water, and blood flow; and --
19   and it has a swelling-like effect, if you will, which
20   ultimately is the catalyst for anabolism, which is the
21   increased rate at which protein is synthesized within a
22   particular body part; therefore, you're -- you know,
23   you're building -- you're -- you're rebuilding fibers
24   and muscles.
25       Q   And did -- did you consider Hard-AF to be a

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 153

1  bodybuilding supplement at the time of the agreement in
2  March of 2017?
3      A  I?  Me personally?  There -- well, hold on.
4  You said March of 2017?  I'm sorry.
5      Q  Yes, sir.
6      A  Oh.  We didn't have Hard-AF then.
7      Q  I'm sorry.  So there was no Hard-AF as of
8  March 2017?
9      A  No, sir.  It didn't come until 20- -- late
10  2018, 2019 -- early 2019.  I could be mistaken, but in
11  and around there.
12      Q  Did you intend for this agreement to cover the
13  products that were then in existence for STEEL
14  Supplements in terms of what constituted a bodybuilding
15  supplement product?
16      MR. STEARNS:  Object to the form.
17      A  Within this agreement?  I'm sorry, Kevin.
18  BY MR. McCOY:
19      Q  Yes, sir.
20      A  If you could just rephrase that one more
21  time --
22      Q  Yeah.
23      A  -- I just want to get it right.
24      Q  Yeah.  So when you were -- here's what I'm
25  trying to understand.  I'll just be direct with you,

Page 154

1  sir.
2      There's a performance drink that STEEL has been
3  working on, true?
4      A  Yes, sir.
5      Q  And what's the name of that?
6      A  Well, we -- we have a variety of performance
7  drinks, and we're constantly working in -- within the
8  space to develop a new one.
9      Q  Okay.
10      A  We have --
11      Q  Let me ask:  What's the one that's not on the
12  market, the ready-to-drink in a can?
13      A  Oh.  Octane.
14      Q  Okay.  And that is a -- that is an energy
15  drink, correct?
16      A  Yes, sir.
17      Q  That was not on the market in March of 2017?
18      A  It was not on the market.
19      Q  And is that -- that product, I presume, is
20  going to be marketed towards the audience of Red Bull,
21  Monster, 5-Hour Energy; is that correct?
22      A  Well, the -- well, primarily it would -- it
23  would mean that, you know, we're in a social media
24  space, and -- and the majority of our affiliates are
25  fitness influencers.  We do have some extreme athletes

Page 155

1  that, you know, they actually do have some Monster
2  contracts that are in place.
3      We would start largely on the backs of the
4  fitness industry, and then it could evolve outside of
5  that into mainstream avenues to appeal to more people,
6  yeah, but that's how it -- how it -- you would give it
7  wings, if you will, is you'd start off in the fitness
8  industry, because the fitness industry is very attuned
9  with trying new supplements to see how they respond to
10  them.  And we know the space, you know, relatively well,
11  so it seems to make sense.
12      We -- we -- we haven't launched it yet, but we
13  have avenues in which we would be deploying the drink to
14  gas stations and airports, things -- things of that
15  nature outside of our -- you know, outside of the
16  website.
17      We've -- we've mapped those things out many
18  years ago.  It's just the drink hadn't been finalized.
19  I've been -- we've been working on concepts of the
20  energy drink since 2017.  Well, actually, no, probably
21  2016 we were working on prototypes.
22      Q  And within the fitness industry that you were
23  talking about, there are segments, true?
24      MR. STEARNS:  Objection.
25      A  Like what do you -- what do you mean by

Page 156

1  "segments"?
2  BY MR. McCOY:
3      Q  Oh.  Like running would be within the fitness
4  industry?
5      A  Oh.  Yes, sir.  Yes, sir.
6      Q  We talked about CrossFit.  That would be in the
7  fitness industry?
8      A  Yes, sir.
9      Q  Bodybuilding would be within the fitness
10  industry?
11      MR. STEARNS:  Objection.
12      A  Well, I mean, I consider bodybuilding to be
13  kind of -- it kind of encompasses the fitness industry
14  as fitness industry encompasses fitness in general.
15  BY MR. McCOY:
16      Q  So bodybuilding -- that goes back to I, I think,
17  where we were before.  You consider bodybuilding to be
18  anything that grows the body?
19      A  Yeah.  You're trying to, you know, make
20  improvements on your body, whether you're trying to lose
21  body fat or increase the amount of muscle in your body.
22  A combination of both is usually preferred and actually
23  the fastest mechanism in how to achieve that.
24      So when you -- you go and you stimulate a
25  muscle, the more muscle that you have, the faster your

39 (Pages 153 to 156)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 157

1  body increases and, therefore, the faster your
2  metabolism, and it's much easier to lose that weight; so
3  you're -- essentially you're building your body.
4       Q   And did you ever share your definition of
5  "bodybuilding" with anyone on behalf of Mr. Bilzerian or
6  with Mr. Bilzerian at the time of negotiating the
7  contract?
8       A   Not -- not specifically in such terms.  I don't
9  recall.
10      MR. McCOY:  All right.  We can take -- we can
11  take the break.  I appreciate it.
12      MR. STEARNS:  Yep.
13      THE VIDEOGRAPHER:  All right.  Off the record
14  at 1:44 p.m.
15      (Recess taken from 1:44 p.m. to 1:53 p.m.)
16      THE VIDEOGRAPHER:  Back on the record at
17  1:53 p.m.
18  BY MR. McCOY:
19      Q   All right.  Mr. Huh, I want to talk a little
20  bit more about the start of the relationship with
21  Mr. Bilzerian's promotions.  We talked a little bit
22  about the website.
23      Prior to Mr. Bilzerian's first post, he had
24  extensive conversations with you about insuring that the
25  website could handle the traffic that he would direct to

Page 158

1  STEEL Supplements, true?
2       A   Prior to the first post?
3       Q   Yes, sir.
4       A   I don't recall.  I don't recall an extensive
5  conversation about that.
6       Q   Did he explain to you that you needed to make
7  sure that you could handle the amount of website hits
8  that would happen once he made the post?
9       A   It is possible.  I just -- I don't recall.
10      Q   And, in fact, after he made the first post, the
11  website was then shut down for days, true?
12      A   I don't remember the approximate time.  It --
13  it was -- it was shut down, but I don't remember the
14  timing of it.
15      Q   Do you dispute that Mr. Bilzerian's first posts
16  drove so much traffic that it crashed the website?
17      A   No.  No, I don't -- I don't dispute that.  It's
18  a -- like I said, the -- on a platform, the door hole is
19  only so big; and when you already have a steady stream
20  of customers that are coming in, any extra, yeah, could
21  cause a hangup in the situation.
22      Q   And, in fact, you had to change service
23  providers after the first posts so that you could handle
24  the traffic that Mr. Bilzerian's posts were directing to
25  STEEL, correct?

Page 159

1       A   Service --
2       MR. STEARNS:  Objection.
3       A   I don't recall changing a service provider.  It
4  might have just been an upgrading in the platform, if
5  you will.
6  BY MR. McCOY:
7       Q   All right.  All right.  Now, my internet is
8  running slow so just give me a moment.
9       A   Yes, sir.
10      Q   Who is -- let's see -- Angel IT Master?
11      A   Oh.  He was a guy that we had on board that
12  helped with technical matters and websites and stuff
13  like that.
14      Q   And he is the individual who was assisting
15  after Mr. Bilzerian's posts in assessing why the website
16  crashed?
17      A   I think he -- he was.  He was a part of helping
18  to -- to fix the situation.
19      Q   All right.  Can you -- let me zoom in for you
20  here.
21      A   Yes, sir.
22      Q   This is Exhibit 9, and this is Blitz -- this is
23  going to be Blitz 49.  And we're, again, on the left
24  side here.  And you are saying to Mr. Bilzerian, "You
25  crashed the site and we have amazing fn Web host

Page 160

1  capabilities, bro.  Congratulations, ha, ha, ha."
2       A   Yes, sir.
3       Q   And does that refresh your recollection that
4  Mr. Bilzerian's posts had, in fact, crashed your site?
5       MR. STEARNS:  Object to the form.
6       A   Yeah.  I mean, we had that conversation.  I --
7  you know, like I said, it -- I don't think that it
8  didn't crash the site.  When -- when an influx -- a
9  pop-off of traffic could definitely cause some issues.
10  BY MR. McCOY:
11      Q   And Mr. Bilzerian was upset because he was
12  afraid that you were going to be losing sales, correct,
13  if we look at Blitz 51?
14      MR. STEARNS:  Object to the form.
15      A   I see that, yes, sir.
16  BY MR. McCOY:
17      Q   And you don't -- do you dispute that these were
18  conversations that the two of you were having?
19      A   I don't dispute that.
20      Q   There's a term throughout the conversations
21  with Mr. Bilzerian here.
22      A   Yes, sir.
23      Q   When you use that term, what does it mean?
24      A   Oh.  Well, it means like all's good.  Dan
25  obviously likes titties; so, you know, as it relates to

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 161

1    Dan, Dan knows -- you know, it's like a back-and-forth
2    way of communicating with each other, a goofy -- goofy
3    kind of way.
4        Q  I understand.  And I just want to make sure for
5    purposes of making it a positive -- it's like a good
6    thing or a bad thing.  Whenever we see the word
7    "titties" throughout this chat, that is intended --
8    that's intended to be a positive thing, meaning all
9    good?
10       A  Yes, sir.
11       Q  All right.  So here Mr. Bilzerian is explaining
12   that you should fire your techs; they cost you hundreds
13   of thousands of dollars.  This is during a period -- how
14   many days was the website down after the first post?
15           MR. STEARNS:  Objection.
16       A  I don't recall.
17   BY MR. McCOY:
18       Q  Was it more than one?
19       A  It may have been, but I really -- I don't
20   recall specific days.
21       Q  In any event, you have a conversation with
22   Angel IT Master.  You say, "Yes, in lease terms, we
23   have a fully decked-out Honda Civic with racing tires,
24   rims, tinted windows, and boosts.  He's driving the
25   stock Honda from the dealership.  We're upgrading to a

Page 162

1    Bugatti/Ferrari now."
2        Do you see that?
3        A  Yes, sir.
4        Q  All right.  Does that refresh your recollection
5    that in some respect you had to upgrade your systems in
6    advance of any further posts from Mr. Bilzerian?
7        A  Well, yeah.  We -- we definitely -- I mean,
8    yes, sir, you refreshed my recollection; but upon
9    learning, you know, that we weren't on a platform in
10   general that would result in long-term growth, it was
11   not only for Bilzerian but for the growth of the company
12   overall.  We realized that, well, this isn't a platform
13   that we should have been on in the first place.  We
14   should -- obviously considering all of the growth that
15   we're looking to have and make, we -- we need to
16   upgrade, yeah.  So we were taking into account all --
17   all avenues, not just Dan.
18       Q  But you were expecting to see an uptick in
19   growth due to the relationship with Mr. Bilzerian, true?
20       A  Well, we were hoping for it, yeah.
21       Q  And did that -- I'm sorry.  Go ahead, sir.  I
22   didn't mean to cut you off.
23       A  Yeah, we were hoping for it, but there was no
24   way of knowing for a fact that that could happen.  We
25   felt pretty confident in -- about it.

Page 163

1        Q  Well, let's go to Exhibit 9, Blitz 252 through
2    253.
3        A  Right.
4        Q  And do you see this screenshot?
5        A  Yes, sir.
6        Q  This was a screenshot you were sharing with
7    Mr. Bilzerian that looks to be some kind of a snap from
8    maybe Shopify?
9        A  Yes, sir.
10       Q  And this would reflect, meaning this screenshot
11   here, would reflect a column for what Shopify was
12   recording as gross sales, correct?
13          MR. STEARNS:  I'm going to object to the form.
14       A  That's -- yeah, that's what it -- it says, yes,
15   sir.
16   BY MR. McCOY:
17       Q  It's literally what the words right there in
18   the column say; is that true?
19          MR. STEARNS:  Object to the form of the
20   question.
21       A  Yes, sir.
22   BY MR. McCOY:
23       Q  And we see here that July 2016 for Shopify you
24   have 202 orders, and you're at $19,000 and some change,
25   right?

Page 164

1        A  Yes, sir.
2        Q  And then you see some growth through 2016, and
3    then the Shopify results from March 2017 to
4    April 2017 --
5        A  Yes, sir.
6        Q  -- the orders nearly double and so does your
7    gross sales?
8           MR. STEARNS:  Object to the form.
9        A  Yeah, for that -- that -- yep, for that time
10   period.
11   BY MR. McCOY:
12       Q  And that was the start of Mr. Bilzerian's posts
13   on behalf of -- or promoting products for STEEL, true?
14          MR. STEARNS:  Object to the form.
15       A  Yeah, that was in and around the time, yep --
16   BY MR. McCOY:
17       Q  And --
18       A  -- but --
19       Q  I'm sorry.  Go ahead.
20       A  I don't recall the exact date that Dan posted,
21   but I thought it was in -- in -- sometime in March --
22   the initial posts -- I'm sorry, the initial posts that
23   he had posted, sometime in March.
24       Q  All right.  Well, at least from what we can see
25   here in the data, you would agree that between these two

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 165

1  months --
2      A  Right.
3      Q  -- gross sales jumped substantially?
4      A  Oh, yeah.  Yeah, they did, but obviously
5  the -- the marketing team plays a big role in how -- how
6  those sales are eventually captured through that
7  retargeting that you were referring to earlier.
8      Q  Did the marketing team between April --
9  March 2017 and April 2017 do anything different?
10         MR. STEARNS:  Object to the form.
11     A  Different in regards to what?
12 BY MR. McCOY:
13     Q  Yeah.  Well, I'm trying to figure out if
14 anything besides Mr. Bilzerian's posts was different --
15     A  Oh, understood.
16     Q  -- between the two months?
17     A  Understood.  From my recollection, we were
18 increasing our marketing spend regarding advertisement.
19     Q  And what kind of advertisement -- I'm sorry.
20 Go ahead.
21     A  Social media-based advertisement.  I just -- I
22 don't recall the exact -- you know, the exact dates in
23 which we started to really uptick, spend; but it kind of
24 coincides -- when you're -- you know, you're marketing
25 in social media, like if somebody were to post -- let's

Page 166

1  say Dan posts.  You want to make sure your targeting
2  team and -- you know, we're doing our jobs as
3  efficiently as possible to facilitate in getting any
4  traffic that comes to the site to -- and any traffic
5  that comes to the site, if they leave, it's like how do
6  you get that customer back?
7          And so when a customer shows up to -- it's like
8  when you show up to a store, if there's nobody in the
9  store to greet you, I mean, that can be okay for some;
10 but some, it may be an issue, so, you know, we have to
11 make sure that there's online chat available, people can
12 get questions answered that they may have.  And then the
13 people that leave the store are, you know, retargeted,
14 if you will, to come back, maybe with an additional
15 promo or like a discount, if you will, to get them to
16 come back.  And so our retargeting efforts are -- you
17 know, we pride ourselves on how good at retargeting we
18 are.
19     Q  And how -- we talked about this briefly
20 earlier, but maybe this will give me better context now.
21         Explain retargeting in this context of what the
22 team was doing, how it works.
23         MR. STEARNS:  Objection.
24     A  I'm not an expert in this space; but from my
25 over -- my -- you know, my -- my understanding, a

Page 167

1  customer comes to the store -- not all customers, I
2  should say, but many customers come to the store, you
3  have the ability to track IP addresses, if I'm not
4  mistaken, and that's how the retargeting works where you
5  will -- if you leave the store, you can go onto Google
6  or a social media platform and be presented with another
7  ad from the company that you had visited.
8  BY MR. McCOY:
9      Q  So if you go to the STEEL Supplements page, it
10 can track IP addresses.  And then based upon those IP
11 addresses, ads can be tailored to -- to kind of have
12 another touch of the customer; is that right?
13         MR. STEARNS:  Objection.
14     A  Like I said, I'm not an expert on whether it's
15 an IP address.  I'm pretty sure it is, but obviously
16 there has to be some means of how do you retarget that
17 in a traditional fashion.  I don't know the technicalities
18 of it; but, yes, you would -- you would come to the
19 store, and you would look to touch them again multiple
20 times, if possible, until they could -- they potentially
21 would come back to the store and make a purchase.
22 BY MR. McCOY:
23     Q  So -- all right.  I think I understand.  You
24 basically have people coming in based upon a post --
25     A  Yes, sir.

Page 168

1      Q  -- and then you're -- you're gathering enough
2  information to be able to have another touchpoint with
3  that customer, true?
4          MR. STEARNS:  Objection.
5      A  Well, it's not necessarily a post.  It's
6  anybody that can -- anybody that comes from anywhere
7  actually.  If you search the site, you can get
8  retargeted.  It doesn't always evolve around a post
9  per se.
10 BY MR. McCOY:
11     Q  All right.  But certainly if somebody is
12 posting and directing people to your site, then that
13 would amplify the retargeting effort, correct?
14         MR. STEARNS:  Object to the form.
15     A  Yes, sir.
16 BY MR. McCOY:
17     Q  And so even after the post is made, there are
18 subsequent opportunities to sell to the same customer,
19 true?
20     A  Yes.  Yes, because you're -- you're -- with the
21 tracking, you can retarget that same customer, yep.
22     Q  And you would have been able to track the
23 customers who were coming to your website as a result of
24 Mr. Bilzerian's posts?
25     A  We -- no.  Again, we aren't able to track

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 169

1   exactly which customers were coming from Dan, Dan's
2   posts. We just could track customers that were coming
3   into the store.
4        Q  I got it. So -- yeah, and you had said that
5   earlier, and that was a poor question.
6        My question was -- was not whether you could
7   trace it to Mr. Bilzerian's posts --
8        A  Yes, sir.
9        Q  -- but you could see if there was, say, a bump
10  after a post, that you were getting more traffic?
11       A  Yes.
12       Q  And that -- basically, does that help you build
13  kind of a customer base?
14       MR. STEARNS: Objection.
15       A  Not necessarily, because they -- they would
16  have to purchase in order to become, you know, a
17  customer base, if you will. They -- because if they
18  don't -- if they don't ever purchase, they fall out of
19  that retargeting phone, and we no longer can touch them.
20  BY MR. McCOY:
21       Q  So I thought the retargeting wasn't specific to
22  them actually making a purchase but just spending time
23  on the site.
24       A  Yeah.
25       MR. STEARNS: Objection.

Page 170

1        A  Yeah. To my knowledge, it's -- retargeting can
2   encompass people that have come to the site and/or made
3   a purchase; but if I -- if I understood correctly, you
4   said that the retargeting of customers that didn't make
5   a purchase could be retargeted, correct?
6        Yes, they can. But the problem is -- is you
7   can only -- my -- my -- my limited knowledge on this is
8   you only retarget them -- you only try to reach out to
9   them -- to them for so long, and then you can no longer
10  touch them.
11  BY MR. McCOY:
12       Q  Unless they come back --
13       A  Yeah.
14       Q  -- correct? Okay.
15       A  Exactly.
16       MR. STEARNS: Objection to the form.
17  BY MR. McCOY:
18       Q  So then going back to where we were talking
19  about earlier, I think it was in the context of a
20  viral -- the viral issue.
21       Is it true that content that stays out for a
22  particular post continues to have value in terms of
23  driving customers to whatever the product is?
24       MR. STEARNS: Objection.
25       A  So like a post that you would put on your

Page 171

1   social media. Like, you said you had an Instagram, so
2   you're talking about the grid where you would leave it
3   up there?
4   BY MR. McCOY:
5        Q  Yes, sir.
6        A  Yeah, it can. But it's -- social media --
7   people with Instagram are very -- they have very short
8   attention spans, and so there's really a limited window
9   in which that post will be relevant because, you know,
10  once you make another post, it -- it -- people just --
11  very few people, you know, are scrolling through looking
12  for other posts that you have made and then responding
13  to them. But it's not impossible that they would do
14  that. Yes, it is -- it is possible that that can
15  happen.
16       Q  Now, one of the other things that STEEL was
17  allowed to do, if we go to 3.2.1 of Exhibit 6 -- and let
18  me blow that back up.
19       A  Yes, sir.
20       Q  So in 3.2.1 STEEL was permitted to use the
21  image, if you will, of Mr. Bilzerian relative to its
22  posts, true?
23       A  Yes, sir.
24       Q  And, in fact, STEEL did that in some instances
25  where it took content that Mr. Bilzerian had provided

Page 172

1   for one product and used it for a different product,
2   true?
3        A  I'm -- if you could specify that one. I'm not
4   entirely sure. I want to make sure I interpret that
5   correctly.
6        Q  Sure. There were instances in which
7   Mr. Bilzerian provided content relative to a preworkout
8   or similar product and STEEL used that content for the
9   male performance pill, Hard-AF, or the like, whatever
10  the line is?
11       MR. STEARNS: Object to the form.
12       A  I'm -- Kevin, I'm not sure I follow. Like --
13  so Dan made a post about a preworkout, but we used it
14  for Hard-AF?
15  BY MR. McCOY:
16       Q  Yes, sir.
17       A  I -- I -- I don't recall. I don't recall using
18  a Dan -- Dan premoting a preworkout for a Hard-AF ad.
19       Q  You just don't remember one way or the other?
20       A  No, I -- yeah, I kind of confused because
21  it's a -- if you promoted one of the -- is there an
22  instance where you could specify like a post that he
23  did, which I can -- it can refresh my memory?
24       Q  I don't have the -- well, we might be able to
25  find it. Let me find it on a break. I think it's in

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

---

Page 173

1    our texts here.  But let's keep going first with 3.2.1
2    for a minute.
3        A   Understood.
4        Q   So one of the -- aside from Mr. Bilzerian doing
5    the posts that we talked about earlier, the other way
6    that STEEL could get a benefit out of this contract was
7    its ability to use Mr. Bilzerian's image and likeness,
8    correct?
9        A   Yes, sir.  Yes, sir.
10       Q   And that was independent of anything
11   Mr. Bilzerian did or didn't do, true --
12           MR. STEARNS:  Objection.
13   BY MR. McCOY:
14       Q   -- in terms of his own posts?
15           MR. STEARNS:  Still same objection.
16       A   I -- to my knowledge, yes.  Yes.
17   BY MR. McCOY:
18       Q   All right.  We had talked a little bit before
19   the last break about Octane.
20       A   Yes, sir.
21       Q   Obviously, you are aware that Ignite ZRO is an
22   energy drink?
23           MR. STEARNS:  Objection.
24       A   Yes, sir.
25   BY MR. McCOY:

---

Page 174

1        Q   When was the first time you learned that Ignite
2    had the ZRO energy drink?
3        A   Well, gosh.  Like, listed for sale or just in
4    general, the idea of it?
5        Q   Just the idea of it.  I want to start there,
6    and then we'll talk about sale.
7        A   I don't recall an exact date.  Gosh.  I don't
8    recall an exact date.  I -- I -- oh.  I vaguely
9    remember, I think, Verona -- Jason -- I'm sorry, Jason
10   Verona -- mentioning it at some point, but I wasn't -- I
11   didn't give it too much of my focus because at the time
12   I was -- I'm always inundated with work, and I wasn't
13   sure of the direction in which it was heading, and I --
14   I don't recall that time period.  I -- the -- the first
15   time that I recall it actually making it to market, I
16   believe, was early 2020.
17       Q   Let's start first with the conversation with
18   Jason Verona.
19           You do acknowledge that you had a conversation
20   with Jason Verona about Ignite ZRO?
21       A   I vaguely remember.  It might have been an
22   email, maybe a phone call.
23       Q   And you understood that Ignite ZRO was going to
24   be a performance energy drink?
25           MR. STEARNS:  Objection.

---

Page 175

1        A   No, I wasn't told -- I wasn't told the details
2    of it or there was -- there was no detailed
3    conversations regarding it.
4    BY MR. McCOY:
5        Q   What did you understand Ignite ZRO was at all,
6    what it --
7        A   I really -- I have very limited understanding
8    of what it was.  I just remember there -- you know,
9    there being talks of a drink; and outside of that, I --
10   I -- I just didn't pry.  I have like tunnel vision, if
11   you will, so I was focused on STEEL and...
12       Q   Did you have conversations with anyone from
13   Ignite about approval of Ignite ZRO?
14       A   Like me -- me giving them the approval of it?
15       Q   Yes, sir.
16       A   No, sir.
17       Q   Did you have conversations with anyone from
18   Blitz in which you gave approval for Ignite ZRO?
19       A   No, sir.
20       Q   Did you ever discuss with Mr. Bilzerian
21   Ignite ZRO prior to the termination letter of
22   December 14, 2020?
23       A   Not to my knowledge, no, sir.
24       Q   Did you ever discuss -- did you ever have any
25   conversations with Curtis Heffernan about Ignite ZRO?

---

Page 176

1        A   I don't recall any conversations.
2        Q   And so your testimony is you would deny that
3    you ever told anyone that Ignite ZRO was not a competing
4    bodybuilding supplement under the agreement?
5        A   Wait.  I'm sorry, Kev.
6        Q   Got it.  That's fair.  Let me -- let me
7    rephrase it.
8        A   Okay.
9        Q   Did anyone from Ignite or Blitz ever approach
10   you to ask whether Ignite ZRO would be considered a
11   competing bodybuilding product under the agreement?
12       A   No, sir.
13       Q   And do you consider Ignite ZRO to be a
14   competing bodybuilding product under the agreement?
15       A   Yes, sir.
16       Q   Why?
17       A   Well, you know, it -- it -- encompasses various
18   ingredients that are found in -- in -- in preworkouts
19   that are geared towards fitness.  And the drink, as I
20   started -- when it -- when it was brought to market, we
21   realized was mainly -- I should say heavily associated
22   with the fitness community.  And here I recall them
23   wanting to do a launch at the Arnold Classic -- it's a
24   fitness convention -- and the various retailers, such as
25   Vitamin Shoppe.  That's the only thing that comes to

---

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

## Page 177

1  mind.
2       There's a fitness -- Stack3D is like a
3  supplement reviewer, if you will, of products; and
4  they -- they promote products in the fitness and body --
5  you know, the body pertaining to people that are trying
6  to build their bodies, and -- and so that -- you know,
7  it's in our -- it's in the space that we are primarily
8  focused on, and that's how it was -- that's how we
9  perceived it to be marketed.
10      So it -- that's why we would consider it. It's
11 kind of like a, you know, smells like a duck, quacks
12 like a duck, looks like a duck, if you will, it's
13 probably a duck.
14     Q   And is coffee -- would that be a competing
15 bodybuilding product?
16     A   Actually, yeah.  Yeah, because there's some --
17 there is some supplement companies that we -- we are
18 competitors with that actually sell just coffee.  And
19 we've actually considered selling coffee ourselves.
20      I was a big advocate, actually, of coffee in
21 my -- my pro career.  Prior to being pro, I remember
22 there was a coffeemaker at the YMCA I trained at since I
23 was 12 years old, and I used to watch the lifters hit
24 sets and go get a little, tiny shot of coffee in
25 between -- you know, in between their breaks, and it

## Page 178

1  caught on.
2       And I vividly remember actually utilizing
3  coffee myself as a means of stimulating my body and mind
4  to be able to train harder and better, for sure.  I
5  loved it.  It was actually -- you know, it was one of my
6  favorite things to drink during my career.
7      Q   What about Gatorade?  Is that a bodybuilding
8  supplement to you?
9      A   Absolutely.  I used Gatorade in my career, and
10 many other bodybuilders do as well, and the reason being
11 it contains electrolytes and glucose, which aids in the
12 healing process, fueling process, and anabolism of
13 muscle.  I mean, it was --
14     Q   So -- I apologize.  Go ahead.
15     A   You know, the creators of Gatorade were -- you
16 know, they were fitness enthusiasts.  They were -- I'm
17 sorry.  The school escapes me, but here in Florida, one
18 of the coaches was one of the founding creators of it.
19     Q   And so in that event, your view is that
20 Mr. Bilzerian would not have been able to promote
21 Starbucks, for example?
22     A   Well, I mean, I guess, you know, you could -- I
23 think it would definitely compete.  I mean, if you're
24 having a cup of coffee and you're just reading the
25 newspaper, you know, that's one thing; but everybody's

## Page 179

1  tolerance for stimulants varies widely.  I'm very
2  sensitive to stimulants, and half a cup of coffee will,
3  you know, propel me through an entire day.  But if it's
4  marketed as a means of increasing your fitness
5  capabilities, then, yeah, that's -- that's a competitive
6  product.
7      Q   All right.  So let me understand, then.  Is
8  it based upon the ingredient in the product, or is it
9  based upon how the product is marketed?
10     MR. STEARNS:  Objection.
11     A   I would -- it's -- it's both, because in
12 coffee, the -- there's over ten compounds within coffee
13 that will stimulate the central nervous system.  And
14 many of those compounds we actually use in preworkouts,
15 the main one being caffeine.  Another one being
16 theobromine and L-theanine, things of that nature.
17 They're -- they're -- these are -- these are key
18 components within a preworkout that -- that would create
19 a very good effect when trying to achieve, you know,
20 better cardiovascular.
21      Maybe you're just having a hard day and you
22 don't get much sleep and you're trying to get in the gym
23 and be as proficient as possible, it will definitely
24 perk you up.  I mean, I'm sure you guys all drink
25 coffee.  It's -- I don't know if any of you guys train

## Page 180

1  -- I'm sorry.  I don't know if you train, Kevin, but it
2  can definitely help power you through even a -- to be
3  honest with you, I don't know how you do seven-hour
4  depositions on a regular basis.  I'm sure you need some
5  coffee.
6  BY MR. McCOY:
7      Q   Is water a bodybuilding supplement?
8      A   I mean, yeah, you could consider -- not a -- I
9  don't know if I would consider it supplemental, because
10 it's -- it's more of a bodybuilding essential.  So
11 everything is water.  We're -- you know, us as a
12 biological being, we're upwards of 98 percent water.
13     Q   How was Blitz supposed to know -- well, let me
14 back up.
15      You're aware that Ignite is a brand of water,
16 true?
17     A   I -- I am -- I actually became aware of that
18 sometime in 2020.
19     Q   You didn't ever see Ignite Water when you were
20 out at the Ignite parties in Los Angeles?
21     A   I don't recall it.  It's very possible it could
22 have been there, but if you've ever been -- well, I'm
23 sorry.  If -- when going to a party or a house, all of
24 that going on, it's not the focal point.
25     Q   The --

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

| Page 181 | Page 182 |
|---|---|

**Page 181**

1    A  I do -- I do recall drinking water at the
2   party, but I -- I -- because I don't drink alcohol.
3   I vividly remember grabbing a little plastic cup and
4   asking for water out of the sink or the -- the soda
5   thing.
6    Q  How -- how -- did you ever express any of these
7   different products that you considered to be a
8   bodybuilding supplement to anyone at Blitz or -- or with
9   Mr. Bilzerian?
10    A  Which products in particular?
11    Q  Well, that -- that Red Bull -- or I'm sorry --
12   coffee, Gatorade, water would all fall, in your opinion,
13   under the bodybuilding-supplement aspect of the
14   contract.
15    A  They -- they could be utilized as a
16   bodybuilding supplement.  They can definitely be
17   utilized as that.
18    Q  Yeah, I'm asking:  Did you ever express --
19    A  Oh, no.  I'm sorry.
20    Q  -- to Mr. --
21    A  There was times when -- you know, when Dan and
22   I would go back and forth on, you know, how do I achieve
23   a certain level of glycomine replenishment, if you will;
24   and we talked of carbohydrates, and I most -- I can't
25   name a specific time, but I'm very confident that I

**Page 182**

1   would have mentioned sometime early in the relationship
2   regarding his training that, you know, Gatorade or
3   Pedialyte -- Pedialyte is notoriously used by athletes,
4   and you can throw extra carbohydrates in there to get
5   you through a workout.
6    And I remember Dan expressing his concerns
7   about products that contained a high level of
8   stimulants, and so we were very cautious as to what
9   stimulants Dan took because I was -- I wanted to be
10   mindful of him and his -- you know, his health and his
11   prior health conditions and not to have him take
12   anything that would be too stimulating.
13    And I expressed to him, I don't -- I don't take
14   a ton of stimulants.  If I do, I'll resort to a weaker
15   stim or less of it or coffee.  And, I mean, I tell all
16   of the people that I've advised in training that if you
17   are stim-sensitive, just to start out with coffee prior
18   to training.  That should be sufficient to give you a
19   fair assessment of how much of a stimulant kick you
20   would need in order to perform optimally.
21    Q  And was there a discussion between you and
22   anyone at Ignite about a relationship concerning ZRO in
23   terms of distribution?
24    A  Oh.  It may have been with Jason Verona.  I
25   just don't remember the exact conversation, and it would

| Page 183 | Page 184 |
|---|---|

**Page 183**

1   have most likely been centered around our marketing
2   efforts, our retargeting abilities, our guys in-house
3   that are -- you know, I'm not tooting our horn, but I
4   consider to be the best in the industry.
5    I don't know.  They -- they would have -- I
6   think there was a conversation -- well, there -- not ZRO
7   in particular, but there has been multiple conversations
8   where Dan wanted us to communicate with the Ignite team
9   on how we could potentially help the brand and various
10   areas with their marketing and -- and help the team.
11    Q  Okay.  But do you dispute that one of the
12   conversations dealt with the idea of a collaboration
13   between --
14    A  No, no, no.  I'm sorry.  I don't dispute that.
15   It's possible; but, I mean, I -- I mean, I would have
16   never have -- you know, it's something I wouldn't have
17   agreed to.  I just -- I needed to get a better
18   understanding of it before we were actually moving
19   forward.
20    And at that time, you know, I was -- you know,
21   there was already conversations that we had had with the
22   team regarding its marketing, and -- and -- and nothing
23   much was done with those conversations.
24    And it was kind of a disappointment because we
25   were just trying to do our best to help out, you know,

**Page 184**

1   show good faith, and the teams weren't able to execute.
2   And it just seems like there was a lot of pieces that
3   were missing to the operation or -- or, you know,
4   good -- good, key positions that were missing that I
5   think believed in the brand that would help to, you
6   know, listen to what it is we were trying to explain for
7   them to put in the right people in order to execute, so
8   it -- if that conversation -- when that conversation
9   might have happened, I -- nothing ever became of it
10   because I was like, well, the conver- -- you know, the
11   conversations we've had thus far were not productive,
12   and you guys haven't really done anything with it.  I'm
13   just not really -- I'm respectfully going to have to
14   decline.
15    Q  Thank you.
16    So I think the take-away from that is you did
17   not have confidence in the marketing abilities of the
18   Ignite team; is that fair?
19    A  Yes, sir.
20    Q  And you did not think that they could
21   successfully launch the ZRO product?
22    A  Oh, I -- I wasn't -- I didn't say that.  I
23   wasn't sure if they could or not.  I just -- we were --
24   you know, we were not interested in -- in -- in trying
25   to facilitate in aiding -- facilitate in launching that

46  (Pages 181 to 184)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 185

1    product.
2         Q  All right.  So do you dispute that in your
3    conversation with Mr. Verona, you told him that you
4    needed to see whether ZRO could be proven in the
5    marketplace before STEEL would be interested?
6         A  No, I don't dispute that.  That's -- that's --
7    that's something I could have said.
8         Q  And at no time prior to December 14, 2020 --
9         A  Uh-huh.
10        Q  -- did you communicate to anyone at Blitz that
11   you considered the Ignite ZRO product to be a competing
12   bodybuilding supplement, true?
13        A  No.  We -- we didn't.  There really wasn't --
14   there wasn't an overwhelming amount of concern because
15   we didn't think anything would become of it until Ignite
16   is a -- you know, we're not in a relationship with
17   Ignite.  I can't tell Ignite what to do.  We were in a
18   relationship with the Blitz party, so I -- you know,
19   what legs do we have to stand on to say, "Hey, that's a
20   competing product"?  But, you know, if the Blitz party
21   were to promote it, then -- then that's an issue.
22        Q  Well, let me make -- let me clarify then.
23        At no time prior to December 14, 2020 did
24   anyone communicate that Mr. Bilzerian's promotion of
25   Ignite ZRO was a breach of the agreement?

Page 186

1         A  Not -- not that I'm aware of, no.
2         Q  All right.  Just to -- just to tie off this
3    section, and I don't -- I mean, I'm happy to keep going;
4    but if we need a break --
5             MR. STEARNS:  We need a five-minute break when
6         you get to a good spot.
7    BY MR. McCOY:
8         Q  That's good.  Let me tie this one off here.
9         A  Yes, sir.
10        Q  So in terms of a list of ingredients, what are
11   the ingredients that would be in a bodybuilding
12   supplement?
13            MR. STEARNS:  Object to the form.
14        A  Oh, boy.  I mean, that's a -- that's a -- I
15   mean, there's a lot of different ingredients.
16   There's -- there's thousands.  Is there anything in
17   particular you want to narrow down or you just want me
18   to --
19   BY MR. McCOY:
20        Q  Well, I'm trying to -- I'm trying to understand
21   in the context of the claim that Ignite ZRO is a
22   bodybuilding supplement, I'm trying to understand
23   factually why that would be.
24        A  Understood.  Okay.  If we're -- you know, to
25   narrow down the ingredients, let's say within the Ignite

Page 187

1    drink that there's -- there's a few ingredients in there
2    that are also utilized in our -- our energy drinks,
3    and -- and we market them as energy drinks, preworkouts,
4    if you will.  And these ingredients have super
5    physiological effects on the mind and body.  Caffeine --
6    let's see -- Alpha GPC, L-tyrosine; these are
7    quintessential ingredients that are in many supplements
8    that -- that -- that are pertaining towards the fitness
9    and bodybuilding industry.
10        Q  The preworkouts that you're mentioning, you
11   don't have any actual drinks right now, correct --
12        A  We -- I mean, we do.
13        Q  -- like in a can?
14        A  Oh, no.  RTDs?  No, not -- not at the moment.
15        Q  So that the preworkouts that you're talking
16   about, that's a powder?
17        A  The ones that we have currently that are for
18   sale, yes.  I mean, we've been working on a liquid since
19   2017.  I mean, we haven't -- I even sent samples to Dan
20   back in the day of the energy liquids that we were
21   working on.
22        Q  And do -- do people use your preworkouts -- are
23   they marketed to individuals who are looking for a
24   stimulant for, say, a party; they can mix it with
25   alcohol?

Page 188

1         A  Yeah.  It's not marketed to those people in
2    particular; but many people in the fitness industry, you
3    have some -- you have some wild cards, I guess, if you
4    will, that they -- they -- they're into fitness, but
5    they also party; and I'm sure that they could, you know,
6    mix an alcoholic drink into it, yeah.  You could do
7    that.  I don't -- I wouldn't advise that.
8         Q  That's not how any of your preworkouts are
9    marketed, correct?
10        A  We may have done a -- I think we did a -- we
11   did a circuit with Robert Frank, one of our influencers
12   we were talking about earlier, where he was at a bar.
13   And we were mixing up Amped, and it didn't show that it
14   was mixed with alcohol, but it was as if the bartender
15   was mixing this, like it was one of the drinks behind
16   the bar.
17        Q  Is that the one with the little child sitting
18   on the bar like it's consuming alcohol?
19        A  Yeah.  Well, that was my son, Leo.  He -- if
20   you remember the video, we -- we poured apple juice into
21   his drink.  He only got apple juice.  There was no
22   alcohol in there.
23            MR. McCOY:  All right.  Let's take a break.
24        Thanks.  I'm good.  Five minutes?
25            MR. STEARNS:  Yeah.  We'll do five.

47 (Pages 185 to 188)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                              49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 189

1   What's the tape time, Duke?
2   THE VIDEOGRAPHER:  All right.  I'll give that
3   to you now.  Off the record at 2:39.
4   (Recess taken from 2:39 p.m. to 2:50 p.m.)
5   THE VIDEOGRAPHER:  All right.  This -- I'm
6   sorry.  This begins Media Unit Number 4, and we're
7   back on the record at 2:50 p.m.  You may proceed.
8   BY MR. McCOY:
9   Q  Okay.  Mr. Huh, you okay to proceed?
10  A  Yes, sir.
11  Q  All right.  There is a -- let me get back here
12  to the amended complaint.  I think we talked about this
13  briefly earlier.  I'm sorry.  Let me screen-share.
14  Oh.  Let's see.  There are some allegations in
15  here about Mr. Bilzerian's -- oh, I'm sorry.  Let me not
16  forget one -- one question here.
17  In terms of communications internally inside of
18  STEEL, did you ever send any emails or communicate with
19  anybody on any of your teams about Ignite ZRO?  And this
20  would be prior to retaining counsel in the case.
21  A  Communicate via email?
22  Q  Yes, sir.
23  A  I don't -- I don't -- no, no, not during email.
24  Q  Did you ever have meetings internally where
25  Ignite ZRO was discussed or a relationship concerning

Page 190

1   Ignite ZRO?
2   MR. STEARNS:  You're still limiting it to prior
3   to counsel, Kevin?
4   MR. McCOY:  Yes, yes.
5   BY MR. McCOY:
6   Q  I don't want to know about stuff that you
7   talked about with lawyers.
8   A  And what was the date -- the time frame again,
9   Kevin?  I'm sorry.
10  Q  Well, I don't know when you hired your lawyers.
11  I know that December 14th is when I'm using --
12  A  No.
13  Q  Yeah?
14  A  Oh, okay.  So you're saying prior to bringing
15  on the legal team, did we have conversations within the
16  STEEL --
17  Q  Yeah.  And here.  Let me just -- let me give
18  you a better context.
19  We talked about the communication with
20  Mr. Verona?
21  A  Oh, yes.
22  Q  Did you ever follow that communication or any
23  others and get a team together and go, "Is there an
24  opportunity here?  Is there cost benefits?  Should we
25  explore this?"

Page 191

1   Was there ever any analysis of a relationship
2   amongst your team concerning Ignite ZRO?
3   A  No.
4   Q  Okay.  All right.  Let's move on, then, to this
5   next topic.  I want to talk about some of these -- these
6   criminal, wrongful, and/or amoral acts.
7   A  Yes, sir.
8   Q  And the first one I'd like to talk about here
9   from Exhibit 3, which is the amended complaint, is that
10  "Ignite's THC-based products are antithetical to STEEL's
11  health-conscious and U.S.-based brand."
12  Do you see that?
13  A  Yes, sir.
14  Q  And --
15  A  If you could zoom in just a bit.
16  Q  Right.  Yep.  Sorry about that.
17  A  No worries.
18  Q  And then it goes on to say, "Bilzerian's
19  ownership and promotion of such products puts the STEEL
20  brand at risk of dilution and risks isolating STEEL's
21  health-conscious customers who turn to STEEL for fitness
22  products, not illicit drugs."
23  We talked about those two paragraphs earlier,
24  right?
25  A  Yes, sir.

Page 192

1   MR. STEARNS:  Object to the form.
2   BY MR. McCOY:
3   Q  And you attended Ignite parties, true?
4   A  Yes, sir.
5   Q  And at those parties, weed was consumed, true?
6   A  I didn't consume any weed, but I'm -- there was
7   weed at the party.
8   Q  And also CBD -- you understand that is a
9   cannabis product?
10  A  It -- no, CBD can be derived from cannabis, you
11  know, marijuana or hemp.
12  Q  And your understanding is hemp is not cannabis?
13  A  I couldn't say with certainty.  I'm not sure on
14  that.
15  Q  All right.  Well, let's go through a couple of
16  things here so I can just understand where we are on
17  this.
18  You congratulated -- all right.  We don't need
19  that one anymore.  Let me get my Exhibit 9 back up.
20  We've got to give this a second.
21  A  Yes, sir.
22  Q  Now, you were aware that Mr. Bilzerian -- well,
23  let me start over.
24  You were aware that Mr. Bilzerian was
25  associated with Ignite?

48 (Pages 189 to 192)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 193

1    A  Yes, sir.
2    Q  And you were aware that Ignite had a cannabis
3   line of products?
4    A  Yes, I am aware.
5    Q  That included CBD products?
6    A  Yes, sir.
7    Q  And that included THC products?
8    A  To my knowledge, yes, sir.
9    Q  And that included vape products?
10    A  I -- I don't recall at the time.  It's very
11   possible.  I -- I just don't recall seeing it.  It's
12   very possible.
13    Q  You indicate that the "association between
14   Mr. Bilzerian and THC is antithetical to the STEEL
15   brand"; is that right?
16    A  Yes, sir.
17    Q  All right.  Let's do something for a second
18   here.
19       Are you able to see my screen?
20    A  Not yet.
21    Q  All right.  To -- sorry -- to share.
22    A  There we go, yes, sir.
23    Q  And do you recognize what that is?
24    A  Yes, sir.
25    Q  What is it?

Page 194

1    A  My Instagram page.
2    Q  All right.  So this is -- this is your
3   Instagram.
4       And you see up here, I put in "Instagram
5   Jason Huh"?
6    A  Yes, sir.
7    Q  Now, we talked earlier about you as being part
8   of the brand for STEEL, true?
9    A  Yes, sir.
10    Q  And as we scroll through here, you see that
11   logo on the -- looks like the left breast of this woman?
12    A  Yes, sir.
13    Q  And that -- you recognize that as the Ignite
14   logo?
15    A  Yes, sir.
16    Q  And so you still have content up involving
17   Ignite on your personal page, true?
18    A  Yes, sir.
19    Q  And this is the video over the delivery of the
20   product to Mr. Bilzerian in the Caribbean; is that
21   right?
22    A  Yes, sir.
23    Q  All right.  And -- and you have a STEEL --
24   there's a STEEL shaker that we can see here next to the
25   logo on the left breast of this woman.  Do you see that?

Page 195

1    A  Yes, sir.
2    Q  And you are still allowing your brand to be
3   associated with Ignite even now; is that true?
4    A  If -- if you were to see this picture, then you
5   would assume that, yes, but I didn't remove it because
6   it was my understanding that we're -- we're not to --
7   you know, I shouldn't delete or remove anything
8   pertaining -- because of the -- the lawsuit.
9    Q  Okay.  So you left all of this content up
10   because the lawsuit had been filed?  Is that what you're
11   telling me?
12    A  I don't -- I don't know the correct
13   terminology, but I guess it was to preserve -- preserve
14   information or data.  So I just didn't want --
15       MR. STEARNS:  Kevin, let us know if we can
16   delete it.  For real, let us know, and that would
17   be -- that would be helpful.
18   BY MR. McCOY:
19    Q  All right.  Let's talk about what's here right
20   now, and then we'll talk about what we do after.
21       MR. STEARNS:  You'll follow up with me on that?
22       MR. McCOY:  Yeah, I sure will.
23       MR. STEARNS:  Okay.
24   BY MR. McCOY:
25    Q  This continues to depict an image of -- this is

Page 196

1   Joe Swoll here in this image, true?
2    A  Yes, sir.
3    Q  And that's the yellow tank top?
4    A  Yes, sir.
5    Q  And there's you in the middle laughing?
6    A  Yes, sir.
7    Q  And then there's Mr. Bilzerian?
8    A  Yes, sir.
9    Q  And this is the Robert -- Mr. Robert?
10    A  Yes, sir.
11    Q  And he's actually a social influencer for
12   STEEL?  We talked about that earlier.
13    A  Yes, sir.
14    Q  All right.  Now, let's go down.  This is a
15   picture of Mr. Bilzerian and you, true?
16    A  Yes, sir.
17    Q  And this is you working out at Mr. Bilzerian's
18   Los Angeles home?
19    A  Well, I wasn't -- I was kind of there watching
20   Dan work out.  I was -- I really can't do much training.
21   I haven't trained, you know, with weights in many years.
22    Q  Fair enough.  You're -- you're in the image.
23   Mr. Bilzerian was training?
24    A  Yes, sir.
25    Q  And part of the reason for the trip to

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

---

Page 197

1    Los Angeles was to -- was this one of the trips to
2    attend an Ignite party?
3        A   Do you have the date on that one by chance?
4        Q   It looks like it was 116 weeks ago.
5        A   Oh.  Your cursor says there "June 24, 2019."
6    So, no, I don't think that was a party.  I -- if I
7    recall correctly, I don't think that was a party.
8        Q   Well, in any event, your -- your comment at the
9    time was, "Between sets, we talked sex, drugs, and
10   STEEL" --
11       A   Yes, sir.
12       Q   -- true?
13       A   Yes, sir.
14       Q   And underneath, "Much love @Dan Bilzerian"?
15       A   Yes, sir.
16       Q   And that's still outward facing with you with a
17   STEEL shirt on to the world as of September 16, 2021?
18       A   Yes, sir.
19       Q   Yes?
20           All right.  And here we have a video.
21           (Video played.)
22   BY MR. McCOY:
23       Q   Are you -- are you seeing that video?
24       A   I am.
25       Q   Now, at the start of this video, Mr. Bilzerian

---

Page 198

1    is smoking weed; is that correct?
2        A   I mean, I don't -- I wasn't smoking.  I'm not
3    sure.  I -- I just know that they were -- he was using
4    the term "dabs."  I'm -- you know, to my knowledge, that
5    is THC.  It's like a --
6        Q   It's weed?
7        A   -- a concentrated form.
8        Q   Okay.  And you were fine to have a video with
9    STEEL Supplements involving Mr. Bilzerian smoking dabs;
10   is that true?
11           MR. STEARNS:  Object to the form.
12       A   At the time we were -- at the time we were
13   doing our best to create an image -- you know, this is
14   the first video that we shot with Dan and the first time
15   we actually met in person, and so it was all very -- you
16   know, it was very eye-opening for us; and we -- we --
17   you know, with it being a really -- a relatively new
18   relationship and there were some -- you know, some
19   tension prior to this -- this video throughout the year.
20   We really just wanted to be flies on the wall, if you
21   will, and to observe Dan in his -- his natural state, if
22   you will, and -- and to -- to, you know, promote
23   the -- the products that we -- were there and to promote
24   Dan in a way that Dan lived and -- and how he, you know,
25   was being truthful to -- to what he did on a regular

---

Page 199

1    basis, and we didn't want to -- we didn't want to
2    sugarcoat that at the time.  As to whether or not, you
3    know, Dan smokes weed legally or illegally, it wasn't --
4    I didn't make any clarifications as to whether or not he
5    did.
6            So we presumed that this is -- this is okay at
7    that time period for Dan to be endorsing -- or to be
8    smoking -- I'm sorry -- and doing what he does, because
9    we -- we just -- you know, it's like when you go into
10   the jungle, we're trying to -- you know, it's just you
11   don't want to disturb the natural habitat, and that's
12   how you capture some of the best content when it comes
13   to film and people's personalities.
14           And we got to, you know, share an experience
15   with Dan and learn a lot -- I got, you know, to learn a
16   lot about Dan in that instance.  And so we didn't want
17   to disrupt things, you know, early.  And we wanted to
18   create a video that Dan would, you know, feel very
19   comfortable and excited about posting or -- or engaging
20   on because it -- it had to feel -- it had to feel good
21   for him and feel comfortable in order to do so; and so
22   we were kind of subjected, if you will, to this needs to
23   fit the palette of both of us, so how do we -- how did we
24   compromise here, if you will, and portray Dan in his
25   life but, at the same time, him taking STEEL products.

---

Page 200

1    And so we did that to the best of our ability to -- to
2    appease, you know, both sides, if you will.
3    BY MR. McCOY:
4        Q   Your team shot this video, correct, Mr. Huh?
5        A   Yes, sir.
6        Q   Your team edited the video, correct?
7        A   Yes, sir.
8        Q   And it starts with your brand plastered on the
9    front of the video, true?
10       A   The beginning?  I'm sorry.  I'm not watching
11   the video repetitively.  I think it does.  I think it
12   might end with the brand.
13       Q   And did Mr. Bilzerian ever tell you that you
14   needed to include shots of him smoking dabs?
15       A   No.  He didn't -- he didn't tell us in -- you
16   know, "Oh, I need you to do that."  But Dan -- getting
17   to know Dan and how he markets, he likes to be very
18   forthcoming with the realities of his lifestyle.  And I
19   respect that, you know, and everybody -- his followers
20   respect that.  That's why they follow Dan.
21           And so we wouldn't want to make something that
22   Dan didn't feel was as forthcoming as he would normally
23   be.  We wanted it to be congruent.
24           And I feel as though this -- this video really
25   helped to -- it really helped our relationship because

---

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 201

1   we -- we were trying to get a video made prior to this,
2   and we did, and it just didn't go the way we wanted it
3   to. We spent over $100,000 trying to do it, and Dan
4   wasn't necessarily ecstatic about it, and so we were --
5   we were -- we were doing our best to try to make this
6   relationship work by any means possible.
7       And so being a photographer -- or I'm sorry,
8   not -- coming from, you know, an artistic background
9   and -- and the videographers that we were working with
10  and editors, they haven't -- you know, they know what
11  angles and what to capture and we're all in the --
12  artists, if you will, and you want to capture people in
13  their natural settings.
14      Q   And we talked earlier; you were aware that
15  Dan Bilzerian smoked weed prior to you even entering
16  into the relationship with him, correct?
17      A   I -- I -- I'm pretty sure he did. I -- I can't
18  recall if there was actually -- there may have been some
19  communications in the beginning about him smoking in
20  regards to the fitness goals that he had in mind. I
21  might have thrown it in. I just can't recall a specific
22  conversation.
23      Q   Will you read this comment here? It looks --
24  did you post this content here, "Who would be down to
25  train?" that we're looking at?

Page 202

1       A   Oh, yes, sir. Yes, sir, I did.
2       Q   And then "Putting @Dan Bilzerian and STEEL to
3   the test with a little weed, weights, and skin-splitting
4   pumps, we are the industry STEEL." Did you write that?
5       A   Yes, sir.
6       Q   All right. And so did you ever tell anyone
7   from Blitz that anything associated with Mr. Bilzerian's
8   use of weed was a problem for STEEL before December 14,
9   2020?
10      A   No. His -- his personal use of weed was never
11  a cause for concern. It was only really a cause for
12  concern when you're promoting the -- you know, promoting
13  the sale of it and there was -- you know, there's some
14  federal legality issues that we wanted to -- you know,
15  that we -- it just doesn't sit right with us at the
16  moment.
17      Q   Meaning right now, at the moment, or I should
18  say maybe as of like December 14, 2020?
19      A   No. Like, it just doesn't sit right with us
20  when you're promoting, like for something that could
21  potentially be federally illegal, we weren't -- and
22  you're selling it, that's never something that we were
23  condoning. And I say "at the moment" because if we were
24  to move forward and it was no longer federally illegal,
25  then that could be a different story, sometime in the

Page 203

1   future.
2       Q   We have another post here. It's live on your
3   Instagram as of September 16, 2021?
4       A   Yeah. Yeah.
5       Q   And this is you depicted here. At the time you
6   had a shaved head except for that piece right there at
7   the top. That's you, sir?
8       A   Yes, sir.
9       Q   And that's Dan Bilzerian to the left?
10      A   Yes, sir.
11      Q   And do you see on the table there that there's
12  a bottle that says "Ignite"?
13      A   Yes, sir.
14      Q   And was that a bottle of Ignite water?
15      A   No. That just looks like a -- like a bottle, a
16  flask that you could purchase to hold various drinks.
17      Q   And your comment here on this post is "Teaching
18  him how to put on muscles and he's showing me how to
19  chill the fuck out"; is that correct?
20      A   Yes, sir. Yes, sir.
21      Q   And by the "chill the fuck out" piece, would
22  that relate to marijuana?
23      A   Well, I mean, Dan's lifestyle is all about
24  chilling, chilling the fuck out. So Dan's -- Dan's
25  energy and who Dan is is very -- Dan's constantly in a

Page 204

1   state of, you know, "Let's take it easy. There's enough
2   stress and strain in the world. I want to live my life
3   how I want to live it." And -- yeah, and I took note to
4   that; and, yes, Dan was smoking, but as a whole, I think
5   Dan does a -- you know, a far better job than I do at
6   chilling out, I guess you could say.
7       And so I was just -- I was observing him in --
8   in -- in his -- his -- his -- his lifestyle, and I
9   respected that. And I took from -- I took from him in
10  regards to, you know, sometimes you just got to -- you
11  just got to let go when it comes to certain things; and,
12  you know, I -- I respected that, so...
13      Q   Let's -- let's look at this next video because
14  I'm not sure what was going on here. This is -- this is
15  a video. It looks like STEEL produced this particular
16  video?
17      A   Yes, sir.
18      MR. STEARNS:  I don't know if the transcript
19  will reflect anything that's goin on right now,
20  Kevin, but...
21      MR. McCOY:  And it's fine. The video will.
22  We're recording it.
23      Is that -- is that true, Duke?
24      THE VIDEOGRAPHER:  Yes.
25      MR. McCOY:  Thank you. All right. So we'll

51 (Pages 201 to 204)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 205

1  sync up his testimony to the video so that we've all
2  got that for trial.
3      MR. STEARNS:  Understood.
4  BY MR. McCOY:
5      Q  So, Mr. Huh, is this a spoof video where this
6  person was supposed to be like a Dan Bilzerian?
7      A  No.  This guy's not supposed to be a
8  Dan Bilzerian.  He's just a -- an athlete or an
9  affiliate, if you will.
10     Q  Okay.  So this video was not supposed to be
11  anything associated with Dan Bilzerian; is that --
12  that's --
13     A  No, no.  Dan's actually -- he's in the video
14  but a very short clip.  There's just an image of him,
15  and it kind of goes over -- the story theme was this guy
16  was looking to -- (audio distortion) -- an ambassador
17  for (audio distortion) -- brand --
18     THE COURT REPORTER:  Wait.  I'm having a hard
19  time hearing you.  There's some audio distortion
20  going on.  Would you start that answer over, please?
21     THE WITNESS:  Yes, ma'am.
22     A  The gentleman in the suit here is posing as
23  a -- like a manager, if you will, that is looking to
24  bring on an ambassador for the brand.  And in that
25  instance right there where he showed a picture of Dan,

Page 206

1  he was saying, "It's either you come on as an ambassador
2  or they're going to take this guy.  They're going to
3  have this guy come on as an ambassador."
4      And this was the video that we -- we had
5  produced that, you know, Blitz was very adamant that we
6  produced a high-production-type video that, you know,
7  would be -- have some level of shock factor to it so
8  that they could -- you know, we could all post across
9  our social media platforms and to promote the brand and
10  implement in there -- implement Dan in there in just a
11  funny type of marketing video.
12     Q  You mentioned 100,000 -- a video of some sort
13  where $100,000 was spent.  What is that about?  What
14  happened there?
15     A  So in the beginning of the relationship, Dan
16  had expressed that -- Dan and Dan's team, they expressed
17  that they -- they had a relationship in the past where a
18  viral video -- or I'm sorry -- a video was produced, and
19  it did very well.  It had, you know, a viral effect,
20  and -- and that this worked for the company at the time.
21  It was a couple of years prior, I think, to our
22  relationship.  And so they had, you know, pushed that
23  this would be very wise to do for STEEL.
24     We weren't against it, but from our -- the
25  landscape of social media was changing so rapidly at

Page 207

1  that time period.  There was no algorithm in place at
2  the time in which that prior company had posted this
3  video -- well, I should -- excuse me.
4      I'm not sure on what platforms they posted
5  because I know YouTube and I'm, sure, on social; but the
6  platforms had changed dramatically, I think, around 20--
7  -- late -- mid 2016 or mid 2017, and they started to
8  implement algorithms.  And so we started to see that we
9  are going to have a really tough time with producing
10  that style of video and having it do as well as, let's
11  say, it did prior to the algorithm changes.
12     And so we -- we were -- we had some serious
13  concerns with producing it and investing that kind of
14  money, given that the simpler -- and one could call it
15  more organic -- style of promoting the brand, like
16  posting on your social media feed with an image and a
17  caption or an IG story that depicted you using the
18  product and a link to direct them to the site, that was
19  proving to be very effective where the more longer,
20  drawn-out comical videos were -- were falling short of
21  being effective in terms of its market -- marketing
22  abilities and ROI, return on investment.
23     And so we were very apprehensive, and we -- we
24  butted heads for quite some time; and as we butted
25  heads, there was a lot of -- you know, there was a lot

Page 208

1  of resistance and a lack of communication on how do we
2  -- you know, how do we move forward and how do we make
3  this work?  How do we -- you know, how do I -- I
4  consider my -- my -- my job here, my role at STEEL, is
5  to like facilitate -- is to facilitate and getting
6  people to work together as best as possible and creating
7  a team where everybody's happy doing what they're doing.
8  And I wanted -- I wanted the same for STEEL and --
9  and -- and the Blitz party.
10     So I was constantly exhausting ideas as to, you
11  know, "Okay.  Should we do this video?  How do we
12  convince them this isn't necessarily going to work to
13  the degree that it did?"
14     But after months of going back and forth and,
15  you know, arguing about it or -- or just there was no
16  communication at all for some time, you know, I -- I
17  just decided to pull the trigger and make that
18  investment to show that, "Look, I will go the distance,
19  get this produced, and I'm hoping that, you know, you --
20  you know, everything will be posted and everything will
21  go as -- as well as you say it will go if we do this."
22  And we -- we produced it, and it -- it did not go as
23  expected in terms of his engagement in ROI.
24     And -- and I'm sure, you know, Dan would argue,
25  well, the video wasn't good enough or it wasn't funny

52  (Pages 205 to 208)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

## Page 209

1   enough or -- and that may be the case, but many other
2   videos at the time that were being produced like that
3   were falling far short, and that's mainly due to the
4   algorithm changes.  And the trend at the time was
5   simpler, more holistic, organic style -- styles of
6   marketing because people who were on the social media
7   front were becoming very acquainted with high-production
8   videos that -- that seemed unrealistic.
9        Q   Thank you for that answer, Mr. Huh.
10       A   Yes, sir.  It was sort of long.
11       Q   It's fine.  Ultimately, the video didn't work;
12  is that fair?
13       A   It didn't.  It didn't work.
14       Q   And that was without any fault of
15  Mr. Bilzerian?
16       A   I don't think -- you know, I don't think it was
17  anybody's -- I wouldn't say it was the fault of anybody.
18  It's just, you know, we tried and business and -- and
19  relationships, regardless, is you try things, you
20  compromise; and if it doesn't work, it just doesn't
21  work.  That's all.
22       Q   And let's go back now to the issue of -- let's
23  go back some of the other content that you are
24  still -- you still have on your page.  So --
25       A   Yes, sir.

## Page 210

1        Q   -- just so you can acquaint yourself, I've now
2   gone up to -- are these still -- these aren't stories,
3   right, because they're still here?  This is just a
4   permanent post up at the top?
5        A   No, these are stories that you can -- you can
6   archive.
7        Q   Okay.  So if I click here on "Parties" --
8        A   Yes, sir.
9        Q   -- this is going to document -- let me get back
10  to the beginning -- some of the parties that you went to
11  at Mr. Bilzerian's home in Los Angeles?
12       A   Yes, sir.
13           (Video played.)
14  BY MR. McCOY:
15       Q   Is that correct?
16       A   Yes, sir, it is -- it is one of the parties.
17       Q   All right.  And here, again, this is a video of
18  Mr. Bilzerian with the various -- do you recognize that
19  there are various marijuana paraphernalia items in front
20  of him?
21       A   Oh, yes, sir.
22       Q   And that is next to -- do you see that
23  bottle of STEEL down there?  We've got to turn our
24  heads, but --
25       A   I see it.  I see it.

## Page 211

1        Q   -- do you see it?  That's STEEL product there,
2   true?
3        A   Uh-huh, yes, sir.
4        Q   All right.  And let's continue on with the
5   video.  Let's see what else is in here.
6            Now, this is a party you attended with your
7   brother and Robert -- what's Robert's name again?
8   Robert Frank?
9        A   Robert Frank.  I'm not -- I don't recall.
10  Jessica, my wife.  I don't know if Paul was there, and I
11  don't know if Robert was at that particular one.
12       Q   Okay.  Question:  Do you know, does Robert
13  Frank smoke weed?
14       A   I -- no, I -- not to my knowledge, no.
15       Q   Do you agree that some individuals in the
16  bodybuilding sector consume cannabis for purposes of
17  recovery or other training reasons?
18       A   Yeah.  They -- they anecdotally say that it
19  will help them recover but mainly in a -- not
20  necessarily in -- to increase the rate at which muscle
21  is repaired but more so to increase one's appetite to be
22  able to eat more food, because a lot of people that are
23  trying to put on muscle have appetite issues and they
24  can't get in a sufficient amount of calories in order to
25  grow as big as they want to grow.  So I have heard that

## Page 212

1   people will smoke in order to increase their appetite.
2        Q   Now, the Ignite party that you went to, that
3   was a party to promote the Ignite brand, correct?
4        A   Yeah.  The -- every party that Dan had put on
5   was an Ignite party, yeah.  He was -- you know, he was
6   doing a lot of promoting of the brand at that time.
7        Q   And -- sorry.  Go ahead.
8        A   You know, our relationship at that time was --
9   we were doing our best to get posts done when we could,
10  and Dan invited us out and -- and invited -- you know,
11  for us to come out; and if we were to come out, we would
12  get a post done while I was out there.  So it was -- it
13  was -- it was a big incentive for us to go out and, hey,
14  we'll get content, and Dan will do a post, you know,
15  with us there, which -- which could be -- you know, it
16  could be a good thing.
17       Q   All right.  So you combined the trip with a
18  business purpose, correct?
19       A   I mean, yeah.  The -- the trip -- the main
20  reason for us going is -- is for business purposes.  We
21  were -- we were trying to get Dan to, you know, do a
22  post because he said he would -- if we came out, he
23  would do a post.
24       Q   And that's fair.  Did you -- did you write off
25  the trip as a business expense?

53 (Pages 209 to 212)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

| Page 213 | Page 214 |
|---|---|

**Page 213**

1  A  I don't recall.  I'm -- I don't recall.
2  Q  Did you fly out private or commercial?
3  A  Commercial.
4  Q  Did you always fly commercial out to the events
5  at Dan's home in Los Angeles?
6  A  Yes, sir.
7  Q  And while you were out there, you rented a home
8  to stay in.  Is that true?
9  A  Each time was different.  I think for this
10  particular event, we stayed at a hotel.
11  Q  Right.  And how many events do you recall going
12  to at the Ignite house in Los Angeles?
13  A  Three.
14  Q  And each one of those, were the Ignite products
15  at the time on display and out?
16  A  Yeah.  They -- they -- they were.  They had
17  the -- yeah, the CBD, I think, and there -- and there
18  was packaged -- if I remember correctly, seeing a
19  packaged marijuana cigarette that they were -- they were
20  giving out.
21      I don't recall seeing any -- any water, but
22  it's most likely that the water was there.
23      He also gave us the green light that if we
24  wanted to come out, we could bring out products and
25  samples, and -- and, in particular, even the Hard-AF,

**Page 214**

1  the male erection formula, to also give out at the
2  party.
3  Q  So you don't recall if you saw Ignite water,
4  but you don't have a reason to dispute that Ignite water
5  would have been one of the products promoted?
6  A  Yeah.
7  Q  Okay.  And -- did you tell Mr. Bilzerian at
8  any point while you were there at his party that you
9  felt like he was promoting a bodybuilding supplement
10  through the Ignite water?
11  A  No.  No, I -- I didn't see a water, so I --
12  and, again, I wouldn't consider -- you know, water is
13  more of an essential.  It's not necessarily
14  supplemental.  Without it, you know, we all cease to
15  exist.
16  Q  So is water a bodybuilding supplement or not?
17  A  No.  I would -- I consider it a bodybuilding
18  essential.
19  Q  A bodybuilding essential but not a bodybuilding
20  supplement?
21  A  I mean, yeah, because water is essential.  We
22  can't -- you cannot, from what I understand, hydrate and
23  supplement without, you know, another liquid in order to
24  stay healthy or stay alive.  It's essential.
25  Q  Let's -- let's look at this post right here.

**Page 215**

1  Can you still see the screen?
2  A  Yes, sir.
3  Q  And this is -- you don't dispute that this is
4  Mr. Bilzerian consuming marijuana?
5  A  I don't dispute that.
6  Q  And this is still part of your posts on your
7  page as the STEEL CEO?
8  A  Yes, sir.
9  Q  All right.  And you are -- STEEL is claiming
10  that the contract with Mr. Bilzerian's company, Blitz,
11  should be terminated because -- because THC is
12  antithetical to the -- to the policies of STEEL?
13  A  Well, the THC, you know, being federally an
14  issue, to distribute that, to promote the sale of it,
15  you know, we believe to be a conflict of interest; and
16  not only, you know, the breach in contract in regards to
17  the Ignite energy drink, it's not just the THC.
18  There's, you know, the other products that were promoted
19  alongside, you know.  There's more than one issue.
20  Q  The other products that were promoted alongside
21  what?
22  A  I'm sorry.  I should have specified.  The ZRO,
23  the -- the Treigning Labs product, the Full Send brand.
24  So there's more to it than just the --
25  Q  So this -- this -- oh, I'm sorry.  Go ahead.

**Page 216**

1  A  There is more to it than the THC element.
2  Q  Let's look at this particular clip.  So it says
3  "@STEELSupplements" down at the bottom.  Do you see
4  that?
5  A  Yes, sir.
6  Q  And then as we pan -- oh, I didn't stop it.
7  You see the STEEL Supplements back there in the
8  background?
9  A  Yes, sir.
10  Q  And did you see the bong that's over here on
11  the side?  Right there.  Is that that same bong
12  Mr. Bilzerian was smoking earlier?
13  A  It looks like it is.
14  Q  And you didn't have any problem with
15  Mr. Bilzerian having posts -- or, in fact, this is
16  content from your page as the CEO, true?
17  A  Yes, sir.
18  Q  Let me just -- let me just cut right to it.
19  Are you maintaining that Mr. Bilzerian's relationship
20  with THC products is a breach of the agreement?
21      MR. STEARNS:  I'm going to object.  I'm going
22  to object only insofar as it calls for a legal
23  question, but you can answer.
24      MR. McCOY:  Okay.
25  A  I'm sorry, Kevin.  Could you repeat that --

**54 (Pages 213 to 216)**

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

---

Page 217

1  BY MR. McCOY:
2      Q  Yeah.
3      A  -- one more time?
4      Q  We've just watched -- I mean, we can go
5  through.  That's a lot more content on here.
6      A  Yeah.
7      Q  I'm just asking you:  Are you maintaining that
8  one of the grounds for breach is Mr. Bilzerian's use of
9  THC products?
10      MR. STEARNS:  Same objection.
11      A  The issue is more so the promotion and sale of
12  a federally illegal substance.  You know, if he has -- I
13  don't -- if he has a prescription to use the drugs,
14  there's -- there's nothing -- you know, that's
15  completely okay.
16  BY MR. McCOY:
17      Q  Okay.  So your issue is that Ignite sells a
18  marijuana product, but you were okay with Ignite
19  marijuana products and the use of marijuana being part
20  of STEEL's posts prior to the termination; is that true?
21      MR. STEARNS:  Object to the form.
22      A  And we weren't.  It was very hard.  It was
23  not -- it was not a comfortable thing because -- but it
24  was very hard to go have -- you know, go to a party
25  and -- and have Dan do a post and there not be

---

Page 218

1  Ignite-branded material there.  You can't -- the Ignite
2  brand was everywhere, and it wasn't -- it was already
3  hard enough getting together with Dan and getting -- you
4  know, getting together and posting anything, let alone
5  posting anything without Ignite-branded material within
6  anything -- within a brand -- within the postings.
7      Dan was doing his very best to grow the Ignite
8  brand in any facet that he possibly could:  logos
9  everywhere, you know, waters, clothing.  So he was -- it
10  was everywhere.  You couldn't go and be in the
11  Dan Bilzerian camp, if you will, and not be surrounded
12  by it.
13  BY MR. McCOY:
14      Q  Okay.  But you never expressed that as being a
15  problem at any point, true?  I mean, you were fine to go
16  to the parties and produce content that included that
17  aspect of his life?
18      MR. STEARNS:  Objection.  There were two
19      questions.  I didn't know --
20  BY MR. McCOY:
21      Q  All right.  Let's break it out.
22      You were fine to go to Ignite parties knowing
23  the association with the sale of cannabis and create
24  content to post on behalf of STEEL, true?
25      MR. STEARNS:  Objection to the form.

---

Page 219

1      A  We were -- we were just doing the best that we
2  could to make the relationship work and, therefore, we
3  kind of turned an eye to the Ignite branding, if you
4  will, just to make sure that we were playing well
5  together, playing, you know, nice together.
6      Dan wanted certain things, and -- and it's very
7  hard to work with Dan if you don't compromise or do what
8  Dan wants you to do.
9  BY MR. McCOY:
10      Q  Okay.  Let's -- let's look at a couple of other
11  things here.
12      A  Yes, sir.
13      Q  So this is something else on your page.  It
14  looks like this is a STEEL produced --
15      A  Yes, sir.
16      Q  And this is for the male erection pill?
17      A  Yes, sir.
18      Q  And -- and you put @Dan Bilzerian in here.  Is
19  this something that Dan collaborated with or you-all
20  just posted and then threw his name in there?
21      A  No, we -- we -- we produced this, and I had
22  sent them over to Dan; and Dan, you know, found them to
23  be humorous.
24      Q  So when -- so besides the kind of what we
25  talked about, the organic posts that Mr. Bilzerian would

---

Page 220

1  do -- you're familiar with those, right?
2      A  Yes, sir.
3      Q  And you agree that the best results for
4  Mr. Bilzerian was when he would post something
5  organically and then show him using the product, like in
6  a workout?
7      MR. STEARNS:  Object.
8      A  Well, I mean, it -- it -- it varied.
9  BY MR. McCOY:
10      Q  I'll withdraw the question.  I'll withdraw the
11  question.  That's fine.  It doesn't matter.  We'll deal
12  with that later.
13      This video here, is this another example of
14  content that you would produce pursuant to the
15  agreement, and then you would, you know, put
16  Mr. Bilzerian's name on it?  So it's content like we
17  talked about before where you would be able to use
18  something associated with his likeness to generate
19  traffic even if he didn't create the content.  Is that
20  an example?
21      A  No.  Actually, that is a -- that's called a tag
22  where if you want -- if you were to post something and
23  you want somebody to see it, it will wind up in their --
24  their -- their inbox, their DM folder, if you fill.  If
25  you put their name there, it will show up that you

---

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

<table>
<tr><td>

Page 221

1  tagged them, and so that they could see it with
2  certainty, because if the algorithm dictated that they
3  didn't see it, then they might not get a chance to.
4      Q   But if you tagged them when you post this,
5  whether it goes to their DM or not, people see "@Dan
6  Bilzerian," correct?
7      A   Yes, sir.
8      Q   All right.  It's another way to link
9  Dan Bilzerian to content?
10     A   Yes, sir.
11     Q   Okay.  And so would this be another example of
12 a STEEL-produced post and then --
13     A   Yes, sir.
14     Q   -- then you just tagged Mr. Bilzerian?
15     A   Yes, sir.
16     Q   All right.  Same with this one.  Is this a
17 STEEL-produced post and you just -- let's see here.
18 Maybe you didn't even get Mr. Bilzerian in that one.
19 Oh, there it is, right there.  "@Dan Bilzerian" --
20     A   Yes, sir.
21     Q   -- right there on the top of the lid?
22     A   Yep.
23     Q   All right.  Similar here, a woman in underwear
24 on that guy, and "@Dan Bilzerian," another one for the
25 Hard-AF?

</td><td>

Page 222

1      A   Yes, sir.
2      Q   Did Mr. Bilzerian ever even use Hard-AF that he
3  relayed to you?
4      A   He told me he did.  Whatever he actually did, I
5  mean, I guess I didn't know for a fact.
6      Q   Do you actually use STEEL products, Mr. Huh?
7      A   Certain ones, yes, but not all of them, no.
8      Q   Did you ever tell Mr. Bilzerian that you don't
9  even use STEEL products because they don't work for you?
10     A   No.  Well, it depends on the type of product.
11 There's -- you know, you have to be specific.
12 There's -- I wouldn't take, let's say, a fat burner like
13 Shredded because it doesn't -- wouldn't work for me.
14 I'm shredded enough, and I -- it -- I don't need that
15 level of stimulants.  You know what I'm saying?  It
16 doesn't -- or the preworkout, if I'm not training, I
17 wouldn't -- I don't take it.  It wouldn't do anything
18 for me because it's not -- it's not necessary; but
19 proteins, the -- actually, the N.O.7 that increases
20 blood oxygenation throughout the blood; HyperAde -- I --
21 I take these products, yeah, and the sleep aid.
22     Q   In terms of the protein, protein is something
23 that somebody would use for build, right, to build
24 muscle?
25     A   Yeah, you can --

</td></tr>
<tr><td>

Page 223

1      Q   Did you ever tell -- I'm sorry.  Go ahead.  Go
2  ahead.
3      A   Yeah, you can use it to build muscle.
4      Q   Did you ever tell Mr. Bilzerian that you
5  wouldn't use a product like a protein to build because
6  you would just use steroids?
7      A   I don't -- it might have been a -- I don't
8  recall that exact conversation.  It could have been,
9  like, a joke because you cannot build -- you can't build
10 a muscle without consuming protein.  That's -- I mean,
11 you can, but it's very, very hard to do that.
12     Q   Part of the gains that you've achieved over the
13 years have involved the use of anabolic steroids.  Is
14 that true?
15     A   Yes, sir.
16     Q   Let's go back here now to this video.  You see
17 here -- this, again, we're now looking September 16,
18 2021.  This is on your page under the "Team" --
19     A   Yes, sir.
20     Q   -- 116 weeks ago.  You recognize that's
21 Mr. Bilzerian's cat?
22     A   Yes, sir.
23     Q   And do you see that Ignite bottle back there?
24     A   Yes, sir.
25     Q   And do you recognize that as a bottle of CBD

</td><td>

Page 224

1  drops?
2      A   I see the word "drops," yes, sir.
3      Q   Do you have any reason to dispute that that's
4  the CBD drops bottle from Ignite?
5      A   I -- I don't.  I mean, I'm sure -- it looks
6  like it says "CBD" behind the cat there, yeah.
7      Q   And then we pan over, and this is a series of
8  gun-shaped bongs that Mr. Bilzerian had in his home?
9      A   Yes, sir.
10     Q   And this is, again, part of the post that you
11 made associating yourself with Mr. Bilzerian and
12 cannabis, true?
13     A   It is.  It is the -- Dan had a very elaborate
14 collection of very artistic bongs that was worth more
15 money than most houses are worth; and, you know, if
16 you've got a bong collection that's worth -- you know,
17 not to -- I don't want to misspeak here, but I would
18 imagine over a half a million dollars in artistic bongs,
19 it's something that -- you don't get to see something
20 like that in person all the time.  And I was, you know,
21 appreciating Dan's -- you know, his lifestyle and his
22 house and, you know, he allowed us into his home and his
23 castle, and we were observing.
24     Q   Okay.  Other question, I just want to confirm:
25 STEEL has not made any payments to Mr. Bilzerian for any

</td></tr>
</table>

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                                   49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 225

1   reason after January of 2020; is that true?
2       MR. STEARNS: Objection.
3       A   Not -- not -- not to my knowledge.
4   BY MR. McCOY:
5       Q   All right.  All right.  I am -- I've had enough
6   fun with these, I think.  Let's -- this looked like a
7   great party.
8       A   That -- that actually -- that wasn't a party.
9   I think we had gone out there, and we were -- we were
10  just spending some time with Dan.
11      Q   Okay.  We talked earlier about the STEEL brand.
12  And I understand, you know, part of the issue is the --
13  Mr. Bilzerian's alleged immorality as the basis to
14  terminate the agreement.  Do you understand that that's
15  part of the issue?
16      A   It is part of the issue, yes, sir.
17      Q   And in your communications, have you been --
18  have you done anything to use derogatory terms that
19  would isolate any of your particular customer base that
20  you can recall?
21      A   In my communications with Dan?
22      Q   Yes, sir.
23      A   It's possible, you know.  We've been
24  communicating for -- you know, for years now, and we --
25  we joke pretty openly with each other about all kinds of

Page 226

1   stuff.  So it's very possible.
2       Q   Do you recall periods where you used homophobic
3   slurs in communicating with Mr. Bilzerian?
4       A   I -- I don't recall a specific incidence --
5   incidence -- I'm sorry -- instance; but it's very likely
6   because Dan -- when we communicated, we both used -- we
7   both used homophobic terminology, what would be
8   considered homophobic terminology.
9           I think in an era in which, you know, we grew
10  up, all of us, you know, homophobic terminology back
11  then really wasn't, I guess, considered that.  It was
12  just kind of a part of the heckling of each other's
13  vocabulary, if you will, like a guy talk.
14      Q   And we talked earlier about one of the STEEL --
15  part of the STEEL mission, or mantra, is respect for
16  customers.  Do you remember that at the beginning of the
17  deposition?
18      A   Yes, sir.
19      Q   And if you were using homophobic language, do
20  you agree that would not be consistent with a respect
21  for STEEL's customers who may fall into that
22  demographic?
23      A   If it's -- yeah, if I were to use that
24  publicly, it wouldn't -- it wouldn't be good.  I
25  don't -- I'm not proud of the terms that we've used and,

Page 227

1   you know, I never meant -- and I don't think Dan would
2   mean any harm to anybody either.
3           As far as I know, Dan and myself, we're
4   actually -- you know, we associate with homosexuals.
5   And it's -- we have them to work in this workplace, and
6   I know Dan has, you know, staff on his side that --
7   that -- there's a lot of people that come and go within
8   these establishments, and we don't have anything against
9   homophobic people.
10          I could see where, yeah, somebody could take
11  offense to it if they saw it, but it's not a message
12  that him nor I would ever promote as -- we would -- we
13  would not -- you know, we would not come off as -- or
14  intentionally come off as homophobic because we're not
15  at all.
16      Q   Okay.  But you don't -- you don't dispute that
17  you have used the word "fag" in your communications with
18  Mr. Bilzerian?
19      A   Oh.  I can't recall in a specific time, but
20  it's very possible.  I know Dan -- you know, he's -- I
21  know Dan's used it, and I'm sure I have, too.
22      Q   Let's go back to Exhibit 9.
23      A   Yes, sir.
24      Q   Your comments are on the left side of the page,
25  correct?

Page 228

1       A   Yep.
2       Q   And that is a term that you see there
3   highlighted on the page, that is a term you used?
4       A   I see that, yep.
5       Q   So you agree with me that that would be
6   antithetical to the respect for STEEL's customers that
7   you expressed at the outset of the deposition?
8       MR. STEARNS: Object to the form.
9       A   If -- if -- if one were to take it offensively
10  as it was directed towards them, but it wasn't directed
11  towards homophobic people in general.  It was -- it's
12  just a term we use like a joking -- a jokingly term.
13          The original definition for a "fag" is a bundle
14  of sticks; so it could be perceived, you know, in many
15  different ways.
16  BY MR. McCOY:
17      Q   But you don't believe that your use of the word
18  in these communications was actually a homophobic slur;
19  is that what you're telling me?
20      A   No.  I'm saying it's used like as a -- like as
21  a joke.  Like, when, you know, you're with the guys and
22  you're hanging out and you call somebody a -- you know,
23  "Hey, you're an asshole," or "You're a jerk," or "You're
24  a dick," it's -- you're not calling somebody an asshole
25  in that they're actually a -- an anal orifice.  It's

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

| Page 229 |
| --- |

1  just -- it's a joking -- it's a way to poke fun at each
2  other, if you will, or make light of a situation.
3      Q   We now move to Blitz 239.  And is that a word
4  that you use that's highlighted there on the page?
5      A   I see it, yes, sir.
6      Q   And you used that word in this communication?
7      A   Yes, sir.
8      Q   And do you agree that that would not be
9  respectful of STEEL's customers in terms of how they
10  would react if somebody might find offense to that word?
11      A   Yeah.  That -- yeah, they could find it
12  offensive; and, you know, I wouldn't -- I would -- and I
13  would never use it in a way to try to hurt anybody.
14  It's a term that, you know, many people, you know, use
15  to hurt people and many people use just to make light of
16  a situation.  You know, Dan's used it.  It's -- you
17  know, it kind of gets thrown around as locker room talk,
18  if you will.  And it's never meant to hurt anybody.  And
19  I know Dan would never try to hurt anybody with such
20  terms.
21      I know he has, you know, many black friends and
22  black celebrity friends, and so do we.  We employ black
23  and African-American people here and my -- you know, my
24  training partner since I was a child was -- was a black
25  guy from South Carolina, and as dark as it got.  And so

| Page 230 |
| --- |

1  we -- neither Dan nor myself -- would ever mean any harm
2  by that.
3      Q   All right.  Let's go to Exhibit 8 real quick
4  because I'm a little bit confused about where we stand
5  on one item here.
6      (Exhibit Number 8 marked for identification.)
7      A   Yes, sir.
8  BY MR. McCOY:
9      Q   Am I still screen-sharing here?
10      A   No.  No, sir.
11      MR. STEARNS:  You are not, Kevin.
12      MR. McCOY:  All right.
13      MR. STEARNS:  When you get to a good point for
14  a break, also, let me know.
15      MR. McCOY:  No worries.  Let me just go through
16  this, and then we can take a break.
17      MR. STEARNS:  Thanks.
18      THE VIDEOGRAPHER:  What exhibit is this again?
19      MR. McCOY:  This is Exhibit 8.
20      THE VIDEOGRAPHER:  Thank you.
21  BY MR. McCOY:
22      Q   So this is a letter again.  You see that this
23  is from the Freeborn law firm, sir?
24      A   Yes, sir.
25      Q   And this is the firm that represents STEEL, and

| Page 231 |
| --- |

1  Ms. Gottlieb is one of the lawyers we identified at the
2  beginning of the deposition?
3      A   Yes, sir.
4      Kev, can you -- would you mind zooming?
5      Q   Oh, yeah.  Look, I'm sorry.  I --
6      A   Oh, no.
7      Q   All good?
8      A   Yeah, perfect.
9      Q   Okay.  So we had -- we had asked in discovery
10  earlier in the case --
11      A   Yes, sir.
12      Q   -- for documents from several entities relating
13  to cannabis, and that was --
14      A   Yes, sir.
15      Q   -- in relation to the allegations in the
16  complaint about THC being antithetical and hurting the
17  brand for STEEL.
18      Ms. Gottlieb wrote, "For example, Blitz's
19  request for documents 'reflecting, discussing, or
20  memorializing the manufacture, production, or sale of
21  any product containing cannabis' have no relevancy to
22  this litigation where (1) they have no relation to STEEL
23  and (2) such products may be manufactured, produced, and
24  sold legally in the United States."
25      Do you see that?

| Page 232 |
| --- |

1      A   I -- I do.
2      Q   And so what I'm trying to understand, is it --
3  is it your position that the sale of cannabis products
4  is legal or illegal in the United States?
5      A   From -- from my understanding, I am -- by no
6  means am I a lawyer -- I understand that it's legal
7  within certain states at different degrees; I think for
8  recreational purposes or medicinal purposes, and there's
9  another purpose that I can't recall.  But there's some
10  issues regarding the federal -- on a federal level, its
11  legalities.  And from what I understand, federally it is
12  not legal.
13      Q   Okay.  Do you know what jurisdictions, states,
14  or territories STEEL sells any cannabis products in?
15      A   Oh, we don't sell --
16      Q   I'm sorry.  I'm sorry.
17      Do you know what jurisdiction, state,
18  territory, or countries Ignite sells cannabis products
19  in?
20      A   I don't know the actual states off the top of
21  my head.  I was told, if I recall, in a conversation I
22  had had with Verona, a very brief one, he had mentioned
23  something about California and Nevada.  To that, I
24  don't -- I don't have a list, no, not in detail.
25      MR. McCOY:  Okay.  Let's take a break, make

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

| Page 233 | Page 234 |
|---|---|
| 1  sure everybody has time to take a -- take a minute | 1  steroids, but I also use STEEL supplements"; is that |
| 2  here. We'll stop share. How much time? | 2  true? |
| 3      MR. STEARNS: Well, how much -- are you going | 3      A  Yes. |
| 4  to go the full seven, do you think, or -- | 4      Q  And that was part of a marketing campaign that |
| 5      MR. McCOY: Yes, sir. Yeah. | 5  STEEL put out? |
| 6      MR. STEARNS: Yeah. So we'll make it fast. | 6      A  I don't recall ever doing a campaign around |
| 7  We'll do five minutes. | 7  this. It was something that we -- I created because Dan |
| 8      MR. McCOY: Okay. | 8  was very forthcoming about his, you know, use of |
| 9      MR. STEARNS: Okay? | 9  steroids. And so it's -- Dan was always trying to |
| 10     THE VIDEOGRAPHER: Okay. Off the record at | 10  market it in such a way where how do I -- how do I |
| 11  3:50 p.m. | 11  maintain my, you know, legitimacy with the physique that |
| 12     (Recess taken from 3:50 p.m. to 4:02 p.m.) | 12  I'm building, being that I've been vocal about using |
| 13     THE VIDEOGRAPHER: Back on the record at | 13  anabolic steroids, but then also to be able to promote |
| 14  4:02 p.m. | 14  the -- the, you know, products that we use in |
| 15  BY MR. McCOY: | 15  conjunction? Because sometimes people will think that, |
| 16     Q  All right, Mr. Huh. I'm going to share my | 16  oh, you didn't build that physique using products. You |
| 17  screen again. Are you okay to proceed? | 17  just -- you only used steroids, but that's -- that's a |
| 18     A  Yes, sir. | 18  far cry from the truth and how things actually work. |
| 19     Q  All right. Let me -- let me zoom in. I've | 19  And -- and so it was a cute way for Dan to, you know, |
| 20  finally trained myself enough here. | 20  hey, if you wanted to wear this shirt in a post, then he |
| 21     We're looking at Exhibit 9, Blitz 371 to 372. | 21  could. |
| 22  And this is similar to what we -- I think we were | 22     Q  Did you ever provide anabolic steroids to |
| 23  looking at something a little later than this before? | 23  Dan Bilzerian? |
| 24     A  Yes, sir. | 24     A  No, sir. |
| 25     Q  You had shirts printed up that said "Yes, I do | 25     Q  Did you ever counsel him on where to obtain |

| Page 235 | Page 236 |
|---|---|
| 1  anabolic steroids? | 1  idea. Dan had brought it up numerous times. I always |
| 2      A  No, sir. | 2  had a lot of apprehension about Joey due to the prior |
| 3      Q  And your testimony is that Mr. Bilzerian used | 3  company he was worth -- I'm sorry -- with, not worth, |
| 4  anabolic steroids? | 4  and which -- which we actually overlooked at one point. |
| 5      A  I mean, he told me he did. He was | 5  We were like, "You know what? That's not a big deal." |
| 6  doctor supervised, and I -- you know, I've -- I've | 6      And then there was other -- the other |
| 7  actually spoken to his doctor. He connected me with his | 7  apprehensions were just based upon how communications |
| 8  doctor in the beginning of the relationship, but it | 8  went between us and Joey. We just couldn't come to an |
| 9  wasn't anything pertaining to anabolic steroid use. I | 9  agreement that made sense. |
| 10  just know that Dan is -- you know, he's doctor | 10     Q  And one of -- was one of the other |
| 11  supervised. He does it, you know, the safe -- the | 11  apprehensions with respect to Mr. Swoll the fact that |
| 12  safest way possible. | 12  he's a homosexual? |
| 13     Q  Your testimony is Mr. Bilzerian is doctor | 13     A  Oh, not that I'm aware of, because I -- he has |
| 14  supervised in how he uses steroids? | 14  a -- he -- I know many girls that he's been with. |
| 15     A  To my knowledge, yes. | 15  He's -- I don't think he's a homosexual because I -- we |
| 16     Q  And that's based upon a communication you had | 16  have an athlete that was -- they might still be |
| 17  with Mr. Bilzerian or his physician or both? | 17  together, and she's a woman on -- on the -- on the STEEL |
| 18     A  No, his -- his -- it was with Mr. -- with Dan, | 18  team right now. |
| 19  with Dan Bilzerian. | 19     Q  All right. So you would deny that one of the |
| 20     Q  All right. Let's go back to Mr. Joey Swoll. | 20  grounds you expressed for not wanting to hire Mr. Swoll |
| 21  We talked about him in the beginning. | 21  was your belief that he was a homosexual? |
| 22     A  Yes, sir. | 22     A  Oh, I don't -- I don't think it would have |
| 23     Q  Were you originally considering Mr. Swoll for a | 23  been -- no, it wouldn't have been him being a |
| 24  position with STEEL? | 24  homosexual. I think now that -- now that you say that, |
| 25     A  We -- we -- we had gone back and forth on the | 25  I think it would pertain to something that Joey had done |

59 (Pages 233 to 236)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                              49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

| Page 237 |
|---|

1  where he was -- I think it's called "Gay For Pay," and
2  he was promoting -- or he was trying to -- prior to, I
3  think, his social media career, he was -- tried to make
4  money on pornographic images that -- that pertained to
5  him performing sexual acts, which I have never seen, and
6  I don't know for a fact that they were -- it was a
7  homophobe -- or homosexual activity, but that's to my --
8  that's what I can recall.
9      Q  All right.  So sitting here right now, you --
10  you don't know one way or the other, to the best of your
11  recollection?
12      MR. STEARNS:  Object to the form.
13      A  As to whether we didn't want to proceed with
14  bringing him on because of the homosexual activities
15  that he was partaking in?
16  BY MR. McCOY:
17      Q  Yes, sir.
18      A  No, again, because we -- we've had -- we've --
19  we have -- we've had and we have homosexual employees at
20  STEEL, and we've had bisexual athletes.  And we had --
21  Joey and I, you know, we go back.  We never talked about
22  our -- he never divulged to me his sexual orientation.
23  I just remember hearing about some of the things that he
24  had done to make money in his past, and it -- you know,
25  the pornographic material was a bit of a concern, but I

| Page 238 |
|---|

1  had never seen it, so it was kind of -- it was
2  overlooked and we still considered Joey as somebody that
3  we could potentially bring on if we could come to an
4  agreement financially.
5      Q  There was -- let's talk a minute here about a
6  couple of other items.  I guess I should just
7  understand, is anything with respect to CBD sales part
8  of the reason why STEEL seeks to terminate the agreement
9  with Blitz?
10      MR. STEARNS:  Object to the form.
11      A  CBD sales -- I'm sorry.  CBD sales for Ignite?
12  BY MR. McCOY:
13      Q  Yes, sir.  Yes, sir.
14      A  I don't -- I don't recall because -- I don't --
15  I'm trying to think here.  I'm sorry, Kevin.
16      Q  It's okay.  Look, I'll withdraw the question.
17  Let's just -- we'll do it this way.  I was going to
18  short-circuit it.  We're on Exhibit 9.  Let me zoom in.
19      A  Yes, sir.
20      Q  And this comes off a story where it looks like
21  you were collaborating with Mr. Bilzerian about somebody
22  wearing a cape and --
23      A  Yes, sir.
24      Q  -- running in a thong through some kind of an
25  expo.  Do you remember that?

| Page 239 |
|---|

1      A  Yes, sir.
2      Q  And that was September -- around September of
3  2018.  What was the expo that you-all were discussing
4  there?
5      A  The Mr. Olympia Expo.
6      Q  All right.  And that was some guy named Vitaly?
7      A  Yes, sir.
8      Q  And the idea was he was going to wear a cape
9  and some kind of a thong and run through the expo?
10      A  Yeah, it was an idea we had.  Vitaly was --
11  he's well known for his streaking capabilities, I guess
12  you could say, and his antics of getting a lot of
13  attention in crowds and -- and, you know, Dan -- you
14  know, we all found Vitaly very comical, and Dan -- and
15  Vitaly was very -- he was very open to the idea.
16      Q  All right.  So then you go on in response to
17  that -- we're on page 430 -- and you say, "Gay as fuck
18  enough to see his ass and dick flinging about."
19      Is that what you said there on the left?
20      A  Yes.
21      Q  All right.  And then we go down.  Mr. Bilzerian
22  is sharing with you some 4 million views on Snap.  Do
23  you see that on the right side?
24      A  Yes, sir.
25      Q  And he said, "Sold 400K of CBD in four days

| Page 240 |
|---|

1  since launch."
2      And you say, "Fn beautiful, bro.
3  Congratulations!  I love it"; is that right?
4      A  Yes, sir.
5      Q  You did not indicate to Mr. Bilzerian that
6  sales of the CBD product were a problem with respect to
7  the relationship with STEEL, did you?
8      A  Not -- not at the moment.  I -- because I
9  didn't have an -- I didn't really know what -- I didn't
10  have a good understanding of what CBD was and the
11  legalities of it at that time.
12      Q  Well, at a certain point, Mr. Bilzerian --
13  Ignite approached STEEL about a relationship concerning
14  a CBD whey, correct?
15      A  Yes.  Ignite -- oh, gosh.  Yeah, Michael Fedder
16  reached out to me regarding something of that nature,
17  yeah.
18      Q  All right.  Let's go up here.  So you're saying
19  at the time that you were congratulating Mr. Bilzerian
20  on the sales of CBD, you did not know what CBD was.  Is
21  that your testimony, sir?
22      A  I didn't really have a very good understanding
23  of it or even its legalities.  I know we had at some
24  point we were -- it was a -- it was kind of like it was
25  trending, if you will.  I don't remember the exact time

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

## Page 241

1  period, so we started to look into it.  But we just
2  found too many roadblocks, and the legality issues were
3  very unclear, and so we decided to stay away.
4      Q  Okay.  And, to your knowledge, Mr. Bilzerian --
5  or Ignite did not move forward with any sort of CBD whey
6  either, correct?
7      A  To my knowledge, it did not.
8      Q  So you see here -- this looks like it's
9  May 24th of 2018, and Mr. Bilzerian is telling you
10  here -- Exhibit 9, Blitz 399, he's telling you that he
11  bought a 43,000-square-foot house in Vegas, indoor gym,
12  good for training.  And you're responding here on the
13  left side; is that correct?
14      A  Yes, sir.
15      Q  And he says, "Awesome, that will be next level.
16  Sorry to hear about mold BS.  That sucks.  Let's try and
17  link in the next two or three weeks, hit the gym,
18  promote STEEL hard, and I'll give you all of the gummies
19  and CBD you want."
20          And you say, "Sounds fn good, bro"; is that
21  right?
22      A  Yeah.
23      Q  And is that because you had been receiving CBD
24  gummies from Mr. Bilzerian?
25      A  I had never received CBD gummies from Ignite or

## Page 242

1  Dan.
2      Q  Did you use CBD gummies at any point?
3      A  Absolutely not.
4      Q  Never used CBD gummies when you were out at the
5  Ignite house?
6      A  Absolutely not.
7      Q  Okay.  Do you have any idea why Mr. Bilzerian
8  would have been telling you that you could have all of
9  the CBD gummies that you want?
10      A  Well, he's -- yeah, Dan is -- you know, he
11  wants to promote his product.  And -- and -- and like
12  we, we would give him anything he wanted, you know, I'd
13  see him returning the favor.  It's kind of like an "I'll
14  scratch your back if you scratch mine," but I just --
15  I'm not -- I didn't -- I wouldn't use them.  And from
16  what I recall, we couldn't technically shift CBD across
17  certain state lines, and that was an issue.
18          If you could actually go back to that.  Do you
19  mind going back to that text message, Kevin?
20      Q  Sure.  Let me get back there.
21      A  Yeah.
22      Q  That's not the right page.  Hold on.
23      A  I think it was -- I think it was around here.
24      Q  Yeah.  It's at -- it's at 388.
25      A  Yep.  It was the part pertaining to this.

## Page 243

1  Yeah, a little bit --
2      Q  Yeah, here we go.  Actually, that's my bad.  I
3  cut this off.  So let's look.
4          May 11, 2018, 5:19 p.m., Blitz 388, Exhibit 9.
5  Your side of the conversation says, "You or your" -- and
6  I imagine that means people?
7      A  Yes, sir.
8      Q  -- "able to send any edibles?"
9      A  Yes, sir.
10      Q  That's what you asked Mr. Bilzerian?
11      A  Yes, sir.
12      Q  And those edibles pertain to cannabis products,
13  correct?
14      A  Yes, sir.
15      Q  And so he's responding now -- it looks like
16  this was on May 21st?
17      A  Yes.
18      Q  And he's saying, "Promote STEEL hard, and I'll
19  give you all of the gummies and CBD you want."
20          And you say, "Sounds fn good, bro."
21      A  Yeah, but there's a -- if you could scroll up a
22  little bit.
23      Q  Sure.
24      A  Okay.  So -- and then scroll down.  You see --
25  a little bit more down.

## Page 244

1      Q  Yes.
2      A  Right where the mold part is.  Okay.  Right
3  there.
4      Q  Yep.
5      A  The "Awesome, that will be -- that will be next
6  level."
7          So they're -- they're -- I am pretty sure there
8  was a phone call here and/or -- and we had spoken about
9  some issues that I was having pertaining to mold in a
10  place that I was staying.  And it was -- I thought it
11  was a health hazard.  And me asking him about the
12  edibles was I had -- there was -- I can't remember who.
13  It was a friend that had reached out to me and asked if
14  they were able -- if Dan or, you know, the Ignite team
15  would be able to send over edibles.
16          So I wasn't asking them for myself, but
17  somebody was actually, you know, "Hey, do you know if
18  Dan could send these?"
19          And I -- I was very unaware of the issues
20  regarding actually shipping such things.  And so when
21  he -- you know, we spoke, I was starting to learn, "Oh,
22  I didn't know you couldn't actually send CBD across
23  certain state lines and edibles."  I actually -- I was
24  not aware of that.
25      Q  Okay.  So -- so do you agree or disagree that

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 245

1  you had asked about Mr. Bilzerian providing CBD edibles?
2      A   Yeah.  I did ask him about that, yeah.
3      Q   And at a certain point, Ignite actually sent
4  you a care package that had various CBD products in it
5  that you then posted to your personal Instagram page?
6      A   I don't recall there being CBD products.  They
7  did send me a care package that -- I think it contained
8  hats, a cup.  I can't remember all of the contents of
9  it, but it was a -- it was, you know, what Dan referred
10  to as like -- or people referred to as, like, a "branded
11  swag," if you will.
12       And the other time I recall getting a package
13  from the Blitz team was the A-Lister brand had sent over
14  soaps and perfume-type stuff.
15      Q   Okay.  Well, I'll tell you what.  We will --
16  the video will be whatever it is because I don't know if
17  I have time to navigate right to that.  Let me see if I
18  can.  Yeah, I'll just make a note.  Let me do that.
19       All right.  So let's go back now to Exhibit 9.
20  At a certain point you were exploring the idea of trying
21  to procure a weed license in Florida, correct?
22      A   I don't recall, but it's -- it is possible.  I
23  don't remember the exact details of it.
24      Q   Well, you asked Mr. Bilzerian whether he had
25  any contacts that could help you get a Florida weed

Page 246

1  license.  Do you recall doing that?
2      A   Yeah.  We were -- we were poking around.  It
3  was -- like I said, everything was trending, the CBD
4  world and THC, when states started to, you know, pop up
5  with -- with it being legal on the state level.  And so
6  we were also doing some exploring.  I think we were
7  looking to -- a license in Florida, because I guess -- I
8  think at the time medically it was legal or going to be
9  legal, so we were just trying to get an idea of, you
10  know, the ins and outs of this, who to talk to, how
11  licensing worked and -- and what the laws and
12  regulations were.  But exploring and digging into it
13  just proved to be far too messy for -- you know, on the
14  legal level.  We just -- we just didn't want to exhaust
15  our resources in trying to walk this tightrope, if you
16  will, of legal/not legal.  It was just -- it was
17  daunting to even -- it's daunting to even think about
18  now.  It's just -- it's a lot.
19      Q   Did you set up a separate company to explore
20  the idea of selling products that contained cannabis?
21      A   We -- we set up a company, Pure Leaf, but that
22  was in regards to like a health and wellness CBD thing.
23  It wasn't geared for -- towards, like, THC usage.
24      Q   Was that for CBD protein?
25      A   Oh, gosh.  Well, it could have encom-- well,

Page 247

1  our thought process, well, if everything works out and
2  there's no legal issues, we could -- we could produce
3  like CBD gel capsules, things of that nature, for pain
4  relief and things like that.
5      Q   And is Pure Leaf an ongoing company?  Is it an
6  active company?
7      A   No.  We -- I get ideas, and I -- I'll just
8  conceptualize a name.  And -- and part of my
9  manifestation process is if I come up with a name, I
10  like to establish -- get an LLC set up or a domain to
11  kind of hold it and to let it fester.  And, you know,
12  conceptualizing ideas are understanding the space of it
13  more.
14      Q   Has Pure Leaf ever sold a product?
15      A   No, sir.
16      Q   Does it have any products in investment?
17      A   No, sir.
18      Q   Do you own a print business?
19      A   A T-shirt printing, yes, sir.
20      Q   And what's the name of that company?
21      A   It's under the HUH Enterprises.  It's STEEL
22  apparel.
23      Q   HUH Enterprises.  And is that a d/b/a, STEEL
24  Apparel?
25      A   Yes, sir.

Page 248

1      Q   And is that an entity that prints shirts and
2  bags and other kinds of items like that on behalf of
3  STEEL?
4      A   Yeah.  We haven't printed bags.  Mainly
5  T-shirts and -- mainly T-shirts.  We've done some pants.
6      Q   And then -- sorry.  Go ahead.
7      A   Further brands outside of the STEEL brand.
8      Q   What about the printing that it does for the
9  STEEL brand?  Does it -- is that the company through
10  which STEEL prints its promotional material that is
11  STEEL-branded?
12      A   Yes, sir.
13      Q   And how --
14      MR. STEARNS:  Object to the form.
15  BY MR. McCOY:
16      Q   -- are those items sold?  Are they sold by HUH
17  Enterprises, or are they sold by STEEL Supplements?
18      A   They're -- if I'm not mistaken --
19      MR. STEARNS:  Objection.
20      A   -- obviously finance would have a better --
21  but -- but HUH sells it to STEEL.  And then STEEL -- we,
22  for the most part, the T- -- we do sell the T-shirts on
23  the STEEL site; but, for the most part, our marketing
24  efforts were very focused on a promotion, a big
25  promotion, that we did with T-shirts where we were

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 249

1    providing a bundle, which the customer could get samples
2    of the product, a shaker cup and a T-shirt, and just
3    cover the shipping.  And that was a very successful
4    marketing campaign that -- you know, that we acquired
5    more new customers with this campaign and still do than
6    any other marketing campaign we've ever brought to
7    existence.
8    BY MR. McCOY:
9        Q   And has STEEL paid Blitz 10 percent on the
10   sales of any of the shirts, cups, bags or other
11   logo-branded items?
12       A   Yeah.  Everything that STEEL sells, it's all
13   encompassed under the -- within that wheelhouse of
14   whatever we sell, we make sure that, you know, Dan is
15   compensated for.
16       Q   Well, there was a period of time where there
17   were Amazon sales that STEEL was not reporting to Blitz,
18   correct?
19       A   That -- I recall I sat in on the --
20   other -- the deposition with Verona, and that was
21   brought up.  And I don't recall that happening because I
22   think Jason and Mehdy had resolved that issue; but I
23   did -- I did learn about that, and -- and I learned that
24   it was resolved immediately.
25       Q   You are the owner of a CM Innovation; is that

Page 250

1    true?
2        A   Yes, sir.
3        Q   Are there any other owners?
4        A   No, sir.
5        Q   Do you sign the tax returns on behalf of
6    CM Innovations?
7        A   Yes, sir.
8        Q   Do you sign those under penalty of perjury?
9        A   Yes, sir.
10       Q   And are the numbers that have been reported in
11   the tax returns for CM Innovations that you signed, are
12   they true and accurate?
13           MR. STEARNS:  Form.
14       A   To my knowledge, yes.  I mean, the accountants
15   prepare them, and I trust that they're doing what
16   they're supposed to do and -- yes, sir.
17   BY MR. McCOY:
18       Q   Now, CM Innovations, based upon what I
19   understood from Mr. Karbid, no employees, no separate
20   physical address, true, from STEEL?
21       A   Yes, sir.
22       Q   And is CM Innovations an affiliate of STEEL?
23       A   What do you mean by "affiliate"?
24       Q   Well, what's the relationship between the two
25   entities?  Is it a subsidiary?  Affiliate?

Page 251

1        A   I gotcha.
2            MR. STEARNS:  Objection.
3        A   To my knowledge, I had had this entity formed
4    many years ago, and it was just kind of -- it was
5    sitting.  And we were talking about doing some wholesale
6    distribution overseas in the beginning of the company,
7    and so we had this as a -- at the time I thought this
8    could be a way of selling products or protecting the
9    STEEL brand, because when you sell to wholesalers,
10   sometimes wholesalers don't always promote your brand in
11   a way that it should be or they could -- they could put
12   us in a position where they sell to the wrong person or
13   a minor, and I thought maybe this could help kind of
14   protect STEEL, I guess, if you will.
15   BY MR. McCOY:
16       Q   And did you ever give directions to anyone to
17   ensure that 10 percent commission of sales from
18   CM Innovations were paid to Blitz?
19       A   I don't recall specifically.  I was always
20   just -- I was just very clear that we -- we -- we need
21   to make sure we pay what is due.  So any sales that were
22   made that -- regarding STEEL products that, you know, we
23   need to make sure that Dan's paid for that.
24       Q   And has CM Innovations paid 10 percent of gross
25   sales to Blitz?

Page 252

1            MR. STEARNS:  Object to the form.
2        A   I don't -- to my knowledge, I don't -- I know
3    STEEL has paid.  I don't know if CM would have paid
4    directly.  I don't -- I don't think so.
5    BY MR. McCOY:
6        Q   So as you sit here, you're the only officer of
7    CM Innovations, true?
8        A   Yes, sir.
9        Q   As you sit here as the only officer of
10   CM Innovations --
11       A   I'm sorry, Kevin.
12       Q   Yes, sir.
13       A   Mehdy, you know, being the CFO, he -- he
14   oversees the other entities as well.  So, yeah, I
15   misspoke.  I was -- I interpreted "officer" as a,
16   potentially, owner.  So, yeah, Mehdy -- Mehdy helps to
17   oversee the other entities.
18       Q   I understand that, but in terms of --
19           MR. STEARNS:  Kevin, real quick.  Hold on,
20   guys.
21           MR. McCOY:  Yes, sir.
22           MR. STEARNS:  Is anyone else experiencing a lag
23   issue?  Because I'm -- for the last couple of
24   questions, I'm hearing Kevin and Jason speak at the
25   same time.  Is anybody else hearing that?

63 (Pages 249 to 252)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 253

1    THE WITNESS:  No.
2        MR. McCOY:  I've been -- I haven't had an
3    overlap, but --
4        THE WITNESS:  I'm okay.
5        MR. STEARNS:  Okay.
6        MR. McCOY:  All right.
7        MR. STEARNS:  If it keeps happening, I'll let
8    you know, but it was happening quite a bit.
9    BY MR. McCOY:
10       Q   Okay.  So my question was a different one,
11   Mr. Huh.
12       You are -- in terms of the paperwork, whatever
13   Mr. Karbid may or may not do, you are the officer and
14   owner of CM Innovations, correct?
15       A   I'm -- yes, sir, I'm the owner and officer.
16       Q   And you do not know, sitting here right now,
17   whether or not CM Innovations has paid 10 percent of the
18   sales, gross sales, that it has made to third parties,
19   true?
20       MR. STEARNS:  Objection.
21       A   I don't know if they paid -- if it went
22   directly from CMI to Dan.  I just know that, you know,
23   we -- we -- we made sure that we made everything, and it
24   would have encompassed that when we made our payments to
25   Dan.

Page 254

1        Q   It would have encompassed the sales so that
2    when you -- when STEEL made its payments to Blitz, your
3    understanding is that payment would have encompassed the
4    10 percent that CMI -- the 10 percent of sales from CMI
5    to third parties; is that correct?
6        MR. STEARNS:  Object to the form.
7        A   I -- I believe so.
8    BY MR. McCOY:
9        Q   All right.  And it's my understanding that
10   CM Innovations has its own Shopify account?
11       MR. STEARNS:  Objection.
12   BY MR. McCOY:
13       Q   Is that true?
14       MR. STEARNS:  Objection to the form.
15       A   Yeah, I'm -- to my knowledge, yes.  I -- I
16   don't -- it's not my area, I guess.  I trust that the
17   team manages the Shopify.  I'm not a very tech savvy
18   guy, but I would imagine that there is.
19   BY MR. McCOY:
20       Q   And that Shopify account for CM Innovations
21   would be linked to a separate bank account for
22   CM Innovations?
23       MR. STEARNS:  Object to the form.
24       A   Yes, sir.
25

Page 255

1    BY MR. McCOY:
2        Q   And have you ever been in meetings with anybody
3    on the team for STEEL where there was a discussion about
4    how sales of CM Innovation's product would be held
5    relative to the payments owed to Blitz?
6        A   No.  I just -- I just always, you know -- I
7    mean, it's always been our understanding across the
8    board that we made sure that Dan gets paid everything
9    that he has to get paid.
10       Q   So when I was speaking with Mr. Karbid, he
11   indicated that STEEL records sales to CM Innovations as
12   cost of goods sold; is that correct?
13       MR. STEARNS:  Objection.
14       A   I -- I -- again, as -- Kevin, it's not my area
15   of expertise, but I think so.
16   BY MR. McCOY:
17       Q   Okay.  And so does STEEL report the income on
18   cost of goods sold as part of the 10 percent paid to
19   Blitz, or does it report the actual sales price of CMI
20   in the calculation for Blitz?
21       MR. STEARNS:  Object to the form.
22       A   I -- I -- I wouldn't know.  I'm not sure how
23   to -- I'm not speaking -- that's just -- I apologize.
24   I'm not involved in -- in -- I'm not as proficient in --
25   in things of that nature, you know.  That's just -- I --

Page 256

1    I would not know how to answer that correctly or at all.
2    BY MR. McCOY:
3        Q   Okay.  Let's go back to -- well, let's just do
4    this to close out some of these other issues here that I
5    skipped at the beginning.
6        We talked about Pure Leaf.  Stella Supplements,
7    Inc., what is that?
8        A   It was a supplement idea that we -- a
9    supplement company idea we had, but it never did
10   anything.  We just -- again, I was just trying to
11   conceptualize.
12       Q   Okay.  Did it ever sell any product?
13       A   No, sir.
14       Q   Coalition Monarchs, LLC, what is that?
15       A   That was a little clothing brand we had years
16   ago, but that was it.  There was just some T-shirts that
17   we were conceptualizing.
18       Q   All right.  STEEL Supps, LLC, what is that
19   entity?
20       A   That was an entity started -- oh, gosh --
21   2000- -- 2015, '16 area, but it -- it didn't -- we
22   didn't use that LLC.  We just went with STEEL
23   Supplements.
24       Q   All right.  Did that ever -- did the STEEL
25   Supps, LLC, ever recognize any revenue?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 257

1    A  No, sir.
2    Q  And I think we talked about this, but I want to
3  understand you.
4       You acknowledge that at a certain point you
5  reached out about trying to earn the screen-printing
6  business for Ignite; is that true?
7    A  I don't recall reaching out to try to earn it.
8  We were -- I don't recall a specific conversation.  I do
9  recall something regarding that, you know, if we can
10 print T-shirts for companies and business -- you know,
11 businesses, then we would like to do so.
12    Q  So if we can go back to Exhibit 9 -- let's see.
13 Well, it's fine.  I don't really -- we can -- it says
14 what it says.  We'll deal with that eventually.
15       Has STEEL had any lawsuits threatened against
16 it relative to its products?
17    A  There's always little -- what do you --
18 like frivolous claims, you know, that come and go with
19 any business.  I can't recall specific ones off the top
20 of my head, but we have had little things here and there
21 and -- like marketing-type stuff, I think.
22    Q  Anything related to the content of product
23 versus the label?
24    A  We -- there's actually a Prop 65 case that
25 we're working on now that, from what legal counsel's --

Page 258

1  I don't know if I should --
2       MR. STEARNS:  Hold -- hold on.
3  BY MR. McCOY:
4    Q  I don't want -- I don't want to know -- I don't
5  want to know about any of that.
6       MR. STEARNS:  Mr. Huh -- and -- and I'll just
7  give you this instruction, sir.
8       THE WITNESS:  Yes, sir.
9       MR. STEARNS:  If you are able to disaggregate
10 knowledge you have from your own versus knowledge
11 you may have about any lawsuit that was provided to
12 you by any lawyer of yours, then you can provide
13 that information; but you cannot answer Mr. McCoy's
14 question to the extent it would call for the
15 disclosure of communications you've had with
16 counsel.  Does that make sense?
17       THE WITNESS:  Okay.  I got it.
18 BY MR. McCOY:
19    Q  Yeah, I don't want to know about any
20 communications with lawyers.  What I want to know, for
21 example --
22    A  Yes, sir.
23    Q  -- if you look at your screen, I'm sharing my
24 screen, and we're looking at a webpage,
25 steelsupplementinvestigations.com.  Do you see that?

Page 259

1    A  Yes, sir.
2    Q  And this is apparently a website that's
3  maintained by Charles C. Weller, attorney at law --
4    A  Yes, sir.
5    Q  -- San Diego, California.
6       Are you aware of any claims that have been
7  threatened against STEEL alleging that the STEEL
8  Supplement protein powders failed to meet the protein
9  contents stated on the label?
10    A  Right.
11    Q  Okay.  Is that the Prop 60-whatever you were
12 talking about, or is that something different?
13    A  It's different.
14    Q  Okay.  And have there been any claims that have
15 been filed against STEEL or demand letters that have
16 been sent to STEEL relative to what's expressed on this
17 website, this investigation website?
18    A  No.
19    Q  All right.
20    A  These are -- you know, I mean, we got counsel
21 that -- they're in the supplement industry.  We deal
22 with a vast majority of claims that are just frivolous
23 claims and they're looking for -- it's like shake-down
24 stuff, they call it.
25       And they'll say that your protein isn't dosed

Page 260

1  according to the label; but then you say, "Can you
2  provide us your testing results," and they provide
3  testing results that were -- were done in Vietnam.
4       And when you understand the FDA's rules on a
5  range for what protein percentage can be in a scoop,
6  we're within that range; therefore, the suits never
7  amount to anything.  It's just -- it's just
8  ridiculousness.
9    Q  So I want to shift gears a little bit now.  Let
10 me go here.  I want to talk about this concept of
11 organic posts a little bit more.
12       We're back to Exhibit 9, and we're at page
13 Blitz 20-- -- this is Blitz 29.  This looks like it's a
14 post or a communication between you and Mr. Bilzerian
15 around March 8th of 2017 at 8:08 p.m.  Do you see that?
16    A  Yes, sir.
17    Q  And one of the discussions that you and
18 Mr. Bilzerian had from the beginning was how he was
19 going to go about posting, correct?
20    A  Yes, sir.
21    Q  And in this particular communication we're
22 looking at on Blitz 29, you're talking about how
23 Robert -- and is that -- remind me of his last name
24 again.
25    A  Frank.

65  (Pages 257 to 260)

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 261

1    Q  Robert Frank, he wanted to post how he wanted
2  to, organically as possible, much like the situation we
3  have and wanted for all that are on board.
4        And what is the organic arrangement that you
5  were discussing there with Mr. Bilzerian?
6    A  Well, kind of like we touched on in the
7  beginning, Dan has a style, and Robert has a style, and
8  we kind of deem that as organic to -- to that person.
9    Q  And throughout the relationship, there were
10  several times where Mr. Bilzerian brought up the idea of
11  investing in STEEL; is that true?
12    A  Yeah, I think there was, but I don't recall,
13  like, exact dates or -- or what was -- I don't recall
14  the exact conversations.
15    Q  Well, part of what Mr. Bilzerian expressed to
16  you was that if he were to invest in STEEL, then he
17  could more publicly promote the product; is that true?
18    A  I -- but Dan never wanted to invest financially
19  into the company.
20    Q  And what do you mean by that?
21    A  Like, I never -- Dan never -- I was never on
22  the same understanding that Dan wanted to inject money
23  into the company.  I don't -- Dan never said that he
24  wanted to do that.
25    Q  Well, there were communications in October of

Page 262

1  2020, shortly before the termination letter, about Dan
2  investing in the company; is that correct?
3    A  Yeah.  Yeah.
4    Q  And what was your reaction to the idea of
5  Mr. Bilzerian investing in the company?
6    A  I was -- I was a little surprised, because from
7  what I gathered, there -- you know, there was some
8  financial issues.  And I wasn't sure if he was looking
9  to invest money and then -- or not; and then there was a
10  conversation we had, I think, on the phone where he had
11  talked about -- saying that he was going to promote or
12  make posts saying that he had invested into the company
13  at like a billion-dollar valuation but wasn't really
14  going to invest into the company with any dollars.
15        He just wanted to announce that, and so it -- I
16  had spoken with Verona shortly about it, and Verona
17  was -- I brought that up to Verona, and Verona was
18  pretty shocked to hear because he said he didn't know
19  where that kind of money could come from.
20    Q  Are you talking about investing in STEEL or
21  investing in Ignite?
22    A  Investing in STEEL.
23    Q  Okay.  And so it was your understanding that
24  Mr. Bilzerian wanted to invest up to how much in STEEL?
25    A  He made a comment, "Oh, I can make an

Page 263

1  announcement that I've invested up to -- into the
2  company at 100 billion" -- or I'm sorry -- a
3  billion-dollar valuation, I think it was.
4    Q  Investing with -- with STEEL being valued at a
5  billion dollars?
6    A  Yes, sir.
7    Q  Well, you had communications with Mr. Bilzerian
8  about STEEL being a billion-dollar company, correct?
9    A  I mean, he -- he had tried -- well, his
10  assumption was that it was, but I don't think we're --
11  we're not a billion-dollar company.
12    Q  At one point he asked whether if he could
13  broker a deal at 800 million, you would be interested,
14  true?
15    A  I mean, if that's -- I mean, that's possible.
16  I mean, I think anybody would entertain the idea; but
17  it's -- I would listen, but I -- I -- that's not the
18  objective with STEEL.  I like STEEL.
19    Q  Did I -- I'm sorry.  What's -- what was not the
20  objective with STEEL?
21    A  I wasn't looking to sell the company.
22    Q  Okay.
23    THE WITNESS:  Hey, Kevin?
24    MR. McCOY:  Yes, sir.
25    THE WITNESS:  Can we take a break?  My --

Page 264

1    MR. McCOY:  That's fine.
2    THE WITNESS:  Bathroom --
3    MR. McCOY:  No problem.  Let's do it.
4    THE WITNESS:  Sorry, guys.
5    MR. STEARNS:  We'll see you guys in about five.
6    THE VIDEOGRAPHER:  Off the record at 4:45.
7    (Recess taken from 4:45 p.m. to 5:05 p.m.)
8    THE VIDEOGRAPHER:  This begins Media Unit
9  Number 5, and we're back on the record at 5:05 p.m.
10  BY MR. McCOY:
11    Q  All right.  Mr. Huh, are you okay to proceed?
12    A  Yes, sir.
13    Q  All right.  I want to circle back.
14        My understanding is that prior to
15  CM Innovations, STEEL Supplements, Inc., was already
16  making wholesale sales; is that correct?
17    A  Yeah, I can't recall with certainty.
18    MR. STEARNS:  Object to the form.
19  BY MR. McCOY:
20    Q  You don't know whether, in addition to any
21  retail -- well, let me ask you this:  Do you know if
22  STEEL Supplements ever sold wholesale?
23    MR. STEARNS:  Objection.
24    A  If I'm not mistaken, yes.
25  BY MR. McCOY:

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 265

1  Q  All right.  And so was there ever a period of
2  time when STEEL Supplements, Inc., discontinued its
3  wholesale sales?
4  A  There -- there was.  I don't recall a date, but
5  it wasn't -- it was just we discontinued wholesale; I
6  think we paused it all together at some point early on,
7  because there was too many issues with storefronts not
8  obeying the map agreements, and so I --
9  Q  And -- I'm sorry.  Go ahead.
10  A  I'm sorry.  I just didn't have the energy at
11  the time to exhaust trying to get storefronts to do what
12  they're supposed to do.  And it really was a very
13  miniscule part of the business.
14  Q  Was there ever a period of time where
15  CM Innovations stopped wholesale sales?
16      MR. STEARNS:  Object to the form.
17  A  I would imagine it would have been around
18  that -- that same time period.
19  BY MR. McCOY:
20  Q  Did you start CM Innovations for the purpose of
21  selling STEEL product wholesale and not reporting the
22  sales to Blitz?
23  A  No, sir.
24  Q  And it's -- as you sit here today, you believe
25  that all of the sales by CM Innovations, the commissions

Page 266

1  have been paid on those sales to Blitz?
2      MR. STEARNS:  Object to the form.
3  A  To my knowledge, yes.
4  BY MR. McCOY:
5  Q  And when you say to your knowledge, where would
6  your knowledge come from?
7  A  CFO Mehdy, Mehdy Karbid.  And I was --
8  everybody knew how -- yeah, how -- well, you know, how
9  important a relationship between STEEL and Dan was, and
10  we wanted to make sure that we're doing the right thing.
11  And, you know, we made sure we paid everything that we
12  owe.
13  Q  How did you make sure that -- how did you make
14  sure that you paid everything that was owed?  What --
15  what -- what kind of process was there to check and make
16  sure?
17  A  For me, to personally check, that there's no
18  process.  I just -- I relied on -- yeah, I relied on
19  Mehdy, our CFO; and Mehdy is a very -- in my tenure with
20  Mehdy, he's a very good, honest, and humble guy, and he
21  loves to do the right thing as well.
22  Q  Did Mr. Karbid ever express to you that you
23  were overpaying Blitz for the services that you were
24  getting?
25  A  No.  I -- I don't -- I mean, I don't -- I don't

Page 267

1  know if I can say this.
2      MR. STEARNS:  Well, hold on.  You certainly
3  can't disclose anything that you would have
4  discussed during any of our attorney-client meetings
5  or things like that.  So if that's what you were
6  going to say, Jason, then no, you can't say that.
7      THE WITNESS:  Understood.
8      MR. STEARNS:  But, you know, if you want to
9  clarify -- and I'm happy to clarify on a break or
10  something, but I don't know what you're going to
11  say; but, yeah, feel free to answer the question.
12  A  Well, I just -- how do I -- I was unaware -- I
13  was unaware that, you know, we -- we would have
14  overpaid.  I wouldn't be surprised.  I always try to --
15  you know, I always want the team to go above and beyond
16  and make sure everything is dotted -- that the I's are
17  dotted and the Ts are crossed.
18      And I know there's -- you know, there's been
19  some misunderstandings in terms of terminology, I guess,
20  in the contract and how we should be compensated.  And
21  so, you know, there could have been some overpayment
22  based upon my knowledge of paying on returns at one
23  point, and I think we stopped paying on returns.  I
24  just -- I don't remember the exact date.
25  BY MR. McCOY:

Page 268

1  Q  My question was a little different.  I'm sorry.
2  My question was:  Did Mr. Karbid ever come to you as the
3  CFO and go --
4  A  Oh.  My apologies, Kevin.  Real quick --
5  Q  "Yeah, we have to find a way out of this -- we
6  have to find a way out of this agreement"?
7  A  Wait.  Wait.  He told me that we overpaid or we
8  have to find a way out of the agreement?
9  Q  Did Mr. Karbid ever come to you and say, "We
10  have to find a way out of this agreement"?
11  A  No, absolutely not.
12  Q  Do you want any relationship with Mr. Bilzerian
13  going forward?
14  A  I'm -- like as a -- in a -- in a business
15  capacity or --
16  Q  Let's start with a business capacity.
17  A  I would -- I would rather not.
18  Q  And your view is that Mr. Bilzerian would be
19  free to promote or associate with any of your
20  competitors at this point; is that correct?
21  A  If we were to -- you're saying at this point
22  in -- like today, as of today, 2021?
23  Q  Yes, sir.
24  A  I mean, I can't -- I don't think I can say
25  otherwise.

67 (Pages 265 to 268)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 269

1    Q  All right.  I want to go through a couple items
2   here.  Oh.  I had asked you before, is there an org
3   chart for STEEL Supplements that shows its relationship
4   to any of the other entities that you control that we
5   talked about today?
6    A  No, no org chart, no.  I'm -- not that I'm
7   aware of, I should say.  I mean...
8    Q  I had asked you this before.  Is CM Innovations
9   a subsidiary of STEEL Supplements, Inc.?
10       MR. STEARNS:  Object to the form.
11   A  To be honest, Kevin, I'm not -- well, could you
12  define "subsidiary"?  I know I sound like an idiot.  I'm
13  sorry.
14  BY MR. McCOY:
15   Q  No.  Yeah, I don't know if STEEL has -- that's
16  why I asked about an org chart, to show relationships
17  between the entities.
18       Let me show you, again, Exhibit 6.  We looked
19  at this earlier today.  And --
20   A  Yes, sir.
21   Q  -- do you see that the agreement here defines
22  STEEL Supplements, Inc., and it has its principal place
23  of business at "1834 Main Street, Sarasota, Florida,
24  (Hereinafter, inclusive of all current and future
25  affiliates and subsidiaries dealing with bodybuilder

Page 270

1   supplements, 'STEEL Supps')"?
2    A  Can you just blow it up a little bit?
3    Q  Yeah, I forgot.  That's on me.  I'm sorry.
4    A  No worries.
5    Q  You would think I would remember by now.
6    A  There we go.  That's perfect.
7        Okay.  I see that, yep.
8    Q  Okay.  Does -- do you consider CM Innovations
9   to be a subsidiary of STEEL Supplements?
10   A  Well, I don't -- I guess I don't really
11  understand the -- the definition of "subsidiary."  I'm
12  assuming that means like a partner, a business partner?
13   Q  Well, if -- is -- is STEEL Supplements the
14  parent company to CM Innovations?
15   A  So -- so does STEEL, like, own CMI?
16   Q  Sure.  Let's start with that.
17   A  No, not --
18       MR. STEARNS:  Object to the form.
19   A  -- no, not to my knowledge, no.  It's a
20  separate entity.
21  BY MR. McCOY:
22   Q  Is CM Innovations an affiliate of STEEL
23  Supplements?
24       MR. STEARNS:  Object to the form.
25   A  I don't -- no, I wouldn't -- I wouldn't have

Page 271

1   classified it as an affiliate.  If I -- if I understand
2   what the term "affiliates" means, I would say that I
3   guess it's a business-partner relationship.
4   BY MR. McCOY:
5    Q  All right.  So if you don't classify
6   CM Innovations as either a subsidiary or affiliate, why
7   would the sales from CM Innovations have been paid to
8   Blitz?
9    A  Well, we -- that's the -- if -- if there's
10  product sold that are STEEL products, that -- you know,
11  that's -- that's STEEL's moneys, no matter what, we'd
12  make sure that gets paid to Dan.  It didn't matter.
13   Q  All right.  So fair enough.  Then -- then we
14  can agree that if CM Innovations sold product, there's
15  no -- there's no issue in terms of whether Blitz should
16  have been paid commissions on that in terms of any
17  definition?
18   A  Can you say that one more time, Kevin?  I'm
19  sorry.
20   Q  Yeah, I just want to make sure there's not
21  something caught up in this here.  Your view is -- set
22  this agreement aside.
23   A  Yes.
24   Q  Your view, Jason Huh's view, is any product
25  that CM Innovations sold, commissions should have been

Page 272

1   paid on that to Blitz?
2    A  Absolutely.  I wouldn't -- I would not -- never
3   try to -- you know, I don't -- I would -- I have no
4   debt.  I would never try to not uphold our -- our deal
5   of the bargain.
6    Q  All right.  Let's go back here.  Just give me a
7   moment.  I want to talk about the Treigning Lab posts.
8    A  Yes, sir.
9    Q  That's one of the grounds that STEEL has cited
10  to terminate the relationship with Blitz, correct?
11   A  Yes, sir.
12   Q  And I believe that was a post that was made
13  July 3rd of 2020?
14   A  I'm not -- off the top of my head, I'm not
15  100 percent sure; but if you have that in front of you,
16  then I would take your word for it.
17   Q  Let me -- let me -- let's make sure we're --
18  let's make sure I'm right.  I don't want to -- I don't
19  want to misstate it.
20   A  Understood.
21   Q  So -- yeah, here we go.  Let's go here first.
22  We're back to Exhibit 3, which is the amended complaint.
23   A  Yes, sir.
24   Q  And you see here that the allegations that have
25  been put forward by the lawyers on behalf of STEEL --

68 (Pages 269 to 272)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                              49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 273

1    A  If you could just blow it up a little bit.
2    Q  -- yeah, cite a July 3rd, 2020 Instagram post
3  by Mr. Bilzerian?
4    A  Yes, sir.
5    Q  And part of the problem is that, in addition to
6  identifying this STEEL product that we're looking at on
7  Exhibit 3 at paragraph 58, there were other products
8  there that he talked about in this post, right?
9    A  Yes, sir.
10    Q  And that is one of the allegations here, the
11  product at issue, an L-tryptophan supplement from the
12  Treigning Lab.  Do you see that?
13    A  Yes, sir.
14    Q  And is -- is tryptophan -- is that the stuff
15  that makes you sleepy?
16    A  It can.  For most people, it does.  You know,
17  there's always the -- an individual that doesn't respond
18  to it, such as somebody can take -- you know, most
19  people can take caffeine and respond well with it, and
20  then there's some people that don't respond; but, in
21  general, yes, it will make you sleepy.
22    Q  Tryptophan is -- is what's in turkey, right?
23  You eat turkey at Thanksgiving?
24    A  It is.  It's actually in many protein sources.
25  It's actually in higher concentrations in pork and other

Page 274

1  meats; but for some reason turkey gets a reputation for
2  being a sleepy food; but I wouldn't attribute it to the
3  tryptophan content of turkey because it's actually lower
4  than other proteins.  I would actually attribute it to
5  the various foods that you're eating in and around
6  Thanksgiving such as high contents of sugar that would
7  cause drops in blood glucose levels, therefore, causing
8  drowsiness.  And so people therefore assume that
9  tryptophan is -- you know, the turkey is causing them to
10  pass out.
11    Q  Is -- and the -- the ingredient that was
12  complained of in the Treigning Lab product is the
13  L-tryptophan?  That's -- it's the same chemical,
14  correct?
15    A  It is.
16    MR. STEARNS:  Object to form.
17  BY MR. McCOY:
18    Q  Okay.  And L-tryptophan you contend is a
19  bodybuilding supplement?
20    MR. STEARNS:  Object to the form.
21    A  Yeah, because when -- when bodybuilding,
22  anything, you know, that you're trying to achieve with
23  your body, whether building muscle or fat loss, the most
24  important times in which you build or burn fat is
25  actually within your sleep.  So it's very important to

Page 275

1  get a sufficient amount of sleep in order to recover
2  properly because that's really --
3  BY MR. McCOY:
4    Q  Sure.
5    A  -- where all of the magic happens, you know,
6  when it comes to your fitness goals.
7    So it's -- it's pivotal that, yes, your
8  training is very important, but just as important is
9  sleep, just as gasoline in your car is to oil.  You
10  definitely need both to be functioning optimally.
11    Q  All right.  Let me try to get to our date here.
12  This looks like it's too late.
13    A  Yes, sir.
14    Q  Hold on.  Well, let's do it this way.  All
15  right.  Can you see -- let me -- let me zoom in.  Can
16  you see --
17    A  Yes, sir, I see.
18    Q  -- the screen?
19    A  Yeah.
20    Q  And you were aware that Mr. Bilzerian made the
21  post containing the Treigning Lab product, correct?
22    A  I am aware of it.
23    Q  Well, you were aware of it at the time,
24  correct?
25    A  Well, what time specifically?  Are you talking

Page 276

1  about a specific time?
2    Q  Yes.  July 3rd, when he made the post, you were
3  aware that he had made the post, correct?
4    A  Yes.
5    MR. STEARNS:  Form.
6  BY MR. McCOY:
7    Q  And you see the text messages that
8  Mr. Bilzerian put in here in the thread December 14th at
9  2 p.m.  That's the day you filed the lawsuit, right?
10    A  Yes.
11    Q  And this was similar to the organic nature of
12  Mr. Bilzerian's posts, correct?
13    MR. STEARNS:  Object to the form.
14    A  Oh.  What do you mean?  That -- how he was
15  posting our -- our products or --
16  BY MR. McCOY:
17    Q  Yeah.  This -- was this typical of how
18  Mr. Bilzerian posted your products, this post?
19    A  Yeah, aside from the tryptophan as a sleep aid,
20  yes.
21    Q  All right.  And right here, this part is your
22  reaction to Mr. Bilzerian's posts, correct?
23    A  Yes, sir.
24    Q  And you say, "Bro, I loved the post and so did
25  the team.  We're just nervous about the timing.  We're

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 277

1    hoping to get the spike by 1 p.m. and to carry till the
2    evening.  If it doesn't carry till the evening -- if
3    it -- if it doesn't, then we will know the holiday
4    weekend killed it.  That's why we said Tues, Weds based
5    on data would have slayed.  Holidays are super risky,
6    not to mention every company and their mother trying to
7    have a sale.  Post sale our numbers have been cruising
8    at over 100K a day."
9         A  Yes, sir.
10        Q  "The damn holidays always suck ass, but
11   seriously all good.  We just gotta see what happens.
12   Again, the post was fuckin' amazing, but by 1 to 5 p.m.
13   Eastern we will know if the holiday and particular day
14   of the week hurt it.  Know how your organic stack posts
15   in the past have performed.  There is no reason that it
16   wouldn't kill it so the post and how you did it is
17   titties."
18        That's what you told Mr. Bilzerian?
19        A  Yes, sir.
20        Q  That was in response to the post that you now
21   have in the complaint that you've provided to the Court
22   as a basis to terminate the agreement with Blitz,
23   correct?
24        A  Yes, sir.  But there's -- if you scroll up,
25   when -- so -- so Dan would typically post at odd hours

Page 278

1    and whenever it was, you know, convenient for him, which
2    we understood.
3         But you can see there that the time in which
4    that came in was right before he went to bed, if I'm not
5    mistaken.  It was earlier in the morning.  And if you
6    scroll down, you can see the post, right?  Yeah, right
7    there.
8         When -- when that screenshot had come in, I
9    wasn't actually at the office.  And so when I saw that
10   post, my reaction was, "Oh, this is great," because I
11   know Dan hasn't posted Alpha; but I didn't -- I, at the
12   time, thought that that was an IG story, like a picture,
13   a still picture.  Does that make sense?
14        Q  Whatever you would like to share with me about
15   that issue, I will listen, and then I have another
16   question.
17        A  Yeah.  So I thought it was a -- a still image.
18   I -- actually, I was -- because I didn't actually watch
19   it.  I didn't go and watch it.  I just -- I was
20   receiving his text message and responding to the fact
21   that, oh, he put up a still image; and the caption in
22   that image right there, I was -- you know, we were
23   excited because we were looking to see what, you know,
24   an Alpha post would do.
25        But I didn't learn that there was actually a

Page 279

1    competitive product until I got to the office that day
2    and it was brought to my attention, and then I watched
3    the video for myself.  Because I remember driving at the
4    time.  I -- I don't watch Instagram stories while
5    driving or -- nor would I go on Instagram.
6         I remember getting in the car after getting the
7    message and heading to the office in a rush.  And when I
8    got to the office is when I saw.  The marketing guys --
9    Jake had brought this up to my attention; and I think
10   Mehdy had mentioned something as to the effect of, "I
11   don't understand why he would post that.  Why wouldn't
12   he just post Rested?"
13        And at that point I -- I -- I felt like a bit
14   of a fool and not -- you know, not only in front of Dan
15   but in front of my entire team, because I actually
16   didn't go and review the video.  I just was looking at
17   this text message thinking that that was a screenshotted
18   IG post.
19        Q  Okay.  Well, let's walk through the time stamp
20   here, Mr. Huh.
21        A  Yes, sir.
22        Q  If we go up, now, we're on Exhibit 9 at
23   page 661, July 3rd, 7:11 a.m.  You see that?
24        A  Yes, sir.
25        Q  And he says, "Did the post, tried something

Page 280

1    different.  Views are high as shit right now."
2         That's what he told you?
3         A  Yes, sir.
4         Q  "Yes, sir.  We're monitoring traffic.  It's a
5    little slow for your typical post, but we're on it."
6         That's how you responded to Mr. Bilzerian?
7         A  Yes, sir.
8         Q  And he tells you, "I feel like it was good, and
9    I mentioned the Alpha and vitamin, too."  Do you see
10   that?
11        A  Yes, sir.
12        Q  And then we go into the part that we just
13   looked at here a minute ago; is that right?
14        A  Yep.
15        Q  And now, notwithstanding everything you just
16   shared to me, we talked at the beginning of this
17   deposition about how you had a direct line to
18   Dan Bilzerian's cellphone, true?
19        A  Yes, sir.  Yes, sir.
20        Q  And, in fact, you could text directly with
21   Mr. Bilzerian at this time, because you were doing it,
22   true?
23        A  Yes, sir.
24        Q  And you could have picked up the phone after
25   you made this revelation that you just shared with us,

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 281

1   and you could have called Mr. Bilzerian, true?
2       A   Yes, sir.
3       Q   And you did not ever do that and ask him to
4   remove the post, correct?
5       A   I did not, because at that time Dan had gone to
6   bed; and -- and getting ahold of Dan is -- can be -- is
7   exceptionally hard, and there's -- I was -- we were --
8   we were just happy that there was a STEEL post made with
9   STEEL products, because it hadn't been done for some
10  time.
11          And we -- we were kind of in shock and awe and
12  processing, okay, this tryptophan matter, you know,
13  later that day, it's like, how do we -- you know, this
14  is -- this is a bit of an issue considering it's -- we
15  have a sleep product called Rested and, you know,
16  what -- what do we do from here?
17          I wasn't -- it was hard to -- it was a bit of a
18  shock, if you will.  It was like a
19  deer-in-the-headlights situation for myself and the
20  team.
21      Q   Okay.  Let's just be clear, though, how this
22  ended with Mr. Bilzerian.  Your communication to him, at
23  least the last one concerning this, was "It is titties,"
24  yes?
25      A   Well, yeah, because, I mean, if he -- if he

Page 282

1   posts up STEEL products in a way that, you know, he's
2   saying I'm using these, then we can get, you know,
3   surges in traffic.  So anytime that there are surges in
4   traffic, it's -- you know, it's -- it's -- it's -- it's
5   a good thing, right?  It's exciting because the
6   marketing team gets to ramp up their efforts and -- and
7   do what they do to try to capture sales and to
8   communicate with the customers via live chat; and so,
9   yeah, it's -- any -- anytime Dan posted, it was -- you
10  know, we were just, like, you know, grateful because it
11  didn't happen very frequently.
12      Q   Well, we've talked earlier.  Mr. Bilzerian had
13  the discretion on how frequently or infrequently he had
14  to post, correct?
15          MR. STEARNS:  Object to the form.
16      A   Yeah.  He had the discretion to post to the --
17  you know, the best of his abilities; but, you know, when
18  things got -- when you started to see how frequently he
19  would post for, let's say, the Ignite brand, we quickly
20  learned that it was -- it was quite -- it wasn't
21  parallel in terms of what he was doing for STEEL.
22  Therefore, we realized that his capabilities far
23  exceeded what he was doing for us, and it -- it -- you
24  know, it hurt.  It -- it was, well, why -- if you can do
25  that for, you know, Ignite and -- and ZRO and post that

Page 283

1   many times in X amount of period, why couldn't we -- why
2   couldn't we have done this for STEEL all these -- all
3   this time?
4   BY MR. McCOY:
5       Q   Did Mr. Bilzerian post more for STEEL at the
6   beginning part of the relationship?
7           MR. STEARNS:  Object to the form.
8       A   The beginning was a little trickier.  I feel
9   like there was more postings that took place -- more
10  frequency in the 2019 time frame, 2019 to -- yeah, that
11  '18 to '19, there were -- it started to uptick a bit
12  more.
13          I think Dan started to recognize -- along with
14  his team, they recognized that, you know, we weren't
15  exactly the inexperienced social media and digital
16  company that we were and that we had the ability to
17  market and capture customers and -- and treat our
18  customers in a way that just isn't typically seen in the
19  industry.
20          And, you know, Dan and his team, I feel that
21  they -- you know, I was told by, you know, certain -- by
22  individuals on his team and Dan that, you know, we're
23  doing -- we're doing a pretty good job and that, you
24  know, it's -- it goes unspoken that if Dan is wanting
25  the Ignite team to converse with our team on how to

Page 284

1   better, you know, build the Ignite brand and to, you
2   know, increase engagement and traffic and capture this
3   traffic, you know, that's also taken as a compliment as
4   that we know what we're doing and how to -- how to build
5   a company on a Web-based platform.
6           So, you know, I -- you know, that's when things
7   started to pivot, because in the beginning of the
8   relationship, it was off to a bit of a rocky start.  And
9   he had sent me a text message regarding I don't want to
10  stand behind one brand; but at some point, either 2017 I
11  started to get wind that there was talks of him
12  promoting another brand, which was -- I think it was --
13  it was Ignite and some of the ideas behind it.  And this
14  was all -- it was kind of disheartening to learn that;
15  but, you know, what -- there's nothing in our agreement
16  that says he can't do that, so I didn't put up a fuss.
17          I did ask him, like, you know, "Well, I know
18  you're focusing on this; but, you know, what -- what
19  about -- what about our, you know, relationship, and,
20  you know -- you know, where are you at with that?"
21          And there really wasn't much of a response
22  until months down the road, and -- and I think he
23  started to realize that, you know, we weren't -- we were
24  more proficient at what we were doing than -- than they
25  had thought.

888.909.2720          Anthem Reporting          813.272.2720

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 285

```
1    BY MR. McCOY:
2       Q   As -- as STEEL got better at social media, did
3    it feel like it did not need the relationship with
4    Mr. Bilzerian any longer?
5       MR. STEARNS:  Object to the -- I'm going to
6    object to the form of that question, Kevin.
7       A   We -- we -- I don't know if you could say we --
8    as we got -- I mean, we're always working on getting
9    better; but when -- from the get, we had pretty good --
10   a pretty good amount of experience on social media prior
11   to Dan.  And we had a team that was very well acquainted
12   with the social media space and how to produce sales.
13      The team, yeah, was very equipped and -- and
14   well-acquainted with it.  That's why, you know, it
15   worked as well as it did and still does.
16   BY MR. McCOY:
17      Q   So let's go back to Exhibit 9, and I want to
18   understand.  We're -- we're at Exhibit 9, Blitz 682.
19   Can you see that, sir?
20      A   Yes, sir.
21      Q   And I want to specifically focus in on this
22   comment you make.  "With all the data we have, the bests
23   post just resided around you organically training and
24   posting."
25      Do you see that?
```

Page 286

```
1       A   Yes, sir.
2       Q   And was that true, that the best post for
3    Mr. Bilzerian resided around when he just posts like
4    he's naturally working out and using the product?
5       A   Yeah, because we've done some experimenting.
6    Dan had done some experimenting with posting just still
7    shots and products and -- and that weren't necessarily
8    in the background of a gym and things of that nature.
9    They didn't do as good.
10      Q   All right.  And then we get to the -- let's see
11   here.  I don't want to do any more.  That's fine.
12      Let's talk about Full Send.  Obviously, you're
13   aware that's an allegation that's in the complaint as
14   well?
15      A   Yes, sir.
16      Q   Do you have any facts to support anything
17   beyond what is just said in the complaint that there was
18   some relationship between Mr. Bilzerian or Blitz with
19   Full Send?
20      MR. STEARNS:  Object to form.
21      A   Outside of the complaint, there's -- you know,
22   there's -- there's pictures and marketing-type, you
23   know, vid-- or videos of them being associated.
24   BY MR. McCOY:
25      Q   Well, the complaint shows the picture of the
```

Page 287

```
1    red bag in the back of the truck, right?
2       A   Yes, sir.
3       Q   And beyond there being a red bag in the back of
4    the truck next to some guns, are you aware of any other
5    facts that would suggest Mr. Bilzerian was promoting any
6    kind of bodybuilding product on behalf of Full Send?
7       MR. STEARNS:  Object to the form of the
8    question, Kevin.
9       A   I'm not aware outside of the promotion of the
10   brand on the bag.
11      (Exhibit Number 11 marked for identification.)
12   BY MR. McCOY:
13      Q   I want to get over and make sure we have time
14   for this.  I've marked it as Exhibit 11, and I don't
15   want to go through the entire video.
16      You appeared on a podcast with -- let me get to
17   my -- Redcon1 in May of 2020?
18      A   Yes, sir.
19      Q   And I have here marked as Exhibit 11 the media
20   file.  It looks like it's an hour and 44 minutes.
21      A   Yes, sir.
22      Q   Redcon1 is a manufacturer of competing
23   bodybuilding supplements, true?
24      A   Yes, sir.
25      Q   And you appeared on their podcast as a guest,
```

Page 288

```
1    true?
2       A   Yes, sir.
3       Q   And in doing that, you were intending to create
4    content that you thought would reach STEEL's customers,
5    true?
6       MR. STEARNS:  Object to the form.
7       A   Reach STEEL?  Well, this is an -- it's an --
8    it's a -- this is a Redcon podcast.
9    BY MR. McCOY:
10      Q   Okay.  So you were -- go ahead.  I'm sorry.  I
11   didn't mean to cut you off.
12      A   I've been friends with Aaron for -- well, I
13   shouldn't -- we're not close friends, but I've known
14   Aaron in the industry for many years.  And he had asked,
15   "Hey, would you be -- you know, I'm trying to start this
16   podcast up.  Would you do me a favor and would you like
17   to come on?  And, you know, we just wanted to kind of
18   get our feet wet with it."
19      And I was like, "Yeah, sure.  Why not?"
20      Q   All right.  Let me just ask you this without
21   going through the whole video.
22      A   Yes, sir.
23      Q   Are there any statements in the Redcon1 podcast
24   from May of 2020 that you would say are untrue?
25      MR. STEARNS:  I'm going to -- I'm going to
```

72 (Pages 285 to 288)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

| Page 289 | Page 290 |
|---|---|

**Page 289**

1    object to the form of that question, Kevin.
2         MR. McCOY:  Okay.
3         A  Gosh, not to my knowledge.  I try to -- I
4    always try to speak from the heart.
5    BY MR. McCOY:
6         Q  You didn't go on that podcast and lie about
7    anything?
8         A  Not that I can recall.  I mean, if you -- if
9    you played maybe a clip, maybe I could --
10        Q  Let's go to 1:34, and we'll play Exhibit 2 --
11             (Video played.)
12        MR. McCOY:  Whoops.
13        MR. STEARNS:  I'm having a hard time hearing
14   the audio file.  Can you guys hear it okay?
15        THE WITNESS:  Yeah, it's a little -- it's a
16   little un- -- it's unclear.
17             (Video played.)
18        THE WITNESS:  It's like it's a little muffled.
19        MR. STEARNS:  Okay.  I cannot hear it at all.
20             (Video stopped.)
21   BY MR. McCOY:
22        Q  Is that true, Mr. Bilzerian has used all of the
23   STEEL products?
24        MR. STEARNS:  I'm going to object to the form.
25   I didn't hear any of that stuff, so...

**Page 290**

1         A  Kevin, I didn't -- I didn't hear the audio.
2         MR. STEARNS:  It sounds like it's garbled.
3    It's talking underwater.  I -- can the court
4    reporter hear it?
5         THE COURT REPORTER:  (Shakes head.)
6         MR. STEARNS:  She's saying "No," so nobody can
7    hear the video, Kevin.
8         MR. McCOY:  Okay.
9         A  If -- did you just want to ask me what I
10   stated?
11   BY MR. McCOY:
12        Q  Oh.  Oh.  Oh, wait a minute.  Yeah, I would
13   like to ask you.  Do you recall making the statement on
14   the podcast that you believed the pie is big enough for
15   everyone to have a piece?
16        A  In regards to the -- I think it was in regards
17   to the -- the company, like two different companies
18   talking with each other, like Redcon and myself.
19        Q  Yes.  Yeah, in connection with a discussion
20   about you coming on the podcast and them being a
21   competitor, it's a $38 billion industry.  Do you
22   remember that part of the conversation?
23        A  Vaguely, yes.
24        Q  And you said, you firmly believe the pie is big
25   enough for everyone to have a piece?

| Page 291 | Page 292 |
|---|---|

**Page 291**

1         A  I -- I'm pretty sure I said that.
2         Q  Okay.  And is that true, that you -- you
3    believed that then?
4         A  Yeah.  I mean, it's -- it's good to -- yeah,
5    you know, it's good to have some level of competition.
6    You want to improve yourself.  It's no different than
7    Steve Jobs and Bill Gates, you know, doing their --
8    their -- their appearances together and talking with the
9    community and an audience of people that were MAC fans
10   and PC fans.
11        So I don't see why, you know, two very
12   intelligent people that have some -- have built some
13   mega companies, some of the biggest companies in the
14   world today, that they can have a conversation and be
15   respectful of each other, I don't understand why I
16   couldn't.
17        Q  All right.  And do you recall talking about the
18   social influencers that STEEL has and that they do not
19   endorse a product that they do not feel comfortable
20   endorsing, not organic, and don't genuinely use it,
21   people are going to know, and I don't want to lie?
22        MR. STEARNS:  Object to the form.
23        A  I -- I -- I'm sure I -- you're saying I did say
24   that?
25   BY MR. McCOY:

**Page 292**

1         Q  Yeah.  Do you recall saying that?
2         A  I don't recall, but it sounds like something I
3    would say because, you know, we -- we don't force any of
4    the affiliates to take a particular product or endorse
5    it if it -- you know, if it doesn't -- if it's not
6    something that they use, we won't force them, no.
7         Q  And that's because if people are promoting a
8    STEEL product that they don't use, your customers are
9    going to know?
10        MR. STEARNS:  Object to the form.
11        A  Not necessarily.  I -- you know, we just want
12   it to kind of flow as naturally as possible and have our
13   affiliates be comfortable, you know.  We don't want to
14   come across as overbearing, because a lot of companies
15   will -- they'll say, "Hey, we've produced this marketing
16   material, and we need you to post this," and it's --
17   it's built into the relationship.  And a lot of people
18   that we've brought on have expressed that they've
19   experienced that, and it's not always -- it -- it's not
20   the most pleasant way to go about marketing.
21   BY MR. McCOY:
22        Q  All right.  And when you talk about the
23   affiliates, is that something different than
24   Mr. Bilzerian, or does that same principle apply to the
25   relationship with Mr. Bilzerian before STEEL terminated

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

## Page 293

1  the agreement?
2       A  Yeah.  I mean, you can't -- I mean, you
3  couldn't tell Dan what to post, you know, if you tried.
4  Dan's going to do what Dan wants to do; and, you know,
5  I -- we respect that.
6       Q  All right.  Let's go back to Exhibit 9 real
7  quick.  Let's zoom in.
8       And Exhibit 9 looks like it is you and
9  Mr. Bilzerian in April of 2017, from Blitz 127 on,
10  discussing a video post that involves a product called
11  C4.  What is C4?
12       A  That's a preworkout product.
13       Q  And did you approve of Mr. Bilzerian posting
14  the post that contains STEEL with C4 and the other red
15  product right here in the middle of page Blitz 130?
16       A  Yeah.  He had asked me about it.  It was -- you
17  know, it was his way of doing a comparison, if you will,
18  or he -- you know, he didn't like those other products
19  in regards to, you know, their lack of effectiveness.  I
20  think he even made a comment about how he opened one up,
21  and it was like half-empty, like a bag of potato chips.
22  And he wanted to do this comparison as to why he would
23  prefer to, you know, use a STEEL product over a
24  competitor.
25       Q  Are you aware of any sales of any product that

## Page 294

1  STEEL lost as a result of Mr. Bilzerian's post on
2  July 3, 2020, showing the Treigning Lab product?
3       A  That we could -- well, like STEEL's -- if -- if
4  you would have -- yeah, I would say there were sales
5  lost because if he had promoted Rested, it's very
6  possible it could have equated to Rested sales, but --
7  so I guess you would classify that as sales lost.
8       Q  And your position would be that the promotion
9  of a product that just contains tryptophan would be the
10  promotion of a bodybuilding supplement?
11       MR. STEARNS:  Object to the form.
12       A  Yeah.  Yeah, I mean, it's a -- it's a -- you
13  know, it helps to induce sleep.  It's a -- it's a type
14  an amino acid that also aids in recovery of muscle,
15  yeah.
16  BY MR. McCOY:
17       Q  So would Mr. Bilzerian had been able to promote
18  Perdue Turkeys?
19       MR. STEARNS:  Objection.
20       A  Well, I mean, you can find tryptophan in all
21  kinds of, you know, meat' but that's not -- you know, an
22  actual animal, I wouldn't consider to be a supplement.
23  That's -- that's a -- that's an actual -- that's a
24  natural whole food.  And all of the plants matter and
25  animal products that we ingest aren't -- they're not

## Page 295

1  considered supplements.
2       MR. STEARNS:  Can I -- Duke, do you have a tape
3  time on you?
4       THE VIDEOGRAPHER:  Do I have a what?
5       MR. STEARNS:  How much time are we on?
6       THE VIDEOGRAPHER:  We have, like, 15 minutes or
7  so.  At 6:07 is when we're supposed to -- we're
8  going to hit that seven-hour mark.
9       MR. STEARNS:  Excellent.  Thank you.
10       THE VIDEOGRAPHER:  Uh-huh.
11  BY MR. McCOY:
12       Q  So you talked earlier about an algorithm,
13  Mr. Huh, in terms of -- I think it was Instagram; that
14  if you -- we were -- it's been hours now, but there's
15  an --
16       A  Yes.
17       Q  -- algorithm where if you posted some kind of
18  content, it may not get much traction because they just
19  know you're not going to like it versus other contact
20  may get other traction.
21       What -- what are the -- do you understand how
22  the algorithm works and what are the triggers for stuff
23  to get more traction?
24       A  I by no means am an expert in -- in regards to
25  the algorithm.  Definitely not a -- like I said, I'm not

## Page 296

1  a -- I'm not a tech guy; but from my rudimentary
2  understanding of it is the algorithm is in place to give
3  people what these big social media-based companies think
4  that people want.
5       So if you were to click -- if you were to go
6  onto your Instagram explore page and you were to look at
7  cars and -- and keep -- continuously look at cars, the
8  algorithm -- they have developed algorithms that are
9  intelligent enough to identify the cars that you're
10  looking at down to the types of cars that you're looking
11  at, and it will continuously feed you those types of
12  cars.  I mean, to the extent -- that's what I understand
13  of it.
14  [REDACTED]

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL



**Page 297**

**Page 298**

13    Q  I don't want to go over anything we've already
14  talked about here today, but are you aware of any other
15  facts that would support the suggestion that
16  Mr. Bilzerian did not use his best efforts to try to
17  promote STEEL's products?
18      MR. STEARNS:  Object to the form.
19      A  Facts?  I mean the fact that, you know, there's
20  been many posts for the Ignite brand and -- and many
21  posts for the ZRO drink in a very short period of time
22  in comparison to the time frame in which he's posted for
23  STEEL, those -- those posts are kind of like -- I mean,
24  those are the facts that we have.  It's -- that's the
25  business that we're in is to -- you know, market; and

**Page 299**

1  when you promote things in a -- you know, as though it's
2  a product geared toward the fitness industry, people
3  that are looking to better themselves, physically,
4  mentally, emotionally, you know, that's -- and as many
5  times as you do, it's -- I mean, it's the -- that's --
6  it's right there, and it was far more than -- than
7  encompassed the entirety of our relationship, which
8  is -- it's unfortunate, but that's just the way it is.
9      Q  I understand.  So what I take from all of that
10  is you have -- you have concluded that Mr. Bilzerian
11  posted more on behalf of Ignite-related products than he
12  posted on behalf of STEEL, correct?
13      MR. STEARNS:  Objection.
14      A  Yes.
15  BY MR. McCOY:
16      Q  And you have, therefore, concluded that because
17  he posted more on behalf of Ignite products than STEEL
18  products, he did not use best efforts under the contract
19  with Blitz to promote STEEL products, true?
20      MR. STEARNS:  Objection.  Legal -- legal
21  question, but...
22      MR. McCOY:  Not really, no.  Is that what
23  you --
24      MR. STEARNS:  You don't think so?
25      MR. McCOY:  No.

**Page 300**

1      MR. STEARNS:  Oh, okay.
2  BY MR. McCOY:
3      Q  Is that what you've concluded, sir?
4      A  I'm --
5      Q  Yeah.  Let me do it again.
6      A  Please.  When you guys go back and forth, I
7  lose my train of thought.
8      Q  That's fine.
9      You've concluded that Mr. Bilzerian posted more
10  for Ignite products than STEEL products, true?
11      MR. STEARNS:  Object to the form.
12      A  Based upon what I've seen, you know, I don't
13  have an exact number off the top of my head; but I'm --
14  yes, that -- that would be the case.
15  BY MR. McCOY:
16      Q  All right.  And because he posted more for
17  Ignite products than STEEL, have you concluded that he
18  did not use best efforts to promote STEEL's products?
19      MR. STEARNS:  Objection.
20      A  Yeah, that -- that would definitely -- I think
21  most people's views, they would say why -- why would you
22  spend this much time with -- in a relationship and, you
23  know, you're -- you've got kids, and you have a family,
24  and you have children.  You have to be very considerate
25  of each child in the amount of, you know, time you spend

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                           49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 301

1    with each child; and you don't want it to be lopsided or
2    else it can cause detrimental effects not only to the
3    child but the family unit as a whole and, therefore,
4    yourself.
5    BY MR. McCOY:
6        Q   Let me go through my notes here. We're almost
7    done, because we have to be; but I might be -- I might
8    even get us out of here a few minutes early. Hold on.
9        Mr. Bilzerian discussed with you the idea of
10   revealing the nature of his relationship with STEEL on
11   multiple occasions?
12       A   I'm sorry. I'm sorry, Kevin.
13       Q   Let me ask you a better question.
14       You and Mr. Bilzerian discussed the idea of
15   Mr. Bilzerian revealing to the public the nature of the
16   relationship between him and -- and STEEL, correct?
17       MR. STEARNS: Objection.
18       A   We -- we've had discussions regarding that over
19   the years a few times, yeah.
20   BY MR. McCOY:
21       Q   And in those discussions, you told
22   Mr. Bilzerian it was better to remain organic in how the
23   relationship appeared, correct?
24       MR. STEARNS: Objection.
25       A   I think it was -- I don't remember a specific

Page 302

1    conversation; but, you know, we were -- we were both on
2    the -- on the same page with wanting to post in a way
3    that was -- that seemed natural.
4    BY MR. McCOY:
5        Q   Meaning it would not appear that Mr. Bilzerian
6    had a financial relationship with STEEL?
7        MR. STEARNS: Objection.
8        A   We -- we wanted super -- well, early on in the
9    relationship, we wanted to align, but Dan insisted that
10   we didn't.
11   BY MR. McCOY:
12       Q   Align in what way?
13       A   Oh, publicly -- I'm sorry -- to -- to make it,
14   you know, publicly -- oh, I mean, make the public that
15   were following Dan and STEEL, that we were in a
16   relationship, if you will, a business -- like a -- how
17   would -- I'm sorry. It's late in the day.
18       Q   That's all right. Your testimony is that
19   Mr. Bilzerian is the one who declined to reveal that
20   relationship?
21       A   He -- he wanted to hold off on any -- any
22   revealing of that. It was just he wanted to post
23   products as though we were -- you know, he was using
24   these products and it was not a paid-for relationship
25   because he said that felt better to him, and it was --

Page 303

1    he felt that it would feel more natural for him and that
2    it could garner a better response from his following.
3        We wanted to align, but it just -- you know,
4    when -- when Dan has something in his head, it's like,
5    you know, I was -- I was just trying to make the best of
6    what we had going on, and so we -- I didn't try to fight
7    him too much on it.
8        We had brought it up on a few occasions, and it
9    was -- it was a pain point that it was just kind of hard
10   to touch on.
11       Q   Dan was using STEEL products, correct?
12       A   To my knowledge, yes. I mean, I guess he could
13   have lied and said he wasn't using them; but he told me
14   he did, and he told me that -- the effects that he had
15   gotten from them.
16       Q   Okay. And -- and you had communications in all
17   of these texts that we're seeing about actually helping
18   train Mr. Bilzerian? That's how the relationship
19   started, when we started talking about that hours ago,
20   right?
21       A   Yes, sir.
22       Q   And Mr. Bilzerian was not paid per post,
23   correct?
24       A   I'm sorry. Paid per post?
25       Q   Yes, sir. There was no arrangement where

Page 304

1    Mr. Bilzerian was paid for each post?
2        A   No, sir.
3        Q   And he did not get a percentage of any sales
4    off any individual posts, correct?
5        A   No, sir.
6        MR. STEARNS: Object to form.
7    BY MR. McCOY:
8        Q   And he had discretion on what products he would
9    or would not use, true?
10       MR. STEARNS: Object to the form.
11       A   Yeah. We -- again, we wouldn't try to push
12   him, you know. We -- we would send him everything that
13   we had, and I would explain to him what these products
14   did. And, you know, he communicated to me that "I don't
15   do well with high-stimulant products due to some health
16   issues that I've had."
17       And I respected that, and I would -- I would
18   never try to push -- push him to take a product that he
19   wasn't comfortable taking.
20   BY MR. McCOY:
21       Q   Did you find that any posts Mr. Bilzerian made
22   concerning STEEL products were misleading in any way?
23       A   Gosh. Sometimes Dan can inflate things, but
24   that's just -- that's -- you know, that's how -- that's
25   how Dan is. And -- and sometimes inflating, I guess,

76  (Pages 301 to 304)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 305

1  could cause somebody to be misled; but I would imagine
2  the majority of his audience knows that this is Dan and,
3  you know, Dan is Dan, and they -- you know, they can
4  read between the lines, if you will.
5      Q  What does that mean, "read between the lines"?
6      A  Oh.  You know, they know that Dan can be
7  exaggerating or making a -- making a joke of something,
8  but they understand it was a joke.  They -- they
9  wouldn't take it literally.
10     Q  Give me one minute.  There's one more document,
11 and now I'm not finding it.
12     A  Yes, sir.
13     Q  Where did that go?  There was an email -- and I
14 can't find it right now -- with an advertising agency
15 down in Florida, Red -- aah.  Red -- Red -- aah.  Where
16 did that go?
17     A  You said red?  Red or rev?
18     Q  R-e-d.  Yeah, Red -- Red -- Red Fix or
19 something like that where you and Mr. Bilzerian or
20 people were talking about an ad campaign, and you were
21 laying out what you would like from Mr. Bilzerian.
22     A  Oh, gosh.
23     Q  Hmm.
24     A  Are you talking about Demand Exposure?
25     Q  Demand Exposure --

Page 306

1      A  Yes, sir.
2      Q  -- yeah.
3          And in there the gentleman laid out a
4  conversation that he had where you had laid out some
5  bullet points that you were requesting as part of the --
6  as part of the relationship.  Does that ring a bell?
7      A  I don't recall -- I -- I -- it can ring a bell,
8  but I don't recall seeing an email.
9          I know around the time that would have
10 happened, it was -- you know, tensions were running
11 high, and there was a lot of misunderstandings, I think,
12 on both sides where, you know, we were trying to -- we
13 had an idea of how things needed to be marketed based
14 upon our experience and what we knew was kind of working
15 and --
16     Q  Here we go.  I found it.  Let's just do this,
17 and then I think we're done.
18     A  Understood.
19     Q  So I'll mark this as -- I don't know what we're
20 up to.  I'll mark it and put it in the folder here.
21     (Exhibit Number 13 marked for identification.)
22 BY MR. McCOY:
23     Q  Rex Raymond, that's the name I was looking
24 for --
25     A  Oh, yes, sir.

Page 307

1      Q  -- at Demand Exposure.
2          And in here Friday, December 15, 2017, "Notes
3  to Review for Still/Bilzerian Addendum."
4          And he's saying that Rob -- I presume that's
5  Rob Hagan?
6      A  Yes, sir.
7      Q  Yep, yep.  Let me get it bigger.  That's
8  Rob Hagan?
9      A  Yes, sir.
10     Q  And he recounts in here a conversation with
11 Jason the other night.  "He sent me some parameters he
12 would like included, along with the original outline,"
13 and he's bullet-pointing it.
14     A  Right.
15     Q  Do you recall -- is the "Jason" here you,
16 Jason Huh?
17     MR. STEARNS:  Object to the form.
18     A  I'm assuming, yes, that would be me.  Yep.
19 BY MR. McCOY:
20     Q  Do you recall having a conversation around this
21 time in December of 2017 with Rex Raymond?
22     A  I don't remember exact conversation, but I
23 wouldn't say that it didn't happen.
24     Q  And this was in discussion about putting
25 together some kind of an advertising campaign with

Page 308

1  Mr. Raymond being involved?
2      A  Yeah, Rex Raymond, the Demand Exposure Company
3  was -- they were the company that helped us put together
4  that -- that high-production video where they sourced
5  actors and various film crew -- or film crew and props
6  and whatnot that -- that we paid around 100 grand for.
7      Q  And he recounts in here in these bullet points
8  what STEEL wants from Dan in 2018, and he lists out six
9  bullet points.  Do you see those?
10     A  Yes, sir.
11     Q  And do you agree that that accurately reflects
12 notes of a conversation you had with Mr. Raymond in
13 2018?
14     MR. STEARNS:  Object to the form.
15     A  Can you just give me a second to read --
16 BY MR. McCOY:
17     Q  Sure.
18     A  -- this, Kevin?
19          Yeah.  Okay.  I -- I -- I've read this, yep.
20     Q  Yeah.  My question -- and then I think we're
21 done:  Does this accurately reflect the six bullet
22 points of what STEEL wants from Mr. Bilzerian in 2018?
23     A  At that -- at that time is when there was a lot
24 of friction in regards to what we thought would -- Dan
25 thought would be better for marketing and what we

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

|  | Page 309 |
| --- | --- |

1   thought; and based upon our understanding of the space
2   and how people were responding and purchasing products,
3   Dan wasn't doing any postings.  And it was basically a
4   hostile stage where Dan said I'm -- well, he'd stay, but
5   he practically didn't post until -- it was said, but it
6   was, "I'm just not posting until we get a viral video
7   done."
8       So at the time, you know, understanding that I
9   have to invest 100,000 into this high-production video,
10  I was just like, "Man, this is a lot of money for us,
11  and knowing that it's very possible that this won't be
12  very effective; you know, with that being said, can we,
13  you know, ask something of you in return?  But --
14  because there was just no postings.  So if we could get
15  some kind of agreement where we could work together and
16  be more proficient about what we're doing and you could
17  be posting on a more regular basis, that would -- that
18  would be great; and, you know, we'll move forward with
19  producing the video.  But they -- you know, they
20  declined and ignored the idea of it, and I just -- I
21  went about it -- I went about producing the video
22  regardless just to be -- like a show of good faith that,
23  you know what?  I'll eat this, and I'll do it.  And
24  it -- it might not work.  It probably won't work, but at
25  least I'll show them that we're -- you know, we're

|  | Page 310 |
| --- | --- |

1   committed to trying to make this work.
2       But it didn't.  It failed and, you know -- I
3   shouldn't say "it failed."  It just -- it didn't garner
4   the reaction that Dan said it would and/or he thought it
5   would.  I was very disappointed.
6       And I think after that it was -- it wasn't too
7   long after that that I think Dan realized, You know
8   what?  These guys -- they're -- you know, they're
9   stand-up dudes.  Like, they went the distance.  They
10  produced this.  It didn't work.  They're willing to go
11  the distance and -- and -- and -- and do what I ask of
12  them, and -- and so Dan was more cooperative.
13      And I remember after producing the video, we
14  were -- you know, we were really disheartened with the
15  whole situation and how it really just didn't work.  And
16  so there was a call that we had all got on, a conference
17  call -- myself, Jake, Tony Pasquale, I'm sorry, Jacob,
18  and Tony Pasquale.  And at the time, Jason Verona had
19  come on board, and Dan was a part.  And we just wanted
20  to, you know, express, you know, can we -- can we get
21  some kind of clarity on -- hey, can we get some kind of
22  commitment at least to when you would post?  We know
23  it's to your discretion, but can we get more
24  consistency?  Once a quarter would be great.
25      And so Dan, on those conversations, said, "You

|  | Page 311 |
| --- | --- |

1   know what?  We'll do once a quarter," and things were --
2   you know, the conversation was very civil.
3       But Jason Verona really facilitated to helping
4   us all communicate a little bit better and to move
5   forward in a more, you know, workable fashion, if you
6   will.
7       Verona -- you know, he really -- you know,
8   without Verona coming into the mix, it would have been
9   extremely difficult.  Verona was -- he was solid.  I --
10  I -- I -- I got -- you know, I got nothing bad to say,
11  you know, about Verona and the efforts that he tried to
12  put in to make our -- make our relationship work and --
13  and for us to be able to communicate respectfully and to
14  gets posts done.  Because he recognized the value in
15  STEEL.  He mentioned that, you know, "It's quite amazing
16  what you guys have done so far, and I'll do my best to,
17  you know, work with Dan and -- and communicate with him
18  when you guys -- you know, when postings will -- will
19  take place and, you know, get him the product and put it
20  in front of him and give him reminders and get" -- you
21  know, during that time period Jason Verona was -- I was
22  very grateful to be able to have somebody to communicate
23  that was wanting to try to help.
24     Q  My question, Mr. Huh, I just want to confirm
25  that what's on STEEL 234 that we're going to mark as --

|  | Page 312 |
| --- | --- |

1   I think it's either 11 or 12 -- that accurately reflects
2   your conversation with Mr. Raymond about what STEEL
3   wants from Dan in 2018?
4       MR. STEARNS:  Object to the form of the
5    question.
6     A  Again, we may have had a conversation.  I'm
7   sure he shot over some ideas, and -- and Tony had some
8   ideas.  And I would have seen this and -- and -- you
9   know, with them conversating back and forth and when we
10  brought those bullet points out, you know, it got sent
11  over.  So I don't remember the exact conversation, but I
12  would have said -- I'm assuming I would have said
13  something to the effect, "Yeah, that would be great, but
14  I don't know how probable that is based upon how, you
15  know, Dan is."
16  BY MR. McCOY:
17     Q  Let me ask -- maybe let me ask another way.
18  I'm sorry.  I don't know why it's difficult.
19     Did you want a 30-day termination clause,
20  either party may execute to terminate the contract?
21       MR. STEARNS:  Objection to form.
22     A  Yes.
23  BY MR. McCOY:
24     Q  Is that true or not?
25     A  I mean, it's there, and he sent that over.

78 (Pages 309 to 312)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)      49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 313

1    It's very possible that I was like, yeah. I mean, if
2    they were open to that, then we -- then we could make
3    that happen. Because at the time both parties were --
4    we were butting heads, if you will, trying to get a
5    better understanding for each other and where each other
6    were coming from.
7        So we -- we wanted to give each other some
8    flexibility that like, "Hey, Dan, if you're not happy
9    with us, then, you know, you can do your thing and part
10   ways; and if -- you know, if we're just not making it,"
11   where we could do the same, but that -- that never was
12   implemented, obviously.
13       Q  Understood. Number 4, "A performance clause
14   with parameters based on a minimum of 700K views per
15   video posted X6."
16       Is that something that you wanted from Dan in
17   2018?
18       MR. STEARNS: I'm going to object to the form.
19       Are you almost done, Kevin? You're over time.
20       MR. McCOY: I know. I didn't realize we were
21   going to -- some of those last answers were longer
22   than I was expecting based on the question, so I am
23   almost done.
24       MR. STEARNS: That's fine. That's fine.
25   You're almost done, though?

Page 314

1        MR. McCOY: Yeah, I am. Well, I'm not doing
2    any more exhibits. I just want to go through this
3    one.
4        MR. STEARNS: All right.
5        A  The performance clause, it would -- it would
6    have, you know, been nice just because it would help to,
7    yeah, regulate how often and when and what.
8    BY MR. McCOY:
9        Q  And then "A minimum of one STEEL-related post
10   on either Facebook or IG per month created by Dan,
11   except the months he posts the viral videos."
12       Is that a -- is that something that STEEL
13   wanted from Dan in 2018?
14       MR. STEARNS: Object to the form.
15       A  Yeah, I'm sure at the time it's something we
16   wanted; but, you know, it was a far cry from being
17   possible.
18   BY MR. McCOY:
19       Q  And then "Post the viral videos on both
20   Facebook and Instagram on a predetermined day."  Is that
21   point 3 something that STEEL wanted from Dan in 2018?
22       MR. STEARNS: Object to the form.
23       A  That's very possible, yes.  Yeah, because it's
24   very hard to -- I shouldn't say it's very hard.  It's
25   just it's nice to have some kind of notice that

Page 315

1    something is going to take place, a post.  And we just
2    want to be prepared and do the best that we can, but
3    that -- that rarely ever happened.
4    BY MR. McCOY:
5        Q  And then point 5, you wanted "Dan to forego his
6    Jan commission" -- I presume that's January of 2019 --
7    "to help pay for the video production. (STEEL feels Dan
8    has been greatly overpaid based on a lack of
9    participation.)"
10       Did -- did you feel that way as of December of
11   2018, that Dan had been greatly overpaid?
12       A  I think we -- we had all felt that way based
13   upon, you know, the lack of postings out the gate.
14       Q  Okay.  And I think that's it for this
15   particular document. I'll stop share.
16       You were talking just a minute ago with
17   relation to that document about the video.  That's the
18   $100,000 video we talked about earlier today, right?
19   There's not a separate production?
20       A  No.  That's the only one that we did.
21       Q  Okay.  All right.  I think that's it.  I
22   appreciate your time, Mr. Huh.
23       Will you confirm that during the period of time
24   while we have been on the record today you have not
25   communicated with anyone via text, chat, email, or any

Page 316

1    other form of communication other than you and me
2    talking through the camera?
3        MR. STEARNS: Well --
4        A  Yes, sir.
5        MR. STEARNS: -- objection.  You mean about
6    this lawsuit and stuff?  I mean --
7    BY MR. McCOY:
8        Q  I mean, while we've been on the record, have
9    there been any texts, chats, communications, emails
10   while you've been giving testimony today, sir?
11       A  No, sir.
12       MR. McCOY: Okay.  All right.
13       MR. STEARNS: Oh.  I misunderstood your
14   question.  Like, while you're talking, you meant --
15   is what you're saying?
16       MR. McCOY: Yeah, yeah, yeah.  I don't mean --
17       MR. STEARNS: Oh.
18       MR. McCOY: -- whatever's happened --
19       MR. STEARNS: I was saying, he's running a
20   business, so I didn't know --
21       MR. McCOY: No.  I probably have 400 emails
22   from people that want stuff two hours ago that I
23   haven't --
24       MR. STEARNS: Understood.  No, I just didn't
25   understand what the question was, Kevin.

79 (Pages 313 to 316)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 317

```
1        MR. McCOY:  Okay.  I think that's it for us.  I
2   appreciate your time.
3        You have the right to read and sign or you can
4   waive that.  I'll let your counsel tell you.
5   Whatever we're going to do, we'll state it on the
6   record, and then we're done.
7        MR. STEARNS:  We will read.
8        MR. McCOY:  Thank you.
9        All right.  And, Bev, you've got my order
10   already.  So thank you very much, and we'll --
11        THE VIDEOGRAPHER:  Just stick around for a
12   second.  I'm going to take us off the record, and
13   then I just wanted to talk to you real quick.
14        MR. STEARNS:  And, Bev, I'll take a copy.
15        THE VIDEOGRAPHER:  This concludes the
16   video-recorded deposition.  We're off the record at
17   6:18 p.m.
18        MR. STEARNS:  I'll take a copy, Bev.
19        (Deposition concluded at 6:18 p.m.)
20
21
22
23
24
25
```

Page 318

```
1              CERTIFICATE OF REPORTER
2
3   STATE OF FLORIDA      )
4   COUNTY OF HILLSBOROUGH )
5
6        I, BEVERLY REPLOGLE, RPR, Court Reporter and Notary
7   Public, do hereby certify that I was authorized to and
8   did stenographically report the foregoing deposition of
9   JASON HUH; that a review of the transcript was requested;
10   and that the foregoing transcript, pages 1 through 317,
11   is a true record of my stenographic notes
12
13        I FURTHER CERTIFY that I am not a relative,
14   employee, attorney, or counsel of any of the parties, nor
15   am I a relative or employee of any of the parties'
16   attorneys or counsel connected with the action, nor am I
17   financially interested in the action
18
19        DATED September 21, 2021 at Tampa, Hillsborough
20   County, Florida
21
22
           BEVERLY REPLOGLE, RPR
23           Notary Public
24
25
```

Page 319

```
1              CERTIFICATE OF OATH
2
3   STATE OF FLORIDA      )
4   COUNTY OF HILLSBOROUGH )
5        I, BEVERLY REPLOGLE, RPR, Notary Public, State of
6   Florida, certify that the witness, JASON HUH, appeared
7   before me via Zoom videoconference on September 16, 2021
8   and was duly sworn
9        WITNESS my hand and official seal this date:
10   September 21, 2021
11   Identification:
12        Personally Known _____
13   Or Produced Identification_____X_____
14   Type of Identification Produced:  Driver's License
15
16
17
18
19
20
21
           BEVERLY REPLOGLE, RPR
           Notary Public, State of Florida
22           MY COMMISSION GG 946680
             EXPIRES 2/25/24
23
24
25
```

Page 320

```
1        E R R A T A  S H E E T
2   IN RE:  STEEL SUPPLEMENTS, INC , vs  BLITZ NV, LLC
3   DEPOSITION OF:  JASON HUH    TAKEN:  09/16/2021
4   DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
5   Please sign, date, and return this sheet to our office
     If additional lines are required for corrections, attach
6   additional sheets
7   At the time of the reading and signing of the
     deposition, the following changes were noted:
8
     PAGE  LINE    CHANGE          REASON
9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   Under penalty of perjury, I declare that I have read my
22   deposition and that it is true and correct subject to
     any changes in form or substance entered here
23   SIGNATURE OF DEPONENT: _____
24   DATE: _____
25
```

80 (Pages 317 to 320)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                              49c48564-9177-40e8-8d44-99ff7cef8509

CONFIDENTIAL

Page 321

```
 1     September 21, 2021
 2     Jason P  Stearns, Esquire
       Freeborn & Peters LLP
 3     201 North Franklin Street
       Suite 3550
 4     Tampa, Florida  33602
 5     In Re:  STEEL Supplements, Inc , vs  Blitz NV, LLC
 6     Dear Mr  Stearns:
 7     Enclosed please find the original errata page with your
       copy of the transcript so JASON HUH may read and sign
 8     Please have him make whatever changes are necessary on
       the errata page and sign it   Please make a copy of the
 9     errata page and place it in your copy of the transcript
       Please then forward the original errata page back to our
10     office at 101 South Franklin Street, Suite 101, Tampa,
       Florida 33602
11
       If the errata page is not signed by the witness within
12     30 days after this letter has been furnished, we will
       then process the transcript without a signed errata
13     page  If JASON HUH wishes to waive his right to read
       and sign, please have him sign on the signature line at
14     the bottom of this letter and send it back to our
       office
15
       Your prompt attention to this matter is appreciated
16
       Sincerely,
17
       Beverly Replogle, RPR
18     Anthem Reporting
19
       I do hereby waive my signature
20
       _____
21     JASON HUH
22     cc:  Kevin McCoy, Esquire
23
24
25
```

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    49c48564-9177-40e8-8d44-99ff7cef8509

# EXHIBIT 4
Full Deposition Transcript of Jason Huh

# PLACEHOLDER
# (This document is being filed under seal pursuant to Dkt. 176)