## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**STEEL SUPPLEMENTS, INC.**,

      Plaintiff,

v.                                                            Case No. 8:20-cv-2971-WFJ-TGW

**BLITZ NV, LLC**,

      Defendant.

_____/

## ORDER

Before the Court is Defendant Blitz NV, LLC's Motion for Summary Judgment (Dkt. 138) as well as Plaintiff Steel Supplements, Inc.'s Supplemental Motion for Partial Summary Judgment (Dkt. 191). Both motions have been opposed (Dkts. 174 & 215), and each opposition filing has been met with a reply (Dkts. 177 & 222). On October 17, 2022, the Court held a hearing on these matters (Dkt. S-236). With the benefit of full briefing and able argument by both sides, the Court grants in part and denies in part both motions.

## BACKGROUND

Defendant's principal Dan Bilzerian is an "influencer," a social media celebrity whose persona is attractive to young, mostly male, body-builder types. Dkt. 32 at 11. Plaintiff is a producer of bodybuilding supplements. *Id.* at 8. Over the course of their contractual relationship, Mr. Bilzerian's social media posts greatly

1

increased Plaintiff's sales and Mr. Bilzerian's company was paid nearly $8,000,000 for his efforts. Dkt. S-183 at 28.

## I.     The Agreement

On March 7, 2017, Plaintiff and Defendant entered into a personal services contract under which Defendant would provide Plaintiff with Mr. Bilzerian's social media promotion in exchange for a 10% commission on Plaintiff's gross sales ("the Agreement"). Dkt. S-16 § 4.[1] The Agreement afforded Mr. Bilzerian broad discretion concerning the content and quantity of his promotions but required that he promote Plaintiff's bodybuilding supplements to the best of his skills and abilities. *Id.* § 3.1.2. In addition, Mr. Bilzerian was prohibited from promoting, publicizing, or endorsing the services or products of any of Plaintiff's competitors (i.e., any "provider, seller, manufacturer or distributer of bodybuilding supplements"). *Id.* § 3.1.1.

From the perspective of "helping [Plaintiff] reach its marketing and business objectives[,]" the Agreement was an apparent success. *Id.* at recital C. Mr. Bilzerian endorsed Plaintiff's products forty-three times between the execution of the

---

[1] Defendant states that, "[a]s a preliminary matter, the Court must decide which of the two competing versions of the Agreement [(Dkt. S-16 or Dkt. S-18)] it should enforce." Dkt. 138 at 10. Plaintiff, however, "does not contest that the Agreement at Docket Entry S-16 is operative." Dkt. S-183 at 11. Accordingly, because Defendant also agrees that Docket Entry S-16 is controlling, the Court will treat it as such.

Agreement the commencement of this lawsuit. Dkt. 32 at 23; Dkt. 138 at 7. During

this time, Plaintiff's sales rose dramatically. Dkt. S-186-1 at 7.

Plaintiff nevertheless claims that, throughout 2020, Mr. Bilzerian committed

a number of acts and omissions that put Defendant in material breach of the

Agreement. Dkt. 32 at 28–33. To begin with, Plaintiff maintains that Mr. Bilzerian

promoted, publicized, and/or endorsed Plaintiff's competitors and their products by:

(1) posting stories to his Instagram page displaying and discussing The Treigning

Lab's L-Tryptophan product; (2) posting a video to his Instagram page displaying a

red "FULL SEND" bag allegedly affiliated with FULL SEND Fitness; (3) promoting

Ignite's "Z-RO" drink on his social media sites; and (4) staging a third-party

promotional video of Vitamin Shoppe before reposting the video on his own

Instagram page. Dkt. 191 at 22–45. Plaintiff also maintains that Mr. Bilzerian failed

to expend his best efforts in promoting Plaintiff and its products by only posting

forty-three times over nearly four years. *Id.* at 45–50.

Defendant offers a different narrative; namely, Plaintiff is the one that

materially breached the Agreement by underpaying on commissions, refusing access

to financial records, and wrongfully attempting to terminate. Dkt. 33 at 68; Dkt. 138

at 7. According to Defendant, Plaintiff underpaid commissions by: (1) failing to

include Amazon sales in its commission payment calculations; (2) failing to include

sales generated from shipping services in its commission payment calculations; and

(3) failing to pay commissions on its wholesale operations. Dkt. 138 at 7. Despite the aforementioned performance issues on both sides, Defendant also suggests that this contract dispute is a product of Plaintiff's desire to escape the Agreement after reaping its initial rewards. Dkt. S-186-1 at 6, 8. This is the exact eventuality Defendant claims it sought to avoid by creating a perpetual contract term with narrow termination provisions. Dkt. S-186-2 at 12.

All the same, on December 14, 2020, Plaintiff sent a termination letter to Defendant offering an ultimatum: acknowledge termination or face suit. Dkt. 141-45 at 5. Defendant chose the latter. Plaintiff filed suit the same day. Dkt. 1.

## II.    The Instant Case

On February 24, 2021, Plaintiff filed its Amended Complaint. Dkt. 32. Therein, Plaintiff brings six counts against Defendant: Count I—breach of contract for (a) Mr. Bilzerian's promotion, publication, and/or endorsement of the services or products of competitors (violation of § 3.1.1) and (b) Mr. Bilzerian's failure to perform to the best of his skill and abilities (violation of § 3.1.2); Count II—breach of the implied covenant of good faith and fair dealing for Mr. Bilzerian's failure to exercise his discretion so as to perform to the best of his skills and abilities; Count III—declaratory judgment stating that the Agreement is terminated; Count IV—declaratory judgment stating that the Agreement provided commission based on Plaintiff's income received; Count V—reformation of the Agreement based on

4

mutual mistake concerning the later version of the Agreement's provision that Defendant would receive a commission based on a percentage of Plaintiff's sales (Dkt. S-16 § 1.6); and Count VI—reformation of the Agreement based on unilateral mistake in the alternative concerning the same provision. Dkt. 32 at 28–40.

Defendant filed its Answer to Plaintiff's Amended Complaint on March 10, 2021. Dkt. 33. Defendant denies all liability, provides six defenses, and generally maintains that Plaintiff is not entitled to any equitable relief. *Id.* at 38–63. Defendant also asserts two counterclaims: Counterclaim I—declaratory judgment stating that the Agreement provides Defendant commissions based on Plaintiff's gross sales beginning on April 1, 2017; and Counterclaim II—breach of contract for (a) failing to report all gross sales, (b) wrongfully attempting to terminate the Agreement, and (c) refusing access to financial records as contractually promised under the Agreement. *Id.* at 63–69.

With discovery now concluded, both parties move for summary judgment. Plaintiff requests summary judgment on Counts I & III, as well as Counterclaim II. Dkt. 191 at 9–11. Defendant requests summary judgment on each Count and Counterclaim currently before the Court. Dkt. 138 at 5–38.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine factual dispute. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). In addition, the Court must resolve any reasonable doubts in the

non-moving party's favor. *Id.* Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

The claims and counterclaims before the Court ultimately go to three issues: (1) what the Agreement provides regarding consideration, (2) whether the Agreement was breached by either side, and (3) whether the Agreement is terminated. The Court will consider the pending summary judgment requests in the order that they serve to inform the Court's discussion of these central issues.

The starting point for interpreting a contract is the "natural and plain meaning" of the contract's language. *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996) (citations omitted). If the terms are unambiguous, "the parties' intent must be discerned from the four corners of the document." *Fecteau v. Se. Bank, N.A.*, 585 So. 2d 1005, 1007 (Fla. 4th DCA 1991) (citations omitted). If the terms are ambiguous, "and the parties suggest different interpretations, the issue of the proper interpretation is an issue of fact requiring the submission of evidence extrinsic to the contract bearing upon the intent of the parties." *Bacardi v. Bacardi*, 386 So. 2d 1201, 1203 (Fla. 3d DCA 1980).

## I.   Consideration

### Gross Sales

The parties' dispute regarding consideration under the Agreement is largely based in their opposing interpretations of Section 1.6, which defines "Gross Sales" as "all sales derived by [Plaintiff] from all sources, including but not limited, to the sale of products, services and related items." Dkt. S-16 § 1.6. According to Defendant, this means that "Gross Sales" include all sales "before discounts, returns, and allowances . . . from 'all sources' including 'services.'" Dkt. 138 at 12. According to Plaintiff, "Gross Sales" only include sales revenue in the form of "the total amount of value in money received for goods sold or services performed[.]" Dkt. S-183 at 14. Each side requests a declaratory judgment finding their interpretation to be correct. Dkt. 32 at 26; Dkt. 33 at 67. In addition, Defendant requests summary judgment on this issue through a grant of Counterclaim I and a denial of Plaintiff's desired declaration in Count IV. Dkt. 138 at 10, 38.

As an initial matter, the Agreement's terms are unambiguous. It is worth reiterating that Section 1.6 explicitly defines "Gross Sales" as "all sales derived by [Plaintiff] from all sources, including but not limited, to the sale of products, services and related items." Dkt. S-16 § 1.6. Section 4 then provides in pertinent part that "[Plaintiff] shall pay [Defendant] a 10% commission on the Gross Sales of [Plaintiff] beginning with sales as of April 1, 2017." *Id.* § 4. This language is not rendered ambiguous merely because the parties offer different interpretations of it. *See BKD Twenty-One Mgmt. Co. v. Delsordo*, 127 So. 3d 527, 530 (Fla. 4th DCA 2012)

(finding that "a true ambiguity does not exist merely because a contract can possibly be interpreted in more than one manner"). Nor is it rendered ambiguous considering it requires analysis. *Penzer v. Transp. Ins. Co.*, 29 So. 3d 1000, 1005 (Fla. 2010) (finding that "[a] provision is not ambiguous simply because it is complex or requires analysis").

That said, neither party offers the one construction that Section 1.6 is reasonably susceptible to based on the four corners of the Agreement. *See BKD*, 127 So. 3d at 530 (finding that "contractual language is only ambiguous if it is susceptible to more than one *reasonable* interpretation"); *see also Fecteau*, 585 So. 2d at 1007 (finding that, where the terms of a contract are unambiguous, "the parties' intent must be discerned from the four corners of the document").

Plaintiff's interpretation unreasonably narrows the meaning of "Gross Sales" in two ways. First, in Section 1.6, the parties intended "Gross Sales" to include "all sales derived by [Plaintiff] from all sources, including . . . *services*[.]" Dkt. S-16 § 1.6 (emphasis added). This includes commission payments that Plaintiff receives on shipping fees. Plaintiff argues that it does not owe a commission on shipping fees to Defendant because, although Plaintiff received these fees, Plaintiff did not perform the work. Dkt. S-183 at 15 (emphasis in original). But Section 1.6 makes no reference to the sale of services performed by Plaintiff itself. Dkt. S-16 § 1.6. If Plaintiff is offering the shipping services of third-party carriers and receiving

remuneration, the most accurate reading of Section 1.6 dictates that Plaintiff is required to pay Defendant a 10% commission on what Plaintiff receives, just as it requires Plaintiff to pay Defendant a 10% commission on product sales.

The second way Plaintiff seeks to limit the Agreement is by limiting the term "Gross Sales" to exclude later returns and allowances. In defining "Gross Sales," however, the parties did not intend to diminish the ordinary breadth that the term "gross sales" is given. "All" is an inclusive adjective, not an exclusive one. It would therefore make little sense to interpret the employment of "all sales . . . from all sources" as an attempt to narrow gross sales to only net sales that result in "money coming in the door." Dkt. S-183 at 11.

Black's Law Dictionary states that gross sales include "[t]otal sales (esp. in retail) before deductions for returns and allowances[,]" *Gross Sales*, Black's Law Dictionary (11th ed. 2019). The Court cannot reasonably interpret Section 1.6 as supplanting all ordinary meaning when the parties have themselves defined "Gross Sales" as "all sales . . . from all sources[.]" Dkt. S-16 § 1.6. This is merely a redefining of gross sales that functionally applies the term to "the sale of products, services, and related like items." *Id.* "Gross Sales" are not net sales.

The Court might be of a different opinion had the parties retained some version of the original contract language, which defined "Gross Profits" as "all *income* derived by [Plaintiff] from all sources[.]" Dkt. S-18 § 1.6 (emphasis added).

But this is not what happened. Plaintiff concedes that the operative contract is found at Dkt. S-16, not Dkt. S-18. Dkt. S-183 at 11 n.2. The appropriate place to consider the import of the earlier contract at Dkt. S-18 is within the Court's later discussion of Plaintiff's reformation claims.[2] As it stands, the Agreement can only be reasonably interpreted as defining "Gross Sales" as "all sales . . . from all sources" (i.e., total sales from all sources before returns and allowances).

On the other hand, Defendant's attempt to read pre-sale discounts (discounts taken prior to transaction) into Section 1.6 unreasonably expands the meaning of "Gross Sales." There is no authority that supports this construction. It is nowhere to be found in Section 1.6 or the Agreement as a whole. Dkt. S-16. It is nowhere to be found in dictionary definitions of gross sales. *See Gross Sales*, Black's Law Dictionary (11th ed. 2019) (defining "gross sales" as "[t]otal sales (esp. in retail) before deductions for returns and allowances"). And, to the extent that Defendant's construction finds support in Investopedia,[3] that support is highly questionable for the reasons noted by Plaintiff.

---

[2] Section 16 of the Agreement presents a traditional merger clause which provides that "[t]his Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all written or oral prior agreements or understandings with respect thereto. No course of dealing or usage of trade shall be used to modify the terms hereof." Dkt. S-16 at § 16.

[3] *See* Marshall Hargrave, *Gross Sales: What It Is, How To Calculate It, and Examples* (last updated Apr. 7, 2022), https://www.investopedia.com/terms/g/grosssales (stating that, "[g]ross sales are calculated by adding all sales receipts before discounts, returns, and allowances together").

First, the Investopedia page that Defendant cites is not a legal dictionary, but a type of blog posting.[4] Second, Defendant's expert admits that the Investopedia page contains inaccurate statements.[5] Third, while it is undisputed that Plaintiff only offers pre-sale discounts, the Investopedia page upon which Defendant relies links its definition of "gross sales" to a second website, which itself links its definitional use of "sales discount" to a form of post-sale discounting (discounts taken after transaction).[6] In sum, this is an unacceptable source to rely on as the sole support for Defendant's construction.

Defendant's construction is also irreconcilable with any reasonable understanding of gross sales. Where a pre-sale discount is applied, a customer will pay the discounted price reflected on the invoice at the point of sale. The non-sale list price is never charged or represented in the purchase. It is therefore unclear how such a list price would figure into "all" or "total" sales since—unlike in the case of a post-sale return or allowance—it never existed in the first place.

_____

[4] *Id.*

[5] *See* Briggs Stahl Deposition Transcript at 98:17–99:11 (Q: "All right. So this Investopedia.com here states that you deduct gross sales – from gross sales you deduct operating expenses to calculate net sales. All right? And that's not correct from a general view of accountancy; is that correct?" A: "Operating expenses are not deducted in getting the net sales, correct.").

[6] The Investopedia page provides a link to another online article: *Gross Sales Definition, Accounting Tools* (last updated Nov. 13, 2022) https://www.accountingtools.com/articles/gross-sales. In turn, the Accounting Tools article links to another online article: *Sales Discount Definition* (last updated Nov. 27, 2022) https://www.accountingtools.com/articles/sales-discount. This article provides that "an example of a sales discount is 2/10 net 30 terms, where a customer can take a two percent discount if it pays an invoice within ten days of the invoice date, or pays full price 30 days after the invoice date. The sales discount concept can also be applied to cash sales, where a discount is offered in exchange for immediate payment."

The Court refuses to read this questionable logic into Section 1.6 without clear support. To do so would be to endorse a fiction that the parties never intended to create through the four corners of the Agreement. Thus, while "Gross Sales" are real, actual sales calculated before deductions for later returns and allowances under Section 1.6, they do not include the unrealized difference between list price sales where the price is reduced or discounted before any sale is made.

It follows that the Court must deny summary judgment to Defendant on Counterclaim I, which seeks a declaration enforcing Defendant's interpretation of "Gross Sales." Simply put, Defendant's interpretation of Section 1.6 of the Agreement is wrong. And this is not to mention the fact that Defendant's declaratory judgment claim (Counterclaim I) necessarily encompasses breach of contract issues (Counterclaim II) better left to independent resolution.[7]

For the same reasons, the Court must grant summary judgment to Defendant on Plaintiff's Count IV (request for declaratory judgment in favor of Plaintiff's interpretation of the Agreement) unless Plaintiff's reformation claims are dispositive. The Court therefore turns to consider Defendant's requests for summary judgment on Plaintiff's Count V (reformation based on mutual mistake) and Count VI (reformation based on unilateral mistake in the alternative).

---

[7] *See Marotto v. Scottsdale Ins. Co.*, 8:08-cv-1375-T-30-MSS, 2008 WL 2952830, at *2 (M.D. Fla. July 30, 2008) (dismissing the plaintiff's declaratory relief claim where the issue presented would be resolved by the plaintiff's breach of contract claim).

## Reformation

"A court of equity has the power to reform a written instrument where, due to a mutual mistake, the instrument does not accurately express the true intention or agreement of the parties to the instrument." *Providence Square Ass'n, Inc. v. Biancardi*, 507 So. 2d 1366, 1369 (Fla. 1987) (citation omitted). This explains why, "in reforming a written instrument [or contract], an equity court in no way alters the agreement of the parties. Instead, the reformation only corrects the defective written instrument so that it accurately reflects the true terms of the agreement actually reached." *Id.* at 1370.

"A mistake is mutual when the parties agree to one thing and then, due to either a scrivener's error or inadvertence, express something different in the written instrument." *Circle Mortg. Corp. v. Kline*, 645 So. 2d 75, 78 (Fla. 4th DCA 1994) (citation omitted). "Due to the strong presumption that a written agreement accurately expresses the parties' intent, the party seeking reformation based on mutual mistake must prove its case by clear and convincing evidence." *BrandsMart U.S.A. of W. Palm Beach, Inc. v. DR Lakes, Inc.*, 901 So. 2d 1004, 1006 (Fla. 4th DCA 2005) (citations omitted).

Plaintiff's reformation claims revolve around changes made to Section 1.6 of the Agreement. The original version of Section 1.6 provided that:

> "*Gross Profits*" shall mean all *income* derived by [Plaintiff] from all sources, including but not limited, to the sale of products, services and related like items.

Dkt. S-18 § 1.6 (emphasis added). The current version of Section 1.6, which Plaintiff claims to be a product of mutual or unilateral mistake, provides that:

> "*Gross Sales*" shall mean all *sales* derived by [Plaintiff] from all sources, including but not limited, to the sale of products, services and related like items.

Dkt. S-16 § 1.6 (emphasis added).

Plaintiff claims that reformation of Section 1.6 based on mutual mistake is appropriate because:

> Following [Plaintiff's] execution of the contract, [Defendant] emailed [Plaintiff] stating it had previously fixed a "minor typo" in the Agreement. Given its characterization of the change, [Defendant] likely believed, as [Plaintiff] believed, that the change was non-substantive and did not effectuate a change in the commission mechanism. Given that the [P]arties (i) intended to correct a "minor typo," (ii) did not intend to effectuate a change in the commission mechanism, but (iii) nonetheless changed the meaning of the contract under this Court's interpretation (if [Defendant's] proposed construction is adopted), the change was inadvertent and the mistake mutual.

Dkt. S-183 at 20 (internal citations omitted). The Court disagrees.

It is important to recognize that, despite alterations to Section 1.6, Section 4 of the Agreement never changed.[8] It has always provided in pertinent part that

---

[8] The Court understands that, at one point, there were discussions about adding a performance metric to Section 4 of the Agreement. However, this did not materialize in the version of the Agreement that Plaintiff has provided at Dkt. S-18.

"[Plaintiff] shall pay [Defendant] a 10% commission on the *Gross Sales* of [Plaintiff] beginning with sales beginning as of April 1, 2017." Dkts. S-16 § 4; Dkt. S-18 § 4 (emphasis added). This means that, had the original contract remained in force, Plaintiff would have been paying commission on "Gross Sales" (undefined) regardless of how "Gross Profits" was defined by Section 1.6. Moreover, as evinced by later alterations and communications, Section 1.6 was changed to conform with Section 4, not the other way around. The parties therefore always intended some form of "Gross Sales"-based commission payments to serve as consideration for Mr. Bilzerian's social media promotion services.

In light of this, Plaintiff's admissions demonstrate that (if anything) the subsequent changes to the specific meaning of "Gross Sales" were mistakes of a unilateral nature.[9] Indeed, Plaintiff admits that its attorney received a message on March 18, 2017, from Defendant's agent stating, "[s]ee attached for [Mr. Bilzerian's] executed copy of the agreement. As we discussed, the only change I made was in *[S]ection 1.6 to make the definition consistent with the language in [S]ection 4*. Please send back your signed copy once you've had a chance to review." Dkt. S-183 at 71 (emphasis added) (admitting to paragraphs 48–52 of Defendant's

---

[9] "In a reformation action in equity, ... parol evidence is admissible for the purpose of demonstrating that the true intent of the parties was something other than that expressed in the written instrument." *Providence Square Ass'n, Inc. v. Biancardi*, 507 So. 2d 1366, 1371 (Fla. 1987).

Statement of Undisputed Material Facts). Plaintiff's attorney then sent back a non-conforming version of the Agreement, to which Defendant's agent responded by saying there "was one minor typo that [he] fixed earlier that was in the document [Mr. Bilzerian] signed that didn't make it into [the returned] version." *Id.* Plaintiff's attorney then replied by sending the "fully executed contract with [Plaintiff's CEO's] initials . . ." and asking to "have [Mr. Bilzerian] proceed as agreed." *Id.*

Clearly, Defendant's agent knew that Section 1.6 had been changed to properly align with Section 4. He intentionally avoided executing the Agreement until his sponsored version was returned. Given this, the Court agrees that the change was not scrivener's error or inadvertence on the part of Defendant that would constitute a mutual error or mistake by both parties. Dkt. S-186-1 at 41.

"Where, as here, the clear and convincing standard applies, the summary judgment inquiry as to whether a genuine issue exists [is] whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Tesfay v. Builders FirstSource-Fla., LLC*, No. 3:07-CV-613-J-34-JRK, 2009 WL 10670760, at *3 (M.D. Fla. Mar. 18, 2009) (alteration in original) (internal quotations and citations omitted). Because there is no clear and convincing evidence that the Agreement inaccurately reflects Defendant's intent, the Court could not find for Plaintiff on its mutual mistake claim

at a bench trial under this standard. The Court therefore grants summary judgment to Defendant on Plaintiff's Count V.

This brings the Court to Count VI, Plaintiff's unilateral mistake claim. Unlike mutual mistake, reformation due to unilateral mistake requires "a unilateral mistake by one party coupled with the inequitable conduct of the other party." *Romo v. Amedex Ins. Co.*, 930 So. 2d 643, 649 (Fla. 3d DCA 2006) (citation omitted). "A written contract will not be reformed on the basis of a unilateral mistake absent clear and convincing proof of fraud or inequitable conduct by the other side" *Robinson v. Wright*, 425 So. 2d 589, 589 (Fla. 3d DCA 1982) (citations omitted).

Assuming *arguendo* that there was a unilateral mistake by Plaintiff,[10] there is no clear and convincing proof of fraud or inequitable conduct by Defendant. Plaintiff's claim to the contrary rests entirely on the fact that, at one point in his correspondences with Plaintiff's attorney, Defendant's agent used the phrase "one minor typo" to describe a change in Section 1.6 that had not made it into a returned version of the Agreement. Dkt. S-183 at 20. Perhaps this was a poor choice of words. In the full context of the parties' negotiations, however, this conduct alone cannot

---

[10] This is itself highly questionable in light of the facts that (1) Plaintiff's CEO was well aware that Mr. Bilzerian wished to be paid in gross sales before executing the Agreement, *see* Jason Huh Deposition Transcript at 102:9–23; (2) at the time he signed the operative form of the Agreement, Plaintiff's CEO was aware of no facts to suggest that Plaintiff did not intend to make substantial changes to Section 1.6, *id.* at 113:1–25; and (3) when Mr. Bilzerian later joked about getting a bad deal in text messages as compared to another influencer in a separate contract, Plaintiff's CEO responded: "Ooh please I guarantee you he isn't getting a percentage of gross . . . That's un heard [sic] of in this industry." Dkt. 161-4 at 55.

justify reformation. Immediately prior to describing the change in Section 1.6 as "a minor typo[,]" Defendant's agent expressly called Plaintiff's attention to the change by stating that he had altered "Section 1.6 to make the definition consistent with the language in [S]ection 4." Dkt. S-183 at 71. Plaintiff's attorney possessed the updated language at this point in the parties' negotiations.

The subsequent phraseology of Defendant's agent might be more suspect if Defendant was negotiating with an unsophisticated party who was executing the Agreement without the benefit of legal and business advice. But the opposite is true. Defendant's agent was speaking directly to an attorney who (1) knew the provision was being altered and (2) possessed the altered language. *See Bone & Joint Treatment Ctrs. of Am. v. HealthTronics Surgical Servs., Inc.*, 114 So. 3d 363, 370 (Fla. 3d DCA 2013) (finding no unilateral mistake where a party to the subject contract "knew the provision was being inserted into the [subject contract] and had itself proposed the specific language of the provision"). It is not inequitable for Defendant's agent to assume that Plaintiff's attorney would read the updated Agreement's language before advising his client to execute it, especially where said language directly impacts Plaintiff's financial obligations.

The Court therefore grants summary judgment to Defendant on Plaintiff's Count VI. Further, because the Court declines to exercise its equitable powers to reform the Agreement either due to mutual or unilateral mistake, the Court also

grants summary judgment to Defendant on Plaintiff's Count IV (declaratory judgment in favor of Plaintiff's interpretation of Section 1.6 of the Agreement). As previously explained, "Gross Sales" means gross, not net. The Court will not declare otherwise.

## II.    Competing Breach Claims

Because Defendant's Counterclaim II primarily goes to Sections 1.6 and 4 (the provisions discussed at length above), the Court begins by considering Defendant's request for summary judgment thereon. Defendant maintains that Plaintiff breached Section 4 by: (a) subtracting returns from its Gross Sales before calculating Defendant's commission payments; (b) inaccurately reporting its Gross Sales from various sources; (c) failing to pay commissions on shipping services; and (d) refusing Defendant access to its financial records, thereby violating Defendant's contractual audit rights. Dkt. S-186-1 at 13–17. The Court largely agrees.

Under Florida law, breach of contract requires: (1) the existence of a contract; (2) a breach of that contract; (3) causation; and (4) damages. *Carpenter Contractors of Am., Inc. v. Fastener Corp. of Am.*, 611 So. 2d 564, 565 (Fla. 4th DCA 1992). There is no genuine dispute of material fact that precludes the Court from finding each of these elements in relation to Defendant's commission payment-based breach claims: the Agreement exists; the above discussion demonstrates that it would be a breach of the Agreement if Plaintiff failed to include all product sales or all service

sales in its Gross Sales calculations; the record makes clear that, to some extent, Plaintiff indeed failed to do so by subtracting returns, excluding shipping service commissions, and excluding product sales from particular sources in its Gross Sales commission payments;[11] and this failure caused Defendant to suffer monetary damages in the form of underpayment. As a result, Defendant is entitled to damages[12] under Counterclaim II. *See Handi-Van, Inc. v. Broward Cnty.*, 116 So. 3d 530, 541 (Fla. 4th DCA 2013) (finding that, "to show entitlement to damages under a breach-of-contract theory, the plaintiff must 'prove by a preponderance of the evidence the existence of a contract, a *breach,* and damages flowing from the breach'").

Less certain is the exact amount of damages Defendant is entitled to. In total, Defendant claims that it was underpaid by $1,264,895.55 (representing a $320,183 underpayment on product sales and a $944,713.55 underpayment on shipping services). Dkt. S-186-1 at 14–15. Plaintiff nevertheless disputes these figures. *See*

---

[11] Plaintiff admits that it "subtracted out returns" and "explicitly told [Defendant] it was not and had not been paying [Defendant] commissions on shipping" as early as February 2020. Dkt. S-183 at 32. In addition, Plaintiff admits that "whether mistakenly … or nefariously . . . [$]1.7 million of gross sales were not disclosed [from wholesale sales on Shopify]." Dkt. S-236 at 57–58.

[12] Defendant's breach claim regarding Plaintiff's alleged denial of access to financial records is problematic for a number of reasons, including the fact that it unfolded in the context of this litigation. Most importantly, however, Defendant fails to present any evidence of damages caused by this alleged breach or explain how it may have caused damages independent from those caused by Plaintiff's underpayment. Under Florida law, damages are an essential element of an action for breach of contract. *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1300 (M.D. Fla. 2009) (citation omitted). The Court therefore declines summary judgment to Defendant on this particular breach theory.

Dkt. S-183 at 22 n.8 (noting the "$25,000 discrepancy between what [Plaintiff's] records show paid and the amounts [Defendant's] records show received"). What is more, Defendant's own expert report contains conflicting numbers. *See* Dkt. S-186-1 at 14–15 n.2–3 (noting that the calculation of Defendant's expert indicates a $295,183.39 underpayment on product sales rather than a $320,183 underpayment). Given these factual discrepancies, the Court finds that it would be premature to grant summary judgment awarding Defendant a precise amount of damages on Counterclaim II. *See TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*, 945 F. Supp. 2d 1331, 1350–51 (M.D. Fla. 2013) (denying summary judgment on the issue of damages where disputed issues of material fact existed as to the amount of damages due). The parties may present their evidence at the upcoming bench trial.

With Plaintiff's breach established, the Court pauses to consider the import of Defendant's prior breach defense before turning to consider Plaintiff's competing breach claims. Defendant contends that "[Plaintiff's] prior material breaches relieved [Defendant] of performance until the breaches [were] cured[.]" Dkt. S-186-1 at 17. Defendant's argument goes like this: Plaintiff underpaid commissions in violation the Agreement, Defendant has now elected to treat Plaintiff's underpayment as a total breach, and Defendant has therefore always been free to suspend its performance under the Agreement. *Id.* at 18–19. In other words,

Defendant essentially maintains that it has been retroactively immunized from all of Plaintiff's breach claims since 2017 when Plaintiff first underpaid.

Defendant is mistaken. A party to a contract has two options when the other party breaches: "(1) continue its own performance under the contract and treat [the breaching party's] noncompliance as a partial breach, limiting [its own] damages but keeping the parties' ongoing obligations under the [contract] intact; or (2) treat the noncompliance as a material breach, giving rise to a claim for total breach but discharging the parties of their ongoing obligations." *Foliar Nutrients, Inc. v. Plant Food Sys., Inc.*, No. 6:13-CV-748-ORL, 2014 WL 3510594, at *4 (M.D. Fla. July 14, 2014) (citation omitted). Defendant's affirmative defense, however, asks the Court to find that Defendant had a third option: stop performance due to Plaintiff's alleged breach and continue to take advantage of the Agreement's benefits.

This option is impermissible. *See Dunkin' Donuts Franchised Rests. LLC v. D & D Donuts, Inc.*, 566 F. Supp. 2d 1350, 1359 (M.D. Fla. 2008) (citation omitted) (finding that "[i]t is well established that one party to a contract may not stop performance due to an alleged breach by the other party 'and still continue to take advantage of the contract's benefits'"). Plaintiff paid Defendant nearly $8,000,000 dollars under the Agreement. Defendant accepted this consideration (month by month for multiple years) while failing to treat Plaintiff's underpayment as a material breach until the commencement of this lawsuit. Accordingly, Defendant cannot

retroactively claim relief from its contractual obligations. *See Hous. & Residence Life, LLC v. Universal Tech. Inst. of Phoenix, Inc.*, No. 6:12-CV-874-ORL-28, 2013 WL 4506395, at *9 (M.D. Fla. Aug. 23, 2013) (citation omitted) (finding that "[a] material breach merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing. . . . If he elects to continue . . . the obligations of both parties remain in force and the injured party may retain only a claim for damages"). And Defendant's third affirmative defense does not shield it from potential liability.

The Court now turns to Plaintiff's contract claims. Plaintiff maintains that Defendant breached the Agreement on numerous occasions. Plaintiff's summary judgment requests go to its claims concerning Sections 3.1.1 and 3.1.2. Dkt. 191 at 13, 45. The Court will consider each in turn.

Sections 3.1 and 3.1.1 of the Agreement provide the following:

3.1   **Exclusivity Rights**. In general, but subject to the provisions that follow, [Defendant] through [Mr. Bilzerian] shall promote, publicize and endorse the [Plaintiff's] Products by providing endorsement of the [Plaintiff's] Products through his social media sites (including Instagram and Facebook) ("Mr. Bilzerian's Social Media Sites").

3.1.1 [Mr. Bilzerian] shall not promote, publicize or endorse the services or products of any Competitor of [Plaintiff] (defined as a provider, seller, manufacturer or distributer of bodybuilding supplement products), or grant any Competitor the right to use the [Defendant's] Marks, without the prior written consent of [Plaintiff].

Dkt. S-16 §§ 3.1, 3.1.1.

According to Plaintiff, Mr. Bilzerian promoted, publicized, or endorsed the services or products of Plaintiff's Competitors in violation of Section 3.1.1 four times. The first alleged breach occurred on July 3, 2020, when Mr. Bilzerian posted a story to his Instagram page that involved him displaying a bottle of The Treigning Lab's L-Tryptophan product and remarking that the product helped him sleep. *See* Dkt. S-213 at Ex. 27.

This was a breach. Despite the parties' dispute concerning the meaning of "Competitor," there is no dispute that The Treigning Lab qualifies as such under the definition of "Competitor" provided in Section 3.1.1 of the Agreement. The bottle of L-Tryptophan supplement capsules displayed by Mr. Bilzerian in the subject Instagram story leaves no doubt that said supplements are The Treigning Lab's product. Mr. Bilzerian, moreover, publicized and promoted this product by displaying it to his followers and remarking on its virtues. Mr. Bilzerian's Treigning Lab post therefore violated Section 3.1.1 of the Agreement.

Anticipating such a finding, Defendant responds that Plaintiff subsequently ratified Mr. Bilzerian's Treigning Lab post in his text messages with Mr. Bilzerian. Dkt. S-186-1 at 20. Generally, "[r]atification occurs where (1) a defendant performs an act which breached the contract; (2) plaintiff knew of the act and that he could reject the contract because of the act; and (3) plaintiff accepted the act." *Gibson v.*

*Lynn Univ., Inc.*, 504 F. Supp. 3d 1335, 1343 (S.D. Fla. 2020) (citing *In re Standard Jury Instructions–Cont. & Bus. Cases*, 116 So. 3d 284, 328–29 (Fla. 2013)). Ratification is only valid where a plaintiff "with full knowledge of all the material facts makes an affirmative showing of his or her express or implied intention to adopt an act or contract entered into without authority." *Zurstrassen v. Stonier*, 786 So. 2d 65, 71 (Fla. 4th DCA 2001). Whether these predicates are satisfied is itself an issue of fact. *See ABC Salvage, Inc. v. Bank of Am., N.A.*, 305 So. 3d 725, 729–30 (Fla. 3d DCA 2020) (citation omitted) (noting that ratification is a question of fact).

Here, the evidence concerning Plaintiff's knowledge cuts both ways. On one hand, after Mr. Bilzerian texted Plaintiff's CEO informing him of the Treigning Lab post (which begins with Mr. Bilzerian discussing two of Plaintiff's supplements), Plaintiff's CEO responded positively by stating, "[b]ro I loved the post and so did the team[.]" *See* Jason Huh Deposition Transcript at 276:25–25. This suggests that Plaintiff's CEO and team watched the video and were aware of Mr. Bilzerian's publication of The Treigning Lab's product. On the other hand, Plaintiff's CEO later testified that:

> I thought it was a – a still image. I – actually, I was – because I didn't actually watch it. I didn't go and watch it. I just – I was receiving [Mr. Bilzerian's] text message and responding to the fact that, oh, he put up a still image; and the caption in that image right there, I was – you know, we were excited because we were looking to see what, you know, an Alpha post would do. But I didn't learn that there was actually a competitive product until I got to the office that day and it was brought to my attention, and then I watched the video for myself . . . And at that

point I – I – I felt like a bit of a fool and not – you know, only in front of Dan but in front of my entire team, because I actually didn't go and review the video. I was just looking at this text message thinking that that was a screenshotted [Instagram post].

*Id.* at 278:17–279:18. This, of course, suggests an ignorance of material facts.

In light of this conflicting evidence, the Court is unable to resolve a material scienter issue without weighing the credibility of deposition testimony.  As a result, the Court cannot grant summary judgment to either party on this aspect of Plaintiff's Count I. *See Matsushita*, 475 U.S. at 587.

Defendant's second alleged breach of Section 3.1.1 occurred on October 26, 2020, when Mr. Bilzerian posted a video to his social media accounts displaying a red "FULL SEND" bag in the trunk of a black SUV. Dkt. S-213 at Ex. 26. Plaintiff claims that "'FULL SEND' is a trademark that Nelk has registered and uses with its and its related entities' operations[.]" Dkt. S-183 at 40. Specifically, "Nelk subsidiary FULL SEND Fitness uses the FULL SEND trademark . . . in connection with the sale of bodybuilding supplements FULL SEND PRE and FULL SEND BCAA." *Id.* at 40–41. Thus, in Plaintiff's view, the FULL SEND video promoted FULL SEND Fitness irrespective of the fact that the video did not depict FULL SEND Fitness or its supplements. Dkt. 191 at 25–27. The Court disagrees.

The Agreement provides that "[Mr. Bilzerian] shall not promote, publicize or endorse *the services or products* of any Competitor[.]" Dkt. S-16 § 3.1.1 (emphasis added). Even if FULL SEND Fitness qualifies as a Competitor, it is undisputed that

FULL SEND Fitness does not sell the red FULL SEND bag depicted in Mr. Bilzerian's video. Dkt. S-183 at 82 (admitting that the red FULL SEND bag is sold on fullsend.com, not fullsendfitness.com). This means that Plaintiff's breach claim rests on the logic that, (a) promoting the "FULL SEND" mark equates to (b) promoting FULL SEND Fitness, which equates to (c) promoting FULL SEND Fitness' products and services.

Plaintiff's reliance on this logic is misplaced. By Plaintiff's own admission, "FULL SEND" is a trademark that Nelk entities use across the board. Dkt. S-183 at 40. It is not tied to any one Nelk entity. Accordingly, (a) promoting the "FULL SEND" mark *does not* equate to (b) promoting FULL SEND Fitness. It follows that the connection between (a) promoting the "FULL SEND" mark and (c) promoting FULL SEND Fitness' products and services is tenuous at best.

This logical jump is simply too great to support Plaintiff's breach claim given the plain language of the Agreement. The "FULL SEND Brand," as Plaintiff puts it, cannot be synonymized with FULL SEND Fitness and its products or services. The Court therefore denies summary judgment to Plaintiff and grants the same to Defendant on this specific Count I breach theory.

Defendant's third alleged breach of Section 3.1.1 occurred in December 2020, when Mr. Bilzerian reposted an "All American Dave" Vitamin Shoppe promotion

video to his Instagram story.[13] Dkt. S-213 at Ex. 19. The video begins with All American Dave (a social media influencer somewhat connected to or allied with Mr. Bilzerian) walking through a Vitamin Shoppe retail store while stating that he "had to run out to get some protein, [so he] came up to Vitamin Shoppe." *Id.* Overlayed on the video is a "THE VITAMIN SHOPPE" location tag, two "@vitaminshoppe" tags, an "@DANBILZERIAN" tag, and an "@IGNITE" tag. *Id.* Seconds later, All American Dave switches the camera (presumably on his phone) to face a shelf of products containing Ignite's Z-RO drink. *Id.* All American Dave then whistles in approval and the video ends. *Id.*

Discovery uncovered that Mr. Bilzerian not only reposted the Vitamin Shoppe video but orchestrated the entire promotion with the express purpose of reposting it to drive consumers to Vitamin Shoppe. *See* John Schaefer Deposition Transcript at 90:2–93:9; *see also* Exhibit 10 to John Schaefer Deposition Transcript at IGN_004632 (President of Ignite John Schaefer's email to Vitamin Shoppe

---

[13] In its response, Defendant claims that Plaintiff "cannot assert its new, un-pled Vitamin Shoppe theory" at summary judgment. Dkt. S-217 at 3 (relying on Eleventh Circuit case law). The problem with this assertion is that, as Plaintiff notes, "[Mr.] Bilzerian's promotion of Vitamin Shoppe is not a new theory but is 'part and parcel' of the breach of Section 3.1.1 identified in the Amended Complaint[.]" Dkt. S-223 at 9. As such, it does not exceed the scope established by Plaintiff's pleading. *See Havana Docks Corp. v. Carnival Corp.*, 592 F. Supp. 3d 1088, 1151–52 (S.D. Fla. 2022) (finding that the plaintiff's summary judgment theory did not exceed the scope of its pled theory where new facts were intimately related to said theory and the allegations fell within the same statute identified in the pleading). For similar reasons, the Court finds that Plaintiff's "new theory" did not exceed the leave granted by the Court to supplement its summary judgment filings.

employee Nicolletta Payne: "Dan then arranged for All American Dave to go into the store and do a promotional post in which he would repost").

Reposting this video was a breach. As an undisputed "provider, seller, manufacturer or distributor of bodybuilding supplement products," Vitamin Shoppe is a Competitor of Plaintiff under the Agreement. Dkt. S-16 § 3.1.1. Vitamin Shoppe is known for the brick-and-mortar retail store services that it offers to customers seeking, among other things, bodybuilding supplement products. The All American Dave video organically publicized this service and the ability that one has to obtain protein (a bodybuilding supplement) through it. Dkt. S-213 at Ex. 19. Hence, by orchestrating this promotion and reposting the video to his own page, Mr. Bilzerian promoted, publicized or endorsed the services or products of a Competitor. Defendant cannot claim otherwise simply because no Vitamin Shoppe-made products were explicitly displayed in the video.

This breach was not accidental or incidental; it was material. Nonperformance of a contractual obligation constitutes a material breach where the nonperformance goes "to the essence of the contract[.]" *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So. 2d 853, 857 (Fla. 4th DCA 1972). The essence of the Agreement is an exchange of a percentage of Plaintiff's Gross Sales for Defendant's procurement of Mr. Bilzerian's exclusive promotion of Plaintiff's products. Indeed, Defendant's only substantive performance obligation under the Agreement was to secure Mr.

Bilzerian's exclusive promotion of Plaintiff's supplements. There is no issue of material fact that could create a genuine question as to whether this was merely "some minor part of [Defendant's] contractual duty[.]" *Covelli Fam., L.P. v. ABG5, L.L.C.*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008). It was Defendant's only duty. Accordingly, the Court grants Plaintiff summary judgment and denies Defendant the same on this Count I breach theory.

Defendant's final alleged breach of Section 3.1.1 occurred between October and December 2020, when Mr. Bilzerian "made at least five posts on his social media promoting [Ignite's Z-RO]." Dkt. 191 at 32. Defendant does not deny this promotion. Rather, Defendant argues that promoting Z-RO was not a violation of Section 3.1.1 because (1) a "Competitor" is defined as a provider, seller, manufacturer or distributor of *bodybuilding supplement products* and (2) Z-RO is not a bodybuilding supplement. Dkt. S-186-1 at 22–27. Plaintiff contests this second point.

The Agreement does not define "bodybuilding supplement." *See* Dkt. S-16 § 3.1.1. This alone does not render the term ambiguous. *State Farm Mut. Auto. Ins. Co. v. Fischer*, 16 So. 3d 1028, 1032 (Fla. 2nd DCA 2009) (noting that a contract term is not automatically rendered ambiguous by virtue of being undefined). But it does mean that these words "must be given their plain and ordinary meaning"

through dictionary reference. *Beans v. Chohonis*, 740 So. 2d 65, 67 (Fla. 3d DCA 1999).

Dictionary sources provide that "bodybuilding" involves exercising and dieting to develop muscles. *See Bodybuilding*, Oxford Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/bodybuilding (last visited Jan. 5, 2023) (defining "bodybuilding" as "the activity of doing regular exercises in order to make your muscles bigger and stronger"); *Bodybuilding*, Merriam-Webster,      https://www.merriam-webster.com/dictionary/bodybuilding (last visited Jan. 5, 2023) (defining "bodybuilding" as "the developing of the body through exercise and diet specifically: the developing of the physique for competitive exhibition"); *Bodybuilding*, Cambridge Learner's Dictionary, https://dictionary.cambridge.org/us/dictionary/english/bodybuilding  (last visited Jan. 5, 2023) (defining "bodybuilding" as "special exercises that you do regularly to make   your   muscles   bigger"); *Bodybuilding*,   Dictionary.com, https://www.dictionary.com/browse/bodybuilding  (last visited Jan. 5, 2023) (defining "bodybuilding" as "the act or practice of exercising, lifting weights, etc., so as to develop the muscles of the body"); *Bodybuilding*, Collins English Dictionary,      https://www.collinsdictionary.com/dictionary/english/bodybuilding (last visited Jan. 5, 2023) (defining "bodybuilding" as "the activity of doing special exercises regularly in order to make your muscles grow bigger").

The same sources provide that a "supplement" is "a thing added to something else to improve or complete it." *Supplement*, Oxford Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/supplement_1?q =supplement (last visited Jan. 5, 2023); *see also Supplement*, Merriam-Webster, https://www.merriam-webster.com/dictionary/supplement (last visited Jan. 5, 2023) (defining "supplement" as "something that completes or makes an addition"); *Dietary Supplement*, Merriam-Webster, https://www.merriam-webster.com/dictionary/dietary%20supplement (last visited Jan. 5, 2023) (defining "dietary supplement" as "a product taken orally that contains one or more ingredients (such as vitamins or amino acids) that are intended to supplement one's diet and are not considered food"); *Supplement*, Cambridge Learner's Dictionary, https://dictionary.cambridge.org/us/dictionary/english/supplement (last visited Jan. 5, 2023) (defining "supplement" as "something that is added to something else in order to improve it or complete it; something extra"); *Supplement*, Dictionary.com, https://www.dictionary.com/browse/supplement (last visited Jan. 5, 2023) (defining "supplement" as "something added to complete a thing, supply a deficiency, or reinforce or extend a whole"); *Supplement*, Collin's English Dictionary, https://www.collinsdictionary.com/dictionary/english/supplement (last visited Jan. 5, 2023) (defining "supplement" as "a pill that you take or a special kind of food that you eat in order to improve your health").

The term "bodybuilding supplement" thus plainly means a thing added to exercising and dieting aimed at improving the development of muscles. Z-RO does not fit this definition. Z-RO is a carbonated, caffeinated energy drink. As its name suggests, it contains zero calories. And there is no evidence to suggest that its ingredients promote muscle growth. Ignite's attempts to market Z-RO as a "performance energy drink" to fitness consumers generally does not change any of these facts, nor does it transform Z-RO into a traditional pre-workout supplement that bears a supplemental-fact panel rather than a nutritional-fact panel.

"[Courts] should arrive at an interpretation consistent with reason, probability, and the practical aspect of the transaction between the parties[.]" *Wright & Seaton, Inc. v. Prescott*, 420 So. 2d 623, 629 (Fla. 4th DCA 1982) (citation omitted). For the reasons stated above, reason, probability, and the practical aspects of this transaction all counsel against finding that Z-RO—a product that is essentially Red Bull with a different label—constitutes a "bodybuilding supplement" under the plain language of the Agreement. Plaintiff does not aver that Ignite deals in any other products that might be considered bodybuilding supplements. That being the case, Ignite is not a Competitor under Section 3.1.1. The Court denies Plaintiff summary judgment and instead grants summary judgment to Defendant on this final Section 3.1.1 breach theory.

This brings the Court to Plaintiff's Section 3.1.2 breach claim. Section 3.1.2 provides the following:

> 3.1.2  [Mr. Bilzerian] shall promote the [Plaintiff's] Products through [Mr. Bilzerian's] Social Media Sites by posting at [Mr. Bilzerian's] discretion regarding content and amount to [Mr. Bilzerian's] Social Media Sites (each, a "Post"); and (ii) otherwise participate in and be involved with other [Plaintiff] activities designed to increase brand awareness and generate sales as agreed by [Mr. Bilzerian] from time to time. [Defendant] agrees to and will procure that [Mr. Bilzerian] provides the services to the best of their skill and ability. [Plaintiff] shall have no ability to control any other social media posts made by [Mr. Bilzerian] and [Mr. Bilzerian] shall not be obliged to remove any such Posts.

Dkt. S-16 § 3.1.2. Plaintiff argues that, "based on the facts as testified to by [Mr.] Bilzerian himself," Mr. Bilzerian did not perform to the best of his skills and abilities. Dkt. 191 at 46, n.8.

Before considering Mr. Bilzerian's testimony or Plaintiff's other supporting evidence, however, the Court must consider the import of juxtaposing a provision granting wide posting discretion to Mr. Bilzerian with a provision requiring Mr. Bilzerian's best efforts. *See Philip Morris Inc. v. French*, 897 So. 2d 480, 488 (Fla. 3d DCA 2004) (citation omitted) (noting that "[c]ourts are required to construe a contract as a whole and give effect, where possible, to every provision of the agreement." "[An] interpretation which gives a reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable." *PNC Bank, N.A. v. Progressive Emp. Servs. II*, 55 So. 3d 655, 658 (Fla. 4th DCA 2011)

(citation omitted). And "[w]hen a contract contains apparently conflicting clauses, [a court] must interpret it in a manner that would reconcile the conflicting clauses, if possible." *Lloyds Underwriters v. Netterstrom*, 17 So. 3d 732, 735 (Fla. 4th DCA 2009).

It follows from these construction principles that a best efforts provision (in this case, a "best skill and ability" provision) is not to be given overbroad meaning in relation to a performance obligation that a party retains control over through other contract provisions. *See TYR Tactical, LLC v. Protective Prod. Enters., LLC*, 711 F. App'x 968, 971 (11th Cir. 2017) (citation omitted) (affirming the district court's finding that a best efforts provision did not require a contractor to file a bid protest where the contractor retained contractual control over bidding, as "such a broad reading is irreconcilable with other provisions of [the contract] giving [the contractor] unilateral control over the parties' submission"). Section 3.1.2's discretion provision grants Mr. Bilzerian near unilateral control over how much he posts. Accordingly, Section 3.1.2's best efforts provision cannot be interpreted as imposing a contrary quantity requirement on Mr. Bilzerian's posting.

Notwithstanding this limitation, the precise meaning of "best skill and ability" under the Agreement is unclear. "Florida law recognizes that '[t]he definition of "best efforts" may vary depending upon factual circumstances surrounding the transaction and the intent of the parties in entering into the transaction.'" *Chen v.*

36

*Cayman Arts, Inc.*, No. 10-80236-CIV, 2011 WL 3903158, at *10 (S.D. Fla. Sept. 6, 2011) (quoting *First Nat'l Bank of Lake Park v. Gay,* 694 So. 2d 784, 788 (Fla. 4th DCA 1997)). Here, the parties offer different interpretations of what they intended this provision to mean. Defendant also offers a fair deal of circumstantial evidence to support its position.

"Where, as here, the interpretation of [a best efforts] term is in dispute, the question is properly for the jury." *Id.* To be sure, "the Court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* (internal quotations and citations omitted). Because the Court finds that this is a contested issue, the Court denies summary judgment to both parties on Plaintiff's 3.1.2 breach theory.

The final breach claim to consider is Plaintiff's claim for breach of the implied covenant of good faith and fair dealing. Defendant alone requests summary judgment on this issue. Defendant argues that, "[b]ecause [Plaintiff] cannot establish a breach of an express term of the Agreement, [Plaintiff] cannot prevail on an implied duty of good faith claim as a matter of law." Dkt. S-186-1 at 29.

The Court has already determined that Defendant materially breached Section 3.1.1 of the Agreement through Mr. Bilzerian's conduct involving Vitamin Shoppe. The Court has also determined that Plaintiff has a viable Section 3.1.2 claim. In view

of this, the Court denies Defendant summary judgment on Plaintiff's implied covenant breach theory.

## III.    Termination

The remaining issues are: (1) whether Plaintiff is entitled to declaratory judgment finding that the Agreement is terminated; (2) whether Defendant is instead entitled to summary judgment on its breach claim for Plaintiff's alleged wrongful termination of the Agreement; and (3) if so, whether Defendant is entitled to prospective economic damages.

The Agreement provides the following regarding termination:

**<u>TERM.</u>** The term of this Agreement is set forth below subject to the provisions of terminations that follow:

2.1    **Term.** The term of this Agreement shall be for the Contract Period, unless this Agreement is terminated.

2.2    **Termination.**

[Defendant] may, upon written notice, terminate this Agreement if [Plaintiff] is in material breach of this Agreement.

[Plaintiff] may, upon written notice, terminate this Agreement; (i) if [Mr. Bilzerian] commits any criminal, wrongful, or immoral act for which [Mr. Bilzerian] has been arrested and convicted of (after exhausting any appellate rights) and then in which, in [Plaintiff's] opinion, would adversely affect the reputation of [Plaintiff] (for the avoidance of doubt such acts do not include general misdemeanors or traffic crimes); or (ii) if [Mr. Bilzerian] dies or becomes physically incapacitated or (iii) if [Defendant] is in material breach of this Agreement.

Dkt. S-16 §§ 2, 2.1, 2.2.

Given this, Plaintiff is due to prevail on each of the aforementioned termination issues. Plaintiff provided written notice of termination to Defendant on December 14, 2020. Dkt. 141-45 at 2. As explained above, Defendant was in material breach of Section 3.1.1 due to Mr. Bilzerian's promotion of Vitamin Shoppe. Section 2.2(iii) of the Agreement provides that the Agreement could be terminated on these grounds. Plaintiff is therefore entitled to declaratory judgment finding that the Agreement is terminated.

This necessarily means that Defendant's breach claim for wrongful termination fails. Plaintiff effectively terminated the Agreement pursuant to Section 2.2(iii). And Defendant is not entitled to prospective economic damages due to said termination.

As a final matter, the Court recognizes that "[Plaintiff's] December 14, 2020 letter did not claim that [Mr.] Bilzerian . . . promoted, publicized, or endorsed The Vitamin Shoppe." Dkt. S-217 at 5. This does not render the termination ineffective. Unlike the subject contract in the case upon which Defendant relies to argue otherwise, the Agreement's termination provisions do not provide for an advanced notice requirement or a cure period. *See Fla. Recycling Servs., Inc. v. Greater Orlando Auto Auction, Inc.*, 898 So. 2d 129, 130–31 (Fla. 5th DCA 2005) (finding an attempted termination ineffective where the subject contract required (1) "the complaining party [to] give written notice of [breach] to the other party" and (2) "the

other party [not] to cure such breach within as least [ten] days thereafter" before written notice of termination could be given). Nor does the Agreement require a terminating party to provide the specific grounds for breach under Section 2.2(iii). All the Agreement calls for is written notice of termination. Plaintiff provided Defendant just that, and it was current in time with the material breach which became fully understood only after Defendant's objections to uncovering it were overcome in discovery.

## CONCLUSION

Both parties breached the Agreement. The Agreement is terminated. The parameters of any remaining bench trial are quite limited. The parties need to consider whether the further expense of litigation is in their interest. The parties must complete one day of mediation before Manuel Mendez, Gregory Holder, or Charles W. Ross within 90 days. Any remaining trial issues are now set on the May, 2023 trial docket.

According, it is hereby **ORDERED** and **ADJUDGED**:

(1) Plaintiff's Motion for Partial Summary Judgment (Dkt. 191) is

    **GRANTED-IN-PART** and **DENIED-IN-PART**. Plaintiff is granted

    summary judgment as to its Vitamin Shoppe-based breach claim (Count

    I) and its termination-based declaratory judgment claim (Count III).

(2)  Defendant's Motion for Summary Judgment (Dkt. 138) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Defendant is granted summary judgment as to its commission payment-based breach claim pertaining to Plaintiff's liability (Counterclaim II), Plaintiff's gross sales-based declaratory judgment claim (Count IV), and Plaintiff's reformation claims (Counts V & VI).

**DONE AND ORDERED** at Tampa, Florida, on January 10, 2023.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record